**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

RALPH S. JANVEY, IN HIS
CAPACITY AS COURT-APPOINTED
RECEIVER FOR THE STANFORD
RECEIVERSHIP ESTATE, AND THE
OFFICIAL STANFORD INVESTORS
COMMITTEE,

                              Plaintiffs,

          -against-

PROSKAUER ROSE, LLP,
CHADBOURNE & PARKE, LLP,
AND THOMAS V. SJOBLOM,

                              Defendants.

Civil Action No. 3:13-cv-00477-N
Judge David C. Godbey

**ORAL ARGUMENT
REQUESTED**

**DEFENDANT CHADBOURNE & PARKE LLP'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' ORIGINAL COMPLAINT**

VINSON & ELKINS LLP

Harry M. Reasoner
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Telephone: (713) 758-2358
Facsimile:  (713) 615-5173
E-mail:  hreasoner@velaw.com

William D. Sims, Jr.
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Telephone:  (214) 220-7700
Facsimile:  (214) 220-7716
E-mail:  bsims@velaw.com

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

Daniel J. Beller*
Daniel J. Leffell*
William B. Michael*
1285 Avenue of the Americas
New York, New York 10019-6065
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
E-mail:  dbeller@paulweiss.com
E-mail:  dleffell@paulweiss.com
E-mail:  wmichael@paulweiss.com
*Admitted *pro hac vice*


ATTORNEYS FOR DEFENDANT
CHADBOURNE & PARKE LLP

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 6

I.      THE PARTIES........................................................................ 6

II.     THE ALLEGED STANFORD FINANCIAL PONZI SCHEME....................................... 7

        A.      Stanford Financial's Alleged Wrongdoing Consisted of Two Distinct
                Phases.................................................................... 7

        B.      The SEC Decided Not to Pursue an Enforcement Action Against Stanford
                Financial Long Before Sjoblom's Retention. ............................... 8

III.    THE CLAIMS AGAINST CHADBOURNE .............................................. 10

        A.      Sjoblom's Retention...................................................... 10

        B.      Sjoblom's Visit to Antigua .............................................. 11

        C.      Sjoblom's September and October 2005 Letters ............................ 11

        D.      The Receiver's Appointment and Assertion of Claims ...................... 12

        E.      The Claims Against Chadbourne ........................................... 15

ARGUMENT ............................................................................. 15

I.      THE CLAIMS AGAINST CHADBOURNE SHOULD  BE DISMISSED
        BECAUSE THEY ARE TIME-BARRED. ................................................ 15

        A.      Plaintiffs' Legal Malpractice Claim Is Time-Barred. ..................... 15

        B.      Plaintiffs Cannot Evade Dismissal for Untimeliness by Improperly
                Fracturing Their Legal Malpractice Claim. ............................... 19

                1.      The Anti-Fracturing Rule Bars Repackaging a Legal Malpractice
                        Claim into Non-Negligence Causes of Action to Avoid the
                        Limitations Period for Negligence........................... 19

                2.      Plaintiffs Have Improperly Fractured Their Malpractice Claim....... 22

        C.      The Remaining Counts are Also Independently Time-Barred. ................ 23

II.     PLAINTIFFS' CLAIMS AGAINST CHADBOURNE SHOULD BE
        DISMISSED UNDER THE DOCTRINE OF *IN PARI DELICTO*. ........................... 24

i

III.   THE COMPLAINT FAILS TO PLEAD ESSENTIAL ELEMENTS  OF THE CLAIMS ASSERTED AGAINST CHADBOURNE. ..................................................... 27

A.    The Applicable Standard ....................................................................... 28

B.    Plaintiffs' Speculative Allegations Regarding Causation Are Insufficient to Confer Standing on Plaintiffs and Inadequate to Plead the Causation Element of All Their Claims Against Chadbourne. ............................................... 28

      1.    Plaintiffs' Theory of Causation Is Too Speculative to Confer Standing. ................................................................................ 30

      2.    Plaintiffs Fail to Allege Facts Showing that Stanford Financial's Alleged Injuries Were Caused by Any Conduct by Sjoblom While at Chadbourne. ........................................................................ 33

C.    Plaintiffs Fail to State a Legal Malpractice Claim Against Chadbourne. .............. 35

      1.    The Complaint Does Not Plead Breach of a Duty to Stanford Financial. ................................................................................ 35

      2.    The Complaint Does Not Plead Causation. .............................. 38

D.    The Complaint Fails to State Viable Aiding and Abetting Claims Against Chadbourne. .......................................................................................... 39

      1.    Plaintiffs Fail to State a Claim for  Aiding and Abetting Breach of Fiduciary Duty. ...................................................................... 41

      2.    Plaintiffs Fail to State a Claim for  Aiding and Abetting a Fraudulent Scheme ................................................................. 42

      3.    Aiding and Abetting Fraudulent Transfers Is Not a Valid Cause of Action Under New York Law. ................................................. 43

      4.    Plaintiffs Fail to State a Claim for Aiding and Abetting Conversion. ............................................................................ 44

E.    The Complaint Fails to State a Claim Against Chadbourne for Civil Conspiracy. .......................................................................................... 45

F.    The Complaint Fails to State a Claim Against  Chadbourne for Negligent Retention or Supervision ........................................................................ 47

CONCLUSION ....................................................................................................... 49

REQUEST FOR ORAL ARGUMENT .................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apex Towing Co.* v. *Tolin*,
  41 S.W.3d 118 (Tex. 2001)...........................................................................15

*Ash Grove Tex., L.P.* v. *City of Dallas*,
  No. 3:08-cv-2114-O, 2009 WL 3270821 (N.D. Tex. Oct. 9, 2009) ........................................30

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)...................................................................................28

*Beck* v. *Law Offices of Edwin J. Terry, Jr., P.C.*,
  284 S.W.3d 416 (Tex. App.-Austin 2009)..............................................................15

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...................................................................................46

*Biliouris* v. *Sundance Res., Inc.*,
  559 F. Supp. 2d 733 (N.D. Tex. 2008) .................................................................28

*Brown* v. *Bronx Cross Cnty. Med. Grp.*,
  834 F. Supp. 105 (S.D.N.Y. 1993)......................................................................48

*Burns* v. *Rochon*,
  190 S.W.3d 263 (Tex. App.-Houston [1st Dist.] 2006)..................................................23

*Camp* v. *RCW & Co., Inc.*,
  No. 4:05-cv-03580, 2007 WL 1306841 (S.D. Tex. May 3, 2007).....................................20, 22

*Chaikovska* v. *Ernst & Young, LLP*,
  913 N.Y.S.2d 449 (App. Div. 2010) ....................................................................27

*Cinel* v. *Connick*,
  15 F.3d 1338 (5th Cir. 1994) ...........................................................................6

*Citidress II Corp.* v. *Tokayer*,
  962 N.Y.S.2d 691 (App. Div. 2013).....................................................................21

*CK DFW Ptnrs. Ltd.* v. *City Kitchens, Inc.*,
  No. 3:06-cv-1598-D, 2007 WL 2381259 (N.D. Tex. Aug. 17, 2007) ....................................24

*Cobalt Multifamily Investors I, LLLC* v. *Shapiro*,
  857 F. Supp. 2d 419 (S.D.N.Y. 2012)...................................................................26

*Cosmetics Plus Group, Ltd.* v. *Traub*,
  960 N.Y.S.2d 388 (App. Div. 2013)...................................................................21

*Croft* v. *Governor of Tex.*,
  562 F.3d 735 (5th Cir. 2009) .........................................................................30

*Cusack* v. *Greenberg Traurig, LLP*,
  972 N.Y.S.2d 11 (App. Div. 2013).................................................................21

*D'Mel & Assocs.* v. *Athco, Inc.*,
  963 N.Y.S.2d 65 (App. Div. 2013) .................................................................43

*DaimlerChrysler Corp.* v. *Cuno*,
  547 U.S. 332 (2006)......................................................................................30

*U.S.* v. *Davis*,
  No. 4:09-cr-00335 (S.D. Tex. Aug. 27, 2009) ...............................................17

*Davis* v. *Klein*,
  88 N.Y.2d 1008 (1996) ..................................................................................35

*Deangelis* v. *Corzine (In re MF Global Holdings Ltd. Inv. Litig.)*,
  998 F. Supp. 2d 157 (S.D.N.Y. 2014)............................................................27

*Derdiarian* v. *Felix Contracting Corp.*,
  51 N.Y.2d 308 (1980) ..............................................................................34, 47

*Detone* v. *Bullit Courier Serv., Inc.*,
  528 N.Y.S.2d 575 (App. Div. 1988) ...............................................................49

*Dickinson* v. *Igoni*,
  908 N.Y.S.2d 85 (App. Div. 2010).............................................................44, 45

*Edwards* v. *Dunlop-Gates*,
  344 S.W.3d 424 (Tex. App.-El Paso 2011) ...............................................20, 22

*Ely* v. *Pierce*,
  755 N.Y.S.2d 250 (App. Div. 2003)...........................................................34, 47

*Exxon Corp.* v. *Emerald Oil & Gas Co.*,
  348 S.W.3d 194 (Tex. 2011)...........................................................................16

*Flaherty & Crumrine Preferred Income Fund, Inc.* v. *TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) .........................................................................28

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007)........................................................39, 40

*FW/PBS, Inc.* v. *City of Dallas*,
   493 U.S. 215 (1990)...................................................................................30

*G.D. Searle & Co.* v. *Medicore Commc'ns, Inc.*,
   843 F. Supp. 895 (S.D.N.Y. 1994).........................................................45

*Gines* v. *D.R. Horton, Inc.*,
   699 F.3d 812 (5th Cir. 2012) ....................................................................6

*Giuffrida* v. *Citibank Corp.*,
   100 N.Y.2d 72 (2003)...............................................................................33

*Goel* v. *Ramachandran*,
   975 N.Y.S.2d 428 (App. Div. 2013)........................................................42

*Granite Ptnrs., L.P.* v. *Bear, Stearns & Co. Inc.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998).......................................................25

*Greathouse* v. *McConnell*,
   982 S.W.2d 165 (Tex. App.-Houston [1st Dist.] 1998)..........................21

*Gregor* v. *Rossi*,
   992 N.Y.S.2d 17 (App. Div. 2014)..........................................................41

*Hadda* v. *Lissner & Lissner LLP*,
   952 N.Y.S.2d 126 (App. Div. 2012)........................................................21

*Halaris* v. *Viacom, Inc.*,
   No. 3:06-cv-1646-N, 2007 WL 4145405 (N.D. Tex. Sept. 21, 2007)....................................28

*Halaris* v. *Viacom, Inc.*,
   No. 3:06-cv-1646-N, 2008 WL 3855044 (N.D. Tex. Aug. 19, 2008) ......................................9

*Hudson* v. *Delta Kew Holding Corp.*,
   No. 16425-12, 2014 WL 1924324 (N.Y. Sup. Ct. Apr. 22, 2014) .........................................39

*Hughes* v. *Boston Scientific Corp.*,
   631 F.3d 762 (5th Cir. 2011) ...................................................................34

*Isaacs* v. *Schleier*,
   356 S.W.3d 548 (Tex. App.-Texarkana 2011)........................................20

*Janvey* v. *Adams & Reese, LLP*,
   No. 3:12-cv-0495-N (N.D. Tex. Sept. 11, 2013) (Godbey, J.) (ORDER) ................................32

*Janvey* v. *Alguire*,
   No. 3:09-cv-00724 (N.D. Tex. Apr. 20, 2009) .......................................24

*Janvey* v. *Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) ........................................................................3, 18

*Janvey* v. *Proskauer Rose LLP*,
    No. 12-155 (CKK), 2014 WL 3668578 (D.D.C. July 24, 2014) .............................14

*Jennings* v. *Zimmerman, Axelrad, Meyer, Stern & Wise, P.C.*,
    No. 04-04-00544-cv, 2005 WL 1959188 (Tex. App.-San Antonio Aug. 17, 2005)...............20

*Kaupp* v. *Church*,
    No. 1:10-cv-07559, 2011 WL 4357492 (S.D.N.Y. Sept. 19, 2011) ......................................48

*Kirkland* v. *Martin*,
    No. 4:10-cv-2865, 2012 WL 3930318 (S.D. Tex. Sept. 10, 2012).........................................20

*Kirschner* v. *KPMG LLP*,
    15 N.Y.3d 446 (2010) ........................................................................... passim

*Knauer* v. *Jonathon Roberts Fin. Grp., Inc.*,
    348 F.3d 230 (7th Cir. 2003) .......................................................................25, 32

*Laub* v. *Faessel*,
    745 N.Y.S.2d 534 (App. Div. 2002)..............................................................................35

*Learning Annex, L.P.* v. *Blank Rome LLP*,
    966 N.Y.S.2d 78 (App. Div. 2013)................................................................................41

*Lewis* v. *Rosenfeld*,
    138 F. Supp. 2d 466, *on reconsideration*, 145 F. Supp. 2d 341 (S.D.N.Y. 2001).................45

*Little* v. *KPMG LLP*,
    575 F.3d 533 (5th Cir. 2009) .......................................................................5, 31

*Lone Star Ladies Inv. Club* v. *Schlotzky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ..........................................................................28

*Long Island Trust Co.* v. *Dicker*,
    659 F.2d 641 (5th Cir. Unit A Oct. 1981)..........................................................16

*Longoria* v. *Whitehurst*,
    No. 12-03-00298-cv, 2005 WL 465527 (Tex. App.-Tyler Feb. 28, 2005).............................20

*Mack* v. *Newton*,
    737 F.2d 1343 (5th Cir. 1984) ...........................................................................44

*Magten Asset Mgmt. Corp.* v. *Paul Hastings Janofsky & Walker LLP*,
    No. 1:04-cv-01256-JJF, 2007 WL 129003 (D. Del. Jan. 12, 2007)........................................44

vi

*Marketxt Holdings Corp.* v. *Engel & Reiman, P.C.*,
    693 F. Supp. 2d 387 (S.D.N.Y. 2010) ..................................................................43

*Mendenhall* v. *Clark*,
    No. 07-11-00213-cv, 2012 WL 512657 (Tex. App.-Amarillo Feb. 16, 2012) ..................3, 21

*Meullion* v. *Gladden*,
    No. 14-10-01143-cv, 2011 WL 5926676 (Tex. App.-Houston [14th Dist.] Nov. 29,
    2011) ..................................................................................................................20

*Mizrahi* v. *Adler*,
    No. 650802/2010, 2014 N.Y. Misc. LEXIS 2934 (Sup. Ct. June 30, 2014) ..........................35

*Monte* v. *Ernst & Young LLP*,
    330 F. Supp. 2d 350 (S.D.N.Y. 2004) ...........................................................48, 49

*Murphy* v. *Gruber*,
    241 S.W.3d 689 (Tex. App.-Dallas 2007) ....................................................20, 21

*Norris* v. *Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ......................................................................6

*Picard* v. *JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*,
    721 F.3d 54 (2d Cir. 2013) ...................................................................25, 27

*FDIC* v. *Porco*,
    75 N.Y.2d 840 (1990) .............................................................................43

*Primeau* v. *Town of Amherst*,
    757 N.Y.S.2d 201 (App. Div. 2003) .............................................................48

*Provident Life & Accident Ins. Co.* v. *Knott*,
    128 S.W.3d 211 (Tex. 2003) .....................................................................16

*Rashidi* v. *American President Lines*,
    96 F.3d 124 (5th Cir. 1996) ......................................................................19

*Reneker* v. *Offill*,
    No. 3:08-cv-1394-D, 2009 WL 3365616 (N.D. Tex. Oct. 20, 2009) .....................29, 36, 37

*Reneker* v. *Offill*,
    No. 3:08-cv-1394-D, 2009 WL 804134 (N.D. Tex. Mar. 26, 2009) .........................20, 36

*Reneker* v. *Offill*,
    No. 3:08-cv-1394-D, 2010 WL 1541350 (N.D. Tex. Apr. 19, 2010) ................................37

*Rudolf* v. *Shayne, Dachs, Stanisci, Corker & Sauer*,
    8 N.Y.3d 438 (2007) .............................................................................35

*Schiffer* v. *Sunrise Removal, Inc.*,
    879 N.Y.S.2d 518 (App. Div. 2009) ..................................................................48

*Schwartz* v. *Soc'y of New York Hosp.*,
    605 N.Y.S.2d 72 (App. Div. 1993) ..................................................................46

*Scott* v. *Fields*,
    925 N.Y.S.2d 135 (App. Div. 2011) .................................................................21

*EEOC v. Simbaki, Ltd.*,
    No. 4:12-cv-00221, 2012 WL 1898882 (S.D. Tex. May 23, 2012)....................23

*Sledge* v. *Alsup*,
    759 S.W.2d 1 (Tex. App.-El Paso 1988) .........................................................19

*Smith* v. *Tex.*,
    No. 4:12-cv-00469, 2012 WL 5868657 (S.D. Tex. Oct. 26, 2012) ...................21

*U.S.* v. *Stanford, et al.*,
    No. 4:09-cr-00342 (S.D. Tex. June 18, 2009) ..................................................17

*SEC* v. *Stanford Int'l Bank, Ltd.*,
    No. 3:09-cv-0298-N (N.D. Tex. Apr. 25, 2013) (ORDER) ...............................29

*Stevenson* v. *Koutzarov*,
    795 S.W.2d 313 (Tex. App.-Dallas 1990) ........................................................23

*Tener* v. *Short Carter Morris, LLP*,
    No. 01-12, 00676-cv, 2014 WL 4259885 (Tex. App.-Houston [1st Dist.], Aug. 28,
    2014) ..............................................................................................................19

*Thomas* v. *Barton Lodge II, Ltd.*,
    174 F.3d 636 (5th Cir. 1999) ..........................................................................23

*Thys* v. *Fortis Secs. LLC*,
    903 N.Y.S.2d 368 (App. Div. 2010) .................................................................45

*Ulico Cas. Co.* v. *Wilson, Elser, Moskowitz, Edelman & Dicker*,
    865 N.Y.S.2d 14 (App. Div. 2008) .............................................................41, 42

*UniCredito Italiano SPA* v. *JPMorgan Chase Bank*,
    288 F. Supp. 2d 485 (S.D.N.Y. 2003) ..............................................................39

*Vermont Mut. Ins. Co.* v. *McCabe & Mack, LLP*,
    964 N.Y.S.2d 160 (App. Div. 2013) .................................................................21

*Vilar* v. *Rutledge*,
    964 N.Y.S.2d 527 (Sup. Ct. 2013) ...................................................................43

*Wagner & Brown, Ltd.* v. *Horwood,*
    58 S.W.3d 732 (Tex. 2001)............................................................16, 18

*Walker, Truesdell, Roth & Assoc., Inc., Trustee of Greenwich Sentry, L.P. Litig. Trust* v.
    *Globeop Fin. Servs. LLC,*
    No. 600469/09, 2013 WL 8597474 (N.Y. Sup. Ct. May 27, 2013).....................27

*Wall Street Assocs.* v. *Brodsky,*
    684 N.Y.S.2d 244 (App. Div. 1999)..................................................24

*Weshnak* v. *Bank of America, N.A.,*
    451 F. App'x 61 (2d Cir. 2012) ......................................................44

*Whitley* v. *Hanna,*
    726 F.3d 631 (5th Cir. 2013) .........................................................28

*Won Pak* v. *Harris,*
    313 S.W.3d 454 (Tex. App.-Dallas 2010) ..............................................21

*Wooley* v. *Clifford Chance Rogers & Wells, L.L.P.,*
    No. 3:01-cv-2185, 2004 WL 57215 (N.D. Tex. Jan. 5, 2004)..............................16

*Zidell* v. *Bird,*
    692 S.W.2d 550 (Tex. App.-Austin 1985)..............................................16

### STATUTES

28 U.S.C. § 1631 .................................................................14

N.Y. CLS CPLR § 213 ............................................................24

N.Y. Debt. & Cred. Law § 276 ....................................................43

TEX. BUS. & COM. CODE § 24.009(b) ...............................................44

TEX. BUS. & COM. CODE § 24.010(a)(1).............................................23

TEX. CIV. PRAC. & REM. CODE § 16.003(a) ......................................15, 23

TEX. CIV. PRAC. & REM. CODE § 16.004(a) ......................................19, 24

### OTHER AUTHORITIES

Fed. R. Civ. P. 8 ................................................................46

Fed. R. Civ. P. 9(b) ..........................................................passim

Fed. R. Civ. P. 12(b)(6)........................................................1, 28

Defendant Chadbourne & Parke LLP ("Chadbourne") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Original Complaint (the "Complaint" or "Comp.") with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

This legal malpractice action was filed more than a year after the *latest* date on which the two-year statute of limitations for legal malpractice claims could have expired and should be dismissed for that reason alone. But if that were not reason enough to require dismissal, the claims asserted against Chadbourne fail for other, equally compelling reasons: Plaintiffs have sued as representatives of the consolidated estate of R. Allen Stanford, Stanford Financial Group and various affiliated entities and individuals (together, "Stanford Financial") — the alleged engineers and perpetrators of a "massive, worldwide Ponzi scheme." (Comp. ¶ 25.) They thus stand in the shoes of these alleged fraudsters, and their claims are barred under the doctrine of *in pari delicto*. Further, Plaintiffs fail to plead injury and causation based on anything more than pure speculation. For that reason, they lack standing to proceed with this action and also fail to plead proximate cause, an essential element of all their claims. Finally, Plaintiffs fail to plead numerous other elements of their claims against Chadbourne for legal malpractice, aiding and abetting breach of fiduciary duty, aiding and abetting a fraudulent scheme, aiding and abetting fraudulent transfers, aiding and abetting conversion, civil conspiracy, and negligent retention/supervision. The claims against Chadbourne, for these and other reasons, should be dismissed.

Plaintiff Janvey is the Court-appointed Receiver for the Stanford Financial estate, and Plaintiff Official Stanford Investors Committee is the assignee of certain of the Receiver's purported claims. They assert claims against Chadbourne based entirely upon "legal services" provided to Stanford Financial by a former Chadbourne partner, Thomas Sjoblom, in 2005 and

2006.  (In August 2006, Sjoblom left Chadbourne and joined Proskauer Rose LLP, also a defendant in this case.)  The alleged actionable conduct by Sjoblom while he was at Chadbourne consists of writing two letters to the SEC — on September 12 and October 3, 2005 — raising certain jurisdictional defenses on Stanford Financial's behalf, in response to SEC inquiries to Stanford Financial.  In particular, Sjoblom argued that Antiguan law prohibited Stanford International Bank, Ltd. ("SIBL"), one of the Stanford Financial entities, from producing documents related to its banking portfolio, and that the SEC lacked jurisdiction over SIBL because its certificates of deposit were not securities under U.S. law.  These legal defenses were ones that the SEC had considered, and believed had possible merit, before ever hearing from Sjoblom.  Nonetheless, Plaintiffs allege that Sjoblom, by sending these letters on behalf of Stanford Financial, helped "obstruct the SEC investigation" of Stanford Financial, thereby permitting it to "lure investor money *into* Stanford Financial" and "*continue receiving economic benefits from the fraud*."  (*Id*. ¶¶ 62, 94, 270 (emphasis added, internal quotation marks omitted).)  On that theory of causation, the Complaint seeks to hold Sjoblom (and, by extension, Chadbourne) liable *to Stanford Financial* — the orchestrator and beneficiary of the fraud — for billions of dollars allegedly "stolen" from it by the Ponzi scheme insiders, despite the absence of any allegation that Sjoblom knew about the Ponzi scheme or the alleged looting by Ponzi insiders during his time at Chadbourne.

There are four primary reasons why the claims against Chadbourne should be dismissed with prejudice:

*First*, all of the claims against Chadbourne are untimely.  Under Texas law, a two-year statute of limitations governs legal malpractice claims.  Plaintiffs filed their Complaint on January 31, 2013.  Yet they seek to hold Chadbourne liable for alleged malpractice that occurred

more than *seven years* prior to the filing date.  Even accepting Plaintiffs' conclusory allegation

that their untimeliness should be excused because the alleged malpractice was only "recently"

discovered, their claims are still time-barred.  In a recent decision in another Stanford Financial

matter, the Fifth Circuit Court of Appeals held that, through the exercise of reasonable diligence,

the Receiver should have been apprised of "the true nature and duration of Stanford's operation

of a massive Ponzi scheme" no later than August 27, 2009.  *See Janvey* v. *Democratic Senatorial*

*Campaign Comm., Inc.*, 712 F.3d 185, 197-98 (5th Cir. 2013).  Moreover, the Complaint and

public record demonstrate beyond doubt that Plaintiffs knew or should have known of their

purported claims no later (and likely much earlier) than October 2009, when a putative class of

Stanford investors — represented by the same counsel who drafted the Complaint in this case —

filed similar claims against Chadbourne in this Court.  *Troice* v. *Proskauer Rose LLP*, No. 3:09-

cv-1600-N (N.D. Tex. Oct. 9, 2009) (ECF No. 6).  The legal malpractice claim therefore had to

be filed *no later than* October 2011.  As it was filed on January 31, 2013, it is time-barred.

Plaintiffs attempt to sidestep the applicable limitations period and avoid dismissal by

repackaging their legal malpractice claim as other claims subject to longer limitations periods,

but that attempt is unavailing.  Under the rule against "fracturing," consistently applied by courts

in Texas and elsewhere, a claimant alleging legal malpractice may not opportunistically restate

such a negligence claim as separate non-negligence claims.  Rather, "if the theory of recovery

against an attorney sounds in tort, *Texas courts are going to treat it as a legal malpractice*

*claim*."  *Mendenhall* v. *Clark*, No. 07-11-00213-cv, 2012 WL 512657, at *2 (Tex. App.-Amarillo

Feb. 16, 2012) (citation omitted, emphasis added).  Accordingly, the improperly fractured claims

asserted in the Complaint — alleging that legal malpractice by Sjoblom (and, by extension,

Chadbourne) somehow aided and abetted tortious conduct or furthered a conspiracy — are also

time-barred.

*Second*, under New York law (applicable here pursuant to a choice-of-law provision in the Chadbourne-Stanford Financial retainer letter), all claims against Chadbourne should be dismissed under the doctrine of *in pari delicto*, which "mandates that the courts will not intercede to resolve a dispute between two wrongdoers" and therefore bars recovery by a corporation against outside advisers where the corporation's "management engaged in financial fraud that was allegedly either assisted or not detected . . . by the corporation's outside professional advisers, such as auditors, investment bankers, financial advisers and lawyers." *Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446, 457, 464 (2010). This doctrine precludes Stanford Financial — allegedly a "massive, worldwide Ponzi scheme" (Comp. ¶ 25) — from pursuing claims against a third party that arise out of the fraudulent scheme, particularly when the third party is alleged to have been, at most, negligent. Under New York law, the fact that claims are asserted by a receiver does not provide any relief from the bar of *in pari delicto*. Where, as here, a receiver stands in the shoes of the primary wrongdoers, their wrongdoing is imputed to him under New York law.

*Third*, the claims against Chadbourne should be dismissed because Plaintiffs do not allege any injury to Stanford Financial caused by Sjoblom while he was at Chadbourne. Plaintiffs' highly speculative theory of causation is that, but for the legal arguments that Sjoblom made in his two 2005 letters, the SEC would have curtailed the alleged Ponzi scheme at some unspecified date earlier than it actually did so, in 2009. This theory is founded upon pure guesswork about what the SEC might have done, and also is belied by the very SEC Inspector General's report that Plaintiffs repeatedly reference and rely upon in the Complaint. That report — based on the review of documents and the testimony of scores of witnesses — attributes the

4

SEC's failure to act to various other factors, chief among them (i) internal pressure from SEC leadership to chase "stats" by pursuing only "slam-dunk" cases, and (ii) the SEC's own concerns that it lacked jurisdiction over the Antigua-based SIBL and could not compel it to produce documents about the bank's CD program — concerns that the report makes clear arose *years* before Sjoblom sent his letters to the SEC advancing jurisdictional arguments in 2005. Plaintiffs' theory of injury also is belied by their own allegations that the SEC not only continued its investigation of Stanford Financial after receiving Sjoblom's letters, but in fact elevated it to a formal order of investigation for fraud in October 2006 (after Sjoblom had left Chadbourne). Furthermore, beyond failing to adequately allege injury, Plaintiffs affirmatively plead that Sjoblom's representation *benefited* Stanford Financial by helping it "lure investor money into Stanford Financial" and "continue receiving economic benefits from the fraud."  Plaintiffs theory of causation is "too conjectural or hypothetical to confer standing."  *Little* v. *KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).  And even if Plaintiffs were deemed to have standing, their causation allegations are nevertheless insufficient to plead proximate cause, an indispensable element of each of their claims.

    *Fourth*, even if Plaintiffs somehow could avoid dismissal by clearing the limitations, *in pari delicto*, standing and proximate cause hurdles described above, their claims should be dismissed for failure to plead numerous other elements of their claims under applicable New York law.  Among other fatal deficiencies, the Complaint does not plead the breach of any duty owed by Sjoblom or Chadbourne as lawyers for Stanford Financial, and does not plead knowing participation or substantial assistance to the Stanford Financial Ponzi scheme by Sjoblom or Chadbourne.  In seeking to hold Chadbourne accountable for billions of dollars in allegedly stolen funds, the Complaint fails to plead facts sufficient to support a plausible inference that

during the relevant time period:  (i) Sjoblom or Chadbourne knew, or should have known, about the alleged Ponzi scheme or any alleged misappropriation from Stanford Financial; (ii) Sjoblom or Chadbourne received any portion of any misappropriated funds or benefited in any way from such misappropriation; or (iii) any act by Sjoblom or Chadbourne furthered, advanced or even related to such misappropriation.

## STATEMENT OF FACTS[1]

### I.   THE PARTIES

Plaintiff Janvey, as Receiver, has sued on behalf of Allen Stanford, Stanford Financial Group and SIBL, as well as other related persons and entities that allegedly engaged in a "massive, worldwide Ponzi scheme."  (Comp. ¶¶ 2, 25.)  The Receiver allegedly "assigned" Counts II through VII of the Complaint to Plaintiff Official Stanford Investors Committee (the "Investors Committee").  (*Id*. ¶ 3.)[2]  Standing in the shoes of those fraudsters, Plaintiffs assert "negligence claims" against Stanford Financial's former attorneys, Defendants Sjoblom, Chadbourne and Proskauer, arising from their provision of "legal services to Stanford Financial." (*Id*. ¶¶ 2, 9-11.)

Chadbourne is an international, full-service law firm.  (*Id*. ¶ 115.)  Sjoblom is a former partner at Chadbourne.  (*Id*. ¶ 7.)  Sjoblom "had been a high-ranking SEC enforcement lawyer for 20 years before joining Chadbourne…."  (*Id*. ¶ 97.)  In June 2005, Stanford Financial retained Sjoblom and Chadbourne.  (*Id*. ¶¶ 97, 115.)  In August 2006, Sjoblom left Chadbourne to join

---

[1]     This factual recitation is drawn from, and relies upon, the Complaint's factual allegations, which are assumed to be true solely for purposes of this motion.  *See Gines* v. *D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).  In evaluating this motion, this Court "may permissibly refer to matters of public record," including papers filed in other litigation.  *Cinel* v. *Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also Norris* v. *Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.") (citation omitted).

[2]     Thus, the Investors Committee does not assert any claims on behalf of Stanford Financial's investors in this action.  Rather, like the Receiver, it seeks to recover damages to *Stanford Financial*.  (Comp. ¶ 3.) Accordingly, this submission does not distinguish between the Receiver and the Investors Committee, which are both merely representatives asserting Stanford Financial's purported claims.

Proskauer, which was "formally retained" as Stanford Financial's "new regulatory counsel" the next month.  (*Id*. ¶ 144.)

## II.   THE ALLEGED STANFORD FINANCIAL PONZI SCHEME

The Complaint recites the alleged unlawful activities of Stanford Financial, a group of companies founded and "ultimately owned" by Allen Stanford.  (*Id*. ¶ 14.)  Its primary business was the sale of certificates of deposit ("CDs") issued by SIBL, also "wholly owned by Stanford himself."  (*Id*. ¶ 16.)  Plaintiffs allege that "Stanford Financial was a massive, worldwide Ponzi scheme" (*id*. ¶ 25), and further allege that Allen Stanford and his co-conspirators "misappropriat[ed] billions of dollars in assets from Stanford Financial companies" (*id*. ¶ 268.)

### A.   Stanford Financial's Alleged Wrongdoing Consisted of Two Distinct Phases.

Plaintiffs describe two phases or elements of the alleged fraudulent scheme:  one in which Stanford Financial allegedly defrauded investors (*i.e.*, "money in"); and a second in which Allen Stanford and the Ponzi insiders allegedly misappropriated vast funds from Stanford Financial (*i.e.*, "money out").

Regarding the first phase, the Complaint alleges that Stanford Financial:

- knew that SIBL was insolvent beginning in at least 1999, but continued selling SIBL CDs "to the bitter end."  (*Id*. ¶ 26.)

- "trick[ed]" investors into purchasing SIBL CDs by falsely marketing them as "safe, secure, insured, and highly liquid," thereby "lur[ing] investor money ***into Stanford Financial*** …."  (*Id*. ¶¶ 25, 62 (emphasis added).)

- induced investors to purchase SIBL CDs by (i) "offering unusually consistent and above-market rates," (ii) "publishing fraudulent financial statements," (iii) "furnishing other data that significantly overstated SIBL's purported earnings and assets," and (iv) making other material misrepresentations to investors.  (*Id*. ¶ 26; *see also id*. ¶¶ 64-65.)

- worked to "shield SIBL from regulators" and "keep the Ponzi scheme alive by evading and obstructing regulatory oversight of SIBL's activities, at every turn, and in every country."  (*Id*. ¶¶ 51, 73; *see also id*. ¶ 74.)

- attempted to "thwart" subpoenas and document requests from the SEC and other

regulators investigating the sale of SIBL CDs.  (*Id*. ¶ 45.)

- violated the Investment Company Act.  (*Id*. ¶ 63.)

Plaintiffs allege that these activities brought vast amounts of investor capital "***into*** Stanford

Financial" (*id*. ¶ 62 (emphasis added)), and that the SIBL CD sales "sustained Stanford

Financial's operations and paid the employees' exorbitant salaries and bonuses" (*id*. ¶ 20).

Regarding the second phase, Plaintiffs allege that once Allen Stanford and his co-conspirators

"lur[ed] investor money into Stanford Financial," they "then stole billions of dollars in assets

from Stanford Financial companies for their own benefit."  (*Id*. ¶ 62; *see also id*. ¶ 66.)  Plaintiffs

allege that these stolen sums were misappropriated by, and primarily flowed to, "Allen Stanford

and his Ponzi insiders."  (*Id*. ¶ 62.)  The Complaint does not allege that Sjoblom, while he was

with Chadbourne, knew of any misappropriation or received any misappropriated funds.

## B. The SEC Decided Not to Pursue an Enforcement Action Against Stanford Financial Long Before Sjoblom's Retention.

Beginning in the 1980s, "Stanford Financial was under constant investigation by

numerous government agencies, including the OCC, SEC, FBI, and U.S. Customs."  (*Id*. ¶¶ 29,

53-55.)  The SEC "first suspected that Allen Stanford and Stanford Financial were running a

Ponzi scheme in 1997" (*id*. ¶ 75), eight years before Sjoblom penned the allegedly wrongful

legal letters to the SEC.

Between 1997 and 2004 — well before Chadbourne had even been retained — the SEC

conducted at least four examinations of Stanford Financial.  (*Id*.)  Each time, the SEC concluded

that the SIBL CD program might constitute a Ponzi scheme.  (*Id*.)  By 1998, the SEC concluded

that Stanford Financial had no legitimate way of delivering the promised investment returns on

the SIBL CDs and was deceiving investors by portraying such CDs as safe and highly liquid.

(*Id*. ¶ 76.)  By 2002, the SEC determined that the SIBL CDs were being sold in violation of SEC

requirements and were therefore unauthorized investment products.  (*Id.* ¶ 82.)

Despite this "constant" scrutiny, no SEC enforcement actions or criminal charges were brought against Allen Stanford or Stanford Financial during the entire period from the late 1980s through Sjoblom's engagement in 2005.  The SEC Inspector General's 151-page investigatory report concerning Stanford Financial, which the Complaint extensively references and relies upon (*see, e.g.*, *id*. ¶¶ 75-89, 94), concludes, based on documents and witness testimony, that the SEC's investigation repeatedly stalled or was shelved due to various "SEC-wide" factors, chief among them internal pressure from senior leadership to chase "stats" by pursuing only "quick-hit" or "slam-dunk" cases, rather than more challenging ones.  *See* U.S. SEC Office of Inspector General, Report of Investigation, Case No. OIG-526, *Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme* (Mar. 31, 2010) (the "OIG Report"), at 16-18, 121-28.[3]  Further, in 1998, long before Sjoblom wrote his allegedly offending letters in 2005, the SEC believed the Stanford Financial investigation was "too difficult," and thus unworthy of pursuit, due to a "major jurisdictional issue":  its "inability to obtain records from Antigua," *id*. at 39 (quoting testimony of Mary Lou Felsman, taken on Dec. 15, 2009), a point that Sjoblom no more than echoed seven years later.  As a result, the SEC "closed the [1998 matter under inquiry] without seeking a formal order because . . . '[it] had questions about the jurisdiction and about [its] ability to successfully subpoena information from that offshore bank.'"  *Id.* (quoting testimony of IA Examiner 1, taken on Jan. 11, 2010).[4]

---

[3]         A copy of the OIG Report is attached as Exhibit 1 to the accompanying Declaration of Daniel J. Beller, at page 3 of the Appendix in Support of Defendant Chadbourne & Parke LLP's Motion to Dismiss Plaintiffs' Original Complaint (hereinafter, "Beller Ex. __").  The Court may consider the OIG Report in evaluating this motion to dismiss.  *See, e.g.*, *Halaris* v. *Viacom, Inc.*, No. 3:06-cv-1646-N, 2008 WL 3855044, at *1 (N.D. Tex. Aug. 19, 2008) (Godbey, J.) ("A court may also consider documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim.").

[4]         *See also* OIG Report at 39 ("[Staff Accountant 1] also testified that it was his understanding that another reason that the investigation did not go forward was the fact that SIB[L] was an offshore entity, which was a jurisdictional issue.") (quoting testimony of Staff Accountant 1, taken on Dec. 15, 2009); *id.* at 88 n.71 ("'From the

Plaintiffs allege that by 1998, the SEC had determined that it lacked "any means of compelling production" of SIBL documents due to these "jurisdictional challenges," and therefore "issued a *voluntary* document request to SGC [Stanford Group Company] concerning SIBL." (Comp. ¶ 79 (emphasis in original).)  Without SIBL records, the SEC "concluded that it would be difficult to prove a fraud case against SIBL." (*Id.* ¶ 85.)  On Plaintiffs' own allegations, it is undisputed that the SEC reached these determinations *years* before Sjoblom or Chadbourne began to represent Stanford Financial or raise jurisdictional defenses on its behalf.

## III.   THE CLAIMS AGAINST CHADBOURNE

The claims against Chadbourne all arise from Sjoblom's legal representation of Stanford Financial in 2005 and 2006, and specifically from two letters that Sjoblom sent to the SEC on behalf of Stanford Financial in 2005.

### A.   Sjoblom's Retention

Sjoblom, on behalf of Chadbourne, executed an engagement letter with Stanford Financial on August 23, 2005.  (*Id.* ¶ 115.)  The engagement letter, which is referenced in the Complaint and submitted herewith, provides that any disputes relating to the Chadbourne-Stanford Financial attorney-client relationship "are to be governed by the laws of the State of New York (exclusive of its conflict of laws principles)."  Beller Ex. 2 at App. 170.

Plaintiffs contend that the SEC "suspected" that Stanford Financial was "some kind of fraud or Ponzi scheme" (Comp. ¶ 94), and allege that Sjoblom learned of the SEC's suspicion from Stanford Financial in June 2005 (*id.* ¶¶ 98, 102).  They further allege that, given his background and experience as an attorney for the SEC, Sjoblom should have realized that

---

moment she became involved in discussions regarding the CD aspect of the 2005 Stanford cycle exam, [Enforcement Staff Attorney 1] reportedly expressed the view that the Stanford CDs were *not* 'securities' regulated under the federal securities law, and were therefore outside of FINRA's jurisdiction.'") (quoting OIG Report Ex. 120 (April 24, 2005 email from Jeffrey Cohen); emphasis in original).

something was amiss at Stanford Financial and that, "[a]t worst," he knew by August 2005 that Stanford Financial was a Ponzi scheme.  (*Id.* ¶ 114.)  However, Plaintiffs do not allege any facts establishing that Sjoblom actually had such knowledge.

### B.      Sjoblom's Visit to Antigua

Sjoblom traveled to Antigua in August 2005, and met with Stanford Financial employees. (*See, e.g.*, *id.* ¶¶ 99-110.)  During that trip, he allegedly also met with Leroy King, the head of the Antigua Financial Services Regulatory Commission ("FSRC"), who told him that "under Antiguan law" the FSRC would not permit SIBL's records to be turned over to the SEC unless or until it made its own finding that Stanford Financial was engaged in fraud.  (*Id.* ¶ 110.)  On the basis of this meeting, the Complaint alleges that Sjoblom knew that the FSRC was "beholden" to Stanford Financial and was "on notice" that Stanford Financial had the Antiguan regulator "in its pocket."  (*Id.* ¶¶ 110-11.)

### C.      Sjoblom's September and October 2005 Letters

On August 23, 2005, Sjoblom told the SEC "that SIBL would not *voluntarily* produce any documents and that the SEC did not have jurisdiction over SIBL."  (*Id.* ¶ 115 (emphasis added).)  Six days later, the SEC wrote to Sjoblom reiterating its request for *voluntary* production of documents relating to SIBL CDs.  (*Id.* ¶ 120.)  Sjoblom responded on September 12, 2005, asserting that (i) Antiguan confidentiality laws prohibited SIBL from producing documents related to its banking portfolio and (ii) SIBL CDs did not qualify as securities under U.S. law, and therefore the SEC lacked jurisdiction over SIBL.  (*Id.*)  On October 3, 2005, Sjoblom sent the SEC a second letter, arguing, *inter alia*, "that the SEC did not have jurisdiction over SIBL's CD program because the CDs did not constitute 'securities' under U.S. law."  (*Id.* ¶ 125.)  Copies of Sjoblom's letters are submitted herewith.  *See* Beller Exs. 3 & 4.

Plaintiffs' damage claims against Chadbourne appear to be predicated on the allegation

11

that these letters assisted Stanford Financial to "obstruct the SEC Investigation of Stanford Financial's, SIBL's, and SGC's fraudulent sales practices."  (Comp. ¶ 270.)[5]  But they allege no *facts* suggesting that Sjoblom's letters stopped the SEC from investigating Stanford Financial. The SEC knew of Stanford Financial's jurisdictional defenses long before receiving Sjoblom's letters, and, without Sjoblom's involvement (he had not even been retained), had closed prior investigations of Stanford Financial due to the "jurisdictional challenges of obtaining records from Antigua."  *See* Fact Section II.B, *supra*.  Further, Plaintiffs allege that the SEC continued its informal investigation of Stanford Financial after receiving Sjoblom's letters and, in October 2006, elevated it to a formal order of investigation for fraud.  (Comp. ¶ 145.)

In August 2006, Sjoblom left Chadbourne to join Proskauer.  (*Id.* ¶¶ 141, 144.)  While the Complaint alleges that Chadbourne later performed other limited, unrelated legal services for Stanford Financial — including providing advice with respect to a "hedge fund of funds" project that was never established (*id.* ¶ 197) — Plaintiffs do not allege that any of these services gave rise to any cause of action asserted in the Complaint.  Nor do Plaintiffs allege, as they could not in good faith, that any of these services extended past February 2009.

### D.    The Receiver's Appointment and Assertion of Claims

The Receiver was appointed on February 16, 2009, and the Complaint and public record establish that he discovered his claims against Chadbourne no later than October 2009. Specifically, on August 27, 2009, certain Stanford Financial investors — represented by the

---

[5]        Plaintiffs allege that Sjoblom performed certain other work on behalf of Stanford Financial while at Chadbourne, but do not appear to claim that any of this other work played any role in the alleged "obstruction" of the SEC investigation.  The work alleged consisted of:  (i) addressing an "issue involving an FA [finance & accounting] recruiter in December 2005" (*id.* ¶ 132); (ii) helping Stanford Financial prepare a response to a letter from the National Association of Securities Dealers ("NASD") that "echoed many of [Sjoblom's] arguments to the SEC," and subsequently assisting on a second letter to NASD, the contents of which are not alleged (*id.* ¶¶ 133, 140); (iii) providing accurate securities law advice on "a new 20th-year marketing brochure for SIBL" (*id.* ¶¶ 134-35); (iv) preparing an allegedly false response to a request from Stanford Financial's auditor — which already had Sjoblom's October 3, 2005 letter to the SEC (*id.* ¶¶ 137-38); and (v) instructing an associate to prepare two legal memoranda (*id.* ¶ 139).

same counsel who drafted the present Complaint[6] — filed a class action lawsuit against Sjoblom and Proskauer (but not Chadbourne) concerning their alleged participation in the Stanford Financial fraud.  *See Troice* v. *Proskauer Rose LLP*, No. 3:09-cv-1600-N (N.D. Tex. Aug. 27, 2009) (ECF No. 1).  On October 9, 2009, the *Troice* plaintiffs filed a Second Amended Class Action Complaint adding Chadbourne as a defendant.  *See id.* (ECF No. 6).  Like the Complaint in this action, the *Troice* complaint alleged that Sjoblom and Chadbourne were retained in 2005 to aid in a "conspiracy to obstruct the SEC investigation" of Stanford Financial.  (*Id.* ¶ 60.)  Based on Sjoblom's October 2005 letter to the SEC, "in which he argued that the SEC did not have jurisdiction over Stanford Financial's CD sales program because the CDs did not constitute securities under U.S. law," the *Troice* complaint asserts claims against Sjoblom and Chadbourne.  (*Id.* ¶ 63.)  At the very latest by this date, the Receiver knew, or was on notice and would have been negligent — if not reckless — in not knowing, enough to assert his present claims against Chadbourne.

In January 2012 — more than two years after the commencement of the *Troice* action — Plaintiffs filed a legal malpractice action against Proskauer, Chadbourne and Sjoblom in the U.S. District Court for the District of Columbia (the "D.C. Action").  At the time the D.C. Action was filed, the *Troice* complaint had been dismissed by this Court as barred by the Securities Litigation Uniform Standards Act, and the Court's dismissal order was on appeal to the Fifth Circuit Court of Appeals.  Thus, it seems apparent that the purpose of the D.C. Action — which was filed by the same counsel who represented the plaintiffs in *Troice* and repeated many of the same allegations as the *Troice* complaint — was to serve as a backup in case the *Troice* plaintiffs' appeal was unsuccessful.

---

[6]    In a September 2014 submission in *Troice*, the class plaintiffs represented that Plaintiffs' Complaint in this action "was largely drafted by the undersigned counsel" for the *Troice* plaintiffs.  *See Troice* v. *Proskauer Rose LLP*, No. 3:09-cv-1600-N (N.D. Tex. Sept. 23, 2014) (ECF No. 143), at 1.

By filing in D.C., Plaintiffs sought to invoke the District of Columbia's *three*-year statute of limitations for negligence claims and avoid the long-expired *two*-year Texas statute.  But the D.C. District Court lacked subject matter jurisdiction, and Plaintiffs' gambit led to lengthy disputes, ultimately resulting in the D.C. District Court denying Plaintiffs' motion to transfer their suit to this Court under 28 U.S.C. § 1631 as contrary to the interest of justice and dismissing the D.C. Action with prejudice for lack of subject matter jurisdiction.  *See Janvey* v. *Proskauer Rose LLP*, No. 12-155 (CKK), 2014 WL 3668578 (D.D.C. July 24, 2014).  That decision is of telling importance in this case, as the D.C. District Court held that Plaintiffs had "filed their suit in this jurisdiction either in bad faith and/or as an attempt at forum shopping," as they were likely aware that the District of Columbia was an improper forum when the case was filed.  *Id*. at *5.  Further, the District Court recognized that Plaintiffs' filing of the D.C. Action was likely an attempt to evade the Texas statute of limitations, which they knew would bar their claims:

> The timing of this suit also suggests that Plaintiffs were attempting to circumvent concerns regarding the constraints of the statute of limitations in Texas.  While the limitations period for negligence claims is two-years in Texas, it is three-years in the District of Columbia.

*Id*.

Plaintiffs, evidently planning for the possibility of this result, had another fallback in reserve.  On January 31, 2013 — shortly after Chadbourne's initial subject matter jurisdiction motion had been fully briefed — Plaintiffs filed their Complaint in this action, containing substantively identical allegations to the D.C. complaint, as a backup in case the D.C. Action was dismissed.

E.      **The Claims Against Chadbourne**

The Complaint purports to assert seven claims against Chadbourne.  Six of them — legal malpractice (Comp. ¶ 256), aiding and abetting alleged breaches of fiduciary duties (*id*. ¶¶ 257-58), aiding and abetting an alleged fraudulent scheme (*id*. ¶ 259), aiding and abetting alleged fraudulent transfers (*id*. ¶¶ 260-61), aiding and abetting alleged conversion (*id*. ¶¶ 262-63) and civil conspiracy (*id*. ¶¶ 264-67) — rely on a theory of *respondeat superior* liability based solely upon the conduct of Sjoblom during 2005 and 2006.  Plaintiffs also assert a direct claim against Chadbourne for negligent retention or negligent supervision on the theory that Chadbourne "should have known that Sjoblom had been specifically retained to help Stanford Financial thwart an active SEC investigation of its activities," and therefore was negligent in retaining him as a partner.  (*Id.* ¶ 268.)  Plaintiffs seek to recover from Chadbourne "billions of dollars" in alleged damages to Stanford Financial.  (*Id.* ¶¶ 256-59, 261-65, 266-67, 268, 270.)

## ARGUMENT

I.      **THE CLAIMS AGAINST CHADBOURNE SHOULD BE DISMISSED BECAUSE THEY ARE TIME-BARRED.**

The claims against Chadbourne should all be dismissed as time-barred.

A.      **Plaintiffs' Legal Malpractice Claim Is Time-Barred.**

Plaintiffs first assert "negligence claims" against Sjoblom, as Stanford Financial's former attorney, and Chadbourne, as his former employer, arising from the provision of "legal services to Stanford Financial," on the theory that Sjoblom did not "exercise the degree of care, skill, or diligence that an attorney of ordinary skill and knowledge commonly possesses."  (*Id.* ¶¶ 2, 9-11, 256.)  Under Texas law, this is a legal malpractice claim, *Beck* v. *Law Offices of Edwin J. Terry, Jr., P.C.*, 284 S.W.3d 416, 428 (Tex. App.-Austin 2009), and is therefore subject to a two-year statute of limitations.   TEX. CIV. PRAC. & REM. CODE § 16.003(a); *see also Apex Towing Co.* v.

*Tolin*, 41 S.W.3d 118, 120 (Tex. 2001) (applying two-year statute to legal malpractice claims).[7] As discussed, the Receiver's legal malpractice claim accrued no later than October 2009 and had to be asserted no later than October 2011.  Because the claim was filed on January 31, 2013 — nearly sixteen months late, at a bare minimum — it is time-barred.

A cause of action accrues "when facts come into existence that authorize a party to seek a judicial remedy."  *Provident Life & Accident Ins. Co.* v. *Knott*, 128 S.W.3d 211, 221 (Tex. 2003) (citations omitted).  The statute of limitations begins to run when the claimant first learns of a wrongful injury, "even if the claimant does not yet know 'the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it.'"  *Exxon Corp.* v. *Emerald Oil & Gas Co*., 348 S.W.3d 194, 207 (Tex. 2011) (citation omitted).  Indeed, the limitations period will begin to run prior to the occurrence of actual harm.  *See Zidell* v. *Bird*, 692 S.W.2d 550, 557 (Tex. App.-Austin 1985, no writ) ("[H]arm to the plaintiff's legally protected interest . . . need not be finally established or an inevitable consequence of the conduct. Rather, the specific and concrete event which follows the defendant's conduct need raise only a *risk* of harm to that [legally protected] interest.") (emphasis in original).

Seeking to hold Chadbourne liable for alleged malpractice that occurred *seven years* prior to the filing of the Complaint, Plaintiffs attempt to excuse their untimeliness by invoking the "discovery rule."  The discovery rule "operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim."  *Wagner & Brown, Ltd.* v. *Horwood*, 58 S.W.3d 732, 734 (Tex. 2001).  The Texas

---

[7]        Although Plaintiffs' claims against Chadbourne are governed by New York substantive law pursuant to the choice-of-law provision in Chadbourne's engagement letter with Stanford Financial (*see infra* p. 24-25), Texas law governs procedural issues, including the statute of limitations.  *See Wooley* v. *Clifford Chance Rogers & Wells, L.L.P.*, No. 3:01-cv-2185, 2004 WL 57215, at *3 & n.7 (N.D. Tex. Jan. 5, 2004) ("The Fifth Circuit has held that Texas applies its own statute of limitations, regardless what substantive law applies."); *Long Island Trust Co.* v. *Dicker*, 659 F.2d 641, 644 n.6 (5th Cir. Unit A Oct. 1981) (applying Texas statute of limitations to contract claims arising under Guaranty governed by New York substantive law).

Supreme Court has "described the discovery rule as a very limited exception to statutes of limitations, and [has] condoned its use only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Id.* (internal quotation marks omitted). "An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* at 734-35. Here, the Receiver asserts that, upon his appointment on February 16, 2009, he could not have discovered the alleged injury to Stanford Financial until an unspecified, "more recent[]" date. (Comp. ¶ 254.) The Receiver's failure to identify that "more recent" date or credibly allege any facts indicating that the unspecified date of discovery would be consistent with the exercise of reasonable due diligence is fatal to his claims and to the Complaint against Chadbourne.

Moreover, this excuse is unavailing because it makes no difference whether the discovery rule applies here. There can be no doubt that the Receiver learned of his claim by October 9, 2009 — at the latest — and therefore had to file his Complaint no later than October 9, 2011 (*approximately sixteen months before he did so*).[8]

Importantly for the issue at hand, the Fifth Circuit has held that the Receiver, through the

---

[8]     The Complaint as well as the public record indicate that at the time of the Receiver's appointment on February 16, 2009, he already had a great deal of information regarding the scheme that Chadbourne and Sjoblom supposedly aided and abetted by providing legal services. By that time, the Receiver knew or should have known that (i) Stanford Financial allegedly obstructed the SEC's investigation and (ii) in 2009, Sjoblom withdrew as Stanford Financial's counsel and disaffirmed all prior representations he made to the SEC. Four months later, on June 18, 2009, Allen Stanford, Laura Pendergest-Holt and three alleged co-conspirators were indicted on 21 counts, including obstruction of an SEC investigation. (Comp. ¶ 72.) The indictment alleged in part that Stanford, Pendergest-Holt "and others . . . made false and misleading statements to SEC attorneys" in an attempt to "conceal from the SEC the true operations and financial condition of SIBL" and "forestall the SEC's investigation through various means…." *See U.S.* v. *Stanford, et al.*, No. 4:09-cr-00342 (S.D. Tex. June 18, 2009) (ECF No. 1), ¶ 39. The indictment referenced Sjoblom, including certain representations he made to the SEC. *Id.* ¶¶ 30, 97-100, 104. Contemporaneous media coverage noted that the indictment would further "increase the focus on Sjoblom." *See* Zach Lowe, *Allen Stanford Indicted*, THE AM LAW DAILY (June 19, 2009). On August 27, 2009, Stanford Financial's former CFO, Jim Davis, pled guilty to several crimes, "including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding." (Comp. ¶ 72.) Davis' plea agreement referred to Stanford Financial's retention of Sjoblom and Sjoblom's travel to Antigua in 2005. *See U.S.* v. *Davis*, No. 4:09-cr-00335 (S.D. Tex. Aug. 27, 2009) (ECF No. 30), at 16. Media coverage of Davis' plea agreement recognized that Sjoblom was "in the crosshairs of a major fraud investigation." *See, e.g.*, Amir Efrati, *The Stanford Affair: Another Bad Day for Proskauer's Tom Sjoblom*, THE WALL STREET JOURNAL (Law Blog) (Aug. 27, 2009).

exercise of reasonable diligence, should have been apprised of "the true nature and duration of Stanford's operation of a massive Ponzi scheme" no later than August 27, 2009. *Democratic Senatorial Campaign Comm.*, 712 F.3d at 197-98.  At the very least, on October 9, 2009, a putative class of investor plaintiffs — represented by the same counsel who drafted the Complaint in this action — filed a Second Amended Class Action Complaint adding Chadbourne as a defendant and making virtually all the same allegations about Sjoblom's conduct that supposedly give rise to the claims against Chadbourne in this action.  *See Troice* v. *Proskauer Rose LLP*, No. 3:09-cv-1600-N (N.D. Tex. Oct. 9, 2009) (ECF No. 6).  The *Troice* complaint, for example, alleges that Sjoblom and Chadbourne were retained in 2005 to aid in a "conspiracy to obstruct the SEC investigation" of Stanford Financial (*id.* ¶ 60); describes Sjoblom's August 2005 trip to Antigua, where he supposedly learned that Leroy "King was passing insider, confidential information about the SEC investigation to Stanford" (*id.* ¶¶ 61-62); and describes Sjoblom's October 2005 letter to the SEC, "in which he argued that the SEC did not have jurisdiction over Stanford Financial's CD sales program because the CDs did not constitute securities under U.S. law" (*id.* ¶ 63).  Like Plaintiffs here, the *Troice* plaintiffs asserted a claim for negligent retention/supervision against Chadbourne.  (*Id.* ¶ 114.)

In light of these allegations, Plaintiffs cannot credibly contend that they discovered their purported claims against Chadbourne *after* October 9, 2009.  The objective, irrefutable facts make a mockery of any contention that the Receiver could not have discovered his purported legal malpractice claim until February 1, 2011, two years before he filed his Complaint, through the exercise of "reasonable diligence."  *See Democratic Senatorial Campaign Comm.*, 712 F.3d at 194-95 (applying reasonable diligence standard); *see also Wagner & Brown*, 58 S.W.3d at 734.  These claims were discoverable no later than October 2009.  Plaintiffs' legal malpractice

claim is therefore time-barred.[9]

## B. Plaintiffs Cannot Evade Dismissal for Untimeliness by Improperly Fracturing Their Legal Malpractice Claim.

Plaintiffs' aiding and abetting, civil conspiracy and negligent retention/supervision claims (Counts 2–7) improperly fracture their time-barred legal malpractice claim (Count 1), and should be dismissed.

### 1. The Anti-Fracturing Rule Bars Repackaging a Legal Malpractice Claim into Non-Negligence Causes of Action to Avoid the Limitations Period for Negligence.

Under the "rule against fracturing," a claimant alleging legal malpractice "may not opportunistically transform such a negligence claim into separate non-negligence causes of action." *Tener* v. *Short Carter Morris, LLP*, No. 01-12, 00676-cv, 2014 WL 4259885, at *10 (Tex. App.-Houston [1st Dist.], Aug. 28, 2014). The anti-fracturing rule is grounded, in part, on promoting efficient litigation:

> Nothing is to be gained by fracturing a cause of action arising out of bad legal advice or improper representation into claims for negligence, breach of contract, fraud, or some other name. If a lawyer's error or mistake is actionable, it should give rise to a cause of action for legal malpractice with one set of issues which inquire if the conduct or omission occurred, if that conduct or omission was malpractice and if so, subsequent issues on causation and damages.

*Sledge* v. *Alsup*, 759 S.W.2d 1, 2 (Tex. App.-El Paso 1988, no pet.). Recognizing that breach of fiduciary duty and fraud claims are subject to a four-year statute of limitations, *see* Tex. Civ. Prac. & Rem. Code § 16.004(a), the rule also serves to prohibit plaintiffs from strategically repackaging a legal malpractice claim as a breach of fiduciary duty or fraud claim (or, as here,

---

[9]     For essentially the same reasons, the doctrine of equitable tolling — which Plaintiffs invoke in passing without any support (Comp. ¶ 254) — also does not apply here. *See Rashidi* v. *American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996) (holding that equitable tolling is applicable "where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights," and rejecting its application because the claimant "could have filed his claim properly with even a modicum of due diligence"). Further, because Plaintiffs' claims had to be asserted no later than October 2011, such claims would remain time-barred even if Plaintiffs were to somehow receive the benefit of their January 2012 filing date for the D.C. Action.

aiding and abetting such torts) to evade dismissal under the shorter statute of limitations for negligence. *See Edwards* v. *Dunlop-Gates*, 344 S.W.3d 424, 427 n.4 (Tex. App.-El Paso 2011) ("The [anti-fracturing] rule serves to prevent legal-malpractice plaintiffs from transforming a claim that sounds only in negligence into other claims to avail themselves of longer limitations periods, less onerous proof requirements, or other tactical advantages.") (citation omitted).

To avoid such gamesmanship, Texas law requires that courts "discern the real substance of the claims" in determining the applicable statute of limitations. *Murphy* v. *Gruber*, 241 S.W.3d 689, 697 (Tex. App.-Dallas 2007) (holding that purported breach of fiduciary duty claims against attorneys were actually legal malpractice claims, and thus subject to — and barred by — the two-year limitations period).[10] "Determining whether allegations against a lawyer — labeled as breach of fiduciary duty, fraud, or some other cause of action — are actually claims for professional negligence is a question of law to be determined by the court." *Meullion* v. *Gladden*, No. 14-10-01143-cv, 2011 WL 5926676, at *4 (Tex. App.-Houston [14th Dist.] Nov. 29, 2011, no pet.) (quotation omitted). In reaching this determination, courts scrutinize the claims asserted and will not defer to "boilerplate allegations" or "formulaic recitations" of some other claim's legal elements. *Reneker* v. *Offill*, No. 3:08-cv-1394-D, 2009 WL 804134, at *8 (N.D. Tex. Mar. 26, 2009) ("*Reneker I*").[11]

---

[10]     *See also Kirkland* v. *Martin*, No. 4:10-cv-2865, 2012 WL 3930318 (S.D. Tex. Sept. 10, 2012) (holding that claims alleging fraud, breach of fiduciary duty and other torts were improperly fractured and time-barred legal malpractice claims); *Isaacs* v. *Schleier*, 356 S.W.3d 548 (Tex. App.-Texarkana 2011, pet. denied) (same with respect to claims alleging fraud, breach of fiduciary duty and breach of contract); *Longoria* v. *Whitehurst*, No. 12-03-00298-cv, 2005 WL 465527 (Tex. App.-Tyler Feb. 28, 2005) (same with respect to claims alleging fraud, misrepresentation, breach of contract, breach of fiduciary and other torts).

[11]     *See also Camp* v. *RCW & Co., Inc.*, No. 4:05-cv-03580, 2007 WL 1306841, at *6 (S.D. Tex. May 3, 2007) (construing claims as a single, fractured malpractice claim where defendant-attorneys allegedly (i) made misrepresentations regarding controlling law, (ii) failed to advise clients of certain transactional risks, and (iii) failed to disclose conflicts of interest); *Jennings* v. *Zimmerman, Axelrad, Meyer, Stern & Wise, P.C.*, No. 04-04-00544-cv, 2005 WL 1959188, at *2 (Tex. App.-San Antonio Aug. 17, 2005, no pet.) (construing claims as a single, fractured malpractice claim where defendant-attorneys allegedly (i) failed to disclose the law firm's lack of experience or intention to associate other legal counsel; (ii) failed to conduct certain discovery; (iii) failed to actively and zealously

Further, the rule applies with equal force to impermissibly fractured claims bearing conspiracy or aiding and abetting labels.  For example, in *Won Pak* v. *Harris*, 313 S.W.3d 454 (Tex. App.-Dallas 2010), the court affirmed dismissal of conspiracy to commit fraud and breach of fiduciary duty claims derived from an attorney's alleged "mishandling of the representation" as fractured malpractice claims, and held that by alleging that the attorney "facilitated, conspired with, or aided and abetted the fraud" of other parties, the claimant merely "recast" a legal malpractice clam "under alternative labels."  *Id*. at 457-59.

"No matter how a plaintiff may try to circumvent the elements of a legal malpractice claim, *if the theory of recovery against an attorney sounds in tort, Texas courts are going to treat it as a legal malpractice claim*."  *Mendenhall*, 2012 WL 512657, at *2 (emphasis added; citation omitted); *see also Smith* v. *Tex.*, No. 4:12-cv-00469, 2012 WL 5868657, at *11 (S.D. Tex. Oct. 26, 2012) ("In Texas, 'a cause of action arising out of bad legal advice or improper representation is legal malpractice.'") (quotation omitted); *Murphy*, 241 S.W.3d at 696-97 (recognizing that "claims regarding the quality of the lawyer's representation of the client are professional negligence claims" regardless of "the labels the parties place on their claims.").[12]

---

work the case; (iv) failed to keep plaintiff apprised of the litigation; and (v) failed to properly advise of or obtain certain benefits to which the plaintiff was entitled); *Greathouse* v. *McConnell*, 982 S.W.2d 165, 172 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (construing claims as a single, fractured malpractice claim where the various claims were each followed by an identical paragraph detailing the defendant-attorney's conduct).

[12]    New York law similarly prohibits duplicating or recasting a legal malpractice claim.  *See Cusack* v. *Greenberg Traurig, LLP*, 972 N.Y.S.2d 11, 14 (App. Div. 2013) ("The motion court correctly dismissed the fraud claim and both negligence claims as duplicative of plaintiff's malpractice claim."); *see also Cosmetics Plus Group, Ltd.* v. *Traub*, 960 N.Y.S.2d 388, 394 (App. Div. 2013) (same for fractured breach of fiduciary duty claim); *Citidress II Corp.* v. *Tokayer*, 962 N.Y.S.2d 691, 692 (App. Div. 2013) (same for fractured breach of contract claim); *Vermont Mut. Ins. Co.* v. *McCabe & Mack, LLP*, 964 N.Y.S.2d 160, 163 (App. Div. 2013) (same for fractured breach of contract and negligent supervision claims).  New York courts also recognize that a fractured or relabeled legal malpractice claim remains subject to the limitations period governing legal malpractice claims.  *See, e.g., Hadda* v. *Lissner & Lissner LLP*, 952 N.Y.S.2d 126, 127 (App. Div. 2012) ("The causes of action for breach of fiduciary duty and breach of contract are duplicative of the malpractice cause of action, and are therefore also time-barred."); *Scott* v. *Fields*, 925 N.Y.S.2d 135, 138 (App. Div. 2011) (holding that fraud claim was time-barred; applying three-year limitations period applicable to legal malpractice actions, rather than the six-year limitations period for fraud, because "in reality" the fraud claim was one for legal malpractice, since "the gravamen of the plaintiff's allegations against [the attorney] is that [she] did not fulfill her professional duty to protect the plaintiff in

### 2.     *Plaintiffs Have Improperly Fractured Their Malpractice Claim.*

Plaintiffs attempt to do exactly what the anti-fracturing rule prohibits:  repackage their time-barred legal malpractice claim into other causes of action in order to avoid the applicable two-year statute of limitations.  That attempt should be rejected.

All of the Plaintiffs' claims are based on the same factual allegations, *i.e.*, that Sjoblom failed to exercise the requisite degree of care, skill or diligence in his role as an attorney for Stanford Financial, in particular by sending two letters to the SEC on its behalf.  (Comp. ¶¶ 120, 125-31, 256.)  These factual allegations are incorporated by reference into each count of the Complaint.  (*Id.* ¶ 255.)  Accordingly, while the Complaint contains a boilerplate recitation of the elements of each cause of action, all of the impermissibly fractured claims (Counts 2-7) are based upon the same factual allegations as the legal malpractice claim (Count 1).  As one example, Plaintiffs claim that Chadbourne aided and abetted fraud through the provision of "legal services" that "assisted a fraudulent scheme that enabled and assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies."  (*Id.* ¶ 259.)  That factual allegation is indistinguishable from the claim that Chadbourne committed legal malpractice by "assisting Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies."  (*Id.* ¶ 256.)  Because each claim is based on the same factual allegations and seeks the same remedy for the same alleged injury, Plaintiffs' various causes of action should be viewed as "one complaint of legal malpractice," notwithstanding their "recitation of independent claims."  *Camp*, 2007 WL 1306841, at *5 (quotation omitted).  Plaintiffs should not be permitted to opportunistically re-label their legal malpractice claim to "avail themselves of longer limitations periods."  *Edwards*, 344 S.W.3d at 427 n.4.  Accordingly, all of Plaintiffs' claims are time-barred.

_____

the real estate transaction at issue.").

### C.    The Remaining Counts are Also Independently Time-Barred.

Even without the anti-fracturing rule, Plaintiffs' remaining counts are still time-barred. First, under Texas law, claims for aiding and abetting conversion (Count 5), civil conspiracy (Count 6), and negligent retention/supervision (Count 7) — even if they are not merely repackaged malpractice claims — are all subject to a two-year statute of limitations.[13]  As discussed above, the Receiver's claims accrued no later than October 9, 2009, well over two years before he filed his Complaint.

Second, even if it were not an impermissibly fractured malpractice claim — and to the extent it exists at all — Plaintiffs' claim for aiding and abetting fraudulent transfer (Count 4) had to be asserted no later than August 2010.  Neither New York nor Texas law recognizes a claim for aiding and abetting fraudulent transfers, as discussed below in Section III.E.3.  If they did, however, such a claim necessarily would be subject to the same limitations period as a primary claim for avoidance of fraudulent transfers.  Where, as here, an alleged fraudulent transfer was made "with actual intent to hinder, delay, or defraud" creditors (Comp. ¶ 260), Texas law provides that such claim must be asserted "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by claimant."  TEX. BUS. & COM. CODE § 24.010(a)(1).[14]  The

---

[13]    *See, e.g., Burns* v. *Rochon*, 190 S.W.3d 263, 271 (Tex. App.-Houston [1st Dist.] 2006, no pet.) ("A cause of action for conversion must be commenced no later than two years after its accrual."); *Stevenson* v. *Koutzarov*, 795 S.W.2d 313, 318 (Tex. App.-Dallas 1990, writ denied) ("Civil conspiracy is governed by the two-year statute of limitations."); *EEOC v. Simbaki, Ltd.*, No. 4:12-cv-00221, 2012 WL 1898882, at *4 (S.D. Tex. May 23, 2012) ("The statute of limitations for a negligent retention claim is also two years."); *see generally* TEX. CIV. PRAC. & REM. CODE § 16.003(a).  Under Texas law, the same limitations period governs an underlying tort and an aiding and abetting claim predicated on the commission of that tort.  *See Thomas* v. *Barton Lodge II, Ltd.*, 174 F.3d 636, 647 (5th Cir. 1999).

[14]    To the extent that the limitations period for a fraudulent transfer claim under Texas law is viewed as substantive, rather than procedural, then New York law may provide the applicable limitations period for this claim.  That would not change the result — the claim would still be time-barred under New York law, which provides that a cause of action relating to such transfer is extinguished unless it is asserted "either within six years of the date that the fraud or conveyance occurs or within two years of the date that the fraud or conveyance is

latest possible date for any fraudulent transfer that allegedly occurred while Sjoblom was a

Chadbourne partner would be in August 2006, when Sjoblom left Chadbourne.  The Receiver

therefore was required to file a claim arising out of any such transfer no later than August 2010.

The one-year post-discovery period does not help the Receiver, as his own allegations establish

knowledge of this claim by no later than October 2009.[15]  The aiding and abetting fraudulent

transfer claim is therefore time-barred.

Finally, a four-year statute of limitations applies to claims for aiding and abetting breach

of fiduciary duty (Count 2) and aiding and abetting a fraudulent scheme (Count 3).  TEX. CIV.

PRAC. & REM. CODE § 16.004(a)(4)-(5) ("A person must bring suit on the following actions not

later than four years after the day the cause of action accrues: . . . (4) fraud; or (5) breach of

fiduciary duty").  Absent the application of the discovery rule, for which Plaintiffs do not plead

any factual basis, these claims should have been brought no later than August 2010.

## II.   PLAINTIFFS' CLAIMS AGAINST CHADBOURNE SHOULD BE DISMISSED UNDER THE DOCTRINE OF *IN PARI DELICTO.*

As previously noted, the engagement letter between Stanford Financial and Chadbourne

provides that any disputes relating to the Chadbourne-Stanford Financial attorney-client

relationship "are to be governed by the laws of the State of New York (exclusive of its conflict of

laws principles)."  *See* Beller Ex. 2 at App. 170.  Accordingly, Plaintiffs' claims against

Chadbourne are governed by New York law.  *See CK DFW Ptnrs. Ltd.* v. *City Kitchens, Inc.*,

No. 3:06-cv-1598-D, 2007 WL 2381259, at *3 (N.D. Tex. Aug. 17, 2007) ("Texas choice-of-law

rules recognize valid choice-of-law clauses.") (quotation omitted).  As a matter of New York

---

discovered or should have been discovered, whichever is longer." *Wall Street Assocs.* v. *Brodsky*, 684 N.Y.S.2d 244, 248 (App. Div. 1999); *see also* N.Y. CLS CPLR § 213.

[15]      Indeed, the Receiver apparently believed he had sufficient information to file fraudulent transfer claims against other defendants by April 2009. *See Janvey* v. *Alguire*, No. 3:09-cv-00724 (N.D. Tex. Apr. 20, 2009) (ECF No. 2).

law, those claims are barred by the doctrine of *in pari delicto*.[16]

Plaintiffs seek to recover — on behalf of Stanford Financial — funds that Stanford Financial allegedly obtained through fraud, and which Allen Stanford and his co-conspirators allegedly then "stole" from Stanford Financial.  (*See, e.g.*, Comp. ¶ 66.)  To that end, Plaintiffs assert claims against an attorney and a law firm who are not alleged to have benefited from any portion of the stolen money, but merely rendered legal services that allegedly allowed Stanford Financial to "continue receiving economic benefits from the fraud."  (*Id.* ¶ 94 (quotation omitted)); *see generally* Section III.B, *infra*.  The doctrine of *in pari delicto* is fatal to these claims.

The *in pari delicto* rule bars recovery by a corporation against "outside professional advisers, such as auditors, investment bankers, financial advisers and lawyers," where the corporation's "management engaged in financial fraud that was allegedly either assisted or not detected at all or soon enough" by the professional advisers, because management's wrongdoing is imputed to the corporate entity on whose behalf the claim against those advisers is being asserted.  *See Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446, 457 (2010).  The rule implements the principle that, "[u]nder New York law, one wrongdoer may not recover against another."  *Picard* v. *JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*, 721 F.3d 54, 63 (2d Cir. 2013) (applying *in pari delicto* to dismiss claims by bankruptcy trustee against third-party defendants allegedly complicit in Madoff's Ponzi scheme) (footnote omitted) (citing *Kirschner*, 15 N.Y.3d at 464).  As stated by New York's highest court, the Court of Appeals, "[t]he doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two

---

[16]        *See Granite Ptnrs., L.P.* v. *Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 n.16 (S.D.N.Y. 1998) ("New York substantive law applies to the claim and, therefore, to the applicability of the [defendants'] *in pari delicto* defense…."); *see also Knauer* v. *Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 235 (7th Cir. 2003) (holding that applicable state law governs application of *in pari delicto* to an equitable receiver) (citing *O'Melveny & Myers* v. *FDIC*, 512 U.S. 79, 83, 88 (1994)).

wrongdoers." *Kirschner*, 15 N.Y.3d at 464.  While "[t]he justice of the *in pari delicto* rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent," it even "applies where both parties acted willfully." *Id.*

The *in pari delicto* doctrine "serves important public policy purposes." *Id.*  It "deters illegality" by denying judicial relief to wrongdoers, and also "avoids entangling courts in disputes between wrongdoers." *Id.*  Thus, "the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that . . . the defense applies even in difficult cases and should not be 'weakened by exceptions.'" *Id.* (quoting *McConnell* v. *Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 470 (1960); citing *Saratoga Cnty. Bank* v. *King*, 44 N.Y. 87, 94 (1870) (characterizing the *in pari delicto* doctrine as "inflexible")).

Consistent with that view, New York law does not recognize any exception to *in pari delicto* where the plaintiff is a receiver suing on behalf of the estate of a wrongdoer like Stanford Financial.  Indeed, New York courts have squarely rejected the argument that the *in pari delicto* doctrine should be weakened or set aside where a trustee or receiver, claiming to be acting on behalf of "innocent" stakeholders, seeks to recover from an allegedly negligent third-party professional.  The New York Court of Appeals has held that such a carve-out would improperly create a "double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents." *Kirschner*, 15 N.Y.3d at 475; *see also Cobalt Multifamily Investors I, LLLC* v. *Shapiro*, 857 F. Supp. 2d 419, 435 (S.D.N.Y. 2012) (dismissing claim by court-appointed receiver based on *in pari delicto* under New York law).  Moreover, in the typical case (as here), corporate wrongdoers "play the dominant role in the fraud" while outside professionals are alleged only to

26

have "not detect[ed] the fraud at all or soon enough."  *Kirschner*, 15 N.Y.3d at 475-76.

The *in pari delicto* defense is properly invoked on a motion to dismiss where its application is plain on the face of the pleadings.  *Id.* at 459 n.3; *see also Picard*, 721 F.3d at 63-65 ("Early resolution is appropriate where (as here) the outcome is plain on the face of the pleadings.").[17]  That is indisputably the case here, given Plaintiffs' allegations that Stanford Financial "was a massive, worldwide Ponzi scheme" (Comp. ¶ 25) that defrauded investors, violated securities laws and went "to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's operations" (*id.* ¶¶ 25, 62-67) — and given that Plaintiffs seek to recover from Chadbourne, a third-party professional alleged to have been negligent in providing legal services, the very funds that Stanford Financial obtained through that fraud.

Under these settled principles of New York law, which have been "wrought in the inmost texture of [New York] common law for at least two centuries," *Kirschner*, 15 N.Y.3d at 464, Plaintiffs cannot, as a matter of law, recover from Chadbourne the money that Stanford Financial illegally obtained from investors.  *Id.* at 464.

## III.   THE COMPLAINT FAILS TO PLEAD ESSENTIAL ELEMENTS OF THE CLAIMS ASSERTED AGAINST CHADBOURNE.

On each of the independent bases set forth above — statute of limitations and *in pari delicto* — the claims against Chadbourne should be dismissed.  But even if Plaintiffs somehow could avoid dismissal on those grounds, their claims against Chadbourne should be dismissed under Rules 12(b)(6) and 9(b) for failure to state a claim.

---

[17]     *See also Deangelis* v. *Corzine (In re MF Global Holdings Ltd. Inv. Litig.)*, 998 F. Supp. 2d 157, 189-91 (S.D.N.Y. 2014) (dismissing claims against auditor under *in pari delicto*); *Chaikovska* v. *Ernst & Young, LLP*, 913 N.Y.S.2d 449, 451 (App. Div. 2010) (affirming dismissal of claims against auditor on *in pari delicto* grounds); *Walker, Truesdell, Roth & Assoc., Inc., Trustee of Greenwich Sentry, L.P. Litig. Trust* v. *Globeop Fin. Servs. LLC*, No. 600469/09, 2013 WL 8597474, at *8-13 (N.Y. Sup. Ct. May 27, 2013) (dismissing bankruptcy trustee's claims on *in pari delicto* grounds; "[P]laintiff, as the Greenwich Sentry Funds' bankruptcy trustee, stands in the Funds' shoes, and is subject to a defense based on the *in pari delicto* doctrine if the Funds would have been subject to the defense.").

A.      **The Applicable Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  However, "allegations [that] are conclusory [are] not entitled to be assumed true." *Id.* at 681.  Thus, a complaint is "insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Whitley* v. *Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted).

Allegations of "fraud or mistake" are subject to the heightened, particularized pleading standards of Rule 9(b), which the Fifth Circuit Court of Appeals "interprets . . . strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc.* v. *TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quotations omitted).  The claims against Chadbourne are all based upon allegations of fraud, and are therefore subject to the standard of Rule 9(b).[18]  None of those claims meet this standard, or even the more lenient standard for non-fraud claims.

B.      **Plaintiffs' Speculative Allegations Regarding Causation Are Insufficient to Confer Standing on Plaintiffs and Inadequate to Plead the Causation Element of All Their Claims Against Chadbourne.**

Plaintiffs' claims against Chadbourne fail as a matter of law, because the claim that

---

[18]      *See, e.g., Lone Star Ladies Inv. Club* v. *Schlotzky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) (holding that Rule 9(b) applies to "all averments of fraud, whether they are part of a claim of fraud or not"); *Biliouris* v. *Sundance Res., Inc.*, 559 F. Supp. 2d 733, 737 (N.D. Tex. 2008) ("Once a fraud claim is dismissed under Rule 9(b), a claim for negligent misrepresentation based on the same operative facts must also be dismissed unless 'it is possible for the Court to describe a simple redaction that removes allegations of fraud from the complaint, but leaves the plaintiff's valid and intelligible negligent misrepresentation claim intact.'") (quotation omitted); *Halaris* v. *Viacom, Inc.*, No. 3:06-cv-1646-N, 2007 WL 4145405, at *9 (N.D. Tex. Sept. 21, 2007) (applying Rule 9(b) to breach of fiduciary duty claim and noting that "[t]he line between a pleading sounding in fraud and one that does not thus appears to be whether the pleading includes allegations of intentional or knowing misrepresentations or omissions").

Stanford Financial was damaged by Sjoblom's work on its behalf rests on unfounded speculation concerning the potential actions of third parties.  Specifically, Plaintiffs fault Sjoblom for agreeing to represent Stanford Financial and for raising jurisdictional defenses to the SEC on its behalf (Comp. ¶¶ 115, 120, 125), but their implicit contention that Sjoblom's refusal would have altered the course of subsequent events is pure speculation.  Plaintiffs do not and could not allege, for example, that if Sjoblom had declined to represent Stanford Financial in 2005 no other attorney or law firm would have taken on the representation or raised the same jurisdictional arguments.  Nor do or could they allege that Stanford Financial was unaware that it was engaged in fraud, such that different legal advice from Sjoblom would have altered its conduct.  *See Reneker* v. *Offill*, No. 3:08-cv-1394-D, 2009 WL 3365616, at *6 (N.D. Tex. Oct. 20, 2009) ("*Reneker II*") (where clients allegedly knew their actions were illegal, "[i]t is speculative to assume that any change in [the law firm's] actions would have altered the actions of the . . . Clients themselves.").  Indeed, this Court has found that Allen Stanford and his Ponzi insiders were not confused about the legality of their actions, but rather acted "with a high degree of scienter…."  *SEC* v. *Stanford Int'l Bank, Ltd.*, No. 3:09-cv-0298-N, ORDER, at 15 (N.D. Tex. Apr. 25, 2013) (Godbey, J.) (ECF No. 1858).

More fundamentally, Plaintiffs allege no facts suggesting that, but for Sjoblom's letters, the SEC might have taken more aggressive or timely steps to end Stanford Financial's alleged fraud.  Indeed, that conjecture is contradicted by the allegations of the Complaint as well as facts disclosed through the OIG Report, which make clear that the SEC (i) was aware of Stanford Financial's jurisdictional defenses long before having received Sjoblom's letters (*see* Fact Section II.B, *supra*), (ii) chose not to pursue Stanford Financial for reasons that had nothing to do with Sjoblom's letters, including internal pressure to chase "stats" by pursuing only "slam-

dunk" cases (*id.*); and (iii) continued and formalized its investigation after receiving Sjoblom's letters (Comp. ¶ 145).

As discussed below, Plaintiffs' highly speculative allegations regarding causation establish that they lack standing.  And even if Plaintiffs' allegations could clear that hurdle, they still fail to plead the element of proximate cause, which is common to all of Plaintiffs' claims.

### 1.     *Plaintiffs' Theory of Causation Is Too Speculative to Confer Standing.*

Plaintiffs bear the burden "clearly to allege facts" establishing their standing to sue. *FW/PBS, Inc.* v. *City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks omitted).  To do so, they must allege:  "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft* v. *Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 342 (2006) (to establish standing, a "plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct") (internal quotation marks omitted).  Because Plaintiffs fail to make these "necessary allegations," they have no standing and their claims against Chadbourne should be dismissed.  *FW/PBS*, 493 U.S. at 231 (internal quotation marks omitted).

"Conjectural or hypothetical allegations do not suffice to confer standing." *Ash Grove Tex., L.P.* v. *City of Dallas*, No. 3:08-cv-2114-O, 2009 WL 3270821, at *5 (N.D. Tex. Oct. 9, 2009).  Plaintiffs "cannot rely on . . . speculative inferences . . . to connect [Stanford Financial's purported] injury to the challenged actions of the defendant." *DaimlerChrysler*, 547 U.S. at 346 (internal quotation marks omitted).  Alleged injuries that depend on decisions of third parties not before the Court — such as Plaintiffs' speculation about the potential course the SEC's investigation would have taken but for Sjoblom's letters — are "too conjectural or hypothetical

to confer standing[.]" *Little* v. *KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

In *Little*, for example, the Fifth Circuit affirmed dismissal on the pleadings of a class action complaint against KPMG LLP, brought by competing accounting firms, alleging that KPMG unlawfully practiced public accountancy in Texas because one KPMG partner lacked a required license. Reviewing *de novo*, the Court of Appeals found the competitors' claim of injury — that KPMG's clients may have sought to replace it, may have done so by selecting one or more of the plaintiff firms, and may have paid such firms the same amount they paid KPMG — to be unduly speculative because it "depends on several layers of decisions by third parties." 575 F.3d at 540-41. The Court of Appeals thus concluded that "the competitors' claim of injury is too speculative to confer Article III standing." *Id*. at 535.

Here, Plaintiffs' allegations are insufficient to confer standing for at least two reasons.

*First*, as discussed above, Plaintiffs claim they were injured because Sjoblom's September and October 2005 letters supposedly "help[ed] Stanford Financial thwart an active SEC investigation" (Comp. ¶ 268), and thereby indirectly "perpetuate[d]" the alleged Ponzi scheme (*id*. ¶ 94 (quotation omitted)). Such a theory of causation is founded on potential decisions by third parties, including the SEC, and is therefore "too speculative" to confer standing. *Little*, 575 F.3d at 535. Indeed, as also discussed above, the inference on which Plaintiffs' standing depends — that the SEC would have ended the alleged fraud but for Sjoblom's 2005 letters — is not only speculative, but contrary to facts affirmatively pled in the Complaint and established by the public record upon which the Complaint relies.

*Second*, Plaintiffs also fail to establish standing because they do not allege any injury at all to Stanford Financial that can be attributed to Chadbourne (through Sjoblom). To the contrary, Plaintiffs allege that Sjoblom's assertion of jurisdictional defenses to the SEC on behalf

of Stanford Financial allowed Stanford Financial to "continue receiving economic benefits from the fraud." (*Id.* ¶ 94 (quotation omitted).)

As the Seventh Circuit Court of Appeals has explained, Ponzi schemes typically consist of two phases: a "sales" phase and an "embezzlement" phase. *Knauer* v. *Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 233 (7th Cir. 2003). In the "sales" phase, "the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits." *Id.* The Ponzi entities "are not injured" through the sales phase, which "result[s] only in the fattening of the companies' coffers." *Id.* at 234. In the "embezzlement" phase, however, the Ponzi schemer "depletes the Ponzi entity of resources" by diverting them to himself or "appropriating large sums of money." *Id.* at 233.

Plaintiffs' allegations relate *only* to the sales phase, in which the alleged Ponzi scheme "lure[d] investor money *into* Stanford Financial." (Comp. ¶ 62 (emphasis added).) The Complaint alleges that Sjoblom's legal arguments in 2005 were meant to "perpetuate" the Ponzi scheme, so that Stanford Financial could "continue receiving economic benefits from the fraud." (*Id.* ¶ 94 (quotation omitted).) Moreover, according to Plaintiffs, the plan worked: Stanford Financial *sold* "roughly *$2 billion* of additional CDs" between 2007 and 2009. (*Id.* ¶ 178 (emphasis in original).) On these allegations, Sjoblom's conduct while at Chadbourne "resulted only in the fattening of the companies' coffers." *Knauer*, 348 F.3d at 234. It did not cause any injury for which *Stanford Financial* (represented by the Receiver) could recover. *Id.*[19]

Plaintiffs also allege that, after "lur[ing] investor money into Stanford Financial," Allen Stanford and his co-conspirators "stole billions of dollars in assets from Stanford Financial

---

[19] Whether investors suffered losses as a result of Sjoblom's conduct — which the Complaint also fails to establish with any factual allegations — is irrelevant to this action. The Receiver "may pursue only claims that belong to the receivership estate." *Janvey* v. *Adams & Reese, LLP*, No. 3:12-cv-0495-N (N.D. Tex. Sept. 11, 2013) (Godbey, J.) (ORDER) (ECF No. 58) ("*Adams & Reese* Order"), at 8.

companies for their own benefit." (*Id.* ¶ 62; *see also id.* ¶ 66.)  But they do not allege any facts connecting Sjoblom's legal work for Stanford Financial to that theft (*i.e.*, the embezzlement phase).  Among other things, Plaintiffs do not allege that Sjoblom had any knowledge that Stanford was stealing money from Stanford Financial.  Nor do they allege that Sjoblom agreed to assist or did anything to assist Stanford in that effort.  Nor do they allege that Sjoblom (or Chadbourne) received or benefited from the stolen funds.  Because Plaintiffs fail to allege facts establishing that Sjoblom's conduct as a Chadbourne partner caused injury to Stanford Financial, they lack standing, and their claims should be dismissed.

> **2.     *Plaintiffs Fail to Allege Facts Showing that Stanford Financial's Alleged Injuries Were Caused by Any Conduct by Sjoblom While at Chadbourne.***

Even if Plaintiffs' allegations regarding causation were sufficient to clear the hurdle of standing — and they are not — they would still fail to adequately plead an essential element common to all their claims against Chadbourne:  injury to Stanford Financial that was proximately caused by Chadbourne, vicariously or directly.

The New York Court of Appeals, the state's highest court, defines "proximate cause" as a "cause that directly produces an event and without which the event would not have occurred…." *Giuffrida* v. *Citibank Corp.*, 100 N.Y.2d 72, 80 (2003).  This causal connection may be severed where the acts of an independent party intervene between the defendant's conduct and the plaintiff's injury:

> In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [conduct.]  If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus.

*Derdiarian* v. *Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980).  The Court of Appeals has observed that "the question of legal cause may be decided as a matter of law" in cases that

"involve independent intervening acts which operate upon but do not flow from the original negligence." *Id*.  Accordingly, "liability may not be imposed upon a party who merely furnishes the condition or occasion for the occurrence of the event but is not one of its causes." *Ely* v. *Pierce*, 755 N.Y.S.2d 250, 251 (App. Div. 2003).

Plaintiffs' apparent theory of causation — that, but for Sjoblom's 2005 letters, the SEC would have curtailed the alleged Ponzi scheme in 2005 or 2006 — is founded upon a regulator taking affirmative actions to remove a risk, and is therefore impermissibly speculative.  *See Hughes* v. *Boston Scientific Corp.*, 631 F.3d 762, 776 n.12 (5th Cir. 2011) (rejecting as "entirely speculative" the theory that "had Boston Scientific properly reported all burns . . . the FDA would have taken some regulatory action . . . including but not limited to removing the HTA from the market") (applying Mississippi law).  Plaintiffs' theory also amounts, at best, to a claim that Sjoblom, by providing legal services in 2005 and 2006, enabled Stanford Financial to continue obtaining funds from its victims, thereby "furnish[ing] the conditions or occasion" that made Allen Stanford's alleged misappropriation possible, *see Ely*, 755 N.Y.S.2d at 251, but not constituting one of its causes.  The misappropriation by Stanford was not set in motion by Sjoblom or Chadbourne, nor was it a "normal or foreseeable" consequence flowing from Sjoblom's provision of routine legal services.  Rather, Allen Stanford's misappropriation from Stanford Financial was an "extraordinary" event, *see Derdiarian*, 51 N.Y.2d at 315, breaking any claimed causal connection between Chadbourne's alleged actions and Stanford Financial's alleged injury.  Accordingly, all claims against Chadbourne should be dismissed for failure to plead causation.

### C.      Plaintiffs Fail to State a Legal Malpractice Claim Against Chadbourne.

To survive dismissal, a plaintiff alleging malpractice must plead facts sufficient to demonstrate "that the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession and that the attorney's breach of this duty proximately caused plaintiff to sustain actual and ascertainable damages." *Rudolf* v. *Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007) (internal quotation marks and citation omitted).  Furthermore, with respect to the "proximate cause" element of this test, New York requires that "a plaintiff must demonstrate that the plaintiff would have succeeded on the merits of the underlying action *but for* the attorney's negligence." *Davis* v. *Klein*, 88 N.Y.2d 1008, 1009-10 (1996) (emphasis added).  Moreover, apart from pleading facts showing that a different factual outcome would have obtained but for the alleged malpractice (*i.e.*, "transaction causation"), a malpractice plaintiff must also plead facts showing that that the claimed difference in outcome was the cause of the plaintiff's loss (*i.e.*, "loss causation").  *Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 2002) (to establish causation in claims for fraud, negligent misrepresentation and breach of fiduciary duty, plaintiff "must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)"); *Mizrahi* v. *Adler*, No. 650802/2010, 2014 N.Y. Misc. LEXIS 2934, at *14-15 (Sup. Ct. June 30, 2014) (dismissing legal malpractice claim where plaintiff pled transaction causation but failed to plead loss causation).

Here, the Complaint does not adequately plead these elements of Plaintiffs' legal malpractice claim (Count 1) against Chadbourne.

### 1.      *The Complaint Does Not Plead Breach of a Duty to Stanford Financial.*

The Complaint does not plead facts demonstrating that Sjoblom breached a legally

cognizable duty owed to Stanford Financial while he was at Chadbourne.  Indeed, Plaintiffs do

not allege that Sjoblom failed to render competent counsel to his client during that time; rather,

their allegation is founded on the premise that Sjoblom was obligated, as a lawyer for Stanford

Financial, to piece together the alleged Ponzi scheme and refrain from any communications with

the SEC that would hinder its investigation.  For well-established reasons of public policy and

professional ethics, however, attorneys have no duty to refrain from providing representation to a

client — even one the attorney believes may be guilty.  In *Reneker II*, for example, this Court

applied Texas law and dismissed — as not "plausible on its face" — a substantially similar

malpractice claim asserted by an SEC receiver.  2009 WL 3365616, at *4.  The receiver there

had sued attorneys for AmeriFirst Funding, a company accused of violating numerous state and

federal securities laws, for their representation of AmeriFirst in connection with an investigation

by the Texas State Securities Board ("TSSB").  The receiver alleged, among other things, that

the attorneys "improperly responded to securities authorities after receiving an inquiry regarding

the AmeriFirst Clients; gave false information to the authorities; failed to correct this false

information upon later learning of the error; and failed to take action to stop the AmeriFirst

Clients' actions," *id*., actions that allegedly "forestalled the TSSB investigation, thus allowing

the AmeriFirst Clients to continue their illegal . . . activity[.]"  *Reneker I*, 2009 WL 804134, at *2

(internal quotation marks omitted).  In dismissing the claim, the court recited precedent holding

that an attorney owes no "legal duty to reveal his client's illegal actions that might harm third

parties…."  *Reneker II*, 2009 WL 3365616, at *4 & n.4.

Plaintiffs' allegations regarding Sjoblom's conduct in 2005 and 2006 are

indistinguishable from those found insufficient to state a claim in *Reneker*.  Plaintiffs assert that

Sjoblom, in the summer of 2005, joined a "conspiracy to obstruct the SEC's investigation" and

had a "meeting of the minds with Allen Stanford" to do so, that he improperly responded to the

SEC's investigation and provided false information to the SEC, and that the effect of his legal

services was to forestall the SEC investigation, thus allowing Stanford Financial to continue its

illegal activity.  (Comp. ¶¶ 95, 115, 120, 124-31, 265.)  But they allege no facts that would

suggest the alleged conduct was part of a "conspiracy," as opposed to simply carrying out the

instructions of the very client who is now suing for malpractice — no facts that would

distinguish the conduct alleged on the part of Sjoblom from any action by any lawyer who

asserts defenses on behalf of a client.  As in *Reneker*, Plaintiffs' allegations do not set forth a

breach of any duty owed to Stanford Financial and thus cannot support a legal malpractice claim.

Nor can Plaintiffs plausibly allege that Sjoblom acted "contrary to [his] clients'

directions."  *Reneker II*, 2009 WL 3365616, at *5.  Indeed, they allege the opposite:  that

Sjoblom was "specifically retained" to help Stanford Financial shield itself from the SEC

investigation (Comp. ¶ 268) and was the "perfect fit for Stanford Financial" (*id.* ¶ 97).  Further,

they allege that Sjoblom's legal services came at direction of, and in direct consultation with, his

clients, including Allen Stanford and in-house counsel.  (*Id.* ¶¶ 98, 124-25, 133, 136.)[20]

The theory that Sjoblom committed legal malpractice by defending Stanford Financial

also fails because the Complaint provides no basis to infer that Sjoblom knew of the alleged

Ponzi scheme — let alone any alleged misappropriation from Stanford Financial — in 2005 or

2006.  In a carefully worded paragraph, Plaintiffs allege that during this span Sjoblom knew or

should have known that Stanford Financial was "committing securities fraud" and, "*[a]t worst*,"

---

[20]         In a subsequent decision on a motion to dismiss the receiver's second amended complaint, the *Reneker* court determined that the receiver had remedied the deficiencies in his prior complaint (which was the subject of *Reneker II*) by alleging "in specific detail that the . . . Clients were unaware of the illegality of their actions and were honestly seeking legal advice on how to lawfully offer their securities for sale."  *Reneker* v. *Offill*, No. 3:08-cv-1394-D, 2010 WL 1541350, at *6 (N.D. Tex. Apr. 19, 2010).  The court concluded, on the basis of such allegations, that the clients plausibly would have "avoided violating certain securities laws" upon receipt of different legal advice.  *Id.*  Plaintiffs here do not (and cannot in good faith) advance any similar allegations.

knew of the alleged Ponzi scheme.  (*Id.* ¶ 114 (emphasis in original)).  They do not affirmatively

allege Sjoblom's knowledge of the alleged Ponzi scheme because no facts support such an

allegation.  As an example, Plaintiffs place great emphasis on Sjoblom's August 2005 meeting

with Leroy King and, based upon that meeting, infer that Sjoblom knew or should have known of

Stanford Financial's close relationship with the Antiguan FSRC.  (*Id.* ¶¶ 110-11.)  But Plaintiffs

offer no basis from which to infer that knowledge of a close relationship with a regulator

amounts to knowledge that a Ponzi scheme was ongoing.[21]

> ### *2.      The Complaint Does Not Plead Causation.*

As discussed above, all of Plaintiffs' claims against Chadbourne fail, because Plaintiffs

have not adequately pled proximate cause.  *See supra* Section III.B.2.  But even if the Complaint

satisfied the general standards for proximate cause — and it does not — it still fails the more

stringent requirements of "but for" causation and loss causation for a legal malpractice claim.

There is nothing in the Complaint suggesting that the Stanford Ponzi scheme would have stopped

any earlier than 2009 "but for" Sjoblom's two letters to the SEC.  And even if Plaintiffs had

adequately pled that Sjoblom's conduct enabled Stanford Financial to continue defrauding

investors, they have not pled any facts indicating that the defrauding of investors caused any loss

to Stanford Financial.  Nor is anything alleged to suggest that Stanford Financial could have

recovered from its wrongdoing management if the Ponzi scheme had shut down in 2006 — and

Plaintiffs' own allegations make clear that any assets held by Stanford Financial at that time

were obtained by fraud and therefore would have been subject to claims by defrauded investors

in any event.  In short, as far as Plaintiffs' allegations are concerned, Stanford Financial would

have been insolvent if its fraud had been shut down in 2006, just as it was when the Receiver was

---

[21]      The Complaint does not allege that Sjoblom knew that Stanford Financial was misrepresenting the liquidity of the SIBL CDs until 2007 — after Sjoblom left Chadbourne.  (Comp. ¶¶ 144, 172-74.)

appointed in 2009.

### D. The Complaint Fails to State Viable Aiding and Abetting Claims Against Chadbourne.

To sufficiently plead an aiding and abetting claim under New York law, Plaintiffs must allege "the existence of the underlying tort, knowledge thereof by the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the tortious act." *Hudson* v. *Delta Kew Holding Corp.*, No. 16425-12, 2014 WL 1924324, at *4 (N.Y. Sup. Ct. Apr. 22, 2014). To meet the "knowledge" prong of this test, plaintiffs must do more than include allegations "of constructive knowledge or recklessness…. Plaintiffs must allege actual knowledge on the part of the defendant," which "requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007). The "substantial assistance" prong exists where "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *UniCredito Italiano SPA* v. *JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003).

All of Plaintiffs' aiding and abetting claims fail as a matter of law because they do not allege facts showing that Chadbourne (and Sjoblom, while there) actually knew about and substantially assisted the alleged Ponzi scheme or any alleged misappropriation of money from Stanford Financial.

Plaintiffs' theory is that Sjoblom aided and abetted various torts committed *against Stanford Financial*. Yet, as discussed above in Section III.C, Plaintiffs do not allege any facts to support a "strong inference" that Sjoblom (while at Chadbourne) actually knew about the alleged misappropriation of money from Stanford Financial — which is the primary violation that

underlies all of Plaintiffs' aiding-and-abetting claims. *Fraternity Fund*, 479 F. Supp. 2d at 367. Plaintiffs recite a laundry list of "red flags about the fraud" that Sjoblom supposedly learned in "due diligence," following his retention by Stanford Financial. (Comp. ¶¶ 99-114.) But none of them relates to a fraud *against* Stanford Financial, and none of them suggests that Sjoblom actually knew of any such fraud. That is why, as discussed, the Complaint stops short of alleging affirmatively that in 2005 and 2006 Sjoblom actually knew that Stanford Financial was running a Ponzi scheme — and does not even try to allege that he actually knew Stanford and others were stealing money from Stanford Financial. (*Cf.* Comp. ¶ 114; *see* Section III.C *supra*.) This failure to allege actual knowledge of a primary violation against Stanford Financial is fatal to all of Plaintiffs' aiding and abetting claims.

Equally, and independently, fatal is Plaintiffs' failure to allege substantial assistance. As discussed in Section III.B above, Plaintiffs have not alleged sufficient facts to establish that Sjoblom, while he was at Chadbourne, proximately caused any harm to Stanford Financial. Even if they had alleged such facts, there is no basis to infer from Sjoblom's alleged conduct that he did anything to affirmatively assist Stanford (or anyone else) in defrauding or committing any other tortious act against Stanford Financial. In conclusory fashion, Plaintiffs assert that Sjoblom's "legal services and other services assisted a fraudulent scheme that enabled and assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies." (Comp. ¶ 259.) But they have not alleged any "other services" that Sjoblom supposedly provided while he was at Chadbourne. And they have not alleged any facts to connect the legal services that Sjoblom did provide to Stanford Financial — writing two letters to the SEC that asserted jurisdictional defenses on the companies' behalf — to the misappropriation of "billions of dollars" from the companies whose interests he was acting to

defend.  *See* Section III.B, *supra*.  As a matter of law, Sjoblom's alleged conduct while at

Chadbourne thus does not amount to substantial assistance.  *See, e.g.*, *Gregor* v. *Rossi*, 992

N.Y.S.2d 17, 19 (App. Div. 2014) (dismissing aiding and abetting claim because "allegations

that the attorneys prepared merger documents and a shareholder agreement are allegations of

ordinary professional activity, not substantial assistance."); *Learning Annex, L.P.* v. *Blank Rome*

*LLP*, 966 N.Y.S.2d 78, 79 (App. Div. 2013) (holding that defendant attorneys' provision of

"routine legal services to the alleged fraudsters is . . . insufficient to establish a claim for aiding

and abetting fraud"); *Ulico Cas. Co.* v. *Wilson, Elser, Moskowitz, Edelman & Dicker*, 865

N.Y.S.2d 14, 23 (App. Div. 2008) (dismissing aiding and abetting claim against law firm where

it merely "rendered legal advice" during the time period of its client's alleged misconduct and

"did no more than carry out the instructions of its client.").

　　　In addition to failure to plead actual knowledge and failure to plead substantial assistance,

which apply to all of the aiding and abetting claims asserted in the Complaint, Plaintiffs fail to

plead other essential elements of each of those claims, as discussed below.

### 1. Plaintiffs Fail to State a Claim for Aiding and Abetting Breach of Fiduciary Duty.

　　　Plaintiffs assert that the directors and officers of Stanford Financial breached their

fiduciary duties by causing it to engage in unspecified "illegal activity" which "enabled and

assisted Allen Stanford and his [unspecified] co-conspirators in misappropriating billions of

dollars in assets from the Stanford Financial companies."  (Comp. ¶ 257.)  They further assert

that Chadbourne (through Sjoblom) "knowingly or recklessly aided, abetted, or participated in

these breaches of fiduciary duties," and that Chadbourne's participation was "a proximate cause

of actual damages to Stanford Financial, and therefore to the Committee as assignee from the

Receiver."  (*Id.* ¶ 258.)  These assertions are unsupported by any facts put forward in the

Complaint.

To establish this claim, Plaintiffs must allege (i) a breach of a fiduciary duty owed to Plaintiffs, (ii) Chadbourne's "substantial assistance . . . in effecting the breach," and (iii) "resulting damages." *Ulico Cas. Co.*, 865 N.Y.S.2d at 23. Here, the Complaint does not even identify the "directors and officers" of Stanford Financial who supposedly breached their fiduciary duties to the companies, much less explain how Sjoblom's conduct while at Chadbourne assisted in such a breach. (*See* Comp. ¶¶ 257-58.) Moreover, the alleged breach that caused injury to Stanford Financial was "enabl[ing] and assist[ing] Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from the Stanford Financial companies." (*Id.* ¶ 257.) But, as discussed above, the Complaint alleges no facts to suggest that Sjoblom knew of such misappropriation while at Chadbourne or did anything to assist it.

### 2.      *Plaintiffs Fail to State a Claim for Aiding and Abetting a Fraudulent Scheme.*

Plaintiffs assert that Chadbourne (through Sjoblom) provided "legal services" that "assisted a fraudulent scheme," which in turn "enabled and assisted" Allen Stanford's alleged misappropriation. (Comp. ¶ 259.) Presumably these allegations seek to make out a claim for aiding and abetting fraud, but they fail to do so for several reasons.

New York law requires a plaintiff to plead specific facts supporting (i) the "existence of the underlying fraud," (ii) the defendant's "actual knowledge" of the fraud, and (iii) the defendant's "substantial assistance" in advancing the fraud's commission, *Goel* v. *Ramachandran*, 975 N.Y.S.2d 428, 438 (App. Div. 2013) (quotation omitted), and in federal court such facts must be pled in compliance with the heightened standard of Rule 9(b). As discussed, Plaintiffs cannot satisfy the actual knowledge or substantial assistance requirements.

As to the existence of a fraud, Plaintiffs contend that Sjoblom's 2005 letters perpetuated

the scheme through which Stanford Financial defrauded investors, but they fail to allege facts suggesting that Stanford Financial was itself defrauded. *Cf. Kirschner*, 15 N.Y.3d at 468 ("Fraud on behalf of a corporation is not the same thing as fraud against it.") (citation omitted). Because Plaintiffs fail to plead that Sjoblom assisted an underlying fraud against Stanford Financial, they cannot state a claim against Chadbourne for aiding and abetting such a fraud. *See Marketxt Holdings Corp.* v. *Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 396-97 (S.D.N.Y. 2010) (dismissing aiding and abetting fraud claim in part because plaintiffs failed to allege facts constituting an underlying fraud); *Vilar* v. *Rutledge*, 964 N.Y.S.2d 527, 528 (Sup. Ct. 2013) ("Based on the absence of a predicate claim for fraud, plaintiffs' claims of aiding and abetting fraud must also fail.").

### 3. *Aiding and Abetting Fraudulent Transfers Is Not a Valid Cause of Action Under New York Law.*

New York law does not allow claims for aiding and abetting fraudulent transfers. While New York law states that "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors," N.Y. Debt. & Cred. Law § 276, New York does not "recognize a cause of action for fraudulent conveyance against defendants who were neither transferees nor beneficiaries of an allegedly fraudulent transfer." *Marketxt Holdings Corp.*, 693 F. Supp. 2d at 399 n.86; *see also FDIC* v. *Porco*, 75 N.Y.2d 840, 842 (1990) ("Those sections did not, either explicitly or implicitly, create a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance."); *D'Mel & Assocs.* v. *Athco, Inc.*, 963 N.Y.S.2d 65, 67 (App. Div. 2013) (dismissing fraudulent conveyance claim because parties "who were not transferees of either conveyance . . . cannot be held liable . . . unless they benefited from the conveyances") (citation omitted).

New York thus aligns itself with "[t]he majority of courts interpreting state . . . laws . . . [which] have concluded that liability cannot be imposed on non-transferees under aiding and abetting or conspiracy theories." *Magten Asset Mgmt. Corp.* v. *Paul Hastings Janofsky & Walker LLP*, No. 1:04-cv-01256-JJF, 2007 WL 129003, at *3 (D. Del. Jan. 12, 2007) (applying Montana version of UFTA and dismissing fraudulent transfer claims against law firm on the basis that it was not the transferee).  Because Plaintiffs do not allege that Sjoblom (while at Chadbourne) was the transferee or the beneficiary of an allegedly fraudulent transfer, Count 4 of the Complaint should be dismissed.[22]

### 4.  *Plaintiffs Fail to State a Claim for Aiding and Abetting Conversion.*

Plaintiffs contend that Chadbourne (through Sjoblom) "knowingly or recklessly aided, abetted, or participated in [the] misappropriation and conversion of billions of dollars in property" stolen from Stanford Financial.  (Comp. ¶¶ 262-63.)  They seek to hold Chadbourne accountable for those "stolen funds."  (*Id.* ¶ 62.)  These allegations do not establish a claim for aiding and abetting conversion, which — like the rest of the aiding and abetting claims — requires plaintiffs to plead "the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance." *Weshnak* v. *Bank of America, N.A.*, 451 F. App'x 61, 62 (2d Cir. 2012).

In addition to failing to plead actual knowledge and substantial assistance, as discussed above, Plaintiffs have failed to plead a valid underlying claim for conversion.  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Dickinson* v. *Igoni*, 908 N.Y.S.2d 85 (App. Div. 2010).  Here, the allegedly converted property

---

[22]      Texas law similarly does not recognize claims for aiding and abetting a fraudulent transfer.  *See* TEX. BUS. & COM. CODE § 24.009(b); *see also Mack* v. *Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984).

consists only of ambiguously-identified fungible cash — *i.e.*, the "billions of dollars" in "stolen funds" that Allen Stanford allegedly took from Stanford Financial.  (Comp. ¶ 62.)  That is not sufficient.  It is "well settled" that an action for conversion of money cannot stand unless there is an "obligation to return or otherwise treat in a particular manner the specific money in question," and the money can be "described, identified, or segregated in the [same] manner [as] a specific chattel…."  *G.D. Searle & Co.* v. *Medicore Commc'ns, Inc.*, 843 F. Supp. 895, 912 (S.D.N.Y. 1994); *see also Thys* v. *Fortis Secs. LLC*, 903 N.Y.S.2d 368, 369 (App. Div. 2010) (allowing an action for conversion where a specific bank account with a specific sum of money was identified).  Plaintiffs have failed to identify any "specific," identifiable fund that allegedly was converted or "an obligation to return or otherwise treat [that fund] in a particular manner."  Accordingly, the Complaint does not adequately allege the elements of an underlying claim of conversion, thus foreclosing secondary liability for aiding and abetting conversion.

E.   **The Complaint Fails to State a Claim Against Chadbourne for Civil Conspiracy.**

"New York does not recognize civil conspiracy to commit a tort . . . as an independent cause of action.  Accordingly, a claim alleging conspiracy to commit a tort stands or falls with the underlying tort."  *Dickinson* v. *Igoni*, 908 N.Y.S.2d 85, 88 (App. Div. 2010) (citations omitted).  Because, for the reasons set forth above, plaintiffs have failed to plead an underlying tort for which Chadbourne could be held liable, their conspiracy claim fails.

Even if they had pled an underlying tort, Plaintiffs have failed to allege facts establishing a claim for civil conspiracy.  To state such a claim, a plaintiff "must allege an independent actionable tort and four additional elements:  (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) a party's intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Lewis* v. *Rosenfeld*,

45

138 F. Supp. 2d 466, 479, *on reconsideration*, 145 F. Supp. 2d 341 (S.D.N.Y. 2001) (citation

omitted).  With respect to each of these elements, Plaintiffs' allegations fail to meet the basic

requirements of Rule 8, as well as the more demanding standard of Rule 9(b).

*First*, Plaintiffs assert that a conspiratorial "meeting of the minds" occurred among

Sjoblom, Stanford and others in August 2005 (*see* Comp. ¶ 265), but allege *no facts whatsoever*

that would plausibly support this conclusory assertion.  *See Twombly*, 550 U.S. at 554-56

(dismissal is required where "nothing contained in the complaint invests either the action or

inaction alleged with a plausible suggestion of conspiracy," despite "a few stray statements [that]

speak directly of agreement").  As discussed above, in Sections III.C and III.D, the Complaint

alleges no facts whatsoever establishing that Sjoblom knew about and agreed to assist the

perpetuation of the alleged Ponzi scheme, let alone the supposed injury to be accomplished —

"Allen Stanford's and his co-conspirators' misappropriation of billions of dollars in assets from

Stanford Financial companies."  (Comp. ¶ 264.)  That omission is fatal.  Sjoblom could not have

agreed to help conceal a fraud or cause an injury of which he was unaware.  Likewise, Sjoblom

could not have intentionally participated in furthering a plan he did not know about.

*Second*, Plaintiffs have not alleged any facts to show that Chadbourne, through Sjoblom,

engaged in any "independent culpable behavior."  *See Schwartz* v. *Soc'y of New York Hosp.*, 605

N.Y.S.2d 72, 73 (App. Div. 1993).  The Complaint asserts that Defendants took various overt

acts to "further the Stanford Ponzi scheme," including "lying to the SEC about Stanford

Financial . . . and encouraging others to lie, hide documents, and otherwise mislead and deceive

the SEC in an ongoing SEC investigation."  (Comp. ¶ 266.)  But none of those allegations

pertain to Sjoblom's conduct while at Chadbourne.  The only relevant action Sjoblom is alleged

to have taken in this time period was sending letters to the SEC raising legal arguments about

jurisdiction and refusing to voluntarily produce documents in response to the SEC's informal

request. (*Id.* ¶ 125); *see supra* Fact Sections III.A-C. The Complaint does not allege facts to

show that the assertion of jurisdictional defenses in Sjoblom's September and October 2005

letters — defenses that the SEC had already considered on its own and found to have possible

merit (*see supra* Fact Sections II.B) — constituted a "lie" or had the purpose or effect of

"mislead[ing] and deceiv[ing] the SEC," which is well-versed in the scope of its own

jurisdiction. And, whatever pejorative spin Plaintiffs may try to put on it, there is nothing

"independently culpable" about a lawyer's refusal, on behalf of his client, to produce documents

in response to a *voluntary* request for information by the SEC.

    *Finally*, as discussed in Section III.B, Plaintiffs fail to plead facts establishing that

Stanford Financial suffered damages resulting from a conspiracy involving Sjoblom while at

Chadbourne. *See Ely*, 755 N.Y.S.2d at 251; *Derdiarian*, 51 N.Y.2d at 315.

    **F.    The Complaint Fails to State a Claim Against
Chadbourne for Negligent Retention or Supervision.**

    As a final fallback claim in Count 7, Plaintiffs allege that Chadbourne is "directly liable

. . . for negligent retention and supervision of [its] employee Defendant Sjoblom." (Comp. ¶

268.) The Complaint does not include any well-pled allegations concerning the circumstances

through which Chadbourne hired, retained or supervised Sjoblom as employee. Instead the

Complaint focuses exclusively on Sjoblom's alleged misconduct. This facial defect, alone,

warrants dismissal. *See Adams & Reese* Order at 23 n.9 (dismissing negligent supervision claim

against law firm where factual allegations "relate solely to [the principally involved] lawyers'

actions in representing the Stanford Entities").

    Furthermore, "[u]nder New York law, in order to recover damages for injuries sustained

due to an employer's negligence in hiring or retaining an employee, a plaintiff must establish a

duty owed by the defendant employer, a breach of that duty by the defendant employer, and damages proximately caused by the defendant employer's breach." *Monte* v. *Ernst & Young LLP*, 330 F. Supp. 2d 350, 365 (S.D.N.Y. 2004). But in addition, "negligent hiring/retention claims are usually sustained *only where a plaintiff has suffered significant physical injury*." *Id.* (emphasis added); *see also Kaupp* v. *Church*, No. 1:10-cv-07559, 2011 WL 4357492, at *3 (S.D.N.Y. Sept. 19, 2011) ("Almost every case where a New York court has recognized a negligent retention claim involved significant physical injury to the plaintiff."); *Brown* v. *Bronx Cross Cnty. Med. Grp.*, 834 F. Supp. 105, 110 (S.D.N.Y. 1993) ("In order to prove this tort, however, plaintiff must show assault or professional incompetence on the part of the negligently hired and retained employee resulting in personal injury to the plaintiff."). Plaintiffs do not and cannot allege that Sjoblom caused Stanford Financial any physical harm. Accordingly, their claim for negligent retention/supervision should be dismissed.

There are at least three more independent reasons why the negligent retention or supervision claim fails. *First*, a negligent retention or supervision claim is only viable if the employee commits an underlying actionable tort. *Primeau* v. *Town of Amherst*, 757 N.Y.S.2d 201, 203 (App. Div. 2003) (noting that an "underlying requirement in actions for negligent hiring or retention is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person"). For all the reasons discussed above, Plaintiffs have failed to allege that Sjoblom committed any actionable tort against Stanford Financial while he was at Chadbourne. Plaintiffs therefore fail to state a claim for negligent retention or supervision.

*Second*, an employer may be held directly liable for negligently hiring, retaining or supervising an employee only where the employer "knew or should have known of the [employee's] propensity for the conduct which caused the injury." *Schiffer* v. *Sunrise Removal,*

48

*Inc.*, 879 N.Y.S.2d 518, 522 (App. Div. 2009).  Thus, Plaintiffs must advance well-pled allegations that it was foreseeable to Chadbourne that Sjoblom would "harm" Stanford Financial. *See Detone* v. *Bullit Courier Serv., Inc.*, 528 N.Y.S.2d 575, 576 (App. Div. 1988) (noting that a negligent retention claim "lies in [the employer] having placed the employee in a position to cause foreseeable harm" which would "have been spared the injured party had the employer taken reasonable care in making decisions respecting the hiring and retention of his employees"). The Complaint does the opposite, lauding Sjoblom's impressive credentials (Comp. ¶¶ 95, 97) while identifying no red flags of any nature that would have made it foreseeable to Chadbourne that he would cause harm to his client Stanford Financial.  Because the alleged injury was unforeseeable, and because Plaintiffs do not point to any steps that Chadbourne failed to take to prevent it, their negligent retention or supervision claim fails as a matter of law.

*Finally,* for the same reasons set forth in Section III.B above, the Complaint fails to plead any facts to support Plaintiffs' conclusory assertion that Chadbourne's conduct in retaining or supervising Sjoblom was a proximate cause of damages to Stanford Financial.  *Cf. Monte*, 330 F. Supp. 2d at 365.

## CONCLUSION

For the foregoing reasons, Chadbourne respectfully requests that Plaintiffs' Complaint, and all claims against Chadbourne asserted therein, be dismissed with prejudice.

## REQUEST FOR ORAL ARGUMENT

Chadbourne respectfully requests oral argument on its Motion to Dismiss.

Dated:  October 3, 2014

Respectfully submitted,


PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
/s/ Daniel J. Beller
Daniel J. Beller*
   N.Y. Bar No. 1643741
Daniel J. Leffell*
   N.Y. Bar No. 1883776
William B. Michael*
   N.Y. Bar No. 4296356
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990
E-mail:  dbeller@paulweiss.com
E-mail:  dleffell@paulweiss.com
E-mail:  wmichael@paulweiss.com
* Admitted *pro hac vice*

VINSON & ELKINS LLP
/s/ Harry M. Reasoner
Harry M. Reasoner
   TX Bar No. 16642000
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Telephone: (713) 758-2358
Facsimile:  (713) 615-5173
E-mail:  hreasoner@velaw.com

William D. Sims, Jr.
   TX Bar No. 18429500
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Telephone:  (214) 220-7700
Facsimile:  (214) 220-7716
E-mail:  bsims@velaw.com

ATTORNEYS FOR DEFENDANT
CHADBOURNE & PARKE LLP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of October, 2014, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of record, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.


/s/ Daniel J. Beller
Daniel J. Beller