IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | § | |
| AS COURT-APPOINTED RECEIVER FOR | § | |
| THE STANFORD RECEIVERSHIP ESTATE, | § | |
| AND THE OFFICIAL STANFORD | § | |
| INVESTORS COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 3:13-CV-477-N-BG |
| | § | |
| PROSKAUER ROSE LLP, | § | |
| CHADBOURNE & PARKE LLP, | § | |
| THOMAS V. SJOBLOM, AND | § | |
| PABLO M. ALVARADO, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S MOTION TO COMPEL**

This discovery dispute involves requests for production and interrogatories served on

Defendant Pablo M. Alvarado (Alvarado) by Plaintiff Ralph S. Janvey, in his capacity as Court-

Appointed Receiver for the Stanford entities (Receiver).  Alvarado objected to portions of the

Receiver's discovery requests, alleging they are irrelevant, overly broad and unduly burdensome,

and seek documents beyond the scope of permissible discovery.  *See* Pl.'s App. in Support of Mot.

to Compel, at Ex. D (Def.'s Disc. Resp.) (ECF No. 165).  On March 30, 2017, the Receiver filed

the motion to compel now before the court.[1]  ECF No. 165.  Through the motion, the Receiver

---

[1] The Receiver originally filed the motion to compel in *Ralph S. Janvey, Receiver, et al. v. Pablo M. Alvarado, et al.*, 3:10-CV-2584-N (Alvarado Action) (*see* ECF No. 136).  On April 5, 2017, however, the district court entered an order consolidating the Alvarado Action with the instant case, *Ralph S. Janvey, Receiver, et al. v. Proskauer Rose, LLP, et al.*, 3:13-CV-477-N (Proskauer Action).  In that order, the district court ordered the Clerk to transfer the Receiver's motion to compel to the docket for the Proskauer Action. *See* 3:10-CV-2584-N, ECF No. 137; 3:13-CV-477-N, ECF No. 153.  Accordingly, all docket references in this order will be to the docket for the Proskauer Action.

seeks a court order compelling Alvarado to provide further responses and produce certain documents in response to the requests for production and interrogatories. Alvarado filed a response on April 21, 2017 (ECF No. 169), and the Receiver filed his reply May 5, 2017 (ECF No. 174).

The District Court has referred discovery issues such as those raised in the pending motion to the undersigned United States Magistrate Judge, *see* Orders, *In re Stanford Entities Secs. Litig.*, 3:09-MD-2099-N (N.D. Tex. Sept. 24, 2012, and Feb. 13, 2014) (ECF Nos. 30, 50), and the motion is ripe for review. The undersigned has considered the papers filed by the parties and determined that the Receiver's motion should be **GRANTED in part and DENIED in part**.

## I.  Background

In his First Amended Complaint (FAC), the Receiver alleges that for nearly a decade Alvarado served as General Counsel and head of the legal department for all Stanford entities. *See, e.g,* FAC, at ¶¶ 30, 18–21 (ECF No. 155). During this period, the Receiver contends Alvarado received approximately $4.5 million in fraudulently transferred CD proceeds from Stanford. *See* Pl.'s Mot. to Compel, at 1; FAC, at ¶ 3. The Receiver asserts claims against Alvarado for breach of fiduciary duty, fraudulent transfer, and unjust enrichment, and seeks to impose a constructive trust and equitable lien on all fraudulently transferred CD proceeds, as well as any assets purchased with those funds. *See id.* at ¶¶ 132–34, 136, 139, 141.

In an effort to track the disputed funds, the Receiver served the discovery requests at issue herein. Requests for Production numbers 1 through 4 seek financial transaction statements and summaries essentially for any bank account held by Alvarado from the time his employment began with Stanford until February 17, 2010 (one year after Stanford went into receivership). *See* Pl.'s Mot. to Compel, at 11; Pl.'s Reqs. for Prod. Nos. 1–4 (Pl.'s App. in Support, Ex. C at 14–15).

Alvarado objects to the requests, arguing they are overbroad, irrelevant, and not proportional to the needs of the case, and that the Receiver has already obtained the documents to which he is entitled, either directly from Alvarado or through subpoenas served on the bank(s). *See* Def.'s Resp., at 2–5. Alvarado has agreed, however, to produce bank statements for accounts into which Stanford income was deposited at any time from January 1, 2006, through December 31, 2010, as well as statements from other accounts to demonstrate they received no Stanford income deposits. *See* Def.'s Resp., at 5; Letter from Alvarado's counsel to Receiver's counsel, dated 2/23/2017 (Pl.'s App. in Support, Ex. G at 55).[2]

The Receiver also argues that to properly trace the Stanford CD proceeds, he needs discovery as to various tracts of real property Alvarado allegedly acquired with those funds, or that Alvarado owned prior to his relationship with Stanford but for which he may have used such funds to maintain ownership in the property, e.g., satisfying mortgages or other indebtedness. Thus far, the Receiver has identified three properties he alleges Alvarado acquired during his tenure with Stanford: (1) 3539 Royal Palm Avenue, Miami, Florida 33133 (the "Royal Palm Property");[3] (2) 801 Brickell Key Boulevard #1211, Miami, Florida, 33131 (the "Brickell Key Property"); and (3) 2222 Sunset Boulevard, Houston, Texas (the "Sunset Property"). *See* Pl.'s Mot. to Compel, at 3–5. The Receiver further alleges Alvarado paid off an existing $120,000 mortgage on property

---

[2] Alvarado objects to producing any such record prior to 2006 based on a statute of limitations or repose defense. *See* Def.'s Resp., at 5; Pl.'s App. in Support, Ex. G at 55.

[3] The Receiver alleges Alvarado purchased the Royal Palm Property in 2008 for approximately $1.6 million in cash. Pl.'s Mot. to Compel, at 3–4. Alvarado maintains that the purchase money consisted of a wire transfer from a Washington Mutual bank account in the amount of $1,084,000 (the proceeds of which came from the sale of his three Houston properties), and a wire transfer from his BNP Paribus bank account totaling $331,065 (which purportedly came from the inheritance of Claire Guglielmi (Alvarado's wife)). *See* Pl.'s Mot. to Compel, at 5 (citing Def.'s Obj. to the Receiver's Mot. to Extend *Lis Pendens*). Despite these assertions, the Receiver claims (and Alvarado apparently does not dispute) that Alvarado has produced no documentation confirming the source of funds for either wire transfer, or identifying the origin of monies utilized to satisfy the remaining portion of the purchase price ($174,935) over and above the wire transfer amounts. *See id.* at 17–18.

located at 1520 Milford, Houston, Texas, during his employment with Stanford. *Id.* at 20. Request for Production numbers 5 through 9 seek all real estate contracts and closing documents on the foregoing properties, as well as the property located at 1514 Milford Street, Houston, Texas, and "any other real properties, including but not limited to any properties located in Florida, Texas, France, or Colombia." *See* Pl.'s App. in Support, Ex. C at 15.[4] Although Alvarado objected to portions of these requests in his formal response (*see* Def.'s Resp. to Req. for Prod. Nos. 5–9 (Pl.'s App. in Support, Ex. D at 24–26)), he subsequently agreed to produce all real estate contracts and closing documents on each property specifically identified in Interrogatory Number 1, as well as any other real property bought or sold between April 1999 and December 2010. *See* Def.'s Resp. to Interrog. No. 1 (Pl.'s App. in Support, Ex. D at 33–34); Letter from Alvarado's counsel agreeing to the foregoing (Pl.'s App. in Support, Ex. G at 56); *see also* Pl.'s Mot. to Compel, at 7.

Request for Production numbers 10 through 14 seek all financial records reflecting Alvarado's payment of the purchase price, down payment(s), mortgage payment(s), or "any other expenditure of funds to acquire or maintain ownership" of the foregoing properties, as well as any other real property Alvarado purchased, owned, held legal title to, or sold. Pl.'s Req. for Prod. Nos. 10–14 (Pl.'s App. in Support, Ex. C at 15–16). It is unclear, however, based on Alvarado's responses to both the requests for production and the Receiver's motion, what documents he has actually produced or agreed to produce. It appears Alvarado has done the following: (1) agreed to produce all sale, purchase, and closing documents on the properties specifically identified in the requests, including records reflecting payments for same (*see* Def.'s Resp. to Req. for Prod. Nos.

---

[4] The Receiver's requests did not specifically identify the Brickell Key Property, apparently because the Receiver discovered its existence after serving the discovery; however, RFP No. 9 and Alvarado's agreement to produce such records for real property acquired between 1999 and 2010 would cover the Brickell Key Property. *See* Pl.'s Mot. to Compel, at 18 (alleging Alvarado acquired the property during the time he received proceeds from Stanford).

10–14 (Pl.'s App. in Support, Ex. D at 26–28); Def.'s Resp., at 6-7);   (2) objected to producing financial records reflecting payments made to acquire or maintain ownership of any other real property (*see* Def.'s Resp. to Req. for Prod. No. 14 (Pl.'s App. in Support, Ex. D at 28)); and (3) agreed that "records of any such funds expended" to acquire properties identified in Requests for Production numbers 10–14 "would most likely be included in documents [he] has already agreed to produce." Letter (Pl.'s App. in Support, Ex. G at 56). Whatever the current state of Alvarado's production, the Receiver alleges it has fallen short. *See, e.g.*, Pl.'s Mot. to Compel, at 16–19.

Finally, Interrogatory numbers 1 and 2 ask Alvarado to identify all bank accounts held by or in his name or that of his wife, and "all properties you have purchased, owned, held legal title to, or sold," the purchase and sale dates for such property, as well as the source of funds used to acquire the property. *See* Pl.'s Interrog. Nos. 1–2 (Pl.'s App. in Support, Ex. C at 17). As set forth above, it would seem as a practical matter that Alvarado has already agreed to provide much of this information, sans that related to his wife. Alvarado has either produced or agreed to produce bank statements for accounts into which Stanford income was deposited at any time from January 1, 2006, through December 31, 2010, as well as statements from other accounts demonstrating they received no Stanford income deposits. He has also agreed to produce all real estate contracts and closing documents on the four properties specifically identified in the requests (including records reflecting payments for same), as well as any other real property bought or sold between April 1999 and December 2010.

It is against the foregoing backdrop that the court considers the Receiver's motion to compel and reply, as well as Alvarado's response. For the reasons set forth below, the court **GRANTS in part** and **DENIES in part** the Receiver's motion.

## II.   Analysis

### A.   Legal Standard

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv). The rule similarly offers relief for a party's failure to answer an interrogatory. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii). For purposes of Rule 37(a), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). Federal Rule of Civil Procedure 26(e)(1) states that "[a] party . . . who has responded to an interrogatory, [or] request for production . . . must supplement or correct its . . . response: (A) in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." Fed. R. Civ. P. 26(e)(1).

Rule 26 also defines the permissible bounds of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Information must therefore be nonprivileged, relevant, and proportional to the needs of the case to constitute discoverable material. Rule 26 does not require, however, that such information "be admissible in evidence to be discoverable." *Id.* District courts possess wide discretion in defining the scope of discovery in each case. *See Landry v. Air Line Pilots Ass'n Int'l. AFL-CIO*, 901 F.2d 404, 436 (5th Cir. 1990); *Cotton v. Hinton*, 559 F.2d 1326, 1333

6

(5th Cir. 1977). "The moving party bears the burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence." *Abraham v. Alpha Chi Omega*, 271 F.R.D. 556, 559 (N.D. Tex. 2010) (citing *Export Worldwide, Ltd. v. Knight*, 241 F.R.D. 259, 263 (W.D. Tex. 2006)). Once a moving party makes an initial showing of relevance, the party resisting discovery has the burden of demonstrating why the requested discovery is irrelevant, overly broad, or unduly burdensome. *Id.* (citing *Spiegelberg Mfg., Inc. v. Hancock*, No. 3-07-CV-1314-G, 2007 WL 4258246, at *1 (N.D. Tex. Dec. 3, 2007)); *see also Clockwork IP LLC v. Parr Mgmt. LLC*, No. 3:14-CV-3879-N, 2016 WL 3350703, at *3 (N.D. Tex. Mar. 21, 2016). In the discovery context, relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).

To properly analyze relevance within the framework of the Receiver's discovery requests, the court must first examine the law applicable to the parties' claims and defenses. The Receiver has alleged claims against Alvarado under the Texas Uniform Fraudulent Transfer Act (TUFTA) (codified at TEX. BUS. & COM. CODE ANN. § 24.001, *et seq.*) for receipt of fraudulent transfers. Specifically, the Receiver seeks to set aside the alleged fraudulent transfer of CD proceeds from Stanford to Alvarado, and to recover such proceeds or impose a constructive trust on assets purportedly acquired or maintained by Alvarado with the disputed funds. *See, e.g.*, FAC, at ¶¶ 124–34. The Receiver contends that "assets purchased by Alvarado using fraudulently transferred CD proceeds" are property of the Receivership estate and are therefore subject to the Receiver's claims for a constructive trust or equitable lien. *See* FAC, at ¶¶ 136, 139, 141. Alvarado, on the other hand, claims much of the information sought, e.g., that involving

expenditure of funds prior to December 17, 2006, is irrelevant due to statute of limitations or repose

defenses, and that TUFTA either does not authorize the tracing of all expenditures he may have

made involving Stanford CD proceeds, or if it does, such remedies are limited to post judgment

collection efforts. *See, e.g.*, Def.'s Resp., at 3–6.

As noted by the Receiver, "[t]he purpose of TUFTA is to prevent debtors from defrauding

creditors by placing assets beyond their reach." *Servicios Integrados Palazuelos S.A. de C.V. v.*

*Ryerson*, No. A-14-CA-616-SS, 2015 WL 12570882, at *4 (W.D. Tex. Sept. 23, 2015) (citing

*Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.)).  To

prevail on a TUFTA claim, the creditor must "offer evidence addressing the elements of fraudulent

transfer as to each alleged transfer." *Id.* (citing *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d

448, 453 (Tex. App.—Dallas 2012, pet. denied)).  TUFTA provides creditors a variety of remedies,

including avoidance of the transfer, and "an attachment or other provisional remedy against the

asset transferred or other property of the transferee" and "an injunction against further disposition

by the debtor or a transferee, or both, of the asset transferred or of other property . . . ." TEX. BUS.

& COM. CODE ANN. § 24.008(a).

One form of relief sought herein by the Receiver is a constructive trust, which Texas law[5]

provides as an equitable remedy to parties that have been defrauded. *See Burkhart Grob Luft und*

*Raumfahrt GmbH & Co. KG v. E-Sys., Inc.*, 257 F.3d 461, 469 (5th Cir. 2001).  In order to impose

a constructive trust, a plaintiff must:  (1) show actual or constructive fraud; (2) demonstrate unjust

---

[5] The court analyzed Texas law on constructive trusts for two reasons.  First, this court has already applied Texas law in evaluating the sufficiency of the Receiver's TUFTA and unjust enrichment claims (*see* Order Denying Alvarado's Mot. to Dismiss the FAC (ECF No. 158)), and sees no reason to depart from its application for the purpose of resolving the discovery issues raised by the Receiver's motion.  Second, neither party argued for or supplied proof in support of the utilization of another jurisdiction's law on this issue, resulting in a presumption that any such law would be identical to that of Texas. *See Janvey v. Suarez*, 978 F.Supp.2d 685, 693–94 (N.D. Tex. 2013).

enrichment of the wrongdoer; and (3) trace the transferred property to an identifiable res. *Id.* (construing Texas law); *see also Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir. 1980) (explaining that under Texas law, a constructive trust attaches to identifiable property that can be traced back to the original property acquired by fraud).

**B.**   **Alvarado must identify all bank accounts held by him from April 1999 through December 2010, and produce all bank statements for such accounts (RFP Nos. 1–4, Interrog. No. 2)**

Based on applicable law and representations or stipulations made by Alvarado during the discovery process, **the court grants the Receiver's motion to compel as to Request for Production numbers 1, 2, 3, and 4 and Interrogatory number 2 as follows.** Texas law authorizes the Receiver to ask a court to set aside any transfer of CD proceeds fraudulently made between Stanford and Alvarado, as defined under TUFTA, and impose a constructive trust either on those funds or property traceable to such funds. The Receiver seeks the identity of all accounts, and production of their statements, held by Alvarado "from the date [he] first became employed by any Stanford Party until February 17, 2010." *See* Pl.'s Req. for Prod. Nos. 1–4 (Pl.'s App. in Support, Ex. C at 14–15) (requesting such information related to Washington Mutual and BNP Paribus accounts, as well as "any other bank accounts" held by Alvarado during that period). Alvarado objects to the requests on relevance and burdensomeness grounds, arguing such production is not proportional to the needs of the case in that the Receiver already has information related to payments made from Stanford to Alvarado (and has obtained *some* documents directly from the banks), and that any application of a constructive trust is restricted to the Royal Palm Property, thereby limiting relevant account information solely to that transaction. *See* Def.'s Resp., at 3; Def.'s Resp. to Req. for Prod. Nos. 1–4 (Pl.'s App. in Support, Ex. D at 23–24). Alvarado further posits that his *expenditure* (as opposed to *receipt*) of Stanford proceeds is

irrelevant as to the Receiver's TUFTA claim, and that discovery directed to assets acquired through such expenditures constitutes improper or premature post-judgment discovery or remedies. Def.'s Resp., at 4. The court examines these objections, and the Receiver's response to each, below.

Initially, the court notes the following in regard to the overarching question of the account information's relevance to this proceeding. Through the parties' attempts to resolve the discovery disputes at issue herein, the court believes Alvarado has already tacitly acknowledged the Receiver's ability to discover the identity of bank accounts held by him during his tenure with Stanford, as well as the necessity to produce statements related to such accounts—he simply disputes the relevant time frame. Alvarado has either produced or agreed to produce bank statements for accounts into which Stanford income was deposited at any time from January 1, 2006, through December 31, 2010, as well as statements from his other accounts to demonstrate the fact that those accounts received no Stanford income deposits. Letter (Pl.'s App. in Support, Ex. G at 55). Although such records should show Stanford CD *deposits* received by Alvarado, he attempts to draw the line at disclosing statement information that would reveal *expenditures* of these Stanford proceeds. As noted above, Alvarado argues such information is irrelevant to the Receiver's TUFTA claim, and that discovery directed to expenditures of CD proceeds on any asset other than the real property specifically mentioned in the FAC (Royal Palm Property) is overbroad, constitutes post-judgment discovery or remedies, and is prohibited. *See* Def.'s Resp., at 3–4.

Alvarado's initial assessment is correct: under the circumstances of this case, the Receiver should be allowed to conduct discovery for the purpose of tracking the trail of disputed proceeds from Stanford to Alvarado, through records showing deposits into his accounts or verifying that an account received no proceeds. The court also concurs with Alvarado's statement that the Receiver may pursue discovery in support of his constructive trust claim on the Royal Palm

Property (*id.* at 4), i.e., to determine whether Alvarado used Stanford proceeds in acquiring the property. The law does not, however, limit the Receiver to tracking proceed expenditures only to an asset specifically identified in the FAC.

The court first observes that it sees no reason (and Alvarado provides none) for limiting the Receiver to seeking imposition of a constructive trust only on property specifically identified in the FAC. Such an approach, in the court's view, is illogical and would require a creditor to do the impossible—identify (or more accurately guess) in its complaint, prior to discovery, where a party may have transferred proceeds or assets in an attempt to defraud creditors. Instead, the court believes the more appropriate course, as contemplated by Rule 8's notice pleading requirement,[6] is to allow a creditor to provide notice in his complaint that he intends to ask the court for a constructive trust on any funds proven to have been fraudulently transferred, or assets acquired thereby, and allow discovery to determine whether evidence exists to support such a remedy.

As argued by the Receiver, the law applicable to fraudulent transfers supports this conclusion. A creditor attempting to recover fraudulently transferred proceeds must trace those funds in the hands of the transferee.[7] *See, e.g., Wilz v. Flournoy*, 228 S.W.3d 674, 676 (Tex. 2007) (confirming that a "party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered"); *Marineau v. Gen. Am. Life Ins. Co.*, 898 S.W.2d 397, 400 (Tex. App.—Fort Worth 1995, writ denied) (holding that constructive trust imposed due to embezzlement of funds covers property purchased with monies traceable to the fraud). The most logical place for such tracking begins with all bank accounts held by the

---

[6] This court previously rejected Alvarado's attempt to apply the pleading standards of Rule 9(b) (party must "state with particularity the circumstances constituting fraud or mistake") to the Receiver's FAC. *See* Order Denying Alvarado's Mot. to Dismiss the FAC, at 4.

[7] Alvarado concedes as much in his response. *See* Def.'s Resp., at 3.

transferee during the relevant period, and statements for those accounts reflecting whether deposits and/or transfers of such proceeds were made. *See Flournoy v. Wilz*, 201 S.W.3d 833, 837 (Tex. App.—Waco 2006), *rev'd on other grounds*, *Wilz*, 228 S.W.3d 674 (finding that deposit slips and checks associated with transferee's account, showing transferees used funds fraudulently taken from creditor's account to make farm mortgage payments, supported imposition of a constructive trust on transferees' farm).

Alvarado's objections alleging that the Receiver seeks a "blanket" constructive trust, and that Alvarado's expenditure of funds is irrelevant to and not an element of a TUFTA claim, require no different result. Considering the first objection, the court agrees the Receiver is not entitled to a "blanket trust" over all Alvarado's real property simply by pleading the remedy of a constructive trust. Alvarado is also correct in noting that to impose a constructive trust, one element the Receiver must satisfy is tracing the purportedly fraudulently transferred funds to an identifiable res. Def.'s Resp., at 3. The court disagrees, however, that the law limits the Receiver to discovery related *only* to an asset (Royal Palm Property) specifically identified in the FAC and for which the Receiver seeks to impose a constructive trust. The Receiver correctly argues that he has pled for imposition of a constructive trust on *all* assets purchased by Alvarado using the disputed proceeds (*see* FAC, at ¶¶ 132–134, 136, 139, 141), and now seeks the production of records that can verify any such purchases. *See, e.g.*, Pl.'s Mot. to Compel, at 14–15; Pl.'s Reply, at 1–2, 5–7. As noted above, discovery is the logical device that gives all parties the best opportunity to determine and prove where proceeds were spent or transferred and for what purpose.

Turning to the TUFTA objection, the distinction Alvarado attempts to draw between tracing expenditures for the purpose of imposing a constructive trust versus establishing expenditures as an element of a TUFTA claim is one without a difference. Alvarado seems to

contend that identifying specific expenditures of Stanford proceeds unrelated to the Royal Palm Property is not a necessary element in proving a TUFTA claim, and as a result, the court should not permit discovery to track such proceeds. Def.'s Resp., at 4. The Receiver counters by arguing Alvarado's position evinces a misunderstanding of the law applicable to both TUFTA and constructive trusts, and that proper application of discovery rules allows the Receiver to trace expenditure of all proceeds. Pl.'s Reply, at 6–7. The court agrees with the Receiver. While a difference does exist between constructive trust as an equitable remedy, imposed upon property obtained by fraudulent means, and TUFTA as a statutory cause of action for fraudulent transfer, the tracing requirement for applying a constructive trust operates independently of the elements necessary for establishing the fraud itself. In other words, a creditor must prove a fraudulent transfer to either recover under TUFTA or impose a constructive trust—discovery used to trace the proceeds involved in such transfers (including the exchange for other assets) simply provides the means by which the fraudulent transfer can be remedied.[8] The information sought by the Receiver is clearly relevant to his claims asserted herein and proportional to the needs of the case, as it directly impacts issues central to resolution of the parties' claims and defenses.[9]

The court further agrees with the Receiver that the fact a creditor may have obtained some account information from a third party, or could obtain the requested documentation from a third party, does not relieve Alvarado of his obligation to produce the information sought in Request for Production numbers 1 through 4. Partial production of the records sought by the Receiver, limited

---

[8] Alvarado cites no authority for his other proposition that § 24.008 of TUFTA (providing for attachment or other provisional remedies) precludes a creditor from conducting discovery in an attempt to trace funds allegedly transferred fraudulently. The court finds that such an interpretation runs contrary to well-established case law providing for imposition of a constructive trust where a creditor can trace fraudulently transferred proceeds to other assets.

[9] The court notes the other 26(b)(1) factors also weigh substantially in favor of allowing the discovery, including the amount in controversy, the parties' relative access to relevant information, and the parties' respective resources.

only to what Alvarado maintained in his actual possession, does not satisfy Alvarado's obligation to produce everything in his "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). In response to a discovery request, a party has the "obligation to produce any documents . . . that he ha[s] 'the legal right to obtain . . . upon demand.'" *Cadle Co. v. Terrell*, No. 4:01-CV-0399-E, 2002 WL 22075, at *5 (N.D. Tex. Jan. 7, 2002), *aff'd sub nom. In re Terrell*, 46 F. App'x 731 (5th Cir. 2002) (finding that party had duty to disclose financial information in response to discovery request where he and his wife had the legal right to request account records from the bank and statements from credit card company); *see also Hughes v. Wells (In re Wells)*, 426 B.R. 579, 610 (Bankr. N.D. Tex. 2006) (acknowledging federal courts have "universally held" that under Rule 34 documents are deemed within a party's possession, custody, or control where they have the legal right to obtain the documents on demand). Additionally, the location of at least one of Alvarado's banks outside the United States (BNP Paribus, Paris, France) further underscores the need for Alvarado to produce his bank records to the Receiver, rather than requiring the Receiver to attempt to procure such records via international treaty or some other means. Such records are in Alvarado's custody and control, and the court therefore orders their production.

The lone remaining objection on this issue that merits further discussion involves the relevant time frame for production. Other than a conclusory objection stating the four requests are "overly broad because [they] unnecessarily request[] large quantities of private financial information that has no bearing on funds paid" to Alvarado by Stanford, Alvarado's responses raise no specific objection to producing such records prior to January 1, 2006 (beginning point for which Alvarado has agreed to produce the disputed information).[10]   As the party resisting

---

[10] Alvarado did object initially to producing documents *after* Stanford went into receivership (February 2009) and after his Stanford employment ended (February 17, 2010); however, such objections raise no point for the court to consider on not ordering production of documents for a period *prior* to 2006. Additionally, Alvarado has since agreed to produce such information through December 2010.

discovery, Alvarado must show how the discovery sought is overly broad, unduly burdensome, or oppressive, by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request."). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v. City of Dall.*, 303 F.R.D. 466, 490 (N.D. Tex. 2014). Because Alvarado offers little more than a general, conclusory objection to the scope of the request, or the burden imposed thereby, the court finds he has submitted insufficient evidence to support or sustain the objection. Even if the court considers the objection, however, the rationale set forth above, i.e., that a creditor has the right to access records in an attempt to trace proceeds allegedly transferred fraudulently, logically requires that the disclosure period start no later than when a transferee first received proceeds to which the creditor might be entitled. Here, that period began when Alvarado first became employed by Stanford.

Although not raised in his objections to the requests, Alvarado references the statute of limitations in his response to the Receiver's motion (Def.'s Resp., at 5) and the statute of repose in his letter to Receiver's counsel (*see* Letter, dated 2/23/2017 (Pl.'s App. in Support, Ex. G at 55)) as justification for not producing the requested information for the period prior to January 1, 2006. The court finds no specific reference to these objections in Alvarado's discovery responses, thereby resulting in their waiver. *See Orchestratehr, Inc. v. Trombetta*, No. 3:13-cv-2110-P, 2015 WL 11120526, at *9 (N.D. Tex. July 15, 2015) (holding that any objection "newly rais[ed]" in response to motion to compel was "untimely and waived," citing *In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989)). Additionally, consideration of the substance of these objections

requires no different result—neither objection provides an adequate basis for narrowing the relevant period to something other than April 1999 through December 2010. The court notes it has already addressed the limitations issue as raised by Alvarado's motion to dismiss, where he sought dismissal of any TUFTA claims based on transfers occurring prior to December 17, 2006. *See* Order Denying Alvarado's Mot. to Dismiss the FAC, at 8. Finding the defense not yet ripe for determination, this court stated that the issue's resolution required "assessment of factual issues concerning when the alleged transfers occurred . . . ." *Id.* The proper forum for providing the parties an opportunity to develop and evaluate those fact issues is discovery. While either or both statutes may ultimately limit the time span for the Receiver's potential recovery, through summary judgment or trial, the issue remains unresolved during the pretrial phase of the case and constitutes fair game for the discovery process.

Alvarado's concern over the privacy of such records and information is understandable; however, he fails to address this issue in his response to the Receiver's motion. Additionally, such privacy interests do not automatically render the information or records undiscoverable. *See, e.g., Cory v. George Carden Int'l Circus, Inc.*, No. 4-13-CV-760, 2015 WL 11072152, at *2 (E.D. Tex. Dec. 18, 2015) (granting motion to compel production of checking account and credit card statements, determining that "the benefit of the discovery outweighs the burden on Plaintiff's privacy"). Given the relative importance of the financial records to both Alvarado and the Receiver, as explained in more detail below, Alvarado's privacy interests do not trump the parties' need for the information, and the objections are therefore overruled. As to the question of protecting such information during the course of discovery, the court notes that it previously entered a Stipulated Protective Order in the original case (Proskauer Action), submitted by the Receiver and other defendants prior to consolidation with the Alvarado Action. *See* ECF No. 131.

The order's expansive definitions and terms give Alvarado the option, as a disclosing party, to designate as "Confidential" or "Highly Confidential" any material, e.g., financial or banking information, he believes to be private or sensitive, and thereby take advantage of the specific safeguards provided for protecting such information. *See, e.g., id.* at 2.

In summary, for the reasons set forth above, the court finds that these discovery requests are relevant to the claims and defenses asserted by the parties herein and proportional to the needs of the case. The court therefore **ORDERS** that Alvarado fully and completely answer and respond to Request for Production numbers 1, 2, 3, and 4 and Interrogatory number 2 for the time period of April 1999 through December 2010, and serve such answers or responses on Receiver **no later than July 10, 2017.**[11]

**C.**    **Alvarado must produce all real estate contracts and closing documents relating to all real property purchased or owned by Alvarado from April 1999 through December 2010, as well as all financial records showing payment of the purchase price, down payments, mortgage payments, and any other expenditures made to acquire or maintain ownership in all real property purchased or owned by Alvarado from April 1999 through December 2010 (RFP Nos. 5–14, Interrog. No. 1)**

As with the bank account information, the court finds that stipulations made by Alvarado during the discovery process moot many of the issues raised either in Alvarado's discovery responses or the parties' respective motion pleadings. Considering Alvarado's representations, as well as applicable law, with the exception noted below **the court grants the Receiver's motion to compel as to Request for Production numbers 5 through 14 and Interrogatory number 1.**

To summarize, the Receiver seeks real estate contracts and closing documents on any real property ever owned by Alvarado (including that purchased prior to his employment at Stanford) (RFP Nos. 5–9), as well as financial records related to funds expended by Alvarado either in

---

[11] The court orders Alvarado to identify all bank accounts held by Guglielmi or in her name (Interrogatory number 2) for the purpose of demonstrating Alvarado neither deposited nor comingled Stanford proceeds with funds from these accounts.

acquiring the property or maintaining his ownership in the property (RFP Nos. 10–14). In regard to these records, the Receiver specifically asks for information related to "the purchase price, any down payments, any mortgage payments, or any other expenditures of funds to acquire or maintain ownership in" the real property in question. Alvarado raises a number of objections in response.

Initially, the court notes that it appears Alvarado has produced the real estate contracts and closing documents sought for specific parcels of real property identified in Request for Production numbers 5, 6, 7, and 8. Alvarado has objected, however, to request number 9, seeking the same documents relating to his purchase, ownership, and/or sale of *all real property* he has ever owned. *See* Def.'s Resp., at 5–6. He argues such a request is overly broad and not properly limited in time and scope, and is not proportional to the needs of case. *Id.* The court agrees to an extent. For any real property Alvarado owned *and sold* prior to his employment with Stanford, the objection is sustained. Any documents related to real property sold by Alvarado prior to his receipt of Stanford proceeds bear no relevance to the parties' claims or defenses herein.

The court cannot, however, abide Alvarado's objection beyond this point. As the previously cited case law makes clear, a creditor attempting to recover for allegedly fraudulent transfers is permitted to trace such funds to the extent possible. Real estate contracts and closing documents reflecting the purchase, ownership, and/or subsequent sale of real property acquired by Alvarado *during his tenure* with Stanford constitute the essence of what a creditor such as the Receiver would need to review to aid in determining whether Alvarado used CD proceeds to acquire or maintain ownership in such property. The court similarly finds that Alvarado should also produce such documents related to real property acquired prior to April 1999 but that he still owned during his time with Stanford. Although the acquisition documents (and the initial pre-Stanford expenditures they represent) would by necessity not involve Stanford proceeds, they

could nevertheless contain information showing loan amounts, projected mortgage payments, estimated property taxes, etc., for which Stanford proceeds may have been used during the relevant time period to maintain ownership of the asset.

For these same reasons, Alvarado must also produce his financial records reflecting actual expenditures between April 1999 and December 2010 for purchase price, down payments, mortgage payments, property taxes, and other similar payments made to acquire or maintain ownership in real property he owned during that period. Such records are necessary for both the Receiver and Alvarado—in regard to a constructive trust, once a creditor tracks fraudulent funds to a specific asset, the burden shifts to the transferee to establish that such payments were actually made with his funds rather than those allegedly transferred fraudulently. *See, e.g., Flournoy*, 201 S.W.3d at 837 (recognizing that "'wrong-doer' bears the burden of proving that his funds paid for the property 'in whole or in part'"); *Marineau*, 898 S.W.2d at 400 (finding that where property is purchased with funds from account containing both embezzled funds and funds belonging to wrongdoer, property is subject to a constructive trust unless wrongdoer can prove property was purchased with his funds); *Graham v. Turner*, 472 S.W.2d 831, 840 (Tex. Civ. App.—Waco 1971, no writ) (same).

Alvarado seems to acknowledge the foregoing, at least in principle, in his attorney's letter to Receiver's counsel discussing the discovery dispute. *See* Letter (Pl.'s App. in Support, Ex. G at 55) (recognizing relevance of funds expended on the Royal Palm Property in regard to claim of constructive trust, and stating Alvarado's willingness to produce bank statements for accounts into which Stanford proceeds were "at any time deposited," as well as bank statements for other accounts "to show that no Stanford funds" were deposited). He balks, however, at producing financial records involving what he claims to be non-Stanford proceed expenditures made on the

real property in question.  As to this case's ultimate resolution, Alvarado may be correct—the vast majority of his real estate holdings may have derived no financial support or benefit from Stanford proceeds.  For example, Alvarado maintains the purchase money for his Royal Palm Property consisted of a wire transfer from a Washington Mutual bank account in the amount of $1,084,000 (the proceeds of which came from the sale of three Houston properties), and a wire transfer from his BNP Paribus bank account totaling $331,065 (which purportedly came from his wife's inheritance).  *See* Pl.'s Mot. to Compel, at 5 (citing Def.'s Obj. to the Receiver's Mot. to Extend *Lis Pendens*).

The Receiver is not required, however, to simply accept such assertions at face value.  The Receiver claims (and Alvarado apparently does not dispute) that Alvarado has produced no documentation confirming the source of funds for either wire transfer, or identifying the origin of monies utilized to satisfy the remaining portion of the purchase price ($174,935) over and above the two wire transfer amounts.  Further confounding the issue is the Receiver's assertion that documents produced by Alvarado show he paid off existing mortgages on two of the three Houston properties sold for acquiring the Royal Palm Property (2222 Sunset and 1520 Milford) *during his employment with Stanford. See, e.g.*, Pl.'s Mot. to Compel, at 5 n.3, 8, 17, 20.  Under the authority discussed above, the court finds that at this stage of the case the parties must be allowed to engage in appropriate discovery to determine whether Alvarado used any CD proceeds to acquire real property, or satisfy mortgage, tax, or similar obligations related to real property, owned by Alvarado during his tenure with Stanford.

The court also briefly addresses Alvarado's vagueness objection in these requests.  In his responses to Request for Production numbers 10 through 14, Alvarado objects to the Receiver seeking records relating to the expenditure of any "funds to . . . *maintain ownership* of" the real

property in question, on the grounds that such requests are "vague and do[] not describe a document or category of documents with sufficient particularity." *See* Pl.'s App. in Support, Ex. D at 26–28 (emphasis added). As the party resisting discovery, Alvarado bears the burden of demonstrating specifically how the request is objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990); *see also Heller*, 303 F.R.D. at 491 (holding that party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity). Alvarado waives any such objections if, in his response to the Receiver's motion to compel, he fails to "urge and argue in support of his objections . . . ." *Jackson v. Stevens Transport, Inc.*, No. 3:14-cv-1416-M, 2015 WL 11019131, at *1 (N.D. Tex. June 17, 2015). The court finds no argument or briefing in Alvarado's response to the motion to compel addressing this specific objection, and therefore concludes he has waived the objection.[12]

To the extent he has not already done so, the court **ORDERS** Alvarado to fully and completely answer and respond to Request for Production numbers 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14 and Interrogatory number 1 for the time period of April 1999 through December 2010, and serve such answers or responses on the Receiver **no later than July 10, 2017.** Specifically, Alvarado must produce all real estate contracts and closing documents relating to all real property

---

[12] Alternatively, the court notes that in responding to discovery, parties "should exercise reason and common sense to attribute ordinary definitions to terms and phrases" used in the discovery. *Heller*, 303 F.R.D. at 491; *see also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 618–19 (D. Colo. 2007) (holding that parties have an obligation to construe discovery requests in a reasonable manner, rather than straining to find ambiguity). Despite an assertion to the contrary in the objection, Alvarado's counsel subsequently agreed the phrase "maintain ownership of" included records relating to property tax payments, and that Alvarado would "produce property tax payments to the extent they are in his possession . . . ." Letter (Pl.'s App. in Support, Ex. G at 56). Even considering the substance of Alvarado's objection, the court believes such records would be included within a reasonable construction of the phrase. As found by the Texas court in *Wilz*, mortgage payments constitute fair game for a creditor attempting to impose a constructive trust based on fraudulently transferred proceeds. Because mortgage payments consist of principle and interest, and typically include sums paid into escrow for taxes and insurance, the court finds that a reasonable construction of the term "maintain ownership of" would necessarily include tax and insurance payments on the real property in question.

purchased or owned by Alvarado from April 1999 through December 2010 (including the Brickell Key Property), as well as all financial records showing payment of the purchase price, down payments, mortgage payments, and any other expenditures made to acquire or maintain ownership of all real property owned by Alvarado during that period.[13]   Alvarado is not required to produce any of the foregoing information on real property he owned and sold prior to April 1999.

### III.    Conclusion

For the reasons set forth above, the court **GRANTS in part and DENIES in part** the Receiver's Motion to Compel Further Responses and the Production of Documents.

**SO ORDERED.**

Dated: June **19**, 2017

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] While such production would necessarily include records evidencing payments purportedly made from Guglielmi's inheritance, the Receiver apparently does not seek, and in any event the court does not order, the en masse production of Guglielmi's inheritance records.