UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
        :

RALPH S. JANVEY, IN HIS CAPACITY    :
AS COURT-APPOINTED RECEIVER FOR   :
THE STANFORD RECEIVERSHIP     :
ESTATE, AND THE OFFICIAL      :
STANFORD INVESTORS COMMITTEE,    :
        :
      *Plaintiffs*,    :
        :
- against -        :
        :
        :
PROSKAUER ROSE, LLP,     :
CHADBOURNE & PARKE, LLP, AND   :
THOMAS V. SJOBLOM,     :
        :
      *Defendants*.    :
        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 3:13-cv-00477-N
Hon. David C. Godbey

**ORAL ARGUMENT
REQUESTED**

---

### DEFENDANT PROSKAUER ROSE LLP'S BRIEF
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Neil R. Burger
Bruce W. Collins
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333
E-mail:  nburger@ccsb.com

James P. Rouhandeh*
Daniel J. Schwartz*
Craig M. Reiser*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
E-mail:  rouhandeh@davispolk.com
* admitted *pro hac vice*

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................iii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND .............................................................................................................. 4

I.     Factual Background ............................................................................................... 4

        A.     The SEC Conducts Numerous Inquiries of
               Stanford Financial Between 1997 and 2005 ........................................... 5

        B.     Stanford Financial Hires Mr. Sjoblom and Chadbourne ....................... 6

        C.     Mr. Sjoblom's Initial Communications with
               Stanford Financial While at Chadbourne............................................... 8

        D.     Mr. Sjoblom's Initial Communications with the SEC
               in 2005 While at Chadbourne .............................................................. 11

        E.     Mr. Sjoblom Continues Representing Stanford Financial
               After Joining Proskauer in 2006 ......................................................... 13

        F.     The SEC Issues a Formal Order of Investigation and Subpoenas to Which
               Stanford Financial Responds ............................................................... 14

        G.     The SEC Revives Its Stanford Financial
               Investigation in December 2008 .......................................................... 18

        H.     Mr. Sjoblom Learns for the First Time in February 2009
               That Stanford Financial Is a Fraud...................................................... 19

II.    The Actions Against Proskauer ......................................................................... 21

        A.     Plaintiff's Improper Suit in the District of Columbia ......................... 22

        B.     The Receiver and OSIC Have Now Abandoned the Arguments They
               Employed to Survive Proskauer's Motion to Dismiss......................... 22

ARGUMENT.................................................................................................................. 24

I.     Plaintiff's Claims Are Barred Under New York's *In Pari Delicto* Doctrine ................ 25

II.    There Is No Evidence of Any Damages Caused by Proskauer....................... 26

III.     There Is No Evidence Proskauer Knew of, or Intended to Aid and Abet,
         Breaches of Fiduciary Duty or Fraud.................................................................................29

         A.       There Is No Evidence Mr. Sjoblom Had Actual
                  Knowledge of Stanford Financial's Ponzi Scheme,
                  Much Less That He Intended to Assist It.............................................................30

         B.       There Is No Evidence Mr. Sjoblom Had Actual Knowledge of,
                  or Intent to Assist, Individual Breaches of Fiduciary Duty or Misconduct
                  by Stanford Financial Employees .......................................................................35

IV.      The Undisputed Record Demonstrates that Proskauer Did Not Substantially Assist Any
         Breach of Fiduciary Duties or Fraud ................................................................................39

         A.       Mr. Sjoblom's Conduct as an Attorney Representing His Clients Cannot
                  Constitute "Substantial Assistance"...................................................................40

         B.       Plaintiff Cannot Show that Proskauer Proximately
                  Prolonged Stanford Financial's Fraud Because the SEC Believed Stanford
                  Financial Was Engaged in a Fraud or
                  Ponzi Scheme and Chose Not to Act ..................................................................41

V.       Chapter 33 Bars Plaintiff's Claims as a Matter of Law ...................................................45

         A.       The Receiver, OSIC, and Stanford Financial Are Each "Claimants" Under
                  Chapter 33 ..........................................................................................................47

         B.       The Undisputed Evidence Proves that Stanford Financial
                  Is More than Fifty Percent Responsible for the Harm for
                  Which Relief Is Sought.......................................................................................48

CONCLUSION...............................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

Abrams v. McGuireWoods, L.L.P.,
518 B.R. 491 (N.D. Ind. 2014) ........................................................ 40

In re Agape Litig.,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) .............................................. 39

Arceneaux v. Pinnacle Entm't, Inc.,
523 S.W.3d 746 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ..................................46, 47

Art Capital Grp., LLC v. Neuhaus,
896 N.Y.S.2d 35 (App. Div. 2010) .................................................. 41

Austin v. Kroger Tex., L.P.,
465 S.W.3d 193 (Tex. 2015) ...........................................................47

Barbarito v. Zahavi,
968 N.Y.S.2d 422 (App. Div. 2013) ................................................ 40

Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,
550 F.3d 465 (5th Cir. 2008) ........................................................... 50

Cantey Hanger, L.L.P. v. Byrd,
467 S.W.3d 477 (Tex. 2015) ........................................................... 40

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ......................................................... 24, 25, 29

Chem-Age Indus., Inc. v. Glover,
652 N.W.2d 756 (S.D. 2002) ........................................................... 40

Crescendo Invs., Inc. v. Brice,
61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ................................. 39

Cromer Fin. Ltd. v. Berger,
137 F. Supp. 2d 452 (S.D.N.Y. 2001) .......................................... 39, 45

Crosstex N. Tex. Pipeline, L.P. v. Gardiner,
505 S.W.3d 580 (Tex. 2016) ........................................................... 30

CRT Invs., Ltd. v. BDO Seidman, LLP,
925 N.Y.S.2d 439 (App. Div. 2011) ................................................ 40

Dugger v. Arredondo,
408 S.W.3d 825 (Tex. 2013) ........................................................... 50

El Camino Res., LTD. v. Huntington Nat'l Bank,
   722 F. Supp. 2d 875 (W.D. Mich. 2010), aff'd,
   712 F.3d 917 (6th Cir. 2013) ......................................................................... 33, 40

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
   No. CIV A H-01-3624, 2006 WL 3716669 (S.D. Tex. Dec. 12, 2006), aff'd,
   535 F.3d 325 (5th Cir. 2008) .............................................................................. 24

Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,
   51 S.W.3d 573 (Tex. 2001) ................................................................................ 29

Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC,
   323 S.W.3d 224 (Tex. App.—Dallas 2010, pet. denied) ..................................... 36

F.D.I.C. v. Tex. Real Estate Counselors, Inc.,
   No. A-88-CA-947, 1992 WL 237611 (W.D. Tex. July 20, 1992) ......................... 50

F.F.P. Operating Partners, L.P. v. Duenez,
   237 S.W.3d 680 (Tex. 2007) .............................................................................. 46

Fed. Sav. & Loan Ins. Corp. v. Tex. Real Estate Counselors, Inc.,
   955 F.2d 261 (5th Cir. 1992) ............................................................................. 50

First United Pentecostal Church of Beaumont v. Parker,
   514 S.W.3d 214 (Tex. 2017) ....................................................... 24, 29, 32, 37, 46

Gregor v. Rossi,
   992 N.Y.S.2d 17 (App. Div. 2014) ..................................................................... 40

Hicks v. State,
   372 S.W.3d 649 (Tex. Crim. App. 2012) ............................................................ 30

Highland Crusader Offshore Partners., L.P. v. LifeCare Holdings, Inc.,
   No. 3:08-CV-0102-B, 2008 WL 3925272 (N.D. Tex. Aug. 27, 2008), aff'd,
   377 F. App'x 422 (5th Cir. 2010) ....................................................................... 24

HSA Residential Mortg. Servs. of Tex. v. Casuccio,
   350 F. Supp. 2d 352 (E.D.N.Y. 2003) ................................................................ 25

Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n,
   525 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ....................... 45

Janvey v. Brown,
   767 F.3d 430 (5th Cir. 2014) ............................................................................. 49

Janvey v. Proskauer Rose, LLP,
   59 F. Supp. 3d 1 (D.D.C. 2014) ......................................................................... 22

JCW Elecs., Inc. v. Garza,
   257 S.W.3d 701 (Tex. 2008) .............................................................................. 48

Jones v. Wells Fargo Bank, N.A.,
   666 F.3d 955 (5th Cir. 2012) ............................................. 50

Juhl v. Airington,
   936 S.W.2d 640 (Tex. 1996) .............................. 29, 31, 34, 38

Krim v. BancTexas Grp., Inc.,
   989 F.2d 1435 (5th Cir. 1993) ............................................28

Kruegel v. Murphy,
   126 S.W. 343 (Tex. Civ. App.—Dallas 1910, writ ref'd) ..................... 41

Legacy Separators LLC v. Halliburton Energy Servs. Inc.,
   No. 4:14-CV-2081, 2016 WL 4386130 (S.D. Tex. Aug. 16, 2016) ....................................... 46

Lerner v. Fleet Bank, N.A.,
   459 F.3d 273 (2d Cir. 2006) ............................................. 30, 33

MCI Sales & Serv., Inc. v. Hinton ,
   329 S.W.3d 475 (Tex. 2010) ............................................. 47

Moreno v. Sterling Drug, Inc.,
   787 S.W.2d 348 (Tex. 1990) ............................................. 27

Murray v. San Jacinto Agency, Inc.,
   800 S.W.2d 826 (Tex. 1990) ............................................. 26

Nabors Well Servs., Ltd. v. Romero,
   456 S.W.3d 553 (Tex. 2015) ............................................. 47

Nat'l Westminster Bank USA v. Weksel,
   511 N.Y.S.2d 626 (App. Div. 1987) ............................................. 33

Perry v. Kaufman Cty.,
   No. CIV.A. 3:98-CV-2870L, 2000 WL 1372832 (N.D. Tex. Sept. 22, 2000) ...................... 27

Roni LLC v. Arfa,
   935 N.E.2d 791 (N.Y. 2010) ............................................. 24, 25

Seven Seas Petroleum, Inc. v. CIBC World Mkts. Corp.,
   No. CIV.A H-08-3048, 2013 WL 3803966 (S.D. Tex. July 19, 2013) ..................... 30, 36, 46

Smith v. East,
   411 S.W.3d 519 (Tex. App.—Austin 2013, pet. denied) ..................... 48

Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.,
   883 N.Y.S.2d 486 (App. Div. 2009) ............................................. 25

Tex. Dep't of Protective & Regulatory Servs. v. Lynn,
    No. 03-04-00635-CV, 2005 WL 1991809
    (Tex. App.—Austin Aug. 19, 2005, pet. denied) ................................................................. 27

Tex. Pari-Mutuel Mgmt. v. Zurich Am. Ins. Co.,
    No. G-12-101, 2012 WL 12946759 (S.D. Tex. Oct. 22, 2012) ............................................. 46

Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.,
    35 S.W.3d 591 (Tex. 2000) ................................................................................................... 46

Troice v. Proskauer Rose, L.L.P.,
    816 F.3d 341 (5th Cir. 2016) ................................................................................................ 40

United States v. Adamson,
    700 F.2d 953 (5th Cir. 1983) ................................................................................................ 30

United States v. Beckner,
    134 F.3d 714 (5th Cir. 1998) ................................................................................... 34, 38, 40

Villarreal v. Wells Fargo Brokerage Servs., LLC,
    315 S.W.3d 109 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ......................................... 50

W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC,
    437 S.W.3d 917 (Tex. App.—Dallas 2014, pet. denied) ...................................................... 46

Woloshen v. State Farm Lloyds,
    No. 3:08-CV-0634-D, 2008 WL 4133386 (N.D. Tex. Sept. 2, 2008) ............................ 24, 46

Woods v. William M. Mercer, Inc.,
    769 S.W.2d 515 (Tex. 1988) ................................................................................................ 27

Yumilicious Franchise, L.L.C. v. Barrie,
    No. 3:13-CV-4841-L, 2015 WL 1822877 (N.D. Tex. Apr. 22, 2015) ................................... 27

## STATUTES & RULES

Fed. R. Civ. P. 56 .......................................................................................................................... 25

Tex. Civ. Prac. & Rem. Code § 16.004(a)(4) ............................................................................... 26

Tex. Civ. Prac. & Rem. Code  § 33 ..................................................................................... passim

## OTHER AUTHORITIES

H. & S. Comm. Rep. for Tex. S. Bill No. 28 (Feb. 28, 1995) ....................................................... 47

Restatement (Second) of Torts § 876 (1979) ............................................................................... 39

Statement of Governor George W. Bush to the Senate Comm. on Economic Development,
    74th Leg., R.S. 2, Hearings on Tex. H.B. 32 (Feb. 2, 1995) ................................................47

Defendant Proskauer Rose LLP ("Proskauer") respectfully submits this brief in support of its motion for summary judgment on the two remaining claims asserted by the Official Stanford Investors Committee ("OSIC" or "plaintiff") as a purported assignee of Ralph S. Janvey (the "Receiver").  The Receiver no longer asserts any claims.[1]

## PRELIMINARY STATEMENT

When the Receiver and OSIC filed this action in 2013, they based their claims on allegations that Proskauer, through former partner Thomas V. Sjoblom, learned of Allen Stanford's worldwide Ponzi scheme in 2005 and helped conceal it from the Securities and Exchange Commission (the "SEC") until February 2009.  After extensive discovery—10 depositions, 10 sets of requests for admissions and interrogatories, and the review of millions of pages of documents—there is not a shred of evidence to support these allegations.  Instead, the undisputed facts now affirmatively establish that Mr. Sjoblom did not know about the Ponzi scheme at any time before February 2009—long after all of the damages plaintiff seeks to recover in this case were suffered.  The undisputed record further shows that, instead of conspiring with Mr. Sjoblom, the principals of the Stanford companies affirmatively lied to and concealed their fraud from Mr. Sjoblom.  When he learned of the fraud in early February 2009, Mr. Sjoblom immediately took steps to stop it, culminating just a few days later in Proskauer's withdrawal from representing the Stanford companies and disaffirming all prior statements to the SEC.  The SEC's own enforcement lawyers have testified that nothing Mr. Sjoblom ever said or did changed how they investigated Stanford.

---

[1] Proskauer has separately sought judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (See ECF No. 99.)  As explained in that motion, which is fully briefed and pending before this Court, the attorney immunity doctrine requires dismissal of this action in its entirety because OSIC is not permitted to assert claims against Proskauer as a matter of settled law.  See, e.g., Order on Motion to Dismiss, Dorrell v. Proskauer Rose, LLP, No. 3:16-CV-1152-N (N.D. Tex. Nov. 2, 2017), Dkt. No. 52.

Over the course of this litigation, the Receiver and OSIC have dismissed Mr. Sjoblom as a defendant and withdrawn five of the claims against Proskauer, and the Court has dismissed a sixth.  There are two remaining claims against Proskauer—claims that may not even exist under Texas law:  aiding and abetting fraud and aiding and abetting a breach of fiduciary duty.  For the following five reasons, Proskauer is entitled to judgment as a matter of law as to those claims:

First, it is undisputed that the Stanford companies—whose claims plaintiff purports to assert—were entirely responsible for perpetrating the Ponzi scheme and causing the same damages plaintiff seeks from Proskauer (and other professional firms).  Indeed, this Court already held as much in granting the SEC summary judgment on its claims under the securities laws.  Under New York's in pari delicto doctrine, wrongdoers like the Stanford companies cannot recover from others for losses caused by their own misconduct.  As set forth in Proskauer's pending motion for choice-of-law determination, the undisputed facts demonstrate that Mr. Sjoblom and the Stanford companies affirmatively selected New York law to govern their relationship, and additional, uncontested evidence taken since Proskauer filed that motion confirms that the parties never intended any other state's law to apply.  New York's in pari delicto doctrine bars plaintiff's claims.

Second, there are no damages recoverable from Proskauer.  Plaintiff seeks to recover the increase in net certificate of deposit ("CD") liabilities incurred by the Stanford companies between September 2006 (when Proskauer was retained) and February 2009 (when the SEC shut down the Ponzi scheme).  But, because plaintiff did not file this action until January 31, 2013, the four-year statute of limitations bars it from recovering any losses incurred before January 31, 2009.  By plaintiff's own admission, the Stanford companies suffered no damages between January and February 2009, when CD liabilities decreased.  Indeed, using the only methodology

plaintiff has proffered (which the Fifth Circuit has rejected), damages are $0 for any point after February 2008.  And, plaintiff has withdrawn any allegation of tolling from the complaint. Because plaintiff has no recoverable damages, it has no viable claims against Proskauer.

Third, to prove aiding and abetting claims—which the Texas Supreme Court has never recognized—plaintiff would need evidence that Mr. Sjoblom had actual knowledge of the fraud and intended to further it.  The record, however, establishes that plaintiff has no evidence of either.  There is neither documentary evidence of such knowledge, nor did any witness testify that Mr. Sjoblom discovered the fraud prior to February 2009.  Other than James Davis—one of the architects of the Ponzi scheme—the witnesses in this case testified that they did not know about the fraud and have no basis to conclude that Mr. Sjoblom did either.  For his part, Davis gave undisputed testimony that he and Stanford were "dirty rotten, fraud-perpetuating liars," and that he did everything in his power to conceal the fraud from him.  Proskauer is thus entitled to summary judgment on this basis as well.

Fourth, there is no evidence that Proskauer or Mr. Sjoblom substantially assisted the Ponzi scheme.  Substantial assistance requires a showing that the alleged aider's conduct proximately caused the asserted loss.  But plaintiff does not even attempt to show that.  Plaintiff's theory—that absent Mr. Sjoblom's conduct, the SEC would have stopped the Ponzi scheme sooner—fails as a matter of law because it amounts to nothing more than "but for" causation.  It is undisputed that Mr. Sjoblom played no role in selling CDs and never interacted with investors.  To the contrary, and as the Fifth Circuit and this Court have already concluded, Mr. Sjoblom did what lawyers do: he made legal arguments, advised on document productions, interacted with opposing counsel, scheduled witness testimony, and defended depositions.  As a matter of law, such conduct cannot amount to substantial assistance.  Even if it could, the undisputed facts establish that the SEC's

failure to act sooner was due to internal disagreement at the SEC, and not because of Mr. Sjoblom

or Proskauer.  Without a proximate causal link, plaintiff's aiding and abetting claims fail.

Fifth, and finally, plaintiff is barred as a matter of law from proceeding against Proskauer

by Chapter 33 of the Texas Civil Practices and Remedies Code.  Chapter 33 provides that a

claimant who is more than 50% liable for its own injury cannot recover from others.  Here, the

Stanford companies, whose claims plaintiff purports to assert, have already been conclusively

determined by this Court to be more than 50% liable for the net CD liabilities that existed as of

February 2009—the same damages plaintiff seeks from Proskauer.  Under Chapter 33's statutory

scheme, plaintiff is by definition a claimant, and therefore is not entitled to any recovery.

For these reasons and those set forth below, the complete lack of evidence to support the

central elements of plaintiff's claims entitles Proskauer to summary judgment on plaintiff's two

remaining claims.

## BACKGROUND

### I.     Factual Background

This case arises from the Receiver's effort to hold Proskauer financially responsible for the

Ponzi scheme perpetrated by R. Allen Stanford and James Davis through Stanford Financial Group

Company ("SFGC") and its affiliates, which Stanford owned and controlled (together, "Stanford

Financial" or the "Company").  See Order, SEC v. Stanford Int'l Bank, LTD., No. 3:09-CV-

00298-N (N.D. Tex. Apr. 25, 2013), Dkt. No. 1858.  Stanford and Davis conducted the Ponzi

scheme through the sale of CDs issued by the Stanford International Bank ("SIB") in Antigua.  Id.

Proskauer and its attorneys never sold any CDs or interacted in any way with CD

purchasers.  Proskauer and its former partner, Mr. Sjoblom, instead served as outside counsel to

Stanford Financial in an SEC investigation between September 2006 and February 2009,

performing the work of attorneys, such as interacting with SEC staff, making legal arguments,

advising on document productions, and scheduling Company witnesses for and defending their

depositions.  (See, e.g., App. 29 [Ex. 1, Alvarado Aff. ¶¶ 25-26].)[2]  There is no dispute that

Proskauer performed only intermittent work for Stanford Financial over the approximately two-

and-a-half years of the engagement; Mr. Sjoblom barely interacted with Stanford or Davis during

that engagement; Mr. Sjoblom, while at Proskauer, billed Stanford Financial less than 200 hours;

and Proskauer received no compensation beyond its attorneys' hourly rates.  (App. 68-132 [Ex.

2, RFA Exs. A-Q]; App. 134-35 [Ex. 3, RFA 115]; App. 164 [Ex. 4, Sjoblom Tr. 385:3-16];

App. 174 [Ex. 5, Davis Tr. 113:1-7].)  Moreover, Davis gave uncontroverted testimony that he

and Stanford repeatedly lied to Mr. Sjoblom and concealed critical information about SIB's

investment portfolio.  (App. 172-73, 184-85, 191, 200, 218-19 [Ex. 5, Davis Tr. 111:6-112:2;

140:24-141:9; 159:15-21; 182:7-15; 217:8-218:1].)  There is no dispute that when Davis

disclosed to Mr. Sjoblom in February 2009 that Stanford Financial had been perpetrating a fraud,

Mr. Sjoblom immediately advised his clients to stop selling CDs and to take other prompt

remedial actions.  (App. 223 [Ex. 6]; App. 200-02 [Ex. 5, Davis Tr. 182:7-184:8]; App. 33 [Ex.

1, Alvarado Aff. ¶ 41].)  Mere days later, Proskauer withdrew from the representation and

disaffirmed all prior statements to the SEC.  (App. 225 [Ex. 7]; App. 228 [Ex. 8].)

A.     **The SEC Conducts Numerous Inquiries of
       Stanford Financial Between 1997 and 2005**

Beginning in 1997, the SEC staff conducted a number of inquiries into the SIB CDs and

repeatedly concluded that Stanford Financial was likely a fraud, a Ponzi scheme, or a prime bank

scheme.  (App. 245-57 [Ex. 9]; App. 313 [Ex. 10]; App. 319 [Ex. 11]; App. 324 [Ex. 12]; App.

336 [Ex. 13]; App. 355 [Ex. 14].)  Indeed, the Receiver has admitted that from 1997 to 2005, the

---

[2] Citations in the form "App. __" are to the Appendix filed in connection with this motion, which includes the Declaration of James P. Rouhandeh, dated February 12, 2018, and the exhibits thereto.

SEC "suspected that Allen Stanford and/or Stanford Financial were perpetrating a fraud" or

"Ponzi scheme."  (App. 379-80 [Ex. 15, RFAs 76-77].)  Nevertheless, due to internal disputes at

the SEC about enforcement priorities, the lack of complaints from Stanford Financial customers

and the SEC's concern that it lacked jurisdiction over SIB, these inquiries ended without action.

(App. 245, 261 [Ex. 9]; App. 393 [Ex. 16]; App. 398 [Ex. 17].)

      **B.**      **Stanford Financial Hires Mr. Sjoblom and Chadbourne**

In April 2005, the SEC's enforcement division opened a new inquiry into Stanford

Financial, with Jennifer Brandt, a staff attorney, in charge.  (App. 267-68 [Ex. 9]; App. 403 [Ex.

18]; App. 410-11 [Ex. 19, Brandt Tr. 164:25-165:11].)  This informal inquiry related to the SIB

CDs, which were sold to accredited investors in the United States through Stanford Group

Company ("SGC"), a U.S.-based broker-dealer and investment adviser.  (App. 264-68 [Ex. 9].)

In June 2005, Stanford Financial retained Mr. Sjoblom and Chadbourne & Parke LLP

("Chadbourne"), where Mr. Sjoblom was a partner, as outside counsel to represent it and certain

affiliates in connection with this SEC inquiry.  (App. 27 [Ex. 1, Alvarado Aff. ¶ 19].)

After being engaged, Mr. Sjoblom sent an August 23, 2005 engagement letter to P.

Mauricio Alvarado, SFGC's General Counsel, who accepted the terms of the representation on

Stanford Financial's behalf.  (App. 28, 47 [id. ¶ 22 & Ex. B].)  Among other terms, the

engagement letter selected New York law to govern the attorney-client relationship between

Stanford Financial and Mr. Sjoblom and Chadbourne.  (App. 28, 47 [id. ¶ 22 & Ex. B]; App. 451-

52 [Ex. 20, RFAs 44, 46].)  The letter further stated that Mr. Sjoblom and Chadbourne would

represent "SFG and its affiliated entities through all stages of the ongoing investigation by the

[SEC] and any related litigation matters that may arise therefrom."  (App. 28, 47 [Ex. 1, Alvarado

Aff., Ex. B].)  To ensure that Chadbourne was paid for certain introductory meetings Mr. Sjoblom

had in June and July 2005, Mr. Sjoblom identified in the Chadbourne engagement letter certain

steps that he had already taken to familiarize himself with his clients' operations in Miami,
Houston, and Antigua.  (App. 47 [id. Ex. B]; App. 140-41 [Ex. 4, Sjoblom Tr. 32:6-33:4].)  These
steps included:  "[i]nterviewing financial advisors and compliance personal at SGC";
"[i]nterviewing appropriate officers and personnel of SIB"; "[i]nterviewing appropriate officers
responsible for managing the assets of SIB"; and "[m]eeting with the appropriate bank regulatory
authorities who oversee and examine SIB."  (App. 48 [Ex. 1, Alvarado Aff., Ex. B].)  Importantly,
the engagement letter did not provide that Mr. Sjoblom would conduct an internal investigation,
and SFGC's General Counsel testified that Mr. Sjoblom was never retained to do so.  (App. 27, 47
[id. ¶ 21 & Ex. B].)

Stanford Financial's Policy Governing Retention of and Relationship with Outside
Counsel applied to its retention of Mr. Sjoblom.  (App. 25-26, 36 [id. ¶¶ 12, 15 & Ex. A].)
Pursuant to that policy, the SFGC Legal Department was involved in the legal strategy and day-
to-day management of Stanford Financial's responses to the SEC inquiry.  (App. 26 [id. ¶¶ 15-
16]; App. 478-82 [Ex. 21, Hamric Tr. 162:21-164:13; 175:22-176:9].)  As outside counsel, Mr.
Sjoblom was authorized only "to complete the tasks that were necessary to properly handle the
matter for which [he was] engaged" and was "not expected to and did not provide legal services
to Stanford Financial unless specifically requested."  (App. 26, 29 [Ex. 1, Alvarado Aff. ¶¶ 16,
25].)  Even with respect to matters pertaining to the SEC's inquiry, Mr. Sjoblom's advice would
sometimes not be sought because it would be "time consuming and costly."  (App. 504 [Ex. 22].)
Correspondingly, neither Mr. Sjoblom nor SFGC's Legal Department was responsible for
uncovering wrongdoing at Stanford Financial.  The Stanford Financial entities had other personnel
who were responsible for monitoring compliance and determining whether and to what extent to

seek advice from in-house or external counsel about compliance issues.  (App. 509-11, 527-29 [Ex. 23, Young Tr. 13:4-22; 18:15-19:14; 242:6-13; 243:23-244:22].)

### C.   Mr. Sjoblom's Initial Communications with Stanford Financial While at Chadbourne

At the start of his engagement, Mr. Sjoblom met with Stanford, Davis, and other Stanford Financial personnel to familiarize himself with Stanford Financial's operations, as well as with SIB's regulator, Leroy King of the Antiguan Financial Services Regulatory Commission (the "FSRC").  Through these meetings and his review of relevant materials, Mr. Sjoblom came to learn of certain legal positions Stanford Financial had previously taken regarding the SIB CDs. The Company had long argued that the CDs were not securities.  (See, e.g., App. 377-78 [Ex. 15, RFAs 66-67].)  Indeed, SGC's other outside counsel, Jack Ballard and Wayne Secore (a former head of the SEC's Dallas-Fort Worth regional office), had previously declined to produce SIB documents to the SEC staff on the ground that the CDs were not securities.  (App. 546 [Ex. 24]; App. 377-78 [Ex. 15, RFAs 66-67]; App. 473, 483 [Ex. 21, Hamric Tr. 142:5-11; 190:10-18].)

For several reasons (including because it did not consider the CDs securities), Stanford Financial had also taken the legal position that the SEC had no jurisdiction over the CD program. (App. 377-78 [Ex. 15, RFAs 64-68, 71].)  Nevertheless, in an "abundance of caution," SIB had filed for an exemption from registration under the Securities Act of 1933 (the "1933 Act") to allow SGC to sell the SIB CDs to "accredited investors" in the United States without registering the CDs as securities.  (App. 473-74 [Ex. 21, Hamric Tr. 142:12-143:1]; (App. 526 [Ex. 23, Young Tr. 214:1-12].)  To those who, like Mr. Sjoblom, were not privy to Stanford and Davis's fraud, Stanford Financial's decision to file for an exemption suggested that the Company took regulatory compliance seriously.  (E.g., App. 526 [Ex. 23, Young Tr. 214:1-12].)

Another longstanding legal position taken by Stanford Financial was that the privacy provisions of the Antiguan banking statute governing SIB's operations—the International Business Corporations Act (the "IBC Act")—prohibited disclosure of SIB's investment portfolio as a matter of Antiguan law.  (App. 555 [Ex. 25].)  This argument, too, had been made to the SEC before Mr. Sjoblom's engagement.  (App. 365 [Ex. 14]; App. 378 [Ex. 15, RFA 68].)  SIB's president, Juan Rodriguez-Tolentino—one of the drafters of the IBC Act—confirmed Stanford Financial's interpretation of Antiguan privacy law to Mr. Sjoblom, informing him that SIB had an opinion from external Antiguan counsel supporting that interpretation.  (App. 30 [Ex. 1, Alvarado Aff. ¶ 30]; App. 146, 163 [Ex. 4, Sjoblom Tr. 133:13-22; 341:5-18].)

During Mr. Sjoblom's introductory meetings with Stanford Financial employees and the FSRC, he also learned certain factual information about the SIB CDs and the operations of SIB and SGC.  Much of that information, however, was deliberately false or misleading.  For example, Mr. Sjoblom was told that SGC performed regular due diligence on SIB.  (See, e.g., App. 571 [Ex. 26]; App. 588 [Ex. 27].)  In reality, and unknown to Mr. Sjoblom, that "diligence" was necessarily inadequate because it was founded on premises that only Stanford and Davis knew were false—i.e., that SIB was subject to real oversight by the FSRC and was being audited by an independent auditor.  (E.g., App. 516-19, 523 [Ex. 23, Young Tr. 79:13-80:1; 81:4-82:3; 176:13-15].)  As it turns out, Stanford and Davis—with whom Mr. Sjoblom barely interacted over the course of the engagement—used a secret bank account to bribe Mr. King, and SIB's auditor, CAS Hewlett.  (App. 167, 171, 173-74, 184-85, 216-18 [Ex. 5, Davis Tr. 41:20-22; 110:15-16; 112:20-113:19; 140:24-141:9; 215:20-217:16]; see Compl. ¶ 62.)  There is no evidence that Mr. Sjoblom learned about the bribes or the bank account at any point.  In fact,

Davis testified that he and Stanford kept them secret from Mr. Sjoblom and others.  (App. 218-19 [Ex. 5, Davis Tr. 217:6-218:1].)

Similarly, numerous Stanford Financial employees told Mr. Sjoblom that while they did not know the exact positions in the SIB CD portfolio, they were generally familiar with the portfolio's investment categories.  (App. 592 [Ex. 28]; App. 594 [Ex. 29]; App. 588 [Ex. 27]; App. 147 [Ex. 4, Sjoblom Tr. 137:4-22].)  The investment categories that Mr. Sjoblom was told about, however, did not accurately reflect SIB's assets.  (App. 168-70 [Ex. 5, Davis Tr. 58:17-60:25].)  In August 2005—the sole occasion on which Mr. Sjoblom spoke with Davis prior to 2009—Davis deliberately and admittedly lied to Mr. Sjoblom regarding the SIB CD portfolio.  (App. 172-73 [id. 111:6-112:2].)  For example, while Mr. Sjoblom was told that SIB invested in real estate, he was expressly told that CD proceeds were not used to fund those acquisitions.  (App. 617 [Ex. 30].)  That was untrue.  (App. 198-99 [Ex. 5, Davis Tr. 180:11-181:4].)

Davis's August 2005 presentation to Mr. Sjoblom, moreover, included false asset allocations and did not reveal that a substantial portion of SIB's assets were invested in highly illiquid private equity companies and included over $1 billion in unpaid "IOUs" from Allen Stanford.  (App. 168-69, 172-73, 208-09 [id. 58:17-59:9; 111:62-112:2; 204:16-205:2].)  There is no evidence that Mr. Sjoblom learned about these loans—or the true components of the CD assets—at any point before February 2009.  (App. 169, 172-73, 203-04 [id. 59:1-9; 111:6-112:2; 185:22-186.4].)  Nor could he have, as Stanford and Davis took pains to conceal their fraud from others, including Mr. Sjoblom.  (App. 172-73, 180-84 [id. 111:6-112:2; 136:10-140:22].)  For example, when Mr. Sjoblom met with Davis in 2005, Davis knew of Stanford Financial's fraudulent conduct, that the SEC was investigating the Company, and that he could have stopped the fraud.  (App. 203-05 [id. 185:2-187:19].)  But, Davis did not want the fraud to come to light;

so he lied to Mr. Sjoblom and did not reveal the scheme to Mr. Sjoblom in 2005 or at <u>any point</u> <u>thereafter</u> prior to February 2009.  (<u>Id.</u>)

Compounding the lies Stanford and Davis told him, Mr. Sjoblom received false information—including through outright misrepresentations—that misled him about the role of SIB's regulator.  For example, Juan Rodriguez-Tolentino, President of SIB, provided Mr. Sjoblom the FSRC's purported examination reports of SIB, which were consistent with Davis's false description of the SIB portfolio.  (App. 168-70 [<u>id.</u> 58:17-60:25]; App. 143 [Ex. 4, Sjoblom Tr. 66:4-25].)  Further, Mr. Sjoblom understood that the FSRC saw "actual holdings and position[s]" in the SIB CD portfolio "every 90 days."  (App. 627 [Ex. 31].)  The FSRC even lied to Mr. Sjoblom directly, telling him in August 2005 that SIB provided "full transparency to [the] FSRC," that the FSRC "exam[ined] the details of the portfolio," and that "SIB's external audit[or] also confirm[ed] investments in the portfolio."  (App. 558, 560 [Ex. 25].)

### D.    Mr. Sjoblom's Initial Communications with the SEC in 2005 While at Chadbourne

Shortly after being retained, Mr. Sjoblom spoke with Brandt regarding the SEC's desire to voluntarily obtain documents from SIB.  (App. 637 [Ex. 32].)  Like prior outside counsel, Mr. Sjoblom advised Brandt of Stanford Financial's position that the SEC lacked jurisdiction over SIB.  (App. 637 [<u>id.</u>]; App. 641 [Ex. 33]; App. 378 [Ex. 15, RFA 67].)  Like prior outside counsel, Mr. Sjoblom therefore declined the SEC's request for SIB to voluntarily produce documents.  (App. 546 [Ex. 24]; App. 637 [Ex. 32].)  Brandt nevertheless sent a voluntary "standard request" to SGC on August 29, 2005 "to memorialize [the SEC's] request" and solicit "a written response."  (App. 637 [Ex. 32]; App. 647 [Ex. 34].)  Around this time, the SEC—unsuccessfully and unbeknownst to Mr. Sjoblom—sought documents regarding SIB directly from the FSRC.  (App. 655 [Ex. 35]; App

672 [Ex. 36].)  After learning that neither SIB nor the FSRC would voluntarily produce documents, a senior member of the SEC staff instructed Brandt to "[c]lose the case."  (App. 676 [Ex. 37].)

Without knowing that the SEC had already decided to drop the inquiry, Mr. Sjoblom provided a written response to the SEC on September 12, 2005, advancing the legal arguments that the CDs were not securities; the SEC lacked jurisdiction over SIB and the CD program; and Antiguan law prevented disclosure of certain information relating to the SIB CDs.  (App. 679-80 [Ex. 38].)  This letter had no effect on the SEC inquiry, given that the SEC had already decided to close its investigation.  In addition, Brandt has testified that the legal arguments Mr. Sjoblom made—with which she disagreed—never "influence[d] her independent judgment."  (App. 415 [Ex. 19, Brandt Tr. 200:21-24].)  In fact, Brandt made clear at her deposition that she would never, under any circumstances, "close an investigation," "delay an investigation," "forgo seeking documents," or "not seek testimony [she] believed was necessary" as a result of anything Mr. Sjoblom said or did.  (App. 415, 419-20 [id. 200:21-24, 206:1-207:8].)

Brandt's counterparts in the SEC's examination division did not agree with enforcement's decision to end the inquiry.  As Brandt testified, there was a lot of "back and forth . . . internally and . . . a discrepancy . . . on how to handle the case."  (App. 427 [id. 227:4-9].)  The examination division therefore sent SGC a deficiency letter on September 12, 2005, setting forth various alleged violations of the securities laws.  (App. 692 [Ex. 39].)  Mr. Sjoblom responded on October 3, 2005, reiterating, among other things, the same legal arguments he had advanced on behalf of his clients to Brandt.  (App. 701 [Ex. 40]; App. 29 [Ex. 1, Alvarado Aff. ¶ 26].)  Mr. Sjoblom's letters (which he sent as a Chadbourne partner) did not change the SEC's analysis of the legal issues; the SEC continued to believe that the CDs were securities and to doubt that the information it was seeking from SIB was confidential as a matter of Antiguan

law.  (App. 416-18, 421-23, 425 [Ex. 19, Brandt Tr. 201:13-203:2; 210:23-212:7; 218:7-14].)

The interdepartmental disagreements at the SEC continued for months, and the staff took no

action whatsoever vis-à-vis Stanford Financial from October 2005 through August 2006.  (App.

692 [Ex. 39]; App. 784 [Ex. 41]; App. 426-27, 429-30 [Ex. 19, Brandt Tr. 226:9-227:9; 229:11-

230:1; 236:4-15]; App. 269-311 [Ex. 9].)  During this 11-month period when the SEC inquiry

remained inactive, Mr. Sjoblom performed "intermittent" work for Stanford Financial and billed

only 47.1 hours to the representation.  (App. 29 [Ex. 1, Alvarado Aff. ¶ 25]; App. 786 [Ex. 42];

App. 805 [Ex. 43]; App. 809 [Ex. 44]; App. 816 [Ex. 45]; App. 822 [Ex. 46].)

     **E.**    **Mr. Sjoblom Continues Representing Stanford Financial**
             **After Joining Proskauer in 2006**

Almost a year after he responded to the SEC examination staff in October 2005, Mr.

Sjoblom left Chadbourne and became a partner at Proskauer.  On September 6, 2006, Mr.

Sjoblom and Alvarado executed a new engagement letter, which provided that Mr. Sjoblom

would "continue representing the Stanford Financial Group and its affiliate companies in the

investigation by the [SEC]."  (App. 58 [Ex. 1, Alvarado Aff. Ex. C].)  The engagement letter

continued the terms set forth in the Chadbourne engagement letter, except as otherwise specified,

and similarly limited the scope of Mr. Sjoblom's representation to "responding to inquiries raised

by the SEC and, at times, other regulatory authorities."  (App. 29 [Ex. 1, Alvarado Aff. ¶ 25];

App. 149-50 [Ex. 4, Sjoblom Tr. 171:20-172:6].)  As SFGC's General Counsel testified, among

the terms that the parties maintained from the prior letter was the selection of New York law to

govern the attorney-client relationship between Mr. Sjoblom and his law firm, on the one hand,

and Stanford Financial, on the other.  (App. 28 [Ex. 1, Alvarado Aff. ¶ 24].)

That same day, Mr. Sjoblom spoke with Brandt, and learned that enforcement would be

seeking a formal order of investigation of Stanford Financial.  (App. 784 [Ex. 41].)  A formal

order would allow the SEC to serve document subpoenas and take sworn testimony from witnesses.  (App. 841 [Ex. 47].)  Around this same time, Mr. Sjoblom learned that the SEC was directly seeking documents from the FSRC.  (App. 892 [Ex. 48].)  On multiple occasions throughout September and October 2006, principals of SGC and SIB informed Mr. Sjoblom that SIB had not caused any delay by the FSRC in producing documents to the SEC.  (App. 29 [Ex. 1, Alvarado Aff. ¶ 28]; App. 893 [Ex. 48]; App. 895 [Ex. 49].)  Mr. Sjoblom relied on these representations when he informed the SEC that his client, SIB, supported the FSRC's cooperation with the SEC and at no point instructed the FSRC not to comply with the SEC's requests.  (App. 903 [Ex. 50]; App. 907 [Ex. 51]; App. 909 [Ex. 52].)  As noted earlier, Mr. Sjoblom was entirely unaware that King was being bribed.  Nor did Mr. Sjoblom know that Allen Stanford had decided that there was "no wa[y]" the SEC would be allowed to visit SIB in Antigua (as Mr. Sjoblom had offered in 2006).  (App. 912 [Ex. 53]; App. 914 [Ex. 54].)

> ### F.     The SEC Issues a Formal Order of Investigation and Subpoenas to Which Stanford Financial Responds

On October 26, 2006, the SEC issued a formal order of investigation (the "Formal Order") to determine whether SGC was violating any securities laws.  (App. 916 [Ex. 55].)  Pursuant to the Formal Order, the SEC staff issued subpoenas for documents and testimony to SGC and several SGC employees.  (App. 920 [Ex. 56].)  The SEC staff chose not to subpoena any other entities or individuals in connection with its investigation, including SGC's external auditor BDO Seidman, LLP ("BDO").  (App. 435 [Ex. 19, Brandt Tr. 274:2-10]; App. 959-60 [Ex. 57, Ancira Tr. 178:18-179:4].)  It is nevertheless undisputed that BDO knew about the SEC inquiry in 2005 and was aware it became a formal investigation in 2006, when the SEC issued a subpoena to SGC.  (App. 951-53, 954, 956-58 [Ex. 57, Ancira Tr. 139:8-141:1; 149:5-22; 162:16-164:17].)  Consistent with both the ABA Statement of Policy regarding Lawyers' Responses to Auditors Requests for

Information and customary practice among defense lawyers representing clients in government investigations, Mr. Sjoblom did not specifically address the SEC investigation with BDO in response to BDO's standard audit inquiry.  (App. 872-75 [Ex. 47].)

Following its initial request to take testimony from the subpoenaed SGC employees, as well as a June 2007 request for testimony from Allen Stanford, Mr. Sjoblom worked with the SEC to schedule depositions for these individuals.  (App. 966 [Ex. 58]; App. 979 [Ex. 59].)  The SEC requested "some flexibility" regarding the scheduling of depositions, however, so that it could "review the emails produced by Stanford [Financial]."  (App. 983 [Ex. 60].)  Mr. Sjoblom's associate (who is now an enforcement attorney at the Financial Industry Regulatory Authority ("FINRA")) assured the SEC that Stanford Financial "would assist with establishing acceptable new dates upon the [SEC]'s request."  (Id.)  There is no evidence of the SEC pursuing testimony from Stanford Financial officers for at least the next 18 months.  (App. 493-97 [Ex. 21, Hamric Tr. 220:24-224:10]; App. 985 [Ex. 61]; App. 989-91 [Ex. 62, Korotash Tr. 13:11-15:8].)

With respect to the document subpoena, Alvarado assembled an internal team of Stanford Financial lawyers and compliance professionals—including Bernie Young, who had served as an NASD regulator for 19 years before joining SGC as its Chief Compliance Officer—to gather and review documents for production to the SEC.  (App. 25-26, 30 [Ex. 1, Alvarado Aff. ¶¶ 14, 31]; App. 464, 466 [Ex. 21, Hamric Tr. 94:4-6; 96:7-11]; App. 507-08, 513, 530-31, 542-43 [Ex. 23, Young Tr. 7:7-8:22; 42:1-4; 253:16-254:13; 324:22-325:1].)  The review team took "compliance with the SEC's subpoena seriously" (App. 531, 543 [Ex. 23, Young Tr. 254:14-16; 325:2-8]), and tried their best to fully "cooperate with the SEC" (App. 476-77, 484 [Ex. 21, Hamric Tr. 145:10-146:12; 193:9-21]).

Mr. Sjoblom's involvement was generally limited to advising the review team when requested.  (App. 464-65, 466 [id. 94:4-95:10; 96:7-11]; App. 514-15 [Ex. 23, Young Tr. 51:25-52:14].)  Consistent with the terms of his limited engagement, Mr. Sjoblom was required to seek approval from Alvarado for "all major tasks or expenditures," including any expenses incurred in traveling to advise the review team.  (App. 997 [Ex. 63].)  Mr. Sjoblom met with the review team regarding the document review on one or two occasions, and advised SGC at those meetings to preserve relevant documents.  (App. 464-65 [Ex. 21, Hamric Tr. 94:16-95:10); App. 532-35 [Ex. 23, Young Tr. 257:20-260:3].)

At the review team's request, Mr. Sjoblom also reviewed a Financial Consulting and Advisory Services Agreement between SGC and SIB (the "2004 Consulting Agreement").  (App. 1000 [Ex. 64].)  While the record is disputed as to whether Mr. Sjoblom advised that the 2004 Consulting Agreement should be sent to the SEC,[3] there is no dispute that Mr. Sjoblom advised that the agreement and other documents deemed nonresponsive should be made available for the SEC's review at SGC's offices—an invitation that the SEC never accepted.  (App. 1007 [Ex. 65]; App. 486-87 [Ex. 21, Hamric Tr. 203:22-204:9]; App. 1016 [Ex. 66].)  Nor is there any dispute that everyone involved understood that the agreement concerned a portfolio that was wholly unrelated to the CD portfolio that was the focus of the SEC's inquiry.  (App. 159 [Ex. 4, Sjoblom Tr. 242:8-15]; App. 491 [Ex. 21, Hamric Tr. 218:5-23].)  As Hamric explained it, she understood that there "were two separate piles of money"—one relating to CDs and one relating to capital markets—and the 2004 Consulting Agreement related to the latter.  (App. 491 [Ex. 21, Hamric Tr. 218:5-23].)  Young likewise understood that the 2004 Consulting Agreement "was not related to the assets underlying the CD[s]," but to capital markets.  (App. 536, 537 [Ex. 23, Young Tr. 265:2-

---

[3] Mr. Sjoblom and Hamric testified that Mr. Sjoblom advised that SGC produce the 2004 Consulting Agreement.  (App. 492 [Ex. 21, Hamric Tr. 219:3-21]; App. 157-58 [Ex. 4, Sjoblom Tr. 240:14-241:18].)

9; 267:9-12].)  As it turns out, this was a lie:  Davis has now admitted that the supposed capital markets portfolio actually <u>did</u> relate to the CDs.  (App. 175-76 [Ex. 5, Davis Tr. 124:12-125:11].)  Nevertheless, Davis testified that he would not have objected to the agreement being produced to the SEC because it would not have revealed the fraud.  (App. 177-78 [<u>id.</u> 126:17-127:8].)  There is no evidence that the decision to set aside the 2004 Consulting Agreement for the SEC's review was made to prevent the SEC from accessing that agreement.  (App. 489-90 [Ex. 21, Hamric Tr. 209:21-210:23]; App. 538-39 [Ex. 23, Young Tr. 270:22-271:25].)

Moreover, the fact that SGC made the 2004 Consulting Agreement available to the SEC at its offices instead of sending it to the SEC did not prevent the SEC from "obtain[ing] documents evidencing at least part of [SIB's] investment portfolio" and learning "that SGC managed part of" that portfolio.  (Compl. ¶ 175.)  Indeed, there is no dispute that the review team produced an agreement from 1996 that was materially similar to the 2004 Consulting Agreement.  (App. 379 [Ex. 15, RFA 73]; App. 1018 [Ex. 67].)  In fact, Brandt could not recall whether she had even reviewed the 1996 agreement that SGC produced.  (App. 408-09, 436-37, 439-40 [Ex. 19, Brandt Tr. 138:8-139:8; 299:23-300:14; 302:9-303:9].)  In addition, in May 2005, SGC produced to the SEC a statement for an SIB account held with Stanford Asset Management—the production of which Mr. Sjoblom expressly noted in his 2005 letter to the SEC.  (App. 681 [Ex. 38].)

In total, SGC made 17 productions between December 2006 and August 2007, consisting of hundreds of thousands of pages of documents.  (App. 1007 [Ex. 65]; App. 986 [Ex. 61]; App. 493-95 [Ex. 21, Hamric Tr. 220:24-222:10].)  After SGC concluded its document production in August 2007, neither Stanford Financial nor Mr. Sjoblom heard from the SEC for nearly a year and

a half.[4]  (App. 497 [Ex. 21, Hamric Tr. 224:6-10].)  The lack of communication caused Stanford

Financial employees to believe the SEC investigation had "died on the vine"—which would not

have been atypical of a regulatory investigation.  (App. 541 [Ex. 23, Young Tr. 274:9-25].)

> G.     **The SEC Revives Its Stanford Financial**
>        **Investigation in December 2008**

On December 29, 2008, just after the SEC charged Bernard Madoff with operating a

multibillion-dollar Ponzi scheme (App. 1024 [Ex. 68]), the SEC issued new testimonial

subpoenas to key officers of Stanford Financial, including Davis and Young (App. 1027 [Ex.

69]; App. 1039 [Ex. 70]).  On January 6, 2009, Young received a document request from the

SEC.  (App. 540-41 [Ex. 23, Young Tr. 273:4-274:19].)  The subpoenas largely focused on the

issues the SEC first identified in 1997, including whether SIB CDs were securities and whether

they were legitimate products.  (App. 1039 [Ex. 70]; App. 1027 [Ex. 69].)

Shortly thereafter, Mr. Sjoblom received the subpoenas that the SEC issued for Davis and

Holt and on January 20, 2009, the SEC subpoenaed Allen Stanford's testimony.  (App. 1042 [Ex.

71].)  On January 21, 2009, Mr. Sjoblom, Davis, Rodriguez-Tolentino, Alvarado, Holt and head of

Global Compliance, Lena Stinson, met to discuss the SEC subpoenas and which Stanford Financial

officers would present the contents of the SIB's investment portfolio to the SEC.  (App. 31 [Ex. 1,

Alvarado Aff. ¶ 35].)  At the meeting, Mr. Sjoblom advised the group that Stanford Financial had

to "go and meet with the SEC and . . . provide them information regarding the bank;

specifically, . . .  about the investment portfolio."  (App. 179 [Ex. 5, Davis Tr. 133:5-8].)  Based on

the information shared at the meeting, everyone agreed that Holt and Rodriguez-Tolentino would

---

[4] During the times in which the SEC investigation was inactive, Mr. Sjoblom had limited involvement with
Stanford Financial.  From September 2007 through December 2008, for example, Mr. Sjoblom billed approximately
42 hours to work on behalf of Stanford Financial.  (App. 134-35 [Ex. 3, RFA 115]; App. 68-132 [Ex. 2, RFA Exs.
A-Q].)

have sufficient information about the portfolio to accurately and truthfully present to the SEC. (App. 31 [Ex. 1, Alvarado Aff. ¶ 35].)  Mr. Sjoblom accordingly proposed to the SEC that Holt and Rodriguez-Tolentino present the contents of the SIB CD portfolio.  (App. 1053 [Ex. 72].)  The SEC ultimately agreed to start with Holt and Rodriguez-Tolentino, not because of Mr. Sjoblom's suggestion that "Holt and [Rodriguez]-Tolentino were better suited to explain the bank's portfolio," but because it was "happy to start" with them.  (App. 994-95 [Ex. 62, Korotash Tr. 67:18-68:2].)  Further, the SEC did not withdraw its subpoenas for Stanford's and Davis's testimony; it expressly reserved the right to enforce them if Holt and Rodriguez-Tolentino did not or could not provide all of the information the SEC sought.  (App. 1053 [Ex. 72].)

### H.    Mr. Sjoblom Learns for the First Time in February 2009 That Stanford Financial Is a Fraud

On February 5, 2009, Mr. Sjoblom attended a meeting with principals of Stanford Financial to prepare for the presentations that Holt and Rodriguez-Tolentino were scheduled to give before the SEC.  (App. 222 [Ex. 6].)  During that meeting, Davis displayed a pie chart to show the contents of Tier III, which demonstrated that CD money had been used to purchase private equity and real estate and that a significant portion of Tier III included notes receivable from Stanford. (Id.; App. 1055 [Ex. 73]; App. 31-32 [Ex. 1, Alvarado Aff. ¶ 36].)  When the meeting resumed the following day, Mr. Sjoblom (and Stanford Financial executives) learned from Davis that SIB's financial statements and SIB's reports to FSRC about the investment portfolio had both been falsified.  (App. 1065 [Ex. 74].)  Mr. Sjoblom also learned that SIB was potentially insolvent, even though Stanford continued to lie by insisting that there were ample assets to cover the CD liabilities.  (App. 200-02 [Ex. 5, Davis Tr. 182:10-184:8].)

Mr. Sjoblom, like others present at the meeting, was shocked by the revelation that Stanford Financial had been lying about the contents of the CD investment portfolio.  (App. 1077

[Ex. 75]; App. 31-32 [Ex. 1, Alvarado Aff. ¶ 36].)  As Davis described it, "mouths dropped and

eyes rolled." (App. 198-200 [Ex. 5, Davis Tr. 180:14-182:1].)  Without access to the shareholder

funding reports prepared by accountant Henry Amadio at the direction of Davis, there would have

been no reason for anyone inside or outside Stanford Financial to know that Allen Stanford was

improperly using CD money, rather than investing the CD proceeds as advertised. (App. 1084-85,

1088 [Ex. 76, Amadio Aff. ¶¶ 9-10, 12, 26].)  Indeed, with the exception of Davis (who was a

participant in the fraud), Stanford Financial employees and advisors consistently testified that they

believed that Stanford Financial and its various businesses were in compliance with relevant laws

(including the securities laws) and took such compliance seriously—notwithstanding their

knowledge of the high returns on the CDs, the referral fees paid by SIB to SGC, and regulatory

investigations. (App. 33-34 [Ex. 1, Alvarado Aff. ¶ 46]; App. 469, 471-72, 500 [Ex. 21, Hamric

Tr. 136:8-11; 138:8-139:2; 247:3-18]; App. 1092-95 [Ex. 77, Bates Tr. 142:17-23; 145:3-146:4;

151:12-25]; App. 522, 525 [Ex. 23, Young Tr. 166:8-13; 200:5-16]; App. 955, 963-64 [Ex. 57,

Ancira Tr. 150:16-21; 213:4-214:17].)  These individuals had no knowledge that Stanford

Financial was engaged in any kind of fraud or Ponzi scheme because Stanford and Davis misled

and lied to them for years—just as they did to Mr. Sjoblom and nearly all of Stanford Financial's

employees, investors, auditors, and regulators. (App. 203-05, 210-14, 215-17 [Ex. 5, Davis Tr.

185:13-187:4; 206:12-210:8; 214:24-216:19]; App. 26-27, 33 [Ex. 1, Alvarado Aff. ¶¶ 18, 44);

App. 1093-94 [Ex. 77, Bates Tr. 145:3-146:4]; App. 467-68 [Ex. 21, Hamric Tr. 131:21-132:3];

App. 524 [Ex. 23, Young Tr. 178:6-12]; App. 153 [Ex. 4, Sjoblom Tr. 188:11-17].)

     After Davis revealed the contents of Tier III, "Sjoblom . . . made a number of

recommendations to the company . . . in light of the revelations." (App. 200 [Ex. 5, Davis Tr.

182:23-25].)  Mr. Sjoblom immediately "recommended that all sales of CD[s] pursuant to the US

accredit[ed] investor program cease"; advised that "[t]here shouldn't be any further public distribution of the disclosure statement or the bank's annual reports"; "advised that there shouldn't be any distribution of any marketing materials that referenced either SIB or the CD[s]"; "advised that distribution of the annual report should cease until the financial statements were re-stated"; and "advised that if there were recent CD deposits that were held at a custodial bank that they might need to be returned." (App. 201 [id. 183:1-21]; App. 33 [Ex. 1, Alvarado Aff. ¶ 41].) He likewise advised that Holt's testimony to the SEC must be "forthcoming and forthright in all respects." (App. 203 [Ex. 5, Davis Tr. 185:2-12].)

On February 10, 2009, Holt appeared before the SEC and, after delivering a presentation, testified under oath. (Compl. ¶ 248.) The SEC thereafter renewed its demand for the sworn testimony of Davis and Stanford pursuant to the earlier issued subpoenas. (App. 1098 [Ex. 78].)

On February 11, 2009, Mr. Sjoblom withdrew from his representation of Stanford Financial, and on February 14, 2009, Mr. Sjoblom "disaffirm[ed] all prior oral and written representations made by [him] and [his] associates while at Chadbourne & Parke and while at Proskauer Rose to the SEC staff regarding Stanford Financial Group and its affiliates." (App. 228 [Ex. 8]; App. 1078 [Ex. 75].) On February 17, 2009, the SEC filed a complaint and applied for a temporary restraining order against Stanford Financial, which sought "emergency relief to halt a massive, ongoing fraud orchestrated by R. Allen Stanford and James Davis." Compl. ¶ 1, SEC v. Stanford Int'l Bank, Ltd., No. 3:09-cv-00298 (N.D. Tex. Feb. 17, 2009), Dkt. No. 1.

## II.     The Actions Against Proskauer

The Receiver was appointed on February 17, 2009—the same day that the SEC filed its action against Stanford Financial. (Compl. ¶ 71.) Once appointed, the Receiver began identifying and asserting claims on behalf of Stanford Financial. (App. 1101-02 [Ex. 79, Janvey Tr. 87:22-88:4].) Through that process, the Receiver took voluminous voluntary discovery from

Proskauer and Mr. Sjoblom, requesting and receiving Proskauer's client file in March 2009 after interviewing Mr. Sjoblom in February 2009.  (App. 1104-05, 1106-07 [id. 98:8-99:16; 100:22-101:13].)  Yet, it was not until nearly four years after the Receiver's appointment that the Receiver and OSIC filed this lawsuit.  And although the Receiver has prosecuted numerous cases on behalf of Stanford Financial in his own right, he chose in this case to assign plaintiff's aiding and abetting claims to OSIC—and he has chosen to let OSIC continue to prosecute them even though he has "[taken] back" certain claims against other defendants that he believed his "counsel would be better handling."  (App. 1110-13 [id. 187:22-190:8].)

### A.   Plaintiff's Improper Suit in the District of Columbia

Although the Receiver filed every single other case on behalf of Stanford Financial "where the receivership is located" because that is "where the jurisdiction of the Court is located" (App. 1125 [id. 295:10-18]), this action was filed in this Court only after the Receiver and OSIC unsuccessfully tried to bring it in the U.S. District Court for the District of Columbia, (App. 1124 [id. 294:16-22]).  As that court concluded, there was only one explanation for that:  the Receiver and OSIC sued in the District of Columbia "to circumvent concerns regarding the constraints of the statute of limitations in Texas."  Janvey v. Proskauer Rose, LLP, 59 F. Supp. 3d 1, 8 (D.D.C. 2014) ("Plaintiffs filed their suit . . . either in bad faith and/or as an attempt at forum shopping.").)

### B.   The Receiver and OSIC Have Now Abandoned the Arguments They Employed to Survive Proskauer's Motion to Dismiss

Following the dismissal of the District of Columbia case, Proskauer moved to dismiss the complaint in this action in its entirety.  (ECF No. 58.)  This Court denied Proskauer's motion except as to plaintiff's claims for aiding and abetting fraudulent transfers.  (ECF No. 79.)  The Receiver and OSIC survived the motion to dismiss with respect to other causes of action on the basis of two baseless contentions that they have since been forced to abandon:

First, they prevented the application of New York's in pari delicto doctrine—under which Proskauer sought dismissal of each of their causes of action—by contesting the authenticity of the engagement letters between Stanford Financial and both Chadbourne and Proskauer. (See ECF Nos. 63, 79.) In discovery, the Receiver has admitted the authenticity of the engagement letters. (App. 451-52 [Ex. 20, RFAs 44-46].). Accordingly, Proskauer has moved for a determination that New York law applies and sought dismissal of plaintiff's claims under New York's in pari delicto doctrine. See infra Part I. As a result of their baseless challenge to authenticity, the Receiver and OSIC succeeded in subjecting Proskauer to enormous costs defending this action and wasted the resources of the Court and the Receivership estate.

Second, the Receiver and OSIC claimed that all of their causes of action were timely because the statute of limitations was not triggered until they "discovered" Proskauer's allegedly tortious conduct years after a putative class of investors asserted substantially similar claims against Proskauer. (ECF. No. 63 at 24.) The Receiver has since admitted in discovery that he learned of that complaint shortly after it was filed in August 2009 and thought it "had merit" when he learned of it. (App. 1108-09 [Ex. 79, Janvey Tr. 105:21-106:8].) Recognizing that they could not stand on the discovery rule, the Receiver and OSIC voluntarily withdrew with prejudice all allegations in the complaint relating to the discovery rule and any other tolling, and dismissed with prejudice five of the seven remaining causes of action (the "Rule 41 Stipulation"). (ECF No. 172.) The discovery rule allegation also required Proskauer to expend enormous resources litigating claims that should never have been brought.

Two aiding and abetting claims now remain: aiding, abetting or participation in breaches of fiduciary duties (Count 2); and aiding, abetting or participation in a fraudulent scheme

(Count 3).  Proskauer now moves for summary judgment on those claims, and respectfully requests that the Court enter judgment in its favor.

## ARGUMENT

A defendant is entitled to summary judgment under Federal Rule of Civil Procedure 56 when the plaintiff cannot "establish the existence of an element essential to [its] case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Here, as set forth below, plaintiff has no evidence with respect to numerous, essential elements of its claims.

As an initial matter, it is unclear whether Texas law even recognizes aiding and abetting claims at all.  See First United Pentecostal Church of Beaumont v. Parker, 514 S.W.3d 214, 224 (Tex. 2017) ("[The Texas Supreme Court] has not expressly decided whether Texas recognizes a cause of action for aiding and abetting.").[5]  To the extent Texas courts have entertained such claims, they have required proof of an underlying, "primary" tort and proof that the alleged aider and abettor (1) knew of the primary tort, (2) substantially assisted in the commission of the primary tort, and (3) caused damages through his own conduct.  Id. at 225.  The same elements must be proven under New York law.[6]  See, e.g., Roni LLC v. Arfa, 935 N.E.2d 791, 792 (N.Y.

---

[5] The complaint asserts causes of action for "Aiding, Abetting, or Participation" in breaches of fiduciary duty and fraudulent scheme.  (Compl. ¶¶ 257-259.)  OSIC's "client representative" (App. 1133 [Ex. 80, Little Tr. 142:1-5]) was unable to identify a distinction between a so-called "participation" claim and an "aiding and abetting" claim (App. 1130-31 [id. 86:2-87:10]), and this Court and others have analyzed allegations of "aiding and abetting" and "participation" in tandem.  See Janvey v. Proskauer Rose LLP, No. 3:13-CV-0477-N, 2015 WL 11121540, at *5 (N.D. Tex. June 23, 2015) (Godbey, J.) (describing the elements of plaintiff's "aiding and abetting/participation claim"); Woloshen v. State Farm Lloyds, No. 3:08-CV-0634-D, 2008 WL 4133386, at *2 n.3 (N.D. Tex. Sept. 2, 2008).  The fact that the remaining two claims premised on aiding and abetting liability are not viable under Texas law is an alternative basis to dismiss those claims and grant summary judgment in favor of Proskauer.  See Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc., No. 3:08-CV-0102-B, 2008 WL 3925272, at *14 (N.D. Tex. Aug. 27, 2008) (dismissing claim for aiding and abetting fraud because "Texas does not recognize such a cause of action"), aff'd., 377 F. App'x 422 (5th Cir. 2010); In re Enron Corp. Sec., Derivative & "ERISA" Litig., No. CIV A H-01-3624, 2006 WL 3716669, at *8 (S.D. Tex. Dec. 12, 2006), aff'd, 535 F.3d 325 (5th Cir. 2008) (finding that Texas does not recognize a claim for aiding and abetting fraud).

[6] New York law applies to plaintiff's claims against Proskauer and requires dismissal under the in pari delicto doctrine for the reasons set forth in Part I.  To the extent plaintiff's aiding and abetting claims exist in Texas, see supra note 5, there is no material conflict between New York and Texas law on the basic elements of liability as (….continued)

2010) (aiding and abetting a breach of fiduciary duty); Stanfield Offshore Leveraged Assets, Ltd.

v. Metro. Life Ins. Co., 883 N.Y.S.2d 486, 489 (App. Div. 2009) (aiding and abetting fraud).  As

set forth below, because plaintiff's claims are barred in their entirety under New York's in pari

delicto doctrine and because the undisputed evidence shows that there is no genuine issue of any

material fact on the elements of plaintiff's aiding and abetting claims or plaintiff's ability to

recover under Chapter 33, Proskauer is entitled to judgment as a matter of law under Federal

Rule of Civil Procedure 56.  See Celotex, 477 U.S. at 322; see also Fed. R. Civ. P. 56.

**I.      Plaintiff's Claims Are Barred Under New York's *In Pari Delicto* Doctrine**

As set forth in Proskauer's pending motion for choice-of-law determination, which is

hereby incorporated by reference, New York substantive law governs the claims in this case

because Stanford Financial (and, therefore, the Receiver, whose claims are being asserted by

OSIC as a purported assignee) agreed that New York law would govern Proskauer's relationship

with Stanford Financial.  (See ECF No. 151.)

The engagement letter between Chadbourne and Stanford Financial (the "Chadbourne

Letter") expressly provides that Stanford Financial's attorney-client relationship would be

governed by New York law (App. 55 [Ex. 1, Alvarado Aff., Ex. B]), and the plain language of

the engagement letter between Proskauer and Stanford Financial (the "Proskauer Letter")

manifests the parties' intention to continue that selection (App. 58 [id., Ex. C]).  Mr. Sjoblom

confirmed as much at his deposition, testifying that the Proskauer Letter served "to continue

what [he] had done [for Stanford Financial] at Chadbourne."  (App. 149 [Ex. 4, Sjoblom Tr.

---

(continued….)

set forth in Parts II-IV below.  See HSA Residential Mortg. Servs. of Tex. v. Casuccio, 350 F. Supp. 2d 352, 363
(E.D.N.Y. 2003) ([T]here is no material conflict between New York and Texas law with respect to the aiding and
abetting claim.").  Accordingly, Proskauer cites the law of both states.

171:16-25].)  Mauricio Alvarado, who entered into both the Chadbourne Letter and Proskauer

Letter on behalf of Stanford Financial, likewise testified that he "understood and intended that

Mr. Sjoblom's representation [at Proskauer] . . . would continue as set forth in the Chadbourne

engagement letter . . . except as otherwise specified in the Proskauer engagement letter."  (App.

28 [Ex. 1, Alvarado Aff. ¶ 24].)  Moreover, as Alvarado has stated under oath, it was not his

"intent as [the] General Counsel of SFGC who engaged Mr. Sjoblom on behalf of the relevant

Stanford Financial entities, to change the law governing Proskauer's attorney-client relationship

from the law of the state of New York" that the parties selected in the Chadbourne Letter.  (Id.)

As the briefing on Proskauer's choice-of-law motion reflects, plaintiff does not—and

cannot—contest that its claims are barred by the in pari delicto doctrine if New York law applies.

(See ECF Nos. 151, 167, 173.)  Accordingly, for the reasons set forth in Proskauer's pending

motion for choice of law determination, this Court should apply New York substantive law and

enter judgment in Proskauer's favor as required by New York's in pari delicto doctrine.

## II.     There Is No Evidence of Any Damages Caused by Proskauer

Proskauer is also entitled to summary judgment because there is no evidence of damages

caused by Proskauer during the time period relevant to plaintiff's aiding and abetting claims.

Plaintiff filed its complaint in this action on January 31, 2013.[7]  Because a four-year statute of

limitation applies to both of plaintiff's remaining claims, see Tex. Civ. Prac. & Rem. Code

§ 16.004(a)(4), any timely claims for damages against Proskauer must have accrued after

January 31, 2009.  This is because, in the absence of tolling, torts accrue "when the wrongful act

occurs resulting in some damage to the plaintiff."  Murray v. San Jacinto Agency, Inc., 800

---

[7] The Receiver has testified that plaintiff is no longer claiming that its claims are timely as of the filing of the complaint in the District Court for the District of Columbia (App. 1126-27 [Ex. 79, Janvey Dep. 311:22-312:18]), which the District of Columbia court found to have been filed in bad faith.  Proskauer Rose, LLP, 59 F. Supp. 3d at 8.

S.W.2d 826, 828 (Tex. 1990); <u>Moreno v. Sterling Drug, Inc.</u>, 787 S.W.2d 348, 351 (Tex. 1990);

<u>Perry v. Kaufman Cty.</u>, No. CIV.A. 3:98-CV-2870L, 2000 WL 1372832 (N.D. Tex. Sept. 22,

2000).  Under the Rule 41 Stipulation, which this Court so-ordered on April 28, 2017, plaintiff

cannot toll its claims to render them timely.  (ECF No. 172.)  The Rule 41 Stipulation is crystal

clear on this point, withdrawing with prejudice plaintiff's allegations that they were entitled to

tolling.  (<u>See</u> <u>id.</u> ("The allegations set forth in paragraph 254 of the Complaint . . .  are <u>withdrawn</u>

<u>with prejudice to Plaintiffs reasserting them</u>. . . ." (emphasis added)).)[8]  Accordingly, the only

period with respect to which plaintiff can assert claims for timely and actionable damages against

Proskauer is the window from February 1, 2009 (four years prior to the date on which the

complaint was filed) to February 14, 2009 (when Mr. Sjoblom disaffirmed all prior written and

oral representations to regulators).

Unsurprisingly, plaintiff cannot adduce any proof that Proskauer somehow caused

damage to the Stanford Financial entities during that two-week period.  Indeed, even utilizing

plaintiff's own method for calculating damages, the alleged damages caused by Proskauer from

February 1, 2009 to February 14, 2009 are zero.  Plaintiff relies exclusively on Karyl Van Tassel

for its damages calculation.  (App. 1135 [Ex. 81].)  Van Tassel calculates plaintiff's purported

"economic damages" as the increase in net CD liabilities to SIB and SGC "during the time []

---

[8] Paragraph 254 of the complaint, which has now been withdrawn with prejudice, provided as follows:

> Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, the true nature of Defendants' participation in the Stanford Ponzi scheme and the injury suffered by Stanford Financial. Moreover, the Defendants' wrongful acts were inherently undiscoverable. Plaintiffs also assert the doctrine of equitable tolling.

It is well-settled that the discovery rule and related tolling doctrines cannot be invoked unless they are pleaded.  <u>See, e.g.</u>, <u>Yumilicious Franchise, L.L.C. v. Barrie</u>, No. 3:13-CV-4841-L, 2015 WL 1822877, at *2 (N.D. Tex. Apr. 22, 2015) (holding that plaintiff must plead the discovery rule to benefit from it); <u>Woods v. William M. Mercer, Inc.</u>, 769 S.W.2d 515, 518 (Tex. 1988) (same); <u>see also</u> <u>Tex. Dep't of Protective & Regulatory Servs. v. Lynn</u>, No. 03-04-00635-CV, 2005 WL 1991809, at *7 n.16 (Tex. App.—Austin Aug. 16, 2005, pet. denied) (rejecting equitable tolling argument where plaintiff "pled neither of these tolling concepts in the district court").

period Mr. Sjoblom and Proskauer were representing SIB and SGC." (App. 1142-44 [Ex. 82, Van Tassel Decl. ¶ 103, 106]; see also App. 1154-55 [Ex. 83, Van Tassel Tr. 130:1-131:6].)[9] And as Van Tassel admits, estimating the increase in SIB's net CD liabilities during Mr. Sjoblom's engagement as outside counsel to Stanford Financial while at Proskauer results in no increased net CD liabilities after February 1, 2008: "[I]t is true that net CD liabilities did not increase after February 1, 2008." (App. 1166 [Ex. 84, Van Tassel Suppl. Decl. ¶ 15]; see also App. 1162 [Ex. 83, Van Tassel Tr. 149:13-24] (testifying that the increase in net CD liabilities between February 1, 2008 and February 16, 2009 was "less than zero").)[10] In addition, as Van Tassel admitted, there was no increase—and, in fact, there was a substantial decrease—in net CD liabilities following October 2008, so nothing Mr. Sjoblom did following that date could have caused any damages to SIB or SGC. (App. 1158-59 [Ex. 83, Van Tassel Tr. 139:14-140:6].)

Simply put, plaintiff concedes, based on its own expert's methodology and computation, that all asserted damages on both of its remaining claims were suffered before February 1, 2008. (App. 1144 [Ex. 82, Van Tassel Decl. ¶ 106]; App. 1156-57 [Ex. 83, Van Tassel Tr. 137:11-138:7].) Because those causes of action accrued when the damages were incurred, they are barred by the applicable statute of limitation, which expired by January 31, 2012 at the latest—nearly a year before the Receiver and OSIC filed this lawsuit. Standing alone, plaintiff's lack of any damages caused by Proskauer's alleged misconduct during the two-week period in which

---

[9] Plaintiff concedes that Proskauer is not liable for any damages that occurred prior to Mr. Sjoblom's employment at Proskauer on September 6, 2006. (App. 1153 [Ex. 83, Van Tassel Tr. 129:4-18].)

[10] In her rebuttal report, Van Tassel asserts that there were ongoing operating costs that SIB or SGC incurred following February 1, 2008 that should be borne by Proskauer. However, Ms. Van Tassel does not include those damages in accounting for her calculation of Proskauer's alleged liability. (App. 1143 [Ex. 82, Van Tassel Decl. ¶ 106].) Indeed, she does not make any attempt to quantify those damages at all. (App. 1160-61 [Ex. 83, Van Tassel Tr. 141:6-142:5].) Such speculative assertions of damages are insufficient to defeat a summary judgment motion, particularly when, as here, there is no evidence that any damage was suffered in the two-week period for which plaintiff's claims are not plainly time-barred. See Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1449 (5th Cir. 1993) (explaining that summary judgment is appropriate when the "nonmoving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation").

plaintiff's claims are not time-barred is dispositive.  As the Texas Supreme Court recently held,

allegedly wrongful conduct that postdates all of the injury caused by an underlying breach of

fiduciary duty cannot support aiding and abetting liability.  See First United, 514 S.W.3d at 225

(holding that alleged lies by attorney to cover up theft of money by his firm's principal "cannot be

the basis for a claim . . . for aiding and abetting" because "there is no evidence the church was

harmed by the only wrongful act in which" attorney engaged).  For that reason alone, the Court

should enter judgment in Proskauer's favor on plaintiff's aiding and abetting claims.  See Celotex,

477 U.S. at 322; Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 583 (Tex.

2001) (absence of evidence as to any element of a tort requires granting of summary judgment).

In any event, plaintiff has not provided any evidence of legally cognizable damages

attributable to Proskauer for any period of time because plaintiff calculates damages as the increase

in SIB and SGC's net CD liabilities during Proskauer's representation, despite the fact that SIB and

SGC were insolvent long before Proskauer began representing Stanford Financial. (App. 1143 [Ex.

82, Van Tassel Decl. ¶ 103]; App. 1147-49 [Ex. 83, Van Tassel Tr. 94:3-96:15].)  The Fifth Circuit

has expressly rejected as improper attempts by a corporation to recover for its "deepening

insolvency"— i.e., damages based on the amount it allegedly fell further into debt.  See In re SI

Restructuring, Inc., 532 F.3d 355 (5th Cir. 2008) (holding that "deepening insolvency is not a valid

theory of damages"); see also In re CitX Corp., Inc., 448 F.3d 672 (3d Cir. 2006) (same).

Accordingly, increasing CD liabilities is not a valid measure of damages.

### III.    There Is No Evidence Proskauer Knew of, or Intended to Aid and Abet, Breaches of Fiduciary Duty or Fraud

Plaintiff's aiding and abetting claims also fail because there is no evidence that

Proskauer, through Mr. Sjoblom, had (i) knowledge of his clients' principals' wrongdoing and

(ii) the "intent to assist" them in committing fraud or breaching their fiduciary duties.  Juhl v.

Airington, 936 S.W.2d 640, 644 (Tex. 1996).

Plaintiff has not created a triable issue of fact on these issues; innuendo will not suffice. Plaintiff must instead adduce evidence that Mr. Sjoblom had "actual" awareness of the underlying fraud or breaches of fiduciary duty when it occurred.  Seven Seas Petroleum, Inc. v. CIBC World Markets Corp., No. CIV.A. H-08-3048, 2013 WL 3803966, at *14 (S.D. Tex. July 19, 2013) (citation omitted)).  General suspicions of wrongdoing, see Lerner v. Fleet Bank, N.A., 459 F.3d 273, 293 (2d Cir. 2006), or recklessness are insufficient to establish actual knowledge, see Court's Charge to the Jury, Janvey v. Dillon Gage Inc. of Dallas, No. 3:10-CV-1973-N (N.D. Tex. July 10, 2015), Dkt. No. 224 ("Actual knowledge is what one actually knows." (emphasis added)); see also United States v. Adamson, 700 F.2d 953, 965 (5th Cir. 1983) (error to "equate reckless disregard with the required higher standard of knowledge"); Hicks v. State, 372 S.W.3d 649, 655 (Tex. Crim. App. 2012) (explaining that "reckless is a less culpable mental state than intentional or knowing").  In addition to proving actual knowledge of the underlying fraud or breaches of fiduciary duty, plaintiff must demonstrate that Mr. Sjoblom "desire[d]" to assist those torts or "believe[d]" that their commission was "substantially certain" to occur.  Crosstex N. Tex. Pipeline, L.P. v. Gardiner, 505 S.W.3d 580, 605 (Tex. 2016).  There is no evidence that Mr. Sjoblom actually knew of the misconduct perpetrated by principals of his clients, much less that he intended to assist them in committing fraud or breaching fiduciary duties.

### A. There Is No Evidence Mr. Sjoblom Had Actual Knowledge of Stanford Financial's Ponzi Scheme, Much Less That He Intended to Assist It

Because plaintiff seeks to hold Proskauer liable for the damages attributable to the entirety of Stanford Financial's Ponzi scheme, to prove its aiding and abetting claims, it must establish that Mr. Sjoblom had knowledge of the fraudulent scheme and intended to assist with

perpetuating it.[11]  Juhl, 936 S.W.2d at 644; Janvey, 2015 WL 11121540, at *5.  The evidence has

not borne out plaintiff's allegations that Mr. Sjoblom had either such knowledge or intent.  (See,

e.g., Compl. ¶ 259.)

        To the contrary, the undisputed evidence establishes that Mr. Sjoblom had no knowledge of

the fraudulent scheme prior to February 5, 2009 because he was misled—in the words of James

Davis—by two "dirty rotten, fraud-perpetuating liars."  (App. 172, 193-96 [Ex. 5, Davis Tr. 111:6-

11, 163:12-164:1, 166:13-167:1]; App. 31-33 [Ex. 1, Alvarado Aff. ¶¶ 36, 44]; App. 153 [Ex. 4,

Sjoblom Tr. 188:11-17].)  Davis testified that he did not tell Mr. Sjoblom—or anyone else—about

the contents of Tier III prior to February 2009; that he, in fact, misrepresented the portfolio's

contents and allocations to Mr. Sjoblom and others; that Mr. Sjoblom was not in the inner circle of

individuals who knew about the fraud; and that he never revealed to Mr. Sjoblom that he and Allen

Stanford were bribing CAS Hewlett and Leroy King to provide clean audits and regulatory

approvals for SIB.  (App. 169-73, 184-85, 193-94, 217-19 [Ex. 5, Davis Tr. 59:19-60:25; 111:6-

112:2; 140:24-141:9; 163:13-164:1; 216:20-218:1].)  Further, Davis admitted that he lied to Mr.

Sjoblom to prevent Mr. Sjoblom from uncovering the fraud.  (App. 172, 205 [id. 111:17-24;

187:12-19].)  Even after Davis revealed the fraud to Mr. Sjoblom and others in February 2009,

Allen Stanford continued to lie in an attempt to deceive Mr. Sjoblom about the scope and

seriousness of the fraudulent scheme.  (App. 200-02 [id. 182:10-184:8].)

        In addition, Stanford and Davis prevented Mr. Sjoblom from having access to

information that could have enabled him to learn of their fraud.  (App. 172-73, 195-97 [id. 111:6-

_____

[11] Plaintiff's damages expert, Karyl Van Tassel, admitted that her calculation of the damages attributable to
Proskauer's alleged misconduct represents Proskauer's purported liability for the entire Ponzi scheme.  (App. 1146-
50 [Ex. 83, Van Tassel Tr. 126:21-128:4; 130:1-20]; see also (App. 1138 [Ex. 82, Van Tassel Decl. ¶ 103]; App.
1131-32 [Ex. 81].)  The Receiver likewise admitted that Van Tassel's declaration sets forth the alleged harm caused
"by Mr. Sjoblom in relation to the Stanford Ponzi scheme."  (App. 1121-22 [Ex. 79, Janvey Tr. 259:21-260:13]
(emphasis added).)

112:2; 166:23-168:10].)  For example, shareholder funding reports, which revealed that CD

proceeds were being funneled through loans to Allen Stanford to fund the other Stanford entities,

were accessible to only six individuals—Stanford, Davis, Mark Kurht (Global Controller), Gil

Lopez (Chief Accounting Officer), Amadio, and Harry Failing (Allen Stanford's personal

accountant)—and were kept secret through threats, coercion, and concealment tactics.  (App.

1084-85 [Ex. 76, Amadio Aff. ¶¶ 11-13].)  Similarly, there is no evidence that Mr. Sjoblom ever

became aware of the electronic model used to create SIB's fictitious returns and false financial

statements.  (App. 193-94 [Ex. 5, Davis Tr. 163:13-164:1].)

Stanford Financial's fraud was also concealed from Mr. Sjoblom through the "smoke and

mirrors" conjured by Davis and Stanford, which provided Stanford Financial with the

appearance of legitimacy.  (App. 181-83, 189-90 [id. 137:2-139:10; 155:16-156:23].)  For

example, Davis and Stanford leveraged Stanford's wealth, political ties, and connections with

prominent professionals—coupled with Stanford Financial's operation of legitimate

businesses—to project an image of propriety.  (App. 181-85 [id. 137:2-139:10; 140:24-141:9].)

And they masked their misconduct by using coded communications, bribes, and lies.  (App. 184-

92, 217-19 [id. 140:24-143:21; 150:3-15; 155:16-156:24; 161:16-19; 216:8-218:1].)  The sum of

this uncontroverted evidence belies any assertion that Mr. Sjoblom had actual knowledge of

Stanford Financial's fraud, which is fatal to plaintiff's aiding and abetting claims.  See First

United, 514 S.W.3d at 225 (affirming dismissal of aiding and abetting action against attorney

when attorney "clearly and consistently disclaimed" knowing of scheme to steal money, when

orchestrater of scheme "disclaimed [attorney's] involvement" and when there was no evidence

attorney "was aware of [orchestrator's] plans or actions until after they had taken place").

Undeterred, plaintiff contends that Mr. Sjoblom had actual knowledge of the underlying

torts because he was aware of certain "red flags."  (App. 1187-90 [Ex. 85, Interrog. 10].)  Such

contentions are insufficient as a matter of law because general suspicions—or even

recklessness—do not and cannot amount to "actual knowledge."  See Lerner, 459 F.3d at 293;

Adamson, 700 F.2d at 965.  In addition, these so-called "red flags," including the high returns on

the CDs, the referral fees paid by SIB to SGC, and the allegations by the SEC, were also known

to investors, officers of Stanford Financial, and other third party professionals, who—like Mr.

Sjoblom—had absolutely no knowledge of Stanford and Davis's fraudulent scheme.  (App. 27,

29-33 [Ex. 1, Alvarado Aff. ¶¶ 21, 29, 32, 33, 36-39, 44];  App. 1091, 1093-94 [Ex. 77, Bates Tr.

31:3-10; 145:3-146:19]; App. 499 [Ex. 21, Hamric Tr. 246:2-14]; App. 520-21 [Ex. 23, Young

Tr. 159:16-160:6]; App. 947-50, 961-62 [Ex. 57, Ancira Tr. 131:16-20; 133:23-134:1; 207:6-

208:8]; App. 1195 [Ex. 86]; App. 744, 749, 768 [Ex. 40].)

       If plaintiff could impute actual knowledge of the fraudulent scheme to Mr. Sjoblom on a

record of purported "red flags," lawyers would be strictly liable for aiding and abetting their

client's misconduct even when—as here—their client deliberately deceives them.[12]  Numerous

courts have cautioned against this very result, and this Court should follow their lead.  See, e.g.,

El Camino Res., LTD. v. Huntington Nat'l Bank, 722 F. Supp. 2d 875, 905 (W.D. Mich. 2010)

("To prevent banks, attorneys and others from incurring near-strict liability for the torts of their

clients, a 'high degree of scienter is necessary to extend fraud liability on an aiding-and-abetting

theory.'" (quoting Nat'l Westminster Bank USA v. Weksel, 511 N.Y.S.2d 626, 630 (App. Div.

---

[12] Plaintiff proves the point through its argument that Mr. Sjoblom knew or should have known his advocacy to regulators about Stanford Financial's compliance with the securities laws was baseless.  The arguments Mr. Sjoblom advanced regarding whether the CDs were securities and whether SIB had to register as an investment company were supported by legal authorities, and had been made by prior counsel with securities experience.  (See supra Background, Part I.C-D; see also App. 679 [Ex. 38]; App. 692 [Ex. 39]; App. 701 [Ex. 40]; App. 378 [Ex. 15, RFA 67].).  Even if the arguments were weak, they had yet to be resolved by any court when Mr. Sjoblom made them (App. 1117-18, 1119 [Ex. 79, Janvey Tr. 225:8-226:6; 229:8-14]), and asserting weak arguments on behalf of a client does not amount to aiding and abetting.

1987))), aff'd, 712 F.3d 917 (6th Cir. 2013); cf. United States v. Beckner, 134 F.3d 714, 720 (5th Cir. 1998) (reversing aiding and abetting conviction against attorney where the fact that the client "routinely lied to him was uncontradicted in the evidence").

In any event, even if Mr. Sjoblom had actual knowledge that Stanford Financial was a fraudulent scheme—a conclusion that lacks any evidentiary support—there is no evidence that he intended to assist that scheme. See Juhl, 936 S.W.2d at 644; (App. 33 [Ex. 1, Alvarado Aff. ¶ 45].) Indeed, as discussed infra in Part III.B, the evidence demonstrates just the opposite as Mr. Sjoblom repeatedly advised the Company to take steps to avoid potential violations of the securities laws. (See App. 148, 154-55 [Ex. 4, Sjoblom Tr. 162:10-14; 198:8-199:11].)  As soon as Mr. Sjoblom learned of his clients' fraud, he immediately advised SGC to halt the sales of CDs in the United States, to curtail the dissemination of SIB's disclosure statement and marketing materials, to conduct an internal investigation, and to consider self-reporting to the SEC.  (App. 200-01 [Ex. 5, Davis Tr. 182:23-183:21]; App. 33 [Ex. 1, Alvarado Aff. ¶ 41]; App. 222 [Ex. 6]; App. 1078 [Ex. 75]; App. 1208 [Ex. 87]; App. 1214 [Ex. 88].)  And mere days after Davis admitted that Stanford Financial had engaged in fraudulent conduct, Mr. Sjoblom resigned from the representation and disaffirmed all prior written and oral representations that he had made.  (App. 228 [Ex. 8]; App. 33 [Ex. 1, Alvarado Aff. ¶ 43].)  Far from assisting the fraudulent scheme, these actions reflect Mr. Sjoblom's intent to stop it once he learned of it.

Moreover, there is no evidence to suggest that Mr. Sjoblom had any incentive or motive to assist his clients' fraud.  Mr. Sjoblom did not receive any payment over and above the reasonable costs of his legal services, and billed less than 200 hours to his clients over the course of his two-

and-a-half year representation of Stanford Financial while at Proskauer.[13]  (App. 68-132 [Ex. 2,

RFA Exs. A-Q]; App. 134-35 [Ex. 15, RFA 115].)  Finally, there is no evidence that Mr. Sjoblom

or Proskauer engaged in conduct that actually furthered the scheme.  It is undisputed that neither

Mr. Sjoblom nor Proskauer (i) participated in any way in promoting, offering, or selling any CDs

or other investments; (ii) made any representations, much less misrepresentations to investors; (iii)

participated in any of Stanford Financial's business or investment decisions; or (iv) were paid any

incentives based on the sale of SIB CDs or otherwise had any financial stake in Stanford Financial.

(See generally, App. 1169 [Ex. 85].)  Thus, the record supports Mr. Sjoblom's testimony that he

only ever intended to fulfill his duties "as a defense lawyer in an SEC investigation."  (App. 152

[Ex. 4, Sjoblom Tr. 187:9-22]; App. 47-62 [Ex. 1, Alvarado Aff., Ex. B & C].)

Because there is no evidence that Mr. Sjoblom actually knew that Stanford Financial's

principals were perpetrating a fraudulent scheme or intended to assist them in doing so, this

Court should grant summary judgment in Proskauer's favor.

### B.   There Is No Evidence Mr. Sjoblom Had Actual Knowledge of, or Intent to Assist, Individual Breaches of Fiduciary Duty or Misconduct by Stanford Financial Employees

Unable to prove the knowledge and participation in Stanford Financial's Ponzi scheme that

they alleged in the complaint (see, e.g., Compl. ¶ 259), plaintiff has more recently argued that Mr.

Sjoblom aided and abetted officers and directors of Stanford Financial who breached their

fiduciary duties of care, loyalty, and obedience not by engaging in a Ponzi scheme but by:

(i) allowing or enabling the Company to market and sell CDs in violation of United States law; (ii)

allowing the marketing and selling of CDs to customers through fraud; (iii) allowing financial

advisers to recommend that their clients invest in the CDs without full transparency and visibility

---

[13]  Even when including the work performed while he was at Chadbourne, Mr. Sjoblom billed a total of 436.4 hours over the course of approximately three-and-a-half years of work.  (App. 786-825 [Exs. 42-46].)

into SIB's portfolio, and not directing that SGC cease all sales of CDs until such full visibility was gained; (iv) relying on a purported interpretation of Antiguan privacy law to deny full transparency; and (v) evading and obfuscating the illegality of SIB's and SGC's purportedly fraudulent conduct by obstructing regulatory investigations by various federal and state regulators. (App. 1171-92 [Ex. 85, Interrogs. 5-6, 8-10].)  This newfound theory fails as well.

As noted supra in Part II, there is no evidence of damages associated with any such alleged breaches because plaintiff's damages expert did not calculate the damages for any specific action by Mr. Sjoblom or for any breaches of fiduciary duty that he is alleged to have aided and abetted.  (App. 1163 [Ex. 83, Van Tassel Tr. 177:19-23].)  For this reason alone, plaintiff cannot prove its claims based on individual breaches of fiduciary duty.  See Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC, 323 S.W.3d 224, 233-35 (Tex. App.— Dallas 2010, pet. denied) (holding evidence of lost profits legally insufficient where expert failed to calculate damages attributable to relevant accounts, rather than the business as a whole).

In addition, there is simply no evidence that Mr. Sjoblom had the requisite knowledge that Stanford Financial officers and directors were violating their fiduciary duties.  See Seven Seas Petroleum, 2013 WL 3803966, at *14.  To the contrary, Stanford Financial officers and employees provided Mr. Sjoblom with information that suggested that Stanford Financial was in compliance with United States securities laws.  For example, Mr. Sjoblom learned that SIB filed for an exemption under the 1933 Act to allow SGC to sell the SIB CDs without registering their sale.  To Mr. Sjoblom's knowledge, SGC was complying with the requirements of that exemption by only selling CDs in the United States to "accredited investors."  (App. 144-45 [Ex. 4, Sjoblom Tr. 120:23-121:10].)  In addition, Mr. Sjoblom learned that SGC performed due diligence on the SIB CD investments (App. 571 [Ex. 26]; App. 588 [Ex. 27]), and that SGC Financial Advisors were

aware of the investment portfolio categories—information that was inconsistent with a violation of

NASD suitability rules (App. 147 [Ex. 4, Sjoblom Tr. 137:20-22]; App. 590 [Ex. 28]; App. 594-

99 [Ex. 29]; App. 588 [Ex. 27]).  Further, Jane Bates (SGC's former Chief Compliance Officer),

Hamric and Young, all of whom had significant experience with securities, testified that they

believed SGC Financial Advisors had sufficient information about the CDs to recommend them to

clients and make a determination about whether the product was suitable for particular investors.

(App. 1096 [Ex. 77, Bates Tr. 175:16-22]; App. 501-02 [Ex. 21, Hamric Tr. 273:5-274:11]; App.

544 [Ex. 23, Young Tr. 332:4-8].)  Additionally, Mr. Sjoblom learned from Rodriguez-Tolentino,

one of the drafters of the IBC Act, that the Company had an opinion of Antiguan counsel to

support its position that the SIB CD portfolio was protected from disclosure.  (App. 146 [Ex. 4,

Sjoblom Tr. 133:12-22]; App. 30 [Ex. 1, Alvarado Aff. ¶ 30].)  Mr. Sjoblom was also informed by

Alvarado that SIB requested that the FSRC fully cooperate with the SEC's requests.  (App. 907

[Ex. 51].)  When Mr. Sjoblom relayed to the SEC that the CD portfolio information was protected

by the IBC Act or that SIB instructed the FSRC to cooperate, he did so in reliance on what he was

told by his clients, which he believed to be true.  (App. 161 [Ex. 4, Sjoblom Tr. 338:14-23].)

       With the benefit of hindsight—including the admissions of one of the architects of the

fraud—we now know that much of the information that Mr. Sjoblom was told by his clients

regarding compliance with United States securities laws was false.  For example, Davis testified

that the investor literature "was full of lies"; that he repeatedly deceived everybody, including Mr.

Sjoblom, about the contents of the SIB CD portfolio; and that the financial statements were

completely fabricated.  (App. 206-07, 215-16, 220 [Ex. 5, Davis Tr. 192:14-193:4; 214:13-215:2;

222:7-20].)  But, aiding and abetting requires knowledge of the underlying tort at the time that it

occurred.  See First United, 514 S.W.3d at 225.  Mr. Sjoblom had no knowledge of that

information's falsity when he was representing Stanford Financial and the facts on which plaintiff

relies to prove his knowledge all came to light after Mr. Sjoblom withdrew in February 2009.

(App. 161 [Ex. 4, Sjoblom Tr. 338:14-23]; App. 1116 [Ex. 79, Janvey Tr. 215:8-20].)  Plaintiff

cannot, with the benefit of hindsight, turn Mr. Sjoblom's actions—making legal arguments based

on facially reliable information provided by his clients—into aiding and abetting.  Cf. Beckner,

134 F.3d at 721 (attorney did not aid and abet fraud where he "was hired to be [the client's] trial

lawyer, and in representing [the client,] did what trial counsel is supposed to do").

        In addition, plaintiff nowhere contends—nor could it based on the record—that Mr.

Sjoblom intended to assist in any of the purported individual breaches of fiduciary duty.  This is

dispositive.  See Juhl, 936 S.W.2d at 644.  In fact, the record reflects that Mr. Sjoblom advised

his clients to take actions to ensure compliance with the law.  For example, Mr. Sjoblom advised

Stanford Financial against using SIB's 20-Year brochure.  (App. 148 [Ex. 4, Sjoblom Tr. 162:10-

14].)  Similarly, Mr. Sjoblom recommended that SGC cease sales contests related to the SIB

CDs, given the SEC's concerns about these sales practices.  (App. 154-55 [id. 198:8-199:11].)

When the SEC issued subpoenas, Mr. Sjoblom instructed Stanford Financial to preserve

documents.  (App. 533-35 [Ex. 23 Young Tr. 258:11-260:3].)  He also advised Stanford

Financial to segregate all documents determined to be non-responsive so that the SEC could

review and evaluate the responsiveness calls if it had any questions.  (App. 488-89 [Ex. 21,

Hamric Tr. 208:25-209:19]; App. 1016 [Ex. 66].)  Lastly, when Mr. Sjoblom learned from Davis

in February 2009 that the investment portfolio had been misrepresented to investors, he advised

that the sales of CDs and the distribution of CD marketing materials and disclosure statements be

immediately halted, to prevent any further violations of the securities laws.  (App. 200-01 [Ex. 5,

Davis Tr. 182:23-183:21]; App. 33 [Ex. 1, Alvarado Aff. ¶ 41]; App. 223 [Ex. 6].)

Because there is no evidence that Mr. Sjoblom knew of and intended to assist any individual breaches of fiduciary duty, Proskauer is entitled to judgment as a matter of law as to plaintiff's newly minted theory of liability.

## IV. The Undisputed Record Demonstrates that Proskauer Did Not Substantially Assist Any Breach of Fiduciary Duties or Fraud

The Court should also grant summary judgment in Proskauer's favor because the evidence precludes plaintiff from showing that Proskauer substantially assisted the alleged fraud or breaches of fiduciary duties. See Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 473 (Tex. App.—San Antonio 2001, pet. denied) ("To be an aider and abettor, there must be evidence of . . . substantial assistance *of the violation*." (emphasis added)). "But for" causation is not sufficient; plaintiff must instead show that Proskauer's conduct proximately caused the asserted injury. See In re Agape Litig., 773 F. Supp. 2d 298, 325 (E.D.N.Y. 2011); Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 472 (S.D.N.Y. 2001) ("[Even if] the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme."); see also Restatement (Second) of Torts § 876 (1979) (for aiding and abetting liability, the "encouragement or assistance is a substantial factor in causing the resulting tort").

Plaintiff's theory of "substantial assistance"—i.e., that Proskauer's conduct as attorneys prolonged Stanford Financial's fraud by delaying regulatory intervention—fails for at least two reasons. First, it is undisputed that Proskauer's alleged "assistance" to Stanford Financial consists of legal services it provided to its client. As a matter of law and policy, an attorney's provision of legal services does not and cannot amount to substantial assistance of a tort. Second, the undisputed evidence confirms that the SEC's failure to commence an enforcement action sooner cannot be proximately attributable to Proskauer because the SEC believed before Mr. Sjoblom was hired—indeed, an entire decade before it commenced an enforcement action—that Stanford

Financial was engaged in a fraud or Ponzi scheme, and there is no evidence that anything Mr.

Sjoblom said or did changed the SEC's mind.

> **A.      Mr. Sjoblom's Conduct as an Attorney Representing His
> Clients Cannot Constitute "Substantial Assistance"**

Plaintiff seeks to hold Proskauer liable for what the Fifth Circuit has already deemed to be

"classic examples of an attorney's conduct in representing his client."  Troice v. Proskauer Rose,

L.L.P., 816 F.3d 341, 348 (5th Cir. 2016); see also Order, Dorrell v. Proskauer Rose LLP, No.

3:16-CV-1152-N (N.D. Tex. Nov. 2, 2017), Dkt. No. 52.  As a matter of law, such actions do not

and cannot constitute substantial assistance because they are the routine kinds of acts lawyers take

on behalf of their clients every day.  See CRT Invs., Ltd. v. BDO Seidman, LLP, 925 N.Y.S.2d

439, 441 (App. Div. 2011) (substantial assistance "means more than just performing routine

business services for the alleged fraudster"); Gregor v. Rossi, 992 N.Y.S.2d 17, 19 (App. Div.

2014) (rejecting claim against lawyers for aiding and abetting fraud because allegations that the

lawyers drafted legal documents and agreements "are allegations of ordinary professional activity,

not substantial assistance"); Barbarito v. Zahavi, 968 N.Y.S.2d 422, 425-26 (App. Div. 2013)

(dismissing claim against law firm for aiding and abetting fraud based on failure to plead

substantial assistance; the firm's "documenting and negotiating" the subject transactions were

within its duties as legal counsel).[14]  Texas recognizes this same principle in the attorney immunity

---

[14] See also Chem-Age Indus., Inc. v. Glover, 652 N.W.2d 756, 774-75 (S.D. 2002) ("[H]olding attorneys liable for aiding and abetting the breach of a fiduciary duty in rendering professional services poses both a hazard and a quandary for the legal profession."); Abrams v. McGuireWoods, LLP, 518 B.R. 491, 503 (N.D. Ind. 2014) ("[T]he general rule is that, in cases involving business professionals like lawyers, substantial assistance means something more than the provision of routine professional services."); El Camino Res., LTD. v. Huntington Nat'l Bank, 722 F. Supp. 2d 875, 911 (W.D. Mich. 2010), aff'd, 712 F.3d 917 (6th Cir. 2013) ("[S]ubstantial assistance means something more than merely providing routine professional services that aid the tortfeasor in remaining in business, but do not proximately cause the plaintiffs' harm."); cf. Beckner, 134 F.3d at 720 ("The predicate acts charged in the indictment amount to nothing more than routine legal services.").

context.  See Cantey Hanger, L.L.P. v. Byrd, 467 S.W.3d 477, 481 (Tex. 2015) (attorneys cannot

be held liable "for actions taken in connection with representing a client").

Sound policy requires that attorneys not be subject to aiding-and-abetting liability for

conduct undertaken in the course of a representation to further their clients' goals and stated

legal interests.  See Kruegel v. Murphy, 126 S.W. 343, 345 (Tex. Civ. App.—Dallas 1910, writ

ref'd) ("[A]ttorneys are authorized to practice their profession, to advise their clients and

interpose any defense or supposed defense, without making themselves liable for damages."); see

also Art Capital Grp., LLC v. Neuhaus, 896 N.Y.S.2d 35, 37 (App. Div. 2010) ("[P]olicy

demands that attorneys, in the exercise of their proper functions as such, shall not be civilly

liable for their acts when performed in good faith and for the honest purpose of protecting the

interests of their clients.").  Because that is all Mr. Sjoblom and Proskauer did in this case, the

Court should enter judgment in Proskauer's favor on plaintiff's aiding and abetting claims.

> **B.      Plaintiff Cannot Show that Proskauer Proximately
> Prolonged Stanford Financial's Fraud Because the SEC
> Believed Stanford Financial Was Engaged in a Fraud or
> Ponzi Scheme and Chose Not to Act**

The undisputed record also belies plaintiff's theory that Mr. Sjoblom's conduct as a

lawyer "prolonged [the] existence" of the Ponzi scheme by "enabl[ing] Allen Stanford and other

officers to continue defrauding the Stanford entities."  Order at 17, Janvey v. Proskauer Rose,

LLP, No. 3:13-cv-00477-N (N.D. Tex. June 23, 2015), ECF No. 79.

As plaintiff has admitted, the SEC suspected that Stanford Financial was a fraud or Ponzi

scheme years before Mr. Sjoblom was hired by Stanford Financial in 2005.  (App. 379-80 [Ex. 15,

RFAs 76, 77]; App. 1132 [Ex. 80, Little Tr. at 95:10-25].)  For example, the Assistant District

Administrator for Enforcement at the SEC's Dallas-Fort Worth regional office, Hugh Wright,

testified that by 1998, "we all thought [Stanford Financial] was a Ponzi scheme . . . .  Always did."

(App. 262 [Ex. 9]; App. 1220 [Ex. 89].)  The SEC's belief that Stanford Financial was engaged in

a fraud or Ponzi scheme was the result of examinations conducted in 1997, 1999, 2002, and 2004,

whereby the SEC—unbeknownst to Mr. Sjoblom—acquired voluminous information about SGC.

(See, e.g., App. 232-61 [Ex. 9]; App. 1251-53 [Ex. 90]; App. 316 [Ex. 10]; App. 1289 [Ex. 91].)

Despite believing that Stanford Financial was engaged in fraud, the SEC failed to act, even as

Stanford Financial's outstanding CD liabilities burgeoned from $250 million in 1998 to $7.8

billion in 2004.  (App. 359 [Ex. 14]; App. 263 [Ex. 9].)

      As the record reveals, the reason the SEC took no action against what it believed to be a

fraud or a Ponzi scheme is that it decided before Mr. Sjoblom and Proskauer were hired to

pursue only "quick hit" or "slam dunk" cases at the expense of more "complex cases" like

Stanford Financial.  (See generally App. 246, 247, 250 [Ex. 9].)  That continued to be the case

when Mr. Sjoblom and Chadbourne were hired in 2005.  The SEC decided, for example, to

"close the case" after Stanford Financial "exercised its right not to voluntar[ily] produce

documents."  (App. 432 [Ex. 19, Brandt Tr. 238:4-22]; App. 677 [Ex. 37].)  When the SEC

revived the case a year later, it served document subpoenas and deposition subpoenas.  It took no

action, however, on the deposition subpoenas—and, indeed, never sought any testimony from

any Stanford Financial witness until December 2008—even though Proskauer told the SEC in

July 2007 that Stanford Financial "would assist with establishing acceptable new dates upon the

[SEC]'s request."  (App. 983 [Ex. 60].)  Then, after SGC completed its document production in

August 2007, the investigation "died on the vine."  (App. 541 [Ex. 23, Young Tr. 274:9-17]; App.

497-98 [Ex. 21, Hamric Tr. 224:6-10; 225:4-22]; App. 985 [Ex. 61].)  There is no evidence that

anyone at the SEC ever reviewed any of the documents that SGC produced in response to the

SEC's subpoena—and the record is uncontroverted that the SEC declined SGC's invitation to

review other documents made available to the SEC in August 2007 in SGC's Houston, Texas

offices pursuant to Mr. Sjoblom's advice.  (App. 441-44 [Ex. 19, Brandt Tr. 322:17-325:1]; App.

485-87, 497, 498 [Ex. 21, Hamric Tr. 202:23-204:9; 224:6-10; 225:4-22].)

Only after the Madoff fraud had been uncovered and pressure within the SEC to stop any

similar fraud schemes intensified, did the SEC resume its investigation of Stanford Financial.

(App. 991-92 [Ex. 62, Korotash Tr. 15:9-16:1].)  When the SEC finally commenced an

enforcement action in February 2009, it alleged facts that it knew for years—i.e., that "SIB

represented that it has experienced consistently high returns on its investments of deposits"; that

"SIB's historical returns were improbable, if not impossible"; and that SIB paid a "significantly

higher rate on its CD than conventional banks."  (Compare Compl. ¶ 28, 30, 31, SEC v. Stanford

Int'l Bank, Ltd., No. 3:09-cv-00298 (N.D. Tex. Feb. 17, 2009), Dkt. No. 1, with App. 445-47 [Ex.

19, Brandt Tr. 331:13-333:5].)

During the course of his representation of Stanford Financial, Mr. Sjoblom advanced

legal arguments to the SEC concerning the SEC's jurisdiction, Antiguan privacy law, and

whether the CDs were securities.  (App. 415, 416-17, 425 [Ex. 19, Brandt Tr. 200:21-24; 201:18-

202:5, 218:7-14].)  Mr. Sjoblom also advanced factual arguments that, based on what he had

seen and understood, he did not believe Stanford Financial was engaged in fraud.  (App. 151 [Ex.

4, Sjoblom Tr. 182:2-18].)  There is no evidence that Mr. Sjoblom's advocacy changed how the

SEC investigated Stanford Financial; in fact, the evidence is to the contrary.  (See, e.g., App.

413-14, 415, 424 [Ex. 19, Brandt Tr. 191:17-192:5 (Brandt's testimony that she would not "take

direction" from Mr. Sjoblom); 200:21-24; 217:12-24].)

Brandt, the lead attorney on the investigation from 2005 through the spring of 2007,

disagreed with Mr. Sjoblom's arguments and was not persuaded by them.  For example, she

testified that she did not "agree with Mr. Sjoblom's arguments that Antiguan privacy law prevented disclosure" of SIB's portfolio and "nothing Mr. Sjoblom said . . . or did in relation to that argument changed [her] view."  (App. 434 [id. 271:1-8].)  From Brandt's perspective, Mr. Sjoblom's factual and legal arguments amounted to "personal views" which were "completely irrelevant" to her.  (App. 424 [id. 217:12-217:24].)  And none of those views ever "influenced [her] independent judgment."  (App. 415 [id. 200:21-24].)  To the contrary, Brandt was emphatic that Mr. Sjoblom's advocacy had no bearing on how the SEC conducted its investigation.  She testified that she would not:

- "[F]orgo seeking documents [she] believed were necessary in an investigation because [Mr.] Sjoblom urged [her] not to seek them."

- Fail to "seek testimony [she] believed was necessary in an investigation because [Mr.] Sjoblom urged [her] not to seek the testimony."

- "[D]elay an investigation of an entity . . . that [she] believed was violating the federal securities law because [Mr.] Sjoblom urged [her] there was no violation."

- "[C]lose" or "try to close" investigation of [an] entity that [she] believed was violating the federal securities laws because [Mr.] Sjoblom urged [her] there was no violation."

(App. 419-20 [id. 206:1-207:8].)

Likewise, Stephen Korotash—the Associate Regional Director for Enforcement at the Dallas-Fort Worth regional office—testified that he gave no "particular deference" to the positions taken by Mr. Sjoblom in his role as defense counsel to Stanford Financial.  (App. 993 [Ex. 62, Korotash Tr. 38:18-22].)  Korotash similarly testified that Mr. Sjoblom's alleged representations about Stanford and Davis's knowledge and their level of involvement in the management of SIB's portfolio did not persuade the SEC to defer taking their testimony under oath; rather, in agreeing to first depose Holt and Rodriguez-Tolentino, the SEC was following its own course that it was "happy" to pursue.  (App. 994-95 [id. 67:8-68:2].)

44

There is simply no evidence that Proskauer's conduct proximately caused the SEC to delay bringing an enforcement action; indeed, all of the evidence is to the contrary. When the SEC wants to shut down a company for engaging in fraud, it has the power to do that. (See, e.g., App. 840-41 [Ex. 47, Flannery Report].) It also has the power to conduct legal and factual research to form its own views about the facts—and the undisputed evidence in this case shows that it did that. (App. 433 [Ex. 19, Brandt Tr. 240:2-19].) Yet, although "from 1997 to 2005, the SEC suspected that Allen Stanford and/or Stanford Financial were perpetrating a fraud" or "Ponzi scheme" (App. 379-80 [Ex. 15, RFAs 76-77]), and continued to believe that throughout the time Mr. Sjoblom represented Stanford Financial, it decided not to bring an enforcement action until 2009. The Receiver has admitted that the SEC "could have earlier gone after SGC" and "some of the people in the United States." (App. 1123 [Ex. 79, Janvey Tr. 262:2-12].)

In sum, the notion that Mr. Sjoblom changed the course of the SEC's investigation defies common sense, and is contradicted by the record, including the fact that the government never took action against Mr. Sjoblom. Because there is no evidence that Proskauer's conduct as lawyers proximately caused the SEC to delay its efforts, Proskauer is entitled to summary judgment on both of plaintiff's remaining claims. See Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n, 525 S.W.3d 875, 882 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (summary judgment was appropriate where parties "conclusively established that their conduct was not the proximate cause of the alleged damages for aiding and abetting"); Cromer Fin. Ltd., 137 F. Supp. 2d at 472.

## V.    Chapter 33 Bars Plaintiff's Claims as a Matter of Law

Under Chapter 33 of the Texas Civil Practices and Remedies Code ("Chapter 33"), plaintiff is barred from recovering damages against Proskauer because Chapter 33 provides that no claimant

with greater than 50% of the fault can recover—as is the case here with respect to the claims asserted on behalf of Stanford Financial by plaintiff as a purported assignee of the Receiver.

To the extent that aiding and abetting claims are viable under Texas law at all, see First United, 514 S.W.3d at 224, they are subject to Chapter 33, which the Texas legislature adopted to apportion liability among all responsible parties for "any cause of action based on tort."[15] Tex. Civ. Prac. & Rem. Code § 33.002 (emphasis added); see also Order at 2-3, Janvey v. Adams & Reese, LLP, No. 3:12-CV-0495 (Nov. 24, 2014), Dkt. No. 151 (Godbey, J.) ("Chapter 33 applies to all common law and statutory torts that do not have separate and conflicting fault allocation schemes."); Seven Seas Petroleum, Inc. v. CIBC World Markets Corp., No. CIV.A. H-08-3048, 2013 WL 3803966, at *22 (S.D. Tex. July 19, 2013) (holding that Chapter 33 applies to claims for aiding and abetting breach of fiduciary duty).  The express terms of the statute support the legislature's intent to convey "broad coverage of the proportionate responsibility statute to tort claims."  F.F.P. Operating Partners, L.P. v. Duenez, 237 S.W.3d 680, 690 (Tex. 2007). Regardless of how claims like aiding and abetting were treated at common law, Chapter 33's plain language governs.  See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc., 35 S.W.3d 591, 596 (Tex. 2000).

By its terms, Chapter 33 requires the jury to divide responsibility among four groups: (1) "each claimant"; (2) "each defendant"; (3) "each settling person"; and (4) "each responsible third party."  Tex. Civ. Prac. & Rem. Code § 33.003.  This framework is "[c]onsistent with the tenet of tort law that a party's liability arises from his own injury-causing conduct."  Arceneaux v.

---

[15] Courts routinely describe aiding and abetting liability as a cause of action based on tort.  See, e.g., Legacy Separators LLC v. Halliburton Energy Servs. Inc., No. 4:14-CV-2081, 2016 WL 4386130, at *3 (S.D. Tex. Aug. 16, 2016) (discussing the "tort of aiding and abetting"); W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 922 (Tex. App.—Dallas 2014, pet. denied) (same); Tex. Pari-Mutuel Mgmt. v. Zurich Am. Ins. Co., No. G-12-101, 2012 WL 12946759, at *4 (S.D. Tex. Oct. 22, 2012) (same); Woloshen v. State Farm Lloyds, No. 3:08-CV-0634-D, 2008 WL 4133386, at *3 (N.D. Tex. 2008) (same).

Pinnacle Entm't, Inc., 523 S.W.3d 746, 748 (Tex. App.—Houston [14th Dist.] 2017, no pet.); see also MCI Sales & Serv., Inc. v. Hinton, 329 S.W.3d 475, 505 (Tex. 2010) ("Chapter 33 expresses the legislature's intent to hold defendants responsible for only their own conduct."). Plaintiffs are likewise responsible for their injury-causing conduct under Chapter 33, which provides for a plaintiff's recovery to be reduced "by the percentage for which the plaintiff was at fault." Nabors Well Servs., Ltd. v. Romero, 456 S.W.3d 553, 559-60 (Tex. 2015); see also Austin v. Kroger Tex., L.P., 465 S.W.3d 193, 210 (Tex. 2015). In other words, as the structure of Chapter 33 confirms, it is designed to prevent wrongdoers from recovering from parties who allegedly assisted them. See H. & S. Comm. Rep. for Tex. S. Bill No. 28, at 2 (Feb. 28, 1995) ("As proposed, [this bill] sets forth the procedure for recovering damages in certain civil actions and limits the conditions under which a court is authorized to find a defendant jointly and severally liable for a claimant's damages." (emphasis added)).[16]

Here, because the Receiver stands in the shoes of the alleged wrongdoer—Stanford Financial—and plaintiff is purporting to assert the wrongdoer's claims, plaintiff is barred as a matter of law from recovering those damages from Proskauer.

### A.     The Receiver, OSIC, and Stanford Financial Are Each "Claimants" Under Chapter 33

Under Chapter 33's express terms, the OSIC, the Receiver, and, most significantly, Stanford Financial, are all considered "claimant[s]" whose percentage of responsibility for the alleged harm must be apportioned.

---

[16] See also H. & S. Comm. Rep. for Tex. S. Bill No. 28, at 2 (Feb. 28, 1995) (explaining the intent to correct current state of law where "a business may be held responsible not only for its own conduct, but also for someone else's"); House Comm. Report for Texas House Bill No. 4 ("This bill will allow juries to assess fault to all responsible parties in a lawsuit."); Statement of Governor George W. Bush to the Senate Comm. on Economic Development, 74th Leg., R.S. 2, Hearings on Tex. H.B. 32 (Feb. 2, 1995) (commenting on the proportionate responsibility scheme: "it is not fair that a business or a person pay for the irresponsible behavior of someone else. Such a concept defies the philosophy of personal accountability that the people of Texas endorse[].").

- <u>First</u>, plaintiff is clearly a "claimant[]" because it is a "person[s] seeking recovery of damages."  Tex. Civ. Prac. & Rem. Code § 33.011(1).  The definition expressly mentions "plaintiff[s]" as claimants.

- <u>Second</u>, Stanford Financial and the Receiver are "claimant[s]" because where, as here, "a party seeks recovery of damages for . . . injury to <u>another</u> person," the word "claimant" is defined to include <u>both</u> (A) "the person who was injured [or] was harmed"; <u>and</u> (B) "any person who is seeking, has sought, or could seek recovery of damages for the . . . harm . . . of that person."  <u>Id.</u> § 33.011(1)(A)-(B).

The complaint alleges that plaintiff is seeking recovery for conduct "that injured the companies comprising [Stanford Financial]."  (Compl. at ¶ 1.)  And in discovery, the Receiver has admitted that the lawsuit seeks damages on behalf of two Stanford Financial entities: SGC and SIB.  (App. 1120 [Ex. 79, Janvey Tr. 236:3-21].)  As a result, Stanford Financial is plainly a claimant under Chapter 33.  <u>Cf.</u> <u>JCW Elecs., Inc. v. Garza</u>, 257 S.W.3d 701, 707 (Tex. 2008) ("When the claim involves death, as here, 'claimant' is defined to include not only the party seeking damages, but also the decedent.").  As a claimant, Stanford Financial's share of the responsibility for the harm alleged must be considered under the proportionate responsibility scheme under Chapter 33.

**B.      The Undisputed Evidence Proves that Stanford Financial Is More than Fifty Percent Responsible for the Harm for <u>Which Relief Is Sought</u>**

The bedrock of Chapter 33 is the provision limiting the extent to which responsible claimants can recover damage: that "a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."  Tex. Civ. Prac. & Rem. Code § 33.001.[17]  As this Court has already concluded, the fraudsters behind the Stanford Ponzi scheme—Allen Stanford, James Davis, SIB, and SGC—must shoulder the <u>entire</u> blame for the damages caused by their

---

[17] <u>See also</u> <u>Austin</u>, 465 S.W.3d at 210; <u>Romero</u>, 456 S.W.3d at 560 ("As long as the plaintiff's own responsibility does not exceed 50%, he is entitled to a recovery reduced by his responsibility percentage."); <u>Smith v. East</u>, 411 S.W.3d 519, 525 (Tex. App.—Austin 2013, pet. denied) ("[O]ne implication of section 33.001's definition of 'claimant' . . . is that section 33.001 bars recovery by a derivative plaintiff if the fact-finder apportions more than 50% of responsibility to the person through whom the plaintiff claims.").

fraud.[18]   See Order, SEC v. Stanford Int'l Bank, No. 3:09-CV-00298-N (N.D. Tex. Apr. 25, 2013), Dkt. No. 1858.  In the order granting summary judgment in favor of the SEC, this Court concluded that Stanford, Davis, SIB, and SGC were jointly and severally liable for $5.9 billion, representing the entire damages associated with the fraud.  Id. at 12.  This amount was based on the criminal forfeiture imposed on Allen Stanford, which equates with the "proceeds generated by the conspiracy and scheme to defraud."  (Order of Forfeiture at Sentencing, United States v. Stanford, No. H:09-342-01-S (S.D. Tex. June 12, 2012), at 3, Dkt. No. 881.)

Plaintiff and its damages expert agree with the Court that Stanford, Davis, and the companies comprising Stanford Financial are responsible for the harm at issue in this case. Plaintiff alleges that Stanford Financial was a Ponzi scheme that ultimately collapsed because of self-inflicted wounds perpetrated by Stanford and Davis's fraudulent conduct on behalf of Stanford Financial.  The unifying thread in plaintiff's complaint is that "Stanford Financial was a massive, worldwide Ponzi scheme." (Compl. ¶ 25.)  At his deposition, the Receiver admitted that SGC and SIB engaged in fraud and stated that their sole shareholder—Allen Stanford—"was responsible for the entire fraud."  (App. 1114-15 [Ex. 79, Janvey Tr. 204:25-205:8 (emphasis added)].)  Van Tassel likewise testified that her theory of damages is based on a subset of the damages that were fundamentally and predominantly caused by Stanford Financial. (App. 1141 [Ex. 82, Van Tassel Decl. ¶ 102]; App. 1150-52 [Ex. 83, Van Tassel Tr. 126:18-128:25].)

Based on these undisputed facts, Stanford Financial is legally responsible for the entire harm associated with Stanford's fraud—which is, as plaintiff concedes, the "harm for which recovery of damages is sought"—and certainly at least 50% of that harm.  Tex. Civ. Prac. &

---

[18] The Fifth Circuit has likewise concluded that "R. Allen Stanford created and owned a network of entities . . . that sold certificates of deposit . . . to investors through the Stanford International Bank, Ltd.," and that "the Stanford principals—Stanford and Davis—were operating a Ponzi scheme." Janvey v. Brown, 767 F.3d 430, 433, 439 (5th Cir. 2014).

Rem. Code § 33.002; see also Fed. Sav. & Loan Ins. Corp. v. Tex. Real Estate Counselors, Inc., 955 F.2d 261, 268 (5th Cir. 1992) (holding that a receiver would not be entitled to damages under Chapter 33 if the bank on whose behalf it was suing was more than 50% responsible for its damages); F.D.I.C. v. Tex. Real Estate Counselors, Inc., No. A-88-CA-947, 1992 WL 237611, at *2 (W.D. Tex. July 20, 1992) (holding that because a bank was more than 50% responsible, the receiver suing on the behalf of the bank was not entitled to damages under Chapter 33). Accordingly, there is no question that Stanford Financial and the principals through whom it acted—and not Proskauer—are responsible for the damages plaintiff seeks.

Because neither this Court nor a jury could conclude that Stanford Financial is less than 50% responsible for the harm for which plaintiff seeks to recover on behalf of Stanford Financial, Proskauer is entitled to summary judgment on plaintiff's aiding and abetting claims.[19] See Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465, 474 (5th Cir. 2008) (questions of fact can be decided on summary judgment "if the summary judgment record compels the conclusion that movant is entitled to judgment as a matter of law").

## CONCLUSION

In light of the undisputed evidence in this case and for the reasons discussed above, Proskauer respectfully requests that the Court enter a summary judgment in Proskauer's favor, dismissing with prejudice plaintiff's remaining claims.

---

[19] In seeking to avoid this conclusion, plaintiff may try to rely on irrelevant cases refusing to apply Texas's in pari delicto doctrine to actions brought by equity receivers. Unlike Chapter 33, "[i]n pari delicto is an equitable, affirmative defense, which is controlled by state common law." Jones v. Wells Fargo Bank, N.A., 666 F.3d 955, 965 (5th Cir. 2012). Courts may refuse (and have refused) to apply it where its application would violate public policy. Chapter 33 is not an equitable defense; it is a legislatively enacted statute. Public policy cannot contravene its plain terms. See Villarreal v. Wells Fargo Brokerage Servs., LLC, 315 S.W.3d 109, 122 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that "the movants' policy argument . . . cannot serve to defeat the plain language" of Chapter 33). Indeed, the Texas Supreme Court has held that Chapter 33 has abrogated Texas's in pari delicto doctrine, further emphasizing that this Court's analysis is dictated solely by Chapter 33's plain language, see Dugger v. Arredondo, 408 S.W.3d 825, 831-32 (Tex. 2013), that Stanford Financial is a "claimant" in this action that cannot recover "damages if [its] percentage of responsibility is greater than 50%." Tex. Civ. Prac. & Rem. Code § 33.001.

Dated:  February 12, 2018

CARRINGTON, COLEMAN,                     DAVIS POLK & WARDWELL LLP
SLOMAN & BLUMENTHAL, L.L.P.


By: /s/ Neil R. Burger                          /s/ James P. Rouhandeh
   Neil R. Burger                              James P. Rouhandeh*
    Texas Bar No. 24036289                    New York Bar No. 2211837
    nburger@ccsb.com                          rouhandeh@davispolk.com
   Bruce W. Collins                            Daniel J. Schwartz*
    Texas Bar No. 04604700                    New York Bar No. 4159430
    bcollins@ccsb.com                         daniel.schwartz@davispolk.com
   901 Main Street, Suite 5500                 Craig M. Reiser*
   Dallas, Texas 75202                           New York Bar No. 4886735
   Telephone: (214) 855-3000                     craig.reiser@davispolk.com
   Facsimile: (214) 855-1333                   450 Lexington Avenue
                                              New York, New York 10017
                                              Telephone:  (212) 450-4000
                                              Facsimile:  (212) 701-5800
                                              * admitted *pro hac vice*

                                              *Attorneys for Defendant Proskauer
                                              Rose LLP*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 12, 2018, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing.  A Notice of Electronic Filing was transmitted to all ECF registrants.

/s/ James P. Rouhandeh
James P. Rouhandeh