UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

RALPH S. JANVEY, IN HIS CAPACITY
AS COURT-APPOINTED RECEIVER FOR
THE STANFORD RECEIVERSHIP
ESTATE, AND THE OFFICIAL
STANFORD INVESTORS COMMITTEE,

                *Plaintiffs*,

        - against -

PROSKAUER ROSE, LLP,
CHADBOURNE & PARKE, LLP, AND
THOMAS V. SJOBLOM,

             *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 3:13-cv-00477-N
Hon. David C. Godbey

---

**APPENDIX IN SUPPORT OF DEFENDANT PROSKAUER ROSE LLP'S
MOTION TO EXCLUDE EXPERT TESTIMONY OF KARYL VAN TASSEL**

---

Neil R. Burger
Bruce W. Collins
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333
E-mail:  nburger@ccsb.com

James P. Rouhandeh*
Daniel J. Schwartz*
Craig M. Reiser*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
E-mail:  rouhandeh@davispolk.com
* admitted *pro hac vice*

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | APPENDIX PAGE(S) |
|---|---|---|
|  | Declaration of James P. Rouhandeh | App. 5 – 6 |
| 1 | Supplemental Declaration of Karyl Van Tassel, dated November 27, 2017 | App. 7 – 28 |
| 2 | Excerpts from the transcript of the deposition of Karyl Van Tassel, dated January 11, 2018 | App. 29 – 55 |
| 3 | Excerpts from the transcript of the deposition of James M. Davis, dated January 18, 2018 | App. 56 – 58 |
| 4 | Declaration of Karyl Van Tassel, dated August 25, 2017 | App. 59 – 111 |
| 5 | Declaration of Karyl Van Tassel, dated July 27, 2009, submitted in SEC v. Stanford Int'l Bank, LTD | App. 112 – 136 |
| 6 | Excerpts from the transcript of the deposition of Ralph S. Janvey, dated January 16, 2018 | App. 137 – 140 |

Dated:  February 20, 2018

Respectfully submitted,

CARRINGTON, COLEMAN,                         DAVIS POLK & WARDWELL LLP
SLOMAN & BLUMENTHAL, L.L.P.


By: /s/ Neil R. Burger                              /s/ James P. Rouhandeh
    Neil R. Burger                                   James P. Rouhandeh*
      Texas Bar No. 24036289                        New York Bar No. 2211837
      nburger@ccsb.com                              rouhandeh@davispolk.com
    Bruce W. Collins                                 Daniel J. Schwartz*
      Texas Bar No. 04604700                        New York Bar No. 4159430
      bcollins@ccsb.com                             daniel.schwartz@davispolk.com
    901 Main Street, Suite 5500                      Craig M. Reiser*
    Dallas, Texas 75202                                New York Bar No. 4886735
    Telephone: (214) 855-3000                        craig.reiser@davispolk.com
    Facsimile: (214) 855-1333                        450 Lexington Avenue
                                New York, New York 10017
                                Telephone:  (212) 450-4000
                                Facsimile:  (212) 701-5800
                                * admitted *pro hac vice*

*Attorneys for Defendant Proskauer Rose LLP*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 20, 2018, I electronically transmitted the

foregoing document to the Clerk of the Court using the ECF system for filing.  A Notice

of Electronic Filing was transmitted to all ECF registrants.


/s/ James P. Rouhandeh
James P. Rouhandeh

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
RALPH S. JANVEY, IN HIS CAPACITY                              :
AS COURT-APPOINTED RECEIVER FOR                               :
THE STANFORD RECEIVERSHIP                                     :
ESTATE, AND THE OFFICIAL                                      :
STANFORD INVESTORS COMMITTEE,                                 :
                                                              :
            *Plaintiffs*,                                     :
                                                              :   Civil Action No. 3:13-cv-00477-N
                                                              :   Hon. David C. Godbey
      - against -                                             :
                                                              :
PROSKAUER ROSE, LLP,                                          :
CHADBOURNE & PARKE, LLP, AND                                  :
THOMAS V. SJOBLOM,                                            :
                                                              :
            *Defendants*.                                     :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DECLARATION OF JAMES P. ROUHANDEH IN SUPPORT OF
DEFENDANT PROSKAUER ROSE LLP'S MOTION TO
<u>EXCLUDE EXPERT TESTIMONY OF KARYL VAN TASSEL</u>**

JAMES P. ROUHANDEH declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney admitted to practice pro hac vice before this Court, and I am a partner in the law firm of Davis Polk & Wardwell LLP, counsel for Proskauer Rose LLP ("Proskauer") in the above-captioned matter.  I submit this declaration in support of Proskauer's Motion to Exclude Expert Testimony of Karyl Van Tassel.  The matters in this declaration are within my personal knowledge and are true and correct.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Supplemental Declaration of Karyl Van Tassel, dated November 27, 2017.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript the deposition of Karyl Van Tassel, dated January 11, 2018.

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the transcript of the deposition of James M. Davis, dated January 18, 2018.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Karyl Van Tassel, dated August 25, 2017.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Karyl Van Tassel, dated July 27, 2009, submitted in SEC v. Stanford Int'l Bank, LTD, No. 3:09-CV-00298-N.

7.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the transcript of the deposition of Ralph S. Janvey, dated January 16, 2018.

Dated:      New York, New York
            February 20, 2018

                                                /s/ James P. Rouhandeh
                                                James P. Rouhandeh

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | ) | |
| AS COURT-APPOINTED RECEIVER | ) | |
| FOR THE STANFORD RECEIVERSHIP | ) | |
| ESTATE, AND THE OFFICIAL | ) | |
| STANFORD INVESTORS COMMITTEE | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 3:13-CV-0477-N-BG |
| v. | ) | |
| | ) | |
| PROSKAUER ROSE L.L.P., | ) | |
| CHADBOURNE & PARKE, L.L.P., AND | ) | |
| THOMAS V. SJOBLOM, | ) | |
| | ) | |
| Defendants. | ) | |

---

## SUPPLEMENTAL DECLARATION OF KARYL VAN TASSEL

---

I, Karyl Van Tassel, of 909 Fannin Street, Suite 2450, Houston, Texas 77010, state as follows:

### QUALIFICATIONS, BACKGROUND INFORMATION AND PRIOR DECLARATIONS

1. I am over the age of 21 years and am legally competent to make this declaration. A copy of my résumé is attached as exhibit KVT-1, which summarizes my education and relevant work experience. As it states, I am a Managing Director with Navigant Consulting, Inc., and I am a Certified Public Accountant in the State of Texas. I have over 30 years of experience in providing a variety of audit, accounting, tax, litigation, valuation, investigation, and other financial advisory services. I have performed detailed investigations and financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud, and

1

wrongful termination matters.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2. This Supplemental Declaration is in response to the expert reports of Dr. Paul Gompers ("Gompers Report") and Andrew Richmond ("Richmond Report") both dated October 27, 2017, which were submitted in response to my declaration dated August 25, 2017 in this case ("Original Declaration").  I disagree with the opinions and assertions that pertain to my Original Declaration that are contained in the Gompers and Richmond Reports. This Supplemental Declaration sets forth my opinions regarding their reports.

3. The fact that I do not address a specific issue in the Gompers or the Richmond Reports should not be construed to reflect my agreement; rather I have concluded that it has been addressed adequately in the Original Declaration, my prior Declarations incorporated by reference in my Original Declaration, in the summary comments herein or elsewhere in this Supplemental Declaration, and does not require further discussion.  Additionally, my analysis is based upon the information I have received and my understanding of the Gompers and Richmond Reports to date.  As Dr. Gompers and Mr. Richmond have yet to be deposed, I may revise my opinions for any additional information received through their deposition testimonies or additional documents received.

4. For abbreviations used throughout this Supplemental Declaration, please refer to my Original Declaration.

5. My firm, Navigant Consulting, Inc., is currently being compensated for my work on an hourly basis at the rate of $520 per hour. (See Case No. 3:09-CV-0298-N, Doc. 2238.)  This hourly rate does not exclude amounts subject to the Court's holdback order. (*See* Case No. 3:09-CV-0298-N, Doc. 1565.)

## GOMPERS REPORT

6. The Gompers Report sets forth opinions in five primary areas:

    1. Economic damage methodology

    2. Linking the economic damages to the actions of Mr. Sjoblom and Proskauer

    3. Application of offsets to economic damages

    4. Inclusion of "reasonable business expenses"

    5. Loss estimates for the period February 1, 2008 and thereafter are zero

### *Fundamental flaws of the Gompers Report*

7. As described further below, the Gompers Report suffers from four fundamental flaws that are discussed throughout my analysis of each of the five areas noted above:

    • Misapplication of economic damage methodologies

    • Attributing opinions to me that are incorrect and/or do not exist

    • Lacking sufficient knowledge of the case facts and/or the information contained in my prior declarations

    • Utilizing incorrect information

### *Economic damage methodology*

8. Dr. Gompers states that to properly assess economic damages one must analyze what would have occurred "but-for" the alleged wrongdoing and compare that scenario to actual results.   However, Dr. Gompers' criticism that I did not engage in a but-for causation analysis is simply incorrect and reflects a fundamental misunderstanding of Plaintiffs' claims and damage model in this case.  Plaintiffs contend that the officers and directors of Stanford breached their fiduciary duties to SGC and SIB by using the companies to violate the securities laws (which the Court has already ruled that they violated, including the Securities Act, the Exchange Act, Rule 10b-5, the Investment Company Act and the Investment Advisors Act) and by obstructing the SEC's investigation.  Plaintiffs also contend that the officers and directors of SGC and SIB used

3

those entities to engage in a fraudulent scheme.  *See* Plaintiffs' Original Complaint dated January 31, 2013 at paragraph 257.[1]  But-for those wrongful acts, which the Plaintiffs allege were aided and abetted by Mr. Sjoblom and Proskauer during the time periods set forth in my Original Declaration, SIB and SGC would not have incurred the increased liabilities which I set forth in my Original Declaration and are the basis of my economic damage analysis.

9.  On April 25, 2013, the Federal District Court in the Northern District of Texas found that Mr. Stanford, SIB and SGC had violated the Securities Exchange Act § 10(b), Rule 10b-5, the Securities Act § 17(a), Section 206(1) of the Investment Advisors Act, and the Investment Company Act §7(d), and that Mr. Stanford was *"liable to disgorge the $5.9 billion that he obtained as a result of his fraudulent scheme,"* and SIB and SGC were found jointly and severally liable for the disgorgement amount.  *See* SEC v. Stanford International Bank, Civil Action No. 3:09-CV-0298-N, Dkt. 1858 (April 25, 2013).  The Court determined this amount by starting with *"the approximately $7.2 billion found to be owed to CD depositors by SIBL at the time SIBL went into receivership"* and discounting approximately $1.3 billion in *"fictitious interest."*  After making an additional deduction of fictitious interest of $500 million for the time period 1998 to 2003, I arrived at total CD liabilities resulting from the Ponzi scheme of $5.4 billion.  *See* Original Declaration at paragraph 102.  Dr. Gompers does not dispute this amount.

10. The Receiver has alleged in this case that certain officers and directors of SIB, SGC and other Stanford Entities breached their fiduciary duties to SIB and SGC and engaged in a fraudulent scheme by operating these companies in violation of U.S. securities laws, operating those and other Stanford entities as a fraud and Ponzi scheme, and by obstructing the SEC investigation.  *See* Plaintiffs' Original Complaint dated January 31,

---

[1] Ralph S. Janvey, in his capacity as Court-appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee Plaintiffs, v. Proskauer Rose L.L.P., Chadbourne & Parke, L.L.P., and Thomas V. Sjoblom, Defendants, Civil Action No. 3:13-CV-00477-N (January 31, 2013).

2013 at paragraphs 73-74.[2]   As I understand them, the claims against Mr. Sjoblom and Proskauer are that Mr. Sjoblom aided, abetted and participated in those breaches of fiduciary duty and in the alleged fraud, i.e. he aided and abetted and participated in the conduct that led to the total CD liabilities of $5.4 billion.   Thus, the most appropriate measure of damages in this case is the amount of increased CD liabilities that accrued to SIB and SGC after Mr. Sjoblom and Proskauer began aiding, abetting or participating in the breaches of fiduciary duties and fraud.   That is the measure of damages set forth in my Original Declaration and remains my opinion.

### Linking the economic damages to the actions of Mr. Sjoblom and Proskauer

11. Dr. Gompers opines that my Original Declaration does not sufficiently link the actions of Mr. Sjoblom or Proskauer to the economic damages, or losses.   In so stating, he simply ignores the facts set forth in my Original Declaration.   My Original Declaration has approximately 36 pages from paragraphs 14 through 90 dedicated to information or documents that were available to Mr. Sjoblom and Proskauer as well as their actions, or in some cases inactions.   The information in my Original Report is what links Mr. Sjoblom and Proskauer to the damages suffered by the Stanford Entities.

12. Dr. Gompers correctly states that I have set forth damages at three separate dates to provide to the trier of fact the economic damages amounts that could be linked to specific actions and/or failures to act by Mr. Sjoblom and Proskauer.   Obviously, these are not the only dates available to the trier of fact.   The three selected dates are linked to the information and knowledge that Mr. Sjoblom and Proskauer had available to them up to those dates and their corresponding actions (or lack of actions) as of those dates.   *See* Original Declaration at paragraphs 103 through 106.   Dr. Gompers apparently fails to understand the premise of my damage calculation, which is that, as alleged by the

---

[2] Ralph S. Janvey, in his capacity as Court-appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee Plaintiffs, v. Proskauer Rose L.L.P., Chadbourne & Parke, L.L.P., and Thomas V. Sjoblom, Defendants, Civil Action No. 3:13-CV-00477-N (January 31, 2013).

Plaintiffs, Mr. Sjoblom and Proskauer aided and abetted the breaches of fiduciary duties and fraudulent scheme perpetrated by the officers and directors of SIB and SGC during the time periods set forth in my Original Declaration, and Mr. Sjoblom and Proskauer are therefore responsible for the increased liabilities caused by those breaches of fiduciary duties and fraudulent scheme during those time periods.

*Application of offsets to economic damages*

13. Dr. Gompers asserts that any recoveries on behalf of SIB and SGC should reduce the economic damages in this matter.  He estimates that accounting for total recoveries reduces the economic damages by $909 million gross, or $464 million net of expenses. These offsets are inappropriate for the following reasons: (1) most of the recoveries are litigation recoveries, and it is my understanding it is the Court's role to determine what, if any, settlement or judgment credits Defendants are entitled to receive under the law as a result of those recoveries; and (2) even if it were proper to deduct recoveries from the sale or liquidation of non-litigation assets from the increased CD liabilities incurred by SIB and SGC, it would be improper to deduct the recoveries from the increased CD liabilities incurred during only a portion of the time Stanford was in operation as Dr. Gompers has done (the total CD liabilities far exceed those for the time periods I use in my Original Declaration).  Furthermore, the CD liabilities that I have computed for the time periods in my Original Declaration would never have been incurred had the Stanford officers and directors not continued to engage in the wrongful conduct that is the subject of this lawsuit, aided and abetted by Mr. Sjoblom and Proskauer as alleged by the Plaintiffs.  Therefore, recoveries from sale and liquidation of non-litigation assets would have been available to distribute to CD investors prior to the time Plaintiffs contend Mr. Sjoblom and Proskauer began aiding and abetting or participating in breaches of fiduciary duties and the fraud.  Accordingly, it is inappropriate to credit those amounts against the CD liabilities incurred after the dates used in my Original Declaration.

6

*Inclusion of reasonable business expenses*

14. Dr. Gompers also improperly offers various scenarios that exclude his estimate of "reasonable business expenses" from my economic damages.  This either illustrates his misapplication of the methodology I am using, or he is trying to construe that the economic damages are somehow a revenue amount from which expenses should be deducted.  Either way, it is incorrect.  The Court found that the Stanford Entities were used by the officers and directors to violate securities laws, Mr. Stanford was convicted of using the Stanford Entities to commit criminal acts, Mr. Davis pled guilty to using the Stanford Entities to commit crimes and obstruct the SEC investigation, and Ms. Pendergest-Holt pled guilty to obstruction of the SEC investigation.[3]  Dr. Gompers is improperly subtracting expenses that were incurred to perpetuate this wrongful conduct and create the liabilities I have included in the economic damages.  Subtracting them would be inappropriate, because they should not have been incurred at all.  The expenses served to continue the operations providing the façade of a legitimate business to attract additional investors.   It is unclear exactly which expenses Dr. Gompers is including in his analysis,[4] but based on the description he provides, they may include the fees paid to the Defendants in this case, salaries for the personnel that perpetrated the scheme,[5] and commissions/fees paid to financial advisors for continuing to sell the CDs.  In fact, as set forth below, the ongoing expenses incurred to perpetuate the wrongful scheme of the officers and directors, aided and abetted by Mr. Sjoblom and Proskauer as alleged by the

---

[3] United States of America v. Robert Allen Stanford, Criminal No. H-09-342, Verdict dated March 6, 2012, United States of America v. Robert Allen Stanford, Criminal No. 4:09-cr-00342, Judgement in a Criminal Case dated June 14, 2012, United States of America v. James M. Davis, Criminal No. H-09-335, Plea Agreement dated December 5, 2011, United States of America v. James M. Davis, Criminal No. 4:09-cr-00335, Judgement in a Criminal Case dated January 25, 2013, United States of America v. Laura Pendergest-Holt, Criminal No. H-09-342-2, Plea Agreement dated June 21, 2012, and United States of America v. Laura Pendergest-Holt, Criminal No. 4:09-cr-00342, Judgement in a Criminal Case dated September 24, 2012.

[4] I was unable to replicate all the of the amounts in Dr. Gompers' analysis.  As more information becomes available I may supplement my opinion.

[5] Dr. Gompers does indicate he excluded the salaries of Mr. Stanford, Mr. Davis, Mr. Kuhrt and Mr. Lopez.  Although we disagree with any reductions, based on his own theory he should have also excluded Ms. Pendergest-Holt's salary.

Plaintiffs, also damaged SIB and SGC by draining cash from the entities through the wrongful conduct.

*Loss estimates for the period February 1, 2008 and thereafter are zero*

15. The Gompers Report asserts that my loss estimates for the period February 1, 2008 and thereafter are zero. This assertion in misleading. SIB and SGC continued to suffer harm after February 1, 2008. Although it is true that net CD liabilities did not increase after February 1, 2008, the Stanford Entities had on-going operating costs necessary to perpetrate the scheme that required significant amounts of cash. The average operating costs for 2008 were over $33 million per month and included employee compensation, advertising and marketing, data software systems payments, dues and memberships, office supplies and services, employee travel expenses, delivery and postage, office rents and expenses associated with the maintenance and operations of airplanes.[6] These expenses served to continue the operations providing the façade of a legitimate business, enticing more investors through the date of the Receivership.

*Other issues from Gompers Report*

16. The Gompers Report also highlights a discrepancy between my damage model in the Alvarado matter and this matter — a discrepancy in the 2007 monthly SGC Portfolio Advisory Fees deducted from the increase in SGC's liability (Gompers Report footnote 35). The SGC Portfolio Advisory Fees used in the Alvarado analysis were identified from SGC's monthly P&L statements under the caption "Merchant Banking." *See* exhibit KVT-2. Per SGC's audited financial statements, SGC received these fees pursuant to an

---

[6] The $33 million per month is a summary of significant cash expenses incurred by only a handful of 130 entities, specifically: Stanford Group Holdings, Stanford Development Company, Stanford Financial Group Company, Stanford Group Company, Stanford Capital Management, Stanford Trust Company, Stanford Coins And Bullion, Stanford Group Company, Stanford Financial Group Global Management, Caribbean Sun Airlines Holdings, Inc., and the various aviation related entities, including; Stanford Aviation, LLC, Stanford Aviation 5555, LLC, Stanford Aviation II, LLC, Stanford Aviation III, LLC, Stanford Aircraft, LLC, Caribbean Airline Services, Ltd., and Caribbean Sun Airlines Holdings, Inc.

agreement with SIB in which it would earn fees based upon the value of SIB's investment portfolio. While preparing my analysis for this matter, I identified that beginning in 2007, the "Merchant Banking" caption in SGC's monthly P&L statements included not only the related party fees received from SIB but also related party advisory and placement fees received from SVCH. *See* exhibit KVT-3 at STAN INVSTR GENL_057467. Accordingly, I revised my analysis to only include the related party fees SGC received from SIB.

## RICHMOND REPORT

17. The Richmond Report states that the concealment schemes were well designed and executed making it difficult to detect the Stanford fraud, and that Stanford concealed information regarding the scheme from numerous parties, including Mr. Sjoblom. The Richmond Report also includes critique regarding my work in this matter, specifically, that certain pertinent information was omitted from my Original Declaration. This section of my Supplemental Report addresses these opinions and criticisms.

### *Fundamental flaws of the Richmond Report*

18. The Richmond Report, in general, has four fundamental flaws that pertain to Mr. Richmond's assertion that the Ponzi Scheme was so well executed that it was difficult to detect and to the specific critiques of my Original Declaration:

- Ignoring relevant information that was conveyed to Mr. Sjoblom by third-parties, such as the SEC

- Ignoring relevant information that was available to Mr. Sjoblom as an attorney representing the Stanford Entities

- Ignoring relevant public information that was available to Mr. Sjoblom and Proskauer

- Highlighting misleading excerpts taken out of context from case documents and failing to consider other pertinent and often inconsistent information available to Mr. Sjoblom

*Detection of the Stanford Ponzi Scheme*

19. I disagree that the concealment was so well designed and executed that it made it difficult to detect the Stanford Ponzi scheme, particularly for someone with the experience, knowledge, information and access enjoyed by Mr. Sjoblom.  Mr. Sjoblom, as the attorney in charge of defending the SEC investigation of SGC and SIB, was uniquely situated with access to confidential, non-public information, to have detected the officers' and directors' breaches of fiduciary duties and the fraudulent scheme.  Mr. Sjoblom had extensive access to people, documents, and information unavailable to the public.  *See* Deposition Transcript of Pablo Mauricio Alvarado dated September 10, 2014 at page 204:4-8.

20. Contrary to Mr. Richmond's contention that the Stanford fraud was difficult to detect, numerous parties both internal and external to the Stanford Entities discovered and alleged that Stanford was a Ponzi scheme or another type of fraudulent scheme, including the SEC, former employees, and financial advisors who had sold the SIB CDs despite their lack of knowledge of how the bank was investing the money.  *See* KVT-6 to Karyl Van Tassel Declaration dated June 2, 2011 and Original Declaration at paragraphs 18, 19 and 26.   Mr. Richmond ignores these facts and Mr. Sjoblom's unique position to discover them.

21. Given his position as SIB's counsel, Mr. Sjoblom could have asked to see support for the bank's portfolio which would have revealed that it was not invested as reported and/or was not invested in a manner consistent with other information he was told regarding the types of investments made by SIB or purchased with SIB CD proceeds (e.g. that a significant amount was invested in real estate as discussed in paragraph 34 below), either of which would have been a red flag of a Ponzi or other type of fraudulent scheme.

22. Moreover, as explained in detail in my Original Report, Mr. Sjoblom had access to information and was told many things indicating that the Stanford Entities operated as a fraudulent scheme.  In the sub-paragraphs below I have included examples of what was

told to Mr. Sjoblom based upon the documents available in this matter and the information to which he had access early in his engagement with the Stanford Entities. I also included these examples in my Original Declaration.

a) Mr. Sjoblom was told that the SEC was accusing SGC and SIB of running a Ponzi scheme when he was first engaged as Stanford's counsel in 2005. *See* Original Declaration at paragraphs 14 and 18. In 2006 Mr. Sjoblom had a telephone conversation with Jennifer Brandt at the SEC, during which Ms. Brandt told Mr. Sjoblom that he should expect a full investigation, including a fraud investigation. *See* Original Declaration at paragraph 22.

b) Mr. Sjoblom was told that former employees who had sold the SIB CDs had felt that the information about the bank's portfolio was inadequate, had claimed Stanford was a Ponzi scheme, a prime bank scheme and had complained about the SIB CD sales practices. *See* Original Declaration at paragraphs 18, 19 and 26.

c) Mr. Sjoblom was told that the SIB investment portfolio was confidential under an Antiguan privacy law that he received in 2005, which on its face only covers the bank's customers' information. *See* Original Declaration at paragraph 55. Nonetheless, Mr. Sjoblom adopted the position that the investment portfolio was confidential in his communications with the SEC. *See* Original Declaration at paragraph 56.

d) Mr. Sjoblom was told early on in his engagement in 2005 that SIB did not make commercial loans and was not a traditional bank, but rather pooled investors' money and invested the money in ways that yielded a return greater than the yield of the CDs. *See* Original Declaration at paragraph 48.

11

e) Mr. Sjoblom had information available to him that the insurance SIB had listed in its marketing brochure provided little or no coverage or security for depositors. *See* Original Declaration at paragraph 32.

23. In several ways, during the years that Mr. Sjoblom and Proskauer represented the Stanford Entities, SGC and SIB had all the hallmarks of a traditional Ponzi scheme: (1) above-market, unexplained returns inconsistent with representations to investors that the bank was investing in safe, liquid and highly marketable securities, (2) excessive commissions paid to the brokers at SGC to sell the CDs, (3) use of single product sales contests to encourage high growth rates in CD sales (4) a secret investment portfolio to which the SGC brokers at SGC did not have access despite the fact the ultimate owner of SGC and SIB was the same, and (5) a façade of a successful, highly profitable business enterprise despite the lack of business reasons for that level of return. Mr. Richmond describes many of these common characteristics of a Ponzi scheme. *See* Ricmond Report at Section F. Despite all this, Mr. Sjoblom represented to the SEC that he had reviewed Stanford's operations and that *"there was no fraud here [at Stanford]"*. *See*, for example, Original Declaration at paragraphs 22 and 25.

24. Additionally, Mr. Sjoblom knew that SIB was an international bank in Antigua, because he visited Antigua early in his representation of Stanford in August 2005. *See* Original Declaration at paragraph 52. Antigua, a country with a population today of approximately 85,000 people, is well known in the United States for its lack of adequate regulation of the financial services sector. In fact, in 2009 there were only three bank examiners in the Financial Services Regulatory Commission of Antigua who were responsible for all of the banks in Antigua. In 2007 and 2008, for example, the entire country's gross domestic product (GDP) was $1.32 billion and $1.39 billion, respectively. During the same years, annual expenditures for the country totaled $200 million and $294 million, respectively, deficits for the country in both years. *See* exhibits KVT-4 at pages 1 and 6 and KVT-5 at pages 18 and 25. The entire country's GDP and annual expenditures were both small fractions of the value of the assets claimed to be deposited with SIB in

12

Antigua during that same time period.  This was public information readily available to Mr. Sjoblom and Proskauer.

25. The high rates of return of the SIB CDs that were reported by SIB, at a time when the world economy was in crisis,[7] likewise were known to Mr. Sjoblom, because they were set forth in the SIB marketing brochure he reviewed and attached to his October 2005 letter to the SEC.  *See* Original Declaration at paragraph 21.  The historical performance of SIB's CDs is extraordinary, to say the least.  SIB offered CD rates that were significantly greater than those offered in the United States.  See Table 1 below.

**Table 1 - SIB CD Yields v. Average U.S. Bank CD yields from 1997 to 2006[8]**

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

26. As shown in Table 1 above, at their worst, SIB CDs had a rate of return 40% greater and at their best 288% greater than the average rate for U.S. Bank CDs.

27. A review of SIB's financial statements also shows that the SIB financial model was not sustainable without the influx of new CD money.  *See* exhibits KVT-3 and KVT-5 to Karyl Van Tassel Declaration dated May 24, 2010.

---

[7] In 2008 the world economy faced a severe crisis. Beginning in 2007 when high home prices in the United States had turned decisively downward, the downturn spread quickly to the overall economy, first to the entire U.S. financial sector and then to financial markets overseas, and then impacted the entire global economy.  For example, the Dow Jones Industrial Average in the U.S. lost 33.8% of its value in 2008.  At the heart of the crisis were mortgage backed securities.  Bear Stearns, one investment bank that invested heavily in mortgage backed securities was rescued by JPMorgan Chase and the Federal Reserve in March of 2008.  In September of 2008, Lehman Brothers, another similarly situated investment bank, declared bankruptcy.  *See* exhibit KVT-6.
[8] *See* exhibit KVT-11 to the Original Declaration at PROSKAUER_JANVEY_00000867.

28. The claimed extraordinary returns provided by the SIB CDs lacked credibility considering SIB's representations regarding its conservative investment strategy and emphasis on guaranteed returns to its CD customers (see paragraph 25 above).  As a general rule, in order to achieve higher levels of returns, it is necessary to take on a higher level of investment risk.  Here, SIB claimed to buck this trend by providing consistently high returns as well as the lowest level of consumer risk.  Moreover, SIB offered no substantive, credible explanation as to how it was able to offer these uncommon CD rates.  In its 2007 annual report, SIB claimed to *focus on maintaining the highest degree of liquidity as a protective factor for our depositors… [by investing] in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  See* exhibit KVT-3 to Karyl Van Tassel Declaration dated May 24, 2010 at page 3.  This obvious disconnect between a conservative investment strategy and consistent and/or above-market returns was known to Mr. Sjoblom because he had reviewed the marketing brochure and the Disclosure Statement and had interviewed the Stanford insiders beginning in 2005.  *See* Original Declaration at paragraphs 31, 32 and 48.

29. SIB's claimed conservative investment strategy also did not square with the information SIB made available to the public about its portfolio.  For example, in its 2007 annual report, which was available to the public, SIB claimed that its investment portfolio at fair value consisted of 58.6% equity, 18.6% fixed income, 15.6% alternative investments (i.e. hedge funds) and 7.2% precious metals.  *See* exhibit KVT-5 to Karyl Van Tassel Declaration dated May 24, 2010 at page 24.  SIB's investment allocation for the years prior, going back to at least 2004, was very similar to this.  *See* exhibit KVT-6 to Karyl Van Tassel Declaration dated May 24, 2010 at page 3.  Other than the fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk, particularly in the 2004 through 2007 time period.  All of this was another characteristic of a fraudulent scheme known to Mr. Sjoblom.

30. Most multi-billion dollar investment funds go through rigorous audits by large and well-known audit firms and in fact switch auditors at regular intervals to avoid even the

14

appearance of impropriety.  This was not the case with SIB.  As reported in SIB's annual statements, from SIB's inception to its closing, its auditing firm was C.A.S. Hewlett & Co., Ltd., a very small local firm in Antigua.  SIB had been audited by the Hewlett firm instead of one of the larger, well-known auditing firms that more commonly audit companies of the size and complexity of SIB, for example, any of the so called Big-4 auditing firms that all had presence in the Caribbean at the time.  Mr. Sjoblom testified that he had not heard of the Hewlett firm and that he did not research it himself.  *See* Sjoblom Deposition at 312:24-314:15.  Had Mr. Sjoblom researched the Hewlett firm, he would have found out that it lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion-dollar investment portfolio.

31. For the above-stated reasons I disagree with Mr. Richmond's assertion that the Stanford fraud was difficult to detect by someone in Mr. Sjoblom's position, a 20-year veteran of the SEC Enforcement Division, with access to non-public information and the employees and records of SIB and SGC.

### *Mr. Richmond's critique regarding allegedly omitted information*

32. The Richmond Report includes various critiques, specifically, that my Original Declaration omits certain information.  The Richmond Report on pages 59 and 60 states the following:

> *"Ms. Van Tassel fails to cite or discuss documents or other evidence indicating that Mr. Sjoblom was a target of – rather than a participant in – various aspects of the Stanford Financial Fraud scheme and related concealment efforts…"*

> *"Ms. Van Tassel fails to mention that Stanford Financial considered replacing Mr. Sjoblom with new outside counsel on multiple occasions, which in my opinion is inconsistent with Mr. Sjoblom being aware of and actively participating in the fraud scheme."*

15

*The "concealment efforts" noted by Mr. Richmond contradict other information that was available or told to Mr. Sjoblom*

33. The common theme in Section VI of the Richmond Report is that statements were made to Mr. Sjoblom *("he was told")* that turned out to be false.  The Richmond Report fails to address the fact that what Mr. Sjoblom *"was told"* is inconsistent with other information that was available to Mr. Sjoblom, either in statements or in documentation.

34. In paragraph 137 of his report Mr. Richmond states that Mr. Sjoblom *"was told that SIBL's real estate investments were funded by the bank's earnings and not from CD investor money."*  In paragraphs 143 and 144 of his report Mr. Richmond further states that Mr. Sjoblom *"initially only had knowledge of two tiers of investments,"* that Mr. *Sjoblom "was told that SIBL's real estate investments were funded by the bank's earnings and not from CD investor money"* and that *"Mr. Sjoblom testified that his first recollection of learning about the existence (not the content) of a 'third tier' of investments was in late 2008 related to a Federal Reserve investigation."* Tier-3 consisted, in part, of real estate investments.  Based on the documents I have reviewed, Mr. Sjoblom has testified that he only learned about "Tier-3" in late 2008.  *See* Sjoblom Deposition at 91:25-92:1.  However, there were other indicators that contradicted this information and that were available to Mr. Sjoblom much earlier during his retention by the Stanford Entities.  Specifically, when visiting Antigua in August 2005, Mr. Sjoblom received an examination report which does not include a separate category for non-CD investments.  *See* Original Declaration at paragraph 60.  In addition, in September 2006 Mr. Sjoblom had learned that former registered representatives had stated that SIB money was used to fund real-estate ventures.  *See* Original Declaration at paragraph 68.  In summary, whether the real estate was funded by CD proceeds or by SIBs earnings (which is not true), there was a clear indication that the real estate was owned by the bank.

35. In paragraphs 138 and 139 of his report Mr. Richmond states that *"Mr. Sjoblom was told "that SIBL's regulator, the FSRC, saw the bank's actual holdings and positions every 90 days,"* that *"Mr. King appears to have reiterated some of the lies already told to Mr. Sjoblom,"* that *"Mr. Sjoblom was told that the FSRC examines the details of SIBL's investment portfolio and satisfies*

16

*itself that the investor funds were invested as represented in SIBL's annual report"* and, *"Mr. Sjoblom was told while in Antigua that SIBL's external auditor also confirmed the investments in the portfolio."*   Mr. Richmond omits that Mr. Sjoblom was also aware of the unusual relationship between Stanford and the FSRC, which he had learned about in September 2006 when Mr. Stanford had called Mr. Sjoblom.  *See* Original Declaration at paragraphs 23, 24, 42 and 68.  I am not aware of Mr. Sjoblom performing any detailed review of SIB's holdings and positions himself.  *See* Original Declaration at paragraphs 53 and 66.  Despite all the obvious inconsistencies and that he was told from day one that the SEC suspected Stanford was a Ponzi scheme, I have seen no evidence that Mr. Sjoblom performed some level of review himself, particularly when he represented to the SEC that he had in fact reviewed Stanford's operations and that there was no fraud.  *See* Original Declaration at paragraphs 22 and 25.

36. In paragraph 140 of his report Mr. Richmond states that Mr. Sjoblom *"was told how SIBL could 'generate such high returns' by using foreign currencies, alternative investments, and global diversification."*  Mr. Richmond fails to mention that regardless of what Mr. Sjoblom may have been told, by any measure the returns that SIB reported were too good to be true, particularly since the explanation he alleges was provided is the same as any other investment strategy and, therefore, does not explain the inordinately high and consistent returns.  *See* paragraph 28 above.

37. In paragraph 141 of his report Mr. Richmond states that Mr. Sjoblom *"was told that SGC makes (or made) two or three due diligence trips to SIBL and that SGC had due diligence files for 'each SIB[L] CD product'…"* and that *"Shortly after this meeting in September 2005, Ms. Bates [Chief Compliance Officer of SGC] e-mailed Mr. Sjoblom a listing of the contents of the alleged SIBL due diligence file.  According to Ms. Bates, her SIBL due diligence file contained: 1) SIBL quarterly updates, 2) a schedule of on-site visits and notes, 3) IMF Report, 4) annual reports, 5) SEC Regulation D filings, 6) Antiguan Certificate of Good Standing, and 7) miscellaneous notes and memos…"*  The documents that I have reviewed do not indicate that Mr. Sjoblom ever asked Ms. Bates to provide any of the documents listed in her email or that he in any other

way attempted to verify that that the due diligence file that Ms. Bates had referred to in her email existed or the nature of its contents. If Mr. Sjoblom indeed believed that the contents of the due diligence file was as reflected by Ms. Bates' email, he should have noted then that the due diligence was inadequate because there is nothing contained therein that reflects any verification of the portfolio.

38. In paragraph 142 of his report Mr. Richmond states that *"Mr. Sjoblom was told that the former employee complaints were unfounded and were the result of disgruntled FAs."* Based on the documents I have reviewed, Mr. Sjoblom did little or nothing to further investigate the claims or just ignored them even though he was already aware of the SEC's allegations about the sale of CDs and that those allegations were consistent with the former employees' claims.

39. In paragraph 148 of his report Mr. Richmond states that *"Mr. Sjoblom was told that SIBL was not the cause of any delays in document production to the SEC despite the FSRC telling the SEC that SIBL was the cause of the delay."* In my Original Declaration I noted multiple occasions when the SEC communicated to the Stanford Entities and Mr. Sjoblom its frustration regarding the problems it encountered in its attempt to receive documents from SIB. *See* Original Declaration at paragraphs 56 and 58. As reflected in correspondence between Mr. Sjoblom and the SEC and communications between Mr. Sjoblom and others, Mr. Sjoblom was a direct participant in this gamesmanship by SIB and authored responses to the SEC as to whether the FSRC or SIB was the cause of delay in the production of SIB's records to the SEC. *See*, for example, Original Declaration at paragraphs 16 and 58.

40. In paragraphs 154 through 156 of his report Mr. Richmond provides several examples that indicate that *"Mr. Sjoblom was excluded from communications among the co-conspirators and others aware of certain aspects of the fraud"* and that *"Fraudsters, like those at Stanford Financial, often attempt to conceal their fraud by being careful about how they communicate and who receives communications concerning any fraudulent activities."* I have included these examples below:

18

a) Paragraph 154: *"For example, after Mr. Sjoblom forwarded information to Mr. Alvarado regarding the SEC's planned visit to Antigua in October 2006, Mr. Alvarado forwarded the same information to Mr. Stanford and Mr. Davis, leaving Mr. Sjoblom off the e-mail. Mr. Stanford replied, also excluding Mr. Sjoblom, "No wa[y] are they coming on Oct 11. We all will meet on Wed in Miami."*

b) Paragraph 155: *"For example, in a January 30, 2008 e-mail chain between Mr. Young, Ms. Stinson and Rebecca Hamric regarding a response to FINRA; Ms. Hamric indicated she was comfortable with the response without Mr. Sjoblom's input which she felt was 'time consuming and costly.'"*

c) Paragraph 155: *"In another example, in a February 9, 2009 e-mail related to questions posed by a Business Week reporter regarding SEC and FINRA investigations of Stanford Financial and numerous other allegations, Mr. Bogar, SGC President, informed Mr. Stanford, Ms. Stinson and Mr. Alvarado, that 'Lena needs either Mauricio or Tom to help with this reporter. This is important.' Mr. Stanford responded to this e-mail with, 'Not Tom.'"*

d) Paragraph 156: Per a text message from Mr. Stanford *"[Sjoblom] is now the Enemy. I am meeting with [Alvarado] and [Bogar],"* and *"[Sjoblom] is setting you and everyone up to make $$$ I have been living with this for 5 years [Alvarado] is far more valuable."*

e) Paragraph 156: *"Mr. Stanford stated to Mr. Davis, 'Read this shit.' It appears Mr. Stanford was reacting to the level of detail Mr. Sjoblom was advising Ms. Holt to present to the SEC."*

41. None of the examples that Mr. Richmond highlights indicate *"fraudulent activities"* being concealed from Mr. Sjoblom. In my experience, it is not uncommon for a company to discuss various matters internally before including external parties in the discussion (40a). I also do not find it uncommon that a company might consider outside counsel's input on certain matters as *"time consuming and costly"* (40b) nor does it suggest any wrongful activity on its face, or that at times a company might prefer to handle certain tasks internally instead of utilizing outside counsel (40c). As for referring to Mr. Sjoblom as the *"enemy"* (40d), based on the information that is available, it is unclear what was the source of or reason for Mr. Stanford's comments. In fact, the same mobile phone records that Mr. Richmond quotes as the source for these statements by Mr. Stanford note that earlier the

19

same day, February 10, 2009, Mr. Davis had stated *"if we want to right this ship, come out of this strong as an invincible army, then we have to talk – yes, talk calmly and strategize with each other and Laura, Danny, Juan AND at this point, Tom." See* exhibit KVT-7 at RECEIVER-PROSKAUER 020087.   Although the full context of this message is not known, it does not appear to support the notion that Mr. Sjoblom was excluded in some way.   Finally, the fact that Mr. Stanford was upset because Mr. Sjoblom was advising Ms. Pendergest-Holt on the level of detail regarding her presentation (40e), again, does not indicate that Mr. Stanford, or the Stanford Entities for that matter, wanted to conceal information from Mr. Sjoblom.

42. Finally, I note that Mr. Sjoblom represented the Stanford Entities for almost four years, from mid-2005 to early 2009.   *See* Original Declaration at paragraphs 14 and 15.   Yet, Mr. Richmond has cited only five examples of communications which he appears to suggest indicating that information was concealed regarding *"fraudulent activities"* from Mr. Sjoblom.

43. In summary, Mr. Richmond's assertion that my Original Declaration omits certain pertinent information is not only misleading in that the excerpts that he presents are incomplete and non-conclusive, but actually highlight more inconsistencies in information that was available to Mr. Sjoblom.

### *Mr. Richmond's opinion of Stanford Entities considering replacing Mr. Sjoblom is inconsistent with the evidence in this case*

44. In paragraph 157 of his report Mr. Ricmond states *"Other communications between the co-conspirators suggest that on multiple occasions Stanford Financial considered replacing Mr. Sjoblom and/or hiring additional outside counsel to assist with SEC matters.   Ms. Van Tassel fails to explain: 1) why Stanford Financial would risk the termination of an (alleged) active participant in the scheme and/or 2) why Stanford Financial would risk bringing in new outside counsel if Mr. Sjoblom was participating."*

20

45. First, the documents that Mr. Richmond references as the basis for his statement do not support the intention to replace Mr. Sjoblom.  For example, Mr. Richmond references a June 2005 article, which mentions that an attorney was leaving the SEC and joining a firm in Dallas, was circulated within between various Stanford personnel.  Replacing Mr. Sjoblom was not mentioned.  *See* exhibits KVT-8 and KVT-9 at RECEIVER-PROSKAUER-RT 00047668.  In other documents referenced by Mr. Richmond dated in September and October 2006, the name of the same attorney was mentioned again and indicate that that attorney had communications with the Stanford Entities about a possible engagement.  But, again, replacing Mr. Sjoblom is not mentioned.  *See* exhibit KVT-10.  In January 2007, Stanford apparently considered engaging another attorney.  As part of the email exchange Yolanda Suarez mentions that she was *"not comfortable with Tom's advice on several fronts."*  *See* exhibit KVT-11 at RECEIVER-PROSKAUER-RT 00057363.  Finally, Stanford may have considered engaging yet another attorney in January 2009.  *See* exhibit KVT-12.  What the documents from 2007 and 2009 do not include is why Ms. Suarez was *"not comfortable"* with Mr. Sjoblom's advice and whether the attorneys that Stanford considered hiring would have replaced Mr. Sjoblom or simply augmented the team with another law firm.

46. In summary, Mr. Richmond's statement that Stanford Entity employees wanted to replace Mr. Sjoblom are not supported by the documents referenced by Mr. Richmond.  Without additional information, Mr. Richmond's opinions are not supported.

I state under penalty of perjury that the foregoing is true and correct.  Executed on the 27th day of November, 2017.

_Karyl N. Van Tassel_
_____

Karyl Van Tassel

# EXHIBIT 2

KARYL VAN TASSEL

Page 1

```
1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3    RALPH S. JANVEY, IN HIS      )
     CAPACITY AS                  )
4    COURT-APPOINTED RECEIVER     )
     FOR THE STANFORD             )
5    RECEIVERSHIP ESTATE, AND     )
     THE OFFICIAL STANFORD        )
6    INVESTORS COMMITTEE,         )
                                  )
7          Plaintiffs,            )
                                  ) Civil Action No.
8                                 ) 3:13-cv-00477-N
       - against -               )
9                                 )
                                  )
10   PROSKAUER ROSE, LLP,         )
     CHADBOURNE & PARKE, LLP,     )
11   AND THOMAS V. SJOBLOM,       )
                                  )
12         Defendants.            )
13
14   ****************************************************
15          ORAL AND VIDEOTAPED DEPOSITION OF
16                 KARYL VAN TASSEL
17                 JANUARY 11, 2018
18   ****************************************************
19
20
21
22
23
24
25
```

KARYL VAN TASSEL

                                                    Page 35

1    connection with the Stanford cases?

2         A.    Yes.  And as I said, I think before we've had

3    issues where in tracing funds, they've gone through

4    Antigua and other entities in the Caribbean, and so at

5    that point we would look at the different regulations

6    that applied.

7         Q.    Now in your reports in this case, you cite a

8    number of documents, emails, attorney case notes,

9    deposition transcripts and the like.  Is that correct?

10        A.    Those are some of my sources, yes.

11        Q.    In terms of reading and interpreting emails,

12   do you have any special expertise in that?

13        A.    Well, from a forensic accounting perspective,

14   my job is to take all the information I can and look at

15   what it means from the perspective of consistency.  So

16   in particular, to emails do I have an expertise?  My

17   expertise is taking whether it's emails or other types

18   of correspondence and looking at it together with the

19   other evidence, what it tells you from a financial

20   standpoint, from issues related to risk, for fraud,

21   those types of areas.

22        Q.    But in terms of reading and interpreting them,

23   you don't have special expertise?

24             MR. ARLINGTON:  Objection, vague.

25        A.    I think I have a specialty in reading emails

KARYL VAN TASSEL

Page 36

1    because I read a lot of them.  I certainly have the

2    qualifications to read emails.  I'm not sure what you're

3    talking about, as far as an expertise in that.

4         Q.   (BY MR. SCHWARTZ)  Well, I mean, if the emails

5    are written in the language that -- let's say English.

6    Right?

7         A.   Yes.

8         Q.   You speak English.  Anyone who can read and

9    understand English can read what the email says.

10   Correct?

11        A.   I think so, yes.

12        Q.   Okay.  Do you have any special expertise

13   beyond what a layperson has in terms of reading that

14   email, reading an email that's in English?

15        A.   No, not in reading it.

16        Q.   Okay.  And in terms of interpreting it, do you

17   have an expertise beyond what a layperson would have in

18   interpreting what the person was saying in the email

19   that they wrote?

20        A.   Well, I think I have an expertise in

21   interpreting it and comparing it as relates to other

22   information and evidence in the case.  So in and of

23   itself, a special ability to interpret, I don't even

24   know what that would mean; but as it relates to what I

25   do, I certainly have a special -- specialization and an

KARYL VAN TASSEL

Page 37

1    expertise in using that information together with other

2    evidence to look at and form opinions about risk and

3    potentials for fraud, financial statement -- financial

4    statement misstatements, those types of things.

5         Q.   Okay.  So other than the three areas you just

6    identified, assessing information in an email and taking

7    it together with other evidence to form opinions about

8    risk, potential for fraud and financial statement

9    misstatements, are there other areas where you feel you

10   have an expertise in terms of interpreting emails

11   together with other information available to you to

12   opine on issues in a given case?

13                   MR. ARLINGTON:  Objection, overbroad,

14   vague and confusing.

15        A.   I'm not sure.  Do you mean is there any other

16   kinds of cases that I would look at emails in?

17        Q.   (BY MR. SCHWARTZ)  Let me -- let me ask a

18   different question.

19        A.   Okay.

20        Q.   In responding to my question, you identified

21   areas of risk, fraud and financial misstatements as

22   areas that you would look at emails to form opinions on.

23   Are there other areas, other issues that you would form

24   opinions on that you would look at emails?

25                   MR. ARLINGTON:  Overbroad, vague and

KARYL VAN TASSEL

                                                            Page 64

1    Right?

2        A.    Well, I think that will be part of the finding

3    that someone will determine.

4        Q.    Is that something that you're bringing an

5    expert opinion to bear on, whether or not Mr. Sjoblom

6    represented one of -- one or more of the Stanford

7    companies in the SEC investigation?

8        A.    Part of my report does set forth information

9    about who was being represented by Mr. Sjoblom and what

10   that representation contained and what he did in that

11   regard and any impacts on the investigation and

12   interaction with the SEC.

13       Q.    Isn't who Mr. Sjoblom -- okay.  Strike that.

14             What expertise are you bringing to bear on the

15   question of who Mr. Sjoblom was representing in the SEC

16   investigation?

17       A.    What my report does is set forth the

18   information that's available in regards to who

19   Mr. Sjoblom represented, as well as information

20   inconsistencies of how that information was used in

21   regards to, for instance, you know, he indicated at one

22   point that, you know, don't necessarily tell them I

23   represent SIBL because maybe we cannot produce documents

24   that way.  So it's contrasting between what is available

25   and, you know, what is said about those things.  So, you

KARYL VAN TASSEL

Page 65

1    know, you're saying that it's just a fact of who he

2    represented.  That's an example of where that seemed to

3    change a little bit on how he wanted to present that.

4    So I'm setting forth that information to compare and

5    contrast.

6        Q.   Okay.  I am not saying anything.  I'm simply

7    asking a question because I don't really understand

8    the -- the portion of the report that we've been

9    describing.

10            So is there -- so is it your testimony that in

11   the portion of your report where you're describing

12   Mr. Sjoblom's -- strike that.

13            Is it your testimony that in the portion of

14   your report where you're setting forth information about

15   Mr. Sjoblom's representation of the companies in the SEC

16   investigation, that you are marshaling information from

17   documents that you've reviewed?

18       A.   I am setting forth, as we would see in the

19   report, information related to that topic, as well as

20   contrasting it with other information available and

21   whether there are inconsistencies.

22       Q.   Do you have any expertise in how a lawyer

23   establishes an attorney/client relationship with a

24   company?

25       A.   I am not opining on a legal issue, if that's

KARYL VAN TASSEL

Page 73

1      A.    Some of them, yes, because they came up in

2   different ways for various issues that have come up

3   throughout the nine years we've been doing this.  Many

4   of them I have looked at as it related to a declaration

5   I prepared earlier for Mauricio Alvarado, and many of

6   them are the same -- same documents.  So I had reviewed

7   them previously for that.

8      Q.    Were there any new documents that you had not

9   seen before?

10      A.    Yes, certainly there were.

11      Q.    Okay.  How did you obtain the documents that

12   you refer to in your declaration?

13      A.    I received them from counsel, having asked for

14   the types of information that I would like to see that

15   were relevant to those issues, and I think they came

16   from counsel.  I know there were searches for emails and

17   different things, productions related to the case.

18      Q.    Did counsel select the materials that they

19   provided to you?

20      A.    Only in that we talked about the information

21   available, and I told them what I wanted in general.

22   There were certainly some exhibits from Mr. Sjoblom's

23   deposition that I wanted to see, and then different

24   types of information that we asked to have searched and

25   sent to us.

KARYL VAN TASSEL

Page 76

1    assumptions that were made.  Again, if I went through

2    each one, I could give you a better idea.

3         Q.   Did counsel give you any instruction on what

4    conclusions to reach?

5         A.   No.

6         Q.   Were there any opinions you were asked to

7    render that you didn't feel comfortable giving?

8         A.   No.

9         Q.   Do you know how many hours you spent preparing

10   the declaration and the supplemental declaration?

11        A.   I don't know exactly what those are.  They

12   would be in our fee applications.

13        Q.   Do you know what the -- do you know whether

14   they're broken out specifically for the work that you

15   did on the declaration and the supplemental declaration

16   in this case?

17        A.   Yes.  Our invoices break out by engagement the

18   fees that are involved, yes.

19        Q.   Do you have an estimate of the amount of time

20   you spent?

21             MR. BUNCHER:  Are you asking just the

22   time spent drafting the reports, or are you including

23   all the time reviewing the material that's referenced in

24   the reports?

25        Q.   (BY MR. SCHWARTZ)  Any work, Ms. Van Tassel,

KARYL VAN TASSEL

Page 94

```
 1    when they had worked for those entities?

 2         A.    No one told me using those words, no.

 3         Q.    Okay.  But you concluded that the Stanford

 4    entities were acting -- were operating as a Ponzi scheme

 5    from at least 1999.  Is that correct?

 6         A.    Yes.

 7         Q.    You've also stated in prior declarations that

 8    SIB was insolvent, which you've defined as liabilities

 9    exceeded the fair value of its assets from at least 1999

10    forward.  Is that correct?

11         A.    That's correct.

12         Q.    And you stand by that opinion in this case?

13         A.    Yes.

14         Q.    And I believe you also had stated that the

15    Stanford Financial Group, which was the parent company,

16    was insolvent in the same sense of liabilities exceeding

17    the fair value of its assets from at least 2000 forward.

18    Do you recall that?

19              MR. ARLINGTON:  Objection, vague and lack

20    of foundation.

21         A.    I'd have to see that.  I don't -- Stanford

22    Financial Group is kind of the holding of entities.

23    That is not a specific entity that I have expressed an

24    opinion on as it relates to solvency.

25              MR. SCHWARTZ:  Get tab 5, please.  Mark
```

KARYL VAN TASSEL

                                                      Page 95

1    this as Exhibit 4.

2                    (Exhibit 4 marked.)

3         Q.   (BY MR. SCHWARTZ)  Ms. Van Tassel, I've handed

4    you -- or the court reporter, rather, has handed you

5    Exhibit 4.

6         A.   Uh-huh.

7         Q.   And this is -- well, take a look at it and let

8    me know if you recognize this document.

9         A.   Let's see.  This appears to be the June 2,

10   2011 declaration that was done in the matter Ralph

11   Janvey, as court appointed receiver, et al. versus James

12   R. Alguire, et al., and there's various actually other

13   captions included here.

14        Q.   And this is your declaration in that matter?

15        A.   Yes.  It's my supplemental declaration.  It

16   would -- are there more than one here?  This is a lot.

17   This is a supplemental declaration.

18        Q.   Okay.  And if you would look at page 4 of

19   Exhibit 2, which is your August 25th declaration in this

20   case.  Sorry to make you jump around.

21        A.   That's okay.  Yes.

22        Q.   Okay.  And you see paragraph 6F says the June

23   2, 2011 supplemental declaration of Karyl Van Tassel.

24        A.   Yes.

25        Q.   Is that this document?

KARYL VAN TASSEL

Page 96

1        A.    Yes.

2        Q.    Okay.  So this is one of the declarations that

3    you've incorporated by reference in your declaration,

4    your August 25th declaration in this case?

5        A.    Yes.

6        Q.    Okay.  So looking at Exhibit 4, if you could

7    take a look at paragraph 5, this is -- spans the Bates

8    pages in the bottom right corner 3391 to 3392.

9        A.    Yes.

10       Q.    And you see that last bullet in paragraph 5,

11   it says SFGC was insolvent, i.e., its liabilities

12   exceeded the fair value of its assets from at least 2000

13   forward and received SIB CD funds?

14       A.    Yes, I have said SFGC.  That is what you asked

15   me about, yes.

16       Q.    And SFGC is what?

17       A.    Is -- what do you -- I'm not sure I understand

18   the question.

19       Q.    What are you referring to as SFGC?

20       A.    Stanford Financial Group Company.

21       Q.    Okay.  I thought that's what I asked about,

22   but --

23       A.    I may have misunderstood.  I thought you said

24   SFG.

25       Q.    Either way, we now have it clear now.

KARYL VAN TASSEL

Page 100

1   was insolvent?

2        A.   Not a specific opinion as to that, no.

3        Q.   And you're not offering a specific opinion

4   that Proskauer knew prior to February 6 of 2009 that SIB

5   was insolvent?

6        A.   No.

7        Q.   Okay.  You've stated --

8        A.   Can I go back to that?

9        Q.   Sure.

10       A.   Something occurs to me.  He was -- part of it

11   goes to the fact that he was told by the SEC and many

12   others that it was a Ponzi scheme, and Ponzi schemes,

13   and anyone involved in enforcement would know that they

14   are, in fact, insolvent.  So he would have -- in that

15   way, he would have known that before.

16       Q.   Mr. Sjoblom was retained to defend SIB and SGC

17   and the Stanford companies in connection with the SEC's

18   investigation.  Right?

19       A.   Yes, that's my understanding.

20       Q.   So the premise of his retention was that the

21   SEC thought that Stanford was operating a Ponzi scheme.

22   Correct?

23             MR. ARLINGTON:  Objection, confusing.

24             MR. SCHWARTZ:  I am not sure that's a

25   valid --

KARYL VAN TASSEL

Page 103

1      A.   Hmm.  I would say that the information that I
2   have set forth, given that he went into this knowing --
3   or having the allegation that that might be the case, if
4   you look at that and you know that, and as an SEC
5   enforcement attorney, knowing what a Ponzi scheme is, I
6   think there's a lot of information that I have that
7   would get -- would provide that information to make that
8   conclusion.
9      Q.   Are you offering an opinion on what
10  Mr. Sjoblom knew?  I thought you had testified earlier
11  that you were not.
12     A.   I'm not opining on what he knew.  I am opining
13  that the information available to him, what he reflects
14  in notes from discussions, interviews with, I think, 15
15  or 16 financial advisers, you know, over the course of
16  several years, what I am saying is that information
17  would certainly, I think, support a finding that it was
18  a Ponzi scheme.
19     Q.   And did any of the Stanford people you spoke
20  to tell you that they had found -- when you did your
21  interviews, that they had found that it was a Ponzi
22  scheme?
23     A.   No.
24     Q.   And did -- okay.  All right.  Now what you
25  just testified seems to me a little bit inconsistent

KARYL VAN TASSEL

Page 129

```
 1       Q.    And who selected -- there are three different
 2    dates.  Correct?
 3       A.    There are, yes.
 4       Q.    Who selected those dates to estimate the
 5    increase in liability to use for purposes of increasing
 6    the liability?
 7       A.    Three dates were selected based upon the
 8    information that you see in the earlier parts of my
 9    report.  We looked at the information as it related to
10    different cutoff points to begin to measure that.  It
11    would certainly be after September of 2006, the date
12    that the retention begins with Mr. Sjoblom and
13    Proskauer, and just looked at what happened and
14    discussions with counsel and I think discussions with
15    other experts who are looking at the conduct of
16    Mr. Sjoblom and/or the law firm and determined these
17    dates were reasonable cutoff times at which to calculate
18    the damages.
19       Q.    So it was a collective decision to use these
20    dates?
21       A.    Yes, that's correct.
22       Q.    Okay.  Now the first date that you selected or
23    that you used, I should say, was November 1 of 2006.
24    Correct?
25       A.    That's correct.
```

KARYL VAN TASSEL

Page 133

1    November 1 of 2006 forward increased the insolvency of

2    SIB?

3        A.   I haven't looked at it on an insolvency basis

4    from a damages perspective.  It increases the

5    liabilities is -- I mean, I've just separated that out

6    as a damage component.

7        Q.   But SIB was insolvent as of November 1, 2006.

8    Correct?

9        A.   Correct.

10       Q.   Because it had become insolvent even earlier?

11       A.   Correct.

12       Q.   And so the additional CD liabilities deepened

13   the insolvency of SIB --

14                 MR. ARLINGTON:  Objection.

15       Q.   (BY MR. SCHWARTZ)  -- from that period

16   forward.  Correct?

17                 MR. ARLINGTON:  Objection, calls for

18   legal conclusion.

19       A.   I can't make a legal conclusion.  From the

20   standpoint of accounting, it does not deepen the

21   insolvency.  At the time that a CD comes in, the cash is

22   increased and there is a liability.  So there is a net

23   impact to the business.  Again, I am not calculating it

24   that way, but the net effect on assets minus liabilities

25   would be zero.

KARYL VAN TASSEL

Page 134

1          Q.   (BY MR. SCHWARTZ)   Right.   For each CD that's
2     sold, right?
3          A.   Yes.
4          Q.   But -- but you're -- okay.   So in what sense
5     then did -- strike that.
6               So if the CDs were purchased and cash came
7     into the business, then why is the increase in CD
8     liability -- why are you using that as the measure of
9     damages if they're being offset by cash coming in?
10              MR. ARLINGTON:   Objection, vague and
11    ambiguous.
12         A.   I can tell you how I did the calculation.   I
13    keep going back to the fact that this is based upon the
14    finding of the Court.   So we're using that to the extent
15    that there has been a finding that SIB and SGC are
16    jointly liable for that amount.   So that is a damage
17    amount.   And to the extent we're parsing it out in
18    different timeframes based upon the issues involved in
19    the case, those would be, you know, looking at the
20    differences in between those dates.   So that's why it
21    increases that amount that ultimately was found as a
22    judgment against the two entities.
23         Q.   (BY MR. SCHWARTZ)   Was SIB injured by the sale
24    of CDs?
25              MR. ARLINGTON:   Objection, vague and

KARYL VAN TASSEL

Page 135

1    calls for legal conclusion.

2         Q.   (BY MR. SCHWARTZ)  Let me ask it differently.

3    Did SIB lose money when it sold CDs?

4         A.   At the time of sale?

5         Q.   Yes.

6         A.   I just described that at the time of sale the

7    cash would come in and there would be a liability.  So

8    you would have cash and a liability of the same amount

9    as of that date.

10        Q.   And so as of that date, the cash and liability

11   would offset each other completely?

12        A.   At the time that it enters, yes.

13        Q.   Okay.  And then SIB would do something with

14   the cash that it received?

15        A.   Yes.  I mean, the point being it would do

16   something different than what it was telling investors

17   it was doing with that money.

18        Q.   Right.  It told investors it was going to

19   invest it in some safe portfolio, safe and liquid

20   portfolio and less of the assets were invested in that

21   sort of portfolio and then other amounts were used to

22   fund other businesses of Stanford's lifestyle.  Correct?

23        A.   Well, it was used in many, many different

24   ways.  Most important -- well, important of which was

25   the current CD holders, to pay them back when there was

KARYL VAN TASSEL

Page 136

1    a redemption or interest payment that was due and was

2    requested by the CD holder.

3        Q.   And that's what SIB did with the money after

4    it received it?

5        A.   Yes.  I mean, in broad strokes.  As I said,

6    there's many, many ways that the funds were used.

7        Q.   I understand that.  And I'm not trying to --

8    to limit it to that one -- one method.  Just to

9    understand the concept here.

10           All right.  Now Mr. -- Dr. Gompers talks about

11   this in his report, and you talk about it in your

12   rebuttal -- sorry -- your supplemental declaration, so

13   Exhibit 3, I guess it is.

14       A.   Okay.

15       Q.   So if you could look at paragraph 15.  And in

16   paragraph 15, there's a discussion about CD liabilities

17   from February 1 of 2008 through February 16 of 2009.

18   Correct?

19       A.   We just say thereafter, but that is --

20   February 16, 2009 is the measurement, yeah.

21       Q.   Okay.  And Dr. Gompers had stated that,

22   according to your calculations, after February 1 of

23   2008, there was no increase in CD liabilities?

24       A.   Well, there's -- the CD liability does

25   increase after that time period, really until October,

KARYL VAN TASSEL

Page 153

1              MR. ARLINGTON:  Objection, vague and

2      ambiguous.

3          A.   I am not sure -- any specific one number for

4      that occurrence?

5          Q.   (BY MR. SCHWARTZ)  Yes.

6          A.   No, because that's not what is relevant in the

7      case.

8          Q.   You next point to the statement, Mr. Sjoblom

9      represented to Ms. Brandt that he had personally gone

10     through all of Stanford's operations and there was no

11     fraud.  Did you compute any dollar amount of loss

12     associated with that statement that Mr. Sjoblom made to

13     Ms. Brandt that he had personally gone through all of

14     Stanford's operations and there was no fraud?

15             MR. ARLINGTON:  Objection, vague and

16     ambiguous, overbroad.

17         A.   Those actions are -- it would probably be

18     easier to say what it is.  These actions are all part of

19     the conduct that is tied.  So it is part of a damage

20     calculation, but I have not assigned any number because

21     that is not -- that wouldn't be appropriate, given the

22     claims, I believe, in this case.

23         Q.   (BY MR. SCHWARTZ)  Okay.  You next say that

24     Mr. Sjoblom helped Stanford stall the SEC's efforts to

25     get SIB portfolio records, including by telling the SEC

KARYL VAN TASSEL

Page 154

1    that the SEC could get access to the SIB portfolio

2    records vis-à-vis FSRC, while knowing the FSRC would not

3    allow the SEC to have such access.

4            So my first question is what do you base the

5    statement that Mr. Sjoblom knew the FSRC would not allow

6    the SEC to have such access on?

7        A.   Well, if you go back through the report and

8    the detail that's contained there, what you find is

9    there was much correspondence back and forth between SIB

10   on the one hand, the FSRC and the SEC.  What had

11   happened was Mr. Sjoblom and his assistant or one of his

12   associates went down to Antigua and they were told that,

13   you know, the FSRC will not provide documents unless

14   there's a showing of -- I don't know how they said fraud

15   or liability.  And between the correspondence,

16   additionally there were discussions that the FSRC was

17   not going to provide the documents.  SIBL had to produce

18   those to them and who -- you know, there was all issues

19   about lag time.  So that is the basis for that comment.

20       Q.   Okay.  Did you conduct an assessment of what

21   type of showing the FSRC needed of fraud or crime or

22   liability to conclude that it should produce the

23   records?

24       A.   What type of fraud or --

25       Q.   No.  What quantum of showing how that showing

KARYL VAN TASSEL

Page 164

1      A.   I don't recall that specifically, no.

2      Q.   Okay.  You don't recall seeing a production

3  letter from Mr. Young to the SEC informing them of that?

4      A.   I don't recall that specifically, no.

5      Q.   So you didn't take that into account in

6  formulating your opinions in this case?

7      A.   Not that specific document, no.

8      Q.   Did you review the testimony of Rebecca

9  Hamric, her deposition testimony in this case?

10      A.   Yes.

11      Q.   Okay.  And you're aware that she was a lawyer

12  who worked on securities matters at Stanford?

13      A.   I know that was part of what she worked on.

14  I'm not sure if that was all that she worked on.

15      Q.   Are you aware that Ms. Hamric was at the

16  meeting where the production of this document was

17  discussed?

18      A.   I don't recall that specifically.

19      Q.   Are you aware that Ms. Hamric testified at her

20  deposition that Mr. Sjoblom may have told her to produce

21  the agreement?

22      A.   I do recall there was a back and forth about

23  that.  I don't think that that came out, from my

24  perspective, as certain in the -- in the deposition.

25      Q.   Was that information that you could have

KARYL VAN TASSEL

Page 165

1    included in your opinion to contrast and compare the

2    consistency of what Mr. Sjoblom did or didn't do with

3    the information that he had?

4         A.   Well, in fact, I did include it.  As I said, I

5    saw that and I didn't feel like there had come to a

6    conclusion.  She said she may have.  Ms. Stinson said

7    that they were told not to.  So you have different

8    testimony there.

9         Q.   So you -- but you included Ms. Stinson's

10   testimony.  You didn't include Ms. Hamric's testimony in

11   your report?

12        A.   That's correct, because, as I said, I didn't

13   feel like it came out as a certainty of what was said.

14   She said she may have.  Ms. Stinson said that that's

15   what -- that's what happened.

16             MR. ARLINGTON:  Just for point of

17   clarification, which report are you talking about?  The

18   one before Ms. Hamric's testimony or the one after?

19             MR. SCHWARTZ:  Either report.

20        Q.   (BY MR. SCHWARTZ)  Obviously before

21   Ms. Hamric's testimony, it couldn't have been included,

22   but in your rebuttal report you don't address that

23   either, do you?

24        A.   I don't specifically include that.

25        Q.   Are you aware that Mr. Sjoblom testified that

KARYL VAN TASSEL

Page 166

1    he told them to produce the document prior to being told

2    that the private equity portfolio was not backed by CD

3    moneys?

4         A.   That he told them to produce the document?

5         Q.   Yes.

6         A.   I don't.  If he did, that must have been a

7    change, because ultimately they were told not to produce

8    the document.

9         Q.   Well, you know what Ms. Stinson said, who is

10   one of several people who attended that meeting.

11   Correct?

12        A.   Yes.

13        Q.   So you don't know whether -- what they were

14   ultimately told, do you?

15        A.   I can't say what anybody said specifically.  I

16   can only refer to the document.

17        Q.   The next thing you have is that Mr. Sjoblom

18   learned in conjunction with that meeting and the

19   agreement that SIB had undisclosed venture

20   capital/private equity investments in its portfolio.

21        A.   Yes.

22        Q.   Were you also aware that Mr. Sjoblom was told

23   that that was a separate portfolio from the one backing

24   the CDs?

25        A.   I am aware of that, and I put that into my

KARYL VAN TASSEL

Page 172

```
 1    Mr. Sjoblom to stall document production and testimony
 2    to the SEC in order to prevent the SEC from getting --
 3    in order to help Stanford prevent the SEC from getting
 4    information about SIB's portfolio.
 5              What tactic -- what delay tactics are you
 6    referring to there?
 7         A.   As of that time, I think they are -- they're
 8    looking at the memos.  I mean, we go through more of
 9    this.  They're looking at the memos as to what would be
10    included, and they are continuing to stall producing any
11    of the documents.  I could go back to the individual
12    paragraphs, if you would like me to.
13         Q.   Yeah, why don't we do that.
14         A.   Okay.  Do you have a specific paragraph you
15    want me to go to or --
16         Q.   No.  I thought you --
17         A.   Okay.
18         Q.   -- had something in mind.
19         A.   I just need to look for dates here.  Okay.
20    Just trying to get to the right timeframe here.
21         Q.   Sure.
22         A.   I'm somehow not seeing the right timeframe
23    here.  One of the things I refer to in my document is
24    the -- this memo regarding the Investment Company Act.
25    They were continuing to try to look at, you know, even
```

KARYL VAN TASSEL

Page 173

1   though, for instance, that they had to be engaged

2   substantially in commercial banking and he knew that not

3   to be true, all of this was, I think, part of the fact

4   that they were continuing to look for reasons that they

5   would not have to produce the documents, because it was

6   not subject to their jurisdiction.

7        Q.   All right.  So you're referring to the August

8   13, 2007 memo that you cite in paragraph C?

9        A.   Yes.

10       Q.   Okay.  Did you assess what standard

11  substantially -- what the substantially and commercial

12  banking standard is that's required under the Investment

13  Company Act as an exemption?

14       A.   I believe in the Act itself or in the memo

15  itself there were indications as to what that would

16  include, substantial commercial banking, commercial

17  deposits.  There was some information that did define

18  what substantially was.

19       Q.   Okay.  And you said elsewhere in your -- in

20  your report that -- your declaration that Mr. Sjoblom

21  knew that the bank did make some loans and issued some

22  credit cards to CD holders.  Correct?

23       A.   Only -- only if they were CD holders.  It was

24  not commercially available except to the CD holders.

25       Q.   Okay.  And I said "knew" there, but it would

KARYL VAN TASSEL

Page 175

1    that would be relevant to those items.  And you know, in

2    addition to that, specifically Mr. Sjoblom was told by

3    financial advisers, for instance, early on in 2005 that

4    it wasn't a commercial bank.  So I have not made a legal

5    determination certainly.  What I have done is read from

6    the document and set forth information that was

7    available about those kinds of issues.

8         Q.   And, again, you don't have a view as to

9    whether the Investment Company Act would even apply if

10   SIB was not -- if the CDs that SIB was selling were not

11   securities?

12        A.   I do not have an opinion on that.

13        Q.   All right.  The other item that you -- that

14   you reference here, meetings in Houston in August of

15   2007.  Mr. Sjoblom discovered that SGC had ignored his

16   advice about discontinuing sales contests and continued

17   its sales contests to incentivize financial advisers to

18   sell more SIB CDs.

19        A.   Yes.

20        Q.   Why did you include that in this paragraph?

21        A.   Because it's during that time period.  So

22   during that time period, he knows that irrespective of

23   what he asks them to do, told them to do, they had not

24   discontinued the sales contests to incentivize the

25   financial advisers.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY
AS COURT-APPOINTED RECEIVER FOR
THE STANFORD RECEIVERSHIP ESTATE,
and THE OFFICIAL STANFORD
INVESTORS COMMITTEE

       Plaintiffs,

v                              File No. 3:13-cv-0477-N-BG

PROSKAUER ROSE, LLP,
CHADBOURNE & PARKE, LLP,
THOMAS J. SJOBLOM, and
PABLO M. ALVARADO,

       Defendants.

                       /

VIDEO DEPOSITION OF JAMES M. DAVIS

Taken by the Plaintiffs on the 18th day of January, 2018, at

250 Monroe Avenue, NW, Suite 400, Grand Rapids, Michigan, at

9:30 a.m.

APPEARANCES:

For the Plaintiff          MR. SCOTT DANIEL POWERS (24027746)
Janvey & Investors         Baker Botts, LLP
Committee:                 98 San Jacinto Boulevard, Suite 1500
                           Austin, Texas 78701
                           (512) 322-2678

                           MR. DOUGLAS JAMES "DOUG" BUNCHER
                           (03342700)
                           Neligan, LLP
                           325 North Saint Paul Street, Suite 3600
                           Dallas, Texas 75201
                           (214) 840-5320

1          **kept secret, yes.**

2     Q     Stanford had real employees; right?

3     **A     Yes.**

4     Q     There were some valid investments; right?

5     **A     Yes.**

6     Q     There were real offices; right?

7     **A     Yes.**

8     Q     There was businesses Stanford was engaged in that were

9          unrelated to the CD's; right?

10    **A     Yes.**

11    Q     Stanford had over 30,000 customers in 130 countries; right?

12    **A     Stanford International Bank you're referring to?**

13    Q     The enterprise more broadly.

14    **A     At least.**

15    Q     Mr. Stanford made the Forbes list of richest people; right?

16    **A     Yes.**

17          MR. CASTILLO:  If he would -- if you would have

18          stole $7 billion, you would too.

19          MR. REISER:  Objection to the sidebar.

20          MR. CASTILLO:  So that's not a crown that you want

21          to wear.

22    Q     Isn't it true that Stanford employed very prominent people

23          in the legal community?

24    **A     Give me an example?**

25    Q     Sure.  Wayne Secour?  You were asked some questions about

Page 137

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | ) | |
| AS COURT-APPOINTED RECEIVER | ) | |
| FOR THE STANFORD RECEIVERSHIP | ) | |
| ESTATE, AND THE OFFICIAL | ) | |
| STANFORD INVESTORS COMMITTEE | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 3:13-CV-0477-N-BG |
| v. | ) | |
| | ) | |
| PROSKAUER ROSE L.L.P., | ) | |
| CHADBOURNE & PARKE, L.L.P., AND | ) | |
| THOMAS V. SJOBLOM, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## DECLARATION OF KARYL VAN TASSEL
_____

I, Karyl Van Tassel, of 909 Fannin Street, Suite 2450, Houston, Texas 77010, state as follows:

### QUALIFICATIONS, BACKGROUND INFORMATION AND PRIOR DECLARATIONS

1. I am over the age of 21 years and am legally competent to make this declaration. A copy of my résumé is attached as **Exhibit KVT-1**, which summarizes my education and relevant work experience. As it states, I am a Managing Director with Navigant Consulting, Inc. ("Navigant") and am a Certified Public Accountant in the State of Texas. I have over 30 years of experience in providing a variety of audit, accounting, tax, litigation, valuation, investigation, and other financial advisory services. I have performed detailed investigations and financial analyses for a variety of litigation

1

matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud, and wrongful termination matters. In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues. In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery. I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2. I use the following acronyms or short hand terms to refer to certain entities in this declaration:

- Stanford or Stanford Entities – All legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB – Stanford International Bank, Limited.

- SFG – Stanford Financial Group, the name given to Mr. Stanford's "global network of financial companies."

- SFGC – Stanford Financial Group Company, which provided shared services including Treasury, Legal and Investment services to SIB and other companies within SFG.

- SGC – Stanford Group Company, a U.S. broker dealer entity incorporated in Texas.

- SEC – United States Securities and Exchange Commission

- FINRA – Financial Industry Regulators Authority, Inc.

- NASD – National Association of Securities Dealers, Inc., FINRA's predecessor.

- FSRC – Antiguan Finance Services Regulatory Committee.

3. I submit this declaration for consideration in the above-captioned lawsuit against Proskauer Rose L.L.P. and Thomas V. Sjoblom, and as a supplement to my prior report concerning Defendant Alvarado. The statements made in this declaration are true and correct based on the knowledge I have gained from the evidence and the many documents, records, and other information I have reviewed and other work I and my

2

team have performed in the course of our investigation on behalf of the Receiver.  Our analysis of the evidence, documents, records, and other information of SIB, SGC, SFGC, R. Allen Stanford, and the other Stanford Entities — including the documents referenced herein and in my prior declarations — was conducted using reliable practices and methodologies that are standard in the fields of accounting and finance.  Such evidence, documents, records, and other information are the types of information upon which professionals in the fields of accounting and finance typically rely, when such information is available, during investigations of this nature.  The documents and other records of the Receivership Estate referenced herein are true and correct copies of records of the Stanford Entities that are in the possession, custody, and control of the Receiver pursuant to the Court Orders in Case No. 3:09-CV-0298-N appointing Mr. Janvey as the Receiver.

4.  I expressly reserve the right to supplement this declaration with additional facts, data, and opinions.

5.  My firm Navigant is currently being compensated for my work on an hourly basis at the rate of $520 per hour.  *See* Case No. 3:09-CV-0298-N, Doc. 2238. This hourly rate does not exclude amounts subject to the Court's holdback order.  *See* Case No. 3:09- CV-0298-N, Doc. 1565.  Hourly rates for others in my firm who have worked on the engagement range from $90 to $400.

6.  I hereby adopt and incorporate by reference as if fully set forth herein my prior declarations, as follows:

   a.  the July 27, 2009 Declaration of Karyl Van Tassel, including the exhibits referenced therein;

   b.  the May 24, 2010 Declaration of Karyl Van Tassel, including the exhibits referenced therein;

   c.  the June 18, 2010 Declaration of Karyl Van Tassel, including the exhibits referenced therein;

   d.  the July 15, 2010 Declaration of Karyl Van Tassel, including the exhibits referenced therein;

e.    the June 1, 2011 Declaration of Karyl Van Tassel, including the exhibits referenced therein;

f.    the June 2, 2011 Supplemental Declaration of Karyl Van Tassel, including the exhibits referenced therein;

g.    the June 7, 2011 Supplemental Declaration of Karyl Van Tassel;

h.    the October 12, 2011 Supplemental Declaration of Karyl Van Tassel, including the exhibit referenced therein;

i.    the December 5, 2011 Direct Testimony of Karyl Van Tassel, including the exhibits referenced therein; and

j.    The March 10, 2017 Supplemental Declaration of Karyl Van Tassel, including the exhibit referenced therein**.**

**SIB AND THE OTHER STANFORD ENTITIES COMPRISED A PONZI SCHEME**

7.    As I have stated in my prior declarations, SIB and all legal entities owned, directly or indirectly, by the named defendants in the case styled *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N, (collectively, the "Stanford Entities") were operating as a Ponzi scheme from at least 1999 forward. *See* the June 1, 2011 Declaration of Karyl Van Tassel **at ¶¶ 8-25** (explaining that SIB was a Ponzi scheme and stating, *inter alia*, "In connection with his guilty plea, Davis admitted that SIB was a 'massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds.' James Davis admitted in his rearraignment that the Stanford Entities was a Ponzi scheme from the beginning, and I have not seen anything in the records I have reviewed to indicate otherwise."); *see also* the June 18, 2010 Declaration of Karyl Van Tassel at **¶¶ 8-25**; *see also* the June 2, 2011 Supplemental Declaration of Karyl Van Tassel **at ¶ 5** ("The Stanford Entities were operating as a Ponzi scheme from at least 1999 forward"); *see also* Davis guilty plea agreement dated August 27, 2009.

8.    Utilizing my prior declarations, this Court has consistently found that the Stanford Entities were operating as a Ponzi scheme. "This Court has repeatedly held that Stanford operated a Ponzi scheme." [*See* Case No. 3:09-CV-0724-N-BG, Doc. 909 at 16;

4

*see also id.* at 17 ("Here, the Court again holds that, as a matter of law, Stanford operated a Ponzi Scheme.").]  The Court further stated:

> Although the Stanford Entities are located all over the world, with affiliates in at least 13 countries, this Court has previously held that the entire network operated as a single entity. . . . Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud.  Further, [the Court has] held that each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise. . . . Additionally, the majority of all the Stanford Entities' proceeds came through the sales of CDs through Stanford International Bank ("SIB")[.]

[*See id.* at 8-9 (quotation marks and citations omitted); *see also id.* at 19 (citing prior declarations and stating that "[t]he Court finds this evidence sufficient to establish that the Stanford Entities operated as a Ponzi scheme.")]

9.  This Court also previously stated:

> The Receiver has shown that Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud.   Each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise.  To ignore these findings would elevate form over substance — thereby legitimizing the corporate structure that Stanford utilized to perpetrate his fraud and running afoul of Fifth Circuit precedent cautioning courts to look beyond the surface.  Thus, because SIB did not observe corporate formalities and because all the Stanford entities were operated as one for purposes of perpetrating a fraud on investors, the Court pierces SIB's corporate veil and aggregates the Stanford Entities.

[*See* Case No. 3:09-CV-0721-N, Doc. 176 at 36 (quotation marks and citation omitted).] "[T]his Court has previously recognized that Stanford and his affiliates operated as one, and there is substantial evidence in the record in this action to support that finding." [*See id.* at 27].  The Court also found that "proliferating corporate fictions" would only "protect sinister characters such as Ponzi schemers[.]"   [*See id.* at 23.]   The Court recognized that "as a Ponzi scheme, all assets and liabilities are difficult to segregate and

5

ascertain"; "commingling of funds among the Stanford Entities was the norm"; "Stanford directly or indirectly owned all Stanford Entities"; and "Stanford and his associates transferred assets among the Stanford Entities in disregard of corporate formalities." [*See id.* at 34-35.] Furthermore, the Court held: "The Stanford Entities comprised a single financial services network referred to as SFG"; "[T]he SIB CD proceeds did more than just keep the bank afloat [:] Stanford Entities and Stanford himself received large disbursements of the proceeds"; and "After deposit, [Jim] Davis would then disburse the funds [used to purchase SIB CDs] among the Stanford Entities." [*See id.* at 28-29, 43.]

10. The Fifth Circuit Court of Appeals has affirmed the Court's prior holdings in this regard. In particular, the Fifth Circuit has found as follows:

> This case stems from the Stanford Ponzi scheme. . . . R. Allen Stanford created and owned a network of entities (the "Stanford entities") that sold certificates of deposit ("CDs") to investors through the Stanford International Bank, Ltd. ("SIB"). These CDs promised investors extraordinarily high rates of return. Using the Stanford entities, Stanford and his employees would explain to "prospective investors that their funds would be reinvested in high-quality securities so as to yield the investors the high rates of return purportedly guaranteed by the CDs." But, instead of actually investing the money raised by selling these CDs, Stanford used the money to pay prior investors their promised returns. By paying the prior investors these returns, Stanford, and the Stanford entities, developed credibility and a track record of supposed success, which in turn allowed them to recruit additional investors.

[See *Janvey v. Brown*, 767 F.3d 430, 433 (5th Cir. 2014) (citing and quoting *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 (5th Cir. 2013)); *see also Brown*, 767 F.3d at 436 ("As prior opinions of this Court and the district court have made clear, the Stanford Ponzi scheme was centered in and operated out of Houston, Texas.")]. The Fifth Circuit continued:

> It is well-established that the Stanford principles—Stanford and Davis—were operating a Ponzi scheme. In both *DSCC* and *Alguire*, we explained that Stanford "created and perpetrated a

6

'Ponzi scheme.'"  We noted that Davis' Plea "reflects a classic Ponzi scheme," and that the "Van Tassel Declarations also provide clear, numerical support for the creative reverse-engineering undertaken by Stanford executives to accomplish the Ponzi scheme."

*Brown*, 767 F.3d at 439 (citing and quoting *Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d at 188, and *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011)).

11. This Court, the District Court for the Southern District of Texas, and the Fifth Circuit have all credited the reliability of my prior declarations and have relied upon such declarations in the context of the Stanford litigation.  [*See, e.g., Brown*, 767 F.3d at 439 ("[T]he Van Tassel Declarations . . . provide clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme.") (quotation marks omitted); *See Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d at 198-99 (affirming finding that the Stanford Entities comprised a Ponzi scheme after considering, *inter alia*, "Van Tassel's declarations and supporting documents" that showed "that the Stanford companies were insolvent entities used by Stanford in a Ponzi scheme from at least 1999 because the corporations were funded and sustained primarily by proceeds from SIBL's sale of the fraudulent CDs"); *See Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 880-81 (S.D. Tex. 2010) ("The Court receives in evidence and credits Van Tassel's conclusions based on detailed analysis of documentary evidence, augmented by interviews of persons with firsthand knowledge, concerning the source and use of SIBL funds, SIBL's financial condition at various points in time, the timing and cost of assets acquired by various Stanford entities (*e.g.*, real estate and private equity investments), and the compensation of financial advisors who sold SIBL CDs.")]; [*See* Case No. 3:09-CV-0724-N-BG, Doc. 909 at 17-18 ("***The Van Tassel Declaration is Competent Summary Judgment Evidence.***  This Court, and others, have repeatedly relied on the declarations of Karyl Van Tassel in connection with Stanford matters. . . . The Court has previously noted that Van Tassel's declarations draw conclusions from objectively verifiable Stanford entity, customer, and third party records, worksheets, and databases using reliable practices and methodologies that are

7

standard in the fields of accounting and finance.") (emphasis in original, quotations marks omitted)].

12. My findings in this declaration and in my prior declarations, as well as the above-cited court holdings that the Stanford Entities comprised a Ponzi scheme, are further supported by the fact that Mr. Stanford is serving 110 years in a federal penitentiary as a result of his Ponzi scheme and by the fact that this Court has granted summary judgment against Mr. Stanford, Mr. Davis, SGC, and SIB in favor of the SEC as result of the Stanford Ponzi scheme.   [*See* Case No. 3:09-CV-0298-N, Doc. 1858 at 6, 7, 12, 15 (recognizing Stanford's criminal guilt and his "massive Ponzi scheme" and stating that "[t]he fraud perpetrated was obviously egregious, was done with a high degree of scienter, caused billions in losses, and occurred over the course of a decade"); *See* Case No. 3:09-CV-0721-N, Doc. 176 at 26 ("[T]he Court takes judicial notice that on March 6, 2012, a jury in Houston, Texas convicted Mr. Stanford of four counts of wire fraud, one count of conspiracy to commit wire and mail fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi scheme.")]

13. The following report sections are delineated to address the various allegations and causes of actions in this matter with documents found through my investigation relating to those allegations.

    A. Mr. Sjoblom represented various Stanford entities, including, SGC and SIB.

    B. Mr. Sjoblom was party to several communications and discussions pertaining to allegations made by Stanford employees and the SEC of fraudulent practices.

    C. Mr. Sjoblom advised Mr. Alvarado, General Counsel for SGC and SIB, regarding regulatory investigation.  Specifically, he:

        i. Endorsed a position that Certificates of Deposit issued by SIB were not securities and, therefore, were not subject to SEC oversight.

8

    ii.    Endorsed a position that because SIB was located in Antigua it was not subject to U.S. regulators' oversight.

    iii.    Endorsed a position that Antiguan law privacy provisions prevented SIB from turning over information to the SEC.

    iv.    Was party to several communications and discussions regarding the composition of the SIB investment portfolio.

    v.    Did not initially disclose the SEC investigation to SGC's auditor BDO.

D.  Other Relevant Information.

E.  Directors and officers promoted SIB's and SGC's central role in the Stanford Ponzi Scheme, which was facilitated by Mr. Sjoblom and Proskauer, causing financial harm to both entities.

    i.    Stanford Group Company was insolvent without SIB CD proceeds, and played a central role in selling the CDs to investors.

    ii.    The directors and officers of SGC and SIB promoted the entities' participation in and furtherance of the Ponzi Scheme, resulting in SIB and SGC increased liabilities to SIB and SGC.

**A.  Mr. Sjoblom represented various Stanford entities, including, SGC and SIB.**

14. Mr. Sjoblom and Chadbourne represented Stanford from 2005 to 2006. *See* **Exhibit KVT-2** (Chadbourne engagement letter dated August 23, 2005).  The engagement letter is addressed to Mr. Mauricio Alvarado, Esq., General Counsel, Stanford Financial Group ("Mr. Alvarado"), and states *"This letter sets forth the scope of engagement, as well as the terms and conditions, under which Chadbourne & Parke LLP ("C&P") will represent The Stanford Financial Group ("SFG") and its affiliate entities,* ***The Stanford Group Company ("SGC") and The Stanford International Bank Ltd ("SIB")****.* (emphasis added) Other documents indicate that Mr. Sjoblom's work had commenced earlier on or around June 9, 2005.  *See* **Exhibit KVT-3** (Sjoblom's notes from teleconference with Talbert Navia and Mauricio Alvarado dated June 9-10, 2005).

9

15. Mr. Sjoblom and Proskauer represented Stanford from 2006 to 2009. *See* **Exhibit KVT-4** (Proskauer engagement letter dated September 6, 2006). The engagement letter is addressed to Mr. Alvarado and states *"Thank you very much for permitting me to continue to represent the Stanford Financial Group and its affiliate companies in the investigation by the United States Securities and Exchange Commission."*

16. On August 9, 2005 Mr. Sjoblom and his Chadbourne associate, Benjamin Ogletree exchanged several emails. *See* **Exhibit KVT-5** (Email chain regarding SEC investigation dated August 9, 2005 through August 16, 2005). These emails indicate that Mr. Sjoblom represented both SGC and SIB. These emails also indicate that Mr. Sjoblom withheld information from the SEC regarding which Stanford entities he represented, to impede the SEC in gaining access to SIB information. See below excerpts from this email exchange:

> *Mr. Sjoblom: "Pls call Jennifer Brandt at SEC Fort Worth to find out status and stage of inquiry."*
>
> *Mr. Ogletree: "Jennifer wants to know who's our client – specifically, which one of the Stanford entities do we represent? Is it Stanford Financial Group (the United States broker dealer), Stanford International Bank (Antigua), both, neither? Jennifer commented that the inquiry is focused on these two entities."*
>
> *Mr. Sjoblom: "Thanks, Ben. I represent both."*
>
> *Mr. Ogletree: "Okay – I trust it's okay for me to pass that along to Jennifer, no?"*
>
> *Mr. Sjoblom: "Hold off in telling her who we represent. Maybe we keep them from getting bank records by not representing the bank in Antigua."*

   **B. Mr. Sjoblom was party to several communications and discussions pertaining to allegations made by Stanford employees and the SEC of fraudulent practices by the Stanford Entities.**

17. Early in his involvement and engagement by the Stanford Entities, Mr. Sjoblom was party to several communications and discussions pertaining to allegations made by Stanford employees and the SEC of fraudulent practices by the Stanford Entities. These

10

allegations included several references to a Ponzi scheme, which as we now know, were accurate.  I have highlighted excerpts from select documents below as examples that indicate Mr. Sjoblom's knowledge of the allegations throughout the pendency of his representation of the Stanford Entities.

18. Mr. Sjoblom first learned about the SEC's Ponzi scheme allegations as early as on June 10, 2005 during a teleconference with Mr. Alvarado.  Mr. Sjoblom's notes include a reference to Wayne Secour who had met with Robert Long of the SEC, and indicate that Mr. Long considered Stanford CDs to be a Ponzi scheme.  *See* **Exhibit KVT-3** at PROSKAUER_JANVEY 00034118 (Sjoblom's notes from teleconference with Talbert Navia and Mauricio Alvarado dated June 9-10, 2005).  Later the same month, Mr. Sjoblom visited Houston and met with Stanford employees, including SGC Financial Advisors ("FA").  Per Mr. Sjoblom's notes he learned about the SEC audit, that the SEC was looking for more details about the SIB portfolio and that the SEC was concerned that the SIB CDs were a Ponzi scheme.  *See*   **Exhibit KVT-6** at PROSKAUER_JANVEY 00000226-227 (Sjoblom's notes from interviews with SGC Financial Advisors in Houston dated June 29-30, 2005) and *see* pages 50:21 to 51:8 of Mr. Sjoblom's deposition dated February 1, 2017.

19. Ms. Lena Stinson, Stanford's Director of Global Compliance, indicated that she had arranged the meetings for Mr. Sjoblom with the Financial Advisors.  She also indicated that during Mr. Sjoblom's meetings with her during the summer of 2005, Mr. Sjoblom indicated that the SEC suspected that SIB was some type of "Prime Bank" scheme and was why the SEC wanted to learn about what the SIB Portfolio consisted of *See* **Exhibit KVT-7** at paragraphs 18 to 21 (Affidavit of Lena Stinson dated October 27, 2014).

20. Additionally, on September 15, 2005 Mr. Alvarado forwarded to Mr. Sjoblom a letter from the SEC to SGC president Jay Comeaux dated September 12, 2005.  *See* **Exhibit KVT-8** (Mr. Alvarado's email to Mr. Sjoblom dated September 15, 2005).  The SEC's letter alleged several violations and deficiencies in SGC's operations.  *See* **Exhibit KVT-9** at PROSKAUER_JANVEY 00003259 (The SEC's letter to Mr. Comeaux dated September 12, 2005).  Sometime after September 15, 2005, Mr. Sjoblom had a teleconference with

Mr. Stanford, Mr. Alvarado, Yolanda Suarez, and two Chadbourne associates Dennis Dumas and Ian Anderson, presumably in response to the SEC's letter dated September 12, 2005.  The first bullet point of Mr. Sjoblom's notes states: *"Can't let this go to formal order of investigation."*  *See* **Exhibit KVT-10** (Mr. Sjoblom's notes from teleconference).[1]

21.  On October 3, 2005 Mr. Sjoblom wrote a reply to the SEC's letter dated September 12, 2005.  Despite the concerns raised by the SEC and the information that had been shared with Mr. Sjoblom over the preceding three months, amongst other things, Mr. Sjoblom stated *"SGC has and continues to pursue the goal of not only meeting, but exceeding the requirements of applicable United States ("US") laws, rules and regulations."*  *See* **Exhibit KVT-11** at PROSKAUER_JANVEY 00000798 (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC).

22.  Approximately one year later, Mr. Sjoblom was party to another series of communications between his client and the SEC.  First, on September 6, 2006, Mr. Sjoblom learned from Jennifer Brandt of the SEC that Ms. Brandt would seek to elevate the status of the investigation to formal including fraud investigation.  *See* **Exhibit KVT-12** at PROSKAUER_JANVEY 0014562 (Mr. Sjoblom's notes from a call with Ms. Brandt (SEC), and Mr. Sjoblom's email to Mr. Alvarado summarizing the call).  Based on an email to Mr. Alvarado later the same day, which summarized Mr. Sjoblom's call with Ms. Brandt, Mr. Sjoblom continued to represent to Ms. Brandt that *"there was no fraud here [at Stanford Entities],"* and that Mr. Sjoblom *"had personally gone through all operations."* *See* **Exhibit KVT-12** at PROSKAUER_JANVEY 0014563 (Mr. Sjoblom's notes from a call with Ms. Brandt (SEC), and Mr. Sjoblom's email to Mr. Alvarado summarizing the call).

23.  A few days later, on September 11, 2006, Mr. Sjoblom learned that the Antiguan regulator and the Stanford Entities shared information in an open and free manner.  Specifically, Mr. Sjoblom learned that Mr. Stanford had discussed with Leroy King of the

---

[1] The notes do not show a date, but the Sjoblom Deposition refers to these notes as the *"issues raised by the letter you just showed me."*  *See* page 152:3-5 of Mr. Sjoblom's deposition dated February 1, 2017.  The previous item discussed in the Sjoblom Deposition is the SEC's letter dated September 12, 2005.  *See* page 143:12-14 of Mr. Sjoblom's deposition dated February 1, 2017.

12

FSRC a conversation between Mr. King and Michael Moore of the SEC. *See* **Exhibit KVT-13** (Mr. Sjoblom's notes from a teleconference with Mr. Stanford dated September 11, 2006). The notes that Mr. Stanford had taken during the call with Mr. King and that Mr. Stanford forwarded to Mr. Sjoblom[2] indicate that, amongst other things, the SEC suspected Stanford to be a Ponzi scheme, that the SEC viewed the SIB CD rates to be unusually high in comparison to rates paid by U.S. banks, and that the SEC viewed Stanford's sales practices as something commonly associated with fraud. The notes also indicate that in the SEC's view SGC refused to provide its financial advisors adequate information regarding the SIB portfolio, and that former registered representatives had stated that they suspected money was funneled to fund Stanford's real-estate ventures. *See* **Exhibit KVT-14** (Mr. Stanford's notes dated September 11, 2006).

24. In my experience, it is unusual for a regulator such as Mr. King, who is supposedly independent of the company under scrutiny, to inform that company of inquiries from other regulators. The foundation of a regulator is independence from the companies under their purview. Mr. Sjoblom's knowledge of the sharing of information between Mr. King of the FSRC and Mr. Stanford would have been unusual and a possible indicator that the relationship between the regulator and the company is not completely independent.

25. Despite the above, one week later, on September 18, 2006, during a phone conversation, Mr. Sjoblom again represented to the SEC that there was no evidence of fraud or embezzlement, Ponzi scheme or pyramid scheme. *See* **Exhibit KVT-15** at PROSKAUER_JANVEY 0000726 (Mr. Sjoblom's notes of the teleconference with SEC dated September 18, 2006). Two days later, on September 20, 2006, in reference to the phone call two days earlier, Mr. Sjoblom wrote a letter to the SEC. Mr. Sjoblom reiterated that the SEC had access to the FSRC and that the FSRC had reviewed SIB's operations and had found no reasons for concern and no indications of improprieties or

---

[2] Mr. Stanford sent these notes to Mr. Sjoblom during or after his call between him and Mr. Sjoblom on September 11, 2006. *See* page 185:3-22 of Mr. Sjoblom's deposition dated February 1, 2017.

fraud.  *See* **Exhibit KVT-16** at PROSKAUER_JANVEY 0001621 (Mr. Sjoblom's letter to SEC dated September 20, 2006).

26. Prior to 2008, Mr. Sjoblom was aware that Mr. Charles Hazlett, a former broker had complained about SGC's practices related to the sale of CD's.  See pages 296:21 to 297:19 of Mr. Sjoblom's deposition dated February 1, 2017.   Similarly, on July 3, 2008 Bloomberg published an article titled *"SEC Investigation Stanford Group Offshore-Bank CDs,"* which Mr. Alvarado forwarded to Mr. Sjoblom.  The article mentions the SIB CDs and more allegations by two former Stanford financial advisors.  Mr. Sjoblom, in turn, forwarded the article to his Proskauer associate, Jacqueline Perrell, noting *"news story could not have been worse."  See* **Exhibit KVT-17** (Email chain between Mr. Sjoblom and various individuals regarding the 2008 Bloomberg article dated July 3 to 4, 2008).

27. As demonstrated by the examples above, Mr. Sjoblom was party to several communications and discussions pertaining to allegations of fraudulent practices made by both Stanford employees and regulators.  Mr. Sjoblom was also aware of the unusual relationship between the Stanford Entities and the Antiguan regulator FSRC.  Furthermore, he became a party to these communications and discussions at the very beginning of his engagement.  Despite the frequent allegations from different sources, the consistency of the allegations, the lack of any internal investigation by the company, and the Stanford Entities' relationship with its regulator that did not have the appearance of independence, I have seen no evidence that Mr. Sjoblom or others from his firm conducted any further investigations, queried the company about the issues, analyzed any documents about the nature of the businesses, or suggested an internal investigation by the company.

14

**C. Mr. Sjoblom advised Alvarado, General Counsel for SGC and SIB, regarding regulatory investigations.**

      i. *Mr. Sjoblom endorsed a position that Certificates of Deposit issued by SIB were not securities and, therefore, were not subject to SEC oversight.*

28. Prior to the Stanford Entities retaining Mr. Sjoblom, the Stanford Entities had consistently taken the position that U.S. regulators had no jurisdiction over SIB because the SIB CDs were not securities. For example, SGC's June 9, 2005 response to the May 12, 2005 NASD Exit Conference states: *"We believe that the CD deposits and the CD certificates are not securities as such term is defined under US Federal and State securities laws."* *See* **Exhibit KVT-18** at STAN ALVARADO 0002161 (Letter from Mr. Poppell, Senior Vice President and Director of Compliance at SGC to Mr. Morrison at NASD dated June 9, 2005). Documents that I have reviewed indicate that Mr. Sjoblom adopted this same position early on. I have highlighted below excerpts from select documents that indicate how Mr. Sjoblom first became aware that the SEC and the Stanford Entities disagreed on whether the SIB CDs were securities and examples of Mr. Sjoblom's endorsement of the Stanford Entities' position.

29. According to the documents I have reviewed, Mr. Sjoblom first became aware of the SIB CDs during one of Mr. Sjoblom's first communications regarding the Stanford Entities, June 9 and June 10, 2005 teleconferences with Mr. Alvarado and Talbert Navia, a Chadbourne attorney who introduced Mr. Sjoblom to Mr. Alvarado. In those discussions, Mr. Navia described the Stanford Antiguan bank as *"involved in issuing securities to clients".* *See* **Exhibit KVT-3** at PROSKAUER_JANVEY 0034117-8 (Sjoblom's notes from teleconference with Talbert Navia and Mauricio Alvarado dated June 9-10, 2005) and *see* pages 37:4-38:7 of Mr. Sjoblom's deposition dated February 1, 2017. Sometime between June 10 and June 29, 2005, Mr. Sjoblom attended a meeting in Miami where the SIB CDs were discussed again.[3] Mr. Sjoblom's notes from the meeting state

---

[3] The exact date of the meeting in Miami is not included in the documents, but Mr. Sjoblom's deposition refers to teleconferences that took place on June 9 and 10, 2005 as the first contact Mr. Sjoblom had with

*"Co views them [CDs] as not securities."*   *See* **Exhibit KVT-19** at PROSKAUER_JANVEY 0000042 (Mr. Sjoblom's notes from a trip to Miami).

30. On August 26, 2005, Mr. Sjoblom's associate Jennifer Arnold drafted a legal memo examining whether a bank CD constitutes a security under U.S. law.  The memo states that a bank CD's status as a security *"depends upon whether the investor's deposit is protected by other regulation from the risk of loss due to insolvency,"* and whether *"the depositor is 'virtually guaranteed' of receiving payment in full."*  The memo concludes that, if such protections exist, a bank CD is not considered a security.  Ms. Arnold sent this memo to Mr. Alvarado on September 30, 2005.  *See* **Exhibit KVT-20** at STAN ALVARADO 0002336 (memorandum drafter by Jennifer Arnold on August 26, 2005 titled "Stanford Financial: Regulation of CDs under the federal securities laws").

31. As noted by Mr. Sjoblom's associate Ms. Arnold, the existence of *"comprehensive"* insurance coverage for investor deposits was integral to justifying SGC's claim that the SIB CDs were not *"securities"* and, hence, not subject to the jurisdiction of U.S. regulatory bodies.  Mr. Sjoblom's notes from his June 2005 meetings indicate Mr. Sjoblom received and reviewed marketing materials, which contain a section on *"Insurance"* that does not include any such description of *"comprehensive"* coverage. The marketing materials indicate that the insurance is limited to 1) a depository insolvency policy insuring funds held in a correspondent financial institutions; 2) A bankers' blanket bond; and, 3) A directors' and officers' liability policy.  *See* **Exhibit KVT-11** at PROSKAUER_JANVEY_00000864 (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC).)

32. On August 29, 2005, the SEC sent a letter to Mr. Sjoblom requesting the voluntary production of certain documents concerning the SIB CD program.  *See* **Exhibit KVT-21** (Email dated August 30, 2005 from Mr. Alvarado to Mr. Sjoblom forwarding the SEC letter).  The next day on August 30, 2005, in an email, Mr. Sjoblom shared his initial thoughts with Mr. Alvarado on how to respond to the SEC, including, *"CDs are not*

---

the Stanford Entities and he makes a reference to a trip Mr. Sjoblom took to Houston on June 29, 2005, after he had taken a trip to Miami. *See* pages 37:24 to 38:7 and 47:2-11 of Mr. Sjoblom's deposition dated February 1, 2017.

16

securities" and "the SEC must defer to the FSRC as the primary and most appropriate regulator." See **Exhibit KVT-22** (Mr. Sjoblom's email dated August 30, 2005 to Mr. Alvarado regarding the SEC letter dated August 29, 2005). On September 12, 2005 Mr. Sjoblom responded to the SEC, by letter, stating, amongst other things, "*it is my view that the underlying CDs issued by SIB are not "securities" subject to the federal securities laws which the SEC administers.*" (emphasis added). See **Exhibit KVT-23** at STAN ALVARADO 0004218 (Letter from Mr. Sjoblom to Ms. Brandt of the SEC dated September 12, 2005). To support this position, Mr. Sjoblom's letter cites "*comprehensive regulation under the laws of Antigua and Barbuda*" and SIB's "*extensive insurance to protect against risk of loss.*" See **Exhibit KVT-23** at STAN ALVARADO 0004219 (Letter from Mr. Sjoblom to Ms. Brandt of the SEC dated September 12, 2005). As stated previously, Mr. Sjoblom had information available to him that the insurance carried by SIB was not extensive to protect against risk. Mr. Sjoblom drafted the response despite the fact that SIB's marketing materials and disclosure documents to which he had access asserted for years that "*You may lose your entire investment (principal and interest) under circumstances where we may be financially unable to repay those amounts.*" See **Exhibit KVT-24** at STAN HAMRIC 0002924 (SIB disclosure statement amended July 31, 2000), which had been discussed and referred to during Mr. Sjoblom's visit to Houston in late June 2005. E.g. See **Exhibit KVT-6** at PROSKAUER_JANVEY 00000179, PROSKAUER_JANVEY 00000184, PROSKAUER_JANVEY 00000192-193, and PROSKAUER_JANVEY 00000197 (Sjoblom's notes from interviews with SGC Financial Advisors in Houston dated June 29-30, 2005). Mr. Sjoblom worked with Mr. Alvarado and his staff when drafting the September 12, 2005 letter. See **Exhibit KVT-25** (Email dated September 12, 2005 at 2:45 pm from Mr. Sjoblom to Mr. Alvarado and others requesting Mr. Alvarado's comments regarding the attached draft response to the SEC) and **Exhibit KVT-26** (Email dated September 12, 2005 at 4:29 pm from Mr. Sjoblom to Mr. Alvarado and others indicating that the letter is being sent to the SEC).

33. Separate from Mr. Sjoblom's response to the SEC letter dated September 12, 2005, on that same day Julie Preuitt of the SEC sent a letter to SGC president Jay Comeaux alleging

17

violations from the examination completed by the SEC staff.  Amongst other things, Ms. Preuitt's letter mentions that the SEC believed the SIB CDs to be securities.  *See* **Exhibit KVT-9** at PROSKAUER_JANVEY 00003259 (The SEC's letter to Mr. Comeaux dated September 12, 2005).  Three days later, Mr. Alvarado forwarded Ms. Preuitt's letter to Mr. Sjoblom.  *See* **Exhibit KVT-8** (Mr. Alvarado's email to Mr. Sjoblom dated September 15, 2005). Sometime after September 12, 2005,[4] Mr. Sjoblom had a teleconference with Mr. Stanford, Mr. Alvarado, Yolanda Suarez, and two Chadbourne associates Dennis Dumas and Ian Anderson, presumably in response to Ms. Preuitt's letter dated September 12, 2005.[5]  The notes appear to contain to-dos that were discussed, including, *"Legal Issues - not securities,"* which Mr. Sjoblom appears to have assigned to himself.  *See* **Exhibit KVT-10** (Mr. Sjoblom's notes from teleconference).

34.   Between September 13 and 15, 2005 Mr. Sjoblom and his Chadbourne associates exchanged emails regarding Stanford marketing materials.   One of Mr. Sjoblom's partners, William Greason, questioned the position that SIB CDs were not securities. Specifically, Mr. Greason wrote to Mr. Sjoblom: *"I am not sure why they think these CDs are not securities -- I guess they treat them like bank deposits." See* **Exhibit KVT-27** at PROSKAUER_JANVEY_00005743 (Email chain dated September 13 to 15, 2005 including Mr. Sjoblom and Chadbourne associates regarding Stanford marketing materials).  The documents that I have reviewed do not indicate that Mr. Sjoblom replied or further elaborated to Mr. Greason the basis for the position he had assumed.   In September 2005, Mr. Sjoblom reviewed the SIB disclosure statement and made edits to the document, including the paragraph addressing the fact that there is no insurance protection for the SIB CDs.   *See*, e.g., **Exhibit KVT-28** at PROSKAUER_JANVEY_00000931 (Fax from Mr. Alvarado to Mr. Sjoblom dated September 21, 2005).

---

[4] Three days later Mr. Alvarado forwarded the SEC's letter to Mr. Sjoblom. See **Exhibit-8** (Mr. Alvarado's email to Mr. Sjoblom dated September 15, 2005).

[5] The notes do not show a date, but Mr. Sjoblom'deposition refers to these notes as the *"issues raised by the letter you just showed me." See* page 152:3-5 of Mr. Sjoblom's deposition dated February 1, 2017.  The previous item discussed in Mr. Sjoblom's deposition is Ms. Preuitt's letter dated September 12, 2005.  *See* page 143:12-14 of Mr. Sjoblom's deposition dated February 1, 2017.

18

35. Despite his Chadbourne partner questioning his position, in an October 3, 2005 letter, in response to the SEC's letter dated September 12, 2005, Mr. Sjoblom reiterated that the SEC lacked jurisdiction over SIB's CD program because the CD did not qualify as a security under federal securities laws.   The letter asserted that *"extant case law provides that as long as the investor's deposit is protected by comprehensive banking regulation, especially when supplemented by insurance against risk of loss, CDs are not securities." See* **Exhibit KVT-29** at STAN ALVARADO 0002176 (Email sent from Ms. Arnold to Mr. Harris (SEC) attaching the October 3, 2005 letter from Mr. Sjoblom to Mr. Harris).   Mr. Sjoblom's letter also concluded that because SIB CD holders were protected by features such as Antigua's comprehensive banking regulations and SIB's excess capital and supplemental insurance coverage, they were *""virtually guaranteed payment in full.""  See* **Exhibit KVT-29** at STAN ALVARADO 0002182 (Email sent from Ms. Arnold to Mr. Harris (SEC) attaching the October 3, 2005 letter from Mr. Sjoblom to Mr. Harris).   Mr. Sjoblom's statement of the guarantee conflicts with the disclaimers Mr. Sjoblom saw in the marketing materials and the Disclosure Statement noted above.

36. Based on the documents that I have reviewed, it appears that after the October 3, 2005 letter from Mr. Sjoblom to the SEC, communications between Mr. Sjoblom and the SEC and Mr. Sjoblom and the Stanford Entities regarding the SIB CDs quieted down until the following year, in September 6, 2006, when Mr. Sjoblom received a call from Jennifer Brandt of the SEC.   Per Mr. Sjoblom's notes, Ms. Brandt represented to Mr. Sjoblom that she continued to view the SIB CDs as a security.   *See* **Exhibit KVT-12** at PROSKAUER_JANVEY 0014562 (Mr. Sjoblom's notes from a call with Ms. Brandt, and Mr. Sjoblom's email to Mr. Alvarado summarizing the call). As stated previously, on September 11, 2006 Mr. Stanford called Mr. Sjoblom.   According to Mr. Sjoblom's notes, Mr. Stanford told Mr. Sjoblom that Mike Moore of the SEC had contacted Leroy King and the FSRC, and that Mr. Moore had made accusations about fraud and a pyramid scheme.   *See* **Exhibit KVT-13** at PROSKAUER_JANVEY_00000729 (Sjoblom's notes from

19

a teleconference with Mr. Stanford dated September 11, 2006).    On that same day,[6] Mr. Sjoblom received the notes that Mr. Stanford had taken based on his conversation with Mr. King, the notes themselves pertaining to the conversation between Mr. King and Mr. Moore.  The notes indicate that the SEC viewed the SIB CD to be a security.  *See* **Exhibit KVT-14** at PROSKAUER_JANVEY 00005458 (Mr. Stanford's notes dated September 11, 2006).    This telephone conversation between the FSRC and the SEC having been provided to Mr. Stanford would be relevant to the assessment of whether SIB was sufficiently overseen by another regulatory body which is part of the basis Mr. Sjoblom and Stanford Entities were relying on in maintaining the CD is not a security.

37. Communications between Mr. Sjoblom and the SEC continued the following month. Mr. Sjoblom wrote an email to Mr. Alvarado summarizing his October 10, 2006 communications with the SEC, including the status of the SIB CDs under U.S. law: *"I reiterated my view that . . . the SEC does not have jurisdiction over SIB because the CDs are not 'securities.'"*   *See* **Exhibit KVT-30** (Mr. Sjoblom's notes from teleconference with SEC dated October 10, 2006) and **Exhibit KVT-31** at STAN ALVARADO 0002781 (Email dated October 10, 2006 from Mr. Sjoblom to Mr. Alvarado regarding teleconference with SEC dated October 10, 2006).

38. As noted previously, Mr. Sjoblom had become aware of the difference in the positions between the SEC and the Stanford Entities regarding the SIB CDs at the very beginning of his engagement in 2005, his Chadbourne partner had questioned his position regarding the SIB CDs, and the issue whether the SIB CDs were a security had surfaced in communications with the SEC multiple times during his engagement.  Despite these and other "red flags" discussed throughout this Declaration, per the documents I have reviewed, only on January 16, 2009 did Mr. Sjoblom ask Mr. Alvarado to send him what Mr. Sjoblom referred to as the *"the opinion letter on 1940 Act issues re CDs"*, presumably the legal opinion forming the basis for the position that the Stanford Entities had assumed regarding the SIB CDs and that Mr. Sjoblom had adopted and used in his

---

[6] Mr. Stanford sent these notes to Mr. Sjoblom during or after his call between him and Mr. Sjoblom on September 11, 2006.  *See* page 185:3-22 of Mr. Sjoblom's deposition dated February 1, 2017.

communications with the SEC.  *See* **Exhibit KVT-32** at STAN ALVARADO 0005443 (Mr. Sjoblom's email to Mr. Alvarado dated January 16, 2009).  On January 19, 2009, as he had requested, Mr. Sjoblom received the opinion letter (Memorandum titled *"Exemption from Investment Company Act of 1940"* dated November 11, 1998 by Greenberg Traurig).  *See* **Exhibit KVT-33** at STAN ALVARADO 0005445 (Email dated January 19, 2009 from Ms. Martinez on behalf of Mr. Alvarado to Mr. Sjoblom attaching Memorandum titled *"Exemption from Investment Company Act of 1940"* dated November 11, 1998 by Greenberg Traurig).[7]

### ii.   Mr. Sjoblom endorsed a position that because SIB was located in Antigua it was not subject to U.S. regulators' oversight

39.  Throughout his engagement with the Stanford Entities, Mr. Sjoblom endorsed a position that because SIB was located in Antigua and subject to the oversight of the FSRC, it was not subject to U.S. regulators' oversight.  I have included excerpts from the documents that I have reviewed as examples of Mr. Sjoblom's endorsement of this position.

40.  On September 12, 2005 Julie Preuitt of the SEC sent a letter to SGC president Jay Comeaux alleging various violations.  *See* **Exhibit KVT-9** (The SEC's letter to Mr. Comeaux dated September 12, 2005).  Three days later, Mr. Alvarado forwarded Ms. Preuitt's letter to Mr. Sjoblom.  *See* **Exhibit KVT-8** (Mr. Alvarado's email to Mr. Sjoblom dated September 15, 2005).  Sometime after September 15, 2005, Mr. Sjoblom had a teleconference with Mr. Stanford, Mr. Alvarado, Yolanda Suarez, and two Chadbourne associates Dennis Dumas and Ian Anderson, presumably in response to Ms. Preuitt's letter dated September 12, 2005.[8]  The notes appear to contain to-dos that were discussed, including, *"jurisdictional reach – applying fed sec laws to foreign investors,"* which

---

[7] Although the Investment Company Act of 1940 does not appear to specifically address the issue of whether a CD is a security, Mr. Sjoblom cited this act early on in his communications with the SEC explaining why SID CDs should not be under SEC purview.

[8] The notes do not show a date, but the Sjoblom Deposition refers to these notes as the *"issues raised by the letter you just showed me."  See* page 152:3-5 of Mr. Sjoblom's deposition dated February 1, 2017.    The previous item discussed in the Sjoblom Deposition is Ms. Preuitt's letter dated September 12, 2005.  *See* page 143:12-14 of Mr. Sjoblom's deposition dated February 1, 2017.

21

Mr. Sjoblom appears to have assigned to Mr. Dumas.  *See* **Exhibit KVT-10** (Mr. Sjoblom's notes from teleconference).

41. In response to the SEC's letter dated September 12, 2005, on October 3, 2005 Mr. Sjoblom wrote a letter to the SEC stating, amongst other things, *"SIB is a highly regulated financial institution subject to comprehensive regulation."* and *"like US banks, SIB is subject to a comprehensive banking regulatory framework under Antiguan law." See* **Exhibit KVT-11** at PROSKAUER_JANVEY 00000801 & 00000803 (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC).

42. As stated previously, on September 11, 2006 Mr. Stanford called Mr. Sjoblom to relay to him information from a phone call that had transpired between the SEC and the FSRC, as provided to Mr. Stanford by the FSRC.  See paragraph 23.  Based on the documents I have reviewed, I have seen no evidence of Mr. Sjoblom questioning the unusual nature of this call which reveals the fact that the Antiguan regulator FSRC relayed information from a communication with the SEC to the CEO of an entity that was subject to both the FSRC's regulation and inquiries by the SEC.  Furthermore, I have seen no evidence that this information prompted Mr. Sjoblom to question the *"comprehensive banking regulatory framework under Antiguan law"* he had referred to in his communications with the SEC earlier (see paragraph 41).  Instead, Mr. Sjoblom's deposition testimony indicates that after the call Mr. Alvarado instructed Mr. Sjoblom as follows: *"You're not going to talk - - you're never - - you're not going to talk to the CEO [Mr. Stanford] at all, at least, not going through me personally." See* page 182:25-184:9 of Mr. Sjoblom's deposition dated February 1, 2017.  I have seen no evidence that Mr. Sjoblom continued to query why the FSRC/Stanford conversation occurred, irrespective of the admonishment to not contact Mr. Stanford after he received the call.

43. On September 18, 2006 Mr. Sjoblom and members of the SEC staff had a teleconference.  Excerpts from Mr. Sjoblom's notes indicate that the SEC requested information on *"returns on the products,"* and *"where that investor's money is going."*  In response Mr. Sjoblom stated that the SEC had *"no jurisdiction over the bank,"* and the SEC should *"get bank exam reports from Bank regulators." See* **Exhibit KVT-15** at PROSKAUER_JANVEY

22

0000726 (Mr. Sjoblom's notes of the teleconference with the SEC dated September 18, 2006).

44. Communications between Mr. Sjoblom and the SEC continued the following month. Mr. Sjoblom wrote an email to Mr. Alvarado summarizing his October 10, 2006 communications with the SEC. In his email Mr. Sjoblom wrote that he had represented to the SEC that although in his and Stanford Entities' view the SEC had no jurisdiction over SIB, the SEC could visit SIB in Antigua. *See* Exhibit **KVT-30** (Mr. Sjoblom's notes from teleconference with SEC dated October 10, 2006) and *see also* Exhibit **KVT-31** at STAN ALVARADO 0002781 (Email dated October 10, 2006 from Mr. Sjoblom to Mr. Alvarado regarding teleconference with the SEC dated October 10, 2006).

45. On October 12, 2006 Mr. Alvarado sent an email to Mr. Sjoblom asking for comments on a response to a NASD letter he was drafting. Mr. Sjoblom provided comments and questions which include *"You could add that no international investment bank discloses its specific portfolio holdings." See* Exhibit **KVT-34** at STAN ALVARADO 0004273 (Email from Mr. Sjoblom to Mr. Alvarado dated October 13, 2006 regarding the NASD CD Inquiry).

46. Based on the documents I have reviewed, on December 5, 2006 Mr. Sjoblom researched Section 7(d) of the 1940 Act, specifically, the possibility that SIB was in violation of the Investment Company Act by selling securities without being registered as an investment company. Mr. Sjoblom also sent an email to Mr. Alvarado, forwarding the SEC's order of formal investigation dated December 5, 2006 and providing his first high level reactions. Apparently, Mr. Sjoblom considered the SEC's allegation of Section 7(d) violation a stretch (that Stanford entities would be considered an *"investment company."*) *See* Exhibit **KVT-35** at PROSKAUER _JANVEY_00017353 (Email exchange dated December 5-6, 2006 between Mr. Sjoblom and Mr. Alvarado regarding SEC's order of formal investigation dated December 5, 2006) and *see also* Exhibit **KVT-36** at PROSKAUER_JANVEY 00033779 (Proskauer invoice dated January 16, 2007 noting *"legal research into question of Section 7(d) of the 1940 Act"*).

23

47. Almost a year later, on August 13, 2007 Mr. Sjoblom received a memorandum from his associate Jacqueline Perrell.  Mr. Sjoblom had asked Ms. Perrell to research whether SIB was subject to Section 7 (d) of the Investment Company Act of 1940.   In her memorandum, Ms. Perrell concluded that SIB was exempt from the definition of investment company because it was a) organized in Antigua, b) regulated by Antigua/FSRC, c) engaged **substantially** in commercial banking, d) not operated for the purpose of evading US regulations. (emphasis added) In her memorandum, Ms. Perrell provided guidance obtained from a No-Action letter by the SEC with regard to the "**substantial** standard indicated in the provision" regarding the definition of commercial banking. (emphasis added) It indicates that to meet the standard of substantial commercial banking, the activities of the foreign bank must be more than nominal. Further, the provision states  it would generally expect a foreign bank to (1) be authorized to accept demand and other types of deposits and to extend commercial and other types of credit; (2) to hold itself out as engaging in, and to engage in, each of those activities on a continuous basis, including actively soliciting depositors and borrowers; (3) to engage in both deposit taking and credit extension at a level sufficient to require separate identification of each in publicly disseminated reports and regulatory filings; and, (4) to engage in either deposit taking or credit extensions as one of the bank's principal activities.   *See* **Exhibit KVT-76** at PROSKAUER_JANVEY_00014053 and PROSKAUER_JANVEY_00014056 (Memorandum by Jacquiline Perrell dated August 13, 2007).

48. At the beginning of Mr. Sjoblom's engagement with the Stanford Entities, he had been notified that SIB did not operate as a commercial bank.  In his interview on June 29, 2005 with Jay Comeaux, an Executive Director of SGC and its former President, Mr. Sjoblom was told that SIB was not a commercial bank as it does not make commercial loans and has no loan loss reserves.  Doug Shaw, a SGC Financial Advisor, also stated SIB was not a commercial bank *"but rather takes the money and invests it into a portfolio on which it obtains a rate of return that is greater than the CD rate."*  Another Financial Advisor, Al Trullenque, also stated that SIB was not a commercial bank.  Mr. Sjoblom affirmed that

24

he received that information in his deposition. *See* pages 55:11 to 57:9 of Mr. Sjoblom's deposition dated February 1, 2017. SIB's marketing materials which Mr. Sjoblom received in June 2005 indicate as well that SIB has no credit risk because it does not extend commercial loans. *See* **Exhibit KVT-11** at PROSKAUER_JANVEY_00000864 (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC). When questioned about this document, Mr. Sjoblom acknowledged that the Financial Advisors did indicate to him that SIB was not a commercial bank, but that the bank also had *"eXpress accounts and credit cards. And loans"*. The accounts, credit cards, and loans are only made to those investors who have purchased a CD. *See* pages 233:23-234:2 of Mr. Sjoblom's deposition dated February 1, 2017. Any loan made by SIB is up to 80% of the CD holdings for the investor.

### iii.   *Mr. Sjoblom endorsed a position that Antiguan law privacy provisions prevented SIB from turning over information to the SEC.*

49. Mr. Sjoblom endorsed a position that Antiguan law privacy provisions prevented SIB from turning over information to the SEC. Based on the documents I have reviewed and his deposition testimony, Mr. Sjoblom adopted this position presumably based on representations by his client that an Antiguan law firm had come to that conclusion. Mr. Sjoblom indicated that he did not ask for the opinion from the Antiguan law firm in 2005 or 2006 when he made these assertions to the SEC. He requested the opinion in 2009. In fact, I have seen no evidence that such a document prepared by Antiguan counsel ever existed. The documents I have reviewed also indicate that Mr. Sjoblom was aware that the Antiguan regulator FSRC would not cooperate with the U.S. regulators' requests for information without the FSRC finding of fraud or a criminal act. Yet Mr. Sjoblom represented to the SEC on multiple occasions that the SEC should work with the FSRC to gain information it was seeking. I have included excerpts from the documents I have reviewed as examples of Mr. Sjoblom's knowledge and involvement and the various

communications that he had regarding the Antiguan privacy laws with his client and the SEC.

50. Per the documents I have reviewed, one of Mr. Sjoblom's first contacts with the Stanford Entities was a June 10, 2005 teleconference with Mr. Alvarado and Talbert Navia. *See* **Exhibit KVT-3** (Sjoblom's notes from teleconference with Talbert Navia and Mauricio Alvarado dated June 9-10, 2005). Amongst other things, Mr. Sjoblom's notes state *"[Mr. Alvarado] wants me to represent company in SEC matter – wants to stop SEC inquiry now."*

51. Sometime between June 10 and June 29, 2005, Mr. Sjoblom attended a meeting in Miami where one of the discussion items included the SEC's allegation that SGC had not provided access to the SIB portfolio.[9] Mr. Sjoblom's notes from the meeting state *"SG[C] won't tell how they produce the rate they get."* *See* **Exhibit KVT-19** at PROSKAUER_JANVEY 0000045 (Mr. Sjoblom's notes from a trip to Miami).

52. In August 2005 Mr. Sjoblom visited Antigua. *See* page 68:7-11 of Mr. Sjoblom's deposition dated February 1, 2017. On August 10, 2005 Mr. Sjoblom met with the FSRC. Per Sjoblom's notes from the meeting, a representative of the FSRC told Mr. Sjoblom that the FSRC would only give out information to the SEC if there was a finding of crime or fraud. *See* **Exhibit KVT-37** at PROSKAUER_JANVEY 00005343 (Mr. Sjoblom's notes dated August 10, 2005 from a meeting with FSRC) and *See* pages 85:8-86:12 of Mr. Sjoblom's deposition dated February 1, 2017. A representative of the FSRC also told Mr. Sjoblom that the FSRC had invited the SEC to visit the FSRC but that the FSRC would not disclose where the SIB portfolio was invested. *See* **Exhibit KVT-37** at PROSKAUER_JANVEY 00005344 (Ms. Sjoblom's notes dated August 10, 2005 from a meeting with FSRC).

53. After his trip to Antigua, Mr. Sjoblom travelled to Memphis on August 24, 2005, where Mr. Sjoblom met with Laura Pendergest-Holt, Chief Investment Officer for Stanford

---

[9] The exact date of the meeting in Miami is not included in the documents, but Mr. Sjoblom refers to teleconferences that took place on June 9 and 10, 2005 as the first contact Mr. Sjoblom had with the Stanford Entities and he makes a reference to a trip Mr. Sjoblom took to Houston on June 29, 2005, after he had taken a trip to Miami. *See* pages 37:24 to 38:7 and 47:2-11 of Mr. Sjoblom's deposition dated February 1, 2017.

26

Financial Group.   *See* **Exhibit KVT-38** at PROSKAUER_JANVEY 00000099 (Mr. Sjoblom's notes from meeting with Ms. Pendergest-Holt dated August 24, 2005).  Mr. Sjoblom's notes include a reference to Ms. Pendergest-Holt overseeing the implementation of the investments strategies set by the board.  Mr. Sjoblom's notes also include a reference stating that Ms. Pendergest-Holt would share information with the SEC regarding *"investment parameters"* but not *"individual positions"*.  *See* **Exhibit KVT-38** at PROSKAUER_JANVEY 00000100 (Mr. Sjoblom's notes from meeting with Ms. Pendergest-Holt dated August 24, 2005).  Also discussed were *"FSRC Sharing of SIB's Banking Info."*  Mr. Sjoblom's notes indicate that the FSRC would not share information with non-bank regulators like the SEC without a finding of fraud or criminal activity.  *See* **Exhibit KVT-38** at PROSKAUER_JANVEY 00000102 (Mr. Sjoblom's notes from meeting with Ms. Pendergest-Holt dated August 24, 2005).   During his visit to Memphis, Mr. Sjoblom reviewed some of the account statements of the holdings.  Because the statements were resident in the Memphis office, Mr. Sjoblom had information available to him that the SIB portfolio information (in whole or in part), had been provided to SFGC and SGC employees.  *See* pages 94:23 to 95:10 of Mr. Sjoblom's deposition dated February 1, 2017.

54. On August 29, 2005, the SEC sent a letter to Mr. Sjoblom requesting the voluntary production of certain documents concerning the SIB CD program, including, how the underlying funds were invested.  *See* **Exhibit KVT-21** at STAN ALVARADO 0002326 (Email dated August 30, 2005 from Mr. Alvarado to Mr. Sjoblom forwarding the SEC letter). The next day on August 30, 2005, in an email, after having been told that the FSRC would not share information with the SEC without finding fraud or criminal activity, Mr. Sjoblom shared his initial thoughts with Mr. Alvarado on how to respond to the SEC, including, *"the SEC must defer to the FSRC as the primary and most appropriate regulator."*   *See* **Exhibit KVT-22** at PROSKAUER_JANVEY_00008258 (Mr. Sjoblom's email dated August 30, 2005 to Mr. Alvarado regarding the SEC letter dated August 29, 2005) and *see* **Exhibit KVT-37** (Ms. Sjoblom's notes dated August 10, 2005 from a

meeting with FSRC) and *see* **Exhibit KVT-38** (Mr. Sjoblom's notes from meeting with Ms. Pendergest-Holt dated August 24, 2005).

55.   On September 2, 2005 Juan Rodriguez-Tentino sent a fax to Mr. Sjoblom.   The fax included Antiguan law on confidentiality and bank secrecy - IBC Act Sections 238-245. Presumably Mr. Sjoblom and Mr. Rodriguez-Tolentino had discussed select sections of this law as comments on the fax cover sheet note *"As discussed, we enclose a copy of subject sections.   Emphasis supplied to section 244."   See* **Exhibit KVT-39** (Fax from Mr. Rodriguez-Tolentino to Mr. Sjoblom dated September 2, 2005).   In his deposition testimony, in reference to this legal provision that he received from Mr. Rodriguez-Tolentino on September 2, 2005, Mr. Sjoblom testified that *"I was told by the general counsel this is the provision and the bank president told me this is the provision that you can't turn stuff over."   See* page 141:14-16 of Mr. Sjoblom's deposition dated February 1, 2017.   The Sjoblom Deposition also includes questions and testimony that indicate that these legal provisions do not provide confidentiality on SIB's portfolio, to which Mr. Sjoblom testified that he is not an Antiguan lawyer and that he was relying on others' interpretations of the statute, but that the statute should also be considered in conjunction with another provision, Statutory Instrument 22.   *See* page 140:9-22 of Mr. Sjoblom's deposition dated February 1, 2017.   The documents I have reviewed indicate that Mr. Sjoblom did not request or review Statutory Instrument 22 until at a later date, in 2009.   *See* **Exhibit KVT-40** (Email dated January 28, 2009 with subject "Records of Bank Assets under IBC Act" from Mr. Sjoblom to Mr. Rodriguez-Tolentino, copying Mr. Alvarado) and **Exhibit KVT-41** (Fax dated January 29, 2009 from Ms. Stinson to Ms. Perrell attaching the Antiguan Statutory Instrument Number 22).   These documents were reviewed again by Mr. Sjoblom on January 28, 2009 after the SEC had issued subpoenas in its investigation.   *See* pages 320:19 – 323:4 of Mr. Sjoblom's deposition dated February 1, 2017.   At that time, Mr. Sjoblom questioned in an email whether the provisions under the secrecy laws as stated would preclude SIB from providing its own documentation to other parties, or only to the information about investors.   *See*

28

paragraph 61 below.  Statutory Instrument 22, which he would later receive, appears to address the confidentiality of the FSRC's examination report.

56. On September 12, 2005 Mr. Sjoblom responded to the SEC by letter dated August 29, 2005, stating, amongst other things, *"we have made every attempt in the past to provide you with all the information SIB is permitted to disclose and we will continue to do so in the future. We have every desire to be responsive to the Securities and Exchange Commission ("SEC") as the regulatory body with oversight of Stanford Group Company ("SGC").  However, there are certain provisions under the laws of Antigua and Barbuda (the violations of which can result in harsh consequences) which prohibit SIB from providing you with all the documentary information you currently request… The last time we spoke, I suggested that you make a similar request of the Financial Services Regulatory Commission ("FSRC"), which is the primary (and appropriate) regulatory body which oversees the operations of SIB.  Consistent with the laws of Antigua and Barbuda, FSRC may well be able to provide you with the information you seek."* See **Exhibit KVT-23** (Letter from Mr. Sjoblom to Ms. Brandt of the SEC dated September 12, 2005).

57. Based on the documents that I have reviewed, it appears that Mr. Sjoblom drafted this response even though he had learned on multiple occasions that the FSRC would not provide the SEC the information it was seeking.  I have not seen documents that suggest that he attempted to consult with an Antiguan legal expert or himself review all applicable Antiguan law provisions that purportedly prevented SIB from sharing information with the SEC (although he had requested and received the applicable statutes by this time).

58. The following year, discussions regarding whether SIB can or cannot share information with the U.S. regulators continued.  In addition, the U.S. regulators continued to express frustration as the FSRC declined to cooperate.  I have included excerpts of these communications:

> ✓ On September 6, 2006 Jennifer Brandt of the SEC told Mr. Sjoblom during a phone conversation that Leroy King and the FSRC had not been cooperative with the SEC.  *See* **Exhibit KVT-12** at PROSKAUER_JANVEY 0014562 (Mr.

29

Sjoblom's notes from a call with Ms. Brandt, and Mr. Sjoblom's email to Mr. Alvarado summarizing the call).

✓ On September 18, 2006 Mr. Sjoblom and members of the SEC staff had a teleconference.   Excerpts from Mr. Sjoblom's notes indicate that the SEC requested information regarding the SIB CD program.   In response Mr. Sjoblom stated that the SEC had *"no jurisdiction over the bank,"* and the SEC should *"get bank exam reports from Bank regulators."   See* **Exhibit KVT-15** at PROSKAUER_JANVEY 0000726 (Mr. Sjoblom's notes of the teleconference with SEC dated September 18, 2006). Two days later, on September 20, 2006, in reference to the phone call two days earlier, Mr. Sjoblom sent a letter to the SEC.  Mr. Sjoblom reiterated that the SEC had access to the FSRC and that the SEC's claims that the Antiguan regulators needed SIB's approval to release certain records were not true.  *See* **Exhibit KVT-16** at PROSKAUER_JANVEY 0001621-1622 (Mr. Sjoblom's letter to SEC dated September 20, 2006). I have seen no indication that Mr. Sjoblom attempted to directly resolve the issue of SIB's release and approval to provide documents to the FSRC.

✓ On September 29, 2006 Michael Moore and Elizabeth Jacobs of the SEC sent a fax to Mr. Sjoblom.  Ms. Jacobs informed Mr. Sjoblom that the SEC would be in Antigua on October 11, 2006 and included a document request.   The document request includes items the SEC wanted from the Stanford Entities (essentially documents regarding the SIB portfolio, including detail). *See* **Exhibit KVT-42** at PROSKAUER_JANVEY 00017273 (Fax from Mr. Moore and Ms. Jacobs to Mr. Sjoblom dated September 29, 2006).  On October 2 and 3, 2006 Mr. Sjoblom had teleconferences with Mr. Alvarado regarding the September 29, 2006 SEC letter/fax.  Mr. Sjoblom's notes indicate *"will not provide any information that given to FSRC because proprietary bank information, which SEC can obtain from FSRC."   See* **Exhibit KVT-15** at PROSKAUER_JANVEY 0000725 (Mr. Sjoblom's notes of the teleconference

with SEC dated September 18, 2006 and Mr. Sjoblom's notes summarizing his call with Mr. Alvarado dated October 2 to 3, 2006).

✓ On October 10, 2006 Mr. Sjoblom sent an email to Mr. Alvarado, attaching a letter from Jennifer Brandt of the SEC dated the same day.  The SEC letter had suggested that earlier Mr. Sjoblom had agreed that the FSRC could provide documents to the SEC, but in his email to Mr. Alvarado he claimed that the SEC letter misrepresents what he had said, and that, instead, *"we could not provide anything which by Antiguan law we were precluded from handing over." See* **Exhibit KVT-43** (Email from Mr. Sjoblom to Mr. Alvarado with subject "Fax from SEC (j.brandt 10-10-06)" dated October 10, 2006).

✓ On October 10, 2006 Mr. Sjoblom had a teleconference with the SEC.  The SEC told Mr. Sjoblom that the SEC was not receiving the information it had asked for regarding the SIB portfolio and asked whether it was SIB or the FSRC that was causing the delays. Mr. Sjoblom is informed that the FSRC does not even have the documents because they are awaiting production by SIB.  *See* **Exhibit KVT-30** (Mr. Sjoblom's notes from teleconference with SEC dated October 10, 2006).  After the teleconference with the SEC, Mr. Sjoblom wrote an email to Mr. Alvarado summarizing his call with the SEC, stating, amongst other things, *"I reiterated my view that . . . the SEC must first deal directly with the FSRC to obtain banking records and reports."*  Mr. Sjoblom also asked Mr. Alvarado whether the delays brought up by the SEC had originated with SIB not providing the documentation for 6-8 weeks.  *See* **Exhibit KVT-31** (Email dated October 10, 2006 from Mr. Sjoblom to Mr. Alvarado regarding teleconference with SEC dated October 10, 2006).

✓ On October 13, 2006 Mr. Sjoblom sent a letter to the SEC, in response to the SEC's letters dated September 29, 2006 and October 10, 2006.  In his letter Mr. Sjoblom stated that SIB was not causing any of the delays, and that Mr. Sjoblom did not know what documents the FSRC has in its possession.  Mr. Sjoblom concluded his letter by stating that *"This is a matter of negotiations*

31

*between the SEC and FSRC." See* **Exhibit KVT-44** (Letter dated October 13, 2006 from Mr. Sjoblom to the SEC in response to the SEC's letters dated September 29, 2006 and October 10, 2006).

59. According to the documents I have reviewed, discussions regarding the Antiguan law provisions that purportedly had prevented SIB from sharing information with the SEC, and that were discussed earlier in paragraph 55, began to surface again in early 2009. First, on January 9, 2009 Mr. Sjoblom had a teleconference with Mr. Alvarado and Juan Rodriguez-Tolentino regarding November 29, 2006 subpoenas that the SEC had issued. Topics discussed included SIB's assets *("From legal standpoint, Bank cannot show SEC the bank's assets - that information is known only to the FSRC").  See* **Exhibit KVT-45** at PROSKAUER_JANVEY 00000634 (Mr. Sjoblom's notes from a teleconference with Mr. Alvarado and Mr. Rodriguez regarding subpoenas).  Then, on January 21, 2009 during a breakfast meeting with the SEC, Mr. Sjoblom raised the issue of Antiguan law and its confidentiality provisions. *See* **Exhibit KVT-46** (Mr. Sjoblom's notes dated January 21, 2009).

60. Request 5 of the November 29, 2006 subpoena included a request *"For the time period January 1, 2001 to the present, all agreements in effect between SGC and SIB, including any referral fee agreements."  See* **Exhibit KVT-47** at Proskauer_Janvey_00001395 (Subpoenas issued November 29, 2006 requiring SGC to produce documents related to SIBL CDs and several Stanford employees to testify).   Pursuant to subpoenas issued on November 29, 2006, the company began gathering documents in January 2007 to comply with the request.   *See* page 277:16-19 of Mr. Sjoblom's deposition dated February 1, 2017.  Although the company handled the production, they called upon Mr. Sjoblom with questions about certain documents.  *See* pages 176:25 to 177:13 and 240:10 to 242:7 of Mr. Sjoblom's deposition dated February 1, 2017.  One document that was brought to Mr. Sjoblom's attention was the *"Financial Consulting and Advisory Services Agreement"* between SIB and SGC to which a summary was attached summarizing the Merchant Banking holdings by SIB and administered by SGC.  *See* **Exhibit KVT-48** at PROSKAUER_JANVEY 00009757-9769 (Financial Consulting and Advisory Services

32

Agreement between SGC and SIBL dated December 1, 2004).  Although he believed it was initially responsive to the request, discussions ensued as to whether it should be produced.  *See* pages 240:10 to 242:7 of Mr. Sjoblom's deposition dated February 1, 2017.  Mr. Sjoblom wrote on the agreement that the document indicated SGC knew of SIB's portfolio, a statement he later revised to indicate that SGC *"did not know"* about the portfolio.  *See* **Exhibit KVT-48** at PROSKAUER_JANVEY 00009761 (Financial Consulting and Advisory Services Agreement between SGC and SIBL dated December 1, 2004).  Additionally, nothing in the document refers to any Antiguan secrecy laws that prevent SIB from disclosing SIB investment information to SGC or any other third party.  *See* **Exhibit KVT-48** at PROSKAUER_JANVEY 00009757-9769 (Financial Consulting and Advisory Services Agreement between SGC and SIBL dated December 1, 2004).  To the extent that SIB was truly prohibited from disclosing SIB investment information, I would have expected this agreement to have addressed those allege privacy laws and the fact that SIB was providing the information to SGC despite those privacy laws, and that by providing the information to SGC, SIB was waiving the confidentiality of the information.  Instead the document is completely silent on the issue.  Per Mr. Sjoblom, the reason why the document originally was thought to reflect that SGC **did** have SIB investment information but then revised to indicate it **did not** was a conversation Mr. Sjoblom had with Mr. Alvarado or Ms. Stinson.  He was told these investments, while belonging to SIB, did not include CD money.  *See* **Exhibit KVT-48** at PROSKAUER_JANVEY 00009761-9769 (Financial Consulting and Advisory Services Agreement between SGC and SIBL dated December 1, 2004), pages 241:9 to 242:7 of Mr. Sjoblom's deposition dated February 1, 2017 and **Exhibit KVT-7** at paragraph 30 (Declaration of Lena Stinson dated October 27, 2014).  Having seen the financial statements for SIB in the FSRC audit report, he admitted there was no separate category for "non-CD" investments.  *See* **Exhibit KVT-49** at PROSKAUER_JANVEY 0005360-5408 (Draft Report of Examination of Stanford International Bank Limited dated March 7, 2005, prepared by FSRC) and pages 261:10-20 of Mr. Sjoblom's deposition dated February 1, 2017.  In fact, if the amounts reflected on the schedule of merchant banking

33

investments were removed from SIB's assets, it would result in more than a 50% decline in equity. *See* **Exhibit KVT-49** at PROSKAUER_JANVEY 0005368 (Draft Report of Examination of Stanford International Bank Limited dated March 7, 2005, prepared by FSRC) and **Exhibit KVT-48** at PROSKAUER_JANVEY 00009763 (Financial Consulting and Advisory Services Agreement between SGC and SIBL dated December 1, 2004). Also, the balance sheet did not reflect a separate line item for assets held by SIB which did not involve the CDs. *See* **Exhibit KVT-49** at PROSKAUER_JANVEY 0005360-5408 (Draft Report of Examination of Stanford International Bank Limited dated March 7, 2005, prepared by FSRC) and pages 261:10-20 of Mr. Sjoblom's deposition dated February 1, 2017.

61. One week later, on January 28, 2009 Mr. Sjoblom sent an email to Juan Rodriguez-Tolentino copying Mr. Alvarado. Mr. Sjoblom made a reference to sections 242-245 of the IBC Act and wrote that he did not *"find any language in those sections that imposes confidential protection over the <u>bank's assets and portfolios.</u>"* and that he did not *"find any provision that says that <u>information provided to the FSRC</u> cannot be disclosed by the bank to outside sources."* Mr. Sjoblom concluded his email by asking *"what section of the IBC Act can we rely on to deny the SEC's current request for documents relating to the <u>bank's assets?</u>"* *See* **Exhibit KVT-40** (Email dated January 28, 2009 with subject "Records of Bank Assets under IBC Act" from Mr. Sjoblom to Mr. Rodriguez-Tolentino, copying Mr. Alvarado).

62. The following day, the morning of January 29, 2009, Lena Stinson sent a fax to Mr. Sjoblom's associate Jackie Perrell, attaching Antiguan Statutory Instrument 22 which focuses on the confidential nature of the FSRC's examination report, not the bank's financial information. *See* **Exhibit KVT-41** (Fax dated January 29, 2009 from Ms. Stinson to Ms. Perrell attaching Antiguan Statutory Instrument 22).[10] Later the same day, Mr. Sjoblom sent an email to Mr. Alvarado copying Juan Rodriguez-Tolentino, and attaching

---

[10] Per Mr. Sjoblom's deposition testimony, Mr. Sjoblom reviewed this Antiguan Statutory Instrument 22 on or around this same day that Ms. Perrell received it. *See* page 344:3-8 of Mr. Sjoblom's deposition dated February 1, 2017. As Mr. Sjoblom sent a draft response to Mr. Alvarado later on that same day (January 29, 2009), it seems likely that Ms. Perrell would have shared the fax she received from Ms. Stinson with Mr. Sjoblom before Mr. Sjoblom finalized his draft response.

34

a draft of Mr. Sjoblom's response to the SEC letter dated January 27, 2009 in which the SEC had raised the issue of *"'sworn testimony' of Juan [Rodriguez-Tolentino] and Laura [Pendergest-Holt] and in which they have asked for portfolio information."* Mr. Sjoblom had drafted a paragraph pertaining to the Antiguan privacy laws with a note to Mr. Alvarado referring to his draft paragraph as the best argument he could make but a *"stretch"* and asked for the Antiguan counsel's opinion. *See* **Exhibit KVT-50** at PROSKAUER_JANVEY 00001995 and 00001997 (Mr. Sjoblom's email dated January 29, 2009 to Mr. Alvarado, copying Mr. Rodriguez-Tolentino, attaching Sjoblom's draft response to the SEC's letter dated January 27, 2009). On February 3, 2009 Mr. Sjoblom sent a letter to the SEC, the draft of which he had shared with Mr. Alvarado on January 29, 2009. Despite his earlier hesitation when drafting his letter, Mr. Sjoblom's letter to the SEC maintained that without clarification from Antiguan counsel, SIB could not provide documents to the SEC. *See* **Exhibit KVT-51** at PROSKAUER_JANVEY 00011692 (Mr. Sjoblom's letter dated February 3, 2009 in response to the SEC's letter dated January 27, 2009).

> ### iv.   *Mr. Sjoblom was party to several communications and discussions regarding the composition of the SIB investment portfolio.*

63. Based on the documents I have reviewed, Mr. Sjoblom became aware early on that the SEC had been interested in information regarding the details of the SIB portfolio but that the Stanford Entities denied specific knowledge both at entity and employee levels, both in their communications with the SEC as well as during meetings with Mr. Sjoblom. Based on the documents I have reviewed, it does not appear that this general lack of knowledge of the SIB portfolio specifics raised concern with Mr. Sjoblom. Instead, it appears that he adopted a position that the U.S. regulators would not be privy to the holdings underlying the SIB CD program. I have included excerpts from the case documents below as examples of communications related to the SIB portfolio.

35

64. On May 19, 2005 the Stanford Entities' reply to questions by the SEC had stated that SGC did not know the specific securities in which SIB invested.  Presumably Mr. Sjoblom was aware of this.  *See* **Exhibit KVT-52** at PROSKAYER_JANVEY 00003272-3275 (Mr. Sjoblom's letter to the SEC dated September 12, 2005 responding to the SEC's letter dated August 29, 2005).[11]  In addition, Mr. Sjoblom attended a meeting in Miami sometime between June 10 and June 29, 2005, where one of the discussion items included the SEC's allegation that SGC had not provided access to the SIB portfolio.[12]  Mr. Sjoblom's notes from the meeting state *"SG[C] won't tell how they produce the rate they get."*  *See* **Exhibit KVT-19** at PROSKAUER_JANVEY 0000045 (Mr. Sjoblom's notes from a trip to Miami).  Finally, on June 29 and 30, 2005, Mr. Sjoblom visited Houston and met with Stanford employees, including several financial advisors.  Mr. Sjoblom appears to have asked several of the financial advisors about the SIB portfolio.  None of the financial advisors appear to have known specifics, only that Memphis oversaw the SIB portfolio, general categories and allocations of the assets.  *See* **Exhibit KVT-6** (Sjoblom's notes from interviews with SGC Financial Advisors in Houston dated June 29-30, 2005).

65. In August 2005 Mr. Sjoblom visited Antigua.  *See* page 68:7-11 of Mr. Sjoblom's deposition dated February 1, 2017.  During his visit, on August 10, 2005 Mr. Sjoblom received the FSRC examination report (draft) dated March 7, 2005.[13]  The examination report does not provide specifics about SIB's portfolio, only that it could be liquidated in 72 hours, that asset allocation is generally kept within defined parameters (cash 10-15%, govt bonds 20-50%, corp bonds 0-20%, equities 0-50%), and provides a snapshot of

---

[11] This document predates Mr. Sjoblom's engagement with the Stanford Entities (August 23, 2005), but Mr. Sjoblom had been provided a copy of this document as he refers to it in his letter to the SEC dated September 12, 2005.  *See* **Exhibit KVT-52** at PROSKAUER_JANVEY 00003269 (Mr. Sjoblom's letter to the SEC dated September 12, 2005 responding to the SEC's letter dated August 29, 2005).

[12] The exact date of the meeting in Miami is not included in the documents, but Mr. Sjoblom refers to teleconferences that took place on June 9 and 10, 2005 as the first contact Mr. Sjoblom had with the Stanford Entities and he makes a reference to a trip Mr. Sjoblom took to Houston on June 29, 2005, after he had taken a trip to Miami. *See* pages 37:24 to 38:7 and 47:2-11 of Mr. Sjoblom's deposition dated February 1, 2017.

[13]  The August 10, 2005 date is based on Mr. Sjoblom's agenda and his deposition testimony which states that Mr. Sjoblom received this report from Juan Rodriguez in Antigua.  *See* **Exhibit KVT-53** (Mr. Sjoblom's agenda for trip to Antigua on August 9-11, 2005) and *see* page 96:8-23 of Mr. Sjoblom's deposition dated February 1, 2017.

36

holdings but only by very broad categories. *See* **Exhibit KVT-49** at PROSKAUER_JANVEY 00005360, 00005370, 00005386 and 00005387 (Draft Report of Examination of Stanford International Bank Limited dated March 7, 2005, prepared by FSRC). I have seen no evidence that Mr. Sjoblom asked for the information that would have allowed the FSRC to compile the percentages indicated in the exam report. The specific percentages could only be derived by detailed information from the portfolio and the underlying investments. Alternatively, he would be alerted that, without the necessary detail, the examiner could not independently derive those percentages but had taken the information provided by SIB at face value.

66. On August 10, 2005 Mr. Sjoblom met with Jim Davis, Michael Zarich and Laura Pendergest-Holt. One of the discussion topics was *"Confirmation that Investments Actually Exist."* Mr. Sjoblom's notes indicate that SIB reported to the FSRC on quarterly basis and that SIB had monthly statements from money managers on file. *See* **Exhibit KVT-54** at PROSKAUER_JANVEY 00000095-96 (Mr. Sjoblom's notes from meeting with Mr. Davis, Mr. Zarich and Ms. Pendergest-Holt dated August 10, 2005). The only review of portfolio investment statements I have noted in my review of documents is the cursory review he conducted in Memphis (see paragraph 53 above).

67. On September 12, 2005, Julie Preuitt of the SEC sent a letter to SGC president Jay Comeaux alleging violations. Amongst other things, Ms. Preuitt's letter mentions that SEC believed that it was not appropriate for the SGC financial advisors to recommend the SIB CDs given the fact that they did not know the specific investments in the SIB portfolio. *See* **Exhibit KVT-9** at PROSKAUER_JANVEY 00003260 (The SEC's letter to Mr. Comeaux dated September 12, 2005). Three days later, Mr. Alvarado forwarded Ms. Preuitt's letter to Mr. Sjoblom. *See* **Exhibit KVT-8** (Mr. Alvarado's email to Mr. Sjoblom dated September 15, 2005). Mr. Sjoblom replied to the SEC's letter on October 3, 2005. *See* **Exhibit KVT-11** (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC). Highlights from Mr. Sjoblom's reply include: *"Disclosure Statement specifically advises all potential investors to consult their financial advisors concerning the CD program, informs them where they can obtain further information, and recommends further due diligence*

37

*before investing.*" and that "*the [SEC] staff's assertion goes too far* [in asserting that the financial advisors should know the specifics of the SIB portfolio.]"  *See* **Exhibit KVT-11** at PROSKAUER_JANVEY 00000810 and 00000823 (Mr. Sjoblom's reply dated October 3, 2005 on behalf of Stanford to the SEC).

68.  On September 11, 2006, Mr. Sjoblom learned that the Antiguan regulator and the Stanford Entities shared certain information in an unusually free manner.  Specifically, Mr. Sjoblom learned that Mr. Stanford had discussed with Leroy King of the FSRC a conversation between Mr. King and Michael Moore of the SEC.  *See* **Exhibit KVT-13** (Sjoblom's notes from a teleconference with Mr. Stanford dated September 11, 2006). The notes that Mr. Stanford had taken during the call with Mr. King and that Mr. Stanford forwarded to Mr. Sjoblom indicate,[14] amongst other things, that in the SEC's view SGC refused to provide its financial advisors adequate information regarding the SIB portfolio, and that former registered representatives had stated that they suspected money was funneled to fund Stanford's real-estate ventures.  *See* **Exhibit KVT-14** at PROSKAUER_JANVEY 00005459-5460 (Mr. Stanford's notes dated September 11, 2006).

69.  On September 18, 2006 Mr. Sjoblom had a teleconference with the SEC, during which the SEC requested information on how the CD returns were generated and how the CD moneys were invested.  Later that same day Mr. Sjoblom had a teleconference with Mr. Alvarado during which Mr. Sjoblom's teleconference with the SEC was discussed.  *See* **Exhibit KVT-15** (Mr. Sjoblom's notes of the teleconference with SEC and subsequent call with Mr. Alvarado dated September 18, 2006).

70.  On September 29, 2006 Michael Moore and Elizabeth Jacobs of the SEC sent a fax to Mr. Sjoblom.  Ms. Jacobs informed Mr. Sjoblom that the SEC would be in Antigua on October 11, 2006 and included a document request.  The document request included items the SEC wanted from the Stanford Entities (essentially documents regarding the SIB portfolio, including detail).  *See* **Exhibit KVT-42** at PROSKAUER_JANVEY 00017273 (Fax from Mr. Moore and Ms. Jacobs to Mr. Sjoblom dated September 29, 2006).  On

---

[14] Mr. Stanford sent these notes to Mr. Sjoblom during or after his call between him and Mr. Sjoblom on September 11, 2006.  *See* page 185:3-22 of Mr. Sjoblom's deposition dated February 1, 2017.

38

October 2 and 3, 2006 Mr. Sjoblom had a teleconference with Mr. Alvarado regarding the September 29, 2006 SEC letter/fax.  Mr. Sjoblom's notes indicate *"will not provide any information that given to FSRC because proprietary bank information, which SEC can obtain from FSRC."*  See **Exhibit KVT-15** at PROSKAUER_JANVEY 00000725 (Mr. Sjoblom's notes of the teleconference with SEC and subsequent call with Mr. Alvarado dated September 18, 2006).

71. On October 10, 2006 Mr. Sjoblom had a teleconference with the SEC.  The SEC told Mr. Sjoblom that the SEC was not receiving the information it had asked for regarding the SIB portfolio and asked whether it was SIB or the FSRC that was causing the delays.  *See* **Exhibit KVT-30** (Mr. Sjoblom's notes from teleconference with SEC dated October 10, 2006)**.**  After the teleconference with the SEC, Mr. Sjoblom wrote an email to Mr. Alvarado summarizing his call with the SEC, stating, amongst other things, *"I reiterated my view that . . . we are prohibited under Antiguan law from releasing certain types of banking reports and records,"*  Mr. Sjoblom also asked Mr. Alvarado whether the delays brought up by the SEC had originated with SIB.  *See* **Exhibit KVT-31** (Email dated October 10, 2006 from Mr. Sjoblom to Mr. Alvarado regarding teleconference with SEC dated October 10, 2006).

72. On October 13, 2006 Mr. Sjoblom sent a letter to the SEC, in response to the SEC's letters dated September 29, 2006 and October 10, 2006.  In his letter Mr. Sjoblom stated that SIB was not causing any of the delays, and that Mr. Sjoblom did not know what documents the FSRC had in its possession.  Mr. Sjoblom concluded his letter by stating that *"this is a matter of negotiations between the SEC and FSRC." See* **Exhibit KVT-44** (Letter dated October 13, 2006 from Mr. Sjoblom to the SEC in response to the SEC's letters dated September 29, 2006 and October 10, 2006).

73. On November 29, 2006 the SEC issued subpoenas on SGC and various SGC employees.  Amongst other items, the subpoena included *"documents evidencing the investments held in SIB's investment portfolios as identified in the 'Investment Strategy and Other Fixed Income Instruments' section of the 'U.S. Accredited Investor Certificate of Deposit Program Disclosure Statement.'"  See* **Exhibit KVT-47** at PROSKAUER_JANVEY 00001395 (Subpoenas issued

39

November 29, 2006 requiring SGC to produce documents related to SIB CDs and several Stanford employees to testify).

74. On January 8, 2009 Mr. Sjoblom had a teleconference with the SEC.  According to Mr. Sjoblom's notes the SEC reiterated that it wanted *"'positive evidence' that (a) the money is invested and (b) the bank can pay the stated rates of return."  See* **Exhibit KVT-45** at PROSKAUER_JANVEY_00000633 (Mr. Sjoblom's notes from a teleconference with Mr. Alvarado and Mr. Rodriguez regarding subpoenas).

75. On January 14 and 15, 2009 FINRA interviewed Stanford financial advisors.  Mr. Sjoblom's notes indicate that Fred Palmliden told FINRA that Tier 3 consisted of private equity and real-estate.  *See* **Exhibit KVT-55** at PROSKAUER_JANVEY 00002425 (Mr. Sjoblom's notes dated January 14-15, 2009).

76. On January 15, 2009 the SEC interviewed Stanford Chief Compliance Officer Bernie Young.  Ms. Perrell's notes indicate that that the topics discussed during the interview included the high returns of the SIB CDs, what was known about the underlying investment strategies, SIB's auditor, and whether the SIB CD was a security.  Mr. Young's answers were very general.  Examples of Mr. Young's answers included *"I've never asked them what is in the portfolio"* and *"not concerned about knowing the underlying investments." See* **Exhibit KVT-56** (Ms. Perrell's notes of Mr. Young's interview dated January 15, 2009).

77. On January 21, 2009, during a breakfast meeting with the SEC, Mr. Sjoblom and members of the SEC staff discussed presentations that Laura Pendergest-Holt and Juan Rodriguez-Tolentino would give to the SEC.  The presentations would include information about the SIB portfolio.  *See* **Exhibit KVT-46** (Mr. Sjoblom's notes dated January 21, 2009).  Three days later, on January 24, 2009, Mr. Sjoblom sent an email to Mr. Alvarado regarding the SEC subpoenas.  In his email Mr. Sjoblom mentioned the presentations by Mr. Rodriguez-Tolentino and Ms. Pendergest-Holt.  Mr. Sjoblom covered what the SEC expected from the presentations, stating, for example *"We can fully anticipate that the SEC <u>will</u> want Juan to testify under oath that the bank is "real," the CD's are "real," that the money is actually invested as described in our documents, and that*

40

*client funds in the CDs are safe and secure."* Mr. Sjoblom concluded his email by stating *"Now is the time for us to come forward with "positive evidence" of everything I have been saying to them [the SEC] for the last 3 years."* and *"After the SEC meeting, we will need to come up with a procedure to verify everything that Laura [Pendergest-Holt] said about the money managers and each segment of the portfolio." See* **Exhibit KVT-57** (Mr. Sjoblom's email to Mr. Alvarado, regarding SEC's subpoena, dated January 24, 2009).

78. On January 26, 2009 Mr. Sjoblom had a phone conversation with Mr. Alvarado regarding the SEC's subpoena on Stanford Senior Investment Advisor Michael Zarich, during which Mr. Alvarado told Mr. Sjoblom that Mr. Alvarado would not pay Mr. Zarich's attorney fees. The same day Mr. Sjoblom had another phone conversation with Laura Pendergest-Holt regarding what Mr. Zarich knew and whether Mr. Zarich could *"hurt us."* Mr. Sjoblom's notes state that *"the Senior Investment Manual (SIO) was written (by Laura) in a manner so that it could not hurt us if it got out"* and that *"Zarich knows nothing about tier 3." See* **Exhibit KVT-58** (Mr. Sjoblom's notes dated January 26, 2009).

79. On February 4, 2009 Kevin Edmundson of the SEC sent an email to Mr. Sjoblom regarding the presentations of Juan Rodriguez-Tolentino and Laura Pendergest-Holt. Mr. Edmundson's email emphasized that the presentations *"need to account, in a manner that can be verified by the Commission, for SIB's entire portfolio of assets." See* **Exhibit KVT-59** (Mr. Edmundson's email to Mr. Sjoblom dated February 4, 2009).

80. On February 5, 2009 Mr. Sjoblom attended a meeting in Miami with several Stanford employees (James Davis, Laura Pendergest-Holt, Juan Rodriguez-Tolentino, Lena Stinson, Mauricio Alvarado). Mr. Sjoblom's notes indicate that Tier 3 holdings were discussed, specifically that Tier 3 consisted of notes receivable consisting of related party transactions and real estate, both of which were not disclosed on SIB financial statements and also not disclosed to the FSRC. Mr. Sjoblom's notes indicate that *"This was the first time I had ever seen anything about the composition of tier 3."* Mr. Sjoblom's notes go on to indicate that based on what he had learned, he *"told the group to immediately shut down sales of all CDs in the US under the US accredited investor program."* Mr. Sjoblom's notes of this meeting conclude by noting that Mr. Stanford arrived at the

end of the meeting and stated that he could possibly raise up to $1 billion in additional funds but that he needed 30 days to do so, and that *"he cannot stop business; otherwise, he would not be able to raise the money."*  *See* **Exhibit KVT-60** (Mr. Sjoblom's notes dated February 5, 2009).

>    *v.*    ***Mr. Sjoblom did not initially disclose the SEC investigation to SGC's auditor BDO***

81. BDO was the auditor for SGC during the time Mr. Sjoblom and Proskauer were retained by SIB and SGC.  As part of the audit process, a "legal letter" is requested by the auditor of any outside counsel involved in cases that could potentially lead to a contingent liability or disclosures.  BDO sent these letters to Mr. Sjoblom for the audit on SGC financial statements for the years ended December 31, 2005, 2006 and 2007.

82. In his deposition testimony Carlos Ancira, the audit partner from SGC auditor BDO, indicated that for the year end December 31, 2005 audit, Mr. Sjoblom returned the legal letter to BDO but did not mention the SEC examination in his legal letter to BDO irrespective of the significant amounts of correspondence with the SEC and assertions made about allegations of fraud by the SEC.  *See* pages 46:20 to 47:9 of Mr. Ancira's deposition dated September 11, 2012.  In its work papers, BDO indicates a follow up discussion was had with Mr. Sjoblom, in which the auditors asked why the 2005 audit legal letter did not address the SEC examination.  The document reflects that Mr. Sjoblom indicated that the matter was an examination and, therefore, there was no litigation. *See* **Exhibit KVT-61** at page 3 (Exhibit 249 to Mr. Ancira's deposition dated September 11, 2012).  Based upon review of the SEC letter dated September 12, 2005, BDO recommended that the examination be included in the footnotes to the financial statements, which was eventually included in the final audited financial statements.  *See* pages 48:25 to 50:2 of Mr. Ancira's deposition dated September 11, 2012.

83. Related to the 2006 year end audit, Mr. Sjoblom again did not immediately respond to BDO's request.  On January 11, 2007, Glen Rigby (Assistant GC of Stanford) asked Mr.

42

Sjoblom to cooperate with BDO and disclose pending legal matters facing Stanford as requested by SGC's auditors, BDO. *See* **Exhibit KVT-62** (Letter from Mr. Rigby to Mr. Sjoblom dated January 11, 2007). Mr. Sjoblom sent a letter to BDO on February 23, 2007, but he did not disclose the SEC investigation, even though notably it had changed from an examination to an investigation. *See* **Exhibit KVT-63** (Mr. Sjoblom's letter to BDO dated February 23, 2007). On February 28, 2007 BDO sent a letter to Mr. Sjoblom stating that the SEC investigation had been brought to its attention by SGC and asked for a conversation. *See* **Exhibit KVT-64** (BDO's letter to Mr. Sjoblom dated February 28, 2007). That same day, Ms. Perrell sent Mr. Sjoblom an email and attached ABA's statement of policy regarding "Lawyers' Responses to Auditor Requests." *See* **Exhibit KVT-65** (Ms. Perrell's email to Mr. Sjoblom dated February 28, 2007 with the ABA's statement of policy regarding "Lawyers' Responses to Auditor Requests" attached). Mr. Sjoblom also had three phone calls with BDO on that same day. *See* **Exhibit KVT-66** at PROSKAUER_JANVEY 00033754 (Proskauer invoice dated April 23, 2007). Per Mr. Ancira's deposition testimony, the audit team again had to discuss with Mr. Sjoblom why he had not disclosed the SEC investigation, and he indicated that the investigation was focused on SIB and its CDs more than SGC issues. *See* pages 56:3 to 57:15 of Mr. Ancira's deposition dated September 11, 2012. Again, for the year ended, December 31, 2006, a disclosure was made in the audited financial statements as to the existence of the investigation, but no accrual was made. *See* page 57:16-20 of Mr. Ancira's deposition dated September 11, 2012.

84. Related to the 2007 year end audit, Mr. Sjoblom again did not mention the SEC investigation in his letter to BDO. On February 8, 2008, Glen Rigby (Assistant GC of Stanford) sent a letter to Mr. Sjoblom requesting Mr. Sjoblom to furnish BDO with information regarding contingencies involving matters for which Mr. Sjoblom had been engaged on behalf of SGC. *See* **Exhibit KVT-67** (Letter from Mr. Rigby to Mr. Sjoblom dated February 8, 2008). On February 14, 2008, Mr. Sjoblom asked Ms. Perrell to assist with the request. As part of the same communication, Mr. Sjoblom instructed Ms. Perrell not to discuss the content of the letter with BDO. *See* **Exhibit KVT-68** (Email

from Mr. Sjoblom to Ms. Perrell dated February 14, 2008). The same day, Proskauer sent a letter to BDO which does not mention the SEC investigation. The letter is signed by Proskauer Partner Richard H. Rowe, with whom Mr. Sjoblom had had communications on February 11, 2008. *See* **Exhibit KVT-69** (Letter from Proskauer to BDO dated February 14, 2008) and **Exhibit KVT-70** (Email chain between Mr. Sjoblom and Mr. Rowe dated February 11, 2008).

### D. Other Relevant Information

85. This section contains additional relevant information related Mr. Sjoblom's and Proskauer's representation of SIB and SGC.

86. On August 25, 2005 Mr. Sjoblom and Chadbourne associates exchanged emails regarding whether proprietary trading strategy or system can be considered a reason to not disclose information assuming a protective order would be in place. Emails suggest that that would not be the case. *See* **Exhibit KVT-71** (Email exchange dated August 25, 2005).

87. On January 26, 2006 Mr. Sjoblom helped draft SGC's response to NASD eventually dated February 3, 2006. *See* **Exhibit KVT-72** (SGC's response to the NASD dated February 3, 2006) and **Exhibit KVT-73** (Fedex from Ms. Hamric sent to Mr. Sjoblom attaching SGC's February 3, 2006 response to the NASD inquiry letter dated January 13, 2006).

88. On January 23, 2007 Proskauer associate Mr. Jonathan D. Hanks sent Mr. Sjoblom a memo about obstruction of justice which Mr. Sjoblom had requested according to Mr. Hanks' email. The memo mentions another Proskauer client (misunderstanding between Mr. Hanks and Mr. Sjoblom). Per deposition transcript, Mr. Sjoblom was worried Stanford was destroying documents and wanted to use this memo to convince Mr. Alvarado not to do so. *See* **Exhibit KVT-74** (Proskauer associate Mr. Hanks memo dated January 23, 2007 sent to Mr. Sjoblom).

89. On January 7, 2009 Mr. Sjoblom had a teleconference with Mr. Alvarado. Mr. Sjoblom's notes emphasize the importance of buying time and how any publicity could *"kill"*

44

Stanford. *See* **Exhibit KVT-75** (Mr. Sjoblom's notes from a teleconference with Mr. Alvarado dated January 7, 2009).

90. On January 16, 2009 Mr. Sjoblom sent an email to Mr. Alvarado stating *"I want to shut down breadth of SEC interrogatories,"* and asked Mr. Alvarado to send him the opinion letter on 1940 Act issues re CDs. *See* **Exhibit KVT-32** (Mr. Sjoblom's email to Mr. Alvarado dated January 16, 2009).

> **E. Directors and officers promoted SIB's and SGC's central role in the Stanford Ponzi Scheme, which was facilitated by Mr. Sjoblom and Proskauer, causing financial harm to both entities.**

> > ***i. Stanford Group Company was insolvent without SIB CD proceeds, and played a central role in selling the CDs to investors.***

91. SGC is a registered U.S. broker-dealer and an investment adviser and, therefore, was subject to regulation and inspection by the SEC and NASD (now FINRA), and had reporting obligations to these entities.

92. The directors and officers of both SGC and SIB played a fundamental role in perpetuating the Stanford Ponzi scheme, including the sale of SIB CDs. The operations of SGC and SIB were linked and resulted in significant amounts of SIB CDs being sold directly by SGC. SGC's financial advisors sold thousands of SIB CDs to investors in the United States, for which it received commissions, or referral fees from SIB. SGC also performed "portfolio management"[15] and other services for SIB related to the SIB investment portfolio, for which it also received fees from SIB. These referral fees and other CD-related compensation constituted 43.96% of SGC's revenue for 2000, 57.36% for 2001, 68.02% for 2002, 72.15% for 2003, 71.65% for 2004, 63.62% for 2005, 65.01% for 2006, 50.38% for 2007, and 52.83% for 2008.

---

[15] The portfolio at issue comprised the overvalued private equity assets of SIB, a summary of which known as "The Book" was produced quarterly by SGC

|  | (in millions) | | | | | |
|---|---|---|---|---|---|---|
|  | SIB CD referral fees | Portfolio Advisory fees | Research fees | SGC SIB related revenues | SGC total revenues | SGC SIB related revenue % |
|  | A | B | C | D = A+B+C | E | D / E |
| 12/31/2000 | $15.6 | - | - | $15.6 | $35.4 | 43.96% |
| 12/31/2001 | $19.2 | $0.5 | - | $19.7 | $34.2 | 57.36% |
| 12/31/2002 | $26.0 | - | - | $26.0 | $38.2 | 68.02% |
| 12/31/2003 | $32.0 | - | - | $32.0 | $44.3 | 72.15% |
| 12/31/2004 | $42.9 | $4.0 | - | $46.9 | $65.4 | 71.65% |
| 12/31/2005 | $56.8 | $5.4 | - | $62.2 | $97.8 | 63.62% |
| 12/31/2006 | $88.1 | $7.4 | $16.0 | $111.5 | $171.5 | 65.01% |
| 12/31/2007 | $77.8 | $8.2 | $17.0 | $103.0 | $204.4 | 50.38% |
| 12/31/2008 | $94.5 | $13.7 | $21.6 | $129.9 | $245.8 | 52.83% |

93. In addition, SGC financial advisors received compensation for the sales of SIB CDs that was above normal market rates for similar services.  In some cases, financial advisors received minimum contractual compensation, which would not be denoted in SGC's records as referral fees, but which reasonably could be allocated to their participation in the SIB CD sales program.

94. SGC was financially dependent on the referral fees and other CD-related compensation it received from SIB.  As noted above, see paragraph 92, a substantial amount of SGC's revenue came from these payments.  Even when this CD-related compensation from SIB is considered along with other income received by SGC, SGC showed positive net income in only two of the nine years, the balance resulting in net losses in each period.  The net income and net losses were $(2,222,478) in 2000, $(4,409,516) in 2001, $2,290,460 in 2002, $4,354,303 in 2003, $(3,628,184) in 2004, $(19,866,431) in 2005, $(20,509,297) in

46

2006, $(27,384,103) in 2007 and $(22,752,483) in 2008.[16]   SGC's CD related compensation and capital contributions between 2000 and 2008 are detailed in the following paragraphs.

95. SGC received $4,300,000 in cash capital contributions in 2001, $10,000,000 in 2004, $21,000,000 in 2005, $51,500,000 in 2006, $41,750,000 in 2007 and $51,000,000 in 2008.  The capital contributions to SGC came primarily from SIB CD sale proceeds.  Of the $175,250,000 in capital contributions received from 2004 through 2008, I and my team have traced a total of $152,250,000 or 87% of that amount.  The records available to me and my team do not contain sufficient detail to identify the source of the remaining $23,000,000 in capital contributions.  The totals are comprised of amounts traced to various Stanford Entity bank accounts, including $87,250,000 to SFGC's Trustmark National Bank account number 3003104586 ("Trustmark 4586") in the years 2005 through 2007, $5,000,000 to SFGC's Bank of Houston account number 8854 ("BOH 8854") in 2007, and $60,000,000 to SFGGM's Bank of Houston account number 8870 ("BOH 8870") in 2007 and 2008.  My July 27, 2009 and June 7, 2011 declarations do not cover the deposits made to the Trustmark 4586, BOH 8854 and BOH 8870 accounts.  Therefore, tracing of those funds is included in the paragraphs below.

96. A total of $1.4 billion was deposited into SFGC's Trustmark 4586 account from 2005 through 2007.  Based on my team's review of records from Trustmark relating to this account 82%, or $1.1 billion of the deposits during this time period were transfers from SIB's Trustmark National Bank account 3003101707 ("Trustmark 1707").  An additional 4%, or $52.6 million of the deposits during this time period were transfers from BOH 8870 and 3%, or $48.3 million of the deposits during this time period were transfers from BOH 8854.

97. A total of $48.2 million was deposited into SFGC's BOH 8854 account in 2007.  Based on my team's review of records from Bank of Houston to this account 48%, or $23.2 million of the deposits during this time period were transfers from SIB's Bank of Houston

---

[16] The sources of this data are audited SGC statements, except for the 2008 figure, which comes from unaudited financial statements.

account 8706 ("BOH 8706").  An additional 37%, or $17.8 million of the deposits during this time period were transfers from SFGC's Trustmark 4586 account. The remaining 15%, or $7.2 million of the deposits during this time period were transfers from SFGGM's Bank of Houston 8870 ("BOH 8870") account.

98. A total of $691.5 million was deposited into SFGGM's BOH 8870 account in 2007 and 2008.  Based on my team's review of records from Bank of Houston to this account 78%, or $541.1 million of the deposits during this time period were transfers from BOH 8706. An additional 11%, or $76.6 million of the deposits during this time period were transfers from SIB's Toronto Dominion account 0360012161670 ("TD 1670").

99. As detailed in paragraphs 96 through 98 above, the substantial majority of funds deposited into Trustmark 4586, BOH 8854 and BOH 8870 came directly or indirectly SIB's Trustmark 1707, BOH 8706 and TD 1670 accounts.  As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations, the substantial majority of funds received by SIB into Trustmark 1707, BOH 8706, and TD 1670 came directly or indirectly from CD sale proceeds.

100. Although we do not have sufficient supporting documentation to complete a tracing analysis of capital contributions received prior to 2004, because the contributions were purportedly made by or on behalf of Mr. Stanford and we know that Mr. Stanford did not have a significant source of income separate and apart from the SIB CD deposits, the capital contributions prior to 2004 more likely than not also came from SIB CD proceeds.

> ii. *The directors and officers of SGC and SIB promoted the entities' participation in and furtherance of the Ponzi Scheme, resulting in increased liabilities to SIB and SGC.*

101. On April 25, 2013, the Federal District Court in the Northern District of Texas found Mr. Stanford *"liable to disgorge the $5.9 billion that he obtained as a result of his fraudulent scheme,"*[17] which came to $6,761,189,969.06 after the addition of prejudgment interest.[18]

---

[17] *SEC v. Stanford International Bank*, Civil Action No. 3:09-CV-0298-N, at 12, Dkt. 1858 (April 25, 2013).
[18] *Id.* at 17.

The Court also found that *"Stanford used SCB [sic] and SGC to sell his CDs, the tool used to perpetuate his massive Ponzi scheme,"*[19] and determined that SIB and SGC were found jointly and severally liable for the disgorgement amount.[20]   The Court noted that *"it may be necessary to offset any disgorgement amount owed by Stanford, Davis, SGC, and SIB by any recovery obtained against them by the Receiver or any assets obtained by the Department of Justice in forfeiture proceedings"* and that *"[t]he sum also may be offset by money returned to investors from the Receiver."*[21]

102. The Northern District reached the $5.9 billion disgorgement number by referring to the criminal money judgment against Mr. Stanford, which the Court found to be *"a reasonable approximation of [Stanford's] ill-gotten gains."*[22]   The criminal court in turn reached this amount by starting with *"the approximately $7.2 billion found to be owed to CD depositors by SIBL at the time SIBL went into receivership"* and discounting approximately $1.3 billion in "fictitious interest."[23]   Hence, SIB and SGC were penalized for their participation in the Stanford Ponzi Scheme as measured by the net amount of investor liability accrued over the life of the scheme, less the "fictitious interest" promised to the investors, and less any amounts recovered by the receivership or Department of Justice and returned to the investors.   Though the Court did not say how it calculated the "fictitious interest," I have calculated this to be $1.8 billion by performing the following calculation: the total of the "Interest Paid" as disclosed in the SIB Annual Reports from 1998 through 2007 plus the "Interest Paid" as identified in the draft SIB excel financial statements minus the payments of interest identified in the SIB CD database withdrawal transactions.   The difference between the court's calculation of $1.3 billion and my calculation of $1.8 billion is the inclusion of "Interest Paid" information from 1998 through 2003.   This results in an updated liability amount of $5.4 billion ($7.2 billion minus $1.8 billion of "fictitious interest").

---

[19] *Id.* at 7. The court was referring to SIB.

[20] *Id.* at 12.

[21] *Id.* at 12 n.2.

[22] *Id.*

[23] *United States v. Robert Allen Stanford*, Criminal No. H-09-342-01-S, at 2-3, Dkt. 881 (June 14, 2012).

49

103. I have analyzed the Stanford financial records to determine what amount of the $5.4 billion penalty as measured by increased liabilities to SIB and SGC was accrued during the time the time periods Mr. Sjoblom and Proskauer were representing SIB and SGC. To do this I obtained the CD liability balance from the SIB Annual reports, or for the final balance at February 17, 2009, the SIB CD Temenos database.  I then calculated an adjusted CD liability balance subtracting the amount of "fictitious interest."[24]  I then calculated the increase to the liability as the difference between the adjusted CD liability balance at the beginning and end of the period in question.  To be conservative, I also netted the amount of referral fees, portfolio advisory fees, research fees and capital contributions received by SGC during each period, since it could be argued that these amounts would have comprised an off-setting "benefit" to SGC from its participation in the scheme.[25]

104. The amounts reflected above include sales to all investors, whether or not they were sold by SGC financial advisors, because the ruling indicates that SIB and SGC have joint and several liability.

105. My results are described in the chart below.  I used three separate time periods which relate to events included in the chronology of Mr. Sjoblom's and Proskauer's representation of SIB and SGC in the paragraphs above, and are also referenced in the original complaint dated January 31, 2013.

    a.  **November 1, 2006** - Proskauer was retained in September 2006, and Mr. Sjoblom called Jennifer Brandt and was told the SEC was conducting a fraud/Ponzi investigation.  Mr. Sjoblom represented to Ms. Brandt that he had personally gone through all of Stanford's operations and there was no fraud.  During late

---

[24] Because the amount of interest could not be accurately determined on the given date, I chose a conservative number that I know to represent a greater amount of interest (and hence a lesser amount of CD liability "principal") than would actually have been the case.  For each period, the "fictitious interest was determined by summing the "Interest Paid" as disclosed in the SIB Annual Reports through the end of the period in question minus the payments of interest identified in the SIB CD database withdrawal transactions through that same period. For periods that did not end or begin on a calendar year, the draft excel financial statements were used as the source of "Interest Paid".

[25] Treating these amounts as a "benefit" is purely intended to present a conservative picture of the damages.  The reality is that these amounts were ill-gotten gains to SGC.

September and into early October 2006, Mr. Sjoblom helped Stanford stall the SEC's efforts to get the SIB portfolio records, including by telling the SEC that the SEC could get access to the SIB portfolio records vis the FSRC, while knowing that the FSRC would not allow the SEC to have such access.

b. **March 1, 2007** - The SEC issued its formal Order of Investigation and issued its documentary subpoena to SGC in the fall of 2006. Mr. Sjoblom continued to assist Stanford in preventing the SEC from getting the SIBL portfolio records. Mr. Sjoblom informed Mr. Alvarado that he thought the SEC's Investment Company Act claim was a "stretch" because "banks are exempt from the definition of investment companies," even though he knew SIB was not a commercial bank. During a document production meeting in Houston in January 2007, Mr. Sjoblom instructed Lena Stinson and Bernie Young not to produce the Financial Consulting and Advisory Services Agreement between SGC and SIB. Instead, they were held in a pile to be considered later, but were never produced. He also learned in conjunction with that meeting and the agreement that SIB had undisclosed venture capital/private equity investments in its portfolio. On February 23, 2007, Mr. Sjoblom sent his response to BDO's audit letter for the 2006 SGC audit that failed to disclose the SEC fraud investigation.

c. **September 1, 2007** - Further delay tactics by Mr. Sjoblom to stall document production and testimony to the SEC in order to help Stanford prevent the SEC from getting information about SIB's portfolio. On August 13, 2007 Ms. Perrell provided a memo to Mr. Sjoblom regarding the applicability of the Investment Company Act to SIB concluding that SIB was exempt from registration because it was a foreign bank *"engaged substantially in commercial banking activity"* even though Mr. Sjoblom had been informed by financial advisors much earlier that SIB was not a commercial bank. During meetings in Houston in August 2007, Mr. Sjoblom discovered that SGC had ignored his advice about discontinuing

sales contests and continued its sales contests to incentivize financial advisors to sell more SIB CDs. [26]

### INCREASED LIABILITIES TO SIB AND SGC

106. The below table reflects the SIB CD liability increase and the net SGC liability increase for the periods on and after November 1, 2006, March 1, 2007 and September 1, 2007, in each case through February 16, 2009.  The economic damages range from $275.4 million to $1.57 billion.

|  | From November 1, 2006 | From March 1, 2007 | From September 1, 2007 |
|---|---|---|---|
| **SIB CD Liability Increase** | $1,573,840,928 | $1,199,631,190 | $465,394,623 |
| **Less: Referral Fees Received** | $188,383,117 | $161,168,717 | $123,171,722 |
| **Less: Capital Contributions** | $102,750,000 | $84,750,000 | $60,000,000 |
| **Less: Research fees** | $41,266,667 | $35,766,667 | $27,266,667 |
| **Less: Portfolio Advisory fees** | $23,316,932 | $20,224,019 | $16,083,009 |
| **Plus: Referral Fees Paid** | $52,504,231 | $46,919,475 | $36,557,725 |
| **Net SGC Liability Increase** | **$1,270,628,443** | **$944,641,262** | **$275,430,950** |

I state under penalty of perjury that the foregoing is true and correct.  Executed on the 25th day of August, 2017.

*Karyl M. Van Tassel*

Karyl Van Tassel

---

[26] I reserve the right to supplement my report, if requested by Plaintiffs' counsel, to provide numbers for other dates.

# EXHIBIT 5

*July 27, 2009 Declaration of Karyl Van Tassel,
with exhibits*

*(KVT-02 to Doc. 119-2)*

**RCVR-PROSKAUER-EXP 0002806**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 03-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL. | § | |
| | § | |
| | § | |
| Defendants. | | |

---

## DECLARATION OF
## KARYL VAN TASSEL

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 24 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have

RCVR-PROSKAUER-EXP 0002807

App. 114

also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2. The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3. I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities — all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB — Stanford International Bank, Limited.

- STCL — Stanford Trust Company Limited, an Antigua trust company.

- SFG — Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SGH — Stanford Group Holdings, Inc., a U.S. holding company incorporated in Delaware.

- SFGC — Stanford Financial Group Company, a U.S. entity incorporated in Florida.

- SFGGM — Stanford Financial Group Global Management, LLC, a U.S. entity incorporated in the U.S. Virgin Islands.

- SGC — Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

- STC — Stanford Trust Company, a Louisiana trust company.

- SEI — SEI Private Trust Company.

### SEC ACTION AND FTI'S INVESTIGATION

4. On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford

DECLARATION OF KARYL VAN TASSEL                        2

Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income of the various Stanford Entities; and (c) trace those funds to determine how they were allocated and disbursed throughout the Stanford Entities.

5.      As part of our work, we have interviewed numerous present and former Stanford Entity employees. These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **KVT-2**. In addition, we have examined the available accounting and other records relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S. We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.      FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston. In addition, FTI has gathered and reviewed electronic and other

RCVR-PROSKAUER-EXP 0002809
App. 116

4

data from Pershing, LLC and JP Morgan Clearing Corp., both of which hold SGC customer accounts, and SEI, which holds STC accounts.

### FACTUAL BACKGROUND

7.      Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC.   These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

8.      Stanford, along with a close band of confidantes, controlled SFG (of which SIB was a part).  These confidants included Jim Davis, CFO of both SFG and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

9.      SIB was nothing like a typical commercial bank.   It did not offer checking accounts and did not, in the normal course, make loans.  It had one principal product line — certificates of deposit — and one principal source of funds — customer deposits from CD purchases.  SIB offered three types of certificate of deposit accounts; Fixed CDs, Flex CDs, and Index-Linked CDs.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

10.      Most, and perhaps all, of the Stanford Entities were part of the scheme alleged by the SEC or derived benefit from it.  The Stanford Entities that were most closely involved with the sale and redemption of SIB CDs were (a) SIB, which issued the CDs and made purported interest and redemption payments to investors; (b) SGC, the broker-dealer whose financial advisors marketed and sold the CDs to investors; (c) STC, where customer accounts were established to hold the purchased SIB CDs as well as purported interest and redemption payments from SIB CDs; and (d) SFGC and SFGGM, companies that provided a broad range

RCVR-PROSKAUER-EXP 0002810

of services, such as human resources, marketing, accounting and legal services, to SIB and SGC.   Customer funds intended for the purchase of SIB CDs were deposited into SIB accounts and then disbursed among the many other Stanford Entities and related accounts.

11.   Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, intending for the brokers to use that misinformation to induce potential investors to purchase SIB CDs.

12.   CD redemptions increased in late 2008 and early 2009 to the point that continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses.   This caused a rapid depletion of liquid assets.   By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many of the Stanford Entities had stopped paying many payables.

13.   At the inception of the U.S. Receivership on February 16, 2009, the total principal amount of outstanding SIB CDs was approximately $7.2 billion (U.S.), according to SIB records.   This $7.2 billion reflects a liability on the books of SIB, as it is owed to the investors.   Although the SIB financial statements reflect investments valued at $8.3 billion (classified as assets) as of December 31, 2008, based on my analysis to date, the combined assets of all Stanford Entities (SIB included) for which we have financial records have a total value of less than $1 billion.   SIB is insolvent and apparently has been for a considerable time.

14.   Our analysis of cash flows for 2008 through February 17, 2009 indicates that funds from sales of SIB CDs were used to make purported interest and redemption payments on pre-existing CDs.   Redemptions of principal and payments of interest on CDs should

RCVR-PROSKAUER-EXP 0002811

generally be paid from earnings, liquid assets or reserves. In this case, CD sale proceeds were used because sufficient assets, reserves and investments were not available to cover the liabilities for redemptions and interest payments. Although SIB received some returns on investments, these amounts were miniscule in comparison to the obligations.

15.     It appears that most CD sale proceeds not used to pay interest, redemptions and current CD operating expenses, including commissions, bonuses, Performance Appreciation Rights Plan ("PAR") payments and up-front forgivable loans to financial advisors who sold the CDs, were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" — *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, *etc.*).

16.     SIB investments (which are over 90% of all assets as of December 31, 2008) were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis and, at least to the extent of Tier 2 assets, Holt.

17.     Tier 1, the smallest tier in dollar value, consisted of cash and cash equivalents. Stanford accounting records indicate that as of February 18, 2009, SIB Tier 1 totaled $31.8 million.

18.     Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash equivalents. According to SIB's weekly summary reports, Tier 2 had a total value of approximately $345 million at February 9, 2009, down substantially from $889 million at December 31, 2007. The documents indicate there were approximately $29 million in further liquidations between February 10, 2009 and February 17, 2009. Tier 2's precipitous decline in

RCVR-PROSKAUER-EXP 0002812

reported value over the thirteen months leading up to the Receivership was due to a combination of declining market values and numerous liquidations ordered by Davis and Stanford and implemented by Holt and her staff.

19.    Tier 3, by far the most significant financially (as valued by Stanford and Davis) and the most secret, was managed by Stanford and Davis, apparently with assistance and participation by Holt and others working under them.   They kept its value and composition secret from regulators, investors, creditors, auditors and others.   Stanford Tier 3 records do indicate, however, that $1.8 billion in value consisted of notes receivable from Allen Stanford.   It appears this amount corresponds to funds that Stanford, with the assistance of Davis and possibly others, diverted from SIB.   These funds were used for various purposes, including transfers to 51 other Stanford Entities.   (*See* **KVT-3**, an internal Stanford schedule listing past uses of SIB funds supporting Allen Stanford's note receivable liability to SIB in the amount of $1.844 billion.).   This receivable appears to be uncollectible, as Mr. Stanford's recent press statements indicate he does not have the $1.8 billion to pay the loan made to him.

20.    Approximately $1.2 billion of Tier 3 value (as apparently valued by Stanford and/or Davis or others acting in concert with them) was in merchant banking assets.   These consisted mostly of equity and debt investments in private and public companies (*see* **KVT-8**, a Stanford Financial Group schedule dated 30 June 2008 listing Tier 3 merchant banking assets), which was contrary to representations made to investors about SIB's investment portfolio.   Early indications are that the fair value of these merchant banking assets was — and remains — only a small fraction of the $1.2 billion value that Stanford and Davis assigned to them for financial reporting purposes.

RCVR-PROSKAUER-EXP 0002813
App. 120

8

21.    In addition, Tier 3 records assigned $3.174 billion of value to real estate. However, those same records list only two assets in this category: real estate holding companies that own properties in Antigua known as Pelican Island and Asian Village. The two properties were purchased (via the purchase of their holding companies) in 2008 for a combined $63.5 million. I have seen no evidence — such as appraisals or other similar valuations — that would support this extraordinary and highly improbable increase in value, particularly in a period that generally is regarded as a global real estate downturn.

22.    SIB investment earnings amounts were provided monthly by Jim Davis and persons working at his direction and under his supervision. I have reviewed internal Stanford documents from which I concluded that earnings were "pegged" at whatever amount was needed to give SIB the appearance of acceptable financial performance and capital ratios for regulatory purposes, as well as continuing to induce investors. In other words, earnings — at least for the last three years and probably longer — were fictitious "plugged" numbers.

23.    Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009 to alleviate a severe cash flow crisis, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.

24.    Based on FTI's analysis to date, I have reached the following conclusions, which are all to a reasonable degree of certainty, and all of which were determined using reliable practices and methodologies, described herein, that are standard in the fields of finance and accounting:

- The substantial majority of funds received or utilized by the Stanford Entities, and in particular SIB, SGC, SFGC and SFGGM, was proceeds from the sale of SIB CDs;

RCVR-PROSKAUER-EXP 0002814
App. 121

- The substantial majority of funds used to pay purported CD interest and redemption payments to investors on pre-existing CDs was proceeds from sales of new SIB CDs;

- The schedules attached hereto as exhibits **KVT-4, KVT-5** and **KVT-6** reflect the identity of certain persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB, and the amounts of payments identified;

- Exhibit **KVT-4** further identifies the Pershing, SEI and JP Morgan accounts currently frozen under the Court's orders determined to be associated with the persons and entities listed on that schedule based on the customer records and other information available;

- Exhibit **KVT-5** further identifies the amounts, which total $18.5 million in the aggregate, transferred by the persons and entities listed on that schedule to the Receiver's segregated escrow account pending final adjudication of rights to those funds;

- Exhibit **KVT-6** identifies persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB (and the amounts of payments identified) and who do not have any accounts currently frozen at Pershing, JP Morgan or SEI and have not transferred any funds to the Receiver's segregated escrow account; and

- The substantial majority of funds used to pay CD commissions, loans, PAR payments and bonuses to financial advisors who sold SIB CDs was proceeds from sales of new SIB CDs.

### OVERVIEW OF SIB BANK ACCOUNTS

25.      Based on our review of the activity in multiple SIB bank accounts, the primary operating accounts for CD activity utilized by SIB were Toronto Dominion account no. 0360-01-2161670 ("TD 1670"), Trustmark account no. 300-310-1707 ("Trustmark 1707"), Trustmark account no. 300-310-1558 ("Trustmark 1558") and Bank of Houston account no. 8706 ("BOH 8706").   SIB also transferred substantial amounts of money between its operating accounts and two money market accounts, Trustmark account no. 1097 ("Trustmark 1097") and BOH account no. 8284 ("BOH 8284").   These money market accounts were

RCVR-PROSKAUER-EXP 0002815

essentially used as short-term holding locations for the funds from the SIB operating accounts, earning nominal amounts of interest, until those funds were needed by SIB. As explained further below, the overwhelming majority of the funds deposited into all of the aforementioned SIB operating and money market accounts was proceeds from the sale of SIB CDs.

26.     The above accounts were used for a variety of purposes. For example, the TD 1670 and Trustmark 1558 accounts were used to make purported CD interest and redemption payments to investors. The TD 1670 account was also used, along with the Trustmark 1707 and BOH 8706 accounts, for the purchase or funding of Tier 2 and Tier 3 investments, payments for services rendered to other Stanford Entities and capital contributions or loans to other Stanford Entities. In 2008 alone, approximately $474 million was transferred from the TD 1670 account to the BOH 8706 account, which in turn distributed roughly $450 million among the various Stanford Entities.

### SUBSTANTIAL MAJORITY OF FUNDS FOR STANFORD ENTITIES CAME FROM CD SALE PROCEEDS

*Deposits of CD Sale Proceeds*

27.     The SIB CDs were SIB's only product line. Although SIB provided a limited number of other financial products (*e.g.* credit card services and loans), these were offered only to CD holders and acted as incentives for the purchase of CDs.

28.     Based on FTI's review of SIB CD sale records, the majority of CD purchasers paid for their CDs with U.S. dollars, and those funds were deposited into SIB's Trustmark 1707 and TD 1670 accounts. Customers who purchased SIB CDs by wire transfer were instructed to wire their funds directly to SIB's TD 1670 account. (*See* **KVT-7**, CD investor wiring instructions). Investors who paid by check sent their checks to SIB in Antigua, where

RCVR-PROSKAUER-EXP 0002816

those denominated in U.S. Dollars were bundled and sent regularly to Trustmark in Houston for deposit into SIB's Trustmark 1707 account. If any SIB CD sales proceeds were actually paid by investors at SIB's offices in Antigua, it was likely a small amount relative to overall sales. Further, as stated above, SIB would promptly send investor checks denominated in U.S. Dollars to Houston for deposit into the Trustmark 1707 account.

29.     Based on our review of 2008-2009 data for the Trustmark 1707 and TD 1670 accounts, and comparing that to SIB's CD sales records for the same time period, my team and I have been able to confirm that the funds from investors who purchased SIB CDs in U.S. dollars were in fact deposited into these accounts.

30.     Because the wire transfer data from the TD 1670 account and the SIB customer account records are both in electronic form, we were able to electronically match the wire transfers into the TD 1670 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD customer account records. Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, approximately $1.7 billion in SIB CD sale proceeds were deposited into the TD 1670 account.

31.     With regard to CD purchases in U.S. Dollars made by check, the data available from Trustmark does not allow for electronic matching with SIB's CD sale records. Instead, FTI has been able to review images of checks provided by Trustmark and then search the SIB CD sale records for transactions in those same amounts. By doing so for checks representing approximately 33% of the commercial deposits reflected on the Trustmark 1707 account statements provided by Trustmark for the time period of January 1, 2008 through February 17, 2009, we have been able to confirm, with only one exception, that each of these checks

RCVR-PROSKAUER-EXP 0002817

corresponds to a specific purchase identified in the SIB CD sale records.[1]  Based on this analysis, we have determined that between January 1, 2008 and February 17, 2009, approximately $384 million in SIB CD sale proceeds were deposited into SIB's Trustmark 1707 account.

32.    In addition to the SIB CD sale proceeds that were deposited directly into the TD 1670 and Trustmark 1707 accounts, there were some small additional amounts of CD sale proceeds that were deposited in other accounts initially and then transferred over to the TD 1670 and Trustmark 1707 accounts.

(a)    Investors who purchased CDs in Canadian dollars were instructed to wire those funds to SIB's Toronto Dominion account no. 0360-01-2161573 ("TD 1573").  (KVT-7). Performing an analysis similar to that performed on the wire transfers into SIB TD 1670, FTI has been able to electronically match the wire transfers into the TD 1573 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD sale records.  Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, over $5 million in SIB CD sale proceeds were deposited into the TD 1573 account. Correspondingly, Toronto Dominion's records reflect that approximately $10 million was transferred into the TD 1670 account and another approximately $10 million into the Trustmark 1707 account from the TD 1573 account.  These transfers included not only the $6 million in deposits referenced above but likely deposits of CD sale proceeds into the TD 1573 account that occurred prior to January 1, 2008.

(b)    Investors who purchased CDs in British pounds or Euros were instructed to wire those funds to SIB accounts at HSBC Bank PLC in London.  (KVT-7).  Although HSBC has not provided any account data to the Receiver, we have been able to determine that over $36 million was transferred from HSBC accounts to the TD 1670 account between January 1, 2008 and February 17, 2009.

---

[1] Though we have been unable to confirm that the one check identified as an "exception" was used to purchase a CD, circumstantial evidence indicates that it was.  The data required to reach a definitive conclusion, however, was not available for this transaction.

RCVR-PROSKAUER-EXP 0002818

*SIB's CD Operating Accounts Were Funded Almost Exclusively from CD Sale*

*Proceeds*

33.     Based on the analysis described above, and additional analysis of data relating to SIB's primary operating accounts — TD 1670, Trustmark 1707, BOH 8706 and Trustmark 1558 — I have determined that the overwhelming majority of funds received by SIB came directly or indirectly from CD sale proceeds.

34.     The deposits into the SIB Trustmark 1707 account between January 1, 2008 and February 17, 2009 totaled approximately $497 million.[2]  The approximately $384 million in checks for CD purchases that were deposited into the account comprised 77% of the deposits into that account between January 1, 2008 and February 17, 2009.  Based on the following, I have concluded that up to an additional $94 million or 19%, for a total of 96%, of the deposits into the Trustmark 1707 account during that time period also consisted primarily of SIB CD sale proceeds.

(a)     Approximately $55 million, or 11% of the deposits into the Trustmark 1707 account were funds from the liquidation of Tier 2 investments  Based on my review of the data relating to the Tier 2 investments, it appears that the vast majority of those investments were funded by monies from the TD 1670 account. Further, the vast majority of the liquidations occurred when the investments were in loss positions.  Accordingly, any deposits from the Tier 2 investments would have consisted primarily of the CD sale proceeds that were originally invested rather than investment returns.

(b)     Approximately $29 million, or 6%, of the deposits into the account were from SIB's BOH 8706 and TD 1670 accounts,

---

[2] This amount does not include approximately $337 million in deposits from the Trustmark 1097 account.  The Trustmark 1097 account was a short term money market investment account that was funded almost exclusively from the Trustmark 1707 account and used to hold those funds until they were needed by SIB.  At that time, the funds were transferred back into the Trustmark 1707 account. Based on my review of the Trustmark 1097 account records, these funds earned only nominal amounts of interest.

RCVR-PROSKAUER-EXP 0002819

App. 126

14

which as discussed below, were funded primarily from CD sale proceeds.

(c)     Approximately $10 million, or 2%, of the deposits into the account were transfers from SIB account TD 1573, which was the account into which CD purchase money in Canadian Dollars was deposited, as described above.

(d)     The other deposits into this account — approximately $19 million or just 4% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

35.     The deposits into the SIB TD 1670 account between January 1, 2008 and February 17, 2009 totaled approximately $2.4 billion. The approximately $1.7 billion in wire transfers for CD purchases that were deposited into the account comprised 71% of the deposits into that account between January 1, 2008 and February 17, 2009. Based on the following, I have concluded that up to an additional 26% or $619 million, for a total of 97%, of the deposits into the TD 1670 account during that time period also consisted primarily of SIB CD sale proceeds.

(a)     Approximately $318 million, or 13%, of the deposits into the account were from SIB's Trustmark 1707 account, which as described above, is funded almost exclusively by proceeds from the sale of SIB CDs.

(b)     Approximately $154 million, or 6% of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (*See* ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c)     Approximately $127 million, or 5%, of the deposits into the account were from SIB's BOH 8706 operating account, which as discussed below, was funded primarily from SIB CD sale proceeds.

(d)     Approximately $20 million, or 1%, of the deposits into the account were transfers from HSBC Bank accounts and the TD 1573 account, which were the accounts into which CD purchase

RCVR-PROSKAUER-EXP 0002820

App. 127

15

money in non-U.S. currency, were deposited, as described above.[3]

(e)  the other deposits into this account — approximately $82 million or 3% of the total — are from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

36.  The total deposits into the SIB BOH 8706 account between January 1, 2008 and February 17, 2009 were approximately $801 million.[4]  Based on the following, I have concluded that up to $710 million or 89%, of the deposits into the BOH 8706 account during that time period consisted primarily of SIB CD sale proceeds.

(a)  Approximately $505 million, or 63%, of the deposits into the account were from SIB's TD 1670 account or Trustmark 1707 account, which as described above, are funded almost exclusively by proceeds from the sale of SIB CDs.

(b)  Approximately $205 million, or 26%, of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (See ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c)  The other deposits into this account — approximately $91 million or 11% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

37.  The total deposits into the SIB Trustmark 1558 account between January 1, 2008 and February 17, 2009 were approximately $127 million.[5]  Based on FTI's review of

---

[3] Another $26.5 million, or 1%, of the deposits into the TD 1670 account was from HSBC accounts. These funds also likely originated from CD purchase money originally denominated in non-U.S. currencies, as described in the wiring instructions attached hereto as exhibit **KVT-7**. Because HSBC has not provided the necessary records, we are unable to confirm that this is the case.

[4] This amount does not include approximately $457 million in deposits from the BOH 8284 account. The BOH 8284 account was a short term money market investment account that was funded exclusively from the BOH 8706 account and used to hold those funds until they were needed by SIB. At that time, the funds were transferred back into the BOH 8706 account. Based on my review of the BOH 8284 account records, these funds earned only nominal amounts of interest.

[5] This amount does not include additional deposits consisting of funds originally paid out of the Trustmark 1558 account that were returned for various reasons (i.e., rejected by recipients, etc.).

RCVR-PROSKAUER-EXP 0002821

records from Trustmark relating to this account, 99% of the deposits during this time period were transfers from SIB's Trustmark 1707 account.  As discussed in paragraph 34 above, the Trustmark 1707 account was funded almost exclusively from the CD sale proceeds. Accordingly, the overwhelming majority of funds in the Trustmark 1558 account consisted of SIB CD sale proceeds.

### PROCEEDS FROM SALES OF NEW CDs WERE USED TO MAKE PURPORTED CD INTEREST AND REDEMPTION PAYMENTS ON PRE-EXISTING CDs

38.     Based on FTI's analysis to date, I have concluded that the overwhelming majority of the funds used to make purported SIB CD interest and redemption payments was proceeds from the sale of new SIB CDs to investors.  Although SIB received some returns on investments, these amounts were miniscule.  Moreover, there were not sufficient assets to cover these payments, illustrated by the fact that liquidating Tier 2 allowed SIB to maintain payments for only a short period of time.

39.     Based on SIB CD transaction records reviewed by FTI, SIB made purported principal and interest redemption payments in U.S. Dollars to investors totaling approximately $2 billion from January 1, 2008 through February 17, 2009.

40.     For interest and redemption payments made by wire transfer in U.S. Dollars, SIB used its TD 1670 account.  FTI has reviewed the outgoing wire transfer records from the TD 1670 account and electronically matched those records to the CD related payment records from SIB.  Based on this analysis, we have been able to confirm that approximately $1.87 billion, or 92%, of all redemption payments made by SIB in U.S. Dollars were made by wire transfer to investors from the SIB's TD 1670 account.  Because the funds deposited into SIB's TD 1670 account were almost exclusively proceeds from the sale of new CDs to investors, the

RCVR-PROSKAUER-EXP 0002822

payments made from the TD 1670 account to investors were likewise almost exclusively CD sale proceeds.

41.     SIB also made some purported interest and redemption payments to investors in U.S. Dollars by checks written from its Trustmark 1558 account.   FTI has reviewed approximately 300 checks written to investors from the Trustmark 1558 account.   By comparing those checks to records of specific payments in SIB's records, we have determined that between January 1, 2008 and February 17, 2009, checks totaling $92 million, or 94% of the sample set of purported CD interest and redemption payments selected,[6] were written from SIB's Trustmark 1558 account.   Because the overwhelming majority of the funds deposited into SIB's Trustmark 1558 account was proceeds from the sale of new CDs to investors, the overwhelming majority of payments made from the Trustmark 1558 account to investors was primarily proceeds from the sale of new SIB CDs to investors.

### IDENTIFICATION OF INVESTORS WHO RECEIVED PURPORTED CD INTEREST AND REDEMPTION PAYMENTS

42.     Attached as exhibits **KVT-4, KVT-5** and **KVT-6** to this declaration are schedules identifying certain investors holding SIB accounts with identified purported CD interest or redemption payments from SIB or who otherwise received purported CD interest or redemption payments from SIB, along with the amounts of payments identified.   The investors listed in **KVT-4** also have Pershing, JP Morgan or SEI accounts that are currently frozen by the Court's orders.   The investors listed in **KVT-5** do not have any accounts that are currently frozen under the Court's orders.   Instead, their accounts were released and they agreed, by stipulations filed with the Court, to transfer funds equal to the amount of purported

---

[6] The sample selected totaled 78% of the population of purported CD interest and redemption payments made by SIB denominated in U.S. Dollars for the period January 1, 2008 through February 17, 2009.

RCVR-PROSKAUER-EXP 0002823

SIB CD redemptions or interest payments they received to the Receiver's segregated escrow account until the rights to those funds are fully adjudicated. The investors listed in **KVT-6** do not have any accounts that are currently frozen under the Court's orders and have not transferred any funds to the Receiver's segregated escrow account.

43.    The schedules contained in exhibits **KVT-4, KVT-5** and **KVT-6** were developed by the FTI team through a detailed review and analysis of the SIB records of CD interest and redemption payments from SIB customer accounts. If a payment was made from an SIB customer account, the customer(s) who held that account were identified as recipient(s) of the purported CD interest or redemptions. Once the customer(s) were identified, the SIB customer records were searched electronically for certain common identifiers, such as name, address, *etc.*, to identify all other SIB accounts associated with the customer(s). If the names on each of the customer accounts appeared to be the same, the purported interest and redemption payments were added together into one line item entry on the schedule. If the names on the accounts did not appear to be the same, they are listed as separate entries on the schedules. If we determined through review of available records that someone other than the SIB account holder received purported CD interest or redemption payments, they are included on the appropriate schedule.

44.    Once the customers who received purported CD interest or redemption payments from SIB were identified, the FTI team also reviewed Pershing, JP Morgan and SEI customer account records to determine whether those previously identified SIB customers also had Pershing, JP Morgan or SEI accounts that are subject to the Court's freeze orders. Similar to how related SIB accounts were identified, the Pershing, JP Morgan and SEI account records were searched electronically for common identifiers — again name, social

RCVR-PROSKAUER-EXP 0002824

App. 131

19

security number, tax identification number, address, *etc.* — to identify any Pershing, JP Morgan or SEI accounts associated with those customers. Those identified accounts, to the extent they are still frozen by the Court's orders, are listed on exhibit **KVT-4**.

45.    Many of the customers listed on exhibits **KVT-4** and **KVT-5**, and perhaps some of those listed on exhibit **KVT-6**, had other Pershing, JP Morgan or SEI accounts that were previously subject to the Court's freeze orders but have since been released. Some of those accounts were released pursuant to the Court's orders dated March 5, March 12, or April 23. Other Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibits **KVT-4** and **KVT-5** have been released through the account application review process approved by the Court in its March 27 and May 27 orders and subsequent modifications thereto. As of the date of this declaration, all Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibit **KVT-4** have been released, except those accounts necessary to satisfy an order of disgorgement from this Court being requested by the Receiver. All Pershing, JP Morgan or SEI accounts associated with customers listed on exhibit **KVT-5** have been released, but funds equal to the amount of proceeds received by the customers identified in **KVT-5** have been transferred to the Receiver's segregated escrow account pending adjudication of rights to those funds.

46.    The investors listed on exhibit **KVT-4** received approximately $373 million in purported CD interest and redemption payments in the aggregate. Comparing these amounts and the amounts contained in the Pershing, JP Morgan and SEI accounts associated with those customers, there is approximately $295 in the Pershing, JP Morgan and SEI accounts that are available to satisfy any claims by the Receiver for the recovery of CD proceeds. The investors listed on exhibit **KVT-5** received approximately $18.5 million in purported CD

RCVR-PROSKAUER-EXP 0002825

interest and redemption payments in the aggregate.  Such amount has been transferred by the investors to the Receiver's segregated escrow account pending final adjudication of rights to those funds.  The investors listed on exhibit **KVT-6** received approximately $494 million in purported CD interest and redemption payments in the aggregate.  There are no frozen Pershing, JP Morgan or SEI accounts that have been identified as associated with these customers, and they have not transferred any funds to the Receiver's segregated escrow account.

### PROCEEDS FROM SALES OF NEW CDS WERE USED TO PAY COMMISSIONS, PAR PAYMENTS AND BONUSES AND MAKE LOANS TO FINANCIAL ADVISORS

47.      Based on a review of accounting and payroll records of SGC, the FTI team and I have determined that many of the financial advisors who marketed and sold SIB CDs to customers received up-front forgivable loans as part of their compensation package when they began work.  For the years 2007, 2008 and 2009 (prior to February 17), loans were made to financial advisors in the approximate aggregate amounts of $12.9 million, $35.8 million and $2.76 million respectively.

48.      Many of the financial advisors further received commission, PAR payments and bonus payments associated with SIB CD sales, typically in the range of 1% to 3% percent of the cumulative value of the CDs they sold.  For the years 2007 and 2008, SGC made commission, PAR payments and bonus payments to financial advisors in the approximate aggregate amounts of $31 million and $38 million respectively.

49.      Based on our analysis and review of the records and information referenced herein, I have concluded that the substantial majority of funds used to pay the loans, bonuses,

RCVR-PROSKAUER-EXP 0002826

PAR payments and commissions to financial advisors was proceeds from the sale of the SIB CDs.

50.     The loans, bonuses, PAR payments and commissions to financial advisors were funded primarily from two Trustmark bank accounts held in the name of SGC, specifically Trustmark account no. 300-310-7357 ("Trustmark 7357") and Trustmark account no. 300-008-7916 ("Trustmark 7916")(collectively, the "Trustmark 7357/7916 accounts"). These were the primary operating accounts used by SGC. Loans were paid directly to the financial advisors from the Trustmark 7357/7916 accounts.  Commissions, PAR payments and bonuses first passed through SGC's payroll account, which was funded exclusively by the Trustmark 7357/7916 accounts, and were then paid to the financial advisors by SGC's third party payroll services provider, ADP.

51.     The SGC Trustmark 7357/7916 accounts, in turn, were funded directly or indirectly from SIB's operating accounts — TD 1670, Trustmark 1707 and BOH 8706 — which, as detailed above, were funded almost exclusively from SIB CD sale proceeds.

52.     One of the primary funding sources for the SGC Trustmark 7357/7916 accounts from which loans, bonuses, PAR payments and commissions were paid was referral fees paid by SIB as compensation for the sale of CDs.  Over the course of 2007 through February 17, 2009, an aggregate total of $172.3 million in referral fees was transferred directly from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts to the SGC Trustmark 7357/7916 accounts.  Based on our interviews with personnel from the various Stanford Entities, FTI learned that these referral fees were, in part, intended to fund commission and bonus payments and loans to financial advisors who sold SIB CDs.  The

RCVR-PROSKAUER-EXP 0002827

App. 134

22

amount of referral fees paid by SIB to SGC between 2007 and 2009 far exceed the amounts of commissions, PAR payments, bonuses and loans paid to financial advisors during that time.

53.     The conclusion that proceeds from the sale of SIB CDs were used to fund commission and loan payments is further confirmed by the fact that another significant source of funding into the Trustmark 7357/7916 accounts was capital contributions that originated from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts. Although many of these capital contributions passed through other Stanford Entities and their accounts before landing in the Trustmark 7357/7916 accounts, they are traceable back to the SIB accounts and therefore to proceeds from the sales of SIB CDs.

54.     For example, in 2008 alone, funds in the amounts of $396 million and $77 million respectively were transferred from the SIB BOH 8706 account and the TD 1670 account into the operating account of SFGGM, BOH 8870. During the same time period, a capital contribution in the amount of $47.5 million was made from SFGGM's BOH 8870 account to SGH's operating account, Trustmark account no. 300-310-2150 ("Trustmark 2150"). Finally, a capital contribution went from the Trustmark 2150 account to the SGC Trustmark 7357/7916 accounts in the amount of $46.5 million. There are many other examples of smaller capital contributions making their way into SGC's Trustmark 7357/7916 accounts that are traceable back to SIB's accounts. In addition, based on FTI's analysis of records available for the accounts that funded the Trustmark 7357/7916 accounts, I have concluded to a reasonable degree of certainty that a majority of the funds deposited into these accounts came from sources traceable to the SIB accounts that were funded almost exclusively by proceeds from the sale of SIB CDs.

RCVR-PROSKAUER-EXP 0002828

Executed this **21** day of July, 2009.

Karyl Van Tassel

DECLARATION OF KARYL VAN TASSEL

23

RCVR-PROSKAUER-EXP 0002829

App. 136

24

# EXHIBIT 6

Page 1

1              UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION
3      RALPH S. JANVEY, IN HIS    )
       CAPACITY AS               )
4      COURT-APPOINTED RECEIVER   )
       FOR THE STANFORD          )
5      RECEIVERSHIP ESTATE, AND   )
       THE OFFICIAL STANFORD     )
6      INVESTORS COMMITTEE,       )
                                 )
7           Plaintiffs,           )
                                 ) Civil Action No.
8                                 ) 3:13-cv-00477-N
         - against -              )
9                                 )
                                 )
10     PROSKAUER ROSE, LLP,       )
       CHADBOURNE & PARKE, LLP,   )
11     AND THOMAS V. SJOBLOM,     )
                                 )
12          Defendants.           )
13
14     ********************************************************
15           ORAL AND VIDEOTAPED DEPOSITION OF
16                  RALPH S. JANVEY
17                 JANUARY 16, 2018
18     ********************************************************
19
20
21
22
23
24
25

Page 24

1    receiverships where I have been able to talk to the

2    Court.

3         Q.   I didn't get that.  Did you say you have been

4    able to or have not been able to?

5         A.   In prior receiverships, I've been able to talk

6    to the Court directly, that's correct.

7         Q.   Do you have an understanding as to why you're

8    not able to talk to the Court directly in this

9    receivership?

10        A.   You would have to ask the judge.

11        Q.   How, if at all, did the judge decide that you

12   would not be able to speak with him ex parte?

13        A.   When I --

14             MR. SNYDER:  Objection, form.

15        A.   In the spring of 2009, when I requested a

16   conference, I was advised that the Court does not

17   believe I have an ex parte right to meet with him, and

18   anything I wanted to say, I could talk to him through my

19   counsel or in a court forum.

20        Q.   (BY MR. REISER)  Does the receiver act on

21   behalf of the entities -- withdrawn.

22             The receiver acts on behalf of the entities in

23   receivership.  Correct?

24        A.   That's correct.

25        Q.   And I'm talking generally, not with respect to

Page 25

1    the Stanford receivership, but I take it that's true of

2    the Stanford receivership too.  Right?

3         A.   In this case, I've told by the Fifth Circuit I

4    stand in the shoes of the entities, that's correct.

5         Q.   What does it mean to stand in the shoes of the

6    entities?

7         A.   That I bring claims and actions that the

8    entities have a right to bring.

9         Q.   What determines whether the entities have a

10   right to bring the claim?

11                  MR. ARLINGTON:  Objection --

12                  MR. SNYDER:  Objection, form.

13                  MR. ARLINGTON:  And objection, overbroad,

14   vague and confusing, and calls for a legal conclusion.

15        A.   I'm not sure I can answer that.

16        Q.   (BY MR. REISER)  What's troubling you, other

17   than the six objections Mr. Arlington just spouted off?

18                  MR. ARLINGTON:  Same objections.

19                  MR. SNYDER:  I had one.

20                  MR. ARLINGTON:  Same objections and

21   argumentative.

22        Q.   (BY MR. REISER)  No, I want to try to clarify

23   the question.  So if there's something that makes it

24   hard for you to answer, let me know.

25        A.   Repeat the question again.