**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | § | |
| AS COURT-APPOINTED RECEIVER | § | |
| FOR THE STANFORD RECEIVERSHIP | § | |
| ESTATE, AND THE OFFICIAL | § | |
| STANFORD INVESTORS COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 3:13-CV-0477-N-BG |
| | § | |
| v. | § | |
| | § | |
| PROSKAUER ROSE, LLP, | § | |
| CHADBOURNE & PARKE, LLP, AND | § | |
| THOMAS S. SJOBLOM, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE TO
MOTION FOR SUMMARY JUDGMENT**

Douglas J. Buncher
Patrick J. Neligan, Jr.
NELIGAN FOLEY, LLP
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:    (214) 840-5320
Facsimile:    (214) 840-5301
dbuncher@neliganlaw.com
pneligan@neliganlaw.com

Edward C. Snyder
Jesse R. Castillo
CASTILLO SNYDER, PC
700 N. St. Mary's, Suite 405
San Antonio, Texas 78204
(210) 630-4200
(210) 630-4210 (Fax)
esnyder@casnlaw.com
jcastillo@casnlaw.com

Judith R. Blakeway
STRASBURGER & PRICE, LLP
2301 Broadway
San Antonio, Texas 78215
Telephone:    (210) 250-6004
Facsimile:    (210) 258-2706
judith.blakeway@strasburger.com

**ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................. ii

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

    A.    SIBL and SGC directors and officers breach their fiduciary duties and engage in a fraudulent scheme. ............................................................. 3

    B.    Stanford Financial hires Sjoblom, a lawyer with 20 years' experience in the SEC's enforcement division, and tells him that the SEC suspects Stanford is operating a Ponzi scheme. ................................................. 5

    C.    Sjoblom reviews SIBL's marketing brochure and disclosure statement and learns Stanford's CDs have all the hallmarks of a Ponzi scheme. ......................... 9

    D.    Sjoblom lies to the SEC about Stanford's CDs, participating in Stanford's ongoing fraudulent scheme. ................................................. 10

    E.    In September 2006, Sjoblom tells the SEC he has "personally gone through all operations" and "there is no fraud here." .......................... 13

    F.    Sjoblom gives the SEC the "runaround" about access to SIBL's portfolio. ......... 15

    G.    Sjoblom instructs SGC personnel to violate an SEC subpoena. .......................... 16

    H.    Sjoblom conceals the SEC investigation from SGC's auditor. ............................ 17

    I.    Sjoblom learns that Tier 3 includes private equity as well as real estate, rather than liquid investments as represented, but does nothing. ........................ 18

    J.    Sjoblom continues to lie to the SEC about Antiguan privacy law. ....................... 19

    K.    Sjoblom steers the SEC away from deposing Allen Stanford and Jim Davis. ................................................................................................ 20

    L.    Sjoblom suborns perjury by Pendergest. ......................................................... 23

    M.    Sjoblom withdraws only after Allen Stanford refuses to pay him a $4 million retainer. ................................................................................. 23

PLAINTIFFS' CLAIMS AND THEORY OF RECOVERY ................................... 24

ARGUMENT AND AUTHORITIES ....................................................................... 25

I.      Plaintiffs' claims are not barred by the in pari delicto doctrine. ....................................... 25

II.     Plaintiffs' evidence of causation and damages raises genuine issues of material fact. ................................................................................................................................ 26

        A.      Plaintiffs' claims are timely and not barred by limitations. .................................. 27

        B.      Plaintiffs are not suing for deepening insolvency. ................................................ 33

III.    There is evidence that Sjoblom knew of and knowingly participated in the Stanford directors' and officers' breaches of fiduciary duty and fraud. ........................... 35

        A.      There is evidence that Sjoblom had actual knowledge of Stanford's fraudulent scheme and breaches of fiduciary duty. .............................................. 35

        B.      There is evidence that Sjoblom's participation in the fraud and breach of fiduciary duties was knowing. ............................................................................. 40

IV.     Sjoblom substantially assisted in fraud and breaches of fiduciary duty. ......................... 41

V.      Chapter 33 does not bar Plaintiffs' claims. .................................................................... 45

        A.      Chapter 33 does not apply to aiding and abetting claims. ..................................... 45

        B.      Applying Chapter 33 to use the conduct of Stanford entities to bar the Receiver's claims inappropriately backdoors the inapplicable in pari delicto defense. .................................................................................................... 47

        C.      If Chapter 33 did apply to aiding and abetting claims, Proskauer would still be jointly and severally liable. ....................................................................... 48

        D.      If Chapter 33 did apply, the statute provides that "the trier of fact" should decide the percentage of responsibility. ............................................................... 49

CONCLUSION ...................................................................................................................... 49

CERTIFICATE OF SERVICE ............................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Austin v. Kroger Texas, L.P.*, 864 F.3d 326 (5th Cir. 2017) ..........................................32

*Barnett v. Homes of Texas & Warranty Underwriters Ins. Co.*, 2011 WL 665309 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ............................................46

*Battaglia v. Alexander,* 93 S.W.3d 132 (Tex. App.—Houston [14th Dist.] 2002), *rev'd on other grounds*, 177 S.W.3d 893 (Tex. 2005) ..........................................46

*CBIF Ltd. P'ship v. TGI Fridays Inc.,* No. 05-15-00157-CV, 2017 Tex. App. LEXIS 3605 (Tex. App.—Dallas, April 21, 2017, pet. filed) ....................................24, 45

*City of Fort Worth v. Pippen*, 439 S.W.2d 660 (Tex. 1969)..........................................24

*Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.*, 1 F.3d 374 (5th Cir. 1993) ..........32

*Computer Assocs. Intern., Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1996) .................................28

*Crabb v. C.I.R.*, 121 F.2d 1015 (5th Cir. 1941) ........................................................31

*David B. Lilly Co. v. Fisher,* 18 F.3d 1112 (3d Cir. 1994) ..........................................26

*DeClaire v. G&B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ................................................25

*Dugger v. Arredondo*, 408 S.W.3d 825 (Tex. 2013) ....................................................48

*Elizondo v. Krist*, 415 S.W.3d 259 (Tex. 2013)........................................................27

*Elmo v. Oak Farms Dairy*, 2008 WL 2200265 (N.D. Tex. May 14, 2008)...................................28

*Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572 (Tex. 2017) ....................................29

*FDIC v. First Interstate Bank of Des Moines, NA*, 885 F. 2d 423 (8th Cir. 1989)......................35

*Fid. & Guar. Ins. Underwriters Inc. v. Wells Fargo Bank*, 2006 U.S. Dist. LEXIS 23545 (S.D. Tex. 2006)............................................................46

*First United Pentecostal Church v. Parker*, 514 S.W.3d 214 (Tex. 2017)........................................................30

*Floyd v. Hefner*, 556 F.Supp.2d 617 (S.D. Tex. 2008) ................................................45

*Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605 (Tex. App.—El Paso, no pet.)....................25

*Gaia Envtl., Inc. v. Galbraith*, 451 S.W.3d 398 (Tex. App.—Houston [14th Dist.] 2014,
pet. denied)...........................................................................................................41

*Garcia v. Wheelabrator Group, Inc.*, 2011 WL 13232701 (N.D. Tex. Nov. 3, 2011)................27

*Gearhart Indus. v. Smith Int'l,* 741 F.2d 707 (5th Cir. 1984).................................................3

*Gebhart v. SEC*,
595 F. 3d 1034 (9th Cir. 2010) ...............................................................................4

*Global-Tech Appliances Inc. v. SEB S.A.*, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011)................40

*Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) ...................24

*Graham v. SEC*, 222 F. 3d 994 (D.C. Cir. 2000)..........................................................4

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)........................................................3

*Hamburger v. State Farm Mu. Auto. Ins. Co.*, 361 F.3d 875 (5th Cir. 2004)..............................27

*Hanly v. SEC*, 415 F. 2d 589 (2d. Cir. 1969) ...............................................................4

*Heat Shrink Innovs., LLC v. Medical Extrusion Technologies-Texas, Inc.*, 2014 WL
5307191 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied).........................................26, 46

*Hooks v. Samson Lonestar, Ltd. P'ship*,
457 S.W.3d 52 (Tex. 2015)...................................................................................28

*Humble Surg. Hosp., LLC v. Davis*, 2017 WL 4679280 (Tex. App.—Houston [14th Dist.]
Oct. 17, 2017, pet. filed) ......................................................................................31

*Hunter Bldgs. & Mfg., L.P. v. MBI Global L.L.C.,* 436 S.W.3d 9 (Tex. App.—Houston
[14th Dist.] 2017, pet. denied) .............................................................................24

*IBP, Inc. v. Klumpe,* 101 S.W.3d 461 (Tex. App.—Amarillo 2001, pet. denied) .......................41

*In re Brooke Corp.*, 467 B.R. 492 (Bankr. D. Kan. 2012).....................................................33, 34

*In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006) ........................................................33, 34

*In re Le-Nature's Inc.*, 2009 WL 3571331 (W.D. Pa. Sep. 16, 2009)....................................33, 34

*In re Life Partners Holdings, Inc. S'holder Deriv. Litig.*, 2015 U.S. Dist. LEXIS 168198
(W.D. Tex. 2015)...............................................................................................3

*Industrial Idem. Co. v. Chapman and Cutler*, 22 F.3d 1346 (5th Cir. 1994) ..............................26

*James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce, N.A. Inc.,* 403 S.W.3d
360 (Tex. App.—Houston [1st Dist.] 2013, no pet.) .............................................24

*Janvey v. Alguire*, 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013) ...............................................28

*Janvey v. Alguire*, 847 F.3d 231 (5th Cir. 2017).......................................................................33, 34

*Janvey v. Alguire,*
    Case No. 3:09-CV-0724-N, Order dated Jan. 22, 2013 ................................................26

*Janvey v. Amadio*, Case No. 3:14-CV-03560-N (N.D. Tex. Jul. 20, 2015)...................................34

*Janvey v. Bogar*, Case No. 3:14-CV-03635-N (N.D. Tex. Feb. 24, 2016)....................................34

*Janvey v. Brown,* 767 F.3d 430 (5th Cir. 2014) ...........................................................................25

*Janvey v. Dem. Sen. Camp. Comm.*, 69 F.3d 848 (5th Cir. 2012) ................................................28

*Janvey v. Dem. Sen. Camp. Communication. Inc.*
    712 F.3d 185 (5th Cir. 2013) .....................................................25, 29, 30, 31, 32, 47

*Janvey v. Hamm*, Case No. 3:14-CV-03213-N (N.D. Tex. Jun. 17, 2015)....................................34

*Janvey v. Hamric*, 2015 WL 11120301 (N.D. Tex. Nov. 5, 2015)................................................34

*Janvey v. Maldonado*, Case No. 3:14-CV-02826-N (N.D. Tex. Feb. 19, 2015) ...........................34

*Janvey v. Willis of Colorado, Inc*.,
    Case No. 3:13-CV-3980-N (N.D. Tex. Dec. 5, 2014) ..............................................34

*Jones v. Wells Fargo Bank, N.A.,* 666 F.3d 955 (5th Cir. 2012) ..................................................25

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942).........................24, 45

*Kirschner v. K & L Gates LLP*, 46 A.3d 737, 753 (Pa. Super. 2012)............................................34

*LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App.
    LEXIS 11201 (App.—Dallas Oct. 29, 2015)...........................................................46

*Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634 (5th Cir. 2007) ...............................................45

*Mitchell v. C & P Shoe Corp*., 286 F.2d 109 (5th Cir. 1960) .......................................................32

*Moreno v. Sterling Drug, Inc*., 787 S.W.2d 348 (Tex. 1990) .......................................................29

*Morgan v. Compugraphic Corp.*, 675 S.W.2d 729 (Tex. 1984).....................................................27

*Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex. 1990) ..............................................29

*Newby v. Enron Corp.*, 623 F.Supp.2d 798 (S.D. Tex. 2009) .......................................................46

*Off'l Comm. of Unsec. Cred. Of Allegheny Health, Ed., and Research Found. v. Pricewaterhouse Coopers LLP*, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007), *vacated and remanded on different grounds*, 607 F.3d 346 (3d Cir. 2010).........................................34

*Off'l Stanford Inv. Comm. v. Greenberg Traurig, LLP*,
Case No. 3:12-CV-4641-N (N.D. Tex. Dec. 17, 2014) .........................................34

*Onyung v. Onyung*, 2013 WL 3875548 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)........................................................................................................47

*Perry v. Kaufman County*,
2000 WL 1372832 (N.D. Tex. Sep. 22, 2000).......................................................30

*Plumber-Williams v. Alta Health & Life Ins. Co.*, 2008 WL 11393152 (S.D. Tex. Jun. 12, 2008) ...............................................................................................................28

*Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211 (Tex. 2003) ................................28

*Rathborne Land Co. v. Ascent Energy Inc.*, 610 F.3d 249 (5th Cir. 2020)...................................32

*Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.*,
344 S.W.3d 56 (Tex. App.—Eastland 2011, no pet.) .............................................41

*S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996)..................................................................30, 31

*Sadeghi v. Gang*, 270 S.W.3d 773 (Tex. App.—Dallas 2008, no pet.) .........................................25

*SEC v. Lyttle*,
538 F. 3d 601 604 (7th Cir. 2008) .......................................................................36

*SEC v. Stanford Int'l Bank Ltd., et al.*, Case No. 3:09-cv-00298-N, Doc. #1858 .........................4

*St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 233 F. Supp.2d 171 (D. Mass. 2002) .......................................................................26

*Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008) .................................................33, 34

*Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636 (5th Cir. 1999)..............................................28, 45

*Tolbert v. RBC Capital Markets Corp.*, 2016 WL 3034497 (S.D. Tex. May 26, 2016)..........28, 29

*United States v. Brown*, 871 F.3d 352 (5th Cir. 2017).........................................................38

*United States v. Gibson*, No. 154-20323, 2017 U.S. App. LEXIS 22261 (5th Cir. 2017) ............40

*United States v. Lara-Velasquez*, 919 F.2d 946 (5th Cir. 1990)..................................................40

*United States v. Miller*, 588 F.3d 897 (5th Cir. 2009) ................................................38

*United States v. Pendergest-Holt*, No. 4:09-cr-00342-2 (S.D. Tex. 2012) .................................... 23

*United States v. Pirate Inv. LLC*, 580 F. 3d 233 (4th Cir. 2009) .................................. 39

*United States v. Wofford*, 560 F.3d 341 (5th Cir. 2009) ................................................ 40

*Villarreal v. Wells Fargo Brokerage Serv. LLC.*, 315 S.W.3d 109 ............................... 47

*Wallace v. United States*, 281 F. 2d 656 (4th Cir. 1960) ............................................. 39

*Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420 (5th Cir. 1992) ............................ 32

*Willard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747 (Tex. App.—Houston [14th Dist.]
   2015, no pet.) ........................................................................................................... 28

## STATUTES

42 U.S.C. § 1983 ............................................................................................................ 30

TEX. CIV. PRAC & REM. CODE § 16.004(a)(4) .............................................................. 28

TEX. CIV. PRAC. & REM. CODE § 33 ................................................... 2, 45, 46, 47, 48, 49

TEX. CIV. PRAC. & REM. CODE § 33.003 ................................................................ 47, 49

Tex. Civ. Prac. & Rem. Code § 33.012 ...................................................................... 48

TEX. CIV. PRAC. & REM. CODE § 33.013 ................................................................ 46, 48

TEX. CIV. PRAC. & REM. CODE § 33.013(b) .............................................................. 48

TEX. PENAL CODE § 32.45 ............................................................................................ 48

TEX. PENAL CODE § 32.46 ............................................................................................ 48

TEX. PENAL CODE § 32.47 ............................................................................................ 48

## RULES

17 C.F.R. 240.10b-5 ...................................................................................................... 35

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws .................................................................. 25

U.S. Const. amend. V .................................................................................................... 23

Plaintiffs Ralph S. Janvey (the "Receiver") and OSIC file this brief in support of their response to Defendant Proskauer Rose LLP ("Proskauer")'s Motion for Summary Judgment [Docket No. 219] (the "Motion") and Brief [Docket No. 220].[1]

## PRELIMINARY STATEMENT

Proskauer's motion for summary judgment must be denied. Plaintiffs claim that former Proskauer partner Thomas Sjoblom ("Sjoblom") aided and abetted a fraudulent scheme and breaches of fiduciary duties by Stanford's officers and directors.[2] There is evidence from which a reasonable jury could conclude that he did.

*First*, as the Fifth Circuit has already ruled, the *in pari delicto doctrine* does not bar Plaintiffs' claims.

*Second*, the four-year statute of limitations does not bar Plaintiffs from recovering damages incurred before January 31, 2009. A cause of action for fraud or breach of fiduciary duty does not accrue until the injured party knows or should have known of his injury. Here, that could not have occurred until some point after February 16, 2009, when the Receiver was appointed. And Plaintiffs are not suing for deepening insolvency, but for increased liabilities, a measure of damages approved by the Fifth Circuit.

*Third*, there is ample evidence that Thomas Sjoblom was on notice of Stanford's

---

[1] The Receiver is still a named Plaintiff in this case because Proskauer argues that the Receiver's assignment of his (non-malpractice) causes of action to OSIC is void. OSIC's claims against Proskauer are not barred by attorney immunity for the reasons set forth in Plaintiffs' Response to Motion of Defendants Proskauer Rose, LLP and Thomas V. Sjoblom for Judgment on the Pleadings and Brief in Support (Document. No. 107). OSIC is asserting claims on behalf of the Stanford entities, Proskauer's former clients, assigned to OSIC by the Receiver, not the claims of any third party. Thus, the attorney immunity doctrine has no application to OSIC's claims. As to the issue of assignability of the claims to OSIC, Plaintiffs have separately sought leave to amend their Complaint to assert all claims on behalf of the Receiver in the event the Court determines that the claims were not assignable, in which case the Receiver has always owned the claims and can continue to assert them. *See* Plaintiff's Opposed Motion for Leave to File Amended Complaint (Document. No. 106).

[2] The Stanford directors and officers that Plaintiffs allege breached their fiduciary duties include, for SGC, Allen Stanford (Director), Danny Bogar (President),, Bernie Young (Chief Compliance Officer) and Mauricio Alvarado (General Counsel), and for SIBL, Allen Stanford (Director), Jim Davis (Director and CFO), Laura Pendergest (Chief Investment Officer), Juan Rodriguez-Tolentino (President) and Mauricio Alvarado (General Counsel). *See* Plaintiffs Responses to Proskauer's Second Set of Interrogatories, Pros. Appx., at 1170-71.

fraudulent scheme, violations of securities laws, and breaches of fiduciary duty when he was first retained in June 2005. By the time he moved to Proskauer in 2006, he certainly knew that Stanford directors and officers were: (1) causing SIBL and SGC to sell SIBL CDs to investors without revealing the lack of transparency into SIBL's investment portfolio, (2) causing SIBL to invest in private equity and real estate, contrary to representations made to investors that SIBL invested only in safe, secure and "liquid" investments, and (3) concealing from investors SIBL's reliance on Antiguan privacy law to prevent anyone from learning what it did with investors' money, even though that law only protected the bank's customers' information. And he knew that Stanford had all the hallmarks of a classic Ponzi scheme. After 20 years with the SEC, Sjoblom was, in his own words, "well-equipped" to recognize the "hallmarks of fraud."

*Fourth*, there is evidence that Sjoblom knowingly and substantially assisted Stanford in evading regulatory oversight. Specifically, he lied to regulators, instructed Stanford to hide or destroy documents, approved marketing materials containing misrepresentations and omissions, failed to disclose SEC, FINRA and Federal Reserve investigations to Stanford's auditors and others, and suborned perjury by a Stanford officer.

*Fifth and finally,* Chapter 33 of the Texas Civil Practice and Remedies Codes does not bar Plaintiffs' claims. Chapter 33 does not apply to aiding and abetting claims. Even if it did, applying Chapter 33 to bar the Receiver's claims based on the conduct of the Stanford entities inappropriately backdoors the inapplicable *in pari delicto* defense. And if Chapter 33 did apply to aiding and abetting claims, Proskauer would still be jointly and severally liable under 33.013(b)(2). In any event, if Chapter 33 did apply, the statute provides that "the trier of fact"— not the court—should decide the percentage of responsibility.

For these reasons and the overwhelming evidence of Thomas Sjoblom's knowing

participation in the fraudulent schemes and breaches of fiduciary duties, which—at a minimum—creates fact issues, Proskauer's motion for summary judgment must be denied.

## FACTUAL BACKGROUND

### A.   SIBL and SGC directors and officers breach their fiduciary duties and engage in a fraudulent scheme.

Stanford directors and officers had fiduciary duties to ensure the entities' compliance with securities laws, to investigate red flags, and to ensure that disclosures to investors and regulators were complete and accurate.[3] They had fiduciary duties to comply with lawful requests from regulators and not obstruct regulatory investigations.[4] Instead, SIBL and SGC directors and officers made material misrepresentations and omissions and concealed what SIBL was doing with the money it obtained from SIBL CD investors in violation of U.S. securities law. Allen Stanford was found guilty of obstructing the SEC investigation, and James Davis, Stanford's CFO ("Davis"), and Laura Pendergest, Stanford's Chief Investment Officer ("Pendergest"), both pled guilty to obstructing the SEC investigation.[5] SGC President Danny Bogar ("Bogar"), Chief Compliance Officer Bernie Young ("Young"), and Vice President Jason Green ("Green") were found to have committed securities fraud by allowing Stanford entities to sell the CDs while knowing that no one, including themselves, knew what SIBL did with the money it obtained from CD investors.[6] The Commission held that, by "wholly failing to carry out his professional due diligence responsibilities" and thereby allowing the fraudulent SIBL

---

[3]It is axiomatic that a corporate director or officer breaches his fiduciary duty by causing the entity to engage in illegal conduct. *Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 719 (5th Cir. 1984) (holding that a director will be held personally liable for a breach of the duty of obedience if he intentionally directs the corporation to violate positive law); *In re Life Partners Holdings, Inc. S'holder Deriv. Litig.*, 2015 U.S. Dist. LEXIS 168198 *32 (W.D. Tex. 2015) (holding that a director is liable for a "knowing violation of law"); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."). Henderson Decl., at 13, 20-21, 26-28, 30-31, 39, App. 1247, 1254-55; 1264-65, 1273; Spindler Decl. at 14-19, App. 1487-92.
[4]Spindler Decl. at 4, App. 1477
[5]PX 14 and 15, App., 1646-1706 and 1707-14 (Davis Plea and Judgment); PX 16 and 17, App. 1715-28 and 1729-35 (Pendergest Plea and Judgment); PX 12, App. 1638-45 (Stanford Criminal Judgment).
[6]PX 10A, App. 1603-1637.

marketing brochure and disclosure statement to be utilized by SGC financial advisors in the U.S.,[7] Young aided and abetted "and caused" SGC's violations of the antifraud provisions of the securities laws.[8] Even without finding that Young knew that SIBL was a Ponzi scheme or that Stanford and Davis were fabricating SIBL's financials,[9] the Commission concluded that Young "played a central role" in the Stanford fraud and that his conduct was "egregious" and extremely reckless to the point of "indifference to regulatory oversight."[10] As a result, the Commission barred Young from the securities industry and ordered disgorgement and fines.[11]

Stanford officers and directors violated their fiduciary duties by

- failing to conduct a due diligence investigation of SIBL's portfolio;[12]

- directing the financial advisors to sell the SIBL CDs using false and misleading marketing materials that failed to disclose their inability to verify any of the claims regarding SIBL's investment performance;[13]

- by failing to register SIBL with the SEC as an investment company.[14]

Stanford directors and officers refused to allow anyone, including the SIBL investors and SGC's own compliance officers, to find out what was in SIBL's investment portfolio,[15]

---

[7]Ex. 10B, at 236, App. 1562-1602. The SEC found that Young "accepted without question that verification of SIBL's portfolio was precluded by Antiguan privacy laws, knew that this lack of verification was not disclosed to investors, and made no effort to require such disclosure". *Id.* at 20.

[8]PX 10A, at 22, 25-34, App. 1625, 1628-1637; Young Depo., at 341:2-342:1; 345:12-348:15, App. 788, 789.

[9]Young Depo., at 336:17-19; 349:3-350:14, App. 786, 790.

[10]PX 10B at 36, App 1598; Young Depo., at 353:3-17, App. 791.

[11]PX 10A at 29-34, App. 1632-1637; Young Depo., 353:18-354:13, App. 791.

[12]Henderson Decl. at 22, 26-28, 45, App. 1256, 1260-62; *see also* Henderson Supp. Decl. at 6-8, App. 1542-44; Spindler Decl., at 55-57, App. 1528-30. It has long been the law that brokers have a duty to investigate proposed investments, and "cannot recklessly state facts about matters of which [they are] ignorant." *Hanly v. SEC*, 415 F. 2d 589, 596 (2d. Cir. 1969); *Graham v. SEC*, 222 F. 3d 994, 1006 (D.C. Cir. 2000).

[13]Henderson Decl., at 13, 15, 20-21, 30 ("SIBL's investment portfolio was central and critical to the CD program and yet SGC and its officers knew nothing about its true content or past performance"), App. 1247, 1249, 1254-55, 1264. Henderson also opined that SIBL's marketing materials were "blindly accepted" by SGC's financial advisors without any independent verification. *Id.*, at 37-39, App. 1271-73. Brokers cannot just blindly accept recommendations made in an issuers' sales literature. *Hanly v. SEC*, 415 F. 2d 589, 596-597 (2d. Cir. 1969); *see also Gebhart v. SEC*, 595 F. 3d 1034, 1044 (9th Cir. 2010) (finding that brokers falsely represented to investors that proposed investments were good and secure investments without performing any investigation of the truth of their representations).

[14]*SEC v. Stanford Int'l Bank Ltd., et al.*, Case No. 3:09-cv-00298-N, Doc. #1858.

[15]Bates Depo., 128:21-130:6; App. 707-708; Young Depo., at 338:2-339:6, App. 787.

ostensibly because Antiguan "privacy law" prohibited disclosure of SIBL's portfolio.[16]

When the SEC requested records from SGC to show what SIBL was doing with investors' money, SGC and SIBL officers and directors "uniformly refused" to provide any information to the SEC.[17] Rather than cooperate, Allen Stanford, Davis, and Mauricio Alvarado, General Counsel for both SGC and SIBL ("Alvarado"), conspired to corruptly influence, obstruct and impede the SEC investigation of SGC and SIBL to prevent detection of the ongoing fraud so that Stanford could continue to sell SIBL CDs to investors in violation of securities and banking laws.[18]

Proskauer's own expert acknowledged that the officers' and directors' concealment of what SIBL was doing with investors' money was "vital" to the fraud and as important to the overall Stanford fraud scheme as the "falsification of financial performance."[19]

## B.   Stanford Financial hires Sjoblom, a lawyer with 20 years' experience in the SEC's enforcement division, and tells him that the SEC suspects Stanford is operating a Ponzi scheme.

Alvarado recommended that Stanford retain Sjoblom, then a partner in Chadbourne & Parke, to handle the SEC investigation because Sjoblom had worked in enforcement at the SEC for some 20 years.[20] During their very first teleconference Alvarado told Sjoblom that the SEC suspected that Stanford was running a Ponzi scheme.[21] Alvarado also informed Sjoblom that the SEC was complaining that SGC had been "stonewalling" the SEC about access to SIBL's

---

[16]Bates testified that she had suggested giving the SEC access to the SIBL portfolio, but her suggestion was rejected based on the Antiguan "privacy law". Bates Depo., at 95:9-96:5; App. 702; Young Depo., at 30:15-19, App. 779. Bates also testified that Sjoblom told her that Antiguan privacy law prohibited her from having access to the SIBL portfolio. Bates at 96:7-99:17, App. 702-3.
[17]Brandt Depo., at 29:22-30:3, App. 674A-B.
[18]PX 14, App. 1646-1706.
[19]Richmond Depo., at 11:13-12:15; 14:17-15:7; 19:3-21:14, 22:8-24:18; 29:22-30:3, 54:19-55:7, App. 766-71.
[20]Stinson Decl., at ¶17, App. 475.
[21]Sjoblom Depo., at 39:14-40:6; 75:4-7, App. 583A-583B, 599 (I was told…the SEC was concerned whether this was a Ponzi scheme"); PX 28, App. 1739-41.

portfolio,[22] and that Stanford wanted Sjoblom to "stop the SEC investigation now."[23] Jim Davis confirmed that Sjoblom was hired to "keep the SEC at bay."[24] Alvarado instructed Sjoblom to be as aggressive as possible to make sure the SEC never gained access to the SIBL portfolio.[25] Sjoblom agreed to vigorously oppose the SEC and maintain Stanford's position that the details of SIBL's portfolio were off limits.[26]

Sjoblom immediately took steps to familiarize himself with his client's operations.[27] On June 28 and 29, 2005, he flew to Houston and interviewed SGC financial advisors, and SGC's top management, Bogar, Green and Jay Comeaux, former President of SGC, with Stanford's Chief of Global Compliance, Lena Stinson ("Stinson").[28] During those interviews, the financial advisors told Sjoblom that none of them knew how SIBL invested the money it held in its portfolio, other than general categories and asset classes provided in SIBL's annual and quarterly reports.[29] Rep Poppell ("Poppell"), an SGC Compliance officer, informed Sjoblom that Poppell did not know how SIBL invested CD money.[30] The financial advisors also told Sjoblom that SIBL was not a typical commercial bank because it did not make loans but was more like an investment bank because it made money based on the returns generated by its investment portfolio.[31] Thus Sjoblom was on notice shortly after he was hired in 2005 that SIBL was operating as an unregistered investment company.

---

[22] Sjoblom Depo., at 44:12-45:10, App. 584-85.
[23] PX 28, App. 1739-41.
[24] Davis Depo., at 93:18-95:19; 110:9-14, App. 755-56, 759 (Allen Stanford told Davis that Sjoblom's role was to keep the SEC at bay).
[25] Stinson Decl., at ¶21, App. 476.
[26] Stinson Decl., at ¶20, App. 476.
[27] Alvarado Depo., at 204:3-16, App. 220 (Sjoblom was given authority to perform due diligence of Stanford's operations in 2005); Bates Depo., at 56:15-24, App. 697 (Sjoblom conducted an investigation); 70:6-25, App. 698 (Sjoblom conducted a due diligence investigation of Stanford in 2005).
[28] Sjoblom Depo., at 47:1-11, App. 586; PX 34 (Sjoblom's handwritten notes of the interviews), App. 1742-97.
[29] Stinson Decl., at ¶18, App. 475; Sjoblom Depo., at 53:8-16:58:25-59:12, App. 587-592; *see also* PX 34, App. 1742-97; *see also* Sjoblom Depo., at 137:4-22, App. 625 (SGC only knew general categories of investments in SIBL's portfolio, not specific holdings).
[30] PX 34, App. 1742-97; Sjoblom Depo., at 59:15-60:18; 62:1-6, App. 592-93, 595.
[31] PX 34; App. 1742-97; Sjoblom Depo., 53:20-23; 55:22-56:1; 56:17-57:9; 58:19-23, App. 587-89.

Financial advisors also explained to Sjoblom that SIBL's portfolio was managed by Davis and Pendergest from Stanford's Memphis office.[32] The President of SGC, Bogar, told Sjoblom that whenever financial advisors asked him how the SIBL portfolio was invested, he told them to ask Davis and Pendergest.[33] Chief Compliance Officer Jane Bates ("Bates") and her successor, Bernerd Young, also understood that any questions concerning the SIBL portfolio should be directed to Davis and Pendergest.[34] Poppell—like Alvarado—told Sjoblom that the SEC suspected that SIBL was a Ponzi scheme.[35] Yet, Sjoblom never asked whether Stanford was operating a fraud or a Ponzi scheme.[36] Sjoblom also never asked why Stanford would not let the SEC see SIBL's portfolio records.[37]

After his June interviews in Houston, Sjoblom travelled to Antigua in August 2005 where he met with Stanford, Davis and Pendergest. Despite knowing that the SEC suspected Stanford was a Ponzi scheme and wanted to know how SIBL's portfolio was invested, and even though he had been told that Davis managed SIBL's investments, Sjoblom avoided asking Davis about the SEC's Ponzi scheme allegations.[38] Sjoblom did not investigate how SIBL was investing the money, "did not dig deep," did not "probe" and questioned Davis and Pendergest about the SIBL portfolio in only a "cursory" manner.[39] Davis testified that Sjoblom "ignored red flags," "hid his eyes" and had a "see no evil, hear no evil, speak no evil" approach to Stanford generally.[40]

During the Antigua meeting, Davis and Pendergest told Sjoblom about the three tiers of

---

[32]Sjoblom Depo., at 57:17-58:18, App. 590-91.
[33]Sjoblom Depo., at 58:25-59:12, App. 591-92.
[34]Bates Depo., at 113:12-114:4, App. 706; Young Depo. at 22:9-24:18, 25:13-23, App. 777, 778.
[35]PX 34 at 55, App. 1797; Sjoblom Depo., at 60:21-61:8, App. 593-94.
[36]Bates Depo., at 70:2-25; 108:17-110:13, App. 698. Young Depo., at 29:7-24, App. 779.
[37]Sjoblom Depo. at 165:23-169:1, App. 633-37; Bates Depo., at 95:9-96:5; App. 702; Young Depo., at 30:15-19, App. 779.
[38]Davis Depo., at 36:12-37:10., App. 751.
[39]Davis Depo., at 36:25-37:10; 44:2-45:12; 62:3-22; 95:24-97:18, App. 751, 753, 756.
[40]Davis Depo., at 95:20-96:3, App, 756.

SIBL's portfolio, but Sjoblom did not press for details.[41] Sjoblom also learned that SIBL's portfolio included Antiguan real estate holdings.[42] Sjoblom instructed Pendergest to move all of SIBL's records out of the U.S. to Antigua.[43] Stanford then loaded a plane with SIBL documents from the U.S. to be burned in Antigua.[44] Sjoblom knew that SIBL documents were moved offshore as a result of his instructions to get the documents away from the SEC.[45]

While in Antigua, Sjoblom also met with Leroy King, the director of SIBL's Antiguan regulator, the Financial Services Regulatory Commission ("FSRC").[46] King provided Sjoblom details of confidential communications with the SEC and said that the FSRC would refuse to give the SEC access to documents related to SIBL's investment portfolio unless the FSRC first made its own finding of fraud or crime.[47] Sjoblom did not interview SIBL's Antiguan auditor, CAS Hewlett, of whom he had never heard before, nor do any research about him despite the fact that he was the sole auditor for Sjoblom's multi-billion dollar investment bank client accused by the SEC of running a Ponzi scheme.[48] Young testified that having a "one man" accounting firm perform SIBL's financial audits was always a red flag to him.[49]

After returning from Antigua, Sjoblom traveled to Memphis, where he learned that copies of monthly account statements for SIBL's portfolio were kept in Memphis by Pendergest's

---

[41]Davis Depo., at 66:3-67:16; 119:24-120:10; App. 754, 760; Pendergest SEC Depo., at 59:4-62:10, App. 163-64. Davis' and Pendergest's testimony that they told Sjoblom about the existence of 3 tiers in the SIBL portfolio, which contradicts Sjoblom, who testified he didn't learn of the existence of Tier 3 until 2008. Sjoblom Depo., at 64:12-66:8; 91:17-93:6; 251:21-252:25. App. 596-98, 609-10, 649-50.

[42]Proskauer's Responses to Plaintiffs' First Request for Admissions, No. 176, App. 107.

[43]Pendergest Depo., at 62:12-68:14, App. 164-65. Sjoblom admitted he had such a discussion with Pendergest, and did not deny that he instructed Stanford to move all SIBL records out of the U.S. to Antigua. Sjoblom Depo., at 196:10-198:7, App. 645-47.

[44]Pendergest Depo., at 68:17-21, App. 165.

[45]Pendergest Depo., at 72:11-20; 433:8-24, App. 166, 192C.

[46]Stinson Decl., at ¶23, App. 477; Sjoblom Depo., at 84:24- 89:19, App. 602-607.

[47]Sjoblom Depo. 85:25-87:21, App. 603-05; PX 39 (Sjoblom's notes of meeting), App. 1798-1813. Sjoblom also received a copy of a draft FSRC exam report of SIBL while he was in Antigua, but it did not list the specific assets in SIBL's portfolio, only general categories. Sjoblom Depo., at 66:9-20; 89:13-19; 96:8-23; PX 41 (FSRC Draft Report), App. 598, 607, 613.

[48]Sjoblom Depo., at 312:24-314:15, App. 653-55.

[49]Young Depo., at 95:18-96:13, App. 783.

team.[50] Although he was aware that Pendergest's group monitored SIBL's portfolio and "operated out of [SGC's]…operations…in Memphis,"[51] Sjoblom never questioned how Pendergest could monitor SIBL's portfolio from Memphis without violating Antiguan privacy laws.[52] Pendergest told Sjoblom that she would not provide the actual investment holdings in SIBL's portfolio.[53] She also confirmed that FSRC would not provide the SEC with any information about SIBL's portfolio absent a finding of a crime or fraud.[54]

### C.    Sjoblom reviews SIBL's marketing brochure and disclosure statement and learns Stanford's CDs have all the hallmarks of a Ponzi scheme.

In June 2005, Sjoblom reviewed SIBL's marketing brochure,[55] and disclosure statement.[56] The SIBL brochure represented that SIBL invested only in safe, "liquid" assets.[57] Neither the brochure nor the disclosure statement revealed that SGC's financial advisors could not verify the representations made about SIBL's portfolio.[58] Sjoblom did not recall ever advising Stanford to disclose that SIBL would not allow investors access to SIBL's portfolio information because of Antiguan privacy laws.[59] The brochure disclosed that the CDs offered consistent above-market rates.[60] In June 2005, Sjoblom also learned that SIBL paid significant referral fees to SGC for the sale of each CD, 3% total with 1% going directly to the SGC

---

[50]PX 47, App. 1875-1889; Davis Depo., at 69:15-25, App.754; Sjoblom's Depo., at 94:23-95:25, App. 611-612.
[51]Sjoblom Depo., at 104:8-25, App. 614. Sjoblom did not recall ever informing the SEC that SIBL's portfolio was overseen from Memphis. Sjoblom Depo., at 310:24-31:15, App. 651-52.
[52]Sjoblom Depo., at 174:20-24, App. 638.
[53]PX 47, App. 1875-1889; Sjoblom Depo., at 109:23-110:3, App. 615-16; Davis Depo, 73:6-15; App. 754A.
[54]PX 47, App. 1875-1889, Davis Depo., at 78:5-79:22, App. 754B.
[55]PX 324, App. 2186-2202. Sjoblom attached a copy of the SIBL Brochure to his October 3, 2005 letter to the SEC. PX 71, App. at 1935-2017; Sjoblom Depo., at 162:4-17, App. 632.
[56]Sjoblom Depo., at 119:16-121:10; 158:7-9, App. 617-19, 639; Hamric Depo., at 35:4-36:14, App. 722; Young Depo., at 374:15-375:12, App. 792. PX 321, App. 2152-2185. On September 13, 2005 Sjoblom e-mailed a copy of SIBL's disclosure statement to a fellow Chadbourne partner and asked him to examine it from a Reg D standpoint. Sjoblom informed his partner that Stanford's position was that the CDs did not qualify as securities. PX 60, App. 1931-1934. His partner responded to Sjoblom that *"I am not sure why they think these CDs are not securities"*. *Id*.
[57]PX 324, App. 2186-2202.
[58]PX 324, App. 2186-2202; PX 321, App. 2152-2185; Young Depo., at 144:8-146:6, App. 784-85.
[59]Sjoblom Depo., at 158:7-159:25, App. 630-31.
[60]PX 324, App. 2186-2202.

financial advisor who booked the sale.[61] Financial advisors were also eligible to receive a 1%

annual "trailing" commission over the term of the CD and SGC held competitive sales contests

and provided expensive prizes to financial advisors who sold a large number of CDs.[62]

In August 2005, Sjoblom asked one of his associates to find out the status of the SEC

Stanford investigation.[63] The associate reported that the SEC had issued a "formal" investigation,

and was seeking SIBL's records showing how the CD investors' money was invested.[64] He also

told Sjoblom that the SEC wanted to know if Sjoblom was representing SGC, SIBL or both**.**[65]

Sjoblom told his associate that he represented both, but asked him not to tell the SEC, because

**"**[m]aybe we keep them [SEC] from getting the bank records by not representing [SIBL]."[66]

### D.      Sjoblom lies to the SEC about Stanford's CDs, participating in Stanford's ongoing fraudulent scheme.

On August 29, 2005, the SEC requested production of SIBL-related documents from

SGC and SIBL.[67] On September 12, Sjoblom responded that, while Stanford would like to

cooperate, Antiguan privacy laws prevented production of SIBL's portfolio-related documents,

and the SEC must obtain them from FSRC (already knowing full well that the FSRC would not

release them).[68] Sjoblom told the SEC that it lacked jurisdiction because the SIBL CDs were not

securities due to SIBL's "extensive insurance to protect against risk of loss".[69] From his review

of the brochure, Sjoblom knew that was false; there was no insurance to protect CD investors.[70]

Sjoblom attached to his response a prior letter from a SGC compliance officer stating that SGC

---

[61]PX 34, App. 1742-97; PX 58, App. 1922-1930, PX 71, App. 1935-2017.
[62]PX 34, App. 1742-97, 58, 71.
[63]PX 44, App. 1871-1874.
[64]PX 44, App. 1871-1874.
[65]PX 44, App 1871-1874.
[66]PX 44, App 1871-1874.
[67]PX 50, App. 1893-1900; Brandt Depo., at 67:1-14, App. 675.
[68]PX 57, App. 1909-1921.
[69]PX 57, App. 1909-1921.
[70]PX 71, App 1935-2017.

was "not privy" to the specific holdings in SIBL's portfolio.[71] Sjoblom knew that too was false, because he learned during his trip to Memphis that paper copies of monthly account statements for SIBL's portfolio were kept in the Memphis office.[72] Sjoblom also knew his representation regarding Antiguan privacy law was false because, on September 2, 2005, Juan Rodriguez-Tolentino, SIBL's President ("Rodriguez"), sent Sjoblom a copy of the statute.[73] On its face, in plain English, the statute provides privacy only to customer information, not the bank's portfolio.[74] Yet, Sjoblom claims that because he is not an Antiguan lawyer, he relied on Rodriguez—a non-lawyer—to tell him what the law provided.[75]

On September 12, 2005, the SEC sent a letter accusing SGC of securities fraud by making material misrepresentations and failing to disclose material information about the SIBL CDs.[76] The SEC claimed that because SGC did not know how SIBL was investing the CD investors' money, SGC could not possibly know if the CDs were suitable for investors and therefore was violating the suitability rule.[77]

On October 3, 2005, Sjoblom replied.[78] Despite knowing that SIBL would not give SGC financial advisors access to SIBL's portfolio, Sjoblom reiterated that SIBL's disclosure told investors that they could request and receive more information concerning SIBL's investments.[79] Sjoblom knew this statement was false—and that no one at Stanford would ever provide

---

[71]PX 57, App. 1909-1921; Sjoblom Depo., at 135:17-137:22, App. 623-25. Brandt testified that Poppell's representation that SGC did not have access to SIBL's portfolio information was consistent with what SGC had been telling the SEC since 2004. Brandt Depo., at 78:25-80:6. App. 678.
[72]Sjoblom Depo., at 94:23-95:25; 104:8-25, App. 611-12; 614.
[73]PX 54, App. 1904-08; Sjoblom Depo., at 139:5-140:6, App. 626-27.
[74]Sir Clare K. Roberts Decl., App. 3356-74.
[75]Sjoblom Depo. at 140:9-16; 141:22-142:5, App. 627; 628-29.
[76]PX 58, App. 1922-1930.
[77]PX 58, App 1922-1930.
[78]PX 71, App. 1935-2017.
[79]PX 71 (page 12), App. 1947. Sjoblom referred to this section in the disclosure statement and attached a copy of the disclosure statement, and the SIBL brochure, to his letter. PX 71, App. 1935-2017.

investors with information about SIBL's portfolio.[80]

Sjoblom also misrepresented to the SEC that, as a result of SIBL's Antiguan regulation, excess capital, and supplemental insurance coverage, SIBL CD holders were "virtually guaranteed payment in full" if SIBL became insolvent so that an investment in SIBL was actually *safer* than an investment in a U.S. bank.[81] He misrepresented that the SIBL CD investors' deposits were insured, despite the fact that Stanford's insurance policies provided no coverage of any sort for the CD investors.[82] And he also falsely asserted that there was "no suitability assessment required" for the sale of the CDs.[83]

From 2005 to 2009, Sjoblom repeatedly represented to the SEC that Antiguan privacy law prevented SIBL from revealing the contents of its investment portfolio.[84] But he never researched the law, relying solely on the word of SIBL President, Rodriguez, whom Sjoblom knew was not a lawyer.[85] Sjoblom testified that Rodriguez and Alvarado told him they had a legal opinion from Antiguan counsel about the law, but until 2009 he never asked to see it because he "didn't feel the need to."[86] Alvarado directly contradicted Sjoblom's testimony, denying that he told Sjoblom he had such an opinion, testifying that he had never seen one, believed there was none, and relied on Sjoblom to determine Antiguan law.[87]

---

[80]Davis Depo., 101:1-103:7, App. 757-58; PX 10A at 9, App 1612. The SEC in its Decision against Young found this statement to be particularly fraudulent. *Id.*
[81]PX 71, App. 1935-2017.
[82]Bates Depo., at 72:16-20; 73:20-74:3; 75:6-16, App. 698-699.
[83]Bates Depo., at 79:8-81:17, App. 700.
[84]In February 2009, when he was presenting Pendergest to testify before the SEC about SIBL's portfolio, Sjoblom reached an agreement with the SEC that such testimony was without waiver of the Antiguan privacy laws. Sjoblom Depo., at 375:4-22, App. 667; PX 299, App. 2146-48. When asked why he couldn't have reached a similar agreement with the SEC in 2005 or 2006, Sjoblom's only response was that a client has a right to have his lawyer assert whatever defenses are available. Sjoblom Depo., at 375:23-376:13, App. 667-68. Proskauer's own expert, Flannery, admitted that Sjoblom could have reached a similar agreement with the SEC to preserve Stanford's arguments about the SEC's lack of jurisdiction while at the same time providing information to the SEC about SIBL's portfolio, but he chose not to do so. Flannery Depo., at 154:22-156:12, App. 744.
[85]Sjoblom Depo., at 132:18-133:17, App. 620-21.
[86]Sjoblom Depo., at 133:23-135:1; 140:9-141:16, App. 621-23; 627-28.
[87]Alvarado Depo., at 196:7-201:22, App. 214-19; Alvarado SEC Depo., at 432:6-433:9, App. 209.

SEC investigator Jennifer Brandt testified that Sjoblom told her SIBL could not produce its records to the SEC because of some "vague" Antiguan privacy law, but never told her that such position was based on what his client had told him; instead, Brandt viewed it as "clearly coming from him" as counsel.[88] She testified that she assumed that Sjoblom had read the statute he was citing and was qualified to render the opinion he gave when he made representations to the SEC about the Antiguan privacy law.[89]

### E.    In September 2006, Sjoblom tells the SEC he has "personally gone through all operations" and "there is no fraud here."

On September 6, 2006, after Sjoblom had joined Proskauer, the SEC's Brandt called Sjoblom and requested copies of Stanford's current marketing brochure and disclosure statement for the SIBL CDs. Brandt explained that the SEC's investigation of Stanford was headed to a formal order of investigation and that it would be a fraud investigation.[90] She advised Sjoblom that the SEC had been trying to get information about SIBL from the FSRC's King, but he was not cooperating.[91] Sjoblom immediately notified Alvarado, and assured him that he had told Brandt that he had "personally gone through all operations" of Stanford and "there was no fraud here."[92]

Based on Sjoblom's representation that he had "personally gone through the operations", Brandt believed that Sjoblom had performed a due diligence investigation and "vetted" Stanford; the fact that Sjoblom was a former SEC lawyer with significant experience and was with a

---

[88] Brandt Depo., at 75:14-76:21, App. 677. Plaintiffs' ethics expert, Chuck Herring similarly opined that when Sjoblom made the representations to the SEC about the import of the Antiguan law, he didn't couch it in terms of "this is what my client told me", but instead presented it as his own opinion of the law. Herring Depo., at 228:9-15; 238:8-239:4, App. 1225, 1225, 1228-29 (not reasonable to "rely on the opinion of a non-lawyer…to get the law"). Herring opined that Sjoblom had an ethical obligation to have fully vetted the Antiguan law issue before he presented it to the SEC. Herring Depo at 228:21-230:21, App. 1225-27.
[89] Brandt Depo, at 118:5-119:6; 268:4-270:25, App. 685; 691-92.
[90] PX 92, App. 2020-2022.
[91] PX 92, App 2020-2022; Brandt Depo., at 92:5-94:10, App. 679-80.
[92] PX 92, App. 2020-2022; Sjoblom Depo., at 182:2-24, App. 639.

respected firm lent credibility to his representations.[93] Sjoblom assured Brandt multiple times that Stanford was legitimate, and told her "trust me; I was with the SEC, I know what I'm doing."[94]

In September 2006, Allen Stanford informed Sjoblom that FSRC's King told him that the SEC called King alleging that Stanford was a fraud and Ponzi scheme.[95] Mr. Stanford gave notes of his call from King to Sjoblom.[96] Stanford's handwritten notes reveal that the SEC told the FSRC they suspected SIBL was a fraud because (1) SIBL paid much higher rates on its CDs than traditional banks; (2) SGC was paying its financial advisors a 3% commission on the CDs, meaning that SIBL had to make 12-13% return on its portfolio consistently to break even; (3) the majority of SGC's revenues came from the sale of the CDs; (4) SGC pushed its financial advisors to sell the CDs with aggressive sales contests with prizes that included cars and extravagant trips; (5) SGC refused to provide the financial advisors with any detailed information about SIBL's investments; (6) the investors were being told the SIBL CD was similar to a traditional U.S. bank CD; and (7) former financial advisors had reported to the SEC that they suspected investor funds were being used to underwrite Allen Stanford's real estate investments in Antigua.[97] Still Sjoblom did not ask why SIBL would not tell the SEC about SIBL's portfolio because "it was not his role as a defense lawyer".[98]

As a result of what Stanford told him, Sjoblom called Mike Moore and Elizabeth Jacobs at the SEC, who reiterated that they believed that Stanford was a fraud and Ponzi scheme.[99] Sjoblom again assured them that he was "well-equipped" to recognize the "hallmarks of fraud;"

---

[93]Brandt Depo., at 92:13-97:8; 204:16-205:4, App. 679-80.
[94]Brandt Depo., at 69:6-19, App. 675.
[95]Sjoblom Depo., at 183:11-184:24, App. 640-41.
[96]Sjoblom Depo., at 185:1-22, App. 642; PX 95, App. 2023-26.
[97]PX 95, App. 2023-26.
[98]Sjoblom Depo., 186:5-187:22, App. 643-44.
[99]PX 103, (Bates page 726-727), App. 2030-31.

that he found SIBL to be credible in all their business dealings; and that he found SIBL to be an "incredible institution."[100]

### F.      Sjoblom gives the SEC the "runaround" about access to SIBL's portfolio.

On October 10, 2006, the SEC contacted Sjoblom seeking "confirmation from us that we will produce records so that the SEC can tell the FSRC that SIBL will do so".[101] In Sjoblom's view: "this is clearly a ploy by the SEC to get the FSRC to produce the banking documents because SIBL says that it is ok to do so. NO!!"[102]

From September 2005, Sjoblom consistently told the SEC that SIBL could not produce its own records and that the SEC had to obtain access from FSRC, even after the SEC told Sjoblom that the FSRC had refused to cooperate with the SEC.[103] Sjoblom knew the FSRC would never cooperate with the SEC.[104] After Sjoblom told the SEC to get the records from the FSRC, the FSRC told the SEC they had to get the records from SIBL.[105] Brandt testified that Sjoblom gave the SEC the "runaround" about SIBL's portfolio records.[106]

On October 26, 2006, the SEC issued a formal order of investigation[107] and began issuing subpoenas for documents and testimony to SGC and some SGC employees.[108] The SEC alleged that SGC was violating the Investment Company Act (by selling CDs without registering under the Act) and the anti-fraud provisions of the securities laws,[109] and requested disclosure of the

---

[100]Davis Plea, PX 14, p. 17, App. 1663.  Later on December 23, 2008—as markets were reeling in the wake of disclosure of Bernie Madoff's Ponzi scheme—Sjoblom again vouched for Stanford telling SEC attorney Edmundson that "this was not Madoff—this is a real bank, with real investments with global portfolio managers, and real assets." PX 319 at 548, App. 3409
[101]PX 105, App. 2037-38.
[102]PX 105, App. 2037-38.
[103]Brandt Depo., at 71:11-75:23; 98:1-104:18; 111:4-112:22, App. 676-77, 681-82, 683.
[104]Pendergest SEC Depo., at 140:18-142:15, App. 173-74. ("[Sjoblom] said, 'you have a good relationship with the FSRC'…and then 'well that won't happen'" referring to whether the FSRC would cooperate with the SEC).
[105]Brandt Depo., at 115:4-116:23, App. 684
[106]Brandt Depo. at 121:13-123:14, App. 685-86.
[107]PX 111, App. 2039-44.
[108]PX 113, App. 2045-70.
[109]PX 111, App. 2039-44.

contents of SIBL's portfolio and agreements between SGC and SIBL.[110] Stanford's strategy was to provide the SEC enough documents "to keep them busy", but to never produce any documents that actually revealed the contents of SIBL's portfolio.[111] Brandt testified that SGC did produce documents to the SEC, but nothing substantive or responsive to the subpoena.[112]

Alvarado assigned Stinson, Stanford in-house lawyer Rebecca Hamric ("Hamric") and Young to assist Sjoblom and his associate Jackie Perrell in responding to the subpoena.[113] Stinson, Young, and Hamric testified that Sjoblom made the ultimate decision concerning which documents to produce.[114] Sjoblom agreed with Alvarado that SGC would "take its time" and take a "slow boat" approach to producing documents to the SEC.[115]

### G.    Sjoblom instructs SGC personnel to violate an SEC subpoena.

Stinson, Hamric, and Young set aside documents that they were unsure were responsive to the SEC subpoena so that Sjoblom could decide whether to produce them or not.[116] One of the documents Young gave to Sjoblom to review in January 2007 was a 2004 "Financial Consulting and Advisory Services Agreement" between SGC and SIBL, through which SGC managed the private equity portion of SIBL's portfolio.[117] The attachment to the agreement revealed private equity positions held in SIBL's portfolio,[118] contrary to what Sjoblom had represented to the

---

[110]PX 111, App. 2039-44.
[111]Davis Depo., at 93:5-17, App. 755.
[112]Brandt Depo., at 193:5-15, App. 689.
[113]Stinson Decl., at ¶28, App. 478-79.
[114]Young Depo., at 51:25-52:14, App. 780; Stinson Decl., ¶28-29, App. 478-79; Hamric Depo., 94:4-95:10, App. 723.
[115]Stinson Decl., ¶28, . App. 478-79.
[116]Stinson Decl., at ¶29, App. 479.
[117]PX 122, App. 3375-3395; Young Depo. at 61:1-63:36, App. 781.
[118]Young Depo., at 26:10-21, App 778 ("I know he looked at it. I showed him."). Hamric testified that the agreement on its face was responsive to the SEC subpoena. Hamric Depo., at 111:1-9, App. 724. The SEC's Brandt also testified that the agreement was responsive to the subpoena but was never produced to the SEC. Brandt Depo., at 139:16-140:10, App. 687. Brandt further testified that the agreement was "critical" because it evidenced that SGC knew about a portion of SIBL's portfolio. Brandt Depo., at 315:7-316:22, , App. 693.

SEC since 2005.[119] Sjoblom instructed Stanford not to produce it.[120]

The agreement and its attachment listing SIBL's private equity holdings was the type of portfolio information the SEC had been seeking.[121] If the SEC received that agreement it would have known that SGC was managing some of SIBL's investment portfolio in Memphis.[122] The same day that Sjoblom advised SGC to withhold the agreement, he had his associate e-mail him a memo on obstruction of justice.[123]

### H.      Sjoblom conceals the SEC investigation from SGC's auditor.

In 2006, 2007 and 2008, Sjoblom received audit request letters from SGC's auditor, BDO Seidman ("BDO"). Even though Sjoblom was representing SGC in a formal fraud investigation by the SEC alleging that SGC was part of a massive Ponzi scheme, Sjoblom informed BDO in 2006 that Proskauer was not working on anything "material".[124]

Sjoblom never disclosed to the BDO audit partner, Carlos Ancira, that the SEC was accusing Stanford of being a Ponzi scheme; Ancira testified that it was "news to me."[125] Ancira testified that the SEC's allegation that Stanford was a Ponzi scheme "should've been disclosed to me."[126] If he had known that the SEC was accusing Stanford of being a Ponzi scheme, BDO would have taken other measures in auditing SGC.[127] Once Ancira learned of the pending investigation from the SEC, he asked his partner to call Sjoblom to find out why he had not

---

[119]Brandt Depo., at 141:5-142:5; 315:19-316:22, App. 687-88, 693.
[120]Stinson Decl. at ¶30, App. 479; Young Depo. at 62:17-66:25 (Sjoblom told them "don't produce it" and Young relied on Sjoblom given his experience and time at the SEC); 69:25-71:1, App. 781-82, 782A. Sjoblom admitted that he hand wrote on the agreement that "this shows we know SIBL's portfolio", but then scratched it out and wrote "does not" before "shows" to make the sentence read "this *does not* show we know SIBL's portfolio". Sjoblom Depo., 240:3-9, App. 648; PX 122, App. 3375-3395.
[121]Brandt at 143:17-144:15, App. 688.
[122]Davis Depo., at 97:23-98:13, App. 756-57.
[123]PX 127, App. 2071-2083.
[124]Ancira Depo., at 25:11-26:7; 27:8-1, App. 730-31, 731.
[125]Ancira Depo., at 27:19-28:1, App. 731
[126]Ancira Depo. at 80:6-81:16, App. 734.
[127]Ancira Depo., 28:2-25; 83:6-13; 103:25-104:18, App. 731, 735, 738 ("if those matters had been brought to my attention, I would have had to change my procedures"); 177:9-20, App. 740.

mentioned the SEC investigation.[128] Sjoblom advised BDO that the SEC inquiry was related to amending compliance procedures as part of a routine examination.[129] In February 2007, Proskauer responded to another audit confirmation letter from BDO. Sjoblom again neglected to mention the SEC's now formal investigation of SGC.[130] Sjoblom told BDO that the SEC was not really investigating SGC and that SGC's exposure was "de minimis."[131] In February 2008, Proskauer's audit response letter again omitted any reference to the ongoing SEC investigation.[132]

## I. Sjoblom learns that Tier 3 includes private equity as well as real estate, rather than liquid investments as represented, but does nothing.

In January 2009, FINRA raided multiple SGC offices seeking information about SIBL's CDs. Sjoblom flew to Memphis and instructed Pendergest to avoid talking to FINRA and to hide in her office behind locked doors.[133] During Sjoblom's meetings with Pendergest in Memphis, Pendergest's assistant advised her that there was a man at the front desk with a package for Pendergest. Sjoblom told Pendergest it was likely an SEC subpoena and instructed her to avoid service, going so far as to have her husband go to their house in the dark of night to retrieve a change of clothes for her so she would not get served at home.[134]

During a FINRA interview of Stanford employee Fred Palmliden on January 15, 2009, Sjoblom learned that SIBL's Tier 3 investment portfolio contained private equity and real estate,[135] contrary to representations in the SIBL brochure that Sjoblom had reviewed,[136] which

---

[128]Ancira Depo., at 37:6-38:3; 41:13-23, App. 732-33, 733.
[129]Ancira Depo., at 37:6-38:3; 41:13-23, App. 732-33, 733.
[130]PX 133, App. 2084-89; Ancira Depo., at 85:16-87:3, App. 735-36.
[131]Ancira Depo., at 101:6-104:18, App. 737-38.
[132]PX 164, App. 2090-93; Ancira Depo., at 115:1-116:9, App. 739.
[133]Pendergest SEC Depo., at 109:16-113:8, App. 167-68.
[134]Pendergest SEC Depo, at 119:2-123:1; 129:1-131:2, App. 169-70, 171-72.
[135]PX 227, App. 2097-2124; Sjoblom Depo., 325:12-326:11, App. 656-57.
[136]Sjoblom Depo., at 119:16-121:10; 158:7-9, App. 617-19; 630. Sjoblom attached a copy of the SIBL brochure to his October 3, 2005 letter to the SEC. PX 71, App. 1935-2017; see also Sjoblom Depo., at 162:4-17, App. 632.

represented that SIBL's portfolio was invested in safe and "liquid' investments.[137] Former SEC enforcement lawyer Steve Korotash testified that evidence that SIBL was invested in private equity and real estate, "was a revelation" to the SEC because it allowed the SEC to establish "a significant material false representation" that would be actionable because SIBL was representing to investors that it invested only in safe and liquid investments.[138] Sjoblom knew from his prior review of SIBL's disclosures that these investments had not been disclosed to CD investors nor the SEC, but Sjoblom still did nothing.[139]

**J.      Sjoblom continues to lie to the SEC about Antiguan privacy law.**

In January 2009, one week after telling the SEC staff yet again that Antiguan privacy law prevented disclosure of SIBL's portfolio,[140] Sjoblom told Rodriguez that he found nothing in Antiguan privacy law that provided protection for SIBL's portfolio, and nothing that would prohibit Stanford or the FSRC from disclosing it to the SEC.[141]

The next day, January 29, Sjoblom wrote to Lena Stinson requesting a legal opinion from SIBL's Antiguan counsel that under Antiguan law the "information regarding SIBL's assets…is confidential."[142] Stinson requested such a legal opinion from Stanford's legal department for the Caribbean region, and in response she received the FSRC regulations, which she forwarded to Sjoblom.[143] Those regulations state that the FSRC is required to maintain the confidentiality of *its own Examination findings*, not that SIBL is prohibited from disclosing the contents of the SIBL portfolio to outside regulators like the SEC.[144]

A week later—with no legal or factual basis—Sjoblom again told the SEC that Antiguan

---

[137]PX 324 (SIBL Brochure). App. 2186-2202.
[138]Steve Korotash Depo., at 41:7-42:4, App. 716-17.
[139]Sjoblom Depo. 328:6-14, App. 658.
[140]PX 243, App. 2125-26.
[141]PX 261, App. 2131-32; Sjoblom Depo., 337:12-22, App. 662.
[142]Stinson Decl., at ¶37, App. 482.
[143]PX 266, App. 2133-39.
[144]PX 266, App. 2133-39.

privacy law prohibited SIBL from disclosing its portfolio information and that, "without the express authorization of the FSRC, SIBL simply cannot provide banking documents to the SEC regarding SIBL's assets."[145]

### K.    Sjoblom steers the SEC away from deposing Allen Stanford and Jim Davis.

On January 7, 2009, Sjoblom emailed Alvarado to relay his conversation with the SEC's Kevin Edmundson.[146] According to Sjoblom, the SEC's main concern related to the CDs' extraordinarily high returns: "[H]ow can it be that the CDs are offered at such great rates?" Sjoblom wrote that Edmundson raised two issues: (i) is the SIBL CD a "security"; and (ii) are the stated rates of return possible?" Sjoblom continued,

> Kevin [Edmundson] stated that a recent brochure states that Stanford returns were 3.9% better than other US bank CDs … there is some concern that this case not be another Madoff-type case.
>
> … Kevin [Edmundson] asked whether I would present a witness that will tell the SEC what is going on and what the allocations are? And, where the money is invested?[147]

On January 21, 2009, the SEC served subpoenas on Allen Stanford, Davis and Pendergest seeking testimony and documents related to SIBL's investment portfolio.[148] The next day, Stanford, Davis, Pendergest, Alvarado, Sjoblom, Stinson and others met at the Stanford airplane hangar in Miami to determine who should testify in response to the subpoenas.[149] At that meeting, Sjoblom was adamant that Allen Stanford and Davis not testify before the SEC.[150] Sjoblom announced that he would misrepresent to the SEC that Stanford and Davis were not involved in the day-to-day affairs of SIBL, did not know the details of SIBL's portfolio, and

---

[145]PX 275, App. 2140-43.
[146]PX 211, App. 2094-96.
[147]PX 211, App. 2094-96.
[148]Stinson Decl., at ¶35, App. 481.
[149]Stinson Decl., at ¶35, App. 481.
[150]*Id.* Pendergest Depo., at 143:1-144:1, App. 174 (testifying that Sjoblom told Mr. Stanford not to worry because has was going to convince the SEC that Mr. Stanford didn't know about the day-to-day operations of SIBL); 293:9-294:2, App. 192 (Sjoblom did not want Davis to be put under oath by the SEC); 507:10-508:6, App. 524.

were not appropriate persons to testify about SIBL's portfolio.[151] Instead Sjoblom planned to offer Pendergest and Rodriguez to testify about SIBL's portfolio.[152] Sjoblom then met with several SEC attorneys at a restaurant in Houston to discuss the SEC's investigation.[153] The SEC attorneys reiterated that the purpose of their investigation was to determine how SIBL's entire portfolio of assets was invested, and where those assets were managed, and that to do so, the SEC needed to depose the Stanford Financial executives with the most knowledge of SIBL's "entire investment portfolio."[154] At this meeting, Sjoblom falsely represented to the SEC that Stanford and Davis did not "micro-manage" SIBL's portfolio, and that Pendergest and Rodriguez were the "better people to explain the details" about SIBL's entire portfolio.[155] Sjoblom also represented to the SEC that SIBL was "not a criminal enterprise" and that "all assets are there."[156]

The next day, Sjoblom asked the SEC to defer its subpoenas to Stanford and Davis.[157] Once again, Sjoblom lied to the SEC by stating that Pendergest and Rodriguez would be better witnesses than Stanford and Davis, who Sjoblom claimed were executive-level officers who were not involved in the "nuts and bolts" of operations and therefore could not testify about the details of SIBL's assets.[158] Sjoblom told the SEC that Davis only "looks at things from the 60,000 foot level" and that Pendergest and Rodriguez had more details about the SIBL portfolio.[159] Sjoblom succeeded in persuading the SEC that Pendergest and Rodriguez, not

---

[151]Pendergest testified that Sjoblom's representation to the SEC that Davis didn't know the "nuts and bolts" of SIBL's portfolio was an "absolute lie". Pendergest SEC Depo., at 148:22-149:13, App. 175. That is because Davis was "hands down" the one person that knew the entire SIBL portfolio. *Id.*, at 175:25-176:10, App. 180.
[152]Stinson Decl. at ¶35, App. 481; Pendergest SEC Depo., at 143:1-145:8; 289:5-291:25, App. 174, 191.
[153]PX 243, App 2125-26.
[154]PX 14, App. 1646-1706; PX 243, App 2125-26.
[155]PX 14, App. 1646-1706; PX 243, App. 2125-26.
[156]PX 14, App. 1646-1706; PX 243, App. 2125-26.
[157]PX 14, App. 1646-1706; PX 243, App. 2125-26.
[158]PX 243, App. 2125-26.
[159]PX 243, App. 2125-26; Sjoblom Depo. 333:24-335:21, App. 659-61.

Stanford and Davis, would be better witnesses to testify about SIBL's portfolio because Davis did not "micromanage" the portfolio.[160] Sjoblom further stated that "[Rodriguez] will have to be fully and carefully prepared," and that Pendergest would "have to get up to speed on Tier 3 before the SEC investigation."[161] Sjoblom told Pendergest and Rodriguez that they needed to "rise to the occasion" and that "our livelihood depends on it," indicating he knew the SEC was on the verge of uncovering their ongoing fraud.[162]

To prepare for the SEC testimony, Sjoblom, Davis, Pendergest, Rodriguez, Alvarado, Stinson, and Bogar gathered at the Miami office of SGC on February 3-6, 2009.[163] On Wednesday, February 4, 2009, Pendergest disclosed that the value of the assets she managed in Tier 2 of the SIBL portfolio totaled only about $350 million, down from $850 million in June of 2008.[164] Davis then revealed the contents of Tier 3 of SIBL's investment portfolio: (1) real estate valued in excess of $3 billion; (2) $1.8 billion in personal loans to Stanford; and (3) various other private equity investments.[165]

Davis testified that after he revealed the contents of the SIBL portfolio, everyone—*except* Sjoblom and Alvarado—was shocked.[166] Sjoblom "didn't appear to be surprised" and was "very calm" about it.[167] Sjoblom still did not advise the Stanford directors and officers that they needed to report the fraud to the SEC.[168]

---

[160]PX 250, App. 2127-30.
[161]*Id.*; *see also* Pendergest SEC Depo., at 146:5-20; 150:7-151:4; 154:1-159:13; 462:8-477:17, App. 175, 176, 177-78, 513-17. (testifying that Sjoblom told her she needed to learn the details of Tier 3 in order to testify about them to the SEC and that he repeatedly called her while she was in Antigua to verify that she was learning about Tier 3).
[162]PX 256, App. 3396-98.
[163]Stinson Decl., at ¶38, App. 482.
[164]Stinson Decl., App. 469-507.
[165]Stinson Decl., App. 469-507.
[166]Davis Depo, at 179:9-181:9, App. 761.
[167]Alvarado SEC Depo., at 150:11-18, App. 198.
[168]Pendergest Depo. at 212:1-213:10, App. 184.

Following Davis' disclosure, Rodriguez refused to testify before the SEC.[169] Sjoblom lied

to the SEC that Rodriguez would not testify because of concerns about Antiguan privacy laws.[170]

### L.    Sjoblom suborns perjury by Pendergest.

On February 10, 2009, Pendergest testified before the SEC while defended by Sjoblom as

attorney for SGC.[171] She did not tell the SEC about Tier 3. Sjoblom did not advise Pendergest

that he was representing SGC and not her individually, nor did he tell her that she had a right not

to testify under the Fifth Amendment.[172] Pendergest believes Sjoblom sent her to testify to the

SEC as a "sacrificial lamb" so that he could find out what the SEC knew and where the SEC was

headed.[173] Based on her testimony, Pendergest was indicted for obstruction of the SEC

investigation, pled guilty and was sentenced to three years in prison.[174]

### M.    Sjoblom withdraws only after Allen Stanford refuses to pay him a $4 million retainer.

Immediately after Davis's disclosure of Stanford's massive fraud, Sjoblom approached

Davis and Allen Stanford and offered to withdraw from representing SIBL and SGC and to

represent Allen Stanford personally in the forthcoming criminal prosecution, requesting a

$4 million retainer.[175] It was only after Allen Stanford refused Sjoblom's solicitation that

Sjoblom officially withdrew from representing SIBL and SGC.[176] Even then, Sjoblom told

---

[169]Alvarado SEC Depo., at 367:16- 370:11, App. 207-08. Pendergest Depo., at 203:19 – 211:7, App. 182-84.
[170]PX 288, App. 2144-45.
[171]Pendergest SEC Depo., App. 160-194, 508-578.
[172]Pendergest SEC Depo., at 161:25-162:12, App. 178-79.
[173]Pendergest Depo., at 178:3-180:5; 261:17-262:11, App. 181, 190; 414:11-417:15, App. 192A-192B; 586:12-588:5, App. 544.
[174]*See United States v. Pendergest-Holt*, No. 4:09-cr-00342-2 (S.D. Tex. 2012) (ECF 890, 1024).
[175]Davis Depo, at 225:17-226:21, App. 762-63; Alvarado SEC Depo, at 233:12-234:12, App. 203-04; 238:22-244:6, App. 205-06; Sjoblom Depo., at 367:8-15, App. 664 (admitting that he asked for a $4 million retainer from Stanford). Plaintiffs' ethics expert Chuck Herring testified that Sjoblom engaged in a "personal interest" conflict of interest when he attempted to get a $4 million retainer from Allen Stanford as he was preparing Pendergest to give perjured testimony regarding SIBL's portfolio to the SEC in February 2009. Herring Depo., at 158:17-160:5, App. 1222-24.
[176]Davis Depo., at 226:9-21, App. 763.

Stinson he did not want to withdraw, but his partners forced him to do so.[177] On February 12, 2009 Sjoblom and Proskauer sent a letter to the SEC advising that they were withdrawing from further representation of Stanford. Two days later, Sjoblom e-mailed Edmundson disaffirming "all prior oral and written representations."[178]

**PLAINTIFFS' CLAIMS AND THEORY OF RECOVERY**

Plaintiffs assert causes of action against Proskauer for aiding, abetting, or participating in fraud and breaches of fiduciary duty by Stanford's officers and directors and seek to recover as damages the increased liabilities that resulted from the conduct Sjoblom aided and abetted. Assisting and participating has long been recognized as a theory for imposing joint liability in Texas. *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969) (when one knowingly participates in another's breach of fiduciary duty, he is a joint tortfeasor); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It is settled law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such.") Thus, if a third party knowingly participates in another's breach of a fiduciary duty, the third party is jointly liable for the damages proximately caused by the breach. *Hunter Bldgs. & Mfg., L.P. v. MBI Global L.L.C.,* 436 S.W.3d 9, 15 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *CBIF Ltd. P'ship v. TGI Fridays Inc.,* No. 05-15-00157-CV, 2017 Tex. App. LEXIS 3605 *42-45 (Tex. App.—Dallas, April 21, 2017, pet. filed); *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce, N.A. Inc.,* 403 S.W.3d 360, 368 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.). Plaintiffs' claims therefore exist under Texas law.

---

[177]Stinson Decl., at ¶43, App. 484.
[178]Prosk. App. 228, 1078 (Ex. 8, 75).

## ARGUMENT AND AUTHORITIES

### I.      Plaintiffs' claims are not barred by the *in pari delicto* doctrine.

Under Texas law, Plaintiff's claims are not barred by the *in pari* delicto doctrine. *Jones v. Wells Fargo Bank, N.A.,* 666 F.3d 955, 964 (5th Cir. 2012); *Janvey v. Dem. Sen. Camp. Communication. Inc.,* 712 F.3d 185, 197 (5th Cir. 2013). Proskauer argues however that New York law applies to Plaintiffs' claims, but neither the law nor the facts support this argument.[179]

The engagement letter between Stanford and Proskauer—unlike Chadbourne's engagement letter—contains no choice of law term.[180] Nor does it incorporate by reference the choice of law term in the Chadbourne letter.[181] Neither SGC nor SIBL ever signed a choice-of-law agreement. Alvarado, who signed the Proskauer agreement, admits that he never discussed with Proskauer the law governing Proskauer's attorney-client relationship.[182] His unexpressed subjective intent (relied upon by Proskauer) is ineffective to add an absent choice-of-law term to the Proskauer engagement letter. *Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 607 (Tex. App.—El Paso, no pet.) (contract formation "measured objectively according to what the parties said and did. The parties subjective thoughts and beliefs do not control."); *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.) (same); *DeClaire v. G&B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (same).

Absent a valid choice-of-law term, Texas law governs Plaintiffs' claims. Texas follows the "most significant relationship" test contained in the Restatement (Second) of Conflict of Laws. *Janvey v. Brown,* 767 F.3d 430, 434 (5th Cir. 2014). Texas is the state with the most

---

[179]In further support of their response to Proskauer's choice of law argument, Plaintiffs incorporate by reference the arguments and authorities contained in Plaintiffs' Response and Brief in Opposition to Defendant Proskauer Rose LLP's Motion for Choice of Law Determination and Brief in Support [Docket No. 167] and in Plaintiffs' Joint Response to Defendants' Motions to Dismiss and Brief in Support [Docket No. 63].
[180]Prosk. App. 58-62.
[181]Prosk. App. 58-62.
[182]Prosk. App. 28.

significant relationship to this case. Stanford was organized, headquartered, and operated in Texas; Sjoblom assisted Stanford in perpetrating a fraudulent scheme out of Texas; Sjoblom obstructed and interfered with the investigations of Texas-based regulatory agencies by routinely corresponding and interacting with Texas-based agents. As a Texas entity headquartered and operated in Houston, Stanford suffered losses in Texas. *David B. Lilly Co. v. Fisher,* 18 F.3d 1112, 1119 (3d Cir. 1994) (injury caused by New York law firm's malpractice occurred in client/plaintiff's state of incorporation); *St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 233 F. Supp.2d 171, 177 (D. Mass. 2002) (injury from firm's malpractice occurred where client took action on advice, i.e. client's headquarters). Moreover, "by venturing into the legal market in Texas [and] undertaking to represent a [Texas] corporation as [a] client," Proskauer subjected itself to Texas law. *Industrial Idem. Co. v. Chapman and Cutler*, 22 F.3d 1346, 1352 (5th Cir. 1994).   Therefore, as this Court has already ruled in another Stanford case,[183] Texas law applies.

## II.    Plaintiffs' evidence of causation and damages raises genuine issues of material fact.

Proskauer argues that there is no evidence of any damages caused by Proskauer. Motion at 26. But the relevant inquiry is whether the breaches of fiduciary duty and fraud caused damages, not whether the aider and abettor himself caused damages. *See, e.g., Heat Shrink Innovs., LLC v. Medical Extrusion Technologies-Texas, Inc.,* 2014 WL 5307191, at *8 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied) (defendant who knowingly participates in a breach of fiduciary duty is jointly and severally liable for damages *caused by the breach*).

Proskauer's assertion that there is no evidence of damages is also incorrect. As set forth in the Declaration of Karyl Van Tassel, while Sjoblom represented the Stanford entities, the Stanford officers' and directors' fraud and breaches of fiduciary duty caused the Stanford entities

---

[183]*Janvey v. Alguire*, Case No. 3:09-CV-0724-N, Order dated Jan. 22, 2013 (ECF 909).

to incur more than \$1.5 billion in increased CD liabilities.[184] At a minimum, this evidence raises genuine issues of material fact on causation and damages. *Garcia v. Wheelabrator Group, Inc.*, 2011 WL 13232701, at *5 (N.D. Tex. Nov. 3, 2011) (direct and circumstantial evidence of causation creates question of fact for jury); *Elizondo v. Krist*, 415 S.W.3d 259, 272 (Tex. 2013) (evidence from which a reasonable juror could infer plaintiff sustained damages precludes summary judgment).

Even without Van Tassel's report, the evidence raises fact issues on causation and damages. For example, Sjoblom testified that when he eventually instructed his clients SGC and SIBL to stop selling the SIBL CDs, they immediately followed those instructions.[185] Based on this evidence alone, a jury could reasonably conclude that, had Sjoblom given a similar instruction in 2005 when he first learned that Stanford financial advisors selling the SIBL CDs had no idea what SIBL was doing with the CD investors' money, all of the damages Plaintiffs seek would have been avoided.[186]

## A.    Plaintiffs' claims are timely and not barred by limitations.

Proskauer argues that Plaintiffs' claims accrued prior to January 31, 2009 and thus "are barred by the applicable statute of limitations." Motion at 26, 28. Relying on a stipulation by Plaintiffs dismissing causes of action governed by two-year statutes of limitations and withdrawing allegations regarding the *post*-receivership tolling of limitations (the "Stipulation") [Docket No. 172], Proskauer now asserts—for the first time—that Plaintiffs' claims accrued *pre*-receivership and that Plaintiffs have waived their right to rely on pre-receivership tolling. Motion

---

[184]Van Tassel Decl., at 52 (App. at 2260).

[185]Sjoblom Depo., at 366:9-369:5, App. 663-666.

[186]*See Hamburger v. State Farm Mu. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) (quoting *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984)) (Under Texas law, "[l]ay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition. Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation.").

at 26-27. Proskauer's argument is contrary to settled law, the plain terms of the Stipulation, and the parties' intent. Proskauer admits that, if Plaintiffs' claims accrued after January 31, 2009, they are timely. Motion at 26 ("[A]ny timely claims for damages against Proskauer must have accrued <u>after</u> January 31, 2009."). Because the undisputed evidence conclusively establishes that Plaintiffs' claims accrued after that date as a matter of law, Proskauer's argument fails.

1.   *Plaintiffs' claims accrued after January 31, 2009 as a matter of law.*

The parties agree that Plaintiffs' claims are governed by a four-year statute of limitations. Motion at 26 (citing TEX. CIV. PRAC & REM. CODE § 16.004(a)(4)).[187] Under Texas law, a cause of action for fraud does not accrue "until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Computer Assocs. Intern., Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *see also Hooks v. Samson Lonestar, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) ("We have long held that fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered."). Likewise, a claim for breach of fiduciary duty does not accrue until the plaintiff knew, or should have known through reasonable diligence, of facts giving rise to the suit. *Willard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

Proskauer's argument that Plaintiffs' claims accrued prior to January 31, 2009,[188] is

---

[187]There is no independent limitations period for aiding and abetting claims; those claims are governed by the limitations period applicable to the underlying tort. *Thomas v. Barton Lodge II, Ltd*., 174 F.3d 636, 647 (5th Cir. 1999).

[188]Proskauer does not identify the date on which it contends Plaintiffs' causes of action accrued. Under Texas law, limitations is an affirmative defense. *Elmo v. Oak Farms Dairy*, 2008 WL 2200265, at *1 (N.D. Tex. May 14, 2008). Thus, to prevail on summary judgment, Proskauer must conclusively establish the date on which limitations commenced. *Plumber-Williams v. Alta Health & Life Ins. Co*., 2008 WL 11393152, at *4 (S.D. Tex. Jun. 12, 2008) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003)); *see also Janvey v. Alguire*, 2013 WL 2451738, at *11 (N.D. Tex. Jan. 22, 2013) (citing *Janvey v. Dem. Sen. Camp. Comm*., 69 F.3d 848, 854 (5th Cir. 2012)). By failing to establish the date on which Plaintiffs' claims accrued, Proskauer has not met its burden and is not entitled to summary judgment on its limitations defense. *See Tolbert v. RBC Capital Markets Corp*., 2016 WL 3034497, at *13 (S.D. Tex. May 26, 2016) ("Since RBC does not establish a specific date as to

foreclosed by the holding in *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185 (5th Cir. 2013) ("*DSCC*"), in which the Fifth Circuit squarely rejected the argument that the Receiver's claims accrued prior to his appointment. There the court refused to impute the fraudsters' knowledge to the Stanford entities, holding that the entities' claims could not have accrued prior to the date the Receiver was appointed. *Id.* at 192-93. So too here. Because the knowledge of Stanford's pre-receivership officers and directors cannot be imputed to the receivership entities on whose behalf Plaintiffs sue, Plaintiffs' claims could not have accrued, as a matter of law, until some date after February 16, 2009, the date on which the Receiver was appointed. Because Plaintiffs sued within four years of that date, Proskauer is not entitled to summary judgment.

The holding in *DSCC* is consistent with the continuing tort doctrine, under which a claim related to a continuing tort does not accrue until the tortious conduct ceases. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 592 (Tex. 2017). Here, Sjoblom's participation in Stanford's fraud did not cease until he withdrew from representing the Stanford entities and disaffirmed his prior representations to the SEC on February 12 and 14, 2009, respectively. Because Plaintiffs initiated this action within four years of those dates, Plaintiffs' claims are timely.

The cases Proskauer cites regarding the relationship between the discovery rule and the accrual of a claim do not compel a different result; none are fraud or breach of fiduciary duty cases. Motion at 26-27. In *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) and *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990), courts held that the discovery rule does not apply to accrual of causes of action based on injuries resulting in death because the relevant statute of limitations specifically provides that "the cause of action accrues

---

when the six-year limitations period began or expired as to the named Plaintiffs, the Court cannot grant summary judgment on this issue."). Proskauer's failure to establish the date on which limitations began to run is an independent reason to deny the Motion. *Id.*

on the death of the injured person." Accordingly, those cases are not relevant here. And *Perry v. Kaufman County*, 2000 WL 1372832 (N.D. Tex. Sep. 22, 2000), which involved a civil rights action under 42 U.S.C. § 1983, supports Plaintiffs' position. In *Perry*, Judge Lindsay held that the claimant was barred from bringing any action based on facts that occurred prior to four years before suit "and of which Plaintiff was aware or could have become aware had he exercised reasonable diligence." *Id*. at *5. Consistent with the holding in *Perry*, Plaintiffs filed this suit within four years of the earliest possible date—February 16, 2009—on which they could have become aware of Sjoblom's and Stanford's harmful conduct.[189]

### 2. *The stipulation does not affect accrual of Plaintiffs' claims for Counts 2 and 3 and pre-receivership periods.*

Proskauer attempts to evade the effect of *DSCC* by arguing that Plaintiffs categorically waived in a stipulation their right to assert principles of tolling. Motion at 27. Not so. As an initial matter, Plaintiffs need not rely on principles of "tolling" to render their claims timely. Texas courts distinguish between tolling and the delay in accrual of a cause of action. *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (recognizing distinction between deferring accrual of a cause of action and tolling a limitations period). In *DSCC*, the Fifth Circuit noted that, while the defendants' limitations argument was "couched in timeliness terms, it is really the same erroneous imputation-of-knowledge argument" the court ultimately rejected. 712 F.3d at 192. The same is true here; although Proskauer couches its argument in terms of timeliness, its

---

[189]Proskauer also relies upon *First United Pentecostal Church v. Parker*, 514 S.W.3d 214 (Tex. 2017) for the proposition that "wrongful conduct that postdates all of the injury caused by an underlying breach of fiduciary duty cannot support aiding and abetting liability." Motion at 29. Because Plaintiffs do not assert claims based on wrongful conduct that postdates the Stanford entities' injuries, *First United* is inapposite. In *First United*, a lawyer, Lamb, stole funds of his client, the church. Parker, a contract lawyer for Lamb's firm, was not part of a plan or scheme to steal the client's money. When Parker learned the money was gone, he agreed with Lamb to cover up the fact that the money was missing and attempt to replace it. The church sued Parker for aiding and abetting Lamb in stealing the church's money. Because there was no evidence that Parker was aware of Lamb's plan to steal the money until after Lamb had taken it, there was no evidence that the church was harmed by Parker's covering up the fact that Lamb had spent the church's money. It was the theft, not the cover-up, that caused the harm. Here—in contrast—Sjoblom was not hired after the fact. He participated in an ongoing fraudulent scheme from the time he was hired in 2005 until he withdrew in 2009.

argument turns upon the "same erroneous imputation-of-knowledge argument" the Fifth Circuit rejected in *DSCC*. As set forth above, under *DSCC* Plaintiffs' claims did not *accrue* as a matter of law until after February 16, 2009, without regard to principles of tolling.[190] Thus, the stipulation has no effect on the accrual of Plaintiffs' claims.[191]

Further, Proskauer's newly-minted assertion that Plaintiffs waived their right to rely upon *pre*-receivership tolling is contrary to the language and intent of the stipulation, under which Plaintiffs dismissed their claims governed by two-year statutes of limitation and withdrew their allegations regarding the applicability of the discovery rule to *post*-receivership time periods. As reflected in the stipulation, Proskauer contended that Plaintiffs' two-year claims were not timely and, to resolve substantial disputes regarding those claims, and substantial, time-consuming and costly discovery regarding when the Receiver discovered or should have discovered the two-years claims after February 16, 2009, Plaintiffs agreed to dismiss those claims and withdraw their allegations with respect to the discovery rule. Stipulation at 1-4. The parties made clear, however, that the stipulation "does not constitute a dismissal or waiver of any claim or defense not specifically addressed" therein, including Counts 2 and 3 of the Complaint (aiding, abetting, participation in a fraudulent scheme and breaches of fiduciary duties), which are governed by a four-year statute of limitations. *Id.* at ¶ 3. By its express terms, the stipulation reserves all rights with reference to Counts 2 and 3, and does not waive any rights with respect to *pre*-receivership periods. A stipulation "should not be given greater effect than the parties intended." *Humble Surg. Hosp., LLC v. Davis*, 2017 WL 4679280, at *4 (Tex. App.—Houston [14th Dist.] Oct. 17,

---

[190]Indeed, the word "tolling" does not appear in the body of the opinion in *DSCC*. This is likely because the Fifth Circuit impliedly relied upon principles of fraudulent concealment, rather than tolling, to reach its decision. *See S.V.*, 933 S.W.2d at 5-6 ("Fraud, we have said, in and of itself prevents running of the statute of limitations, as does fraudulent concealment.") (internal citations omitted).

[191]The parties could not by stipulation alter the effect of *DSCC*. *See Crabb v. C.I.R.*, 121 F.2d 1015, 1016 (5th Cir. 1941) (parties cannot change law by stipulation).

2017, pet. filed).

The context in which the stipulation was entered further demonstrates that it was not the parties' intent to preclude Plaintiffs from asserting tolling with respect to *pre*-receivership periods. Before the stipulation, Proskauer *never* contended that Plaintiffs' claims accrued prior to the date the Receiver was appointed. To the contrary, Proskauer consistently argued that Plaintiffs' claims accrued *after* the Receiver was appointed (February 16, 2009) but *before* January 31, 2011 (i.e., two years prior to the filing of this case).[192] Moreover, the stipulation was entered after the decision in *DSCC*, which held that Plaintiffs' claims accrued no earlier than February 16, 2009 as a matter of law. So, Plaintiffs no longer needed the discovery rule to render their claims timely.[193]

### 3. *Plaintiffs are not required to plead the discovery rule.*

A party is not required to plead the discovery rule to assert it in response to a limitations defense. *Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc*., 1 F.3d 374, 376 (5th Cir. 1993). ("[T]he law is clear that, while the discovery rule must be specifically pleaded in Texas State Court to avoid the statute of limitations, it need not be specifically pleaded in federal court."); *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1425 (5th Cir. 1992). Accordingly, Plaintiffs' withdrawal of allegations regarding the discovery rule does not foreclose Plaintiffs from asserting that Plaintiffs' aiding and abetting claims did not accrue until the Receiver was

---

[192] *See, e.g.,* Defendant Proskauer Rose LLP's Motion to Dismiss and Brief in Support of its Motion to Dismiss Plaintiff's Original Complaint [Docket No. 58] at 14-18 (arguing that Plaintiffs' claims are governed by a two-year statute of limitations and reciting facts that purportedly demonstrated that Plaintiffs' claims accrued shortly after Receiver was appointed). Had Proskauer contended Plaintiffs' causes of action accrued prior to the Receiver's appointment, it certainly would have sought dismissal of the Complaint on those grounds.

[193] To the extent the stipulation can be construed to waive Plaintiffs' ability to rely upon pre-receivership tolling, Plaintiffs request that the Court relieve them of the stipulation to prevent the manifest injustice. *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336-37 (5th Cir. 2017); *Rathborne Land Co. v. Ascent Energy Inc.,* 610 F.3d 249, 262-63 (5th Cir. 2020); (court "has not only the right but the duty to relieve a party from a pretrial stipulation where necessary to avoid manifest injustice . . . ."); *Mitchell v. C & P Shoe Corp.*, 286 F.2d 109, 114 (5th Cir. 1960) (same).

appointed.

**B.     Plaintiffs are not suing for deepening insolvency.**

Proskauer conflates the distinct concepts of "deepening insolvency" and "increased liabilities." "Deepening insolvency" measures an entity's solvency at two points in time; in contrast, "increased liabilities" are a traditional measure of damages resulting from an independent cause of action. *See In re Brooke Corp.*, 467 B.R. 492, 511 (Bankr. D. Kan. 2012) (discussing distinction between deepening insolvency and increased liabilities); *In re Le-Nature's Inc.*, 2009 WL 3571331, at *9 n.13 (W.D. Pa. Sep. 16, 2009) (characterizing "increased liabilities" as "traditional" damages rather than damages based on a deepening insolvency theory).[194] "Traditional damages, [such as increased liabilities] stemming from actual harm of a defendant's negligence, do not become invalid merely because they have the effect of increasing a corporation's insolvency." *Thabault v. Chait*, 541 F.3d 512, 523 (3d Cir. 2008). Here, Plaintiffs' expert, Karyl Van Tassel, calculated increased liabilities, not deepening insolvency.[195]

Thus, while the Fifth Circuit Court of Appeals has rejected "deepening insolvency" as a measure of damages, it has recognized "increased liabilities" as a valid measure of damages. *Janvey v. Alguire*, 847 F.3d 231, 243 (5th Cir. 2017) ("Expanding the number of defrauded investors in the Bank . . . expanded the Bank's ultimate liabilities and increased the injury to the Bank . . . ."). This Court has repeatedly held that Stanford's increased liabilities to defrauded

---

[194]For an explanation of the distinction between "deepening insolvency" and "increased liabilities," *see Brooke Corp.*, 467 B.R. at 511-12. In short, "deepening insolvency" as a measure of damages entails a comparison of balance sheets before and after the alleged wrongful act, whereas "increased liabilities" as a measure of damages "require[s] proof of specific itemized damages, such as increased liabilities and lost profits, proximately caused by a breach of a legally recognized duty." *Id.* at 511. As the *Brooke Corp.* court explained, "[t]he fact that damages may be labeled deepening insolvency damages does not change the fact that they can be classic damages too; despite the similarity, the difference is in the proof: not just a comparison of balance sheets, but proof of specific, actual, itemized damages proximately caused by the wrongdoing." *Id.*; *see also In re CitX Corp., Inc.*, 448 F.3d 672, 678 (3d Cir. 2006) (noting that the calculation of damages in the form of increased liabilities is made "without reference to the incidental impact upon the solvency calculation.").

[195]Karyl Van Tassel Depo. at 132:25-133:25, App. 3467-68 ("I haven't looked at it on an insolvency basis from a damages perspective….I've just separated [the increased liabilities] out as a damage component.").

investors is a valid theory of damages to the receivership entities.[196] So too have other courts.[197]

Accordingly, the amount of the Stanford entities' "increased liabilities" proximately caused by the fraud and breaches of fiduciary duty by Stanford's directors and officers is a viable measure of damages. This is true regardless of whether the Stanford entities were insolvent at the time they incurred the increased liabilities. *See Kirschner,* 46 F.3d at 753 (trustee's claim for increased liabilities was not prohibited claim for deepening insolvency); *Thabault*, 541 F.3d at 523-25 (permitting recovery for increased liabilities where corporation was insolvent at time liabilities were incurred); *Brooke Corp*., 467 B.R. at 511 (same); *see also Alguire*, 847 F.3d at 243 (noting that expanding the number of defrauded investors in an insolvent Ponzi scheme results in harm to the entities incurring the liabilities); *accord Hamric*, 2015 WL 11120301, at *4, *Willis Order* at 8-9, and *Greenberg Order* at 9 (all holding that insolvent Ponzi scheme's increased liabilities to investors is harm to receivership entities). Accordingly, the Stanford entities' "increased liabilities" is a valid measure of damages regardless of whether the entities

---

[196]*See Janvey v. Hamric*, 2015 WL 11120301, at *5 (N.D. Tex. Nov. 5, 2015) ("Winter's breach of his fiduciary duty injured SIBL by causing SIBL to incur increased liabilities."); *see also* Order [Docket No. 69] at 3, *Janvey v. Bogar*, Case No. 3:14-CV-03635-N (N.D. Tex. Feb. 24, 2016); Order [Docket No. 25] at 4-5, *Janvey v. Amadio*, Case No. 3:14-CV-03560-N (N.D. Tex. Jul. 20, 2015); Order [Docket No. 154] at 8, *Janvey v. Hamm*, Case No. 3:14-CV-03213-N (N.D. Tex. Jun. 17, 2015); Order [Docket No. 18] at 7, *Janvey v. Maldonado*, Case No. 3:14-CV-02826-N (N.D. Tex. Feb. 19, 2015); Order [Docket No. 114] at 9 – 10, *Off'l Stanford Inv. Comm. v. Greenberg Traurig, LLP*, Case No. 3:12-CV-4641-N (N.D. Tex. Dec. 17, 2014) (the "Greenberg Order"); Order [Docket No. 64] at 8 – 9, *Janvey v. Willis of Colorado, Inc*., Case No. 3:13-CV-3980-N (N.D. Tex. Dec. 5, 2014) (the "Willis Order").

[197]*See Thabault*, 541 F.3d at 523-25 ("When a plaintiff brings an action for professional negligence and proves that the defendant's negligent conduct was the proximate cause of a corporation's increased liabilities . . . , the plaintiff may recover damages in accordance with state law."); *CitX*, 448 F.3d at 678 ("[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities . . . , then the firm may recover, without reference to the incidental impact upon the solvency calculation."); *Le-Nature's*, 2009 WL 3571331, at *8 (recognizing increased liabilities as a valid measure of damages distinct from deepening insolvency); *Off'l Comm. of Unsec. Cred. Of Allegheny Health, Ed., and Research Found. v. Pricewaterhouse Coopers LLP*, 2007 WL 141059, at * (W.D. Pa. Jan. 17, 2007), *vacated and remanded on different grounds*, 607 F.3d 346 (3d Cir. 2010) ("[T]he Committee alleges independent causes of action in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give [the debtor] a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits.") (quotations omitted); *Brooke Corp*., 467 B.R. at 511-12 (recognizing increased liabilities as a damage model where there is "proof of specific itemized damages, such as increased liabilities, . . . proximately caused by a breach of a legally recognized duty."); *Kirschner v. K & L Gates LLP*, 46 A.3d 737, 753 (Pa. Super. 2012) (characterizing "increased liabilities" as "traditional tort damages" and holding that a claim for increased liabilities of an insolvent corporation is distinct from a claim for deepening insolvency).

were insolvent at the time they incurred the liabilities.

For this additional reason, Proskauer's motion should be denied.

III.   **There is evidence that Sjoblom knew of and knowingly participated in the Stanford directors' and officers' breaches of fiduciary duty and fraud.**

There is evidence from which a rational juror could find that Sjoblom (1) knew of his clients' wrongdoing and (2) participated in it. Although Sjoblom professes innocence and attempts to present himself as an unsuspecting dupe of his crooked clients, a rational juror could disbelieve his account. While he may not have known that Allen Stanford and Davis falsified SIBL's financials, he knew that his clients were engaged in a fraudulent scheme and that the directors and officers were breaching their fiduciary duties. That is all that Plaintiffs are required to show. But there is more—the evidence shows that, in addition to knowing that his clients were violating the Investment Company Act, suitability rules and selling securities through material misrepresentations and omissions in violation of Rule 10b-5, he was also well aware that Stanford had all the hallmarks of a classic Ponzi scheme.

A.   **There is evidence that Sjoblom had actual knowledge of Stanford's fraudulent scheme and breaches of fiduciary duty.**

Sjoblom knew that the Stanford directors and officers were breaching their fiduciary duties by causing SGC and SIBL to sell the CDs through fraud and in violation of securities laws and were obstructing the SEC investigation. *FDIC v. First Interstate Bank of Des Moines*, *NA*, 885 F. 2d 423 (8th Cir. 1989) (knowledge element for aiding and abetting satisfied when the aider/abettor knows that the conduct of its principal is unlawful and that its own role is part of an overall improper activity). Specifically, between 2005 and January 2007 Sjoblom knew that:

- The SEC alleged that SGC and SIBL were running a Ponzi scheme, and that SGC was violating securities laws by selling the CDs without disclosing that it lacked transparency into SIBL's portfolio and in violation of the suitability

requirements;[198]

- The Stanford directors and officers withheld information from SGC financial advisors and compliance personnel about the assets in SIBL's portfolio;[199]

- Former Stanford financial advisors had accused Stanford of engaging in illegal or fraudulent conduct and of using investor funds to underwrite Antiguan real estate investments;[200]

- The Stanford directors and officers represented to the SEC that SGC was "not privy" to the SIBL portfolio;[201]

- SGC had SIBL's investment account statements in Memphis, was actively managing SIBL's private equity portfolio and knew its contents;[202]

- The SIBL brochure and disclosure statement did not disclose the lack of transparency in SIBL's portfolio and the disclosure statement falsely invited investors to request more financial data from SIBL;[203]

- Stanford was not disclosing to investors that it was relying on Antiguan privacy laws to prohibit access to SIBL's portfolio by investors, SGC financial advisors, compliance personnel and the SEC;[204]

- Sjoblom did not read or research the Antiguan privacy law himself or see an opinion of Antiguan counsel;[205]

- The FSRC would not cooperate with the SEC and would provide SIBL information to the SEC only after its own finding of fraud or crime;

- FSRC's King was tipping off Allen Stanford about information he received from the SEC about its investigation;[206]

- SIBL represented that it invested in only safe, low risk and liquid investments;[207]

- Contrary to what was represented, SIBL invested in Antiguan real estate;[208]

- Contrary to what was represented, SIBL invested in private equity;[209]

---

[198]Sjoblom Depo. 40:1-6; 75:4-7; App. 583B, 599; PX 28, App. 1739-41.

[199]Stinson Decl. ¶18; App. 475-76; Sjoblom Depo. 53:8-16:58:25-59:12; App. 587, 591-92; PX 34; App. 1742-97.

[200]PX 95, App. 2023-26.

[201]PX 57, App. 1909-21.

[202]PX 47, App. 1875-1889; Davis Depo. at 69:15-25, App. 754; Sjoblom Depo. at 94:23-95:25, App. 611-12.

[203]PX 71, App. 1935-2017.

[204]PX 71, App. 1935-2017.

[205]Sjoblom Depo. at 132:18-133:17, App. 620-21. Proskauer argues that Sjoblom was entitled to rely on what his (non-lawyer) client told him about Antiguan law. But one does not have to be the inventor of a lie to be responsible for repeating the lie to others. *SEC v. Lyttle*, 538 F. 3d 601 604 (7th Cir. 2008) ("defendants could not have thought that the fact that Eldridge told them something implausible...made it true").

[206]Sjoblom Depo. 85:25-87:21, App. 603-05; PX 39, App. 1798-1813. Plaintiff's ethics expert, Chuck Herring, testified that it was a major red flag when Sjoblom discovered that the FSRC was tipping off Stanford about communications the FSRC received from the SEC concerning its investigation of Stanford. Herring Depo., at 178:15-21; 180:3-181:24, App. 1224C, 1224D-E.

[207]PX 324, App. 2186-2202.

[208]Proskauer's Responses to Plaintiffs' First Request for Admissions No. 176, App. 107.

- The SEC alleged that SIBL was operating as an investment company in violation of the Investment Company Act;[210]

- Because SIBL was not a commercial bank, it was required to register as an investment company;[211]

- Davis—and not Pendergest—was more knowledgeable to testify about SIBL's portfolio.[212]

This evidence is sufficient to allow a jury to infer that Sjoblom knew that the Stanford directors and officers were breaching their fiduciary duties and engaging in a fraudulent scheme to violate securities laws. [213] Sjoblom did not need to "ferret out" the fraud; the securities law violations were "right in front of him".[214]

Almost as soon as he was engaged, Sjoblom was told that the SEC believed that Stanford was running a Ponzi scheme.[215] Instead of asking his client or investigating whether that were true, Sjoblom carefully avoided finding out what the SEC wanted to know: what was SIBL doing with the investors' money?

The elements of a Ponzi scheme, as listed on the SEC's website, include:

- Investment returns that were abnormally high, unusually consistent and too good to be true;
- Excessive incentives paid to those selling the investments;
- Use of misleading and false information; and

---

[209]Young Depo. 26:10-21, App. 778. Proskauer's own "fraud" expert testified that SIBL's investment in private equity and real estate was contrary to what was represented in Stanford's marketing materials (that SIBL was invested in safe, secure and liquid investments). Richmond Depo., at 97:20-101:4, App. 771A-771B. Richmond also admitted that Sjoblom knew that SIBL held private equity and real estate in its portfolio. *Id.*,

[210]PX 58, 1922-1930.

[211]PX 34, App. 1742-97; Sjoblom Depo. 53:23-23; 55:22-56:1; 56:17-57:9; 58:19-23.

[212]Pendergest SEC Depo. at 148:22-149:13, App. 175.

[213]Proskauer's own liability expert in this case, former SEC lawyer Anne Flannery, has *admitted* that Sjoblom knew about the omissions in the SIBL marketing materials regarding lack of transparency into SIBL's portfolio based on Antiguan privacy laws. Flannery Depo., at 108:18-109:10; 139:17-20; 227:14-18, App. 743A-743B, 743E, 744A (admitting Sjoblom was aware that Stanford was not disclosing to investors the lack of transparency into SIBL's portfolio). Flannery also *admitted* that Sjoblom knew that Stanford was not disclosing to the investors that SIBL would not allow the SEC, or even the Stanford financial advisors and compliance personnel to have access to the SIBL portfolio. Flannery Depo. at 110:22-111:22; 122:15-20, App. 743B, 743D. ("I know that [Sjoblom] knew they were not disclosing"). Ms. Flannery also admitted that she had seen no evidence in the record that Sjoblom ever advised Stanford to amend the disclosure statement to make clear that SIBL would not allow anyone to obtain detailed information about SIBL's portfolio. Flannery Depo., at 113:19-114:23, App 743C.

[214]Spindler Depo., at 104:6-19; 190:2-191:21. App. 822; 844.

[215]Sjoblom Depo., 40:1-6; 75:4-7, PX 28, App. 1739-41.

- Lack of transparency.[216]

In the first months of his engagement, Sjoblom learned that Stanford had all these badges of fraud, namely:

- The SIBL CDS sold to investors offered consistent above-market rates that were "too good to be true";[217]

- SGC was paying excessively high commissions to the financial advisors to market the CDs, conducted sales contests, with prizes including cars and trips to Antigua;

- SIBL marketing materials used misleading and false information;

- SIBL prohibited transparency into its portfolio, to anyone including to SGC's financial advisors, compliance personnel and even the President of SGC.

In short, Sjoblom was in possession of facts that demonstrated that Stanford had all the hallmarks of a Ponzi scheme—consistent above-market returns, extraordinary sales commissions, and lack of transparency to the investment portfolio.[218] As a lawyer with 20 years' experience with the SEC enforcement division, it is incredible to believe he did not know a Ponzi scheme when he saw one, especially after the SEC told him why they believed Stanford was one.[219]

The evidence shows that Sjoblom was deliberately ignorant and willfully blind about the contents of SIBL's investment portfolio. His "charade of ignorance" is "circumstantial proof of guilty knowledge." *United States v. Brown*, 871 F.3d 352, 355 (5th Cir. 2017). The evidence shows that he "was subjectively aware of high probability of the existence of illegal conduct and purposely contrived to avoid learning of the illegal conduct." *United States v. Miller*, 588 F.3d 897, 906 (5th Cir. 2009). It is simply unbelievable to think that a sophisticated SEC lawyer, such as Sjoblom, did not know that it was highly likely that something illegal was afoot at Stanford.

---

[216]Chance Decl. re SEC website, App. 2203-07.
[217]PX 71, App. 1935-2017.
[218]Henderson Supp. Decl., at 3, App. 1539.
[219]See Henderson Decl., at 21, App. 1255 (opining that "indicia of the Ponzi scheme were evident, particularly to experienced securities professionals").

This is especially true in light of the falsehoods Sjoblom told when he vouched for Stanford to the SEC, including that he had investigated Stanford and there was "no fraud there." *United States v. Pirate Inv. LLC*, 580 F. 3d 233, 243 (4th Cir. 2009) (making statements when in possession of facts suggesting the statements are false is "classic evidence of scienter").

The evidence shows that Sjoblom purposely avoided learning the details of SIBL's portfolio. He never asked Alvarado or Young why Stanford could not show the SEC the portfolio;[220] he never asked Davis or Bates or Young about the SEC's allegation that Stanford was a Ponzi scheme;[221] and he did not probe or dig deep on the details of SIBL's portfolio with Davis or Pendergest despite knowing that was the critical information the SEC would require to satisfy itself that Stanford was not a Ponzi scheme.[222] Based on Sjoblom's 20 years' experience as an SEC enforcement lawyer, and given all the red flags that he discovered in 2005, Sjoblom must have known Stanford was a fraud.[223] Because ethical rules prohibit lawyers from assisting clients in committing fraud, once Sjoblom learned that the SEC suspected Stanford was an ongoing fraud and Ponzi scheme, Sjoblom had to either (1) satisfy himself that Stanford was not engaging in fraud or running a Ponzi scheme; or (2) decline the representation.[224] *See Wallace v. United States*, 281 F. 2d 656, 659-60 (4th Cir. 1960) (inferring attorney's knowledge of tax fraud where an attorney could not possibly have performed his job without having investigated his client's books).

---

[220]Sjoblom Depo., at 165:23-169:1, App. 633-34; Young Depo., at 40:14-41:7, App. 779A-779B.

[221]Davis Depo., at 36:12-13, App. 751; Bates Depo., at 70:2-25, 108:17-110:13, App. 698, 704-05; Young Depo. at 29:7-24, App. 779.

[222]Davis Depo., at 36:25-37:10; 44:2-45:12; 62:3-22; 95:24-97:18, App. 751, 753, 756; Pendergest Depo., at 59:4-62:10.

[223]Herring Depo., at 76:18-25; 79:16-23, App. 1221J, 1221L.

[224]Herring Depo., at 67:23-77:20; 145:9-146:10, App. 1221A-K, 1221S-T. *Id.*, at 72:2-8; 86:2-87:10; 99:14-100:14, App. 1221F, 1221M-N, 1221O-P. (Sjoblom had ethical duty to investigate Stanford to make sure it was not an ongoing crime or fraud); 124:24-125:9; 173:8-174:21 ("a lawyer cannot escape responsibility by avoiding inquiry"); 190:12-191:4; 231:9-14; App. 1221Q-R, 1224A-B, 1224F-G, 1227A. ("If you're not doing anything wrong, why not just give the documents? Why not answer the questions? And if you're a lawyer for somebody that's not doing that, you ought to have all your antennas go up.").

Although most frequently arising in criminal cases, willful blindness also applies in civil proceedings. *Global-Tech Appliances Inc. v. SEB S.A.*, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011). Moreover, the same evidence of Sjoblom's subjective awareness of a high risk of illegal conduct supports a reasonable inference that he actually knew of that conduct. *United States v. Gibson*, No. 154-20323, 2017 U.S. App. LEXIS 22261 *30 (5th Cir. 2017) ("The same evidence of [defendant's] subjective awareness of a high risk of illegal conduct supports a reasonable inference that [defendant] actually knew of that conduct."); *United States v. Wofford*, 560 F.3d 341, 354 (5th Cir. 2009) ("The evidence supporting the inference that Wofford was subjectively aware that his conduct was unauthorized and illegal also supports the inference that he had actual knowledge."); *United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990) ("[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct.") At a minimum, this evidence raises a fact issue defeating summary judgment.

**B.     There is evidence that Sjoblom's participation in the fraud and breach of fiduciary duties was knowing.**

Sjoblom demonstrated his intent to help the Stanford directors and officers obstruct the SEC's access to the SIBL portfolio (1) in 2005 when he told his associate of his intent to "prevent the SEC from getting the bank records" by selectively not acknowledging that he represented SIBL (after being retained to do so);[225] (2) in 2006 when he lied to the SEC and gave the SEC the "run around" about who could provide the SEC with access to the SIBL portfolio;[226] (3) in 2007 when he instructed SGC personnel to withhold the SIBL/SGC Agreement from

---

[225]PX 44, App. 1871-1874.
[226]Brandt Depo. 121:13-123:14, App. 685-86.

production;[227] (4) in 2009 when he told the SEC that Pendergest was a better witness than Davis to testify about SIBL's portfolio,[228] (5) when he repeatedly lied to the SEC about Antiguan privacy laws,[229] (6) when he downplayed the significance and extent of the SEC investigation to Stanford's auditors;[230] and (7) when he made no attempt to counsel remediation of Stanford's multiple violations of securities laws.

Proskauer's securities law expert admitted that Sjoblom could have advised SGC to stop the sale of the CDs until the SEC's concerns were cleared up, but he did not.[231] Plaintiffs' expert confirmed that in 2005 and 2006 Sjoblom had in his possession information that the sales of the SIBL CDs were illegal, and it should have taken him no more than 15 minutes to advise the Stanford directors and officers to stop selling the CDs, but he did not.[232]

## IV.    Sjoblom substantially assisted in fraud and breaches of fiduciary duty.

Proskauer argues that Sjoblom's conduct in representing his client cannot constitute substantial assistance because his actions were just "routine kinds of acts lawyers take on behalf of their clients every day" (Motion at 40) and were undertaken "in good faith and for honest purpose." (*Id.* at 41), citing New York law. But Texas courts have consistently held lawyers liable for participating in criminal conduct of their clients. *Gaia Envtl., Inc. v. Galbraith*, 451 S.W.3d 398, 404 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[C]riminal conduct can negate attorney immunity."); *Rawhide Mesa-Partners, Ltd. V. Brown McCarroll, L.L.P.*, 344 S.W.3d 56, 60 (Tex. App.—Eastland 2011, no pet.) (Texas courts have consistently held lawyers liable for criminal activity); *IBP, Inc. v. Klumpe,* 101 S.W.3d 461, 475-76 (Tex. App.—Amarillo

[227]Stinson Decl. at ¶30, App. 479; Young Depo. 62:17-66:25; 69:25-71:1, App. 781-82, 782A; Sjoblom Depo. 240:3-9, App. 648; PX 122, App. 3375-3395.
[228]PX 243, App. 2125-26; Sjoblom Depo. 333:24-335:21, App. 659-61.
[229]PX 57, App. 1909-1921; PX 275, App. 2140-43; PX 299, App. 2146-48.
[230]Ancira Depo. 25:11-26:7; 37:6-38:3; 41:13-23; 85:16-87:3; 101:6-104:18; 115:1-116:9, App. 730-39; PX 127, App. 2071-2083; PX 133, App. 2084-89; PX 164, App. 2090-93.
[231]Flannery Depo., at 151:7-20, App. 743F.
[232]Spindler Depo., at 137:23-138:23, App. 830.

2001, pet. denied) (denying immunity to lawyer complicit in client's theft of trade secrets). Sjoblom substantially assisted Allen Stanford and others in obstructing justice, destroying evidence, committing securities fraud, committing wire fraud and mail fraud, as well as aiding and abetting violations of the Investment Company Act and the securities laws. These were not the actions of a lawyer performing routine legal services "in good faith and for honest purpose."

Plaintiffs' ethics expert testified that the entire purpose of Sjoblom's representation was to delay and obstruct the SEC investigation.[233] He testified that Sjoblom violated multiple ethics rules and that his conduct overall was "unethical, horrible, unprofessional."[234] His lies to the SEC violated the ethical rules that prohibit lying to regulators.[235] The expert found it unethical that Sjoblom did not read the law himself but instead relied on a non-lawyer to interpret Antiguan privacy law, when that law was the basis for denying the SEC access to SIBL's portfolio.[236]

Sjoblom also took frivolous legal positions designed to impede the SEC's investigation.[237] For example, Sjoblom argued to the SEC that the SIBL CDs were not securities because SIBL was a bank, when Sjoblom knew that SIBL was not a commercial bank.[238]

Sjoblom had a duty to ensure Stanford's compliance with securities laws. He should have counseled remediation of any securities laws violations and cooperation with the SEC.[239] For example, Sjoblom should have counseled that Stanford make additional disclosures that SIBL was relying on Antiguan law to prevent transparency into its portfolio, and that SIBL held

---

[233]Herring Depo., at 262:4-22, App. 1229A.
[234]Herring Depo., at 144:22-145:3., App. 1221R-1-2.
[235]Herring Depo., at 105:8-17; 221:15-222:7, App. 1221P-1, 1224H-I.
[236]Herring Depo., at 225:9-226:2, App. 1224J-K.
[237]Spindler Depo., at 177:25-179:13, App. 840-41.
[238]Spindler Depo., at 152:5-19, App. 834.
[239]Spindler Decl., at 20, 22, 60, App. 1493, 1495, 1533.

private equity and real estate investments in its portfolio.[240] Sjoblom should have advised SGC to stop selling the SIBL CDs until they had satisfied themselves – and the SEC – that such sales did not violate the Investment Company Act.[241] Had Sjoblom provided such counsel, "damages from the Stanford Ponzi scheme would have been lessened."[242] If Sjoblom had told him that the Stanford entities had problems or were violating the law, Alvarado would have "suggested self-reporting to the authorities" and ordered that the CDs sales stop.[243]

Instead of advising SGC to comply with the law, make full disclosures or cease the sales of the CDs, Sjoblom engaged in a legal strategy to delay and impede the SEC investigation, which "delayed the revelation of the Ponzi scheme, and enabled additional fraudulent SIBL CD sales."[244] Sjoblom had the information "right in front of him" that SIBL was violating securities laws and "dramatically increasing the liabilities" so injury to the entities was entirely foreseeable to Sjoblom.[245] Perhaps the best evidence of what "could have" happened had Sjoblom complied with his ethical obligations and not chosen to assist the Stanford directors and officers in continuing to carry out their fraudulent scheme (in violation of their fiduciary duties) is what actually did happen in February 2009. Sjoblom testified that he personally "shut down" the sale of the SIBL CDs after the Davis disclosure in February 2009.[246] He then withdrew. Days later the SEC filed its enforcement action against Stanford and appointed the Receiver.

But instead of insisting back in 2005 or 2006 or 2007 that the Stanford directors and officers comply with the law or shut down the sales of CDs, Sjoblom agreed to assist them to continue the sales and obstruct the SEC investigation. In doing so, Sjoblom delayed the SEC

---

[240]Spindler Decl., at 59, App. 1532.
[241]Spindler Depo., at 192:20-194:5, App. 844-45; Spindler Decl. at 57, 60 App. 1530, 1533.
[242]Spindler Supp. Decl., at 4, 14 App. 1551, 1561.
[243]Alvarado Depo., at 205:20-206:13, App. 220A-220B.
[244]Spindler Decl., at 39, 41, App. 1512, 1514.
[245]Spindler Depo., at 194:1-5, App.845.
[246]Sjoblom Depo., at 366:9-15; 368:18-369:5, App. 663, 665-66.

investigation and made it more difficult for the SEC to carry out its investigation.[247] Because the SEC would not bring a case against Stanford without evidence sufficient to obtain and sustain a judgment in favor of the government, Sjoblom undoubtedly knew that it was imperative to keep the SEC from getting SIBL records.[248] The fact that the SEC did not act sooner, even though it believed all along that Stanford was operating a Ponzi scheme, does not show that Sjoblom's conduct was without effect. To the contrary, it demonstrates that he was successful in forestalling SEC enforcement by making it difficult, costly and time-consuming. The SEC could not prosecute without evidence and it could not get evidence from Stanford or from FSRC. If Thomas Sjoblom had acted as an ethical and honest lawyer, his client would not have gotten away with fraud for as long as it did. It is no justification for his defalcation to blame the SEC. The criminal should not go free because the constable did not act sooner.

Finally, there is evidence that Sjoblom was incentivized to remain ignorant of his client's illegal conduct. As Sjoblom should have been—and probably was—aware, Stanford had obvious motives to keep its lawyer in the dark and use him to paint a gloss of respectability on its dubious transactions. For his part, Sjoblom was incentivized to please his clients to retain their business—including a future criminal defense case justifying a $4 million retainer—and thus was happy to labor under conditions of imperfect information. Indeed, on the eve of the SEC's discovery of the fraud, Sjoblom offered to abandon his clients, SGC and SIBL, to represent Allen Stanford in the coming criminal proceeding in exchange for a $4 million retainer. And he is now incentivized to claim he had no idea what was going on because, if he did, he is exposed to losing his law license and facing civil and criminal liability.

Because there is evidence from which a jury could find that Sjoblom substantially

---

[247]Brandt Depo., at 190:16-191:6, App. 689.
[248]Brandt Depo., at 70:12-71:9, App. 676.

assisted in Stanford's fraudulent scheme and breaches of fiduciary duty, Proskauer's motion for summary judgment must be denied.

## V.      Chapter 33 does not bar Plaintiffs' claims.

### A.      Chapter 33 does not apply to aiding and abetting claims.

Texas law recognizes a number of circumstances in which one person is held legally responsible for harm caused, at least in part, by the conduct of another. This responsibility may be the result of shared culpable conduct such as intentionally participating in a fraudulent scheme or breach of fiduciary duty. Such aiding and abetting liability is joint and several. *Floyd v. Hefner*, 556 F.Supp.2d 617, 654 (S.D. Tex. 2008) (parties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable); *Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007) (same); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("…where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."); *CBIF, Ltd. P'ship v. TGI Fridays Inc.*, No. 05-15-00157-CV, 2017 Tex. App. LEXIS 3605 *42-45 (Tex. App.—Dallas April. 21, 2017, pet. filed)("when a defendant knowingly participates in the breach of a fiduciary duty, he becomes a joint tortfeasor and is liable as such."); *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 647 (5th Cir 1999)("each party to a fraudulent transaction is responsible for the acts of the others done in furtherance of the scheme.").

In these circumstances, Chapter 33 does not apply. The reason is clear: a defendant who intentionally aids fraudulent conduct by another should not be able to escape liability simply by blaming the fraudster. The responsibility of a person whose liability is derived from the wrongful conduct of another should not be apportioned with that of the person who directly caused the injury because to do so will eliminate any incentive to refrain from assisting bad behavior. This

concern is especially great when the injury-causing event is a crime given the likelihood that a jury, when asked to apportion responsibility between a person who commits a crime and a person whose conduct simply facilitates the crime, might be expected to apportion most of the responsibility to the person who actually committed the crime.

For this reason, Chapter 33 does not apply to aiding and abetting claims—like knowingly participating in breaches of fiduciary duty or fraud—that provide for joint and several liability. *Battaglia v. Alexander,* 93 S.W.3d 132, 144 (Tex. App.—Houston [14th Dist.] 2002), *rev'd on other grounds*, 177 S.W.3d 893 (Tex. 2005) ("Common-law joint-and-several liability rules for partnership, agency, joint venture, and piercing the corporate veil situations survived the enactment of § 33.013 of the Texas Civil Practice and Remedies Code."); *Heat Shrink Innovations, LLC v. Medical Extrusion Techs.-Tex., Inc.,* No. 02-12-00512-CV, 2014 Tex. App. LEXIS 11494, at 18-20 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied) (when "[the aider's] liability for knowingly participating was wholly dependent upon and wholly derived from [the underlying tortfeasor's] breach of his fiduciary duty, it was unnecessary to submit a question to the jury to apportion liability; [the aider's] liability was [the underlying tortfeasor's] liability"); *Fid. & Guar. Ins. Underwriters Inc. v. Wells Fargo Bank*, 2006 U.S. Dist. LEXIS 23545 (S.D. Tex. 2006) (concluding that Chapter 33 did not apply to claims that a bank knowingly and willfully aided and abetted misconduct by another party); *Newby v. Enron Corp.*, 623 F.Supp.2d 798, 833 (S.D. Tex. 2009) ("[J]oint and several liability for common-law civil conspiracy to defraud was not abolished by Chapter 33."); *LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *28-30 (App.—Dallas Oct. 29, 2015) (concluding that Chapter 33 does not apply to conspiracy claims); *Barnett v. Homes of Texas & Warranty Underwriters Ins. Co.*, 2011 WL 665309 at *7 n. 11 (Tex. App.—Houston [14th Dist.]

2011, no pet.) (noting that Chapter 33 is "generally not applicable to cases…wherein two defendants were held jointly and severally liable for the same damages"); *Onyung v. Onyung*, 2013 WL 3875548 at *11 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (same).

Because Chapter 33 does not apply when liability is joint and several, Proskauer's motion for summary judgment on this issue must be denied.

**B.   Applying Chapter 33 to use the conduct of Stanford entities to bar the Receiver's claims inappropriately backdoors the inapplicable *in pari delicto* defense.**

Proskauer argues that "because the Receiver stands in the shoes of the alleged wrongdoer—Stanford Financial—and plaintiff is purporting to assert the wrongdoer's claims, plaintiff is barred as a matter of law from recovering those damages from Proskauer." Motion at 47. Although this argument is couched in terms of Chapter 33, it is really the same erroneous imputation-of-wrongdoing argument that both this Court and the Fifth Circuit have already rejected. *DSCC*, 712 F.3d 197 (rejecting *in pari delicto* defense in actions brought by receivers to recover assets for investors). Adopting Proskauer's position would eviscerate a receiver's ability to recover from defendants who have committed highly culpable conduct like aiding and abetting a fraudulent scheme. Nothing in the plain language of the statute compels such a result. The reason that the responsibility of Stanford Financial should not be submitted to the jury under Chapter 33 is that, under *DSCC*, the Receiver (the claimant), who is not charged with SGC's or SIBL's wrongdoing, is not guilty of "causing or contributing to cause in any way the harm for which recovery of damages is sought" within the meaning of § 33.003. Therefore, his conduct is not submitted under Chapter 33.

The cases cited by Proskauer in footnote 19 do not support its argument. *Villarreal v. Wells Fargo Brokerage Serv. LLC.*, 315 S.W.3d 109, 122 (Tex. App.—Houston [1st Dist. 2010, no pet.) allowed the joinder of a responsible third party who had a valid limitations defense.

*Dugger v. Arredondo*, 408 S.W.3d 825, 831-32 (Tex. 2013), contrary to Proskauer's representation, did not hold that Chapter 33 abrogated Texas's *in pari delicto* doctrine. Rather, it held that in a wrongful death case the common law unlawful acts doctrine did not bar the plaintiff's recovery altogether; instead the plaintiff's fault would bar recovery only to the extent the jury apportioned liability to him. For this additional reason, Proskauer's motion for summary judgment should be denied.

### C.     If Chapter 33 did apply to aiding and abetting claims, Proskauer would still be jointly and severally liable.

Section 33.013 provides in pertinent part:

> (b) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

> (1) the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent; or

> (2) the defendant, with the specific intent to do harm to others, acted in concert with another person to engage in the conduct described in the following provisions of the Penal Code and in so doing proximately caused the damages legally recoverable by the claimant:

> *****

> (J) Section 32.45 (misapplication of fiduciary property or property of financial institution);

> (K) Section 32.46 (securing execution of document by deception);

> (L) Section 32.47 (fraudulent destruction, removal, or concealment of writing). . . .

TEX. CIV. PRAC. & REM. CODE § 33.013(b).

Here, there is summary judgment evidence that Sjoblom aided and abetted misapplication of fiduciary property or property of a financial institution (SIBL), aided and abetted the sale of fraudulent CDs by means of deceptive and misleading offering materials and disclosure statements, which purchasers had to sign to be accredited investors, and participated in concealment of documents responsive to SEC subpoenas. For this additional reason, Proskauer's

motion for summary judgment must be denied.

**D.      If Chapter 33 did apply, the statute provides that "the trier of fact" should decide the percentage of responsibility.**

Section 33.003 provides in pertinent part:

CPRC §33.003. DETERMINATION OF PERCENT OF RESPONSIBILITY

> (a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, . . . .

TEX. CIV. PRAC. & REM. CODE § 33.003.

Therefore, assuming that Chapter 33 somehow applied—which is denied—the apportionment of responsibility is quintessentially a question of fact for the jury. For the above reasons, Proskauer has not established as a matter of law that Stanford Financial is more than 50% responsible for Stanford Financial's damages.

## CONCLUSION

Proskauer has failed to establish its entitlement to a judgment as a matter of law. There is ample evidence that Thomas Sjoblom knowingly and substantially facilitated the fraudulent scheme and breaches of fiduciary duty by assisting SIB and SGC in evading regulatory oversight, lying to regulators, concealing information from regulators and auditors, and suborning perjury. At a minimum, there are genuine issues of material fact for the jury. Proskauer's motion must therefore be denied.

Respectfully Submitted,

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CASTILLO SNYDER**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@strasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:    (210) 250-6004
Facsimile:    (210) 258-2706

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@strasburger
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone:    (214) 651-4300
Facsimile:    (214) 651-4330

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

On March 13, 2018, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court which served all counsel of record electronically as authorized by the Court pursuant to The Federal Rules of Civil Procedure.

*/s/ Judith R. Blakeway*
Judith R. Blakeway