# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | CIVIL ACTION 3:13-CV-0477-N |
| PROSKAUER ROSE, LLP, CHADBOURNE & PARKE, LLP, AND THOMAS S. SJOBLOM, | § § § § | |
| **Defendants.** | § § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE TO LIMIT EXPERT OPINION TESTIMONY OF PROFESSOR PAUL GOMPERS

Douglas J. Buncher
**NELIGAN LLP**
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com

Edward C. Snyder
Jesse R. Castillo
**CASTILLO SNYDER, P.C.**
One Riverwalk Place
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210
esnyder@casnlaw.com
jcastillo@casnlaw.com

Judith R. Blakeway
**STRASBURGER & PRICE, LLP**
2301 Broadway
San Antonio, Texas 78215
Telephone: (210) 250-6004
Facsimile: (210) 258-2706
judith.blakeway@strasburger,com

David N. Kitner
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330
david.kitner@strasburger.com

**COUNSEL FOR PLAINTIFFS**

## TABLE OF CONTENTS

| EXHIBIT | DOCUMENT | APPENDIX PAGE(S) |
|---------|----------|------------------|
| | Declaration of Douglas J. Buncher | 1 – 2 |
| A | Expert Report of Professor Paul Gompers | 3 – 32 |
| B | True and correct pages of the Deposition of Paul A. Gompers, taken on January 22, 2018 | 33 - 70 |

Dated:  March 30, 2018

Respectfully submitted,

**NELIGAN LLP**

By:  */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

**STRASBURGER & PRICE, LLP**

By:  */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@strasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone: (210) 250-6004
Facsimile: (210) 258-2706

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@strasburger.com
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

**ATTORNEYS FOR PLAINTIFFS**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 30th day of March, 2018 I electronically submitted the foregoing document with the Clerk of the Court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court which served all counsel of record electronically as authorized by the Court pursuant The Federal Rules of Civil Procedure.


*/s/ Douglas J. Buncher*
Douglas J. Buncher

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY §
AS COURT-APPOINTED RECEIVER §
FOR THE STANFORD RECEIVERSHIP §
ESTATE, AND THE OFFICIAL §
STANFORD INVESTORS COMMITTEE, §
§
    Plaintiffs, §
§    CIVIL ACTION 3:13-CV-0477-N
§
v. §
§
PROSKAUER ROSE, LLP, §
CHADBOURNE & PARKE, LLP, AND §
THOMAS S. SJOBLOM, §
§
    Defendants. §

DECLARATION OF DOUGLAS J. BUNCHER IN SUPPORT OF
PLAINTIFFS' MOTION IN LIMINE TO LIMIT EXPERT OPINION
TESTIMONY OF PROFESSOR PAUL GOMPERS

    DOUGLAS J. BUNCHER declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

    1.    I am an attorney admitted to practice before this Court, and I am a partner in the

law firm of Neligan LLP, counsel for the Receiver in the above-captioned matter. I submit this

declaration in support of *Plaintiffs' Motion in Limine to Limit Expert Opinion Testimony of*

*Professor Paul Gompers* (the "Motion"). The matters in this declaration are within my personal

knowledge and are true and correct.

    2.    Attached hereto as Exhibit A is the Expert Report of Professor Paul Gompers,

dated October 27, 2017.

87380v 1

**APP. 001**

3.      Attached hereto as Exhibit B are true and correct copies of pages from the Deposition of Paul A. Gompers, taken on January 22, 2018, that are referenced in the Motion.

Dated: March 30, 2018                              /s/ Douglas J. Buncher
                                                    Douglas J. Buncher

DECLARATION OF DOUGLAS J. BUNCHER IN SUPPORT OF PLAINTIFFS' MOTION
IN LIMINE TO LIMIT EXPERT OPINION TESTIMONY OF PROFESSOR PAUL GOMPERS                    PAGE 2

87380v.1

APP. 002

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY AS
COURT-APPOINTED RECEIVER FOR THE
STANFORD RECEIVERSHIP ESTATE, AND
THE OFFICIAL STANFORD INVESTORS
COMMITTEE,

Plaintiffs,

v.

PROSKAUER ROSE, LLP, CHADBOURNE &
PARKE, LLP, AND THOMAS V. SJOBLOM,

Defendants.

CIVIL ACTION NO. 3:13-CV-00477-N

# EXPERT REPORT OF PROFESSOR PAUL GOMPERS
## October 27, 2017

Confidential

**APP. 004**

# Table of Contents

I.     Qualifications.................................................................................................1

II.    Assignment ..................................................................................................2

III.   Summary of Opinions .................................................................................3

IV.    Background ..................................................................................................6

       A.     The Alleged Stanford Ponzi Scheme ...............................................6

       B.     The Stanford Financial Entities .......................................................8

       C.     Proskauer's Engagement by the Stanford Financial Entities............9

V.     Ms. Van Tassel Estimates Losses to Stanford Financial, But Fails to Provide a
       Reasonable Estimate of Economic Damages..............................................10

       A.     Economic Damages .......................................................................10

       B.     Ms. Van Tassel Fails to Link Losses to Stanford Financial to the Alleged
              Wrongdoing ...................................................................................10

       C.     Ms. Van Tassel Fails to Account for Recoveries.............................14

VI.    Accounting for Recoveries Substantially Lowers Ms. Van Tassel's Loss Estimates..15

       A.     Estimation of Recoveries ...............................................................16

              1.     Recoveries by the Receiver...................................................16

              2.     Recoveries by the Joint Liquidators.....................................18

              3.     Combined Recoveries .........................................................19

       B.     A Substantial Portion of Losses Were or Are Expected To Be Recovered.....19

VII.   Potential Damages Adjusted for Expenses Incurred by the Stanford Financial
       Entities ....................................................................................................21

       A.     Reasonable Business Expenses Incurred by the Stanford Financial Entities ..21

       B.     Ms. Van Tassel's Offsetting Benefits to SGC Can Be Used as an
              Appropriate Estimate of Reasonable Business Expenses for SIBL.................24

VIII.  Conclusion .................................................................................................25

Confidential

## I.     Qualifications

1.      I am the Eugene Holman Professor of Business Administration and Chair of the Elective Curriculum at the Harvard Business School. I teach courses and conduct research in corporate finance, company structure and governance, company valuation, and institutional investor behavior. I teach these courses to Ph.D., M.B.A., and Executive Education students. In addition to my teaching responsibilities, I am a Research Associate at the National Bureau of Economic Research. Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where I taught entrepreneurial finance from 1993 to 1995. I received an A.B. in Biology from Harvard College in 1987, a M.Sc. in Economics from Oxford University in 1989, and a Ph.D. in Business Economics from Harvard University in 1993.

2.      In my career as an academic, I have written many case studies and technical notes and published numerous articles in peer-reviewed finance and economics journals on valuation, the venture capital and private equity industries, and entrepreneurial finance. Many of these case studies, notes, and research articles have directly examined financial and valuation issues relating to business entities. I am the co-author of several books: *The Venture Capital Cycle* (editions 1 and 2) published by MIT Press, *The Money of Invention* published by Harvard Business School Press, and *Entrepreneurial Finance: A Casebook* published by John Wiley Press.

3.      I am an Associate Editor of the *Journal of Finance*, *Journal of Economic Literature*, *Small Business Economics*, and *Journal of Private Equity*, as well as a referee for a number of academic journals, including the *Journal of Financial Economics*, *Journal of Political Economy*, *Quarterly Journal of Economics*, and *Review of Financial Studies*. I have served on the boards of directors of several companies, including ZEFER, Mercanteo, and OnTheFrontier.com. I have also been on the boards of directors or advisory boards of several venture capital and private equity firms, including New Capital Partners, OnPoint Technologies, Khosla Ventures, the Highland Consumer Fund, Knightsbridge Advisors, Spur Capital Partners, Evergreen Capital, and Gemini Capital, where my duties included valuation of companies. In addition, I have advised numerous firms (including private equity and venture-capital-financed firms) on

fundraising, future projections, and valuation. My Curriculum Vitae, including the list of publications I have authored, is attached as **Exhibit 1**.

4.      I have served as an expert in a number of legal matters. In numerous of these matters, I have been asked to analyze alleged damages and class certification issues. I have also served as an expert on the custom and practice of private equity and venture capital organizations, the valuation of public and private companies, factors affecting public company securities prices, whether securities markets were efficient, and the terms and conditions of employment agreements at entrepreneurial firms. I have been qualified to serve as an expert witness in cases pertaining to the private equity and venture capital industry, in securities and valuation cases, and in cases in which I provided testimony regarding alleged damages in a variety of industries. A list of proceedings in which I have provided sworn testimony during the last four years in deposition, trial, or arbitration is attached as **Exhibit 2**.

## II.    Assignment

5.      I have been retained by counsel for Proskauer Rose LLP ("Proskauer") to review and respond to the report of Karyl Van Tassel, dated August 25, 2017 ("Van Tassel Report"). I have also been asked to assess potential damages attributable to Proskauer in the above-captioned matter associated with the legal services provided to the Stanford Financial group of companies (collectively referred to herein as "Stanford Financial") by Mr. Thomas V. Sjoblom—a former partner at Proskauer. I have not been asked to evaluate and I offer no opinions regarding the merits of the claims for liability either asserted in the Complaint[1] in this matter or addressed in the Van Tassel Report.

6.      In forming my opinions, in addition to the Van Tassel Report, I have also reviewed and relied on financial reports and statements of multiple Stanford Financial entities—namely Stanford International Bank Ltd. ("SIBL"), Stanford Group Company ("SGC"), Stanford Financial Group Company ("SFGC"), Stanford Trust Company Limited ("STCL"), Stanford Financial Group Global Management LLC ("SFGGM"), and Stanford Group (Antigua) Ltd.

---

[1] Plaintiffs' Original Complaint, *Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-M, filed January 31, 2013 ("Complaint").

("SGAL"). I have also reviewed and relied on reports issued by Ralph S. Janvey, the Court-Appointed Receiver for the Stanford Receivership Estate ("Receiver"), and the Antiguan Joint Liquidators ("Joint Liquidators"), the websites of the Receiver and the Joint Liquidators, news articles and press releases relating to Stanford Financial, and other legal documents. A complete list of the materials I have considered is attached as **Exhibit 3**. It is my understanding that fact discovery is ongoing. The opinions expressed in this report are based on the information available as of the date of the report, and I reserve the right to update my opinions should new information become available.

7.        I am being compensated at my regular hourly rate of $975 for my time spent on this matter. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. I am a Senior Advisor to Cornerstone Research and receive compensation from Cornerstone Research based on its billings on matters where its staff supports me. My compensation in this matter, including my compensation from Cornerstone Research, is in no way contingent or based on the content of my opinions or the outcome of this or any other matter.

## III.    Summary of Opinions

8.        Based on my experience, expertise, and the analyses discussed in further detail below, I have reached the following conclusions:

   a.  Ms. Van Tassel purports to calculate economic damages to SIBL and SGC attributable to Mr. Sjoblom and Proskauer. Yet, her damages methodology amounts to an attempt to calculate economic damages caused by the alleged Stanford Ponzi scheme as a whole, based upon speculation as to what Mr. Sjoblom may have done to support the scheme and could have done to stop it. This approach is fundamentally flawed. In order to assess economic damages, if any, to SIBL and SGC attributable to Mr. Sjoblom and Proskauer, Ms. Van Tassel would had first to define a "but-for" world in which, but for the conduct of Mr. Sjoblom and Proskauer, the losses allegedly incurred by SIBL and SGC as a result of the Stanford Ponzi scheme would have been lower. To define such a but-for world, Ms. Van Tassel would have to identify specific actions by Mr. Sjoblom

and Proskauer that would have ended the Ponzi scheme, as well as the date or dates on which those actions would or should have been taken. Ms. Van Tassel would also have to present a methodology for (i) assessing the effects of those actions on decisions by investors to purchase, hold, or redeem the SIBL Certificates of Deposit ("CDs") that were sold to investors in furtherance of the Stanford Ponzi scheme (either directly or by affecting decisions by the U.S. Securities and Exchange Commission ("SEC") regarding whether to intervene and seek an injunction, which, in turn, would affect investor decisions), and (ii) quantifying the monetary value of the CDs that would not have been purchased, held, or redeemed in the but-for world. In other words, Ms. Van Tassel would have to assess whether the but-for actions by Mr. Sjoblom and Proskauer could and would have ended the Stanford Ponzi scheme.

b.  However, Ms. Van Tassel fails to present such a but-for world. Instead, Ms. Van Tassel estimates "economic damages" without proposing an appropriate methodology that links her estimates of "economic damages" to the facts of this matter or to the allegations brought by the Receiver and the Official Stanford Investors Committee (collectively, "Plaintiffs"). Instead, she merely calculates the increase in CD liabilities on and after three different dates (November 1, 2006; March 1, 2007; and September 1, 2007) and deducts interest accrued to investors from those calculations, and presents the results as her estimate of "economic damages." Ms. Van Tassel's "economic damages" estimates appear to be based on an assumption that as of these three dates, Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme or a fraud and that Mr. Sjoblom provided substantial assistance to the scheme or fraud by somehow preventing the SEC from enforcing the law. However, Ms. Van Tassel does not provide any basis to suggest that Mr. Sjoblom actually had such knowledge or would have been able to end the Ponzi scheme immediately on any of these three dates or, indeed, any other date. In fact, Ms. Van Tassel makes no effort to quantify the effects of Mr. Sjoblom's actions or the purported breaches of fiduciary duty by those at Stanford Financial that Mr. Sjoblom allegedly aided and abetted.

c.  Furthermore, while Ms. Van Tassel acknowledges in her report that any recovery amounts need to be accounted for, she fails to actually account for recoveries obtained on behalf of SIBL and SGC.  Accounting for gross recoveries reduces Ms. Van Tassel's loss estimates by $909 million and accounting for net recoveries, calculated as gross recoveries net of expenses incurred to secure those recoveries, reduces Ms. Van Tassel's loss estimates by $464 million (see **Exhibit 4**).

d.  To the extent that Stanford Financial's business expenses constituted reasonable business expenditures that did not enrich the perpetrators of the Stanford Ponzi scheme, deducting them from losses net of recoveries yields a reasonable estimate of ill-gotten gains by the perpetrators.  As I will explain in detail below, Ms. Van Tassel's estimate of transfers from SIBL to SGC constitutes a reasonable estimate of such business expenses.  Accounting for both recoveries and business expenses further lowers Ms. Van Tassel's loss estimates.  These calculations, presented in **Exhibits 5, 6,** and 7, would constitute estimates of economic damages only if Plaintiffs can prove that as of any of the three dates Ms. Van Tassel chose, or any other date for that matter, Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme, and that he should and could have acted in a way that would have immediately ended the scheme on that date.

e.  Finally, I note that Ms. Van Tassel's own loss estimates are zero for SIBL for any period starting on or after February 1, 2008 and for any period starting on or after January 1, 2008 for SGC.  Table 1 shows the dates as of which Ms. Van Tassel's estimates, as well as potential damages, for SIBL and SGC become zero, depending on which methodology is applied.

Confidential

APP. 010

Table 1
Earliest Start Dates of Periods for Which Van Tassel Loss Estimates and Potential
Damages Are Zero

|  | SIBL | SGC |
|---|---|---|
| Losses | February 1, 2008 | January 1, 2008 |
| Potential Damages Using Gross Recoveries | June 1, 2007 | April 1, 2007 |
| Potential Damages Using Net Recoveries | October 1, 2007 | August 1, 2007 |
| Potential Damages Using Gross Recoveries and Deducting Reasonable Business Expenses | April 1, 2007 | -- |
| Potential Damages Using Net Recoveries and Deducting Reasonable Business Expenses | August 1, 2007 | -- |

## IV.    Background

### A.    The Alleged Stanford Ponzi Scheme

9.    Robert Allen Stanford, founder of Stanford Financial, started a bank on the island of Montserrat in 1985, then called Guardian International Bank.[2]  Guardian International Bank moved to Antigua in 1990 and was renamed Stanford International Bank.[3]  Over time, Stanford Financial grew to include more than 100 separate but interconnected companies.[4]

10.    SIBL offered three main CD products:  FixedCD, FlexCD, and Index-Linked CD.[5] Stanford Financial advertised above-market interest rates as a primary feature of these CDs, claiming that SIBL CDs outperformed CDs offered by U.S. banks every year from 1997 through 2006.[6]  It was revealed following a 2009 investigation by the SEC that Stanford Financial was in

---

[2] "Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release No. 12-756, June 14, 2012.

[3] "Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release No. 12-756, June 14, 2012.

[4] Report of the Receiver Dated April 23, 2009, *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00298-N, filed April 23, 2009, p. 5.

[5] Stanford International Bank Ltd. Brochure (STAN INVSTR GENL_032561–77 at 74).

[6] Stanford International Bank Ltd. Brochure (STAN INVSTR GENL_032561–77 at 71).

fact able to offer such high interest rates because it was running a Ponzi scheme.[7]

11.    According to a report published by the SEC on its investigation of the Stanford Financial entities, the SEC believed Stanford Financial might be running a Ponzi scheme as early as 1997, based on the results of its 1997, 1998, 2002, and 2004 examinations of Stanford Financial.[8] These examinations predated Mr. Sjoblom's retention by Stanford Financial, which began in August 2005 while he was employed at Chadbourne & Parke LLP ("Chadbourne").[9]  As I discuss below, Mr. Sjoblom continued his representation of the Stanford Financial entities at Proskauer starting in September 2006.[10]

12.    On February 16, 2009, the SEC obtained a temporary restraining order freezing Mr. Stanford's assets and those of SIBL and SGC, and placed Stanford Financial into Receivership.[11] The next day, the SEC charged Mr. Stanford and his companies with running a fraudulent scheme centered on the CD program.[12]  On June 14, 2012, Mr. Stanford was sentenced to 110 years in prison.[13]

13.    Plaintiffs have brought this action against Proskauer to "recover damages for the Stanford Receivership Estate from [Proskauer] based on [its] participation in the massive Ponzi scheme orchestrated by Allen Stanford and others that injured the companies comprising Stanford Financial Group."[14]  Plaintiffs allege that Mr. Sjoblom aided, abetted, or participated in the Ponzi scheme and thus caused damages to the companies comprising Stanford Financial.[15]

---

[7] "Report of Investigation:  Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme, Case No. OIG-526," United States Securities and Exchange Commission, Office of Inspector General, March 31, 2010 ("SEC Report of Investigation"), p. 1.

[8] SEC Report of Investigation, p. 16.

[9] Chadbourne engagement letter dated August 23, 2005 (STAN P CAST_0007277-86 at 78).

[10] Proskauer engagement letter dated September 6, 2006 (PROSKAUER_JANVEY_00021562-66).

[11] "Securities and Exchange Commission v. Stanford International Bank, et al., Case No. 3-09CV0298-L (N.D.Tex.): SEC Obtains Temporary Restraining Order, Asset Freeze, and Other Relief Against Defendants," SEC Litigation Release No. 20901, February 17, 2009.

[12] "SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme," SEC Press Release 2009-26, February 17, 2009.

[13] "Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release No. 12-756, June 14, 2012.

[14] Complaint, ¶ 1.

[15] Complaint, ¶¶ 100-253, 257-59.  I understand that Chadbourne has reached a settlement with Plaintiffs and that claims against Mr. Sjoblom have been dismissed from the case.  See Final Bar Order, Securities and Exchange Commission v. Stanford International Bank, Ltd., et al., United States District Court, Northern District of Texas,

B.    The Stanford Financial Entities

14.    While the entities for which Ms. Van Tassel has attempted to calculate damages that comprised Stanford Financial were SIBL and SGC, I understand that there were several other Stanford Financial entities that were interconnected with SIBL and SGC.  Based on my review of SIBL's audited annual reports, the following entities can be directly linked to SIBL:  SGC, SFGC, STCL, SFGGM, and SGAL.[16]  Each of these entities received referral or management fees from SIBL in exchange for certain services during the time Proskauer represented Stanford Financial.  For instance, SGC and SIBL jointly marketed and offered fixed-income and trust products, and SFGC provided various functions for SIBL and SGC, including technology services, research, and treasury-related functions.[17]

15.    Ms. Van Tassel cites the Court, which concluded that:[18]

> Although the Stanford Entities are located all over the world, with affiliates in at
> least 13 countries, this Court has previously held that the entire network operated
> as a single entity. . . .  Stanford operated the entire network of Stanford Entities as
> an integrated unit in order to perpetrate a massive worldwide fraud.  Further, [the
> Court has] held that each Stanford Entity either participated in the scheme,
> derived benefit from the scheme, or lent the appearance of legitimacy to the
> entirety of Stanford's fraudulent enterprise. . . . Additionally, the majority of all

Dallas Division, Case No. 3:09-cv-0298-N, filed August 30, 2016; Order of Dismissal with Prejudice, *Ralph S Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-N-BG, filed December 22, 2016.  I further understand that on April 28, 2017, the Court so ordered the stipulation between the parties which resulted in the dismissal of Counts 1, 4, 5, 6, and 7 of the Complaint.  Only the Plaintiffs' claims against Proskauer for aiding, abetting or participation in breaches of fiduciary duties and aiding, abetting, or participation in a fraudulent scheme remain.  Rule 41 Stipulation and Order of Dismissal with Prejudice of Counts 1, 4, 5, 6, and 7 of the Complaint, *Ralph S Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-N-BG, filed April 28, 2017.

[16] Stanford International Bank 2006 Annual Report (STAN INVSTR GENL_058270–318 at 305 and 306); Stanford International Bank 2007 Annual Report (STAN INVSTR GENL_058319–56 at 42 and 43).

[17] Stanford Group Company Consolidated Financial Statements and Supplemental Material (STAN INVSTR GENL_058071–100 at 87 and 88) (2006 Audited Financial Statements); Stanford International Bank 2006 Annual Report (STAN INVSTR GENL_058270–318 at 306).

[18] Van Tassel Report, ¶ 8; Order, *Ralph S Janvey, et al v. Alguire, et al*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00724-N-BL, filed January 22, 2013 at 8–9 (quotation marks and citations omitted).

the Stanford Entities' proceeds came through the sales of CDs through Stanford International Bank ("SIB")[.]

16.    The Court further noted that:[19]

> The Receiver has shown that Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud. Each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise.  To ignore these findings would elevate form over substance — thereby legitimizing the corporate structure that Stanford utilized to perpetrate his fraud and running afoul of Fifth Circuit precedent cautioning courts to look beyond the surface.  Thus, because [SIBL] did not observe corporate formalities and because all the Stanford entities were operated as one for purposes of perpetrating a fraud on investors, the Court pierces [SIBL's] corporate veil and aggregates the Stanford Entities.

### C.    Proskauer's Engagement by the Stanford Financial Entities

17.    Mr. Sjoblom and Chadbourne signed an engagement letter to represent certain Stanford Financial entities in connection with certain regulatory investigations in August 2005.[20]  In August 2006, Mr. Sjoblom joined Proskauer.[21]  On September 6, 2006, Mr. Sjoblom signed an engagement letter on behalf of himself and Proskauer to represent Stanford Financial in connection with certain regulatory investigations by the SEC and other regulatory bodies.[22]  Mr. Sjoblom and Proskauer represented Stanford Financial in those matters from September 6, 2006 to February 11, 2009.[23]

---

[19] Van Tassel Report, ¶ 9; Order, *In Re: Stanford International Bank, Ltd.*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00721-N, filed July 30, 2012 at 36 (quotation marks and citation omitted).

[20] Chadbourne engagement letter dated August 23, 2005 (STAN P CAST_0007277–86).  Mr. Sjoblom may have been working with Stanford Financial as early as June 2005.  *See* Thomas Sjoblom Notes dated June 10, 2005 (PROSKAUER_JANVEY_00034117–8).

[21] James, Ben "Proskauer Gets Veteran Securities Lawyer From Chadbourne," *Law360*, August 15, 2006, available at https://www.law360.com/articles/8680/proskauer-gets-veteran-securities-lawyer-from-chadbourne, last accessed on October 26, 2017.

[22] Proskauer engagement letter dated September 6, 2006 (PROSKAUER_JANVEY_00021562–66).

[23] Proskauer engagement letter dated September 6, 2006 (PROSKAUER_JANVEY_00021562–66); Mr. Sjoblom's withdrawal letter dated February 12, 2009 (PROSKAUER_JANVEY_00009978–79) (noting that Mr. Sjoblom withdrew on February 11, 2009).

APP. 014

V.  **Ms. Van Tassel Estimates Losses to Stanford Financial, But Fails to Provide a Reasonable Estimate of Economic Damages**

A.  **Economic Damages**

18.     It is generally accepted that, to assess economic damages properly, one should measure the difference between the actual outcome and the outcome that would have occurred "but for" any alleged wrongdoing.[24] Losses that would have occurred regardless of any alleged wrongdoing are not recoverable as damages.[25] Thus, in this case, only the portion of the losses suffered by Stanford Financial that would not have occurred in the but-for world can be characterized as economic damages attributable to Mr. Sjoblom's actions. In addition, a proper assessment of damages needs to account for any recoveries of the losses that can be linked to the alleged wrongdoing by Mr. Sjoblom.

19.     As I explain in detail below, contrary to standard practice, Ms. Van Tassel fails both to link her purported damages estimates to the alleged wrongdoing by Mr. Sjoblom and to account for any recoveries in this matter.

B.  **Ms. Van Tassel Fails to Link Losses to Stanford Financial to the Alleged Wrongdoing**

20.     Ms. Van Tassel purports to estimate the economic damage caused to SIBL and SGC by the alleged participation of Mr. Sjoblom in the Stanford Ponzi scheme.[26] She states that the "directors and officers of SGC and SIB promoted the entities' participation in and furtherance of

---

[24] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition (Washington, DC: The National Academies Press), 2011, pp. 425–502 at 432. *See also* Joshi, Randy C., Catherine F. Madrid, and Lee-Anne V. Mulholland, "Causation Issues and Expert Testimony," in *Litigation Services Handbook: The Role of the Financial Expert*, 5th ed., edited by Roman L. Weil et al. (Hoboken, NJ: John Wiley & Sons, Inc., 2012), Chapter 3, p. 2 ("A financial expert retained to measure damages must therefore understand and be prepared to explain the following: [a] The defendant's wrongful conduct; [b] How the plaintiff alleges the defendant's wrongful conduct *caused* damages to the plaintiff and how the defendant alleges that *it did not cause the damages*; [c] The logic that connects the defendant's wrongful conduct and the plaintiff's damages; [d] Other factors that could have caused or exacerbated the plaintiff's damages; and [e] Whether the plaintiff's damages were reasonably expected to result from the defendant's wrongful conduct.") (emphasis in original).

[25] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition (Washington, DC: The National Academies Press), 2011, pp. 425–502 at 432.

[26] Van Tassel Report, ¶¶ 102–06.

the Ponzi Scheme, resulting in . . . increased liabilities to SIB and SGC."[27] She then estimates the net increase in CD liabilities for SIBL and SGC for the periods on and after three different dates during the time when Mr. Sjoblom represented Stanford Financial.[28]

21.     Ms. Van Tassel explains that she obtained the CD liability balance from the SIBL Annual Reports, and for the final balance on February 17, 2009, the SIBL CD Temenos database.[29] She further explains that she "calculated an adjusted CD liability balance subtracting the amount of 'fictitious interest.'"[30] And then she "calculated the increase to the liability as the difference between the adjusted CD liability balance at the beginning and end of the period in question."[31] Ms. Van Tassel calculates the adjusted increase in CD liabilities on and after three different dates (November 1, 2006; March 1, 2007; and September 1, 2007).[32]

22.     Based on this methodology, Ms. Van Tassel estimates that the "economic damages" suffered by SIBL are $1,574 million for the period on and after November 1, 2006; $1,200 million for the period on and after March 1, 2007; and $465 million for the period on and after September 1, 2007.[33]

23.     Ms. Van Tassel also estimates "economic damages" to SGC by deducting net transfers from SIBL to SGC and capital contributions to SGC because, according to her, these could be interpreted as potential offsetting benefits to SGC.[34] She concludes that the "economic damages" suffered by SGC are $1,271 million for the period on and after November 1, 2006;

---

[27] Van Tassel Report, ¶ 13.

[28] Van Tassel Report, ¶¶ 103–06.

[29] Van Tassel Report, ¶ 103. I did not have access to the Temenos database.

[30] Van Tassel Report, ¶ 103.

[31] Van Tassel Report, ¶ 103.

[32] Van Tassel Report, ¶¶ 105–06.

[33] Van Tassel Report, ¶ 106. To calculate Ms. Van Tassel's purported "economic damages" to SIBL for any period on and after a specific date that is not one of these three dates, I use the electronic backup for Ms. Van Tassel's analysis and perform the calculations using her methodology. *See* "Summary Financial Data_08242017.xlsx." For the remainder of this report, I refer to both the SIBL losses she provides in her report as well as the SIBL losses that I calculate using her backup and methodology as Ms. Van Tassel's loss estimates for SIBL.

[34] Van Tassel Report, ¶ 103. In her footnote 25, Ms. Van Tassel claims that "[t]reating these amounts as a 'benefit' is purely intended to present a conservative picture of the damages. The reality is that these amounts were ill-gotten gains to SGC." To calculate Ms. Van Tassel's purported "economic damages" to SGC for any period on and after a specific date that is not one of these three dates, I use the electronic backup for Ms. Van Tassel's analysis and perform the calculations using her methodology. *See* "Summary Financial Data_08242017.xlsx." For the remainder of this report, I refer to both the SGC losses she provides in her report as well as the SGC losses that I calculate using her backup and methodology as Ms. Van Tassel's loss estimates for SGC.

$945 million for the period on and after March 1, 2007; and $275 million for the period on and after September 1, 2007.[35]

24.     Because Ms. Van Tassel estimates purported economic damages as the increase in liabilities incurred by SIBL and SGC on and after each of her three dates, which she attributes to "participation in and furtherance of the Ponzi scheme," her purported economic damages can only be understood to represent losses resulting from the alleged Ponzi scheme as a whole.[36]  She does not appear to provide purported damages estimates based on any claim other than participation in the Ponzi scheme.  Ms. Van Tassel makes no attempt to quantify the effects of Mr. Sjoblom's actions or the purported breaches of fiduciary duty by those at Stanford Financial that Mr. Sjoblom allegedly aided and abetted.

25.     Importantly, Ms. Van Tassel's purported damages estimates appear to be based on her implicit assumption that as of the three dates she chose—November 1, 2006; March 1, 2007; and September 1, 2007—Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme and that he should have taken actions that would have immediately caused the scheme to unravel and the CD liabilities to cease increasing.  Yet, neither Ms. Van Tassel, nor any of the other experts retained by Plaintiffs,[37] provide any substantiated basis to show that Mr. Sjoblom knew about a

---

[35] Ms. Van Tassel has submitted several declarations in matters involving the Stanford Ponzi scheme.  In a previous matter against Pablo Alvarado, General Counsel of SFGC, she has utilized a similar methodology.  While she purports to perform the same "economic damages" calculation in the Alvarado matter as she does in this matter, I note that there are a few discrepancies in some of the data between the two matters.  For example, the values for the SGC Portfolio Advisory Fee for every month of 2007 are different – higher for certain months, lower for others – leading to slightly higher economic losses for SGC in the Proskauer matter as of certain dates, compared to her estimates in the Alvarado matter.  For example, SGC losses as of March 1, 2007 are $7 million higher in this matter than in the Alvarado matter.  *See* Supplemental Declaration of Karyl Van Tassel, *Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al. v. Pablo M. Alvarado*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:10-cv-02584-N-BG, filed March 10, 2017, ¶¶ 62–68 and Exhibit KVT-200 (RCVR-PROSKAUER-EXP 0002793–8); "Summary Financial Data_08242017.xlsx."

[36] Van Tassel Report, ¶ 13.

[37] Report of James C. Spindler, *Ralph S. Janvey v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-N, dated August 25, 2017; Expert Witness Report of Jeffrey E. Marcus Esq., *Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-N-BG, dated August 25, 2017; Expert Report of Charles Herring, Jr., *Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 1:16-cv-418-LY, dated August 25, 2017; Expert Witness Report of Douglas Henderson, *Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:13-cv-00477-N-BG, dated August 25, 2017.

Ponzi scheme or fraud, let alone that he could have immediately stopped the increase in CD liabilities as of any of the three dates. While a significant portion of Ms. Van Tassel's report focuses on certain aspects of Mr. Sjoblom's work during the time he represented Stanford Financial, nowhere does she explain when he allegedly knew that Stanford Financial was a Ponzi scheme nor what he could and should have done to stop the scheme. In other words, Ms. Van Tassel has failed to establish any link between Mr. Sjoblom's purported knowledge of the scheme and the fraud for which she estimates "economic damages." Furthermore, Ms. Van Tassel has failed to assess what damages, if any, resulted from Mr. Sjoblom's own conduct, including the purported fiduciary breaches that he allegedly aided and abetted. Therefore, Ms. Van Tassel has failed to establish that there are indeed any economic damages in this matter at all.

26.     Specifically, whether the alleged Ponzi scheme would have unraveled completely and the CD liabilities would thus have ceased increasing on any one of the three dates Ms. Van Tassel chose depends critically upon (a) when Mr. Sjoblom would have had access to relevant information about the operations of the Stanford Financial entities in the but-for world; (b) what actions he would have taken upon accessing that information; and (c) what impact, if any, those actions would have had on the CD liabilities. Ms. Van Tassel does not consider any of these components of the but-for world that a proper analysis of economic damages requires. Thus, Ms. Van Tassel fails to present a but-for world that links Mr. Sjoblom's alleged actions or omissions to her purported damages estimates, leaving these calculations as mere estimates of losses having no connection to Plaintiffs' allegations, let alone Defendants' conduct.

27.     In fact, there are potential but-for actions by Mr. Sjoblom and Proskauer that would not have resulted in any damages. For example, consider a but-for world in which Mr. Sjoblom suspected wrongdoing, alerted the SEC, but the SEC decided not to take further actions with respect to Stanford Financial (as it did several times in the real world). Under these circumstances, Mr. Sjoblom and Proskauer could not reasonably be held responsible for any damages. Alternatively, if Mr. Sjoblom had suspected potential wrongdoing in the but-for world, but lacked sufficient evidence to demonstrate any wrongdoing and therefore had withdrawn from representing Stanford Financial without notifying the authorities, the Stanford Financial entities may have continued operating as before and Mr. Sjoblom and Proskauer would

thus not have been responsible for any damages. Ms. Van Tassel fails to consider any such scenario (among others) in which potential but-for actions by Mr. Sjoblom would have failed to cause the alleged Ponzi scheme to unravel.

### C.    Ms. Van Tassel Fails to Account for Recoveries

28.    In addition, even assuming that Plaintiffs can establish that Mr. Sjoblom and Proskauer had knowledge of the scheme and could have taken action that would have ended it on any of the three dates Ms. Van Tassel chose, or any other date for that matter, Ms. Van Tassel's purported damages estimates merely show losses incurred by SIBL and SGC. These losses are not equivalent to economic damages because, in addition to the other defects in her analysis, Ms. Van Tassel fails to account for recoveries.

29.    While Ms. Van Tassel acknowledges that any recovery amounts need to be accounted for, she, in fact, ignores actual recoveries. She cites the Court's ruling that "it may be necessary to offset any disgorgement amount owed by Stanford, Davis, SGC, and [SIBL] by any recovery obtained against them by the Receiver or any assets obtained by the Department of Justice [("DOJ")] in forfeiture proceedings" and that "[t]he sum also may be offset by money returned to investors from the Receiver."[38] However, her purported damages estimates do not consider recoveries at all.[39] As I explain in the next section, accounting for recoveries leads to a substantial reduction in Ms. Van Tassel's purported damages estimates.

---

[38] Van Tassel Report, ¶ 101.

[39] In her report, Ms. Van Tassel states that "SIB and SGC were penalized for their participation in the Stanford Ponzi Scheme as measured by the net amount of investor liability accrued over the life of the scheme, less the 'fictitious interest' promised to the investors, and less any amounts recovered by the receivership or Department of Justice and returned to the investors." Van Tassel Report, ¶ 102.

## VI.    Accounting for Recoveries Substantially Lowers Ms. Van Tassel's Loss Estimates

30.    Several entities have pursued recoveries associated with the Stanford Ponzi scheme in the past, including the Receiver,[40] the DOJ,[41] and the Joint Liquidators.[42]  It is my understanding, based on the Settlement Agreement and Cross-Border Protocol between the Receiver, the DOJ, the Joint Liquidators and other entities,[43] that the two main entities still pursuing recoveries are the Receiver and the Joint Liquidators.[44]  Therefore, my calculation of recoveries is based on the recoveries obtained by these two entities.  Since Ms. Van Tassel's measure of losses suffered by SIBL and SGC considers the total increase in liabilities for these entities, regardless of which entity sold the CDs and where the CD investors resided, it is appropriate to consider all recoveries by both the Receiver and the Joint Liquidators.

31.    I take a conservative approach by only accounting for actual recoveries that have been obtained to date by the Receiver or the Joint Liquidators, some of which have already been distributed.  I also account for amounts agreed upon that have not yet been received by the Receiver or the Joint Liquidators, but for which a firm agreement is in place.  Those include, for example, settlements from litigation pursued by the Receiver or the Joint Liquidators.  I do not consider any amounts that may be recovered due to ongoing efforts by the Receiver and the Joint Liquidators, but for which a formal agreement had not been reached as of April 30, 2017 for the Receiver and as of December 31, 2016 for the Joint Liquidators.  In addition to estimating gross recoveries, I also estimate recoveries net of any expenses incurred (or expected to be incurred) by the Receiver or the Joint Liquidators.

---

[40] Stanford Financial Group Receivership, http://www.stanfordfinancialreceivership.com, last accessed October 26, 2017.

[41] "Closed Criminal Division Cases: *United States v. Robert Allen Stanford et al.*, Court Docket Number: H-09-342," Department of Justice, available at https://www.justice.gov/criminal-vns/case/stanfordr, last accessed October 26, 2017.

[42] Stanford International Bank (SIB) Liquidation, http://www.sibliquidation.com, last accessed October 26, 2017.

[43] The other entities include the SEC, the Court-appointed Examiner, and the Official Stanford Investors Committee.

[44] Appendix in Support of Joint Motion of the SEC, Receiver, Examiner, and Official Stanford Investors Committee to Approve Settlement Agreement and Cross-Border Protocol, *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00298-N, filed March 12, 2013, pp. 5–6.

A.    **Estimation of Recoveries**

1.    **Recoveries by the Receiver**

32.    To calculate recoveries by the Receiver, I have reviewed Reports issued by the Receiver, including the Receiver's "Thirteenth Interim Report Regarding Status of Receivership, Asset Collection, and Ongoing Activities" ("Receiver's Thirteenth Report").[45] This report lists recovery amounts collected by the Receiver and recovery amounts agreed upon but not received, as well as fees and expenses incurred as of April 30, 2017.

33.    The total amount of cash collected by the Receiver as of April 30, 2017 was $408 million.[46] This amount consisted of: (i) cash balances recovered by the Receiver or related to income earned prior to the inception of the Receivership totaling $69 million; (ii) net cash proceeds from the liquidation of private equity and real estate investments and the disposition of airplanes and watercraft of $63 million; (iii) proceeds from the liquidation of Latin American assets, recoveries from assets held in Canada, and funds from a Stanford Financial-related insolvency proceeding in Quebec totaling $35 million; (iv) settlement amounts and sums from other litigation efforts totaling $163 million; (v) returned political contributions not already included as litigation recoveries totaling less than $1 million; (vi) recoveries from the liquidation of other investment accounts held on behalf of Stanford Financial of $74 million; and (vii) recoveries from the sale of other miscellaneous assets of $2 million.[47]

34.    The Receiver reported total expenses incurred of $196 million, which include professional fees and expenses of $136 million and other expenses of $60 million.[48]    The

---

[45] Receiver's Thirteenth Interim Report Regarding Status of Receivership, Asset Collection, and Ongoing Activities, *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00298-N, filed June 1, 2017 ("Receiver's Thirteenth Report").

[46] Receiver's Thirteenth Report, p. 1.

[47] Receiver's Thirteenth Report, pp. 2–6.

[48] Receiver's Thirteenth Report, p. 7.

Receiver's net recovery as of April 30, 2017 was $210 million,[49] and $94 million of this amount had already been distributed.[50]

35.    Additional expected recoveries for the Receiver total $294 million and consist of: (i) $232 million in recoveries pursuant to settlement agreements or term sheets that were signed, but for which the settlement funds were not received prior to April 30, 2017; (ii) injunctions to hold additional assets totaling $26 million; and (iii) Stanford Financial assets in Switzerland to be distributed by the Receiver of $35 million.[51]  These numbers do not include additional amounts that the Receiver may be able to obtain or distribute at a later date.[52]  Assuming the ratio of net recoveries to gross recoveries collected by the Receiver is consistent over time,[53] additional expected net recoveries equal $151 million.

---

[49] In addition to subtracting the Receiver's fees and expenses from the gross recovery, I also exclude an additional $2 million that, while included by the Receiver in the total amount of cash collected, does not appear to be available for the payment of claims or expenses at this time. This figure includes amounts held pending the outcome of a dispute between the Receiver and Dillon Gage, funds held in relation to the Bank of Antigua, and amounts subject to potential liens. *See* Receiver's Thirteenth Report, p. 2.

[50] Receiver's Thirteenth Report, p. 2.

[51] Receiver's Thirteenth Report, pp. 4–6. The sum of Stanford Financial assets in Switzerland to be distributed by the Receiver does not include funds held by Société Générale that are subject to a claim of lien and set-off by Société Générale and that therefore may not be recoverable. There are Stanford Financial assets worth $53 million in Switzerland that are not subject to this claim, two-thirds of which are expected to be recovered by the Receiver and one-third by the Joint Liquidators, according to the Eighth Report of the Joint Liquidators of Stanford International Bank (In Liquidation), *In the Matter of Stanford International Bank Limited (In Liquidation)* and *In the Matter of the International Business Corporations Act, Cap 222 of the Laws of Antigua and Barbuda*, The Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda, Claim No. ANUHCV 2009 0149, dated March 24, 2017 ("Joint Liquidators' Eighth Report"), p. 6. Note that depending on the outcome of the litigation surrounding the assets subject to Société Générale's lien, up to an additional $157 million may be available for recovery for the Receiver and Joint Liquidators, which I have not considered. *See* Joint Liquidators' Eighth Report, p. 6.

[52] The Receiver entered into a settlement agreement with Hunton & Williams, LLP on August 16, 2017 for $34 million. A hearing on the Motion to Approve the Hunton Settlement has been set for November 28, 2017. To be conservative, I have not added these amounts to my calculation of expected recoveries. *See* Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with Hunton & Williams, LLP, to Enter the Bar Order, to Enter the Final Judgment and Bar Order, and for Plaintiffs' Attorneys' Fees, *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00298-N, filed August 16, 2017 and Scheduling Order, *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-00298-N, filed August 23, 2017. There is an additional potential recovery of less than $1 million consisting of assets in U.S. banks and brokerages. However, it is unclear if there are agreements in place regarding the transfer of those assets to the Receiver. Therefore, I exclude this amount from my analysis as well. *See* Receiver's Thirteenth Report, p. 7.

[53] This is a conservative assumption given the fact that more than 29% of professional fees and expenses incurred through April 30, 2017 were incurred by the Receiver during the first year of the Receivership. *See* Receiver's Thirteenth Report, p. 7.

36.    In conclusion, total expected gross recoveries by the Receiver, calculated as the sum of gross recoveries as of April 30, 2017 and additional expected gross recoveries, are $701 million. Total expected net recoveries by the Receiver are $362 million.[54]

### 2.    Recoveries by the Joint Liquidators

37.    To calculate recoveries by the Joint Liquidators, I have reviewed Reports issued by the Joint Liquidators, including the Joint Liquidators' Eighth Report, which lists recovery amounts by the Joint Liquidators, assets being pursued, and fees and expenses incurred as of December 31, 2016.

38.    The total amount received by the Joint Liquidators as of December 31, 2016 equals $182 million and includes: (i) U.K. recoveries of $99 million; (ii) distributions from the sale of Guana and Pelican Islands of $65 million; (iii) non-U.K. recoveries of $11 million; and (iv) other recoveries of $6 million.[55] Expenses incurred by the Joint Liquidators as of December 31, 2016 total $92 million and include: (i) fees and expenses of the Joint Liquidators and legal advisors of $51 million; (ii) former liquidators' advisors' fees and the cost awarded for the removal of former liquidators totaling $9 million; (iii) cost of third-party funding of $14 million; and (iv) other expenses totaling $18 million.[56]

39.    Thus, the Joint Liquidators' net recovery as of December 31, 2016 is $89 million. I have not considered the amount of assets currently being pursued, as there is no guarantee that these will in fact become available for distribution.

40.    The additional expected recoveries by the Joint Liquidators total $26 million and consist of: (i) Stanford Financial assets in Switzerland to be distributed by the Joint Liquidators totaling

---

[54] I understand that in 2012 the U.S. Internal Revenue Service ("IRS") filed a 'notice of claim' with the Court advising the Court that it was the IRS's view that Mr. Stanford was indebted to the United States for approximately $432 million in personal tax liability. The Receiver issued a statement regarding this claim based on discussions with the DOJ, that notes that "the purpose of the IRS claim is simply to ensure that, in the unlikely event that there is any money left after Stanford victims' claims are fully satisfied, such money might be used to satisfy a claim that the IRS may establish against Mr. Stanford, rather than being returned to Mr. Stanford himself." Stanford Financial Group Receivership, http://www.stanfordfinancialreceivership.com, last accessed October 26, 2017. I therefore do not consider this claim by the IRS as a claim against the recoveries obtained by the Receiver to date.

[55] Joint Liquidators' Eighth Report, Appendix A.

[56] Joint Liquidators' Eighth Report, Appendix A.

$18 million;[57] and (ii) expected proceeds from the sale of physical assets of $9 million.[58] Assuming the ratio of expenses and fees incurred to assets recovered by the Joint Liquidators is consistent over time,[59] additional expected net recoveries by the Joint Liquidators equals $13 million.

41.     In conclusion, total expected gross recoveries by the Joint Liquidators, calculated as the sum of gross recoveries as of December 31, 2016 and additional expected gross recoveries, are $208 million.  Total expected net recoveries by the Joint Liquidators are $102 million.

### 3.    Combined Recoveries

42.     Adding the Receiver's and Joint Liquidators' recoveries leads to combined gross recoveries to date of $590 million and total expected gross recoveries of $909 million. Combined net recoveries to date are $299 million and combined total expected net recoveries are $464 million.  **Exhibit 4** presents these gross and net amounts recovered and expected to be recovered by the Receiver and the Joint Liquidators.[60]

### B.    A Substantial Portion of Losses Were or Are Expected To Be Recovered

43.     To demonstrate the effect of accounting for recoveries, I adopt Ms. Van Tassel's approach to estimate losses to SIBL and SGC as of each month starting October 1, 2006 and

---

[57] Total Stanford Financial assets in Switzerland to be distributed by the Joint Liquidators do not include funds held by Société Générale that are subject to a claim of lien and set-off by Société Générale and that therefore may not be recoverable.  As mentioned above in footnote 51, there are Stanford Financial assets worth $53 million in Switzerland that are not subject to this claim, two-thirds of which are expected to be recovered by the Receiver and one-third by the Joint Liquidators.  Note that depending on the outcome of the litigation surrounding the assets subject to Société Générale's lien, up to an additional $157 million may be available for recovery for the Receiver and Joint Liquidators, which I have not considered.  *See* Joint Liquidators' Eighth Report, pp. 6–7.

[58] This figure relates to the proceeds from the expected sale of Crabbs Marina, which was owned by a Stanford Financial subsidiary.  *See* Joint Liquidators' Eighth Report, p. 21.  There is an additional $7 million relating to the liquidation of Stanford Trust Company and its Colombian subsidiary that I have excluded from my analysis of expected recoveries.  These funds were worth $12 million when the Joint Liquidators took office in 2011, but due to currency fluctuations, this amount has fallen to $7 million.  Additionally, it is unclear how much, if any, of this amount the Joint Liquidators will be able to obtain.  *See* Joint Liquidators' Eighth Report, pp. 26–28.

[59] This is a conservative assumption as certain costs that were incurred initially are unlikely to be incurred going forward, including costs associated with the removal of the former liquidators.  In addition, the Joint Liquidators have started to consolidate their operations in Antigua by moving their remaining staff to a smaller facility, which is likely to be a cost-saving measure.  *See* Joint Liquidators' Eighth Report, p. 36 and Appendix A.

[60] To the extent that there are successful third-party claims against the Stanford Financial entities or the Receivership, such amounts would need to be deducted from Recoveries.

**APP. 024**

ending January 1, 2009, and then deduct recoveries from losses. This demonstration notwithstanding, as I explained in detail above, Ms. Van Tassel's interpretation of these losses as damages is fundamentally flawed because she fails to link her estimates of losses to the alleged wrongdoing.

44.     Using Ms. Van Tassel's approach, I have replicated loss estimates for SIBL and SGC for each period starting on the first date of every month between October 2006 and February 2009. For the three dates for which Ms. Van Tassel estimates losses, my calculations match her estimates. I have also estimated losses net of actual and expected recoveries. The results are shown in **Exhibit 5**. Ms. Van Tassel calculates losses for SGC by deducting from SIBL's losses certain offsetting benefits to SGC including referral fees, portfolio advisory fees, research fees, and capital contributions received by SGC "since it could be argued that these amounts would have comprised an offsetting 'benefit' to SGC from its participation in the scheme."[61] Ms. Van Tassel's SIBL and SGC loss estimates are not additive. She presents SGC losses under the implicit assumption that SGC, not SIBL, may have been the entity that was harmed by the fraud.[62]

45.     As **Exhibit 5** demonstrates, for any given month, deducting actual and expected gross recoveries of $909 million or net recoveries of $464 million leads to substantially lower potential damages for both SIBL and SGC. For example, based on Ms. Van Tassel's method, losses to SIBL are $1,014 million for the period on and after May 1, 2007, but become $105 million if gross recoveries are taken into account and $551 million if net recoveries are taken into account. Similarly, losses to SGC are $783 million for the period on and after May 1, 2007, but become zero if gross recoveries are taken into account and $319 million if net recoveries are taken into account.[63] Note, again, that these calculations of potential damages would constitute estimates of economic damages only if Plaintiffs can prove that as of any of the three dates Ms. Van Tassel

---

[61] Van Tassel Report, ¶ 103.

[62] Van Tassel Report, ¶ 106.

[63] Ms. Van Tassel estimates "economic damages" as the increase in liabilities at SIBL (or SGC) on and after each of her three chosen dates, as she estimates "economic damages" at the level of these entities. She applies this methodology to multiple parties that have been sued by Plaintiffs, including, for example, Mr. Alvarado. Thus the damages she estimates for other parties already include the damages she has estimated in this case, leading to double counting of damages. Ms. Van Tassel has not proposed a reasonable methodology for apportioning damages, let alone an appropriate way to apportion recoveries. Consequently, I deduct from this loss estimate all the assets available to pay back the increased liabilities she attributes to Mr. Sjoblom (which Ms. Van Tassel has also attributed to, for example, Mr. Alvarado).

chose, or any other date shown in the exhibit, Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme, and that he should and could have acted in a way that would have immediately ended the scheme on that date.

46.     It is important to note that Ms. Van Tassel's loss estimates are zero for any period starting on or after February 1, 2008 for SIBL (January 1, 2008 for SGC) because the adjusted liability balance Ms. Van Tassel estimates for SIBL (SGC) is lower as of February 2009 than at the beginning of any month starting in February 2008 (January 2008).  Therefore, regardless of the but-for world, there would not be any damages for SIBL on or after February 1, 2008 and for SGC on or after January, 1 2008 even if Plaintiffs could establish that Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme, and that he should and could have acted in a way that would have immediately ended the scheme.  Moreover, deducting gross recoveries from Ms. Van Tassel's loss estimates suggests that potential damages are zero for any period starting on or after June 1, 2007 for SIBL and April 1, 2007 for SGC.  Deducting net recoveries from losses indicates that potential damages are zero for any period starting on or after October 1, 2007 for SIBL and August 1, 2007 for SGC.

## VII.    Potential Damages Adjusted for Expenses Incurred by the Stanford Financial Entities

47.     I have deducted reasonable business expenses incurred by Stanford Financial from the potential damages amounts for SIBL based on Ms. Van Tassel's estimated losses and actual and expected net recoveries.  To the extent that such expenses constituted reasonable business expenditures that did not enrich the perpetrators of the Stanford Ponzi scheme, deducting them from losses net of recoveries would yield a reasonable estimate of ill-gotten gains by the perpetrators.

### A.      Reasonable Business Expenses Incurred by the Stanford Financial Entities

48.     As I explained in Section IV above, the Court determined that the Stanford Financial entities perpetrated the Ponzi scheme together as a single unit.  Thus, the business expenses associated with the fraud should include not just the reasonable business expenses of SIBL, but also reasonable business expenses incurred by the Stanford Financial entities that received fees

from SIBL. As also explained in Section IV, I have identified five entities that received payments from SIBL in the form of management or referral fees: SGC, SFGC, SFGGM, STCL, and SGAL.[64] I reviewed the financial statements of these entities, as well as those of SIBL, to estimate which of their expenses would have been incurred even in the absence of the fraud.[65]

49.     Based on my review of available documents, I develop two alternative estimates of reasonable business expenses for the six entities: one that includes only salaries[66] and another that includes all expenses other than those that I could identify as intercompany transfers.[67] I exclude the salaries of Mr. Stanford, Mr. Davis (Stanford Financial's Chief Financial Officer), Mr. Lopez (Stanford Financial's Chief Accounting Officer), and Mr. Kuhrt (Controller for SFGC from April 2006 to August 2007 and Global Controller for SFGGM from August 2007 onward)

---

[64] These entities all received a fee from SIBL according to the SIBL audited annual reports. Note that SFGC received management fees from SIBL through June 2007. Starting in July 2007, SFGGM received management fees instead of SFGC. Therefore, SFGGM expenses prior to July 2007 are not considered. SFGC received an outsourcing fee from SFGGM through the end of 2007. Since the outsourcing fee paid by SFGGM to SFGC is close in value to the management fees paid by SIBL to SFGGM, it appears that SFGC may have been receiving fees from SIBL indirectly from July 2007 through December 2007. However, I have not identified documents clearly listing outsourcing fees from SFGGM to SFGC in 2008. As a result, I do not consider expenses for SFGC in 2008. *See* Stanford International Bank 2006 Annual Report (STAN INVSTR GENL_058270–318 at 305–306); Stanford International Bank 2007 Annual Report (STAN INVSTR GENL_058319–56 at 42–43); Stanford Group Company Consolidated Financial Statements and Supplemental Material (STAN INVSTR GENL_058071–100 at 87–88) (2006 Audited Financial Statements); Stanford Financial Group Global Management, Statement of Condition (Unaudited) (STAN_INVSTR_GENL_039722) (July 2007 Financial Statements); Stanford Financial Group Global Management, Statement of Condition (Unaudited) (STAN_INVSTR_GENL_039741) (December 2007 Financial Statements); Stanford Financial Group Company, Notes to Unaudited Financial Statements (STAN_INVSTR_GENL_039623) (December 2007 Financial Statements); Stanford Financial Group Global Management, Balance Sheet (Unaudited) (STAN INVSTR GENL_040418) (December 2008 Financial Statements).

[65] Expenses are based on annual reports for SIBL; annual reports for SGC; and monthly income statements for SIBL, SGC, SFGC, SFGGM, STCL, and SGAL.

[66] To estimate such expenses, I reviewed the relevant financial statements and identified the line items containing salaries. These include Wages and Salaries for SIBL; Employee Compensation and Related Benefits for SGC in 2006 and 2007; Salaries for SGC in 2008; Salaries and Personnel Costs for SFGC, SFGGM, and SGAL; and Salaries and Employee Benefits for STCL.

[67] To estimate such expenses, I reviewed the relevant financial statements and excluded expenses that I could identify as transfers to any other Stanford Financial entity. These include Referral Fees, Rent and Maintenance of Offices and Equipment, and Management Fees for SIBL; Referral Fees Paid to SIBL and operating expenses incurred with SFGC and other affiliates for SGC in 2006 and 2007; Referral Fee - IB, Referral Fees Expense, Commission, Software & Communication Charge, FA Insurance, Advertising/Business Development, Furniture & Equipment Rent, Office Rent, Software/Hardware Accessories Cost, Telecommunications, Telecommunications - Cellular, Travel - Airfare, and Insurance for SGC in 2008; Legal and Other Professional Fees and Aviation Expense for SFGC; Promotion and Marketing/Advertising, Legal and Other Professional Fees, Aviation Expenses, and Non-Controllable Fees for SFGGM; Rent, Utilities, Management fees, and Non-Controllable Global Marketing Expenses for STCL; General and Administrative and Non-Controllable Fees for SGAL.

from both estimates.[68]  To my knowledge, these are the only employees of Stanford Financial that pleaded guilty to or were convicted of fraud.[69]

50.  Salaries for all six entities total $248 million between the fourth quarter of 2006 and the end of 2008.  Exclusive of intercompany transfers, total expenses are $536 million from the fourth quarter of 2006 to the end of 2008.

51.  Exhibit 6 shows the impact of deducting these expenses from losses after accounting for gross recoveries.  For each date included in the exhibit, I sum expenses incurred from that date onward and deduct that sum from SIBL's losses after accounting for gross recoveries.  In particular, the third column of the exhibit deducts salaries from SIBL's losses net of gross recoveries for all six entities.  The fourth column deducts all expenses other than intercompany transfers for all six entities from SIBL's losses net of gross recoveries.  The last column presents losses net of gross recoveries for SGC as described in Section VI above.

52.  As shown in Exhibit 6, SIBL losses after deducting gross recoveries are $782 million for the period on and after October 1, 2006, but deducting salaries reduces this amount to $534 million, and deducting all expenses other than intercompany transfers reduces it to $246 million.

53.  Exhibit 6 also shows that potential damages for SIBL are zero for any period starting on or after April 1, 2007 if salaries are deducted from losses net of gross recoveries, and January 1, 2007 if expenses other than intercompany transfers are deducted from losses net of gross recoveries.  Similarly, Exhibit 7 shows that potential damages for SIBL are zero for any period starting on or after August 1, 2007 if salaries are deducted from losses after accounting for net

[68] While it may be appropriate to consider salaries of key employees as reasonable business expenses, such salaries could, depending on the employee, be construed as ill-gotten gains in this matter.  Based on available documents, the salaries of Mr. Stanford, Mr. Davis, and Mr. Lopez are assumed to be paid by SFGC and the salary of Mr. Kuhrt is assumed to be paid by SFGC until August 2007 and by SFGGM thereafter.  See "Former Executives of Stanford Financial Group Entities Sentenced to 20 Years in Prison for Roles in Fraud Scheme," Department of Justice Press Release No. 13-200, February 14, 2013; Superseding Indictment, *United States of America v. Gilbert T. Lopez, Jr. and Mark J. Kuhrt*, United States District Court, Southern District of Texas, Houston Division, Case No. 4:09-cr-00342, filed July 11, 2012, ¶ 9; and STAN INVSTR GENL_110278.  As previously explained, SFGC expenses in 2008 are not included in this analysis.  Thus, the salaries of Mr. Stanford, Mr. Davis, and Mr. Lopez in 2008 are already excluded from the calculation.  Annual salaries of Mr. Stanford are taken from his tax returns (STAN INVSTR GENL_138470–672 and STAN INVSTR GENL_138673–997).  Annual salaries of Mr. Davis in 2006 and 2007, Mr. Lopez, and Mr. Kuhrt are not readily available, but to be conservative, these are all assumed to equal Mr. Davis' 2008 annual salary of $960,000 and bonus of $1.9 million as listed in Stanford International Bank Attorney Notes dated February 6, 2009 (PROSKAUER_JANVEY_00015915–24).

[69] "Closed Criminal Division Cases: *United States v. Laura Pendergest-Holt* and *United States v. Gilbert Lopez and Mark Kuhrt*," Department of Justice, available at https://www.justice.gov/criminal-vns/case/holt-lopez-kuhrt, last accessed October 26, 2017.

recoveries, and July 1, 2007 if expenses other than intercompany transfers are deducted from losses after accounting for net recoveries.

**B.    Ms. Van Tassel's Offsetting Benefits to SGC Can Be Used as an Appropriate Estimate of Reasonable Business Expenses for SIBL**

54.    A number of factors, including the lack of reliable financial data or documents regarding many Stanford Financial entities[70] and intercompany transfers relating to fees for services allegedly performed, render it difficult to estimate accurately reasonable business expenses for SIBL. One way of overcoming this difficulty is to rely on Ms. Van Tassel's estimates of offsetting benefits to SGC as an estimate of reasonable business expenses for SIBL.

55.    SIBL required the services of SGC, its U.S.-based broker-dealer, to continue selling CDs and managing its investment portfolio, suggesting that transfers received by SGC in return for such services constituted reasonable business expenses incurred by SIBL. Ms. Van Tassel states that such transfers from SIBL to SGC, including referral fees, research fees, and portfolio advisory fees, and capital contributions, can be considered offsetting benefits to SGC.[71] She states that SGC suffered net losses in 2006, 2007, and 2008,[72] suggesting that SGC would not have been able to cover its expenses without the capital contributions. Thus, like the fees SIBL paid SGC for services provided, capital contributions constituted a reasonable business expense for SIBL. Finally, I note that Ms. Van Tassel's estimates of offsetting benefits to SGC are bounded by the two estimates of reasonable business expenses I described in the previous section.

56.    Consequently, Ms. Van Tassel's estimates of offsetting benefits to SGC can be used as an appropriate estimate of reasonable business expenses for SIBL, avoiding the potential issues associated with estimating intercompany transfers based on financial documents that may be incomplete or unreliable.[73] Deducting offsetting benefits to SGC from SIBL's losses after

---

[70] For many of these entities, I have not seen audited financial statements.

[71] Van Tassel Report, ¶ 103.

[72] Van Tassel Report, ¶ 94.

[73] Ms. Van Tassel claims that the offsetting benefits to SGC are actually ill-gotten gains. *See* Van Tassel Report, ¶ 103, Footnote 25. However, it is my understanding that SGC never paid any of the key perpetrators of the scheme. Additionally, SGC was not profitable during the relevant period. *See* Van Tassel Report, ¶ 94. Therefore, these offsetting benefits cannot reasonably be construed as ill-gotten gains.

accounting for gross recoveries yields the SGC losses after accounting for gross recoveries that are shown in the last column of **Exhibit 6** (the last column of **Exhibit 7** shows the same calculation after accounting for net recoveries).  Thus, even if SIBL is assumed to be the entity damaged as a result of the Ponzi scheme, potential damages would equal SGC losses net of recoveries if reasonable business expenses incurred by SIBL are accounted for.  Note that when accounting for gross recoveries and reasonable business expenses, potential damages to SIBL are zero for any period starting on or after April 1, 2007 (see last column of **Exhibit 6**).  When accounting for net recoveries and reasonable business expenses, potential damages to SIBL are zero for any period starting on or after August 1, 2007 (see last column of **Exhibit 7**).  Therefore, regardless of the but-for world, on or after these dates there would not be any damages even if Plaintiffs could establish that Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme, and that he should and could have acted in a way that would have immediately ended the scheme.

## VIII.   Conclusion

57.    Ms. Van Tassel purports to estimate "economic damages" by calculating the increase in Stanford Financial's total CD liabilities on and after three different dates (November 1, 2006; March 1, 2007; and September 1, 2007) and deducting interest accrued to investors from those calculations.  These purported damages estimates appear to be based on the assumption that as of these three dates, Mr. Sjoblom knew that Stanford Financial was running a Ponzi scheme and that he should and could have acted in a way that would have immediately ended the scheme.  However, Ms. Van Tassel fails to provide any basis to suggest that Mr. Sjoblom knew of the scheme and could have stopped the operations of the Stanford Financial entities on any of these three dates or, indeed, any other date.  Therefore, her estimate of "economic damages" is flawed and unreliable.

58.    Furthermore, while Ms. Van Tassel acknowledges that any recovery amounts need to be accounted for, she inexplicably fails to account for recoveries obtained on behalf of SIBL and SGC.  Accounting for gross recoveries reduces Ms. Van Tassel's loss estimates by $909 million and accounting for net recoveries reduces Ms. Van Tassel's loss estimates by $464 million,

indicating that Ms. Van Tassel's loss estimates substantially overstate potential economic damages to SIBL and SGC.

59.     Accounting for both recoveries and business expenses further lowers Ms. Van Tassel's loss estimates. **Exhibit 6 (Exhibit 7)** shows that accounting for gross (net) recoveries and reasonable business expenses results in potential damages estimates that are substantially lower than Ms. Van Tassel's loss estimates. For example, Ms. Van Tassel's loss estimate for SIBL for the period on and after November 1, 2006 is $1,574 million. Accounting for gross (net) recoveries and reasonable business expenses reduces potential damages to $361 million ($807 million).

60.     Finally, I note that Ms. Van Tassel's loss estimates are zero for any period starting on or after February 1, 2008 for SIBL and January 1, 2008 for SGC. As **Exhibits 6** and **7** show, potential damages for SIBL are zero for any period starting on or after:

    a.  June 1, 2007 taking into account gross recoveries and

    b.  October 1, 2007 taking into account net recoveries.

61.     Furthermore, because Ms. Van Tassel's estimates of offsetting benefits to SGC can be used as an appropriate estimate of reasonable business expenses for SIBL, her loss estimates for SGC are equivalent to accounting for reasonable business expenses for SIBL. Thus, potential damages for SIBL accounting for reasonable business expenses (or potential damages for SGC) are zero for any period starting on or after:

    a.  April 1, 2007 taking into account gross recoveries and

    b.  August 1, 2007 taking into account net recoveries.

Executed this 27th of October, 2017

_____

Paul Gompers

Confidential

APP. 031

Exhibit 4

## Janvey v. Proskauer Rose LLP
### Receiver and Joint Liquidators Recovery Amounts
(in millions)

### Receiver

| | | Recovery |
|---|---|---|
| Gross Recovery as of April 30, 2017 | A | $408 |
| Net Recovery as of April 30, 2017 [1][2] | B | $219 |
| Additional Expected Recovery | C = D + E | $294 |
| Litigation [3] | D | $258 |
| Stanford assets in Switzerland to be distributed by the Receiver [4] | E | $35 |
| Additional Expected Net Recovery [5] | F = C * (B / A) | $151 |
| Total Expected Gross Recovery | G = A + C | $701 |
| Total Expected Net Recovery [5] | H = B + F | $362 |

### Joint Liquidators

| | | Recovery |
|---|---|---|
| Gross Recovery as of December 31, 2016 | I | $182 |
| Net Recovery as of December 31, 2016 [1] | J | $49 |
| Additional Expected Recovery | K = L + M | $26 |
| Stanford Assets in Switzerland to be distributed by the Joint Liquidators [4] | L | $18 |
| Crabbs Manna Facility | M | $9 |
| Additional Expected Net Recovery [6] | N = K * (J / I) | $13 |
| Total Expected Gross Recovery | O = I + K | $208 |
| Total Expected Net Recovery [6] | P = J + N | $102 |

### Receiver and Joint Liquidators

| | | Recovery |
|---|---|---|
| Combined Gross Recovery to Date | Q = A + I | $590 |
| Combined Total Expected Gross Recovery | R = G + O | $909 |
| Combined Net Recovery to Date | S = B + J | $299 |
| Combined Total Expected Net Recovery | T = H + P | $464 |

Source  Appendix in Support of Joint Motion of the SEC, Receiver, Examiner, and Official Stanford Investors Committee to Approve Settlement
          Agreement and Cross-Border Protocol filed March 12, 2013; Eighth Report of the Joint Liquidators of Stanford International Bank, in
          Liquidation, filed April 5, 2017; Receiver's 13th Interim Report Regarding Status of Receivership, Asset Collection, and Ongoing
          Activities filed June 1, 2017.

Note
          [1] Net Recovery equals gross recovery net of fees and expenses.
          [2] This figure does not include $1.8 million that is not available for payment of claims or expenses of the Estate.
          [3] This figure includes agreed-upon settlements and injunctions to hold additional assets.
          [4] Stanford assets in Switzerland that are subject to Senate Commerce claim of lien and set-off, totaling $157 million, are excluded.
              There are an additional $53 million of Stanford assets in Switzerland that are not subject to the claim, two-thirds of which are
              expected to be recovered by the Receiver and one-third by the Joint Liquidators, according to the Eighth Report of the Joint
              Liquidators. If the Receiver and Joint Liquidators are successful on the Swiss claims, Total Expected Gross Recovery would increase
              by $105 million for the Receiver and $52 million for the Joint Liquidators, and Total Expected Net Recovery would increase by $54
              million for the Receiver and $26 million for the Joint Liquidators.
          [5] This estimate of Additional Expected Net Recovery assumes that the rate of expenses and fees incurred for assets recovered by the
              Receiver going forward is the same as it has been through April 30, 2017. To the extent that there are successful third-party claims
              against the Stanford entities or the Receivership, such amounts would need to be deducted from Recoveries.
          [6] This estimate of Additional Expected Net Recovery assumes that the rate of expenses and fees incurred for assets recovered by the
              Joint Liquidators going forward is the same as it has been through December 31, 2016.

Confidential

**APP. 032**

# EXHIBIT B

VOLUME:   I
PAGES:   1 - 202
EXHIBITS:   1 - 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CASE NO.:   3:13-CV-0477-N-BG

-----------------------------------x
RALPH S. JANVEY, IN HIS CAPACITY AS
COURT-APPOINTED RECEIVER FOR THE
STANFORD RECEIVERSHIP ESTATE, AND
THE OFFICIAL STANFORD INVESTORS
COMMITTEE,

          Plaintiffs

vs

PROSKAUER ROSE, LLP, CHADBOURNE &
PARKE, LLP, THOMAS J. SJOBLOM,
AND PABLO M. ALVARADO,

          Defendants
-----------------------------------x

        VIDEOTAPE DEPOSITION OF PAUL A. GOMPERS,
PhD, taken on behalf of the Plaintiffs, pursuant
to the applicable provisions of the Federal
Rules of Civil Procedure, before James A. Lyons,
CSR No. 117993, a Registered Diplomate Reporter,
Certified Realtime Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at
the offices of Cornerstone Research, One Exeter
Plaza, 699 Boylston Street, 5th Floor, Boston,
Massachusetts 02116-2836, on Monday,
January 22, 2018, commencing at 9:38 a.m.

-----------------------------------------
        NATIONAL COURT REPORTERS, INC.
SERVING LEGAL PROFESSIONALS FROM COAST TO COAST
              7835 FREEWAY CIRCLE
            CLEVELAND, OHIO 44130
  PHONE:   440.826.4000 / FAX:   440.826.9800
          WEBSITE:   www.bramanti-lyons.com
    E-MAIL:   mail@nationalcourtreporters.com

2

1    APPEARANCES:

2

3    Douglas J. Buncher, Esq.
     Neligan, LLP
     325 N. St. Paul, Suite 3600
4    Dallas, Texas 75201
     Attorney for the Plaintiffs
5    Tel:  214-840-5300
     E-mail:  dbuncher@neliganlaw.com
6

7    Daniel J. Schwartz, Esq. and
     Daniel S. Magy, Esq.
8    Davis, Polk & Wardwell, LLP
     450 Lexington Avenue
9    New York, New York 10017
     Attorneys for the Defendants
10   Tel:  212-450-4581
     E-mail:  daniel.schwartz@davispolk.com
11            daniel.magy@davispolk.com

12

     VIDEOGRAPHER:
13

     Oleg Bolotov
14   National Court Reporters, Inc.

15

16

17

18

19

20

21

22

23

24

APP. 035

1          conviction, as I sit here, again, I haven't

2          reviewed; so I don't recall the specifics of the

3          conviction.

4     Q.   All right.

5               Are you aware that he was convicted of

6          obstructing an SEC investigation?

7     A.   Again, the specifics of the indictment and the

8          conviction, as I sit here, I just haven't

9          reviewed Mr. Stanford's -- the verdict against

10         Mr. Stanford.

11    Q.   And then Mr. Davis pled guilty to a variety of

12         securities law violations as well as

13         obstruction of the SEC's investigation into

14         Stanford.

15              Are you familiar with that?

16    A.   Again, as I, you know, for preparation today, I

17         haven't reviewed.  Certainly, I know that he

18         pled guilty; so in my report, I sort of

19         highlight that Mr. Davis pled guilty.  But for

20         today, I haven't reviewed the guilty plea that

21         he entered.

22    Q.   Have you reviewed Ms. Holt's guilty plea where

23         she pled guilty to obstruction of the SEC

24         investigation?

A.    Again, it would be the same answer that, to the
      best of my recollection, early on in the
      engagement, I reviewed it.  But I haven't
      reviewed it sort of in preparation for today.

Q.    And you have not reviewed the evidence to try
      to formulate an opinion about whether
      Mr. Sjoblom's actions, in any way, aided and
      abetted those criminal acts by the officers and
      directors I just mentioned?

A.    So I don't have an opinion on, as you said, the
      liability.

            Certainly, I have an opinion that none
      of the plaintiff experts identify specific
      actions in a but-for world that Mr. Sjoblom
      could have taken that would have, at the
      various points in time that Ms. Van Tassel
      identifies, would have stopped the Ponzi scheme
      at that point in time.

            And so I don't have an opinion on the
      liability.  But as it would relate to loss
      causation, from a damages perspective, I
      certainly have an opinion that none of the
      plaintiff experts have identified specific
      actions at specific points in time that

1    Mr. Sjoblom should or could have taken which

2    would have ended the Ponzi scheme.

3 Q.  Are you aware that Mr. Sjoblom is the one that

4    instructed the clients to stop selling the CDs

5    in February of 2009?

6 A.  I'm aware of that, yes.

7 Q.  And if Mr. Sjoblom, at any point in time prior

8    to February of 2009, had told them to stop

9    selling the CDs, don't you agree that would have

10   avoided whatever further losses occurred after

11   that date?

12        MR. SCHWARTZ:  Objection to the form.

13   Calls for speculation.

14 A.  Not necessarily.

15        You don't know whether or not they would

16   have complied, whether or not they would have

17   terminated Mr. Sjoblom's representation; so we

18   don't know.  We don't know what that but-for

19   world would have looked like, nor do we have any

20   plaintiffs who say --

21        None of the plaintiff experts say had

22   Mr. Sjoblom said to the Stanford management

23   team in May of 2008 or at any point in time

24   earlier, if he had said that, that they would

1    have stopped selling the CDs.

2         So again, there is no specification of a

3    but-for world, then certainly there is no

4    opinion that, had he said that, that that would

5    have stopped the Ponzi scheme at that point in

6    time.

7    Q.   Did they, in fact, stop selling the CDs when he

8         told them to stop selling the CDs in February of

9         2009?

10   A.   So they stopped.  But there was certainly --

11        The context was very different.  So the

12        financial crisis had certainly imposed

13        particular constraints on all types of financial

14        institutions.  And so the question is, in the

15        but-for world, there is no opinion that, at any

16        point in time earlier, had Mr. Sjoblom said what

17        he said in February of 2009 that SGC and SIBL

18        would have stopped issuing CDs.

19   Q.   Do you agree with me that the actions of Allen

20        Stanford and James Davis caused all of the

21        damages?

22   A.   So I haven't been asked to look at sort of the

23        causation of what Mr. Davis and Mr. Stanford

24        did as it would relate to the scheme to sell

1       true?

2               MR. SCHWARTZ:   Objection to the form.

3       Foundation.

4   A.  So I think you're asking me to offer a specific

5       opinion about the nature of the claim against

6       SGC.  I haven't been asked to offer an opinion

7       on that.  And I haven't reviewed it in a way in

8       which I would feel comfortable offering

9       opinions; so...

10  Q.  Okay.

11              Have you been provided -- in connection

12      with this statement you made about the but-for

13      world in terms of causation -- have you been

14      provided with any case law from Texas that

15      describes the causation that's required to be

16      shown in a claim for aiding and abetting a fraud

17      or a breach of fiduciary duty?

18  A.  Well, I think that would be irrelevant for me as

19      a matter of financial economics.  I'm offering

20      economic opinions.  I'm a financial economist.

21      That's what I do in terms of research, and

22      that's where my testimony is based.

23              And I certainly understand, as a matter

24      of economics, what's necessary to show loss

1    causation.  And from the perspective of

2    economics, what's necessary is to identify a

3    but-for world in which Mr. Sjoblom knowing what

4    he knew at that time could have and should have

5    taken a particular action which would have

6    caused the suspension of the Ponzi scheme.

7              And I've read through Ms. Van Tassel's

8    report.  I've read through the Spindler report.

9    I've read through the Marcus report.  And none

10   of them identify a specific action that they

11   claim or they offer the opinion would have

12   affirmatively ended the Ponzi scheme on that

13   date given the action that Mr. Sjoblom should

14   have taken.

15 Q.  Is there some reason you think that we have to

16   have an expert to tell the jury whether his

17   actions could have stopped the Ponzi scheme or

18   not?

19             MR. SCHWARTZ:  Objection to the form.

20 A.  The issue is whether or not an economist

21   without a context to understand what the but-for

22   world would look like can offer an opinion on

23   damages.

24             I outline in my report a number of

1    alternative worlds in which, even if Mr. Sjoblom

2    had suspected something was wrong at the

3    Stanford entities, there are a number of

4    scenarios in which it would have continued to go

5    on.

6         So I identify, for example, perhaps

7    Mr. Sjoblom would say something and the Stanford

8    financial -- the Stanford senior management

9    would just ignore it. Or Mr. Sjoblom might

10   actually sort of resign his representation, and

11   the Stanford managers would go on and find

12   another outside counsel. So there are a number

13   of actions that Mr. Sjoblom may have taken which

14   would have had absolutely no effect on the

15   continuation of the scheme.

16        And absent the identification of a

17   particular action given what he knew that he

18   should or could have taken, at that point in

19   time, which affirmatively would have ended the

20   Ponzi scheme, you can't attribute loss

21   causation and damages to Proskauer and

22   Mr. Sjoblom.

23   Q.  Are you aware that Texas law provides that

24       someone that aids and abets a breach of

1          fiduciary duty is jointly and severally liable

2          for the harm that was caused by those officers

3          and directors?

4     A.   I think that would require me to offer a legal

5          opinion to be a lawyer.  And so what I'm

6          offering is an opinion on economic damages.  How

7          does one approach the measurement of economic

8          damages?

9     Q.   Okay.

10              What economic damages did the officers

11         and directors' breach as a fiduciary duty cause

12         in this matter?

13              MR. SCHWARTZ:  Objection to the form.

14    A.   I haven't been asked to look at that.  I've

15         been asked to respond to Ms. Van Tassel's

16         report in which she tries to measure damages

17         which are attributable to the actions or

18         inactions of Mr. Sjoblom and Proskauer.

19    Q.   And so that was one of the questions that I had

20         for you today.

21              Your assignment was not to come up with

22         your own damage model that might apply in this

23         matter; correct?

24    A.   That's correct.

1    Q.    You were asked to simply critique Ms. Van

2          Tassel's report and methodology; is that

3          right?

4    A.    I was asked to respond.  I was asked to review

5          her report and to respond to the opinions that

6          she offered in that report.

7    Q.    So you haven't been asked to formulate your

8          own model of the damages that may have been

9          caused by the officers and directors of SGC or

10         SIB?

11   A.    That's correct.

12   Q.    And you haven't been asked to come up with your

13         own model of potential damages caused by

14         Mr. Sjoblom's conduct; right?

15   A.    That's correct.

16               But I do offer an opinion that if you

17         look and accept, for hypothetical purposes, the

18         model put forward by Ms. Van Tassel, what

19         additional considerations would you have to

20         consider in order to appropriately measure

21         damages?

22   Q.    And that assumes that Mr. Sjoblom --

23               MR. BUNCHER:  Well, strike that.

24   Q.    That assumes that the plaintiffs are required to

1        prove separate damages caused by Mr. Sjoblom's

2        conduct alone.

3              Is that the basis for your analysis?

4              MR. SCHWARTZ:  Objection to the form.

5   A.   I think you're asking me to offer a legal

6        opinion.

7              As a matter of economics, in order to

8        ascribe damages to Proskauer and Mr. Sjoblom,

9        what's necessary is for an expert to estimate a

10       but-for world in which another action would have

11       been taken.

12             So given what Mr. Sjoblom knew, what

13       should he and could he have done that would have

14       caused the suspension of the Ponzi scheme at

15       that point in time?  And that is, from a matter

16       of economics -- which is all I can testify to

17       because I'm an economist -- as a matter of

18       economics, that's what's necessary to show that

19       there are damages attributable to Mr. Sjoblom

20       and Proskauer.

21  Q.   If the law provides that he, as an aider and

22       abetter is jointly and severally liable for all

23       of the harm caused by the directors and

24       officers' conduct, you do not have an opinion as

1    Q.    I'm not asking you whether the plaintiffs'

2          experts have said anything about it.  I'm

3          asking you, as a factual matter, if he had

4          instructed them to stop selling the CDs

5          earlier, the losses that Ms. Van Tassel

6          calculates would have been avoided; isn't that

7          true?

8                MR. SCHWARTZ:  Objection to the form.

9          Asked and answered.  And it calls for

10         speculation.

11   A.    I haven't been asked to offer an opinion, and I

12         don't offer any opinion or make any assumptions

13         as to that.

14                I can certainly imagine, as I stated

15         earlier, that Mr. Sjoblom may have said at an

16         earlier point in time to the senior management

17         at Stanford "Stop selling these," and they would

18         have continued selling them.  They would have

19         replaced him as senior counsel.  They would have

20         done a lot of things that would have meant that

21         the path of the Ponzi scheme was unchanged.  And

22         there is no opinion from the plaintiffs to the

23         contrary.

24   Q.    You say you can imagine a scenario where he

1      instructs them to stop selling the CDs earlier

2      in time, and they would have ignored his

3      instructions.

4          Isn't it equally as possible that, had he

5      instructed them earlier, they would have done

6      what they did in February of '09 and stopped

7      selling the CDs?

8          MR. SCHWARTZ:  Objection to the form.

9  Q.  Do you have any opinion about that?

10         MR. SCHWARTZ:  Objection to the form.

11     Foundation and calls for speculation.

12 A.  I don't have any opinion, one way or the

13     other.

14         The important thing here is you just

15     can't assume it.  There is no opinion.  There is

16     no evidence that it would have stopped.

17 Q.  Well, the evidence we do have is, when he

18     instructed them to stop selling the CDS, they

19     did, in fact, stop selling them; is that

20     true?

21         MR. SCHWARTZ:  Objection to form.

22 Q.  Is that a factual matter in this case?

23         MR. SCHWARTZ:  Objection to the form.

24     Asked and answered.  Lacks foundation.

1   A.    In the particular context in the height of the

2         financial crisis, yes, they stopped selling

3         CDs.

4   Q.    Have you reviewed Mr. Sjoblom's interview notes

5         when he went to interview the people at the

6         broker-dealer that were selling the CDs early in

7         his representation?  I believe it was June of

8         2005.

9   A.    I don't believe I've reviewed the notes

10        themselves.

11             Certainly, in the Spindler and the Van

12        Tassel report, there is a discussion of numerous

13        events that they talk about in terms of the type

14        of information which was available to

15        Mr. Sjoblom.  But the actual notes themselves I

16        have not reviewed.

17  Q.    Okay.

18             Are you aware that the brokers at SGC as

19        well as the compliance officer at SGC informed

20        him in 2005 that they did not know what the bank

21        was doing with the funds that were being

22        invested?

23             MR. SCHWARTZ:  Objection to the form.

24  A.    Again, as I sit here, I don't recall what was

1    perspective on what the typical duties and

2    responsibilities of managers and directors

3    are.

4           I can't opine as a matter of law.  I'm

5    not a lawyer who can provide those types of

6    legal opinions about what the legal standards

7    are.

8    Q.   Now, earlier we were talking about this but-for

9         causation issue that you've discussed in your

10        report.  And you pointed out that none of the

11        plaintiffs' experts have suggested or opined on

12        what actions Mr. Sjoblom did or did not take

13        which would have caused the Ponzi scheme to come

14        to an end earlier.

15           In that connection, you are not offering

16        your own separate opinion about what damages

17        were caused by Mr. Sjoblom's conduct or

18        inactions in this case; are you?

19           MR. SCHWARTZ:  Objection to the form.

20   A.   So I haven't been asked to offer an opinion

21        about what particular actions Mr. Sjoblom could

22        or could not have taken that would have ended

23        the Ponzi scheme.

24           What I've been asked to look at is

1          So I can imagine circumstances where it

2     would have been, you know, virtually identical

3     to what happened in the real world.

4  Q.  Can you imagine any circumstances where it

5     wouldn't have been virtually identical?

6          You keep talking about every

7     circumstance you can imagine where the CD

8     liabilities would have just gone on anyway.

9          Can you imagine any scenario, as you sit

10    here today, where Mr. Sjoblom could have done

11    something that would have stopped this from

12    occurring?

13         MR. SCHWARTZ:  Objection to the form.

14 A.   You know, given what he knew, I don't see an

15    action that he could or should have taken that

16    would have stopped it.

17 Q.   Okay.

18         So even if Mr. Sjoblom had told the

19    broker-dealer Don't sell any more CDs until

20    you find out what the bank is doing with the

21    money, and if the broker-dealer had followed

22    those instructions, you still can't imagine a

23    world in which the CDs sales would have

24    stopped?

APP. 050

1          MR. SCHWARTZ:  Objection to the form.

2    A.    So if you're asking me to assume that they

3          stopped selling, well, then you're asking me to

4          assume loss causation.  There is no sort of --

5               There is no real evidence or there is no

6          sort of real opinion and reasoning here.  You're

7          asking me to assume that they stopped selling

8          CDs.  If they stopped selling CDs, then it's

9          tautological that the liabilities wouldn't have

10         increased.

11              The question is, in the real world,

12         given what he knew, is it possible that he told

13         the broker-dealer to stop selling that they

14         would have continued?  Is it possible that

15         additional information would have been

16         provided and they would have continued to

17         sell?

18              And absolutely, there is nothing that

19         indicates to me that there is a specific action,

20         given what he knew, that would have caused the

21         scheme to stop.

22   Q.    But you're not going to testify about what he

23         knew, are you, at any point in time?

24   A.    No.  But I'm testifying on have the plaintiffs

1          anything he could have done would have stopped

2          the Ponzi scheme --

3               MR. SCHWARTZ:  Objection to the form.

4          Foundation.

5     Q.   -- or are you just observing the fact that there

6          isn't an expert opinion about that?

7     A.   So I would think that it would be important to

8          have an expert inform the jury about what an

9          outside counsel could have done and should have

10         done given what Mr. Sjoblom knew that would have

11         caused the Ponzi scheme to stop at that point in

12         time.

13    Q.   We know he ultimately made a noisy withdrawal.

14         In other words, he sent a correspondence to the

15         SEC and said I disaffirm everything I've ever

16         told you or words to that effect.

17              Are you aware of that?

18    A.   Yes.

19    Q.   Had he done such a noisy withdrawal at an

20         earlier period of time, can you imagine a

21         scenario where that would have impacted what

22         occurred?

23              MR. SCHWARTZ:  Objection to the form.

24         Foundation.  Calls for speculation.

1    A.    I can imagine yes, and I can imagine no.

2                 There is nothing that would

3          affirmatively say this would cause the Ponzi

4          scheme to stop at that point in time.  What he

5          knew at a prior point was different.  The

6          context at a prior point was different.

7                 The SEC had investigated Stanford for, at

8          least, four times prior to Mr. Sjoblom's

9          representation.  So it's quite possible, as I

10         think I put that as a possibility in the report,

11         that Mr. Sjoblom could have resigned or could

12         have gone to the SEC.  And still at prior points

13         in time, it wouldn't have changed the

14         trajectory.

15   Q.    But it could have, too?

16                 MR. SCHWARTZ:  Objection.

17   Q.    Wouldn't you agree?

18   A.    I imagine lots of things are possible.  But

19         there is no evidence that there is a specific

20         action that he could have taken that would have

21         stopped it.

22   Q.    So you can imagine different things occurring,

23         but you can't imagine any circumstance where

24         anything Mr. Sjoblom did or didn't do would have

1    made any difference.

2              Is that your opinion?

3              MR. SCHWARTZ:  Objection to the form.

4    A.   What I've reviewed is, had the plaintiffs

5         demonstrated loss causation, had they shown

6         that there was an available action to

7         Mr. Sjoblom at prior points in time, given what

8         he knew, that would have stopped the Ponzi

9         scheme.  And nothing that plaintiff has shown

10        has demonstrated that that is what could have

11        happened.

12   Q.   Nothing plaintiff has done or nothing in the

13        plaintiffs' expert reports about that?

14             MR. SCHWARTZ:  Objection to the form.

15        Asked and answered.

16   A.   I've certainly reviewed the plaintiff

17        complaint, and I've reviewed the plaintiff

18        experts.  And I've seen nothing in either of

19        those, in any of those, that identified a

20        specific action that Mr. Sjoblom could have

21        taken and should have taken given what he knew

22        that would have stopped the Ponzi scheme to

23        end.

24   Q.   Didn't Mr. Henderson opine that the

79

1          from in terms of Exhibit 4 in my report.

2    Q.    Do you know what litigation was settled that

3          resulted in these expected recoveries that

4          haven't been received yet?

5    A.    I haven't investigated what settlements total

6          that 232.

7    Q.    Are you aware of the settlement with The

8          Willis Group?  Do you know anything about

9          that?

10   A.    No.

11   Q.    Do you know anything about a settlement with

12         Lloyds?

13   A.    No.

14   Q.    Do you know or did you know that those

15         settlements are on appeal to the Fifth Circuit

16         Court of Appeals?

17   A.    No.

18   Q.    Would that impact your analysis of whether they

19         should be included or not if they're on appeal

20         being challenged?

21   A.    It would depend.  It would depend upon a review

22         of the circumstances behind those appeals.

23         Maybe yes, maybe no.

24   Q.    And you have not undertaken to review those

1          And so that's the entire increase in net

2      liabilities over the period of the relevant

3      periods in time.  So in order to understand what

4      damages are in those, it's reasonable to deduct

5      from those numbers the amount of the recoveries

6      in question.

7   Q.  Now, you have two kinds of recoveries.  One is

8      from liquidation of assets, nonlitigation

9      assets.

10          And then you have recoveries from

11      litigation; right?

12   A.  That's correct.

13   Q.  With respect to the recoveries for nonlitigation

14      assets, did you undertake any analysis to

15      determine what time period those assets were

16      acquired by Stanford?

17   A.  No.  And it's not relevant.  These are assets

18      which are --

19          So if we think about what Ms. Van Tassel

20      has done is looked at the liabilities which sort

21      of accrue over time.  And relative to the

22      liabilities, there are a given set of assets.

23      And so the real question is, what is the

24      underlying assets which can be used to fulfill

APP. 056

1        those liabilities?

2    Q.    Understood.

3              But the liabilities that Ms. Van Tassel

4        has calculated for this lawsuit, for the

5        Proskauer lawsuit, are far less than the total

6        liabilities on the books of Stanford as of the

7        date it went into receivership; correct?

8    A.    Well, that's correct.

9              But Ms. Van Tassel has not done an

10       analysis of what the difference between assets

11       and liabilities are at any date over the entire

12       period of time in question; so we have some end

13       of period assets, and we have some liabilities

14       over time.

15             And in other cases, in another case, I've

16       actually looked at how the liabilities and the

17       assets in the Madoff case, how the liabilities

18       and the assets changed over time and how the

19       difference was not static.

20             And so given that we don't have that,

21       it's reasonable to take the assets which exist

22       today to fulfill those liabilities and to offset

23       the liabilities which she estimates as increases

24       in net liabilities.

1              MR. BUNCHER:  I'm going to have to

2       object.

3    Q.   You did not respond to my question.  I wasn't

4       asking you what Ms. Van Tassel did or didn't do.

5       What I asked you is, you have not undertaken an

6       analysis to determine when the assets were

7       acquired --

8              MR. BUNCHER:  Well, strike that.

9    Q.   What are the total liabilities on the books of

10      Stanford at the date of the receivership; do you

11      know?

12   A.   In the Stanford case, I believe Ms. Van Tassel

13      estimates it's something like 5.4 billion.

14   Q.   That's the CD liabilities; right?

15   A.   That's correct.

16   Q.   What other liabilities were on the books at

17      Stanford at the date of the receivership?

18   A.   I haven't reviewed those.

19              What I'm looking at is the methodology

20      that she takes in this case is to look at the

21      change in net CD liabilities over a given period

22      of time which is the same methodology that she

23      applied in the Alvarado case and then in the

24      Stanford case.

1    Q.    Okay.

2              If you'll just listen to my question and

3         answer my question.  I know what you've said in

4         your report, and all I want is an answer to my

5         questions and then it will go a lot quicker.

6              So you do not know what the total

7         liabilities on the books at Stanford were as of

8         February 16, 2009 when it went into

9         receivership; correct?

10   A.    I have not undertaken that evaluation.

11   Q.    You have not looked at any of the claims data of

12        the receivership to determine what are the total

13        allowed claims in the receivership; have you?

14             MR. SCHWARTZ:  Objection to the form.

15   A.    I didn't have that data; so no.

16   Q.    So all of these recoveries are dollars that are

17        available to pay all of the claims against the

18        receivership; right?

19             MR. SCHWARTZ:  Objection to the form.

20        Foundation.

21   A.    Again, that would seem to me to require some

22        legal opinion about what the responsibility of

23        the court and the disposition of these assets

24        would be.  Well, my opinion relates to looking

85

1    at the framework where Ms. Van Tassel has

2    actually double and triple-counted the increase

3    in net CD liabilities across different cases.

4         So that if you look, for example, if you

5    add up the increase in CD liabilities from the

6    Alvarado case and this Proskauer case, the total

7    increase in net CD liabilities is $5.7 billion

8    because it's 1.6 plus the 4.1 which is more than

9    the overall increase in net CD liabilities for

10   the entire period which is 5.4.  And in fact, if

11   you add up all three cases, you get something

12   like, you know, 11.1 billion.

13   Q.   What's the third case that you are referring

14        to?

15   A.   So over the entire period of time in which the

16        scheme existed, the increase in net CD

17        liabilities is $5.4 billion.

18   Q.   Right.

19         Isn't that the total CD liabilities on

20        the books as of the date of the receivership

21        less the -- she backs out the fictitious

22        interest to come up with that number.

23         Do you understand that?

24   A.   I understand that, yes.

```
1              that, as she's double-counting damages, also to

2              allocate the entire recoveries against that 1.6

3              billion as well.

4    Q.   Have you issued a report in the Alvarado

5         litigation?

6    A.   No.

7    Q.   So we're talking about the Proskauer litigation

8         here?

9    A.   That's correct.

10   Q.   Because you have no opinions in the Alvarado

11        case; right?

12   A.   That is correct.

13   Q.   So the only CD liabilities that we are

14        discussing are those incurred after November 1,

15        2006 in this case; right?

16   A.   That is correct.

17   Q.   And that's where she comes up with an

18        approximate $1.5 billion increase.

19             Do you recall that?

20   A.   Yes.

21   Q.   That 1.5 billion of CD liability increase is

22        only some portion of the 5.5 billion that's on

23        the books at the date of the receivership;

24        right?
```

1   A.   That is correct.

2   Q.   But you have nonetheless allocated 100 percent

3        of the receivership recoveries to this $1.6

4        billion.  And you have disregarded those other

5        CD liabilities in this analysis?

6                MR. SCHWARTZ:  Objection to the form.

7   A.   I've been asked to offer an opinion in this

8        case.

9   Q.   Yes, sir.

10  A.   And in this case, given that her methodology is

11       to look at in all of these cases the increase in

12       net CD liabilities, to show what the economic

13       damages, quote, that she identifies would be, if

14       you offset them by both the gross recoveries and

15       the net recoveries, what ultimately the court

16       does with those recoveries is for the court to

17       decide.  And I don't have a legal opinion on

18       that.

19                I'm providing an estimate of what the

20       damages number looks like when one offsets the

21       gross and net recoveries.

22  Q.   Okay.

23                But you have deducted 100 percent of the

24       gross recoveries from the 1.6 or $1.5 billion

1          of CD liabilities which were incurred in the

2          finite period of November 1, 2006 to the end;

3          correct?

4    A.    That is correct.

5    Q.    Do you think that's reasonable to do that, given

6          that those recoveries will be allocated to all

7          of the CD claimants, not just these $1.6 billion

8          of CD claimants?

9    A.    Yes.

10   Q.    Well, aren't you giving Proskauer a windfall by

11         allocating 100 percent of the recoveries to just

12         this portion of the liabilities as opposed to

13         the entirety of the liabilities?

14   A.    I think it's an appropriate methodology to look

15         at the damages number given that, across various

16         matters, Ms. Van Tassel is allocating the entire

17         increase in net CD liabilities to multiple

18         parties.

19   Q.    Do you know if the figures you used for the

20         anticipated litigation recoveries under the

21         settlement agreements takes into account the

22         contingency fees and expenses that are to be

23         deducted from the gross recoveries?

24   A.    So I do not know.

1          But what I do in my calculation in

2     Exhibit 4 to go from gross to net recoveries is

3     to assume that the same expense ratio that was

4     incurred on the actual recoveries to date would

5     be incurred on the expected recoveries.

6  Q.  Right.

7  A.  So it's, roughly, a 50 percent expense ratio.

8  Q.  Okay.

9  A.  And that's what I do.

10 Q.  Right.

11          Do you know what the contingency fee

12     percentages are on the litigation that's been

13     settled?

14 A.  I have not investigated that.  But I believe

15     that what I've done in terms of assuming the

16     same expense ratio on the expected recoveries is

17     both reasonable and conservative.

18 Q.  The 1.6 billion -- I keep saying 1.6 -- the 1.5

19     billion or --

20 A.  It's 1.57 or something like that.

21 Q.  Okay.  So let's call it 1.6.

22          The $1.6 billion of CD liabilities that

23     Ms. Van Tassel computes were incurred after

24     November 1, 2006.  You don't dispute that's an

1       accurate number; do you?

2  A.   I've replicated her analysis, and I've done it

3       month by month.  And for the three dates she

4       chooses, we get the exact same number.

5  Q.   So the only opinions that you are offering are

6       there should be some credit given for gross or

7       net recoveries and perhaps some other offset for

8       some business expenses; is that right?

9           MR. SCHWARTZ:  I object to the form.

10  A.   So we've spent a lot of time on loss causation

11      already; so let's put that aside.

12        But in terms of the actual calculation

13      itself, the opinion is, one, that if one is to

14      measure the economic harm to the entities SIBL

15      and SGC, you need to offset it by the

16      recoveries and then if one thinks about a

17      but-for world in which there are these

18      legitimate business expenses.

19        So this is a case unlike Madoff in which

20      there were actually people doing real work.

21      These weren't part of the Ponzi scheme.  People

22      were actually doing work at a variety of the

23      Stanford entities; and so it's reasonable to

24      deduct those expenses from the estimated damages

1          month-by-month salary and expenditures.  And

2          then the cumulative totals are what you see in

3          the next four columns; so 7, 8, 9 and 10.

4     Q.   So the Key Players Salary columns are the

5          salaries of Mr. Stanford, Mr. Davis, Mr. Lopez

6          and Mr. Kuhrt that you've identified in

7          paragraph 49 of your report?

8     A.   That is correct.

9     Q.   What about Ms. Holt?

10    A.   I have not excluded her salary; because she has

11         not either pled guilty or been convicted of

12         fraud.

13    Q.   She pled guilty to obstruction of the SEC

14         investigation.  Were you aware of that?

15    A.   Yes.

16    Q.   By only deducting out these certain salaries

17         that you say you called Key Player Salaries,

18         you are assuming that no other employees at

19         Stanford were part of the fraud; is that

20         right?  Because if you knew other employees

21         were part of the fraud using the same logic, you

22         would want to take their salaries out, too?

23    A.   If other members of Stanford had been convicted

24         or pled guilty of fraud, I would have excluded

1           so...

2      Q.   Okay.

3      A.   I don't recall the exact language that she uses,

4           but it relates to the last paragraph of her

5           responses to my report.

6      Q.   Do you take issue with the proposition that

7           increased liabilities can, in fact, be a measure

8           of damages to an organization?

9      A.   So certainly increases in liabilities, while

10          without an offsetting increase in assets,

11          makes an organization more insolvent than it was

12          at a point in time when it had lower

13          liabilities.

14               So the difference between the claims in

15          the form of liabilities and the assets

16          underlying those liabilities can be a matter of

17          insolvency or impairment or damages.

18     Q.   Have you been involved with any other cases,

19          other than this one, where an increased

20          liability theory of damage was asserted?

21     A.   Not as I sit here, I don't recall that

22          proposition.  Again, there may be.  I'd have to

23          go and review some of my prior cases, but not as

24          I sit here.

162

1    Q.    But you don't have issue with that being a

2          potentially appropriate measure of damages in an

3          appropriate case?

4              MR. SCHWARTZ:  Objection to the form.

5    A.    So I haven't offered an opinion that it's an

6          appropriate measure of damages here.

7             As I've mentioned that, if a firm incurs

8          a liability without an offsetting increase in

9          the underlying assets, that difference between

10        the claim on the company and the assets goes up;

11        and therefore, in some sense, may measure

12        damages.

13   Q.    Okay.

14           One other matter, if you look at

15        paragraph 60 of your report.  You say, "I note

16        that Ms. Van Tassel's loss estimates are 0 for

17        any period starting on or after February 1, 2008

18        for SIBL and January 1, 2008 for SGC."

19           Do you see that?

20   A.    I do.

21           MR. BUNCHER:  I'm going to hand you what

22        I'll have the reporter mark Exhibit 6 now.

23          (Exhibit No. 6, For Identification,

24            marked.)

1    damages framework.

2         So there are two reasons why I view her

3    statements in her deposition in response to my

4    opinion that damages after those two dates are 0

5    is inappropriate.

6    Q.   You haven't endeavored to separately analyze

7    whether there was harm caused by or any harm

8    suffered by SGC or SIB after January or February

9    of 2008; have you?

10   A.   What I've done is to utilize the methodology

11   that Ms. Van Tassel presents and, taking that

12   methodology, show that that methodology leads

13   to 0 damages after the two dates we've just

14   talked about.

15   Q.   Right.

16        But you haven't tried to come up with

17   your own model of what damages may have been

18   incurred by SGC or SIBL after those dates; have

19   you?

20   A.   I wasn't asked, nor did I develop my own

21   affirmative damages model.  I looked at what

22   Ms. Van Tassel built as a damages model and

23   then both showed what it implies as well as make

24   the reasonable adjustments that we've been

1          talking about today.

2     Q.   And do you know what the run rate was on

3          business expenses on a monthly basis from

4          January 1, '08 to the end?

5     A.   For all of the entities?

6     Q.   Yes.  Or let's just start with SGC and SIB.

7     A.   Well, the easiest thing to do is going to be

8          look at the summary exhibit that we looked at

9          here.  So the run rate on expenses is the

10         noncumulative totals in this exhibit; so...

11    Q.   Which exhibit are you referring to?

12    A.   This was Exhibit 5 that you gave me.

13    Q.   Yes.

14    A.   And so the summary, page 2 in, looks at the

15         salaries and expenses that I was able to

16         identify.  So the run rate is between 6 and $7

17         million on salaries only.  And --

18              Oh, that's no adjustments; so I have to

19         do the adjustments.  So it's 5.8 million to

20         roughly 6.9 million in 2008.  And total expenses

21         are somewhere between 14.9 and I guess 24

22         million for total expenses.  So those middle

23         columns gives you the monthly run rate for

24         salary and expenses.