UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
RALPH S. JANVEY, IN HIS CAPACITY :
AS COURT-APPOINTED RECEIVER FOR :
THE STANFORD RECEIVERSHIP :
ESTATE, AND THE OFFICIAL :
STANFORD INVESTORS COMMITTEE, :
: Civil Action No. 3:13-cv-00477-N
*Plaintiffs*, : Hon. David C. Godbey
:
- against - : **ORAL ARGUMENT**
: **REQUESTED**
PROSKAUER ROSE, LLP, :
CHADBOURNE & PARKE, LLP, AND :
THOMAS V. SJOBLOM, :
:
*Defendants*. :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPENDIX IN SUPPORT OF DEFENDANT PROSKAUER ROSE LLP'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY OF KARYL VAN TASSEL**

Neil R. Burger
Bruce W. Collins
CARRINGTON, COLEMAN, SLOMAN
  & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333
E-mail:  nburger@ccsb.com

James P. Rouhandeh*
Daniel J. Schwartz*
Craig M. Reiser*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
E-mail:  rouhandeh@davispolk.com
* admitted *pro hac vice*

App. 1

## TABLE OF CONTENTS

| EXHIBIT | DOCUMENT | APPENDIX PAGE(S) |
|---|---|---|
|  | Declaration of James P. Rouhandeh | App. 4 – 5 |
| 1 | Excerpts from the transcript of the deposition of Karyl Van Tassel, dated January 11, 2018 | App. 6 – 17 |

Dated:   April 4, 2018

Respectfully submitted,

| | |
|---|---|
| CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P. | DAVIS POLK & WARDWELL LLP |
| By: /s/ Neil R. Burger | By:   /s/ James P. Rouhandeh |
| Neil R. Burger<br>  Texas Bar No. 24036289<br>  nburger@ccsb.com<br>Bruce W. Collins<br>  Texas Bar No. 04604700<br>  bcollins@ccsb.com<br>901 Main Street, Suite 5500<br>Dallas, Texas 75202<br>Telephone: (214) 855-3000<br>Facsimile: (214) 855-1333 | James P. Rouhandeh*<br>  New York Bar No. 2211837<br>  rouhandeh@davispolk.com<br>Daniel J. Schwartz*<br>  New York Bar No. 4159430<br>  daniel.schwartz@davispolk.com<br>Craig M. Reiser*<br>  New York Bar No. 4886735<br>  craig.reiser@davispolk.com<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone:  (212) 450-4000<br>Facsimile:  (212) 701-5800<br>* admitted *pro hac vice*<br><br>*Attorneys for Defendant Proskauer Rose LLP* |

## CERTIFICATE OF SERVICE

I hereby certify that, on April 4, 2018, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing. A Notice of Electronic Filing was transmitted to all ECF registrants.

/s/ James P. Rouhandeh
James P. Rouhandeh

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
RALPH S. JANVEY, IN HIS CAPACITY :
AS COURT-APPOINTED RECEIVER FOR :
THE STANFORD RECEIVERSHIP :
ESTATE, AND THE OFFICIAL :
STANFORD INVESTORS COMMITTEE, :
:
*Plaintiffs*, :
: Civil Action No. 3:13-cv-00477-N
- against - : Hon. David C. Godbey
:
:
PROSKAUER ROSE, LLP, :
CHADBOURNE & PARKE, LLP, AND :
THOMAS V. SJOBLOM, :
:
*Defendants*. :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JAMES P. ROUHANDEH IN SUPPORT OF DEFENDANT
PROSKAUER ROSE LLP'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO
EXCLUDE EXPERT TESTIMONY OF KARYL VAN TASSEL**

JAMES P. ROUHANDEH declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney admitted to practice pro hac vice before this Court, and I am a partner in the law firm of Davis Polk & Wardwell LLP, counsel for Proskauer Rose LLP ("Proskauer") in the above-captioned matter. I submit this declaration in support of Proskauer's Reply Brief in Support of its Motion to Exclude Expert Testimony of Karyl Van Tassel. The matters in this declaration are within my personal knowledge and are true and correct.

2. Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the transcript of the deposition of Karyl Van Tassel, dated January 11, 2018.

3. I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
           April 4, 2018

                                                    /s/ James P. Rouhandeh
                                                    James P. Rouhandeh

# EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3   RALPH S. JANVEY, IN HIS    )
     CAPACITY AS                )
 4   COURT-APPOINTED RECEIVER   )
     FOR THE STANFORD           )
 5   RECEIVERSHIP ESTATE, AND   )
     THE OFFICIAL STANFORD      )
 6   INVESTORS COMMITTEE,       )
                                )
 7           Plaintiffs,        )
                                ) Civil Action No.
 8                              ) 3:13-cv-00477-N
       - against -              )
 9                              )
                                )
10   PROSKAUER ROSE, LLP,       )
     CHADBOURNE & PARKE, LLP,   )
11   AND THOMAS V. SJOBLOM,     )
                                )
12           Defendants.        )
13
14   *********************************************************
15            ORAL AND VIDEOTAPED DEPOSITION OF
16                   KARYL VAN TASSEL
17                   JANUARY 11, 2018
18   *********************************************************
19
20
21
22
23
24
25
```

Page 148

1    A.   There are, yes.
2    Q.   Okay.  Can you tell me how did you compute the
3    SIB CD liability increase for each of those dates?
4    A.   Well, first of all, I have a spreadsheet that
5    goes by year and then by month that ties to the
6    $5.4 billion, which is from the judgment, remember?  You
7    take that by month.  So you go from the November 1, 2006
8    number and compare it to the February 16, 2009 number.
9    Q.   And which number is it, the outstanding CD
10   liability number for each month?
11   A.   It would be the amount.  I am not sure what
12   the line item is called.  It would be the amount that
13   totals to 5.4 billion because it is without interest.
14   Q.   Okay.
15   A.   The calculation -- the spreadsheet has the
16   gross number as well.
17   Q.   Is it possible that it's called the adjusted
18   CD liability on the spreadsheet?
19   A.   It may be.  I just don't -- I don't recall.
20   Q.   Okay.  But we take whatever that number is for
21   whatever that CD liability number is that removes --
22   that's based on the judgment but removes the interest?
23   A.   Correct.
24   Q.   We look at that number for February 16 of
25   2009, and we subtract it from whatever the start date

1  is, and that yields the numbers that are in the top line
2  of this chart?
3       A.   That's correct, yes.
4       Q.   Okay.  And for the net SGC liability increase,
5  you do the same thing, but you also deduct out or add in
6  the fees and contributions that are listed in this
7  table?
8       A.   That's correct.  The top line, just to be
9  clear, is the joint liability.  But it is reflected as
10 the SIB CD liability increase, and then the net SGC
11 liability increase removes certain amounts that were
12 charged back and forth.
13      Q.   Okay.  Now we were talking about Dr. Gompers
14 opinion earlier and your response to that in your
15 supplemental declaration.  And just so that I am clear,
16 if you were to use the methodology we just talked about
17 for the SIB CD liability increase, so you take whatever
18 that number is on your spreadsheet from February 16th of
19 2009 that reflects the amounts of the judgment less the
20 interest component, and then you subtract from that the
21 same number for the start date of February 1 of 2008, is
22 that number greater than zero?
23      A.   No.  It's less than zero, but it would not be
24 the damages that you would calculate.
25      Q.   Okay.  And why would it not be the damages

```
 1      A.   That's correct.
 2      Q.   SIB produced many documents to the FSRC?
 3           MR. ARLINGTON:  Objection.
 4      Q.   (BY MR. SCHWARTZ)  It was required --
 5           MR. ARLINGTON:  Objection, lack of
 6   foundation.
 7      Q.   (BY MR. SCHWARTZ)  You've reviewed the IBC
 8   Act.  Correct?
 9      A.   Yes.  I saw that in the information, yes.
10      Q.   The IBC Act provides that international
11   business corporations will provide a number of different
12   types of documents to the FSRC, does it not?
13      A.   I think, yes, it referenced documents that
14   will be provided, yes.
15      Q.   Okay.  Did you assess whether the FSRC's
16   insistence on a showing of crime or fraud applied to all
17   documents that the FSRC had for SIB or just detailed
18   portfolio records?
19           MR. ARLINGTON:  Objection, lack of
20   foundation.
21      A.   I have not done an analysis or have
22   information about any differentiation there.
23      Q.   (BY MR. SCHWARTZ)  Okay.  Going back to
24   paragraph 105A, did you compute a dollar value loss that
25   you attribute to Mr. Sjoblom's telling the SEC that it
```

Page 158

1  could get access to the portfolio records through the
2  FSRC?
3              MR. ARLINGTON:  Objection, vague and
4  ambiguous.
5      A.   I'm not sure the way you stated that is
6  exactly what I have here, but I will say I have not done
7  a specific calculation that relates to any one item.  I
8  explained to you the process, which includes looking at
9  the actions as a whole, not from one particular action
10 or the other.
11     Q.   (BY MR. SCHWARTZ)  Okay.  Let's look at
12 paragraph B, March 1, 2007.
13     A.   Okay.
14     Q.   Okay.  So you note that the SEC issued its
15 formal order of investigation and its documentary
16 subpoena to SGC in the fall of 2006.
17     A.   That's correct.
18     Q.   Okay.  Why is March of 2007 an appropriate
19 date to measure damages from conduct that occurred in
20 the fall of 2006?
21     A.   The date was selected -- each of these dates,
22 you have to look at what happened in between the first
23 date, November 1 of 2006, and then what actions were
24 taken by the parties or inactions that didn't get done
25 up to the next date.  So what's relevant is -- in 105

1    B what I'm describing is after November 1st of 2006,
2    which is my first date, what happened after that time up
3    until March 1 of 2007.  So that's why it's relevant.
4    The information is cumulative as you go along in time.
5         Q.   Okay.  But you could have picked a different
6    date besides March 1 of 2007, if you wanted to capture
7    the damage that you attribute to the SEC's issuance of
8    its formal order of investigation and its subpoena to
9    SGC?
10              MR. ARLINGTON:  Objection,
11   mischaracterizes the witness' testimony.
12        A.   The damages that I calculated I have done at
13   the beginning -- we don't have the liability information
14   for every day.  So it is always the first day after the
15   month that we're ending that period on.  So I would not
16   have that information for any specific day within that
17   time period.
18        Q.   (BY MR. SCHWARTZ)  Right.  But if the subpoena
19   and formal order were issued in, say, November of 2006,
20   you could compute -- you could compute the increase in
21   CD liability in December of 2006.  Correct?
22        A.   Yes.  I mean, the trier of fact can look at
23   any dates that might be -- that they might find would be
24   applicable.  The spreadsheet is done on a yearly for
25   some years and then a monthly basis for others just for

1  that fact.  That is, these are not the only dates that a
2  damage calculation could be made from.
3       Q.   Okay.  You next state that Mr. Sjoblom
4  continued to assist Stanford in preventing the SEC from
5  getting the SIBL portfolio records.  What do you mean by
6  that?
7       A.   I mean by the actions of working with
8  Mr. Alvarado and others, there was communication back
9  and forth between the SEC, FSRC and Mr. Alvarado and
10 Mr. Sjoblom that related to holding off on getting --
11 trying to push back getting the portfolio documents --
12      Q.   Well, let me --
13      A.   -- from the SEC.
14      Q.   Sorry.
15           Let me ask a different question, which is --
16 is what you're referring to in that sentence the other
17 conduct that's listed in this paragraph?
18      A.   That's part of it, yes.
19      Q.   Okay.  The next item you have there is
20 Mr. Sjoblom informed Mr. Alvarado that he thought the
21 SEC's Investment Company Act claim was a stretch because
22 banks are exempt from the definition of investment
23 companies even though he knew SIB was not a commercial
24 bank.
25           Are you aware of evidence in this case that

Page 169

1   A.   I did not.  The information is to be given to
2   the auditor so they can make that assessment.
3   Q.   If the client requests that an attorney
4   disclose an unasserted claim.  Correct?
5         MR. ARLINGTON:  Objection, argumentative.
6   Q.   (BY MR. SCHWARTZ)  Let me ask you this.  Are
7   you familiar with the ABA statement of policy?
8   A.   I am.
9   Q.   Do you know what the ABA statement of policy
10  says about unasserted claims being disclosed in audit
11  request letters?
12  A.   Not specifically, no.
13  Q.   Going back to paragraph B, I think I know the
14  answer to this.  If we looked at any one of the items
15  that we just went through that you list in paragraph B,
16  did you compute a specific dollar value loss for any one
17  of those particular items?
18        MR. ARLINGTON:  Objection, vague and
19  ambiguous.
20  A.   Again, explaining just the process, it would
21  be these items that are indicated here, plus others in
22  my report would be looked at.  And the calculation is
23  done as of the date that you are -- that is reflected
24  here.
25  Q.   (BY MR. SCHWARTZ)  Okay.

Page 170

1  A. Not of -- these are the dates that they -- at
2  which we made the calculations.
3  Q. Right. And just to be clear, you did not
4  compute a specific dollar value loss that you attribute
5  to Mr. Sjoblom's informing Mr. Alvarado that the SEC's
6  Investment Company Act claim was a stretch. Correct?
7       MR. ARLINGTON: Objection, vague and
8  ambiguous.
9  A. Are you referring to something in the -- in my
10 analysis or --
11 Q. (BY MR. SCHWARTZ) Yeah. I'm asking you.
12 A. Okay.
13 Q. Is it correct that you did not compute a
14 specific dollar value loss that you associated with
15 Mr. Sjoblom's conduct of informing Mr. Alvarado that he
16 thought that the SEC's Investment Company Act claim was
17 a stretch?
18      MR. ARLINGTON: Objection, vague and
19 ambiguous.
20 A. Again, our process was to look at all of the
21 actions that continued to have the Ponzi scheme ongoing,
22 and the calculations were done at specific periods, not
23 related to a specific act or document.
24 Q. (BY MR. SCHWARTZ) Okay. And so if I asked
25 that question as to the decision not to produce the

Page 171

1   financial, consulting and advisory services agreement,
2   the answer would be the same.  Is that right?
3              MR. ARLINGTON:  Objection, vague and
4   ambiguous.
5        A.   It would be the same in that it would be
6   included, but it is not -- that fact would be included
7   in the analysis.  There is not a separate analysis done
8   for each individual issue either here in this paragraph
9   or in the rest of my report.
10       Q.   (BY MR. SCHWARTZ)  Okay.  So looking at
11  paragraph C --
12             MR. BUNCHER:  Can't we -- doesn't that
13  cover -- instead of having to go through every single
14  sentence and ask the same question, she said like ten
15  different times it's not based on any one individual
16  act.  I don't see the point in why we have to sit here,
17  Daniel.  I mean, it's your deposition, but I mean,
18  really, she's already said it five times.  Her numbers
19  aren't based on individual actions.
20             MR. SCHWARTZ:  I have other questions
21  about paragraph C, just as I did about paragraph A and
22  B, besides that particular question.
23             MR. BUNCHER:  Fine.
24       Q.   (BY MR. SCHWARTZ)  So in paragraph C,
25  September 1 of 2007, you write, Further delay tactics by

1      A.   The duties to the companies to act in their
2  best interest.  Generally, that's my understanding.  I'm
3  sure there's other specifics.
4      Q.   Okay.  Are there specific acts you had in mind
5  in referring to the increased liabilities caused by the
6  breaches of fiduciary duties?
7      A.   I have never looked at it as parsing them out
8  between different claims.  I would have to go back
9  through and look at that to see if that would make
10 sense.
11     Q.   And if there are specific actions that
12 plaintiffs have alleged were breaches of fiduciary
13 duties, is it fair to say that you haven't specifically
14 computed a dollar value loss for any of those that you
15 attribute to that particular breach of fiduciary duty?
16     A.   That's fair.  Again, the damages are done
17 based upon all the information and have been done at
18 three dates, which is inclusive of all that information.
19     Q.   Okay.
20           MR. SCHWARTZ:  Why don't we take a short
21 break.
22           THE VIDEOGRAPHER:  The time is 3:51 p.m.
23 We're off the record.
24           (Break from 3:51 p.m. to 4:05 p.m.)
25           THE VIDEOGRAPHER:  We're back on the