## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § § | Civil Action No. 3:13-cv-00477-N |
| *Plaintiffs,* | § § | |
| PROSKAUER ROSE, LLP, CHADBOURNE & PARKE, LLP, AND THOMAS V. SJOBLOM, | § § § § | |
| *Defendants.* | § | |

## <u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

I.      PREFACE ........................................................................................................ 1

II.     PARTIES ........................................................................................................ 2

III.    PERSONAL JURISDICTION ....................................................................... 3

IV.     SUBJECT MATTER JURISDICTION AND VENUE ................................. 5

V.      FACTUAL BACKGROUND .......................................................................... 5

        A. The Stanford Financial Group Empire ...................................................... 5

        B. Stanford Financial's Operations in the United States .............................. 7

        C. The Anatomy of the Stanford Ponzi Scheme ..........................................10

            a.   The Beginning: Guardian International Bank ................................... 11

            b.   Stanford Creates a Safe Haven in Antigua ...................................... 12

            c.   The Stanford Task Force ................................................................. 15

            d.   Stanford Solidifies His Power with Bribes, Loans and Kickbacks ..................... 18

            e.   Stanford Financial Was Under Constant Investigation ....................... 20

            f.   Stanford Financial Expands Sales into the United States.................... 21

            g.   Stanford Financial Breeds Loyalty Through Exorbitant Compensation ............. 23

            h.   Dissecting the Fraud ...................................................................... 23

            i.   Stanford Financial's House of Cards Finally Collapses...................... 26

        D. Stanford Financial's Regulatory Obstruction and Concealment
           Conspiracy ..............................................................................................28

            a.   The SEC First Suspected Stanford Was a Fraud in 1997.................... 28

TABLE OF CONTENTS

(Continued)

b.   Stanford Financial's Anti-Regulatory Conspiracy Gains Urgency ..................... 36

E.  Chadbourne and Sjoblom Participate in the Stanford Ponzi Scheme ....... 39

a.   Sjoblom's Due Diligence Raises Numerous Red Flags About the
     Fraud .......................................................................................... 39

b.   Sjoblom's Letter to the SEC Misrepresents Material Facts and
     the Law ....................................................................................... 49

c.   Sjoblom Witnesses Allen Stanford's Order to "Paper the Files" ........ 53

d.   Sjoblom Tries to Conceal the SEC Investigation from SGC's
     Auditor ........................................................................................ 54

F.  Proskauer and Sjoblom Participate in the Stanford Ponzi Scheme .......... 57

a.   Sjoblom and Leroy King Continue Their Obstructionary Shell
     Game .......................................................................................... 57

b.   Stanford Financial Hires Spencer Barasch ....................................... 61

c.   The SEC Moves Forward with a Formal Order of Investigation ........ 62

d.   Barasch Violates SEC Ethics Rules by Representing Stanford
     Financial ...................................................................................... 64

e.   Sjoblom Advises Stanford Financial to Violate SEC Subpoenas ....... 66

f.   Proskauer Tries to Conceal SEC Investigation from BDO Seidman .. 69

g.   The SEC Issues Document and Testimony Subpoenas to Allen
     Stanford ....................................................................................... 70

h.   Suspicious Facts and Allegations of Fraud Continue to Mount .......... 72

i.   Proskauer Lies to BDO Seidman Again ........................................... 73

TABLE OF CONTENTS

(Continued)

j.  Former SGC Financial Advisors Allege that SGC Destroyed
    Documents ....................................................................................73

k.  FINRA and the Federal Reserve Board Pursue Their Own
    Investigations ..............................................................................74

l.  Chadbourne Continues to Represent Stanford Financial ...................77

m. SGC's Clearing Broker Refuses to Wire Funds to SIBL for CD
    Purchases ....................................................................................77

n.  Sjoblom Learns the Full Extent of SIBL's Real Estate and Private
    Equity ........................................................................................80

o.  The SEC Requests Testimony Regarding SIBL's Investments .........80

p.  Sjoblom Discovers More Incriminating Facts About SFIS
    and SIBL ....................................................................................81

q.  FINRA Raids SGC's Offices Across the United States ...................82

r.  Opinion Letter Confirms that SIBL is an "Investment Company" ....83

s.  Sjoblom Explicitly Agrees to Offer False Testimony to the SEC .....84

t.  Sjoblom Prepares Rodriguez-Tolentino and Pendergest-Holt for
    Testimony ....................................................................................87

u.  Allen Stanford Meets with Sjoblom and Personally Admits the
    Fraud ..........................................................................................91

v.  Sjoblom Prepares Pendergest-Holt for False Testimony to
    the SEC........................................................................................95

w.  Sjoblom Knowingly Presents False Testimony to the SEC...............98

x.  Sjoblom Withdraws and Disavows All Prior Representations ..........99

TABLE OF CONTENTS

(Continued)

VI.     STATUTE OF LIMITATIONS DEFENSES ............................................................ 100

        A. Discovery Rule/Inquiry Notice/Equitable Tolling ................................100

VII.    CAUSES OF ACTION ........................................................................................ 100

        A. COUNT 1: Negligence ................................................................................100

        B. COUNT 2: Aiding, Abetting, or Participation in Breaches of
           Fiduciary Duties.......................................................................................101

        C. COUNT 3: Aiding, Abetting, or Participation in a Fraudulent
           Scheme .......................................................................................................103

        D. COUNT 4: Aiding, Abetting, or Participation in Fraudulent
           Transfers ....................................................**Error! Bookmark not defined.**

        E. COUNT 5: Aiding, Abetting, or Participation in Conversion ...............103

        F. COUNT 6: Civil Conspiracy .....................................................................104

        G. COUNT 7: Negligent Retention / Negligent Supervision......................106

VIII.   RESPONDEAT SUPERIOR..............................................................................107

IX.     ACTUAL DAMAGES .........................................................................................107

X.      PUNITIVE DAMAGES ......................................................................................108

XI.     CONDITIONS PRECEDENT .............................................................................108

XII.    JURY DEMAND..................................................................................................108

XIII.   PRAYER...............................................................................................................108

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 3:13-cv-00477-M |
| PROSKAUER ROSE, LLP, CHADBOURNE & PARKE, LLP, AND THOMAS V. SJOBLOM, | § § § § | |
| *Defendants.* | § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Ralph S. Janvey, in his capacity as the Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee file this First Amended Complaint ("Complaint") against Defendants Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom (collectively, the "Defendants"),[1] and allege as follows:

## I.    PREFACE

This action is filed to recover damages for the Stanford Receivership Estate from Defendants based on their participation in the massive Ponzi scheme orchestrated by Allen Stanford and others that injured the companies comprising Stanford Financial Group (defined in Paragraph 14).

---

[1] Plaintiffs have settled with Defendant Chadbourne & Parke, LLP ("Chadbourne"), and the claims against Chadbourne are stayed pending the Court's ruling on the motion to approve the settlement, which is set for hearing on August 12, 2016. Therefore, this amendment only affects the claims against Proskauer Rose, LLP and Thomas V. Sjoblom. Any references to Chadbourne are solely intended to preserve the claims asserted against Chadbourne in the Original Complaint pending the approval of the settlement, and no new allegations, claims or theories are being asserted against Chadbourne in this Amended Complaint.

## II.   **PARTIES**

Plaintiff Ralph S. Janvey was appointed by the United States District Court for the Northern District of Texas, Dallas Division, to serve as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities that the foregoing persons and entities own or control, including but not limited to Stanford Financial Group Global Management, LLC and Stanford Financial Group Company (collectively, the "Stanford Receivership Estate"). Plaintiff Janvey asserts all claims against the Defendants as described below in this Complaint in his capacity as the Receiver for the Stanford Receivership Estate,.

Plaintiff The Official Stanford Investors Committee (the "Committee") was formed by this Court on August 10, 2010. *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order"). Plaintiff Committee, through this Complaint, is cooperating with the Receiver to identify and prosecute actions and proceedings for the benefit of the Stanford Receivership Estate. The Court has previously held that OSIC has standing, both as an unincorporated association and by virtue of this Court's Order constituting OSIC as a representative of the Stanford investors, to participate in this litigation along with the Receiver. *See* Order on Motions to Dismiss, pp. 3-6, in *Janvey, et al. v. IMG Worldwide, Inc. et al.*, Civil Action No. 3:11-CV-0117-N [Docket No. 33], entered on September 24, 2012.

Defendant Proskauer Rose, LLP ("Proskauer") is a limited liability partnership organized under the laws of the State of New York. Proskauer has already appeared and answered herein.

Defendant Chadbourne & Parke, LLP ("Chadbourne") is a limited liability partnership organized under the laws of the State of New York. Chadbourne has already appeared and answered herein.

Together, Defendants Proskauer and Chadbourne are collectively referred to as the "Law Firm Defendants."

Defendant Thomas V. Sjoblom ("Sjoblom") is an individual who currently resides in the State of Virginia. From 2002 to 2006, Defendant Sjoblom was a partner at Defendant Chadbourne. From 2006 to 2009, Defendant Sjoblom was a partner at Defendant Proskauer. Sjoblom has already appeared and answered herein.

### III.   PERSONAL JURISDICTION

This Court has personal jurisdiction over non-residents Proskauer, Chadbourne, and Sjoblom under the Texas Long Arm Statute. Chadbourne and Sjoblom conducted continuous and systematic business in the State of Texas for over a year and are therefore subject to general jurisdiction. Additionally, Proskauer and Sjoblom conducted continuous and systematic business in the State of Texas for over two years and are therefore subject to general jurisdiction. Furthermore, as described herein, the Law Firm Defendants and Sjoblom engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial, including Stanford Group Company and Stanford International Bank Ltd., headquartered in Houston, Texas. These specific jurisdiction contacts by the Law Firm Defendants and Sjoblom

give rise to Plaintiffs' causes of action, and therefore the Law Firm Defendants and Sjoblom have done business and committed torts, in part, in the State of Texas.

From June 2005 until approximately August 2006, Chadbourne and Sjoblom provided legal services to Stanford Financial, headquartered and controlled in Houston, Texas, including but not limited to Stanford Group Company and Stanford International Bank Ltd. Specifically, Chadbourne and Sjoblom defended Stanford Financial in the investigations conducted by the United States Securities and Exchange Commission and the National Association of Securities Dealers.  In August 2006, Sjoblom left Chadbourne to join Proskauer, and while a partner at Proskauer, Sjoblom continued to defend Stanford Financial in these investigations.  Despite Sjoblom's departure from Chadbourne, however, Chadbourne continued to provide other legal services to Stanford Financial as described herein, despite Chadbourne's knowledge of Stanford Financial and its operations.

From approximately August 2006 until February 2009, Proskauer and Sjoblom provided legal services to Stanford Financial, headquartered and controlled in Houston, Texas, including but not limited to Stanford Group Company and Stanford International Bank Ltd. Specifically, Proskauer and Sjoblom defended Stanford Financial in several investigations conducted by the United States Securities and Exchange Commission, the National Association of Securities Dealers, and the Federal Reserve Board.

When providing such legal services to Stanford Financial, the Law Firm Defendants and Sjoblom engaged in extensive contacts with Stanford Financial personnel based in Houston, Texas, including Allen Stanford and the General Counsel of Stanford Financial, and attended various meetings with such personnel in Houston, Texas.  These contacts assisted and perpetuated the Stanford Ponzi scheme described herein and give rise to Plaintiffs' causes of

action. Based on their general and specific contacts with the State of Texas, the Law Firm Defendants and Sjoblom purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Texas Long Arm Statute.

Furthermore, this Court has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

## IV. SUBJECT MATTER JURISDICTION AND VENUE

The Court has jurisdiction over this action, and venue is proper, under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Further, as the Court that appointed the Receiver and formed the Committee, this Court has jurisdiction over any claim brought by the Receiver related to the Stanford Receiverhsip Estate to execute Receivership duties. Further, within 10 days after the Court entered the Order and Amended Orders Appointing Receiver, the Receiver filed the original Securities and Exchange Commission Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court in rem and in personam jurisdiction in those districts and every other district where the Complaint and Order have been filed.

## V. FACTUAL BACKGROUND

### A. The Stanford Financial Group Empire

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford") — a former bankrupt gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds. The empire was comprised of over 140 companies from across the globe, all of which

were ultimately owned by Stanford himself. The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas. The conglomeration of Stanford companies (collectively, "Stanford Financial" or "Stanford Financial Group") included but were not limited to: (i) the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC"); (ii) the Houston-based administrative company that serviced all the different companies, Stanford Financial Group Company; (iii) Stanford International Bank Ltd. ("SIBL"), an offshore bank organized under the laws of Antigua; (iv) Stanford Trust Company (Louisiana) ("STC"); (v) Stanford Trust Company Ltd. (Antigua) ("STCL"); and (vi) the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston, and San Antonio. Stanford Financial was ultimately controlled and managed from Houston, Texas in the United States.

Stanford Financial's offshore banking operation began as Guardian International Bank in the mid-1980s. Over the years, Stanford Financial grew into a purported full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services. Stanford Financial gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes list of the richest people in the world with a personal fortune estimated at $2.2 billion.

The entire Stanford Financial operation was fueled primarily by one product: Certificates of Deposit ("CDs") issued by SIBL, which was wholly owned by Stanford himself. Clients who were introduced to Stanford Financial, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL

CD. SIBL CDs were sold worldwide by a web of different Stanford Financial promoter companies, including SGC, STC and SFIS, whose function was to promote the sale of SIBL CDs. For example, to access additional investor capital in Latin America, Stanford Financial established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled and administered by Stanford Financial employees in Houston, Texas. By February 2009, Stanford Financial's records reveal that SIBL had total purported CD account balances of approximately $7.2 billion.

## B. Stanford Financial's Operations in the United States

For the first decade of its operations, 1985 to 1995, Stanford Financial and its offshore bank (whether Guardian or SIBL) targeted a Latin American clientele. But by the late 1990s, Stanford Financial Group had established a foothold in the United States. In 1995, Stanford Financial Group established SGC, and in February 1996, SGC was registered as a broker/dealer and investment adviser. SGC established offices initially in Houston and Baton Rouge, Louisiana. SGC began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying them enormous signing bonuses to leave their jobs at other firms and transfer their books of clients over to SGC. Fueled by this influx of veteran bankers, brokers

and financial advisers, SGC grew from 6 branch offices in the United States in 2004 to more than 25 offices across the United States (but principally concentrated in the Southern United States) in 2007.

Since the 1980s, Allen Stanford recognized the huge potential for marketing his offshore CDs to Latin Americans via the "gateway" city of Miami. In 1998, Stanford Financial established SFIS in order to sell the SIBL CDs to foreign investors out of Miami. SFIS was organized under Florida state law in order to evade federal banking and securities regulations. The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial, primarily from sales to CD investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela. Stanford Financial also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities.

Stanford Financial also increased sales of SIBL CDs by targeting the IRA accounts of its U.S. investors. In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC. After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in many cases, all of their IRA accounts into the SIBL CDs.

For all of these promoter companies – whether SGC, SFIS, or STC – the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial's operations and paid the employees' exorbitant salaries and bonuses. The promoter companies were all members of Stanford Financial, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial in Houston, Texas.

Houston, Texas was Stanford Financial's nerve center and principal base of all operations, including SIBL, SGC, SFIS, and STC.  STC was wholly owned by Houston-based SGC and controlled by Stanford Financial personnel in Houston, and virtually every member of the STC Board of Directors at any time was an employee of SGC.  Stanford Financial directed STC's operations and provided all administrative functions from Houston.  STC's annual budget and financial forecasts were prepared by Stanford Financial personnel in Houston, and even reimbursement of expenses for STC employees was handled out of Houston.

All the sales and marketing practices for the entire Stanford Financial group of companies — including *SIBL* — as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial.  SIBL itself never had a marketing or sales arm in Antigua; rather it depended entirely on all the separate promoter or "feeder" companies like SGC, SFIS, and STC to sell its CDs.  The head of Stanford Financial's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.

The sales practices, directives, techniques, strategies and reward programs for Stanford Financial, including SIBL, were developed and crafted in Houston and disseminated to the various Stanford Financial branch offices around the world, including STC and SFIS.  The sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

In addition, mandatory sales training for the Stanford Financial sales force for SIBL CDs was conducted principally in Houston (known to the foreign financial advisers as the

"Houston experience") by Stanford Financial personnel. In those mandatory training sessions, sometimes twice a year, Stanford Financial's financial advisers ("FAs") were trained to sell the image of Stanford Financial. The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads.

### C. The Anatomy of the Stanford Ponzi Scheme

In reality, Stanford Financial was a massive, worldwide Ponzi scheme. The gist of the fraud was actually quite simple. Stanford Financial sold SIBL CDs through a flashy marketing campaign that was designed to trick investors into believing they were purchasing safe, secure, insured, and highly liquid CDs, which were purportedly regulated in the United States because SGC was a U.S. licensed broker/dealer. At the same time, Stanford Financial maintained a veil of secrecy over SIBL's purported investment portfolio and its use of CD investors' money. Thus, Stanford Financial went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's purported operations and assets.

SIBL was actually insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 1999 and yet it continued selling CDs to the bitter end. Stanford Financial induced investors to buy CDs by offering unusually consistent and above-market rates, publishing fraudulent financial statements prepared by a small accounting firm in Antigua, C.A.S Hewlett & Co., Ltd. ("Hewlett & Co."), furnishing other data that significantly overstated SIBL's purported earnings and assets, and misrepresenting the bank's business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.

In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses. SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford Financial would simply determine what level of fictitious revenue SIBL "needed" to report to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses. Stanford Financial would then "plug" the necessary revenue amount by assigning equally fictitious revenues to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a. The Beginning: Guardian International Bank

Stanford opened his first offshore bank, Guardian International Bank Ltd. ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents). To provide the veneer of legitimacy and aid sales, Stanford established representative offices for Guardian Bank in Miami and Houston, under the name of Guardian International Investment Services ("Guardian Services"). Guardian Bank and Guardian Services provided the starting point and roadmap for creating the Stanford Financial empire, as Stanford followed this same strategy for the next 24 years: utilizing an offshore bank with U.S. sales and administrative offices in order to minimize regulatory scrutiny. Guardian Bank's main product was a bank certificate of deposit — with rates typically 2% to 3% above the average rates available in the U.S. market — and protected by all the confidentiality associated with offshore private banking. Stanford brought in his old college roommate James Davis to help run operations.

By 1988 Stanford had been accused of violating banking laws in Texas for running unlicensed "feeder" sales offices in Houston for Guardian Bank. In 1988 and again in 1989, the U.S. Office of the Comptroller of the Currency ("OCC") issued advisories concerning Stanford's similar violations of banking laws in Florida and California.

By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities. Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location. On November 28, 1990, the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's banking licenses because: (i) Guardian Bank's auditor, Hewlett & Co., was not an approved auditor; (ii) Guardian Bank was operating in a manner "detrimental to its depositors"; (iii) Guardian Bank failed to supply satisfactory details as to its liquidity; (iv) one of Guardian Bank's directors (Stanford) was formerly bankrupt; and (v) Guardian Bank had failed to submit annual financial statements. Before the threatened revocation could be imposed, however, Stanford picked up and re-incorporated Guardian Bank in Antigua in December 1990, and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank. By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford later sued the Government of Montserrat to have that order rescinded). After re-incorporating Guardian Bank in Antigua, Stanford continued the same basic business plan that had proven so profitable when the bank was incorporated in Montserrat. Stanford eventually changed the name of his offshore bank from Guardian to Stanford International Bank Ltd. (SIBL) in 1994.

**b. Stanford Creates a Safe Haven in Antigua**

Stanford could not have perpetuated this fraud without his significant influence over the Antiguan Government.  To gain this influence, Stanford used bribes to curry favor with Antiguan officials and build a safe haven for his Ponzi scheme.  Stanford had fled Montserrat precisely because he could not exert such pressure on the local government, and he was swept up in Montserrat's clean-up of the banking sector in the late 1980s.  When Stanford fled to Antigua in December 1990, Antigua had the reputation of being the most corrupt island in the Caribbean.

Stanford immediately "bought" his influence in Antigua by purchasing the ailing and insolvent Bank of Antigua.  He extracted concessions from the Antiguan Government, including permits to establish a new bank by replacing Guardian Bank with SIBL and Stanford Trust Company Ltd. ("STCL"), as well as residency status in Antigua for Stanford and his top executives.

In 1994, Stanford strengthened his Antiguan political ties by inserting himself and his companies into the Antiguan Government's efforts to build a new hospital.  This opportunity arose after Stanford helped the Prime Minister, Lester Bird, by flying him to Houston and paying for Bird's medical expenses after Bird thought he was having a heart attack.

In November of that year, Bird allowed Stanford to select contractors for the hospital project, and Stanford's bank assumed the role of lead financier on the project. Stanford's Bank of Antigua (*i.e.*, SIBL) purportedly funded an interim loan to the Antiguan Government to finance 100% of the project's architectural and engineering costs.  Eventually, Stanford Financial loaned the Antiguan Government over $40 million for the new hospital.  The impoverished Antiguan Government, which in essence served as SIBL's *only* purported regulator, became heavily indebted to Stanford.

Stanford's involvement in the hospital project prompted a 1996 U.S. Congressional investigation of corruption in Antigua, spearheaded by the FBI. The Antiguan hospital scandal ignited a firestorm of negative press in Antigua about Lester Bird, Antiguan corruption, and Stanford's influence on the island. In November 1995, two front-page articles in Antigua's "Outlet" newspaper questioned where Stanford got $40 million to finance the project, as the Bank of Antigua likely did not have that kind of money, and the bank did not even publish its financial statements as required by Antiguan banking law. The articles also complained that Lester Bird's government had basically allowed Stanford to "run things" in Antigua, and had been giving away Antiguan land to Stanford, including the Antiguan airport and contiguous land.

By 1995, Stanford was really flexing his muscle in Antigua. The government even allowed Stanford to rewrite the banking laws that regulated SIBL. In June 1995, Stanford began drafting offshore trust legislation for Antigua because Antigua had no such legislation in existence (despite the fact that Stanford had set up a "trust" company, STCL, in Antigua in 1991). Stanford's right hand and General Counsel at the time, Yolanda Suarez ("Suarez"), described how Stanford needed trust legislation for Antigua because he wanted to "develop Antigua as a platform" for offshore trust operations.

In 1996, Antigua was attacked in the international press for providing a haven to money launderers and drug smugglers. Offshore banks were being established left and right. Stanford feared this undesirable press coverage would eventually disrupt or endanger SIBL. He decided that he had to "clean up" Antigua's reputation. In September 1996, Stanford's agents directed a letter to Antigua's Prime Minister, Lester Bird, and offered suggestions on how Antigua could clean up its banking sector. The letter noted how Antigua had recently been the subject of some terrible reports in the press, including an article in the Washington Post, which

described how Antigua and its offshore banking sector had become a haven for fraudsters and con artists. The letter then suggested 15 steps for the government to take in the banking and trust areas to establish some credibility for Antigua's financial sector.

### c. The Stanford Task Force

In June 1997, at Stanford's instigation, the Antiguan Government formed and chartered the "Antiguan Offshore Financial Sector Planning Committee." The Committee's purpose was to offer recommendations for reforming Antigua's offshore banking sector. Not surprisingly, Stanford was appointed to chair the Committee. The Committee formed a Task Force (the "Stanford Task Force") to (i) review all offshore banks licensed in Antigua to ensure they were legitimate, and (ii) evaluate Antigua's banking regulatory regime and make recommendations to address any weaknesses.

Stanford appointed every member of the Task Force, and every member was on Stanford Financial's payroll. The Task Force's members included three of Stanford Financial's outside lawyers; Kroll executives Tom Cash and Ivan Diaz; and several partners or associates from Stanford Financial's auditor in the United States, BDO Seidman, namely Michael Ancona, Jeffrey Balmer, Keith Ellenburg, and Barry Hersh. No Antiguan citizen served on the Stanford Task Force.

On September 15, 1997, the Task Force outlined some of its recommendations "for further development and eventual implementation" by the Antiguan Government. In the section entitled "International Cooperation," the Task Force wrote that, while it was important for the Antiguan Government to cooperate with the judicial and regulatory authorities of other countries, at the same time, "*it is essential that Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions.*" **One**

way to avoid such "overly aggressive enforcement actions," according to the Task Force, was to revise the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the *"most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'."*

The Task Force worked closely with Wrenford Ferrance, an Antiguan Government official that Prime Minister Bird nominated as the Government's representative and liaison to the Task Force. Although he was appointed by Prime Minister Bird to serve as Antigua's Director of International Business Corporations, Ferrance looked to Stanford Financial's agents on the Task Force for guidance.

The Task Force's reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), which was charged with supervising and regulating the offshore banking sector. Incredibly, Stanford was appointed to serve as the ***Chair of the IFSA***. Furthermore, one of Stanford Financial's U.S. lawyers served along with its Antiguan lawyer, Errol Cort, who also happened to be the Attorney General of Antigua. As a former member of the British High Commission in Barbados, Rodney Gallagher, put it: "*Stanford effectively became the man who controlled the regulator.*"

After the IFSA was set up, according to news reports, Stanford's first order of business was to seize all the banking records of SIBL's offshore bank competitors in Antigua. Althea Crick, an Antiguan woman who had been appointed as the executive director of the IFSA, refused to turn the records over to Stanford. So on February 8, 1999, Stanford sent his agents to the IFSA offices in the middle of the night, where they took the locked door off its hinges,

stormed inside, seized file cabinets containing the confidential bank records, and then carted them off to Stanford Financial's offices to be copied.[2]

The U.S. Government responded to Stanford's banking reforms and other shenanigans.  In April 1999, the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions that banking transactions involving Antigua should be given enhanced scrutiny because the Antiguan government had *significantly weakened* its banking laws and regulatory agencies.  The nearly unprecedented Advisory also warned that the Antiguan Government had vested supervisory authority to a new regulator, the IFSA, which was rife with conflicts of interest because its *"board of directors includes representatives of the very institutions the Authority is supposed to regulate."*  According to the Advisory, this *"rais[ed] serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."*  The Advisory continued,

> The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua].  These changes threaten to create a 'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware.  The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].

---

[2]   Michael Bilton, *"The Texan Who Fell to Earth"*, The Sunday Times, January 9, 2011.

As described below, from 2005 through 2009, Defendants Proskauer, Chadbourne, and Sjoblom relied on some of these provisions to thwart several subpoenas and requests for documents issued by the United States Securities and Exchange Commission (the "SEC" or "Commission") and other regulators who were investigating Stanford Financial's CD program.  The constant refrain from Stanford Financial and Defendants was that Antiguan secrecy laws prohibited SIBL from providing any of its financial records to the SEC or other regulators.

### d.  Stanford Solidifies His Power with Bribes, Loans and Kickbacks

Now firmly established in Antigua, Stanford Financial continued to strengthen its political ties with the Antiguan Government and corrupt officials.  In return for political cover, Stanford Financial eventually became a major source of funding for the entire island, eventually loaning tens of millions of dollars to the Antiguan Government.  Stanford Financial even bought the Antiguan newspaper, the Antiguan Sun, to influence the media.  By 2004, the Antiguan Government owed over $87 million to Stanford Financial — nearly half the island's annual tax revenues — and certain of its loans were secured by the Government's tax revenues and medical fund.

Stanford continued to leverage this influence through bribes, loans and kickbacks. Various companies within Stanford Financial loaned tens of thousands of dollars to various Antiguan Government officials.  For example, Stanford Financial companies loaned $30,000 to the Antiguan Minister of Finance, Molwyn Joseph, in February 1992, evidenced by a Promissory Note.  The Minister of Finance, *who during this time period was ultimately charged with overseeing SIBL*, never paid a dime on that loan.

Stanford disguised these purported loans and other bribes as political contributions. For example, in a May 6, 1994 memo from Stanford to his personal assistant, Jean Gilstrap, Stanford instructed Gilstrap to mark Molwyn Joseph's Promissory Note as "paid" and record it on company books as a political contribution. He further noted that, prior to the recent Antiguan elections, Stanford had informed Joseph that he would contribute to Joseph's political party, the ALP, by "liquidating" Joseph's personal note. Stanford also instructed Gilstrap to make sure she noted the "contribution" was made "after" the elections.

Also in January 1996, Suarez prepared several spreadsheets that detailed money Stanford had loaned to senior Antiguan Government officials, either through direct loans or through credit cards, as well as loans made to the Antiguan Government. This document revealed that **11 senior Antiguan Government officials**, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.

Stanford's efforts to corrupt Antiguan officials were simply brazen. A November 2003 newspaper article reported that Stanford had been accused of bribing two Antiguan Government officials — his old friend Molwyn Joseph and Gaston Browne — by giving them $100,000 each in connection with a land swap that Stanford was trying to orchestrate. The article reported that members of the Antiguan opposition party had brought motions to suspend both ministers. The article further reported that Stanford's response to these accusations was to hold a press conference in which he "surprised" the audience by cavalierly declaring that he was going to donate an additional $200,000 to each of the two Antiguan officials.

Antigua's corruption and lax banking regulations is likewise borne out by the Plea Agreement entered by Stanford Financial CFO Jim Davis (the "Davis Plea"), as well as by the

June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's financial regulator, the Financial Services Regulatory Commission (the "FSRC"), which replaced the previous IFSA.  The Davis Plea and Indictment allege that for years, King — while acting as the CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL.  King even entered into a bizarre "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford.  As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" who relayed information to Stanford concerning the SEC's investigations of Stanford Financial and SIBL from 2005 all the way until 2009.  This was all just part of the broader conspiracy to keep the Ponzi scheme alive by evading and obstructing regulatory oversight of SIBL's activities, at every turn, and in every country.

The Indictment and Plea Agreement also describe how SIBL's Antiguan auditor, Hewlett & Co., accepted "special" compensation from Stanford's secret "SocGen" "slush fund" account to fraudulently report SIBL's financial condition for use in SIBL's annual reports for some 20 years.  Hewlett & Co. forwarded those fraudulent "audits" to Stanford Financial in Houston, Texas every year for 20 years with full knowledge that the fraudulent audits would be utilized in Stanford Financial's marketing materials to defraud depositors.

### e. Stanford Financial Was Under Constant Investigation

Stanford Financial was under constant investigation by numerous government agencies, including the OCC, SEC, FBI, and U.S Customs.  For example, in addition to the SEC investigation of Stanford Financial that began in 2005, the FBI and U.S. Customs had been

investigating Stanford's possible involvement in laundering drug money as far back as 1991. At one point, this investigation resulted in a U.S. Customs search of Stanford's private jet aircraft when he returned from the Caribbean. After this search, FBI documents indicate that *"the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities."*

U.S. Customs documents from this same period described Guardian Bank as having *"constant cash flow"* from foreign depositors but *"no regulation of [the bank's] activities."* Other documents note that U.S. Customs in San Antonio had taken an interest in the *"possible smuggling activities of principals in the Stanford organization."* FBI documents also reveal that Stanford had been under constant investigation for possible money laundering going back to 1989, and the FBI had even sent an agent to London as part of this investigation in September 1992. Stanford was well known to U.S. authorities and "stayed very prominently on the radar for years," says one former FBI agent who investigated Stanford. "There was a series of investigations. Obviously none of them ever ended in indictments. But we're talking various FBI field divisions, with multiple agents, then multiple agencies."

**f. Stanford Financial Expands Sales into the United States**

In 1996, Stanford Financial finally crossed the Rubicon and entered the United States securities market. First, it registered the newly formed SGC as an SEC-licensed securities broker/dealer and investment adviser. SGC's sole mission was to sell SIBL CDs to American investors. At approximately this same time, Stanford Financial also expanded domestic sales of SIBL CDs to Latin American investors by establishing a representative office for Stanford Trust Company Ltd. (STCL), its Antiguan offshore trust company.

In September 1998, Stanford Financial established a trust representative office in Miami, naming it Stanford Fiduciary Investor Services ("SFIS"). Stanford Financial expanded this SFIS model by opening additional SFIS "trust representative offices" in Houston and San Antonio in 2001 and 2005. SFIS's sole mission was to sell SIBL CDs to Latin American investors, including exclusively Mexican investors through the San Antonio office. The SFIS model proved very successful: Stanford Financial sold more than $1 billion in SIBL CDs through the Miami office alone.

In 1998, Stanford Financial also established STC in Baton Rouge, Louisiana. STC provided trustee and custodial services that allowed SGC to sell SIBL CDs to its clients' IRA accounts. This new IRA component of the Stanford Ponzi scheme eventually funneled hundreds of millions of dollars into Stanford Financial.

In November 1998, SIBL filed a Regulation D ("Reg. D") exemption with the SEC. The exemption allowed SGC to sell SIBL CDs to "accredited investors" in the United States without registering the CDs as securities. This initial exemption, which permitted a $50 million offering, planted the seed for Stanford Financial's exponential future growth.

In 2001, SIBL filed an amended Reg. D exemption to increase the offering to $150 million. By 2003, Stanford Financial had printed and distributed some 30,000 offering brochures to its FAs. In response to increasing sales to U.S. investors, SIBL filed two additional amendments in 2004 that increased the offering to $200 million and then *$1 billion*. These amendments set the stage for an intensive television advertising campaign, which Stanford Financial launched in 2005 to promote further sales to accredited investors in the United States.

By March 2006, Stanford Financial had distributed 4,424 SIBL CD "Accredited Investor" packets to investors under the Reg. D offering.  Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the offering to *$2 billion*.

**g.  Stanford Financial Breeds Loyalty Through Exorbitant Compensation**

From 2004 to 2008, Stanford Financial grew into a high-powered sales and marketing machine.  The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine," "Aztec Eagles" (the Mexico team) and "Superstars."  To market and sell SIBL CDs, Stanford Financial established a commission structure that provided huge incentives for its FAs, including those at SGC, to "push" the SIBL CDs on investors.  SIBL paid disproportionately large referral fees to SGC for the sale of its CDs:  SGC received a 3% referral fee for each CD sale, with 1% going to the SGC broker who made the sale.  The FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD.  Stanford also held "sales contests" and gave lavish gifts to FAs who sold the most CDs.  Stanford Financial used these inflated commissions to recruit established financial advisers, and to reward advisers who aggressively sold SIBL CDs to investors.  Of course, these incentives are extremely rare for bank CDs because they are economically unsustainable.

**h.  Dissecting the Fraud**

The ultimate reality of Stanford Financial is that it was a Ponzi scheme based out of Houston, Texas.  In essence, Allen Stanford and his co-conspirators used the promise of SIBL CDs to lure investor money into Stanford Financial and then stole billions of dollars in assets from Stanford Financial companies for their own personal benefit.  Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi

insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) fund investments in speculative, illiquid, and high-risk assets, including private equity holdings and speculative investments in Antiguan real estate.

In addition to stealing billions of dollars from Stanford Financial companies, Allen Stanford and his co-conspirators violated the Investment Company Act by failing to segregate the investor funds that SIBL received for the purchase of CDs. Instead, investor funds were commingled and then spread across various purported investments, which means Stanford Financial was actually operating as an unregistered investment "fund" that sold its internal securities product — the SIBL CDs — to investors. But Stanford Financial was never registered nor legally authorized to operate as an investment company in the United States. Furthermore, Stanford Financial's sales of SIBL CDs were unenforceable against investors under Section 47(b) of the Investment Company Act:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

These facts were never disclosed to CD investors. Instead, investors were consistently and uniformly told — both verbally and via promotional materials — that Stanford Financial was compliant, authorized, and regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor

Protection Corporation ("SIPC") and Lloyd's of London.  CD investors were never told that the

acts of Stanford Financial and its unregistered investment company were void as a matter of law

under Section 47 of the Investment Company Act.

      As part of this fraud, Stanford Financial also uniformly touted the high liquidity

of SIBL's purported investment portfolio.  For example, in its marketing materials distributed to

CD investors from at least 1995 through 2009, Stanford Financial emphasized the importance of

the SIBL CD's liquidity.  Under the heading "Depositor Security," Stanford Financial's materials

state that the bank focuses on "maintaining the highest degree of liquidity as a protective factor

for our depositors."  None of that was true.  Likewise, Stanford Financial trained its FAs to stress

liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that

the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide

security to SIBL clients . . . ."  To ensure investors would buy SIBL CDs, Stanford Financial,

through its FAs, assured investors that SIBL's investments were liquid and diversified, and

therefore the CDs themselves were highly liquid and could be redeemed with just a few days'

notice.

      In reality, however, billions of dollars in assets had been stolen by Allen Stanford

and his co-conspirators.  Contrary to Stanford Financial's verbal and written statements to

investors from 1995 through 2009, Allen Stanford and his Ponzi insiders misappropriated

billions of dollars from Stanford Financial companies to: (i) support the lavish lifestyles of Allen

Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford;

(iii) capitalize other entities wholly owned by Allen Stanford; and (iv) invest in speculative,

illiquid, and high-risk ventures, including private equity and real estate development projects in

Antigua and elsewhere in the Caribbean.  For example, by February 2009, Allen Stanford and his

cronies had stolen at least $1.8 billion through the bogus loans alone. Stanford Financial also failed to inform investors that hundreds of millions of dollars of depositor funds were used to create and perpetuate the charade of Stanford Financial's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial's image of wealth, power, and prestige.

As alleged in the Davis Plea and the criminal Indictment of Allen Stanford and his associates, Stanford and his CFO Jim Davis fabricated the nature, size, and performance of SIBL's purported investment portfolio. Gilberto Lopez and Mark Kuhrt, accountants for the Stanford Financial companies, fabricated the financial statements using pre-determined returns on investments that were typically provided by Stanford or Davis. Lopez and Kuhrt used these fictitious returns to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn. The information in SIBL's financial statements, created and issued by Hewlett & Co., bore no relationship to the actual performance or existence of SIBL's purported investments. SIBL's financial statements were prepared, drafted, and approved by Hewlett & Co. in conjunction with Stanford, Davis, Lopez and Kuhrt. As alleged by the SEC and the United States Department of Justice, Stanford and Davis also fraudulently inflated real estate and private equity holdings in SIBL's purported portfolio so the bank could maintain its minimum capital requirements.

### i.   Stanford Financial's House of Cards Finally Collapses

In 2008, capital markets seized in a worldwide financial meltdown, and many anxious SIBL investors sought to liquidate their investments. By October 2008, this depositor "run" on SIBL had triggered liquidity constraints that frustrated Stanford Financial's ability to

satisfy client requests for redemptions and funds transfers.   Company records indicate that approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009.   These redemptions had a huge impact on the ability of Stanford Financial's FAs to keep clients pacified, and on Stanford's ability to keep the Ponzi scheme afloat.   As a result, the FAs intensified their efforts to push the CDs on investors to generate new money.

In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady examined SIBL's publicly available annual reports as a favor for a friend. Dalmady concluded that Stanford Financial was also an investment Ponzi scheme.  He published his findings in a Venezuelan magazine under the title "Duck Tales."  His findings were then re-published in various blog postings.

On February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying David Nanes, that illuminated Stanford Financial's crumbling empire:

> [T]hings are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on [sic], David's name and many others and they are very real…[w]e are all in this together.

On February 17, 2009, the SEC filed a Complaint against SGC and SIBL, as well as Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions."  The SEC obtained an injunction to freeze the assets of Stanford Financial, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial companies

On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and

money laundering.   Former Stanford Financial CFO Jim Davis subsequently pled guilty to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding.   On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money laundering.   On June 14, 2012, Stanford was sentenced to 110 years in prison for his crimes.

### D. Stanford Financial's Regulatory Obstruction and Concealment Conspiracy

Stanford Financial's successful efforts to completely shield SIBL from regulators was a central pillar of the Stanford Ponzi scheme.   Stanford Financial thwarted regulatory scrutiny in every country by concealing the true nature of its operations and SIBL's purported investment portfolio.   After learning the lessons of Montserrat, Allen Stanford did not want SIBL's operations to be threatened by another regulator, so he secured a safe haven in Antigua, and beginning in 1991, Stanford, Davis, and others — including Defendants — embarked on a relentless conspiracy to obstruct regulatory scrutiny and conceal the true nature of Stanford Financial's global activities.

This obstruction-and-concealment conspiracy was essential to the Ponzi scheme's success, and it quickly became one of the scheme's main objectives.   To accomplish this goal, Allen Stanford and his co-conspirators resorted to lies, trickery, bribery, "blood brother" rituals, regulatory corruption and obstruction, and other machinations to thwart regulators and protect the Ponzi scheme.

### a. The SEC First Suspected Stanford Was a Fraud in 1997

According to the March 31, 2010 Report of Investigation from the SEC Office of Inspector General ("OIG"), the SEC's Fort Worth office first suspected that Allen Stanford and

Stanford Financial were running a Ponzi scheme in 1997. From 1997 through 2004, including the time when Defendant Sjoblom was a high-ranking SEC enforcement lawyer (1997 to 1999), the Commission's Fort Worth office conducted a broker/dealer examination of Allen Stanford and Stanford Financial four times (1997, 1998, 2002 and 2004), and in each examination, the staff doubted the legitimacy of SIBL's CDs and believed SIBL's purported investment returns were "highly unlikely" given the bank's purportedly conservative investments. Because of these doubts, the examination staff concluded that SIBL's CDs were likely a Ponzi scheme or similar fraudulent scheme.[3]

The SEC's first broker/dealer examination occurred in 1997 after the Fort Worth staff identified SGC as a risk and target for examination. In August 1997, after only six days of field work examining SGC, the examiners concluded that SIBL "appeared" to be misrepresenting its CDs as "safe and secure" investments. The examiners believed the SIBL CDs' burden of high interest rates and substantial "referral" fees to SGC were simply too great to be supported by SIBL's purportedly low-risk investment portfolio. In fact, the Assistant District Administrator of Fort Worth's examination program concluded that the CDs' interest rates, SIBL's claimed investment returns, and SIBL's purportedly conservative investment approach all served as "red flags" of a Ponzi scheme. The Fort Worth Branch Chief believed the CDs' purported returns were "absolutely ludicrous," and further concluded that SGC's substantial "referral" fees indicated the CDs were not legitimate.[4]

The Fort Worth examination staff were also concerned that SGC did not maintain books and records for CD sales. Moreover, SGC purported to have no actual information about SIBL or the bases supporting the CDs' generous interest rates, even though SGC's FAs were

---

[3]   SEC OIG, Report of Investigation, Case No. OIG-526 (March 31, 2010) ("OIG Report") at 16.
[4]   OIG Report at 17.

recommending SIBL CDs to investors and receiving substantial "referral" fees for doing so.  The

examiners were also concerned by the revelation that Allen Stanford had contributed $19 million

in cash to SGC in 1996, while at the same time SIBL had "loaned" $13.5 million to Allen

Stanford personally, and also "loaned" nearly $5.5 million to Stanford Financial, for a total of

nearly $19 million.  The Branch Chief believed the cash infusion and corresponding loans were

red flags that Allen Stanford "was possibly stealing from investors."[5]

In May 1998, while Defendant Sjoblom was still working as an SEC enforcement

lawyer, the Commission's Enforcement Division opened a Matter Under Investigation ("MUI")

on Allen Stanford and his companies.  The Enforcement Division issued the MUI in response to

the examination staff's referral and information received from U.S. Customs that Allen Stanford

was suspected of laundering money.  The MUI was classified as securities fraud and "possible

organized crime," and between July and September 1998, the SEC received requests for access

to its Stanford investigative files from the FBI, the Department of Justice, the IRS, and the U.S.

Customs Service.[6]

Despite this interest from various federal agencies, the SEC was concerned about

the jurisdictional challenges of obtaining records from Antigua, so the Commission issued a

*voluntary* document request to SGC concerning SIBL.  Not surprisingly, SGC simply refused to

produce numerous documents relating to SGC's referrals of investors to SIBL.  Without any

means of compelling production, the SEC, acting under the direction of Spencer Barasch in the

Commission's Fort Worth office, closed the MUI in August 1998.  Spencer Barasch and other

---

[5]   OIG Report at 18.
[6]   OIG Report at 18.

SEC staff members later testified that the MUI was closed in part due to the Commission's inability to access SIBL's records in Antigua.[7]

In June 1998, while the Stanford MUI was still open, the SEC's Fort Worth office also began an investment-advisor examination of SGC. The investment-advisor examiners found that SIBL's "extremely high interest rates and extremely generous compensation" to SGC, coupled with SGC's "extreme[] dependen[ce] upon that compensation to conduct its day-to-day operations," was "very suspicious." The investment-adviser examiners also noted SGC's complete lack of information regarding SIBL CDs and SIBL's investment portfolio. In fact, when examiners asked SGC to produce all of its due diligence information concerning SIBL CDs, SGC claimed it did not even have *access* to such information. In sum, the examiners concluded that SGC had "virtually nothing" to provide a "reasonable basis" for recommending SIBL CDs to its customers.[8]

The examiners also identified SGC's possible violations of its fiduciary duties as an investment adviser, including SGC's affirmative obligation to employ reasonable care to avoid misleading clients. The examiners noted that any departure from this fiduciary standard would constitute fraud under Section 206 of the Investment Advisers Act of 1940. The investment-advisor examiners raised some of these concerns in a July 16, 1998 letter to SGC, and like the broker/dealer examiners before them, they believed Allen Stanford and Stanford Financial's operations were fraudulent.[9]

In November 2002, the SEC's Fort Worth office conducted another investment-advisor examination of SGC. The examiners identified the same red flags as before: SIBL's

---

[7]   OIG Report at 18-19.
[8]   OIG Report at 18, 44.
[9]   OIG Report at 18, 44-45.

"consistent, above-market reported returns," which were "very unlikely" to be achieved with "legitimate" investments, and the high commissions earned by SGC's FAs for selling SIBL CDs that they failed to adequately understand.   According to the 2002 Examination Report, the examiners noted that "[t]here was no indication that anyone at SGC knew how its clients' money was being used by SIBL or how SIBL was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC."   The examiners concluded that SGC's failure to conduct sufficient due diligence concerning SIBL CDs violated Section 206 of the Investment Advisers Act.   The Examination Report also concluded that Stanford Financial's website constituted a "general solicitation" or public offering in violation of SIBL's Reg. D exemption because the site provided all the information that clients needed to purchase SIBL CDs, including contact information for SGC representatives.   The Examination Report further assigned SGC a risk rating of "1," the highest risk rating possible, and one former examiner testified that a "big factor" supporting this rating was the staff's "suspicions [that] [SIBL] was a Ponzi scheme."[10]

On December 19, 2002, the examiners sent a deficiency letter to SGC's Chief Compliance Officer, Jane Bates.   The letter informed SGC that its due diligence file for SIBL CDs lacked sufficient information for SGC to recommend such investments to clients.   The letter requested that "SGC perform and document substantial additional due diligence to determine whether [SIBL's] use of proceeds . . . would indicate that the investment is suitable for [SGC's] advisory clients."

In response to this letter, SGC "markedly changed its previous representations to the SEC concerning its due diligence regarding [SIBL's] CDs."   In a letter dated January 23,

---

[10]   OIG Report at 19-20, 48, 56-57.

2013, Bates claimed that SGC's Chief Operating Officer and Chief Complaint Officer regularly visited the bank, participated in quarterly calls with the bank's CFO, and received quarterly information concerning the bank's portfolio allocations, investment strategies, and top five equity and bond holdings.  One examiner thought these revelations were another red flag given SGC's previous denials, and he believed Bates was either "out of it" or "ly[ing]."[11]  In a letter dated February 13, 2003, the examiners responded to SGC's marked change of heart, criticizing SGC's use of "hindsight" due diligence and highlighting SGC's failure to provide requested information concerning SGC's sales of SIBL CDs.

In 2003, the SEC also received two additional letters from private citizens that raised concerns about Stanford Financial.  On August 4, 2003, the Commission received a letter comparing the "striking similarities" between a recently exposed Ponzi scheme — believed to be the $425 million InverWorld fraud — and Stanford Financial's operations.  In particular, the letter noted how the organizations avoided regulatory oversight by depositing investor funds in offshore entities and devising a "Byzantine corporate structure" that used domestic entities for "administrative services" only.  On October 10, 2003, the NASD forwarded a letter from a former Stanford FA who questioned SIBL's true investment activities and believed Stanford Financial was a "LINGERING CORPORATE FRAUD SCANDAL PERPETUATED AS A MASSIVE PONZI SCHEME." (emphasis in original)  The SEC's Forth Worth office discussed these matters again but ultimately concluded that it would be difficult to prove a fraud case because the Commission could not compel SIBL to produce any records.[12]

In October 2004, the SEC's Forth Worth office initiated another broker/dealer examination of SGC, this time for the specific purpose of sparking a potential enforcement

---

[11]   OIG Report at 51-52.
[12]   OIG Report at 63-69.

action.  In their Examination Report, the examiners found SGC to be a "high regulatory risk" and suspected that SIBL's CD offerings "may in fact be a very large [P]onzi scheme, designed and marketed by [SIBL] and [SGC] to lull investors into a false sense of security by their claims that [SIBL] products are similar to traditional U.S. bank CDs."  The examiners' "suspicion [was] fueled by SGC's apparent inability and [SIBL's] refusal to provide requested documents regarding the CDs, including the actual uses of the monies raised."  The examiners further noted their inability to force SIBL to provide "the necessary documents to either verify or allay [these] suspicions."  The Report also discussed the examiners' belief that SGC was possibly violating its fiduciary duty to clients and the NASD's suitability rule, as well as Section 206 of the Investment Advisers Act, Section 5 of the Securities Act of 1933, and Rules 10b-5 and 10b-10 of the Securities Exchange Act of 1934.[13]

On November 2, 2004, SGC responded to an October letter from the SEC regarding SGC's due diligence of SIBL's investment portfolio.  The letter described SGC's due diligence efforts but acknowledged that SGC "[did] not have access to the detailed portfolio mix of [SIBL's] assets."  On December 21, 2004, the SEC examiners responded to SGC with an additional request for documents, including information concerning SGC's receipt of referral fees and details of SIBL's investment portfolio.  In a letter dated January 6, 2005, SGC reiterated that it did not have the "specifics" regarding SIBL's investments.

On or about April 15, 2005, the broker/dealer examiners officially referred the Stanford case to the SEC's Enforcement Division in Fort Worth.  According to the examiners' 2005 Enforcement Referral memo, the evidence suggested SGC and SIBL "may be violating the securities laws," namely that: (i) SGC may be selling unregistered securities without a valid

---

[13]   OIG Report at 70-74.

exemption; (ii) SGC and SIBL may be misrepresenting the unregistered offering; and (iii) SIBL

"may be engaging in a fraudulent scheme (possibly either a money laundering and/or a Ponzi

scheme) through the sales of the unregistered securities." According to the memo, SIBL "refuses

to provide the staff with sufficient information to dispel [these] concern[s]." The memo also

noted SGC's continued representations to the Commission that SGC could not get any

information from SIBL concerning the composition of SIBL's portfolio or its investments, and

that SIBL claimed Antiguan bank secrecy laws prevented the bank from even producing such

information to SGC.

> SGC claims that it keeps no records regarding the portfolios into
> which [SIBL] places investor funds and that it cannot get this
> information from [SIBL]. Indeed, SGC has related to the Staff that
> [SIBL] claims it cannot divulge the specifics of how it has used
> customers' deposits, based (variously) upon the bank secrecy laws
> of Antigua and [SIBL's] own internal "Chinese Wall" policies
> with SGC.[14]

> According to the OIG Report, the Enforcement Division's reaction to the memo

was "very positive." One enforcement attorney described his initial impression:

> [T]here was the thought that this could have been a Ponzi scheme
> and that if, essentially, we could get kind of bank records that
> would reflect, you know, the money basically going in and then
> not being used for legitimate investment purposes but being used
> to kind of pay back prior investors, that, you know, we'd be able to
> bring a case quickly.

That same day, April 15, 2005, the Enforcement Division opened a new MUI that eventually led

to a formal order of investigation. The enforcement staff promptly contacted the Office of

International Affairs to help the Commission obtain SIBL's records in Antigua.[15]

---

[14]  OIG Report at 74, 81-82.
[15]  OIG Report at 83-85.

On May 19, 2005, SGC's Rep Poppell provided additional information to the SEC regarding SGC's knowledge of SIBL's investment portfolio:

> It is important to note that SIBL utilizes [independent] portfolio advisors all over the world. . . . SGC is not privy to the names of the securities purchased by [SIBL's] independent portfolio advisors, most of which have full discretion to manage their designated portion of the Bank's portfolio. . . . [But] SIBL did open a managed account with Stanford Asset Management in April 2005, and we have attached the most recent statement indicating the corporate bond holdings. Because this is managed by SGC's investment adviser, we have knowledge of those securities purchased.

While Poppell's disclosure to the SEC was misleading at best, his admission that SGC had at least *some* knowledge of SIBL's investments would later be contravened by Defendant Sjoblom's stance with the Commission that SGC had *no* knowledge of SIBL's investments.

### b. Stanford Financial's Anti-Regulatory Conspiracy Gains Urgency

On June 9, 2005, the SEC's Office of International Affairs sent a letter to Leroy King regarding the Stanford investigation. The letter described the SEC's suspicions of fraud and "a possible Ponzi scheme by [SIBL]," including its concerns that Allen Stanford or Stanford Financial were misappropriating customer funds. The letter requested the FSRC's cooperation in helping the Commission obtain SIBL's records in Antigua. When King received the letter, he immediately forwarded a copy directly to his "blood brother," Allen Stanford.

An enforcement staff member called King to discuss the Commission's concerns. During the call, King apparently rejected the SEC's allegations as mere "innuendo." He questioned whether the SEC's concerns implicated criminal conduct and declined to provide much assistance. When the staff member told King that some people believed Allen Stanford was *stealing* the investors' money, King demanded to know the people's identities (presumably so he could inform Allen Stanford). King formally responded to the SEC request in a letter dated

June 21, 2005, where he bluntly informed the Commission that the FSRC believed "any further investigation of [SGC's] 'possible' fraudulent activities is unwarranted."[16]

On that same day, June 21, 2005, the SEC sent an investigatory referral letter to the National Association of Securities Dealers ("NASD") (now Financial Industry Regulatory Authority, or "FINRA"). The letter outlined the Commission's concerns, including its suspicions that: (i) Stanford Financial was committing securities fraud; (ii) SIBL's CDs constituted "securities" under U.S. law; and (iii) Stanford Financial appeared to be operating an illegal unregistered investment company (*i.e.*, a mutual or hedge fund) in the United States. The letter informed the NASD that SGC "claims that it keeps no records regarding the portfolios into which [SIBL] places investor funds and that it cannot get this information from [the bank,] . . . [which] suggests [SGC] may be violating NASD Rule 2310 (Suitability)." The letter also reported that as of 2004, SGC had earned *63%* of its revenues from SIBL CD sales, and had sold at least *$1.5 billion* in CDs to investors. The NASD promptly opened its own investigation of Stanford Financial.

The bottom line is that from 1997 to 2005, the SEC's staff in Fort Worth strongly suspected that Allen Stanford and Stanford Financial were operating some kind of fraud or Ponzi scheme. *See* OIG Report at 103 ("Everybody, everybody believed that this was probably a Ponzi scheme."). In response to the SEC's expanding investigation, and as alleged in the Jim Davis Indictment, Allen Stanford, Jim Davis, and their co-conspirators blocked and obstructed the Commission's investigation at all turns, beginning in at least the summer of 2005 and ending

---

[16]  On or about July 8, 2005, the SEC discovered that Leroy King received his position at the FSRC based on Allen Stanford's recommendation, and that King was a member of the corrupt Lester Bird "gang." The SEC also learned that Allen Stanford wielded enormous power in Antigua, in part through his ownership of Antigua's newspapers, airport, several restaurants, and several other properties. In short, Stanford "was the money guy" in Antigua.

shortly after the SEC finally seized Stanford Financial in February 2009. The Indictment alleges that from June 2005 through March 3, 2009, Stanford, Davis, Pendergest-Holt, King and others (collectively, the "Stanford Conspirators") engaged in a conspiracy to "corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before … the SEC, in violation of 18 U.S.C. § 1505." According to the Indictment, the object of this conspiracy was to obstruct the SEC's investigation of Stanford Financial and SIBL in order to "perpetuate and prevent detection of an ongoing fraud" so that Stanford Financial and SIBL could "continue receiving economic benefits from the fraud."

In the summer of 2005, Defendant Sjoblom also joined this conspiracy to obstruct the SEC's investigation. Defendant Sjoblom — *who had 20 years of experience as a senior lawyer in the SEC's Enforcement Division* — spent the next four years delaying and obstructing the investigation by lying to the SEC, falsely stating that he had personally confirmed Stanford Financial was not a Ponzi scheme, instructing Stanford Financial to hide documents from the SEC, misrepresenting the existence and nature of the SEC's investigation to SGC's auditors, and offering false testimony to the SEC.

With the advice, cooperation, and substantial assistance of Defendant Sjoblom and the Law Firm Defendants, the Stanford Conspirators developed an obstruction strategy to prevent the SEC from *ever* obtaining documents regarding SIBL's investment portfolio. Their strategy became a shell game: Stanford Financial and Defendant Sjoblom claimed that Antiguan law prohibited SIBL from producing its documents, and that only the FSRC could provide them, but the Stanford Conspirators and Defendant Sjoblom knew that Leroy King would *never* allow the FSRC to produce those documents to the SEC.

### E. Chadbourne and Sjoblom Participate in the Stanford Ponzi Scheme

In June 2005, Stanford Financial retained Defendants Chadbourne and Sjoblom to defend and obstruct the SEC investigation. Sjoblom, a partner in Chadbourne's Washington, D.C. office, was the perfect fit for Stanford Financial. He had been a high-ranking SEC enforcement lawyer for 20 years before joining Chadbourne, and he personally knew many of the SEC lawyers involved in the investigation.

On June 9, 2005 — *the very same date of the SEC's first letter to Leroy King regarding Stanford Financial* — Sjoblom received a call from Chadbourne's Talbert Navia, a good friend of Stanford Financial's General Counsel Mauricio Alvarado, regarding Stanford Financial's potential retention of Chadbourne and Sjoblom for the SEC investigation.[17] The next day, June 10, 2005, Navia and Sjoblom held a teleconference with Alvarado, who described Stanford Financial's business operations and its issues with the SEC, including the SEC's belief that Stanford Financial was a *Ponzi scheme*. According to Sjoblom's notes, Alvarado told them that he wanted Sjoblom to "stop [the SEC inquiry] now."

### a. Sjoblom's Due Diligence Raises Numerous Red Flags About the Fraud

Sjoblom went to work immediately, starting with his own due diligence of Stanford Financial. On June 15, 2005, Sjoblom obtained a copy of the "Response and Counterclaim" filed by Charles Hazlett against SGC in an arbitration proceeding with the NASD. Hazlett, a former FA for SGC, described how SGC pressured him to sell SIBL CDs, how SIBL refused to permit the disclosure of its financial information, and how SGC asked him to resign for simply asking questions about SIBL's finances. Notably, Hazlett also described how he

---

[17] Stanford Financial's first choice for this assignment was Spencer Barasch, who had recently retired from the SEC as the Enforcement Director of the Fort Worth office, but the SEC's ethics office disqualified Barasch from representing Stanford Financial in 2005. As discussed further below, however, Barasch would go on to help Stanford Financial and Sjoblom in 2006.

received a $100,000 car as a bonus for selling more than $10 million in SIBL CDs in a single quarter.

On June 29 and 30, 2005, Sjoblom traveled to Stanford Financial's global headquarters in Houston, Texas. He reviewed Stanford Financial's offering materials and disclosures to U.S. accredited investors for the SIBL CD program. He also interviewed several SGC FAs and other personnel, including SGC's top managers Jay Comeaux, Alvaro Trullenque, Jason Green, and Danny Bogar. **Sjoblom asked each one of them if they knew how SIBL invested SGC's client funds, but none of them could tell Sjoblom anything about SIBL's portfolio other than the general categories and asset classes disclosed in SIBL's annual reports.** When discussing the bank, Comeaux, Trullenque, and other FAs also told Sjoblom that SIBL was *not* a commercial bank, as these banks earned money through traditional lending. Instead, they told him that SIBL was an *investment* bank. For example, Comeaux referred to the bank as "our affiliate [SIBL], a private investment bank," and he explained that SIBL was not a commercial bank because it did not issue commercial loans. Similarly, FA Trevor Ling described SIBL as a "classic" investment bank that invested client funds and guaranteed a rate of return. Ling and Trullenque also told Sjoblom that SIBL's portfolio managers were located in Memphis, Tennessee. When discussing SIBL's CDs, FA Doug Shaw told Sjoblom that these investments were more like corporate bonds and were simply "called" CDs.

SGC's FAs also told Sjoblom about the 1% trailing commission they received on every million dollars that their clients invested in SIBL CDs, and they discussed the contests that Stanford Financial used to promote CD sales. Jason Green told Sjoblom that he was "Team Captain" for SGC's U.S. sales team, which competed against foreign sales teams from

Venezuela and other countries.  Danny Bogar also told Sjoblom about Stanford Financial's "Top Producers Club" for FAs who sold more than $1 million in new SIBL CDs for the year.

On June 30, 2005, Sjoblom met with Barbara Fortin, Stanford Financial's insurance risk manager, who explained SIBL's insurance policies from Lloyd's of London. **Sjoblom's notes show that SIBL's insurance provided up to $20 million in coverage for** *_SIBL's deposits in correspondent banks_* **but no insurance is listed for the** *_CD investors'_* *_deposits at SIBL._*  Sjoblom also met with Stanford Financial compliance officer Rep Poppell, who described the SEC's examination and Stanford Financial's compliance procedures for SGC. According to Sjoblom's notes, Poppell told the SEC "ad nauseum" that he did not know where SIBL's money was invested.  **Poppell also said that SEC enforcement attorney Jennifer Brandt told him the Commission wanted to determine whether SIBL's CD program was a Ponzi scheme.**

On August 9, 2005, Sjoblom asked his associate, Ben Ogletree, to contact Jennifer Brandt at the SEC and inquire about the status of the Stanford investigation.  That same day, **Ogletree reported back to Sjoblom that the SEC proceeding had become a "formal" investigation.**[18]  Ogletree said the SEC wanted to obtain SIBL's investment records "showing how the money was invested," but SGC had taken the position that it "had no access to such records and thus cannot provide them."  He also told Sjoblom that Brandt wanted to know if Chadbourne represented SGC, SIBL, or both entities.  **Sjoblom told Ogletree that he represented both** *SGC and SIBL,* **but he advised Ogletree** *_not_* **to inform the SEC because "[m]aybe we keep [the SEC] from getting the bank records by not representing [SIBL]."** (emphasis added)

---

[18]   The SEC's Enforcement Division opened a formal investigation on July 15, 2005.

On August 9, 2005, Sjoblom traveled to Antigua to continue his due diligence, where he met with Allen Stanford, Stanford Financial's Chief of Staff Yolanda Suarez, and SIBL President Juan Rodriguez-Tolentino.   During Sjoblom's meeting with Allen Stanford, Stanford revealed his plans for the massive real estate development projects underway in Antigua, including the Island Club, which was Stanford's dream project of a massive resort in Antigua and adjacent islands for wealthy tourists.   Stanford's chief architect also attended the meeting and explained the details of Stanford's Antiguan development projects.   According to Sjoblom's handwritten notes from this meeting, the projects were funded by Stanford Financial.   Sjoblom's notes demonstrate that by August 9, 2005, Sjoblom was acutely aware of Stanford Financial's substantial investments in speculative Antiguan real estate.   His notes also reveal Sjoblom's knowledge that SIBL also held real estate investments in Antigua and Venezuela.

The next day, August 10, 2005, Sjoblom toured SIBL with its President, Juan Rodriguez-Tolentino, who described SIBL's history and the Antiguan regulatory environment governing SIBL.   Stanford Financial CFO Jim Davis joined them for lunch, where Rodriguez-Tolentino told Sjoblom that SIBL's main clients (at least 90% at that time in 2005) were from Latin America, because Latin Americans did not like market risk and thus preferred conservative instruments like CDs.   According to Sjoblom's notes, Rodriguez-Tolentino also claimed that SIBL's "issue of privacy" was being "mistaken for lack of transparency."

After lunch, Sjoblom met with Davis and Stanford Financial's Chief Investment Officer ("CIO") Laura Pendergest-Holt.   Sjoblom asked them who managed SIBL's investment portfolio and where SIBL maintained its accounting records.   Davis told Sjoblom that SIBL's "First Tier" (or "Tier 1") investments consisted of cash held in correspondent accounts.   The

Tier 1 assets were overseen by SIBL's accounting staff with assistance from Patricia Maldonado, who was Stanford Financial's Global Treasury Manager in *Houston, Texas*.

Davis also told Sjoblom that SIBL's "Second Tier" (or "Tier 2") investments were managed by roughly 20 managers located in Canada and Europe, and *monitored by Stanford Financial research analysts in Memphis, Tennessee*.   Davis said the analysts in Memphis worked for Stanford Financial Group Company under a management agreement (*i.e.*, contract) with SIBL.

Davis also informed Sjoblom that SIBL's "Third Tier" (or "Tier 3") investments were managed by European advisors and *monitored by Jim Davis and Allen Stanford*.   Davis said the Tier 3 assets were longer-term credits such as bonds and notes issued by countries and international corporations.   Davis and Pendergest-Holt also told Sjoblom that SIBL did *not* invest in private equity because the investments were illiquid, and that *SIBL's entire portfolio could be converted to cash in 120 days*.   Finally, Davis and Pendergest-Holt told Sjoblom that SIBL's financial statements were audited by Hewlett & Co., a local accounting firm in Antigua.

Notably, Davis and Pendergest-Holt never told Sjoblom anything about the *specific investments* in SIBL's portfolio, even though they were responsible for monitoring most of those investments.   Instead, they simply provided general descriptions of asset classes (*i.e.*, nothing more than the information that was already disclosed in SIBL's offering materials). Sjoblom conspicuously failed to press this issue even though he knew that the primary focus of the SEC's investigation was to examine SIBL's actual investment holdings, and he knew SGC had told the Commission that this information was unavailable.   But the information was *not* unavailable.   Davis and Pendergest-Holt had confirmed that SIBL's investment information was available in the United States — a fact that Sjoblom first learned from SGC's FAs in June —

because SIBL's investments were monitored by Stanford Financial personnel in Memphis and Houston.

Later that afternoon, Rodriguez-Tolentino took Sjoblom to visit Leroy King, the head of Antigua's FSRC, who purportedly served as an "independent" regulator on the island. **Shockingly, King proceeded to tell Sjoblom about the SEC letter he recently received regarding the Commission's Stanford investigation. King also told Sjoblom that the FSRC would *not* produce any documents concerning SIBL to the SEC.** Sjoblom's notes from this meeting reflect King's comment that under Antiguan law, King would not permit SIBL's records to be turned over to the SEC unless he and the FSRC first found that SIBL was engaged in fraud or crime. King also told Sjoblom that he might show the FSRC's SIBL examination reports to the SEC, but ***King would not provide the SEC with any documents showing how SIBL's portfolio was invested***.

Sjoblom's notes demonstrate that as of August 10, 2005, Sjoblom knew the FSRC would *not* produce SIBL's portfolio records to the SEC absent its own finding that SIBL had engaged in fraud or crime. He also knew the FSRC was *not* truly independent from Stanford Financial because King had openly discussed his confidential communications with the SEC concerning SIBL. Sjoblom's file also reveals that he received a copy of the FSRC's examination report for SIBL, dated March 7, 2005, which was marked "DRAFT" and "CONFIDENTIAL." It is not clear when Sjoblom actually obtained this *draft, confidential* report from SIBL's "independent" regulator. But if he received the report during his meeting with King, then Sjoblom also knew on August 10, 2005 that *the FSRC was beholden to Stanford Financial*. There is simply no other credible explanation for King's disclosure of the FSRC's confidential correspondence with the SEC regarding SIBL, and his provision of a draft, confidential SIBL

examination report to the attorney who represented SIBL.  Sjoblom was on notice that Stanford Financial had the FSRC in its pocket.

By this time, Sjoblom had also gathered critical information about Stanford Financial's business operations.  He knew that Stanford Financial's securities marketing and sales operation was based in Houston, Texas.  He also knew that Stanford Financial primarily sold CDs issued by its offshore bank, SIBL, which was formed under Antiguan law.  He knew that SIBL's Tier 1 and Tier 2 assets were monitored by Stanford Financial personnel in Houston and Memphis, and that Jim Davis, who was based in the United States, monitored SIBL's Tier 3 assets with Allen Stanford.  He also knew that SIBL CDs were sold to domestic investors through SGC, which served as Stanford Financial's registered investment adviser and broker/dealer in the United States.  More importantly, he knew that SGC was recommending SIBL CDs to investors even though SGC's key managers and FAs did *not* know how SIBL invested depositor funds.  Moreover, he knew that SGC was actively misleading the SEC regarding the availability of SIBL's investment information.  Sjoblom also knew that SIBL used Antigua's purported "privacy laws" to keep its purported investments secret from the SEC even though Stanford Financial had SIBL's investment information in Memphis and Houston.

Sjoblom also knew that SIBL CDs offered returns that were far greater than prevailing market rates, and that Stanford Financial aggressively incentivized CD sales by paying above-market commissions and sponsoring numerous sales contests.  Sjoblom also knew that these excessive CD rates and lucrative sales incentives — when coupled with the secrecy concerning SIBL's investment portfolio and Stanford Financial's refusal to provide requested information — caused the Commission to suspect that Stanford Financial was operating a

massive fraud or Ponzi scheme.   Finally, Sjoblom also knew that Stanford Financial was investing substantial sums of money in speculative real estate development projects.

These facts demonstrate that as of August 2005, Defendant Sjoblom — a former SEC enforcement lawyer with 20 years of experience investigating securities and investment fraud — knew that Stanford Financial was, *at best*, committing securities fraud through an unregulated investment company based in Houston, Texas that issued securities from an offshore bank in the most corrupt fraud haven in the Caribbean. ***At worst, Sjoblom already knew that Stanford Financial was running a Ponzi scheme.***

Instead of declining the engagement, however, Sjoblom eagerly agreed to help. After concluding his due diligence, Sjoblom reported back to Talbert Navia and agreed to represent Stanford Financial.   On August 23, 2005, Navia and Sjoblom executed the engagement letter on behalf of Chadbourne, agreeing to represent Stanford Financial and its affiliates SGC and SIBL through all stages of the SEC's ongoing investigation.   That same day, Sjoblom called the SEC and told the Commission that SIBL would not voluntarily produce any documents and that the SEC did not have jurisdiction over SIBL.

On August 24, 2005, Sjoblom traveled to Memphis to learn more about how SIBL's investments were managed.   There he met again with Pendergest-Holt.   His notes from this meeting detail her explanation that Stanford Financial Group Company provided SIBL with accounting, legal, financial and treasury management services from the U.S. through services agreements between the two companies.   Pendergest-Holt told Sjoblom that Stanford Financial could provide SIBL's investment *parameters* to the SEC but it could not provide its actual investment positions because this information was ***proprietary***.   Of course, Sjoblom knew — as would any lawyer with his experience and expertise — that "proprietary" information was fully

discoverable by the SEC and could not be withheld.  Pendergest-Holt compared SIBL's situation

to Bank of America or Merrill Lynch, which might disclose investments held in their mutual

funds (as required by law) but would not disclose the loans that backed their CD products.  She

also explained that SIBL was not really a mutual fund because it issued a CD to investors with a

"guaranteed" rate of return, thus SIBL had "taken away all the risk" that an investor would

otherwise bear when holding mutual fund shares.  According to Pendergest-Holt, that was the

*only* difference.

She also explained to Sjoblom how SIBL's investment positions were confidential

under Antiguan law and could not be disclosed.  She said the FSRC, by law, could not share its

bank examination reports with foreign regulators absent a finding of fraud or criminal activity.

**She also told him that as long as SIBL invested depositor funds within the parameters set**

**by the Board, then there could be no fraud or criminal act.  At this point, Sjoblom made a**

**note to himself: a question on whether Antiguan law really provided confidentiality for a**

**bank's investment portfolio information.**  *Sjoblom thereafter intentionally, recklessly or*

*negligently failed to answer that question, and as described further below, he still questioned*

*whether this was true in January and February 2009.*

Sjoblom immediately searched for ways to justify SIBL's refusal to provide its

investment information to the SEC.  On August 25, 2005, he asked Chadbourne lawyers Ken

Weitzman and Richard Martinelli to advise him on whether trade secret law would justify

SIBL's refusal to provide investment information to the SEC.  Weitzman and Martinelli advised

Sjoblom that even if SIBL's investment positions were trade secrets, they could always be turned

over to the SEC pursuant to a Protective Order, and the SEC's own regulations protected

confidential materials.

The next day, Chadbourne associate Jennifer Arnold drafted a legal memo examining whether a bank CD constitutes a security under U.S. law. Arnold's memo states that a bank CD's potential status as a security "depends upon whether the investor's deposit is protected by other regulation from the risk of loss due to insolvency," and whether "the depositor is 'virtually guaranteed' of receiving repayment in full." If these factors are satisfied, then a bank CD is *not* considered a security.[19]

On August 29, 2005, the SEC sent a letter to Sjoblom requesting Stanford Financial's voluntary production of documents concerning SIBL's CD program. In a letter dated September 12, 2005, Sjoblom responded that Stanford Financial would like to cooperate with the SEC's request but Antiguan confidentiality laws prevented SGC or SIBL from producing SIBL's portfolio-related documents. Sjoblom's letter suggested that the SEC request such documents from Antigua's FSRC even though Sjoblom knew that King would reject the SEC's requests. Sjoblom's letter also stated that the SEC lacked jurisdiction over SIBL, as SIBL's CDs did not qualify as securities given the FSRC's "comprehensive regulation" and SIBL's "extensive insurance to protect against risk of loss." **Of course, Sjoblom already knew that Stanford Financial's "extensive insurance" amounted to less than 5% of SIBL's CD liabilities, and that the FSRC lacked the independence to effectively regulate SIBL.**

That same day, September 12, 2005, the SEC sent a letter to SGC President Jay Comeaux regarding SGC's numerous violations of law. The Commission claimed that SGC's Disclosure Statement for U.S. accredited investors was materially misleading concerning the risks associated with SIBL CDs, and that SIBL's marketing brochures for foreign investors failed to disclose any risk at all. Instead, SIBL's disclosures falsely portrayed SIBL CDs to be as safe

---

[19]   At Sjoblom's request, Arnold later forwarded this memo to Mauricio Alvarado on September 30, 2005.

and secure as FDIC-insured CDs issued by U.S. banks.  SGC was also violating the NASD's suitability rules by recommending the CDs to investors when SGC lacked even basic information concerning SIBL's portfolio, which SGC needed to assess the risk level associated with SIBL CDs.  The SEC further alleged violations related to the excessive "referral" fees paid on CD sales, and the failure to disclose these fees and SGC's sales contests to investors.

The next day, September 13, 2005, Sjoblom emailed a copy of SIBL's marketing brochure to fellow Chadbourne partner Peter Ingerman and asked him to examine the brochure under Reg. D to see if there were any problems.  Based upon his review of the brochure, Ingerman responded that Stanford Financial "appear[ed] to be promoting a brokerage or investment advisory service," and he asked Sjoblom "what securities are being sold . . . ?" Sjoblom responded that Stanford Financial was selling CDs from an offshore bank through its broker/dealer affiliate in Houston.  Sjoblom noted that Stanford Financial did *not* believe the CDs were securities.  Ingerman promptly responded, "***I am not sure why they think these CDs are not securities.***" (emphasis added)

That same day, Sjoblom emailed Alvarado and said he was concerned about SGC using SIBL's brochure while the SEC investigation was pending.  Sjoblom informed Alvarado that he "sent [the] marketing brochure to [Chadbourne's] [Reg. D] expert for his reaction."

**b.    Sjoblom's Letter to the SEC Misrepresents Material Facts and the Law**

On September 14, 2005, Sjoblom advised Chadbourne associate Jennifer Arnold that, vis-a-vis the SEC, "*we need to fight back, hard.*" (emphasis added)  With the help of Arnold and fellow Chadbourne lawyer Dennis Dumas, as well as Stanford Financial's Mauricio Alvarado and Yolanda Suarez, Sjoblom spent the next three weeks crafting a massive response letter to the SEC.  Sjoblom's notes indicate that the letter's primary objectives — as agreed by

Sjoblom, Allen Stanford, Suarez and Alvarado — was to prevent the SEC investigation from becoming a "formal order of investigation," "contain it at the Ft. Worth office," and "do it rapidly, before enforcement takes off."[20]

The final draft of Sjoblom's 36-page letter was forwarded to the SEC on October 3, 2005, with a copy to the NASD's Dallas office.  Sjoblom's letter flatly rejected the SEC's allegations of fraud and argued that the Commission lacked jurisdiction over SIBL's CD program because the CDs did not constitute "securities" under U.S. law.  In short, **Sjoblom stated that if SIBL became insolvent, SIBL's CD holders were *"virtually guaranteed payment in full"* because they were protected by Antigua's comprehensive banking regulations and SIBL's excess capital and supplemental insurance coverage.**[21]  Incredibly, Sjoblom also stated that an investment in SIBL was actually *safer* than investing in a U.S. bank.

At the time Sjoblom sent this letter, he already knew that SIBL had grossly inadequate insurance to protect against the risk of loss from its *own* insolvency.  He also knew that Antigua's FSRC lacked the independence necessary to regulate SIBL.  Indeed, in addition to Sjoblom's knowledge that Leroy King had provided highly confidential information and documents to him, Sjoblom also knew about Allen Stanford's key role in developing Antigua's banking regulations, a fact that shreds any remaining doubt about the legitimacy of SIBL's purported regulator in Antigua.[22]  These facts demonstrate that Sjoblom had no reasonable basis to assert that SIBL's CDs were not securities under U.S. law.  Moreover, his fellow law partner,

---

[20]   While the investigation became formal on July 15, 2005, the Commission did not issue a Formal Order of Private Investigation until October 26, 2006.

[21]   In early drafts, Sjoblom also claimed that SIBL's insurance coverage "include[ed] the protection of SIBL depositors," which was "similar in substance to FDIC insurance."

[22]   Early drafts of Sjoblom's letter specifically discuss Allen Stanford's role in spearheading the development of Antigua's "comprehensive" banking regulatory system.  This discussion was eventually deleted by Stanford Financial personnel and did not appear in the final draft of Sjoblom's letter to the SEC.

Peter Ingerman, had already told Sjoblom that he did not see how SIBL's CDs were ***not*** securities.

Sjoblom's letter also stated that SIBL's sales to foreign investors were likely outside the SEC's jurisdiction, even though Yolanda Suarez had told Sjoblom that most foreign investors were referred to SIBL through ***SGC***. Sjoblom's letter also defended SIBL's marketing brochures by repeating the unfounded claim that SIBL CD holders were "virtually guaranteed" to receive the return of their principal, such that it was proper for SIBL's brochures to compare SIBL CDs to FDIC-insured CDs from U.S. banks.

Prior drafts of Sjoblom's letter provide further insight into his knowledge and state of mind. In early drafts, Sjoblom questioned whether he could represent that SIBL had an "unblemished 21-year history," and that SIBL had never suffered any material regulatory violations. Sjoblom ultimately decided to make that representation to the SEC despite the bank's serious problems in Montserrat.

An early draft of Sjoblom's letter also reflects his concern about the SEC obtaining a copy of the Risk Survey report issued to Lloyd's, Stanford Financial's insurer. According to Sjoblom's notes, this "[c]ould create a problem[,]" as the report "contain[ed] some extremely imprecise language" and referred to SIBL CDs as "investment securities." Calling this issue a "problem" was an understatement. The Risk Survey, prepared by Stogniew & Associates for Lloyd's renewal of Stanford Financial's insurance in August 2003, was a "limited-scope" engagement concerning SIBL that primarily relied upon audited financial statements, reports for Stanford Financial companies and interviews with senior management. The Risk Survey explicitly stated in underlined text that Stogniew & Associates "<u>did not</u>

independently test the effectiveness of internal controls, risk management systems or the accuracy of financial reports." (emphasis in original)

Despite the obvious limitations of this report, SIBL's marketing brochure for 2006 touted the Risk Survey's conclusion that "[SIBL] had reasonable internal controls and risk management systems," and that Stogniew & Associates *found no material weaknesses in these areas*." (emphasis added)  SIBL's marketing brochure was materially false because it failed to inform CD investors that SIBL's Risk Survey did not actually *test* any of the Bank's internal controls, risk management systems or financial reports.  Sjoblom was right to be concerned about this issue and his final letter did not even mention the Risk Survey.

Sjoblom's final letter also deleted references to his concerns about Stanford Financial's failure to inform foreign investors about SGC's 3% referral fee and its sales contests for SIBL CDs.  Moreover, the final letter included a misrepresentation about the nature of SIBL's disclosures in its marketing brochure — even though Sjoblom himself had pointed out this misrepresentation to Mauricio Alvarado — but Sjoblom included the statement at Alvarado's insistence.

After Sjoblom sent his letter to the Commission, things went quiet on the SEC front for a while.  In the meantime, Stanford Financial continued to forward more business to Sjoblom and Chadbourne, including an issue involving an FA recruiter in December 2005.  The recruiter had sent an email to Allen Stanford stating that a potential FA recruit had responded negatively to the idea of selling SIBL CDs, and according to the recruiter, the "[FA recruit] said 'I wouldn't want to go to jail.'"

On January 13, 2006, the NASD sent a letter to SGC raising concerns about SIBL's sales brochures, its "accredited investor" disclosures, and SGC's due diligence on SIBL

for investment-suitability purposes.    Stanford Financial's Alvarado once again requested Sjoblom's and Chadbourne's assistance in responding to the NASD.    Sjoblom helped SGC prepare its response letter, which echoed many of his arguments to the SEC, including his unfounded claim that Antiguan law provided "extensive protection" for depositor funds and that SIBL's insurance provided "extensive coverage and protection against risk of loss."  During the drafting process, Sjoblom emailed Alvarado on January 31, 2006 to warn him that the NASD may request SIBL's filings with the FSRC.  Sjoblom reminded Alvarado that these reports were "confidential."   On February 3, 2006, Rep Poppell sent SGC's response letter to the NASD.

### c.    Sjoblom Witnesses Allen Stanford's Order to "Paper the Files"

On February 3, 2006, Stanford Financial compliance officer Lena Stinson emailed Sjoblom for his advice on a new 20th-year marketing brochure for SIBL.  Sjoblom cautioned Stinson that Stanford Financial needed to avoid trouble with the SEC because it was under investigation.  He also informed Stinson that he wanted a Chadbourne securities partner to review the brochure.

On February 16, 2006, after apparently conferring with "other securities lawyers at Chadbourne," Sjoblom responded to Stinson with his comments on SIBL's new brochure.  He advised — *for the first time* — that if SIBL's CDs turned out to be securities, then SIBL could not rely on its Reg. D exemption "for use of general solicitation materials" (which is apparently how Chadbourne's "other securities lawyers" viewed the SIBL brochure).  Additionally, he advised that because SIBL did not limit its CD sales, this "general solicitation" would allow the SEC to "undoubtedly succeed in any enforcement case to establish liability" for the sale of unregistered securities.  Sjoblom (or Chadbourne's "other securities lawyers") further advised, *also for the first time*, that regardless of whether the CDs were securities, SGC might have issues

regarding the suitability of its clients' investments in SIBL CDs.  Finally, Sjoblom advised that *"because Allen Stanford owns and/or controls all of the entities involved in the sale of the CDs, it will be difficult to argue that SIBL (the issuer of the brochure) must be viewed and treated as separate and distinct from SGC."*[23]  Sjoblom concluded his email by advising Stinson that if Allen Stanford used this brochure as solicitation material, it would likely expose Stanford Financial to more "battles on a larger and wider scale," a risky strategy given that Stanford Financial was already facing a formal SEC investigation as well as deficiency letters from the NASD.

Allen Stanford promptly intervened, and in a February 16, 2006 email to both Stinson and Sjoblom, Stanford asked for ways to avoid these compliance issues.  When addressing the due-diligence-and-investment-suitability problem, Stanford ordered Stinson to "get down to Antigua and cover our rears with tons of due diligence paperwork" — *i.e.*, paper the files.  Sjoblom's advice to Stanford Financial reveals his knowledge that SIBL was already generally soliciting CD sales in violation of Reg. D, and as a result, SIBL was selling unregistered securities and could be liable for rescission of all CD sales.  Furthermore, Sjoblom had now heard directly from Allen Stanford that the solution to SGC's compliance and suitability problems was to merely "cover our rears" with paperwork.

### d.       Sjoblom Tries to Conceal the SEC Investigation from SGC's Auditor

On or about February 22, 2006, Chadbourne received an audit letter request from SGC regarding BDO Seidman's audit of SGC's annual results for 2005.  The audit letter asked Chadbourne to provide information to BDO concerning "all matters of pending or threatened litigation, claims or assessments (excluding unasserted claims)" against SGC.  The letter also

---

[23]   Of course, these statements are completely inconsistent with Sjoblom's representations to the SEC.

noted SGC's representation to BDO that "there is [sic] no unasserted possible claims that you have advised us are probable of assertion and should be disclosed in accordance with Statement of Financial Accounting Standards No. 5."

**In Chadbourne's audit response letter to BDO, dated February 24, 2006, Sjoblom omitted _any_ reference to the SEC's formal investigation of SGC for possible securities fraud.** Later that same day, Sjoblom wrote to Alvarado and Suarez that he received a "strange phone call" from BDO inquiring about Chadbourne's audit response letter and Chadbourne's earlier letter to the SEC in October 2005, where Sjoblom responded to the SEC's investigation and allegations of possible securities fraud. **Sjoblom informed Alvarado that he asked BDO where they obtained Chadbourne's letter to the SEC. Sjoblom also informed Alvarado of his statement to BDO that the SEC matter was mostly related to "amending compliance procedures," and that it was just part of a _routine examination._** Sjoblom's audit response letter wrongfully concealed the SEC investigation and his representations to BDO regarding that investigation were patently and intentionally false.

In March 2006, Chadbourne associate Jacqueline Perrell prepared a memo for Sjoblom concerning SIBL's 20-year anniversary marketing brochure. Although Perrell's memo properly describes the brochure's purpose as "solicit[ing] investors in connection with" the CD offering, she concludes that Stanford Financial could legally use the brochure because it did not "constitute an offer to sell securities." Later that month, Perrell prepared another memo to Sjoblom advising that Stanford Financial could continue to use CD sales contests for FAs. Her memo was later forwarded to Stanford Financial Director of Global Compliance, Lena Stinson, on June 13, 2006.

On March 9, 2006 SGC received another letter from the NASD, which was "continuing its inquiry" into SGC's offering of SIBL CDs. Among other issues, the NASD requested evidence of SGC's due diligence on SIBL — the very same due diligence that Allen Stanford had just demanded in order to "cover our rears with . . . paperwork." Chadbourne and Sjoblom helped SGC respond to the NASD in a letter dated April 5, 2006.

In July 2006, Sjoblom announced that he was leaving Chadbourne to join the Washington, D.C. office of Proskauer Rose. As part of his departure, Sjoblom prepared a July 26, 2006 memo for Chadbourne partner's Talbert Navia and Scott Balber regarding "Status of Stanford Financial Group Matters." The memo stated that Sjoblom had worked on two Stanford Financial matters: the SEC investigation and responses to regulatory inquiries. The memo described Sjoblom's substantial response letter to the SEC in October 2005. Sjoblom claimed his letter "set them 'back'" such that the Commission was "reconsidering" its SIBL investigation and had referred the matter to the NASD for minor regulatory issues. Sjoblom's memo also advised that Jackie Perrell had researched the legality of Stanford Financial's sales contests and concluded that such contests were permissible, although Sjoblom nevertheless advised Stanford Financial not to conduct the contests. He concluded the memo by stating that "[e]veryone seems to prefer the 'let sleeping dogs lie' approach."

That same month, Leroy King received a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB"). The ECCB letter was directed to Antigua's FSRC and concerned, *inter alia*, SIBL's affiliated relationship with the Bank of Antigua. King transmitted a copy of the letter to Stanford Financial's General Counsel, Alvarado, on July 30, 2006.

On August 1, 2006, Alvarado drafted King's purported response letter from the FSRC, which was calculated to mislead the ECCB regarding SIBL's finances and prevent legitimate scrutiny by the ECCB. King faxed a draft of the response letter back to Alvarado with the following handwritten words: "Please do not bill me (laugh), Thanks a million, Lee." That same day, Alvarado sent an email to Allen Stanford, reporting that "I am attaching a copy of the letter that I have drafted for Leroy King. He is very happy with it."

### F. Proskauer and Sjoblom Participate in the Stanford Ponzi Scheme

Sjoblom and his associate Jackie Perrell left Chadbourne in August 2006 to join Defendant Proskauer. On September 6, 2006, Stanford Financial formally retained Proskauer to serve as its new regulatory counsel. The client listed in Proskauer's engagement letter is "Stanford Financial Group and its affiliated entities." The engagement letter further states that Sjoblom's hourly rate would be *discounted* to $650/hour, but the rate would increase "should the matter go to litigation."

### a. Sjoblom and Leroy King Continue Their Obstructionary Shell Game

On that same day, September 6, 2006, Sjoblom received a call from the SEC's Jennifer Brandt, who demanded copies of Stanford Financial's current marketing brochures and disclosure statements for SIBL CDs. Brandt informed Sjoblom that the SEC's investigation of Stanford Financial was being elevated to a Formal Order of Investigation for fraud. She also informed Sjoblom that the SEC had been trying to get information about SIBL from the FSRC's Leroy King, but King was not cooperating. Sjoblom immediately notified Alvarado. He also informed Alvarado that he responded to Brandt's statements regarding the fraud investigation by stating that he had ***personally gone through all operations*** of **Stanford Financial and** *"there*

*was no fraud here.*" Sjoblom also protested to Brandt that he should be "given an opportunity to demonstrate that there is no fraud before the SEC moves to the formal order stage."

On September 11, 2006, Sjoblom's handwritten notes indicate that he participated in a teleconference with Allen Stanford. **During the call, Stanford told Sjoblom that *Leroy King had informed Stanford* about several phone calls that King received from Mike Moore at the SEC, and that Moore was making wild accusations about Stanford Financial, including allegations regarding a fraudulent pyramid scheme. Stanford told Sjoblom that King had called the SEC and spoken to some staff members (among them Elizabeth Jacobs), who informed King that the SEC had been interviewing some current or former FAs for Stanford Financial. Stanford told Sjoblom that King reportedly told the SEC to put all their requests in writing.** Sjoblom's notes state that "just like before it is former reps (who got fired) and not depositors who are complaining." Apparently, Sjoblom was not concerned by the fact that SIBL's "independent" regulator in Antigua was providing highly sensitive, confidential information to SIBL's sole shareholder, or that SGC's former FAs were continuing to raise serious concerns about the SIBL CD program.

On September 18, 2006, Sjoblom held a teleconference with several SEC staff members, including Jennifer Brandt from the Fort Worth office and Mike Moore and Elizabeth Jacobs from the SEC's Office of International Affairs. **During the call, the SEC staff bluntly told Sjoblom that they suspected Stanford Financial was a fraud and a Ponzi scheme. They also told Sjoblom that several former FAs from Stanford Financial had informed the SEC that they suspected investor money at SIBL was being used to underwrite Allen Stanford's real estate projects in Antigua and the Caribbean.**

The SEC once again asked Sjoblom if SIBL will voluntarily produce documents evidencing how the bank invested depositor funds.  The SEC informed Sjoblom that it had requested these materials from the FSRC, **but the FSRC told the Commission that *SIBL* did not provide its *approval* for the FSRC to produce the documents.**  Sjoblom responded that he heard "through the grapevine" that the SEC had not provided the FSRC with an *appropriate* request for such documents.  Of course, Sjoblom knew that the root of this "grapevine" was Leroy King, who had provided confidential information to Allen Stanford about the FSRC's correspondence with the SEC.  Sjoblom also knew that the SEC's request for SIBL documents from the FSRC would be fruitless because King would not produce them.

Sjoblom told the SEC staff that the Commission had no jurisdiction over SIBL, and that it would have to "go to Antigua" to get SIBL's information directly from the FSRC. **Finally, Sjoblom informed the staff that he was "well-equipped" to recognize the "hallmarks of fraud" because he spent 15 years investigating fraud for the Commission, and based upon his experience and personal visit to the bank in Antigua, Sjoblom said he found SIBL to be an "incredible institution" that was credible in all its business dealings.**

Sjoblom immediately called Alvarado to relay his conversation with the SEC.  In response, Alvarado told Sjoblom that SIBL had asked the FSRC to *fully cooperate* with the SEC. The next day, September 19, 2006, Sjoblom began preparing a letter to the SEC's Office of International Affairs.  Sjoblom's letter reiterated that the SEC had yet to make a formal written request to the FSRC for documents evidencing the composition of SIBL's portfolio.  Instead, Sjoblom alleged, the SEC had "resorted to a telephone campaign" of wild accusations even though the FSRC had found no fraud or improprieties in SIBL's operations.  Sjoblom falsely stated that the SEC's phone calls to the Antiguan regulators had placed a "severe strain on

[SIBL's] relations" with the FSRC, and he chided the Commission to "not be guided" by statements from "former disgruntled" FAs.

Sjoblom's draft letter also stated that "[t]o the extent my client has any input into the process, my client has informed the bank regulator to cooperate with the SEC's written request for information and produce relevant documents to which it is entitled." On September 20, 2006, however, Alvarado and Allen Stanford conspicuously deleted that statement in their comments to Sjoblom. Sjoblom's final letter, which was sent to the SEC that same day, merely stated that Sjoblom would "ensure that [his] client supports the cooperation of the [Antiguan] bank regulator" with the SEC.

On September 21, 2006, Sjoblom informed Alvarado that he had invited Allen Stanford to the Virginia Gold Cup, and he was trying to get Venezuela's ambassador to attend as well, so perhaps Sjoblom could help Stanford with business development in Venezuela.[24] He also invited Stanford, Alvarado and Suarez to an "open house" that Proskauer hosted at its Washington, D.C. office. Later that month, Sjoblom arranged for Proskauer to make a formal presentation of its securities-law capabilities for Stanford Financial.

On September 25, 2006, the SEC sent a letter to the FSRC labeled "Confidential and Nonpublic." The letter formally requested records and information regarding SIBL's CD investment portfolio and attached a *list* of requested documents. The letter also stated that the SEC did not object to the FSRC providing the document *list* to SIBL, and that the SEC would be providing a copy of the *list* to SIBL's counsel (Sjoblom). **King immediately provided a copy**

---

[24] This was not the last time that Sjoblom offered to help Stanford Financial with its business ventures. On March 22, 2007, Sjoblom wrote to Alvarado that he had a billionaire client that might be interested in global investment opportunities and asked Alvarado to inquire whether Allen Stanford had any interest in such an investor for his "planned business **or real estate ventures.**"

of the *letter* to Stanford and Alvarado.   Alvarado, in turn, consulted with Sjoblom regarding the contents of the SEC's letter.

On September 29, 2006, the SEC provided a copy of the document list to Sjoblom.   In its cover letter, the SEC asked Sjoblom for his "client's cooperation in making [SIBL's] documents available for review."   The SEC also referenced an upcoming visit to Antigua on October 11, 2006.

On October 2, 2006, Sjoblom forwarded a copy of this letter to Alvarado.   In a teleconference that same day, Sjoblom and Alvarado agreed that the SEC would have to get its requested documents from the FSRC because SIBL's information is "proprietary," but maybe they could "throw them [the SEC] a few crumbs" by providing a few documents.   Alvarado also forwarded the letter to Allen Stanford.   Stanford replied, "No wau [sic] are they coming on Oct. 11.   We all will meet on Wed[nesday] in Miami."

### b.    Stanford Financial Hires Spencer Barasch

Allen Stanford desired more "insider" assistance to help defend the SEC's escalating investigation, so he arranged a meeting with Spencer Barasch, the former Director of Enforcement for the SEC's Fort Worth office, who was now a partner at the Dallas office of Andrews Kurth LLP.   On October 3, 2006, Barasch met with Alvarado in Stanford Financial's Miami office.   During the meeting, Alvarado and Barasch jointly called Sjoblom to discuss the status of the SEC investigation.   Alvarado said the FSRC had no memorandum of agreement or understanding with the SEC, and it would not cooperate with the Commission without one. Sjoblom told Alvarado and Barasch that according to the SEC, the FSRC had told the Commission that *SIBL* was the cause of any delays in producing responsive information, as

SIBL told the FSRC that it would take six to eight weeks to gather the kind of documents requested by the SEC.

Alvarado, Sjoblom and Barasch also discussed the NASD inquiry. Alvarado reported that Stanford Financial had just hired a former NASD official, Bernard Young, as Chief Compliance Officer, and that Young could deal with the NASD. Alvarado, Sjoblom and Barasch then discussed Stanford Financial's overall defense strategy, which was to push the SEC to deal with the FSRC for SIBL's documents. Of course, Alvarado and Sjoblom knew this strategy would only frustrate and delay the SEC's investigation because they knew Leroy King would not cooperate with the SEC's document requests. Shortly thereafter, Barasch accepted the representation.

### c.    The SEC Moves Forward with a Formal Order of Investigation

On October 10, 2006 — just one day before the SEC's scheduled visit with the FSRC in Antigua — Leroy King finally responded to the SEC's formal request for records and information concerning SIBL's CD investments. King's letter stated that the FSRC's recent examinations of SIBL had revealed no matters affecting SIBL's standing, confirmed SIBL's compliance in all areas, and concluded that there are "no other issues or matters of concern with SIBL to date." More importantly, however, King's letter also stated that the SEC and FSRC had to enter an acceptable memorandum of understanding before the SEC could visit the FSRC in Antigua.

That same day, the SEC called Sjoblom and told him that the Commission still had not received any documents regarding SIBL's portfolio or investments. The SEC reiterated SIBL's prior statement to the FSRC that it would take SIBL six to eight weeks to produce such information. **The SEC demanded confirmation from SIBL that it would produce responsive**

**documents to the FSRC.**   According to Sjoblom's notes from the call, the "SEC wants confirmation from us that we will produce records so that the SEC can tell the FSRC that SIBL will do so." In parentheses following this note, Sjoblom revealed his knowledge and complicity in Stanford Financial's shell-game strategy to obstruct the SEC's investigation: "***this is clearly a ploy by the SEC to get the FSRC to produce the banking documents because SIBL says that it is ok to do so. NO!!***" (emphasis added).

Later that day, Sjoblom held another teleconference with the SEC. He reiterated his position that the SEC lacked jurisdiction over SIBL and that Stanford Financial was "prohibited under Antiguan law from releasing" certain bank records. Of course, when Sjoblom made this representation, he had no idea whether Antiguan law actually prevented Stanford Financial from producing SIBL's bank records.

The SEC's Jennifer Brandt sent Sjoblom a letter confirming their teleconference. She noted that the FSRC possessed responsive documents regarding SIBL and that Sjoblom represented during the call that SIBL had no objection to the FSRC's production of such documents to the SEC. On October 12, 2008, Sjoblom emailed Alvarado and attached the letter, stating that the SEC "misrepresents what I said." According to Sjoblom, he told the Commission that it had to seek documents from the FSRC, as Stanford Financial could not provide anything that was prohibited under Antiguan law.

Sjoblom prepared a response letter to the SEC, and both Alvarado and Allen Stanford provided comments. Sjoblom's letter, dated October 13, 2006, informed the SEC that, *inter alia*, "it would be inappropriate for me to authorize you to have access to the FSRC's files." Then Sjoblom proceeded to strangely speak for the FSRC, stating that "[w]hile I cannot confirm what the FSRC desires from the SEC" in the form of a memorandum of understanding, "it is my

understanding that the FSRC is insistent that appropriate bi-lateral government protocols and proper procedures be followed in this case."

Frustrated by Sjoblom's constant shell game, the SEC issued a Formal Order of Investigation (Case No. FW-2973-A) (the "Order") on October 26, 2006. The SEC's Order alleged, *inter alia*, that Stanford Financial might be violating Section 7(d) of the Investment Company Act by selling what amounted to investment company securities (the SIBL CDs) without registering SIBL as an investment company.

Sjoblom first contacted the SEC about the Order on November 21, 2006, and on December 4, 2006, he formally requested a copy from the Commission. After reviewing the document, Sjoblom informed Alvarado that he thought the SEC's investment company allegation was a "stretch" because "banks are exempt from the definition of investment companies[,]" but Sjoblom believed the claim raised some jurisdictional issues that could lead to a court fight. Sjoblom also noted the Order's allegations regarding SGC's failure to properly supervise employees who may have violated federal securities laws.

> The failure to supervise allegation sweeps everyone at the supervisory level within SGC, so some folks may need separate representation as we go along. For now, let's keep everyone together as a team and under the same tent. But, we need to watch how this shakes out.

### d. Barasch Violates SEC Ethics Rules by Representing Stanford Financial

On November 21, 2006 — the same day that Sjoblom first contacted the SEC about the Order — Sjoblom sent Alvarado an email entitled "Spencer Barasch" and asked:

> . . . [D]o you have Spencer's phone number and name of his law firm. [sic] I am sending the letter to the SEC requesting formal order. So that I get the formal order, I need to also tell them that I will accept service, but will not be back until late next week. So, don't send subpoenas until then.

Alvarado sent Barasch's contact information approximately one hour later. An email from Barasch to Alvarado later that day suggests that Barasch and Sjoblom may have discussed the SEC investigation after Sjoblom received Barasch's contact information. In that email, Barasch stated:

> Would you ask Tom [Sjoblom] if he recalls who the other SEC person was that called him yesterday? [May be somebody I know well and can call for info.]

Alvarado responded a few minutes later, "He told me that the call was from . . . the new Chief." Barasch replied, "'New chief' could mean a number of people – if he has the name, it would help. [I]f not, no big deal." Alvarado then asked Sjoblom, "What are the names of the SEC folks who called you yesterday?" Alvarado later emailed Barasch, "He did not get the name."

On or about November 27, 2006, Barasch spoke with SEC enforcement lawyer Jeff Cohen about Stanford Financial. Cohen asked him during the conversation, "Spence, can you work on this?" According to Barasch, Cohen told him, " . . . I'm not sure you're able to work on this[,]" and Barasch replied, "I'm already talking to Rick Connor about it."

On that same day, Barasch belatedly sought permission from the SEC's Ethics Office to represent Stanford Financial. Sometime after that request, SEC staff reminded Rick Connor about Barasch's prior involvement in the Stanford Financial matter, so Connor called Barasch and told him that he could *not* represent Stanford Financial in the SEC investigation. Barasch then called Alvarado and relayed that decision.

By the time Barasch contacted Connor on November 27, 2006, Barasch had already met with Alvarado, Stanford Financial's General Counsel, participated in telephone conferences with Alvarado, and reviewed pertinent documentation. Sjoblom's billing records also indicate that he was continuing to discuss the SEC investigation with Barasch as of

*December 6, 2006*, more than a week after Barasch was barred from participating in the investigation. Barasch was subsequently investigated for violations of federal ethics rules. In 2012, Barasch agreed to pay a $50,000 civil fine to the U.S. Justice Department for violations of those rules, and the Commission announced on May 24, 2012 that it had barred Barasch from appearing and practicing before the SEC for one year.

### e.     Sjoblom Advises Stanford Financial to Violate SEC Subpoenas

Shortly after Sjoblom first contacted the SEC about its Order, the Commission began issuing the first of several subpoenas to SGC, including a November 29, 2006 subpoena seeking, *inter alia*, all documents regarding SGC's due diligence of SIBL and SIBL's CDs, all agreements in effect between SGC and SIBL, and all documents evidencing investments held in SIBL's portfolio. In response to these subpoenas, Sjoblom told the Commission that SGC would begin a "rolling" production in late December 2006 and that production would continue for a maximum of 60 days. Sjoblom also told the Commission that he would produce various SGC employees for testimony after the production was complete. The document production began on December 21, 2006, with SGC's Bernard Young producing a variety of responsive documents to the SEC.

Over the next several weeks, Sjoblom worked with Stanford Financial to review and discuss additional documents for possible production to the SEC. It was at this point that Sjoblom pushed his shell game to new heights of obstruction. **Sjoblom advised Stanford Financial to withhold (*i.e.*, *not* produce) critical documents that were clearly responsive, non-privileged, and crucial to the SEC's concerns.** Some of the first files that Sjoblom told his client to *withhold* from production were files belonging to SFIS, SIBL's representative office in the United States. Inexplicably, Sjoblom characterized SFIS as having "nothing to do with

SGC" despite the facts that SFIS was SIBL's representative office in the U.S. and it shared offices and *personnel* with SGC in Houston and Miami. **But the most telling document that Sjoblom ordered his client to withhold from production was SGC's contract with _SIBL_.**

On January 23 and 24, 2007, Sjoblom traveled to Houston and met with Stanford Financial personnel, including Lena Stinson, Bernard ("Bernie") Young and Rebecca Hamric, to review documents and coordinate Stanford Financial's production to the SEC. During these meetings, Young pulled a copy of a Financial Consulting and Advisory Services Agreement ("Private Equity Agreement") between SGC and SIBL, effective as of December 1, 2004. Schedule A of the Private Equity Agreement provided a description of SGC's advisory services for SIBL:

> **SGC will provide financial consulting and advisory services to SIBL, which will include management of certain holdings in SIBL's existing and future portfolio. SGC will review and monitor the financial condition and business operations of the portfolio companies, including analysis of financial statements and shareholder reports, and will provide evaluations and reports to SIBL in such form as reasonably requested by SIBL. SGC may also perform due diligence and assist in negotiating terms on future investments . . . .**

Young showed the Private Equity Agreement to Sjoblom for his review. A copy of the Agreement in Sjoblom's file suggests that the document had already been Bates-labeled for production to the SEC. This same copy shows that Sjoblom made the following notations on the first sentence of Schedule A: "SGC will provide financial consulting and advisory services to SIBL, which will include management of certain holdings in SIBL's existing and future portfolio." (emphasis in original) The Private Equity Agreement was clearly responsive to item 5 of the SEC's November 29, 2006 subpoena, which demanded production of "all agreements in effect between SGC and [SIBL], including any referral agreements," from January 1, 2001 to the

present. Additionally, SGC's production log to the SEC shows that Stanford Financial had already produced responsive agreements in Young's initial production to the SEC on December 21, 2006.

During Sjoblom's ensuing discussion with Young, **Sjoblom learned that over $230 million of SIBL's portfolio was invested in illiquid *private equity* holdings, and that SGC *managed* these investments under its Private Equity Agreement with SIBL.** This information directly contradicted what Jim Davis and Laura Pendergest-Holt told Sjoblom on August 10, 2005 when they stated that SIBL did *not* invest in private equity because the investments were illiquid. Based upon Sjoblom's substantial due diligence and experience representing Stanford Financial, he knew these private equity investments had *not* been disclosed to SIBL's CD investors, nor had SGC's management of these investments been disclosed. Sjoblom also knew that both he and Stanford Financial had repeatedly misrepresented SGC's knowledge of SIBL's investment portfolio to the SEC.

Sjoblom also realized that if the Private Equity Agreement was produced to the SEC, then the Commission could finally obtain documents evidencing at least part of SIBL's investment portfolio, and possibly the *entire* portfolio. In other words, if the SEC received a copy of this Agreement in January 2007 — and thus discovered that SGC managed part of SIBL's investment portfolio — then Sjoblom knew he could no longer object to the SEC's efforts to link SGC with SIBL and potentially investigate *all* of SIBL's portfolio holdings.

**Sjoblom advised Young, Stinson and Hamric to *NOT* produce SGC's Private Equity Agreement with SIBL.** **Instead, Young placed the Agreement in a folder marked "Do not produce."** **On a copy of the Agreement in Sjoblom's file, which he marked "1/23/07," Sjoblom wrote on Schedule A's description of services that "this shows we know**

of [SIBL's] portfolio because capital market group of SGC," but then he scratched out the words "shows we" and wrote above "does not." (underline emphasis in original)

Under the Sarbanes-Oxley Act, Sjoblom had a duty to report this matter up to his client's Chief Legal Officer, Alvarado, and from there to SGC's Board of Directors, and if unavailing, to withdraw from representing Stanford Financial altogether. He did none of that. Instead, **on that same day, January 23, 2007, Sjoblom asked his associate Jonathon Hanks to send him (via email to Rebecca Hamric) a copy of a memo he had previously prepared for another client on "Obstruction of Justice."**

If SGC's Private Equity Agreement with SIBL had been properly produced to the SEC, then the Commission would have confirmed its suspicions — and Sjoblom's personal knowledge — that Stanford Financial was misrepresenting SIBL's portfolio and SGC's knowledge of that portfolio. If the Agreement had been properly produced, then the SEC could have shut down Stanford Financial's operations much sooner than February 2009. Instead, Stanford Financial's Ponzi scheme continued to grow for another two years, enabling SIBL to sell roughly *$2 billion* of additional CDs.

### f.   Proskauer Tries to Conceal SEC Investigation from BDO Seidman

During this same period, Sjoblom was also busy drafting Proskauer's response to a new audit letter request concerning BDO's annual audit of SGC for 2006. Like the prior request, SGC's letter asked Proskauer to provide information to BDO concerning "pending or threatened litigation, claims or assessments," and noted SGC's representation to BDO that "there is [sic] no unasserted possible claims that you have advised us are probable of assertion and should be disclosed in accordance with Statement of Financial Accounting Standards No. 5."

When Sjoblom received this audit request, he knew that the SEC had launched a formal fraud investigation of SGC in the summer of 2005, and that in 2006, the SEC had entered a Formal Order of Investigation and issued several subpoenas in pursuit of that investigation. Despite this knowledge, **Sjoblom's audit response letter, dated February 23, 2007, once again failed to disclose the SEC's fraud investigation to BDO.** In response to this glaring omission, Sjoblom received a February 28, 2007 email from Carlos Ancira, BDO's audit partner for SGC:

> Tom, I am the audit engagement partner of Stanford Group Company (SGC). I am aware of the SEC investigation which recently was brought to my attention by Mr. AJ Rincon and Mr. Bernerd [sic] Young. **When we sent out the legal representation letters, we were not aware of this matter.** Due to the sensitivity of the situation, the only persons knowledgeable about this matter in our audit engagement team are myself and my senior manager, Marie O'Neil.
>
> I understand the reason for your legal letter response not addressing this matter. However, I would like to have a conversation with you about this. As you know, SGC needs to file its audit report to the NASD today and I would need to speak with you before I approve release of our opinion in the audit report."

(emphasis added). According to Sjoblom's billing records for that day, he held three separate teleconferences with BDO regarding his false audit response letter.

### g.   The SEC Issues Document and Testimony Subpoenas to Allen Stanford

That same day — February 28, 2007 — Proskauer's Jackie Perrell informed Sjoblom that the SEC had called her to discuss scheduling testimony from four SGC officers and *Allen Stanford*. Sjoblom promptly called Jason Rose at the SEC and told him that Allen Stanford was unavailable for testimony until *June 2007*. Sjoblom also pushed back the SGC officers' testimony until May 2007.

On April 11, 2007, Sjoblom advised Alvarado that he spoke with the SEC and told them that the requested testimony could not occur until June or July.  On June 5, 2007, the SEC formally subpoenaed Allen Stanford and demanded that he produce all his SIBL-related emails by June 29 and testify in September 2007.  The Commission also issued new subpoenas to SGC's Danny Bogar, A.J. Rincon, Eddie Rollins, and Jay Comeaux, ordering them to produce their SIBL-related emails and testify in August and September 2007.

Despite the SEC's efforts to further its investigation, Sjoblom and Stanford Financial engineered delay after delay in producing the requested emails, including "unforeseen" technical problems that caused even further delays.[25]  Sjoblom and Stanford Financial also continued to explore ways to withhold responsive documents from the SEC.  On July 31, 2007, Sjoblom received an email from Proskauer associate Jackie Perrell advising him that Stanford Financial's David Nanes is one of SGC's top producers *and President of SIBL's branch office in Mexico*.  According to Perrell's email,

> David [Nanes] wears two hats – one under SGC as a broker and another under [SIBL] as president of the Mexico office.  **Manis [sic] conducts both bank business and SGC brokerage business.**
>
> **Lena [Stinson] would like to do the following with respect to David[] [Nanes'] emails and wants your blessing.  Any of his emails relating to bank business will not be produced on the basis that the SEC has no jurisdiction over the bank;** however, emails relating to his SGC brokerage business will be produced, if relevant (SGC receives the referral fee on Manis' [sic] book of brokerage business).

In the meantime, Proskauer associate Jackie Perrell was also drafting a memo addressing the SEC's new allegation that Stanford Financial was violating Section 7(d) of the

---

[25]   When Sjoblom responded to the SEC's first subpoenas, he told them that SGC would begin a "rolling" document production in December 2006 that would continue for a maximum of 60 days, and that he would produce various SGC employees for testimony once the production was complete.

Investment Company Act by selling SIBL CDs without registering SIBL as an investment company. On August 13, 2007, Perrell provided her memo to Sjoblom, in which she concluded that SIBL was *exempt* from the Investment Company Act because it was a foreign bank incorporated in Antigua and was "engaged substantially in commercial banking activity." Of course, Sjoblom knew her conclusion was unfounded because he knew that SIBL was *not* substantially engaged in commercial banking activity, as SIBL did not make traditional loans and its sales brochures marketed SIBL as having "no credit risk" because it did not make such loans.

### h.      Suspicious Facts and Allegations of Fraud Continue to Mount

It was during this period of orchestrated delay that Sjoblom uncovered even more suspicious activities and fraud allegations at Stanford Financial. On August 13 through 17, 2007, during another week of meetings at SGC's offices in Houston, Sjoblom and Perrell discovered that SGC had *ignored* Sjoblom's advice and continued its sales contests for SIBL CDs. One contest allowed SGC's FAs to earn additional bonuses — *above* the extraordinary 3% referral fee — if they met certain sales thresholds, including a "mega (super) bonus of an additional $125,000 if they reach[ed] $25 million in one quarter from one client." Sjoblom and Perrell also learned that Stanford Financial circulated a weekly "scorecard" for the contest, called the "Hustle Sheet," which listed CD sales quotas, goals, and results for various sales teams, including the "SGC Superstars." The Hustle Sheet made it clear that SIBL CDs were the *only* product marketed and sold by the SFIS offices in Miami, Houston and San Antonio. During these meetings with SGC, Sjoblom also learned that SGC regularly conducted CD sales seminars to market SIBL CDs to investors, a practice that cast serious doubts on whether Stanford Financial was generally soliciting investors in violation of SIBL's Reg. D exemption.

Sjoblom also discovered that Stanford Financial's list of "disgruntled" former employees alleging fraud was growing, and now included Charles Hazlett, Mark Grensch and Ron Rossi.[26] **Sjoblom also learned that SIBL's grossly inadequate private insurance, which purportedly "protected" depositors from loss, now amounted to less than $100 million, _or less than 2%_, of SIBL's total outstanding CD liabilities.** Finally, Sjoblom discovered that a Stanford Financial employee in Mexico had been "intercepted" by Mexican authorities for illegally taking checks out of Mexico for investments in SIBL CDs. Despite these revelations, Sjoblom continued to represent Stanford Financial and failed to report up the chain or withdraw as counsel as required under the Sarbanes-Oxley Act.

### i.       Proskauer Lies to BDO Seidman Again

On February 8, 2008, Sjoblom received an audit request letter from Glen Rigby, Stanford Financial's Assistant General Counsel, concerning BDO's annual audit of SGC for 2007. In an email dated February 14, 2008, Sjoblom instructed Perrell to prepare Proskauer's response, and told her not to discuss the content of Proskauer's response with BDO. The letter, dated February 14, 2008 and signed by Proskauer partner Richard Rowe, purposefully omitted any discussion of the SEC's formal fraud investigation.

### j.       Former SGC Financial Advisors Allege that SGC Destroyed Documents

On July 3, 2008, Bloomberg published a damning article regarding the SEC's investigation of SGC and the SIBL CD program. The next day, Sjoblom emailed Jacqueline Perrell about Bloomberg's report, "Bad News – the news story could not have been worse." That same month, the SEC subpoenaed former SGC FAs Charlie Rawl and Mark Tidwell, who

---

[26] Charles Satterfield, another former employee who was terminated by SGC, alleged in a 2007 FINRA arbitration proceeding that Stanford Financial executives held the SEC in "utter contempt," refused to file required documents, hid information from the SEC, and destroyed files.

had previously filed a lawsuit alleging that SGC purged files and destroyed documents related to the SEC investigation.[27]  When Alvarado informed Sjoblom of this matter, Sjoblom immediately recognized that he interviewed Tidwell in June 2005 during his initial due diligence on Stanford Financial.  Sjoblom advised Alvarado that Tidwell was "bound by confidentiality," and that Stanford Financial could use this information against him in a motion to dismiss.

### k.      FINRA and the Federal Reserve Board Pursue Their Own Investigations

On August 29, 2008, FINRA (formerly the NASD) sent a letter to SGC regarding its January 2008 responses to FINRA's requests for information about SIBL.  The letter informed SGC that its responses to FINRA's requests were incomplete "given the direct affiliation between SIBL and SGC as well as both entities' common ownership."  FINRA reiterated its demands for information regarding SIBL's asset portfolio and a list of asset managers.

With the help of Alvarado and Rebecca Hamric, Bernie Young responded on behalf of SGC in a letter dated September 24, 2008.  Young's letter provided copies of some additional SIBL due diligence materials but informed FINRA that SGC stood by its original responses:

> . . . SGC does not have access to SIBL's books and records.  This includes SIBL's investment portfolio statements, position reports and other documents that would identify and detail all holdings, assets, and allocations of the investment portfolios underlying the SIB CDs that you have requested from SGC.  **SGC has produced**

---

[27]  As alleged in their lawsuit, SGC adopted new policies in response to the ongoing SEC investigation, including ordering the removal or destruction of information contained in client or company files and purging electronic data from computers.  Rawl and Tidwell allegedly became concerned when, in the summer of 2006, all the assistants for Stanford Financial's FAs were told to remove any information from their client files that wasn't on SGC letterhead, including notes and interoffice email, just *before* an SEC inspection.  Then in March 2007, Rawl and Tidwell were called into a meeting with management, in which they were told to stop enumerating their concerns about SIBL in intercompany emails because the emails could fall into the hands of the SEC.  Rawl and Tidwell were terminated by SGC before they could resign, and were then *sued* by SGC, which was Stanford Financial's common practice for anyone who questioned what was really going on.

> **to you everything in its possession relating to investments in SIBL's portfolio . . . .**

(emphasis added)  To support SGC's position, Hamric prepared a legal memo concluding that SGC could not be required to produce SIBL documents just because both companies were ultimately owned by the same person, Allen Stanford.

Meanwhile, the Federal Reserve Board ("Federal Reserve") had opened its own investigation to determine whether SIBL was using SFIS to operate unregistered bank representative offices in Miami, Houston and San Antonio.  On September 26, 2008, the Federal Reserve served a subpoena on the Miami office of SFIS and requested documents relating to, *inter alia*, the relationship between SFIS and Stanford Trust Company Ltd (Antigua) ("STCL"), as well as documents concerning SFIS's marketing and sales of SIBL CDs, and all communications related to SIBL CDs between SFIS and other Stanford Financial-related entities. The Federal Reserve also issued similar subpoenas to Allen Stanford and Stanford Trust Company (STC) in Baton Rouge, Louisiana.

On September 30, 2008, Sjoblom held a teleconference with Alvarado about the Federal Reserve's subpoenas.  In typical fashion, Alvarado asked Sjoblom whether Proskauer "knew anyone" at the Federal Reserve, and asked whether the Federal Reserve even had jurisdiction over SFIS.  The next day, October 1, 2008, Sjoblom called Federal Reserve lawyer Lisa Villareal to question the basis for its jurisdiction.  Villareal told Sjoblom that the Federal Reserve was investigating whether SFIS was actually operating as an unregistered branch office of SIBL in the United States, and that it had jurisdiction over this matter under the International Banking Act, 12 U.S.C. § 3101, and Regulation K.  Villareal also told Sjoblom that the Federal Reserve was concerned that SFIS had strayed way beyond its authorization from the State of

Florida.   Additionally, regardless of that authorization, the Federal Reserve had never given *its* approval for SFIS to act as SIBL's representative office in the U.S.

Sjoblom asked Perrell to research whether the Federal Reserve had jurisdiction over SFIS and STC.   In a memo dated October 1, 2008, Perrell concluded that the Federal Reserve did in fact have jurisdiction over these entities because they were affiliated with SIBL.   Moreover, Perrell concluded that SFIS was in fact acting as SIBL's representative office in the U.S. **But then Sjoblom changed her memo.** In the draft copy that Sjoblom sent to Alvarado the next day, Sjoblom argued that SFIS was not subject to the Federal Reserve's jurisdiction because it was technically a representative office for STCL, *not* SIBL.   Of course, Sjoblom knew that SFIS's only function was to market and sell SIBL's CDs in the United States.   Sjoblom also advised Alvarado that STC could quash the Federal Reserve subpoena because STC was not performing any banking functions.

On October 15, 2008, Sjoblom, Perrell, Alvarado and Stinson met with the Federal Reserve.   During that meeting, **Sjoblom falsely represented to the Federal Reserve that Allen Stanford was *not* involved in Stanford Financial's day-to-day operations**, and he offered to submit Allen Stanford's verified statement to that effect.   Sjoblom also convinced the Federal Reserve that Stanford Financial needed more time to produce the voluminous records requested in the subpoena.   The Federal Reserve allowed Stanford Financial to begin its document production on November 17, 2008 and continue producing documents on a rolling basis through February 2009.

On October 19, 2008, Perrell prepared a legal memo for Sjoblom that addressed the remedies available to the Federal Reserve if SFIS qualified as SIBL's unregistered bank representative office in the United States.   Perrell's memo concluded that SFIS could be liable

for civil damages up to $25,000 per day, and its principals could face possible prison time for up to five years and fines up to $1 million per day.

On October 30, 2008, Perrell prepared another legal memo to address the types of activities that comprised "core" banking functions versus "back office" functions. Perrell's memo concluded that virtually all of SIBL's back office functions, including legal, human resources, information technology, and accounting, were being performed by Stanford Financial Group Company in Houston. Of course, Sjoblom had known this since 2005.

### l.    Chadbourne Continues to Represent Stanford Financial

Chadbourne continued to represent Stanford Financial despite Thomas Sjoblom's departure to join Proskauer in August 2006. Besides assisting its client with litigation in 2006 (as disclosed in Chadbourne's February 2007 audit response letter to BDO), Chadbourne also continued to represent Stanford Financial in other securities matters. For example, in November 2008, Chadbourne partner Peter Ingerman corresponded with Alvarado concerning a new "hedge fund of funds" project that Stanford Financial was trying to structure. The transaction was part of Stanford Financial's new plan to move all operations to St. Croix, U.S. Virgin Islands. Chadbourne and Alvarado began structuring the various funds in late 2008, and in January 2009, Chadbourne forwarded drafts of the fund documents to Stanford Financial.

### m.    SGC's Clearing Broker Refuses to Wire Funds to SIBL for CD Purchases

On December 12, 2008, Sjoblom received new information that his client's fraud was beginning to unravel. In a discussion with Stanford Financial Assistant General Counsel Larry Fontana, Sjoblom learned that SGC's clearing firm, Pershing LLC, had informed Stanford Financial that it would no longer process wire transfers to SIBL for client purchases of SIBL CDs. Fontana told Sjoblom that Stanford Financial was considering an alternative path to allow

SGC to keep selling SIBL CDs anyway, which involved Pershing wiring client funds to an intermediary escrow account at the Bank of Houston. Fontana asked Sjoblom to advise Stanford Financial on the securities and regulatory implications of this approach. *And still Sjoblom did not report up the chain nor resign as required under the Sarbanes-Oxley Act.*

A few days later, on December 16, 2008, the Federal Reserve sent a letter to Sjoblom stating that Stanford Financial's document production was deficient. According to the letter, Stanford Financial had produced documents from its U.S. offices only, and had failed to produce documents from SIBL, despite the Federal Reserve's subpoena to SIBL's Chairman, Allen Stanford. The Federal Reserve's letter demanded that Stanford Financial produce SIBL's documents.

Sjoblom immediately informed Alvarado of the letter and started preparing his response. During the drafting process, Sjoblom exchanged heated words with Hamric about how to describe Allen Stanford's involvement in operations. The original draft of Sjoblom's letter stated that Allen Stanford "delegates all operations of [Stanford Financial] to other executives." This language was revised to state that he "receives reports from independent operating companies, but not [sic] responsible for day-to-day operations of those independent operating companies." In the next draft, the language changed again to state that Allen Stanford was "*[u]ltimately responsible for overall operations*, but does not intervene on [sic] the day-to-day operations that are delegated to other employees." (emphasis added)

In a December 19, 2008 email thread between Sjoblom, Perrell, Alvarado, Hamric and Stinson, Perrell informed Alvarado that Sjoblom was "uncomfortable" stating that Allen Stanford "oversees" operations because the language was "[t]oo synonymous with monitoring or responsib[ility]." In other words, Sjoblom was uncomfortable suggesting that Allen Stanford

played any meaningful role in operations, despite the fact that Sjoblom knew very well that Allen

Stanford was *substantially involved* in operations.  Hamric responded,

> The request was for 'job responsibilities.' There is no one else
> listed as an officer with overall responsibility.  It will look like no
> one is in charge. The only other 2 people listed are [Jim Davis], as
> CFO, [Linda Wingfield] as SVP, and [Patricia Maldonado], as
> Asst. Secretary.  We are dealing with semantics here.  Someone
> has to have overall responsibility.

Sjoblom quickly retorted,

> **No, we are not dealing with just semantics.  We are dealing
> with critical legal distinctions, as well as factual ones, that have
> broad implications, and not just on issues of culpability but on
> issues of jurisdiction.**

Sjoblom revised the language to state that Allen Stanford was a "[b]oard member

and from time to time, receives and reviews reports from *independent* financial service

companies; but, [sic] not responsible for day-to-day operations of those independent companies."

(emphasis added)  When Hamric questioned this language, Proskauer's Jackie Perrell supported

the change,

> We would prefer the language proposed by Tom [Sjoblom]
> because . . . (ii) we are working through some 'affiliate' and
> 'control' issues and therefore we do not want any statement out
> there saying that Mr. Stanford is 'responsible' from a legal
> standpoint or otherwise in control of all these entities.

In the final draft of Sjoblom's letter, which was sent to the Federal Reserve on December 23,

2008, Sjoblom asserted that the Federal Reserve lacked jurisdiction and therefore could not

demand SIBL's documents.

On that same day, December 23, 2008, Sjoblom held a teleconference with the

SEC as markets were reeling in the wake of Bernie Madoff's Ponzi scheme.  **Sjoblom told SEC**

**attorney Kevin Edmundson that "this was not Madoff – this is a real bank, real**

**investments with global portfolio managers, and real assets."** Sjoblom's representations to the SEC are nothing short of shocking because he knew his client was committing securities fraud and lying to the Commission, and he had seen a mountain of evidence indicating that his client *was* in fact running a Ponzi scheme.

  **n. Sjoblom Learns the Full Extent of SIBL's Real Estate and Private Equity**

    Then Stanford Financial revealed equally shocking news about SIBL's fraudulent investment portfolio. According to Jim Davis's plea agreement, **Sjoblom was informed in early January 2009 that SIBL's Tier 3 investment portfolio included both private equity and *real estate*.** More importantly, <u>**Sjoblom learned that this Third Tier of real estate and private equity investments — which Stanford Financial had *never* disclosed to CD investors nor the SEC — constituted roughly *80%* of the entire reported value of SIBL's investment portfolio, or approximately *$6 billion*.**</u> According to the plea agreement, Sjoblom knew and understood from his prior review of SIBL's disclosures that these investments had not been disclosed. Again, however, Sjoblom did not report up the chain nor withdraw as required under the Sarbanes-Oxley Act.

  **o. The SEC Requests Testimony Regarding SIBL's Investments**

    On January 5, 2009, Sjoblom received a call from Bruce Bettigole, an attorney with Mayer Brown LLP, concerning SGC's former Chief Compliance Officer, Jane Bates. Bettigole told Sjoblom that the SEC had asked Bates to meet with the Commission in Fort Worth, Texas on January 8, 2009. Sjoblom informed Alvarado of the situation, advising him that "it might make some sense for me to represent Jane as well," as **we may want to 'contain' what is happening in Texas."** (emphasis added)

On January 7, Sjoblom emailed Alvarado again to relay his conversation with the SEC's Kevin Edmundson.  According to Sjoblom, the SEC's main concern related to the CDs' extraordinarily high returns.  "[H]ow can it be that the CDs are offered at such great rates?"  Sjoblom wrote that Edmundson raised two issues: (i) is the SIBL CD a "security"; and (ii) "are the stated rates of return possible"?  Sjoblom continued,

> Kevin [Edmundson] stated that a recent brochure states that Stanford returns were 3.9% better than other US bank CDs . . . there is some concern that this case not be another Madoff-type case.
>
> . . . Kevin [Edmundson] asked whether I would present a witness that will tell the SEC what is going on and what the allocations are? And, where the money is invested?

Sjoblom discussed these issues with Alvarado later that day.  According to Sjoblom's notes, Alvarado told him that Stanford Financial's immediate objective for the SEC investigation was to "gain time" because "any publicity could kill us."

### p.    Sjoblom Discovers More Incriminating Facts About SFIS and SIBL

During this same period, Sjoblom was continuing to defend SFIS in the Federal Reserve investigation.   On January 8, 2009, Sjoblom held a teleconference with Stanford Financial's Lena Stinson, in which he discovered that for many years, SIBL had issued bank credit cards to clients referred by SFIS, and had consistently issued those credit cards to SFIS in Miami, Houston or San Antonio.  Sjoblom also learned that SFIS regularly instructed SIBL to pay SIBL customers' bills from their SIBL accounts.  This information left little doubt that SFIS was acting as SIBL's representative office in the U.S.  Meanwhile, Proskauer's Jackie Perrell continued drafting her legal memo regarding the Federal Reserve's jurisdiction.  Perrell's memo confirmed her prior conclusion that the Federal Reserve likely had jurisdiction over SFIS as an affiliate of SIBL, and that it possibly had jurisdiction over *SIBL* as well.

q.     **FINRA Raids SGC's Offices Across the United States**

On January 12, 2009, Stanford Financial's scheme nearly reached the breaking point when FINRA examiners raided several SGC offices, including Miami, Tupelo, Dallas, Memphis, Baton Rouge, Charlotte and New Orleans.  FINRA's examiners demanded access to SGC's computers and documents and began interviewing SGC employees.  When several SGC branch managers refused to cooperate, the examiners threatened to revoke their securities licenses.  FINRA launched the raids to search for information concerning the SIBL CD program.  In the Memphis office, FINRA's examiners successfully seized a computer hard drive that possibly contained *all* of SIBL's portfolio information.

Contemporaneously, the SEC's Forth Worth office launched several examinations of Stanford Financial companies, including SGC (investment advisor and broker/dealer exams), Stanford Capital Management, LLC (investment advisor exam), and Stanford Family Office (investment advisor exam).  During these examinations, the SEC gathered evidence of fraudulent performance data for a Stanford Financial mutual fund wrap program.

According to Sjoblom's notes, Alvarado called him in "a panic."  The next day, January 13, 2009, Sjoblom exchanged emails with FINRA's Andy Favret about the hard drives seized from SGC's offices in Memphis and Tupelo.  Sjoblom objected to the "forced production" and "strong arm tactics" employed during FINRA's raids, which he later characterized as a "blitzkrieg" raid.  Later that day, FINRA sent a letter directly to SGC's Bernie Young and Danny Bogar, noting SGC's "continued failure to provide access" to the remaining computer records in its Memphis office.  FINRA also noted that SGC's "outside counsel" (Sjoblom) had informed FINRA that SGC would *not* provide access to these computer records.  FINRA stated that all negotiations were over.  FINRA demanded that *all* of SGC's computer records in Memphis be

made available, or FINRA would take disciplinary action against SGC and the individuals involved.

On January 14, 2009, Sjoblom interviewed Memphis analysts Mark Collinsworth, John Adams, and Wade McGee. Each analyst confirms that SIBL's investment portfolio includes private equity and real estate holdings. That same day, the SEC issued document and testimony subpoenas to Jim Davis and Laura Pendergest-Holt, requiring them to produce documents by January 26 and provide testimony on January 29 and 30, 2009.

The next day, January 15, 2009, Sjoblom interviewed Bernie Young, Stanford Financial's Chief Compliance Director, and for the very first time Sjoblom grilled his client about SIBL's auditor, Hewlett & Co. Sjoblom asked Young how SGC was comfortable with Hewlett & Co. as SIBL's auditor. Young told Sjoblom that he merely looked up Hewlett & Co. on the Internet and talked to people at SIBL. That was it. Sjoblom asked Young about the size of Hewlett & Co.'s firm, the number of people from the firm who were involved in SIBL's annual audits, and whether the firm had any other clients. **Young did not know the answers.**

r.      **Opinion Letter Confirms that SIBL is an "Investment Company"**

On January 16, 2009, Sjoblom emailed Young and asked him to "call me ASAP BEFORE next interview." (emphasis in original) Sjoblom also emailed Alvarado and said he wanted to "shut down the breadth of the SEC exam interrogations." He asked Alvarado to send him a copy of Stanford Financial's prior opinion letter concerning its compliance with the Investment Company Act. Of course, Jackie Perrell had already researched this issue and concluded that SIBL was exempt from registration under the Act because it was a foreign commercial bank that supposedly issued loans. But Sjoblom knew her conclusion was wrong because his own due diligence showed that SIBL was a private *investment* bank that did ***not***

make traditional loans, and SIBL's sales brochures marketed the bank as having "no credit risk" because it did not hold such loans.

The following day, January 17, 2009, Young advised Sjoblom that he sent the "due diligence file" to Sjoblom's house. Two days later, Alvarado's secretary emailed Sjoblom a copy of Stanford Financial's prior opinion letter. The November 11, 1998 letter from Greenberg Traurig LLP opined that Stanford Financial would be exempt from registration under the Investment Company Act if it is "engaged substantially in commercial banking activity," which can be satisfied if "it derives a substantial amount of its business from accepting demand and other deposits, and . . . extending commercial and other types of credit." The letter also stated that Stanford Financial should be exempt because "[it] is not primarily engaged in the business of investing in, holding, or trading securities . . . ."

When Sjoblom reviewed this letter, he knew that ***neither*** of these exemptions applied. Based upon his substantial due diligence and experience representing Stanford Financial, Sjoblom knew that (i) SIBL was not a commercial bank because it did not "derive[] a substantial amount of its business" by issuing loans, and (ii) SIBL operated more like a "classic" investment bank that "primarily engaged in the business of investing in, holding, or trading securities." The opinion letter once again confirmed that SIBL was an investment company and had to be registered under the Act.

s.     **Sjoblom Explicitly Agrees to Offer False Testimony to the SEC**

On January 21, 2009, the SEC issued a subpoena to Allen Stanford, demanding that he testify before the Commission on February 6, 2009. That same day, Sjoblom met with Davis, Pendergest-Holt, Alvarado, Stanford (by phone) and others at Stanford Financial's airplane hangar in Miami to discuss the SEC investigation and determine who should testify.

When Sjoblom attended this meeting, he understood that the SEC subpoenas would require Stanford, Davis, and Pendergest-Holt to make a complete and transparent presentation to the Commission, *under oath*, regarding all investments in SIBL's CD program, including Tier 3 assets. **Even though they knew that Stanford and Davis had the most knowledge about the assets in SIBL's Third Tier portfolio – which purportedly contained approximately *$6 billion* of undisclosed real estate and private equity investments – Stanford, Davis, Pendergest-Holt, and Sjoblom all agreed in this meeting that Sjoblom would try to convince the SEC that Stanford and Davis did not know *anything* about SIBL's assets, and that Pendergest-Holt and another SIBL executive, President Juan Rodriguez-Tolentino, could provide the best testimony and evidence to the SEC regarding SIBL's *entire* investment portfolio.** They also agreed to meet in Miami during the week of February 2, 2009 to bring Pendergest-Holt and Rodriguez-Tolentino "up to speed on Tier 3" before their testimony to the SEC.

The next day, January 22, 2009, Sjoblom met with several SEC attorneys at a restaurant in Houston, Texas to discuss the SEC's investigation. The SEC attorneys reiterated that the purpose of their investigation was to determine how SIBL's entire portfolio of assets were invested, and where they were managed, and that in order to do so, the SEC needed to depose the Stanford Financial executives with the most knowledge of SIBL's "entire investment portfolio." **At this meeting, Sjoblom *falsely* represented to the SEC that Stanford and Davis did not "micro-manage" SIBL's portfolio, and that Pendergest-Holt and Rodriguez-Tolentino were the "better people to explain the details" about SIBL's *entire* portfolio.** Sjoblom also represented to the SEC that SIBL was "not a criminal enterprise" and that "all assets are there."

The next day, January 23, 2009, Sjoblom met again with an SEC attorney at Stanford Financial's offices in Houston.   Sjoblom asked the attorney to defer the SEC's subpoenas to Stanford and Davis.  **Once again, Sjoblom *lied to the SEC* by stating that Pendergest-Holt and Rodriguez-Tolentino would be better witnesses than Stanford and Davis, whom Sjoblom claimed were executive-level officers who were not involved in the "nuts and bolts" of operations, and therefore could not testify about the details of SIBL's assets.**  As a result of Sjoblom's false and misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and Davis, and instead agreed to obtain testimony from Pendergest-Holt and Rodriguez-Tolentino on February 9 and 10, 2009, respectively.

On January 24, 2009, Sjoblom sent an email to Alvarado, which Alvarado then forwarded to Davis, Pendergest-Holt and Stanford on January 25, 2009.  According to Sjoblom's email, he successfully persuaded the SEC that Pendergest-Holt and Rodriguez-Tolentino — not Stanford and Davis — would be better witnesses to testify about SIBL's entire investment portfolio.  Sjoblom's email further stated,

> We can fully anticipate that the SEC <u>will</u> want [Rodriguez-Tolentino] to testify under oath that the bank is 'real,' the CDs are 'real,' *that the money is actually invested as described in our documents*, and that client funds in the CDs are safe and secure. The [SEC] staff will want to be protected against obstruction and perjury . . . [Rodriguez-Tolentino] will have to be fully and carefully prepared so that he can provide details as best as humanly possible.

(underline emphasis in original)  Sjoblom's email also stated that Pendergest-Holt would have to explain her management and supervision of the bank portfolio to the SEC, and that because she knew "little about Tier 3," she would "have to get up to speed on Tier 3" before her deposition. Sjoblom added that the SEC also reserved the right to put Pendergest-Holt under oath to ensure her truthfulness and protect against perjury and obstruction.  Sjoblom said he wanted to make

sure Rodriguez-Tolentino and Pendergest-Holt had enough time to "prepare and practice" the week before the SEC meeting. Finally, Sjoblom closed his email to Alvarado,

> [T]o put quite simply, this is our chance – our chance to demonstrate to the SEC that we are 'for real' and who we say we are. *I have said all of the great things I can about the company, about Allen [Stanford], Jim Davis, Juan [Rodriguez-Tolentino] and Laura [Pendergest-Holt]. Now is the time for us to come forward with 'positive evidence' of everything I have been saying to [the SEC] for the last 3 years.*

(emphasis added).

During this last week of January 2009, as the SEC's investigation intensified to a fever pitch, Davis traveled to Antigua and met with Leroy King of the FSRC. King appeared very stressed. He told Davis that the SEC had contacted him again. King asked Davis, "[Are] we were going to make it?"

### t.  Sjoblom Prepares Rodriguez-Tolentino and Pendergest-Holt for Testimony

On January 26, 2009, Sjoblom emailed a 95-page outline to Juan Rodriguez-Tolentino entitled "SEC Presentation." The outline, which Sjoblom drafted in **2005**, was intended to address the SEC's fraud allegations by providing a detailed summary of Stanford Financial's operations and regulatory environment. Sjoblom's outline also tried to bolster SIBL's legitimacy by distinguishing the bank from another recent fraud involving high-yield bank securities from secretive overseas markets: the "Prime Bank" Ponzi schemes. Ironically, however, Sjoblom's "[c]haracteristics" for the Prime Bank schemes were nearly *identical* to Stanford Financial:

> ➢  [I]nvolve international investment programs or are associated with international banking. They typically involve some sort of bank instrument . . . .

> ➢  [P]romise of a high rate of return with little to no risk.

> ➢ [P]romoters typically . . . [i]nsist on strict confidentiality – high level of secrecy . . . .

> ➢ Participation is usually by invitation only, and is offered only to high net worth individuals. . . . Money invested is pooled together for higher trading ability.

> ➢ It is unclear who is involved in the investment and where the money goes.

Sjoblom's outline also stated that SIBL's investment portfolio was "made up of equities, bonds, treasury debt, fiduciary placements, currencies, and metals." But Sjoblom knew this information was false because it did not disclose the approximately $6 billion in real estate ventures and private equity holdings that comprised roughly 80% of the bank's total investments.

That same day, January 26, Sjoblom learned that the SEC had just contacted SIBL's former Senior Investment Officer, Michael Zarich. When Sjoblom relayed this information to Pendergest-Holt, she assured him that Zarich could not "hurt" them: "Zarich knows nothing about [T]ier 3."

On January 27, 2009, Sjoblom emailed Pendergest-Holt and Rodriguez-Tolentino, with a copy to Davis, regarding the need to address all three Tiers of SIBL's asset portfolio, and to "[p]rovide 'positive proof' that investor funds are invested as and where we say they are."

> We need to 'account for' the full amount stated in the financial statements related to the CDs. E.g., if we say there is $8.2 billion attributed to the CDs, we have to account for the full $8.2 billion . . . you will need to address all 3 tiers, not just tier 1 and tier 2.

Sjoblom also noted the need to alleviate the SEC's concerns that "Allen [Stanford] 'owns' [the FSRC] . . . [,]" and SIBL's ability to "continue to pay such high rates of return[.]" Sjoblom closed his email by challenging Pendergest-Holt and Rodriguez-Tolentino:

> Tidwell and others have 'thrown down the gauntlet,' so we need to rise to the occasion. I know we can and must. **Our livelihood depends on it.**

(emphasis added).  At this point, Sjoblom was clearly intent on doing whatever was necessary to keep Stanford Financial in business.

On January 28, 2009, Jackie Perrell emailed Sjoblom the relevant sections of Antigua's International Business Corporations Act (the "IBC Act").  Perrell followed up with an email to Sjoblom later that day, "***I do not see anything [in the IBC Act] that expressly prohibits FSRC from disclosing the information . . . .***"  **Less than an hour later, Sjoblom wrote to Juan Rodriguez-Tolentino that he had studied the Antiguan law and found *nothing* in that law which provided confidential protection to the composition of SIBL's asset portfolio, and nothing that would prohibit Stanford Financial or the FSRC from disclosing this information to the SEC.**

The next day, January 29, 2009, Sjoblom emailed Lena Stinson to request a copy of SIBL's opinion letter from its Caribbean counsel, Erroll Cort, "with an interpretation under the IBC Act that information regarding SIBL's <u>assets</u> . . . is confidential." (emphasis in original)  Sjoblom said he needed the opinion to prepare his response "to a pending request from the SEC staff."  But Stinson responded that she had only spoken to Stanford Financial's "*internal* Caribbean [General Counsel] . . . ." (emphasis added)  She then suggested that Sjoblom could find the answer in the FSRC's *internal rules*, which purportedly required the FSRC to maintain the confidentiality of "information specific to [its] exam and findings," which "cover the portfolio holdings."  She added that Rodriguez-Tolentino could provide "better information."  **And *still* Sjoblom didn't resign.**

Instead, Sjoblom drafted a letter to the SEC in which he continued to argue that Antiguan law prohibited SIBL from disclosing its portfolio information "without the express

authorization of the FSRC." That same day, January 29, Sjoblom sent a draft of his letter to

Alvarado,

> Mauricio [Alvarado], this is the best argument I can make, but it
> may be a stretch, and we should have an opinion of Antiguan
> counsel to *verify its accuracy*, since I am not licensed to interpret
> Antiguan regulations.

(emphasis added).

Also on January 29, 2009, Sjoblom emailed Alvarado and proposed that Stanford

Financial hire a third-party consultant to audit SIBL's portfolio records and present its findings

to the SEC staff.

> I am concerned about the SEC notifying our portfolio managers
> and ruining the business. The SEC in Fort Worth harbors grave
> doubts about the veracity of our current auditors, CAS
> Hewlett & Co. My suggestion brings an independent auditor to the
> table, [and] is the best way to keep the SEC away from the
> portfolio managers . . . .

Despite this recommendation, Stanford Financial did not hire an independent auditor. That same

day, Sjoblom also learned that the SEC had issued subpoenas for testimony from SGC officer

Zach Parrish and Mark Stys. When Sjoblom raised this issue with Alvarado, he responded to

Sjoblom and Perrell, "Please no e-mails on the subject."

The next day, January 30, 2009, Sjoblom emailed Alvarado an updated draft of

his letter to the SEC. Sjoblom asked Alvarado to focus on the paragraph discussing Antiguan

privacy laws, advising him that "[w]e need an opinion of . . . outside counsel to the bank[] to

support it." Sjoblom never received that opinion.

On February 2, 2009 — after years of lying to the SEC, withholding documents,

and generally helping his client obstruct the Commission's investigation — Sjoblom finally

became nervous. **He asked Perrell to review the Sarbanes-Oxley Act and determine a**

**lawyer's duties when he suspects his client is engaged in securities fraud.**  Perrell sent him

Section 307 of the Act, which requires a lawyer to "report up" the fraud to his client's Chief

Legal Officer or Chief Executive Officer, and if that is unsuccessful, to report up to the Board of

Directors and/or resign.

Instead of complying with the Act, however, Sjoblom kept going.  In fact, on

February 3, 2009, Sjoblom signed and forwarded the final draft of his response letter to the

SEC's Kevin Edmundson.  **Sjoblom's letter continued to argue that Antiguan privacy laws**

**prohibited SIBL from disclosing its investment information, even though Sjoblom was**

**unable to confirm the veracity of this argument and never received an independent opinion**

**from licensed Antiguan counsel.**

> **u.      Allen Stanford Meets with Sjoblom and Personally Admits the Fraud**

On February 3, 2009, Sjoblom met with Pendergest-Holt, Rodriguez-Tolentino,

Davis, Alvarado and others at Stanford Financial's Miami offices for four days of meetings to

prepare for SEC testimony.  During their initial meetings, Pendergest-Holt reported that the

assets she managed in Tier 2 had fallen to only $350 million, down roughly ***$500 million*** from

June 2008.  On February 4, while Sjoblom continued his meetings, the SEC's Kevin Edmundson

responded to Sjoblom's prior letter and made his expectations crystal clear,

> As an accommodation to you, we agreed to let Mr. Rodriguez and
> Ms. Holt make a brief oral presentation in advance of their sworn
> testimony.  But I do not want there to be any misunderstanding.
> We intend to inquire about, among other things, the witnesses'
> knowledge of [SIBL's] investment portfolio.  As I told you in
> Houston, Mr. Rodriguez and Ms. Holt need to account, in a
> manner that can be verified by the Commission, for [SIBL's] entire
> portfolio of assets.

That same day, Sjoblom met with Alvarado.  According to Sjoblom's notes, he warned Alvarado

that they were treading on thin ice,

[I]t [is] now Wednesday (two days into the meeting) and we still don't know what is going on with [T]ier 3. We discussed the need for Allen [Stanford] and Jim [Davis] to come clean. Mauricio [Alvarado] said that he was an ethical lawyer, with integrity and highly respected in his office. He would not be involved in anything that was improper or illegal.

**The next day, February 5, 2009, Davis presented a pie chart reflecting the assets in SIBL's Tier 3 portfolio. According to Sjoblom's notes, "[Rodriguez-Tolentino] . . . said this was the first he had ever *heard* of [Tier 3]." (emphasis added) <u>During the ensuing presentation, Davis revealed that SIBL's Tier 3 assets were comprised of: (i) real estate valued at more than $3 billion, which SIBL had purportedly acquired earlier that year for less than *$90 million;* (ii) at least $1.8 billion in "loans" to Allen Stanford; and (iii) other private equity investments totaling $1.2 billion.</u> Davis explained SIBL's real estate purchases to the group and "sketched out" how "Mauricio [Alvarado] and Allen [Stanford] were in . . . 'deal mode'" to purchase properties. Sjoblom asked whether Stanford Financial had used "straw men" to complete the deals and wanted to know whether SIBL had fairness opinions for the assets.**

**Sjoblom's notes from this meeting reveal his knowledge that SIBL's real estate assets had never been disclosed to investors nor regulators: "Real estate – not disclosed in bank's financial statement and not disclosed to FSRC." His notes reveal the same problem for SIBL's purported loans to Allen Stanford: "Notes receivable – related party transactions that are not disclosed in bank's financial statements and not disclosed in quarterly report to FSRC in Antigua."**

**<u>When Davis told the group that SIBL still had "plenty of assets" to cover its CD obligations and that SIBL's auditors were preparing a consolidated balance sheet, Sjoblom advised Davis that "consolidated reporting . . . did not change the fact that the</u>**

**bank's balance sheet was false and being used to sell the CDs." Sjoblom informed the group that SIBL's disclosures contained several false or misleading statements and that Stanford Financial could not continue to use SIBL's annual report or marketing materials.**

Shortly thereafter, Allen Stanford arrived at the meeting and told the group that SIBL still had "at least $850 million more in assets than liabilities." Stanford said he could raise another $1 billion if he could just have 30 more days but he could not get the funds if they stopped selling CDs. According to Sjoblom's notes, "[Stanford] says that he needs to keep the business going. Otherwise, all the depositors get hurt."

On the morning of February 6, during Sjoblom's last day of meetings in Miami with Stanford, Davis, Alvarado, Stinson, Pendergest-Holt, and Rodriguez-Tolentino, SGC President Danny Bogar broke down crying and said "the party is over." Rodriguez-Tolentino said he would *not* testify to the SEC, and both he and Bogar said they would have to report these revelations to the Commission. When Sjoblom asked about the information in SIBL's quarterly reports to the FSRC, Davis said the reports had been falsified to omit SIBL's related-party notes receivable from Allen Stanford and its real estate investments.

At this point, Stanford ordered a short break in the meeting and everyone left the room except for Stanford, Davis, and Sjoblom. His ensuing discussion with Stanford and Davis revealed that there was an even "larger problem" for the group: SIBL was insolvent and its $1 billion in capital was "underwater" by $800 million. When everyone returned and the meeting resumed, however, Stanford told the group that SIBL had "ample assets to cover CD deposit liabilities." **Before the meeting closed, Sjoblom reminded the group that SIBL's balance sheet was falsely stated. Later that afternoon, in a private conference between Sjoblom, Stanford, and Davis, Stanford admitted to Sjoblom that SIBL's assets were**

**overstated in its financial statements and the bank's assets and financial health had been misrepresented to investors.**

Sjoblom met with Alvarado later that evening. According to Sjoblom's notes, they discussed how SIBL's reports to the FSRC had been falsified, and how SIBL's revenue and retained earnings had been overstated in the bank's financial statements. They also discussed SIBL's real estate investments and Alvarado presented the contracts that he negotiated for several of the transactions. Sjoblom's notes reveal his growing mistrust of Alvarado: "**I felt uncomfortable . . . [because] these documents showed that Mauricio knew about the real estate deals that were put in Tier 3.**" (emphasis added) In a second meeting that evening, Sjoblom advised Bogar and Stinson that the company may need to start an internal investigation, possibly self report its violations to the SEC, and consider a change in management. Sjoblom told them he would meet with Allen Stanford the next morning and would know more information tomorrow.

Early in the morning of February 7, 2009, Sjoblom met with Allen Stanford and Juan Rodriguez-Tolentino in the lobby of Miami's Intercontinental Hotel. During their discussions, Stanford was adamant that Stanford Financial's total assets were greater than SIBL's deposit liabilities, and he discussed how Stanford Financial could consolidate all of its assets under SIBL Holdings, which owned the bank. According to Sjoblom's notes, "[T]his is allowed [because] <u>Allen</u> [Stanford] owns <u>all</u> companies!" (emphasis in original) Sjoblom and Stanford also discussed how SIBL could restate its earnings, which would create a "huge negative" of hundreds of millions of dollars.

**During the meeting, Sjoblom and Stanford also agreed that Pendergest-Holt would "stay the course" and make her presentation to the SEC as planned. Stanford**

**wanted Rodriguez-Tolentino to continue with his presentation as well but Sjoblom warned against this approach because Rodriguez-Tolentino could no longer represent SIBL "as being sound" nor could he explain the Tier 3 assets given yesterday's revelations about SIBL's financial statements.** Later that day, Sjoblom instructed Pendergest-Holt to "study you [sic] presentation."

      v.      **Sjoblom Prepares Pendergest-Holt for False Testimony to the SEC**

On the following day, February 8, 2009, Sjoblom seemed to question his marching orders. He emailed Pendergest-Holt to inform her that she may not be testifying to the SEC on Feb. 10th as originally planned. **He also stated that he would probably try to find her** *separate counsel* **for her testimony. Sjoblom also emailed Alvarado and advised him that all sales of SIBL CDs in the U.S. under Stanford Financial's Accredited Investor Program should** *cease* **and there should be no further distributions of SIBL's disclosure statements, annual reports, and marketing materials.**

That same day, Sjoblom also advised the SEC's Kevin Edmundson that he had learned some information, *but under Antigua's privacy laws*, he was not "at liberty" to reveal the information at that time. Sjoblom also informed Edmundson that Rodriguez-Tolentino would not be appearing for testimony tomorrow as originally agreed.

On February 9, 2009, Sjoblom advised Alvarado on Stanford Financial's obligations to conduct an internal investigation.

> The company needs to consider the need to conduct an internal investigation with a view towards fulfilling its obligations under the SEC's Seaboard release, a copy of which I provided to you last week.

> We need to discuss whether some disinterested committee or directors need to be informed of the status of matters to determine a proper course of action.

Sjoblom also reviewed Pendergest-Holt's presentation to the SEC and emailed Alvarado about several troubling issues,

> Her slides can be interpreted as misleading on many items – both in general and to the extent the Strategic Investment Committee and [Stanford Investment Model] also apply to [T]ier [sic] 3 investments. For example, since returns on [T]ier 2 for 2008 are large negatives, how does she justify payment of stated ROI on CDs? Answer: [T]ier 3. . . . I am considering not using her slides or only a few. But, she will need to address location and portfolios of each money manager.

Sjoblom reminded Alvarado that she would be asked "lots of questions" about SIBL, marketing materials, players, and a little about Tier 3 assets. A few hours later, Alvarado responded with frustration,

> I do not understand why you did not raise those issues during [Pendergest-Holt's] rehearsal presentation last week. In any event, her presentation needs to be complete, accurate, and correct. Thus, you need to postpone her appearance before the SEC.

Alvarado followed up in a second email, "You are the expert please get it done." Later that night, an equally frustrated Sjoblom finally replied,

> . . . [Pendergest-Holt's] presentation was discussed briefly last Tuesday or Wednesday. She was asked by everyone in the room to cut some things and add others. We saw bits and pieces. She never had a completed product when she left to return home last Friday night. You also know that Thursday and Friday were taken up and consumed with other issues important to Allen [Stanford] and Jim [Davis]. This evening we were still adding and deleting to [sic] her presentation.

Sjoblom's email exchanges with Alvarado continued through the next day until literally 30 minutes before Pendergest-Holt began her presentation and testimony to the SEC.

That evening, upon arriving in Fort Worth, Sjoblom and Pendergest-Holt spoke with Stanford and Alvarado. Sjoblom asked Alvarado how he, as general counsel of a privately

held company, decided issues concerning attorney-client relationship. At this point, Alvarado "exploded and started screaming . . . 'What do you think you are doing. [sic] You have crossed the line." Sjoblom said he needed to ensure that Pendergest-Holt was a member of some board so that he could discuss privileged information with her. Alvarado kept screaming but Sjoblom told him "that [he] would not be manipulated by him or anyone else." According to Pendergest-Holt's notes, she was a director of Stanford Capital Management and was therefore protected by the attorney-client privilege.

The next morning, February 10, 2009, Alvarado finally responded to Sjoblom's email advising the company to conduct an internal investigation, "[P]lease discuss these issues with Danny [Bogar], Lena [Stinson], and Juan [Rodriguez-Tolentino]." Disgusted by Alvarado's deflecting response, Sjoblom forwarded Alvarado's email to Jackie Perrell, and in a surprising moment of candor, wrote the following note for Perrell,

> **Here again Mauricio [Alvarado] is protecting himself and putting any future blame on me. Add this to our Internal files on these Ethics Issues.**

(emphasis added).

That same morning – before Pendergest-Holt began her testimony – Jackie Perrell received an email from Proskauer's Cynthia Herron, entitled "Telephone Messages – Tom Sjoblom,"

> **He's called three times because he has extinguished the capacity for leaving a message each time on your voice mail. _He told me to tell you not to erase the messages – you need to preserve them._**

(emphasis added).

**w.      Sjoblom Knowingly Presents False Testimony to the SEC**

On the morning of February 10, 2009, Pendergest-Holt gave a two-hour presentation about Stanford Financial to the SEC at the Commission's offices in Fort Worth, Texas.   In the afternoon, she testified *under oath* before the SEC as an executive of Stanford Financial.   **During that testimony, where she was represented by Sjoblom as counsel for Stanford Financial, Pendergest-Holt committed perjury over and over again while Sjoblom just sat there, clearly aware of his client's outright lies to the SEC.**   In fact, Sjoblom actively suborned Pendergest-Holt's perjury.   When she answered a direct question about whom she had met to prepare for her testimony, Pendergest-Holt said she had *only* met with Sjoblom.   When the SEC lawyers pressed her to confirm whether anyone else attended those meetings, Sjoblom interrupted Pendergest-Holt when she started to answer the question, and he intentionally steered her to answer "no" by improperly narrowing the question to "when we were preparing *last night*, was there a third person present?," to which she answered "no."   *See* SEC Testimony of Laura Pendergest-Holt, February 10, 2009, at 13:7-14:15.   In addition to withholding information regarding her meetings in Miami the prior week and the participants at those meetings, Pendergest-Holt falsely testified that she was ***unaware*** of the assets and allocations in Tier 3 of SIBL's purported portfolio, including the existence of billions of dollars in real estate and private equity holdings, and at least $1.8 billion in personal "loans" to Allen Stanford.

Shortly after Pendergest-Holt's perjured testimony to the SEC, Sjoblom received a cryptic email from Jim Davis,

> thk victory.   U said yourself, God is in this.   RAS' salvation.
> Preservation of God's glory.   Victory for thousands.   Your vision
> of the school.   Thk out of the box here.   We can do it with u and
> with Stanford.   There is something huge here Tom fir God.   Let's
> build and push fwd-not pull back.   Thks for who u r.

(errors and acronyms in original).

On the morning of February 11, 2009, Sjoblom informed Alvarado that Pendergest-Holt **"did well yesterday"** but the SEC insisted on talking to Allen Stanford and Jim Davis. Sjoblom also started preparing a memo to the file and instructed Perrell,

> [N]ote in the memo about [Pendergest-Holt's] presentation that, since Mauricio [Alvarado] would not respond to my request for approval to use [her] power point presentation, I called Allen Stanford at 9:30 a.m. (Fort Wroth [sic] time) to get his approval to use the slides. He agreed and said he would send me an email confirming that approval.

That evening, Sjoblom emailed Allen Stanford, Jim Davis, and Alvarado, advising them that the SEC has asked for evidence for four years and has "reached the end." "[I]f we do not respond," then the SEC "will go subpoena enforcement." Sjoblom recommended that each individual consult with independent counsel before making any appearance before the Commission so that all issues (both personal and corporate) have been covered.

### x.      Sjoblom Withdraws and Disavows All Prior Representations

The next day, February 12, 2009, Sjoblom advised Alvarado that Proskauer had withdrawn as counsel to Stanford Financial. Sjoblom notified FINRA and the Federal Reserve and sent a letter to the SEC informing the Commission that Proskauer and Sjoblom had withdrawn from its representation of Stanford Financial, including SIBL, in all enforcement and other regulatory matters before the SEC. That same day, Alvarado tendered his resignation.

**On February 13, 2009** — the day *after* Proskauer and Sjoblom had withdrawn as Stanford Financial's legal counsel — **SGC finally produced to the SEC the very same Private Equity Agreement that Sjoblom had previously advised Stanford Financial to withhold from its production.  <u>The next day, Sjoblom sent an email to SEC attorney Kevin Edmundson in which he *disaffirmed* "all prior oral and written representations [he] made"</u>**

**to the SEC regarding Stanford Financial and its affiliates, from the very beginning of his**

**retention in 2005 until February 2009.**

On February 25, 2009, Pendergest-Holt was *criminally* charged with lying to

the SEC during her testimony on February 10, 2009.  In late March 2009, Pendergest-Holt

filed a lawsuit against Proskauer and Sjoblom for legal malpractice and breach of fiduciary duty.

According to her suit, **Pendergest-Holt discovered – after her testimony to the SEC – that**

**Sjoblom had solicited a multimillion-dollar retainer from Allen Stanford to represent**

**Stanford** *personally* **the night** *before* **Pendergest-Holt met with Sjoblom to prepare her**

**testimony to the Commission.**

## VI.   STATUTE OF LIMITATIONS DEFENSES

### A. Discovery Rule/Inquiry Notice/Equitable Tolling

The SEC filed an action against Allen Stanford and SIBL *et al.* on February 17,

2009, and on that same day the Receiver was appointed.  Over a year later, on August 10, 2010,

the Committee was formed by this Court.  *See* Case No. 3:09-CV-0298-N, Doc. 1149.  The

Receiver did not discover, and could not with the exercise of reasonable diligence have

discovered until more recently, the true nature of Defendants' participation in the Stanford Ponzi

scheme and the injury suffered by Stanford Financial.  Moreover, the Defendants' wrongful acts

were inherently undiscoverable and fraudulently concealed.  Plaintiffs also assert the doctrine of

equitable tolling.

## VII.   CAUSES OF ACTION

For each of the following causes of action, Plaintiffs incorporate by reference and

reassert the allegations above as if fully set forth below.

### A. COUNT 1:   Negligence

Defendants owed a duty to Stanford Financial and its affiliated member companies, including but not limited to SIBL, SGC, STC, SFIS, STCL, and Stanford Financial Group Company, and therefore to the Receiver, that required Defendants to exercise the degree of care, skill, or diligence that an attorney of ordinary skill and knowledge commonly possesses. Defendants' negligent acts or omissions breached that duty to Stanford Financial, and therefore to the Receiver. Defendants' breach of this duty proximately caused an injury to Stanford Financial, and therefore to the Receiver, by assisting Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies. As a result of Defendants' breach, Stanford Financial, and therefore the Receiver and the Receivership Estate, suffered damages.

## B. COUNT 2:    Aiding, Abetting, or Participation in Breaches of Fiduciary Duties

The directors and officers of the Stanford Financial companies, including but not limited to the directors and officers of SIBL, SGC, STC, SFIS, STCL, and Stanford Financial Group Company, owed fiduciary duties to their respective member companies within the Stanford Financial Group. These directors and officers breached their fiduciary duties to the Stanford Financial companies, particularly SIBL, SGC, STC, SFIS, STCL, and Stanford Financial Group Company, by causing such companies to engage in illegal activity, by failing to use reasonable care in operating and managing such companies, by failing to operate such companies in a reasonably prudent manner, and by failing to operate such companies in compliance with all applicable laws and regulations. For example, SGC's directors and officers breached their fiduciary duties to SGC by allowing SGC's FAs to recommend the purchase of SIBL CDs to SGC's investor clients when SGC and its FAs lacked sufficient information regarding SIBL and SIBL's purported investment portfolio to properly recommend such

investments. Additionally, by ignoring numerous red flags and acting with little or no knowledge of SIBL's purported investments or Stanford Financial's operations generally, the Stanford Financial companies' directors and officers breached their fiduciary duties by allowing their respective member companies within Stanford Financial to be dominated, controlled and exploited by Stanford Financial, such that their respective member companies did not further their own interests but rather served the interests of the Stanford Ponzi scheme to their own detriment. The fiduciary breaches of the Stanford Financial companies' directors and officers enabled and assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from the Stanford Financial companies. As a result of these fiduciary breaches, Stanford Financial, the Receiver and the Receivership Estate suffered damages.

Defendants knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties. Defendants knew that the Stanford Financial companies' directors and officers, including but not limited to the directors and officers of SIBL, SGC, STC, SFIS, STCL, and Stanford Financial Group Company, owed fiduciary duties to their respective companies within Stanford Financial, and Defendants were aware that these directors and officers were breaching their fiduciary duties. Defendants also knew that they were aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein. The fiduciary breaches by the Stanford Financial companies' directors and officers and Defendants' participation in these breaches were a proximate cause of actual damages to Stanford Financial, the Receiver and the Receivership Estate. Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in extraordinary harm to Stanford Financial. Accordingly, the Receiver is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

### C. COUNT 3:    Aiding, Abetting, or Participation in a Fraudulent Scheme

By their conduct described herein, Defendants aided, abetted, and/or participated with the Stanford Financial companies' directors and officers, including but not limited to the directors and officers of SIBL, SGC, STC, SFIS, STCL, and Stanford Financial Group Company, in a fraudulent scheme against such companies, and therefore the Receiver and the Receivership Estate.   In particular, Defendants' legal services and other services assisted a fraudulent scheme that enabled and assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies, and therefore from the Receiver and the Receivership Estate.   As a result of this conduct, Defendants are directly liable for fraud, and Defendants' actions, in combination with the actions of the Stanford Financial companies' directors and officers, are a proximate cause of actual damages to Stanford Financial, and therefore to the Receiver and the Receivership Estate.

### D. COUNT 4:    Aiding, Abetting, or Participation in Conversion

The Stanford Financial companies, and therefore the Receiver and the Receivership Estate, owned, possessed, or had the right to immediate possession of personal property.   Allen Stanford, his co-conspirators, and the Stanford Financial companies' directors and officers wrongfully exercised dominion or control over such property, and thereby enabled and assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in such property from the Stanford Financial companies, thereby causing damages to Stanford Financial, and therefore causing damages to the Receiver and the Receivership Estate.

By their conduct described herein, Defendants knowingly or recklessly aided, abetted, or participated in this misappropriation and conversion of billions of dollars in property

from the Stanford Financial companies, and therefore from the Receiver and the Receivership Estate. Defendants were aware that Allen Stanford, his co-conspirators, and the Stanford Financial companies' directors and officers were wrongfully exercising dominion or control over the Stanford Financial companies' personal property, and Defendants were also aware that they were aiding, abetting, or participating in this wrongful conversion of the Stanford Financial companies' personal property. The wrongful conversion of property by Allen Stanford, his co-conspirators, and the Stanford Financial companies' directors and officers was a proximate cause of actual damages to Stanford Financial, and therefore to the Receiver and the Receivership Estate. As a result, Stanford Financial, and therefore the Receiver and the Receivership Estate, has suffered injury.

### E. COUNT 5:   Civil Conspiracy

Defendants conspired with Allen Stanford, his co-conspirators, and the Stanford Financial companies' directors and officers to commit the wrongful conduct described herein, including breaches of fiduciary duties, participation in a fraudulent scheme, fraudulent transfers, and conversion. Defendants are responsible for all wrongdoing done by each of the other members of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, Laura Pendergest-Holt, Rebecca Hamric, Jane Bates, Lena Stinson, Bernie Young, SIBL's president Juan Rodriguez-Tolentino, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise. In particular, Defendants are responsible for Allen Stanford's and his co-conspirators' misappropriation of billions of dollars in assets from Stanford Financial companies, and therefore from the Receiver and the Receivership Estate.

There was a meeting of the minds between Stanford, Davis, Alvarado, King, and others as to the need to conceal Stanford Financial's true nature and activities (particularly the

contents of SIBL's portfolio) and to evade regulatory scrutiny.  This meeting of the minds grew to include other participants, including Pendergest-Holt, members of the Antiguan Government, and eventually, Defendants.  Defendant Sjoblom, while employed by Chadbourne, joined the conspiracy and had a meeting of the minds with Allen Stanford and his co-conspirators in August 2005, and this meeting of the minds continued while Sjoblom was employed by Proskauer.  In this meeting of the minds, Defendants agreed to assist Stanford Financial in concealing the fraudulent nature of its activities by evading regulatory scrutiny from 2005 through February 2009, which concealment was crucial and central to the perpetuation of the Stanford Ponzi scheme.  Further, Defendants were actively involved in furthering the objective of this conspiracy during Sjoblom's respective employment at Chadbourne and Proskauer. Defendants therefore knowingly combined together with Allen Stanford and the co-conspirators in assisting Stanford Financial to frustrate the investigatory efforts of the SEC and other U.S. regulatory bodies and agencies so as to enable the Stanford Ponzi scheme.

As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIBL to accomplish the goal of shielding Stanford Financial and SIBL from regulatory scrutiny and therefore further the Stanford Ponzi scheme.  These overt acts in furtherance of the conspiracy included lying to the SEC about Stanford Financial, SIBL, and SGC, and encouraging others to lie, hide documents, and otherwise mislead and deceive the SEC in an ongoing SEC investigation.  By doing so, Defendants acted pursuant to their meeting of the minds with Stanford, Davis, Alvarado and other co-conspirators in pursuit of the common purpose of the conspiracy: to conceal the fraudulent nature of Stanford Financial's and SIBL's activities and shield Stanford Financial and SIBL from regulatory scrutiny by thwarting an active investigation by the SEC so as to allow Stanford Financial and SIBL to continue perpetuating the

Ponzi scheme. Defendants' conspiracy with these co-conspirators to breach fiduciary duties, participate in a fraudulent scheme, fraudulently transfer assets, and convert the Stanford Financial companies' property is a proximate cause of actual damages to Stanford Financial, and therefore to the Receiver and the Receivership Estate.

Defendants' actions in furthering the conspiracy to conceal, hinder and obstruct regulatory investigations were taken during the conspiracy's operation. Indeed, Defendants' actions were taken to protect the Stanford Ponzi scheme and to avoid regulatory intervention so that the Stanford Ponzi scheme could continue and Stanford Financial could continue paying Defendants' bills. Therefore, Defendants' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing Ponzi scheme conspiracy. But for the overt acts taken by members of the conspiracy to further the conspiracy's objectives as described herein, Allen Stanford and his co-conspirators would not have been able to execute the Ponzi scheme, and billions of dollars in damages to Stanford Financial companies, and therefore to the Receiver and the Receivership Estate, would have been avoided.

### F.  COUNT 6:   Negligent Retention / Negligent Supervision

Defendants Proskauer and Chadbourne are directly liable to the Receiver and/or the Committee for negligent retention and supervision of their employee Defendant Sjoblom. From the time that Sjoblom joined the conspiracy described here in August 2005 until sometime in August 2006, Sjoblom was employed by Chadbourne. Thereafter, from August or September 2006 through the end of 2009, Sjoblom was an employee of Proskauer. Defendants Proskauer and Chadbourne owed a duty to Stanford Financial, and therefore to the Receiver and the Receivership Estate, to use ordinary care in the hiring, supervision and retention of their agents and employees and in monitoring the activities of their employee in representing a purported

offshore bank selling financial products in the United States, and representing an SEC-registered broker/dealer and investment adviser that offered and sold such products in the United States, which were both under investigation by the SEC. Defendants Proskauer and Chadbourne knew or should have known that Sjoblom had been specifically retained to help Stanford Financial thwart an active SEC investigation of its activities. As a result, Defendants Proskauer and Chadbourne breached the duty owed to Stanford Financial, and therefore to the Receiver and the Receivership Estate, by not exercising ordinary care in the hiring, supervision and retention of Sjoblom and in not monitoring his activities with regard to this specific, inherently high-risk, client matter. Defendants' breaches of their duties and failure to supervise have proximately caused damages to Stanford Financial, and therefore to the Receiver and the Receivership Estate, because they assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies.

## VIII.    RESPONDEAT SUPERIOR

Defendants Proskauer and Chadbourne are liable for the tortious acts of their employee, Defendant Sjoblom. From the time that Sjoblom joined the conspiracy described herein in August 2005 until sometime in August 2006, Sjoblom was employed by Chadbourne. Thereafter, from August or September 2006 through late 2009, Sjoblom was an employee of Proskauer. Sjoblom was acting within the course and scope of his respective employments with Proskauer and Chadbourne, and in furtherance of said law firms' respective businesses, when he engaged in the wrongful conduct described herein.

## IX.    ACTUAL DAMAGES

The Stanford Financial companies, and therefore the Receiver and the Receivership Estate, have suffered the loss of billions of dollars in assets that were proximately

caused by the wrongful conduct of Defendants and their conspiracy with Allen Stanford and others as described herein.  In the alternative, Defendants Chadbourne, Proskauer and Sjoblom are liable for all damages caused to Stanford Financial, and therefore to the Receiver and the Receivership Estate, during the time period from 2005 to 2009 when the Defendants participated in the conspiracy to obstruct the SEC investigation of Stanford Financial's, SIBL's, and SGC's fraudulent sales practices.  In addition, the Receiver is entitled to recover his just and reasonable attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to them.  The Receiver and the Committee have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

## X.    PUNITIVE DAMAGES

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect.  The Receiver is, therefore, entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

## XI.    CONDITIONS PRECEDENT

All conditions precedent to filing this Complaint have been met.

## XII.    JURY DEMAND

The Receiver and the Committee demand a trial by jury.

## XIII.    PRAYER

WHEREFORE, the Receiver and the Committee request that the Defendants be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Receiver recover the damages as alleged herein, including their actual damages,

punitive damages, and the costs and expenses of suit, including reasonable attorneys' fees. The

Receiver and the Committee pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**NELIGAN FOLEY LLP**

By:    /s/ Douglas J. Buncher
Douglas J. Buncher
State Bar No. 03342700
dbuncher@neliganlaw.com
John D. Gaither
State Bar No. 24055516

Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**ATTORNEYS FOR RALPH S. JANVEY,
IN HIS CAPACITY AS RECEIVER FOR
THE STANFORD RECEIVERSHIP ESTATE**

**CASTILLO SNYDER, P.C.**

By:  */s/ Edward C. Snyder*
    Edward C. Snyder
    State Bar No. 00791699
    esnyder@casnlaw.com
    Jesse R. Castillo
    State Bar No. 03986600
    jcastillo@casnlaw.com
    300 Convent Street, Suite 1020
    San Antonio, Texas  78205
    (210) 630-4200
    (210) 630-4210 (Fax)

**STRASBURGER & PRICE, LLP**
2301 Broadway
San Antonio, Texas 78215
Telephone:    (210) 250-6004
Facsimile:    (210) 258-2706

BY: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@strasburger.com

901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone:    (214) 651-4300
Facsimile:    (214) 651-4330
DAVID N. KITNER
david.kitner@strasburger.com

**ATTORNEYS FOR THE OFFICIAL
STANFORD INVESTORS COMMITTEE**

### CERTIFICATE OF SERVICE

    I hereby certify that on this 2nd day of June, 2016, the foregoing First Amended Complaint was served on all counsel of record via the Court's ECF system.

    */s/ Douglas J. Buncher*