# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § § | |
|  | § | Civil Action No. 3:13-cv-00477-M |
| *Plaintiffs*, | § § | |
| PROSKAUER ROSE, LLP, CHADBOURNE & PARKE, LLP, AND THOMAS V. SJOBLOM, | § § § § | |
| *Defendants*. | § § | |

---

## APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE TO PROSKAUER ROSE, LLP'S MOTIONS IN LIMINE

---

### TABLE OF CONTENTS

| EXHIBIT | DOCUMENT | APPENDIX PAGE |
|---|---|---|
| 1 | Initial Decision dated August 2, 2013 in proceeding brought the Securities and Exchange Commission against Daniel Bogar, Bernerd E. Young, and Jason T. Green | 001 – 034 |
| 2 | Opinion of the Commission in a proceeding brought by the Securities and Exchange Commission against Bernerd E. Young | 035 - 074 |

**NELIGAN LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

By:  */s/ Douglas J. Buncher*
    DOUGLAS J. BUNCHER
    dbuncher@neliganlaw.com

**COUNSEL FOR RECEIVER**

**CASTILLO SNYDER, P.C.**
One Riverwalk Place
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
Telephone:   (210) 630-4200
Facsimile:    (210) 630-4210

BY:*/s/ Edward C. Snyder*
    EDWARD C. SNYDER
    esnyder@casnlaw.com
    JESSE R. CASTILLO
jcastillo@casnlaw.com


**CHALK HILL PLC d/b/a CLARK HILL STRASBURGER**
2301 Broadway
San Antonio, Texas 78215
Telephone:   (210) 250-6004
Facsimile:    (210) 258-2706

BY:*/s/ Judith R. Blakeway*
    JUDITH R. BLAKEWAY
    judith.blakeway@clarkhillstrasburger.com

901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone:   (214) 651-4300
Facsimile:    (214) 651-4330
DAVID N. KITNER
david.kitner@clarkhillstrasburger.com

**COUNSEL FOR OSIC**

## CERTIFICATE OF SERVICE

    I hereby certify that on this 18th day of April, 2018, the foregoing Response was served on all counsel of record via the Court's ECF system.


                    */s/ Douglas J. Buncher*

INITIAL DECISION RELEASE NO. 502
ADMINISTRATIVE PROCEEDING
FILE NO. 3-15003

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| | |
|---|---|
| In the Matter of | : |
| | : |
| DANIEL BOGAR, | :   INITIAL DECISION |
| BERNERD E. YOUNG, and | :   August 2, 2013 |
| JASON T. GREEN | : |

APPEARANCES:   David Reece, B. David Fraser, Chris Davis, and Janie Frank for the
Division of Enforcement, Securities and Exchange Commission

Thomas L. Taylor, III, and Andrew M. Goforth of
The Taylor Law Offices, P.C., for Respondent Daniel Bogar

J. Randle Henderson for Respondent Bernerd E. Young

George C. Freeman, III, and David N. Luder of Barrasso Usdin
Kupperman Freeman & Sarver, L.L.C., for Respondent Jason T. Green

BEFORE:   Carol Fox Foelak, Administrative Law Judge

## SUMMARY

This Initial Decision (ID) concludes that Daniel Bogar (Bogar), Bernerd E. Young
(Young), and Jason T. Green (Green) violated the antifraud provisions of the federal securities
laws while employed at a broker-dealer owned by convicted Ponzi-schemer R. Allen Stanford
(Allen Stanford). The ID orders them to cease and desist from further violations and bars them
from the securities industry. Additionally, the ID orders disgorgement of ill-gotten gains by
Bogar ($1,555,485.75 plus prejudgment interest), Young ($591,992.46 plus prejudgment
interest), and Green ($2,613,506.47) and orders each to pay a third-tier civil penalty of $260,000.

## I. INTRODUCTION

### A. Procedural Background

The Securities and Exchange Commission (Commission) instituted this proceeding with
an Order Instituting Proceedings (OIP) on August 31, 2012, pursuant to Section 8A of the



Securities Act of 1933 (Securities Act), Sections 15(b) and 21C of the Securities Exchange Act of 1934 (Exchange Act), Sections 203(f) and 203(k) of the Investment Advisers Act of 1940 (Advisers Act), and Section 9(b) of the Investment Company Act of 1940. The undersigned held a fifteen-day hearing between February 11 and May 20, 2013, in Houston, Texas, and remotely. Twenty-six witnesses testified, including Bogar, Young, and Green, and numerous exhibits were admitted into evidence.[1]

The findings and conclusions in this ID are based on the record. Preponderance of the evidence was applied as the standard of proof. See Steadman v. SEC, 450 U.S. 91, 97-104 (1981). Pursuant to the Administrative Procedure Act, 5 U.S.C. § 557(c), the parties' Proposed Findings of Fact and Conclusions of Law and Reply pleadings were considered. All arguments and proposed findings and conclusions that are inconsistent with this ID were considered and rejected.

## B. Allegations and Arguments of the Parties

This proceeding concerns Respondents' conduct during their association with companies owned and controlled by convicted Ponzi-schemer Allen Stanford, whose scheme included selling so-called certificates of deposit (CD) of his offshore bank, Stanford International Bank Ltd. (SIB or SIBL), through his broker-dealer, Stanford Group Company, Inc. (SGC), to investors in the U.S. The OIP does not charge Respondents with actually knowing about, much less operating, the Ponzi scheme, which was run by Allen Stanford and two close associates, Jim Davis (Davis) and Laura Pendergest-Holt (Holt). Rather, the OIP alleges that Respondents were culpable in their actions or inactions related to disclosure concerning SIB's assets and insurance coverage.

The Division of Enforcement (Division) is seeking cease-and-desist orders, disgorgement, third-tier civil money penalties, and bars. Respondents argue that the charges are unproven and no sanctions should be imposed.

## II. FINDINGS OF FACT

### A. Respondents and Other Relevant Entities

#### 1. Allen Stanford and His Affiliates

Allen Stanford was convicted of fraud, money laundering, obstruction of a Commission investigation, and other charges related to the events at issue in this proceeding and sentenced to 110 years imprisonment and other sanctions.[2] United States v. Stanford, No. 4:09-cr-00342-1 (S.D.

---

[1] Citations to the transcript will be noted as "Tr. __." Citations to exhibits offered by the Division of Enforcement, Bogar, Young, and Green will be noted as "Div. Ex. __," "Bogar Ex. __," "Young Ex. __," and "Green Ex. __," respectively.

[2] Official notice, pursuant to 17 C.F.R. § 201.323, is taken of the fact that Allen Stanford's associates in the Ponzi scheme are also incarcerated. Davis was convicted, on his plea of guilty,

2

Tex. June 14, 2012), appeal pending, No. 12-20411 (5th Cir.). SIB, located on the Caribbean island of Antigua, and owned and controlled by Allen Stanford, is central to the events at issue. Tr. passim; Div. Exs., Bogar Exs., Young Exs., Green Exs. passim. SIB's only business was its so-called CDs. Tr. 79, 83, 320, 3343. SGC, owned by Allen Stanford-owned Stanford Group Holdings, was during the time at issue a Commission-registered broker-dealer and investment adviser. Tr. 80, 88-89. Registered representatives associated with SGC were referred to as financial advisors (FA). Tr. passim. Branch managers were referred to as managing directors (MD). Tr. 3127. In February 2009, SGC had approximately thirty offices. Tr. 89. SGC's office in Memphis, Tennessee, oversaw certain of SIB's investments and provided research, investment, and financial analysis. Tr. 89-90, 716-22. SGC's so-called merchant banking group was in its office in Miami, Florida, and managed SIB's private equity portfolio. Tr. 91-92, 659-63, 2444-45. Allen Stanford-owned Stanford Financial Group Company provided administrative services, such as legal, accounting, HR, and IT to other Allen Stanford-owned companies (Stanford companies). Tr. 80-81. There were at least 130 Stanford companies. Tr. 81. The Stanford enterprises were seized, and their operations halted, on February 17, 2009. Tr. 1411, 2200-01.

## 2. Daniel Bogar

Bogar was SGC's president from March 2005 through February 2009. Tr. 2594, 2611, 2620. He had authority over SGC's sale of the SIB CD, which he considered SGC's premier product. Tr. 2874. He supervised SGC's compliance personnel himself. Tr. 2619-20. Bogar joined the Stanford companies in 2000. Tr. 2557, 2565-66. Previously, he worked as an executive in the wireless communications industry. Tr. 2557. He joined the Stanford companies following a chance encounter with Davis, his wife's uncle, at a family funeral. Tr. 2558-59. Bogar started in Miami, Florida, where he headed the merchant banking group. Tr. 659-62, 2564-66. Even after becoming president of SGC, he remained involved in managing the private equity deals. Tr. 662. Bogar reported to Davis. Tr. 663, 2566-67. Bogar, his family, and his friends invested in SIB CDs. Tr. 2773, 2841. Bogar regrets his association with SGC and the damage inflicted on customers and on former employees. Tr. 2841-42. FBI Agent Vanessa Walther (Walther) interviewed Bogar numerous times in connection with the criminal investigation into the Allen Stanford Ponzi scheme

---

of conspiracy to commit mail, wire, and securities fraud; mail fraud; and conspiracy to obstruct a Commission investigation and sentenced to sixty months imprisonment followed by three years supervised release. United States v. Davis, No. 4:09-cr-00335-1 (S.D. Tex. Jan. 25, 2013). Holt was convicted, on her plea of guilty, of obstruction of a Commission investigation and sentenced to thirty-six months imprisonment followed by three years supervised release. United States v. Holt, No. 4:09-cr-00342-2 (S.D. Tex. Sept. 24, 2012). Stanford accountants Gilbert T. Lopez, Jr., and Mark J. Kuhrt were convicted of wire fraud and conspiracy to commit wire fraud and each sentenced to 240 months imprisonment. United States v. Lopez, No. 4:09-cr-00342-3 (S.D. Tex. Feb. 22, 2013), appeal pending, No. 13-20115 (5th Cir.); United States v. Kuhrt, No. 4:09-cr-00342-4 (S.D. Tex. Feb. 22, 2013), appeal pending, No. 13-20115 (5th Cir.). Leroy King, former head of the Antiguan Financial Services Regulatory Commission, was indicted but has yet to appear. United States v. King, No. 4:09-cr-00342-5 (S.D. Tex. June 18, 2009). He has been fighting extradition from Antigua since his indictment. Tr. 2195.

and found that the information he provided was helpful and accurate, as corroborated by other evidence. Tr. 2183-85, 2187.

### 3. Bernerd E. Young

Young was SGC's chief compliance officer from July 2006 through February 2009. Tr. 3113-14. Previously, Young was employed at the NASD, and was District Director of its Dallas, Texas, office at the time he was terminated in May 2003. Tr. 3096-3103. Thereafter, until he joined SGC, Young operated his own consulting firm, providing services to broker-dealers and investment advisers in Texas, including providing compliance training to SGC. Tr. 3104-11. Bogar was responsible for hiring him. Tr. 2621-23, 3111.

### 4. Jason T. Green

Green first joined SGC in 1996 as an FA in Baton Rouge, Louisiana. Tr. 3673-74. In 2000 or 2001, Green became the branch manager of SGC's Baton Rouge office. Tr. 3676. In 2004, Allen Stanford appointed him captain of the "Superstars" team of FAs in the United States who competed in sales of the SIB CD. Tr. 3679-80. In 2007, Allen Stanford promoted Green to President of the Private Client Group (PCG), in which capacity he managed all of SGC's retail brokerage operations and reported to Bogar. Tr. 3677-78. Green recommended the SIB CD to family members. Tr. 3936. Green's father, aunt, and brother-in-law's mother lost a total of almost $1.8 million as a result. Tr. 2546-47, 3934-37. Walther interviewed Green numerous times in connection with the criminal investigation into the Allen Stanford Ponzi scheme and found that the information he provided was helpful and accurate, as corroborated by other evidence, and he testified in two criminal trials of participants in the scheme. Tr. 2169-74, 2234-35.

### B. The SIB CD

In the United States, SIB CDs were exclusively marketed through SGC. Tr. 103, 3857, 4006; Div. Ex. 602, Div. Ex. 644 at 12. SIB and the SIB CD contributed a large part of SGC's revenues, as all three Respondents knew. Tr. 2289-90, 2377, 2487-88, 2641, 2917, 2936, 3345-46; Div. Ex. 260. In fact, SGC was built around SIB and the SIB CD. Tr. 2879, 4006-07, 4014. SIB compensated SGC on the sale of SIB CDs at the rate of 3% at the time of sale and a trail commission of 3% per year for as long as the investor held the SIB CD.[3] Tr. 103-04, 3365; Div. Ex. 602. Other revenues that SGC received from SIB included fees to manage SIB's private equity portfolio and research fees. Tr. 2488-89. Receipts from sales of SIB CDs continued to come into SIB until it was shut down in February 2009. Tr. 135-37, 3889-90.

---

[3] SGC sent clients who had purchased the SIB CD a letter notifying them of the referral fees. Tr. 3559-66; Div. Exs. 386, 628, 629, 630, 631, 632. The referral fee letter states, "SGC receives a referral fee of 3% (annualized) from SIBL, and may receive additional incentive fees for Financial Advisors who refer SGC clients to SIBL." Div. Exs. 629, 632, Div. Ex. 386 at 4. While the fee was paid annually, the most obvious meaning of "annualized" is that the 3% fee would be prorated over the term of the SIB CD. Young could not explain the use of "annualized" in lieu of "annually." Tr. 3566.

The SIB CDs were unlike conventional CDs issued by U.S. banks. Funds received from investors were pooled and purportedly invested in various investments in the manner of a hedge fund. Tr. 410-11, 2746, 2875, 3344, 3759. But, describing the SIB CDs as a "hedge fund" was strictly forbidden within SGC. Tr. 1152, 2875. "[I]nternally . . . any time you said that, you'd get slapped on the wrist. It's a <u>bank</u>." Tr. 2875 (emphasis added).

SGC sold the SIB CD pursuant to a Regulation D exemption from securities registration. Tr. 3189, 3467-68; Div. Ex. 370, Div. Ex. 569 at 174-81. Some investors liquidated existing holdings of mutual funds, stocks, and bonds and used the proceeds to buy the SIB CD. Tr. 1223-24, 1485, 1495-96, 1551-52, 2705, 2976.

Marketing material furnished to investors and training material used in training FAs compared the SIB CDs with conventional CDs issued by U.S. banks, showing the SIB CDs with much higher interest rates.[4] Div. Ex. 607 at 10, Div. Ex. 608 at 10, Div. Ex. 611 at 10, Div. Ex. 742 at 9. Because of the high fees, including 3% annually on all SIB CDs, other fees paid to SGC, and ordinary expenses, SIB would have had to have earned far more than the interest it paid out in order to break even. Addressing that issue, training materials used by Green showed annual portfolio returns of about 5% more than the SIB CD interest rate. Div. Ex. 65 at 30; Green Ex. 261 at 32, Green Ex. 268 at 30.

As of February 2009, SIB's total outstanding SIB CD obligations amounted to approximately $7.6 billion. Tr. 88. Almost all of SIB's funds were invested in private companies, companies that were traded over-the-counter or in the "pink sheets," real estate, and a $2 billion loan to Allen Stanford. Tr. 85. The real estate, in Antigua, had been purchased in 2008 for $63.5 million but was valued on SIB's books at $3.2 billion. Tr. 85-86. This allocation is consistent with the understanding of Fred Palmliden (Palmliden) of SGC's Memphis, Tennessee, analyst group, that SIB's assets consisted of a small amount of cash (Tier 1), another 15%-20% (less than $1 billion) of the portfolio that the Memphis group oversaw (Tier 2), and the bulk of the assets, overseen by Davis and Allen Stanford (Tier 3); the Memphis analysts had no understanding of the Tier 3 assets. Tr. 721-24, 743, 787, 795. Had Bogar, Young, or Green asked Palmliden about the nature and value of assets that the Memphis group was actually overseeing, he would have supplied the information requested. Tr. 746, 750, 796-98. However, none of them asked. Tr. 750-53. SIB's auditor, from at least 1997 onward, was C.A.S. Hewlett (Hewlett), a tiny Antigua firm. Tr. 87-88. Allen Stanford responded to suggestions that he engage a larger firm by saying that he stayed with Hewlett out of loyalty. Tr. 355, 424-26.

SGC paid the individual FAs who sold the SIB CDs to customers a 1% commission ("referral fee") at the time of sale and a trail commission of 1% per year for as long as the investor held the SIB CD. Tr. 114, 427, 3365. There was also a quarterly bonus program based on volume of sales and renewals of SIB CDs. Tr. 115-116, 427-28, 3365, 4010. A super bonus, infrequently awarded, required an FA to sell, for example, as much as $22.5 million in SIB CDs to a single

---

[4] The interest rates shown on the training material, Div. Ex. 742, are similar to, but not the same, as those shown on the marketing material.

customer to receive a bonus of $125,000. Tr. 4012-13; Div. Ex. 606 at 76. There was also a sales contest[5] among FA teams called "Money Machine," "Superstars," and the like related to selling SIB CDs. Tr. 116, 429-30. Forty percent of Green's time was allocated to overseeing this activity.[6] Tr. 4002-03; Div. Ex. 606 at 44-46. Green maintained team and individual FA standings and disseminated so-called "TPC Hustle Sheets that listed standings and payouts for individuals and teams."[7, 8, 9] Tr. 1374-79; Div. Exs. 788, 789. There were also rewards for the TPC (Top Producers [or Performers] Club [or Celebration]) in the form of attending meetings at destination resorts based on the volume of SIB CD sales. Tr. 118, 332, 1078-79, 1106-07, 3365, 4009-10; Div. Ex. 790. Compensation for selling conventional CDs issued by U.S. banks was a minute fraction of SIB CD related compensation. Tr. 116-17, 431-32. Bogar intended to inaugurate a compensation plan in 2009 based on total assets rather than only SIB CDs,[10] yet "without killing the golden goose, which was the bank." Tr. 2784-86, 2791-92, 2811, 2916; Div. Ex. 271; Bogar Exs. 399, 400.

Bogar sought to make SGC a mainstream broker-dealer and broaden it away from dependence on the SIB CD by hiring personnel from well-known wire houses.[11] Tr. 334, 1079-80, 1320-21, 2595-606, 2857-58. For example, in June 2004 he hired Marty Karvelis (Karvelis), who had been associated previously with Paine Webber and with Merrill Lynch, as MD of the Miami, Florida, office. Tr. 1149-50, 1202, 1216-17, 1319-21, 1324. Karvelis implemented a plan to diversify the product mix away from the SIB CD in spring 2007. Tr. 1191-93. Consequently, SIB

---

[5] Bogar balked at the term "contest," instead using the more euphemistic term "recognition." Tr. 2927-32.

[6] Green's clients who testified at the hearing were not told of these additional incentives to sell the SIB CD. Tr. 1416-17, 1422-23, 1506-08, 1563-64.

[7] Bogar and Young received copies of the hustle sheets. Tr. 2928-29, 3364-65.

[8] Green recalled meeting in 2005 with an attorney, Tom Sjoblom, who was performing due diligence on SGC to decide whether he was going to represent it. Tr. 3837-41. Green said that he described SGC's compensation, including contests and bonuses, and was told that they did not present a problem. Id.

[9] SGC dropped out of the sales contest in December 2008. Tr. 3890-91; Green Ex. 300.

[10] McLagan, a consulting firm, was engaged. Tr. 2784; Div. Ex. 271; Bogar Exs. 399, 400. McLagan's February 15, 2008, draft "Financial Advisor Compensation Plan" distributed to Bogar and others, noted that SGC's current compensation plan did not "promote behavior that is in the best interest of clients because of its strong bias towards the proprietary SIB product" and was "economically unsustainable because of its extremely high SIB compensation coupled with above market interest rates." Div. Ex. 271 at 5.

[11] Bogar theorized that this would build SGC into something of value that could be taken public in the future. Tr. 2601, 2605-06. In any event, revenues from the sale of the SIB CD continued to grow but decreased as a percentage of total revenues. Tr. 2602.

6

CD sales in his office dropped and investments in equities and other instruments that were less profitable to SGC increased. Tr. 1193. In August 2007, Green fired him, with Bogar's approval, due to the lack of profitability. Tr. 1194-96, 1325, 2259-61, 2289-90, 2405-06, 2866-67.

In support of their previous belief that there were no improprieties in the sale of the SIB CD, all three Respondents advert to various inside and outside attorneys employed by the Stanford companies who drafted disclosure and marketing materials and dealt with other issues relating to the SIB CD. Tr. 2570-72, 2607-09, 2851-52, 3226-27, 3700-02, 3943-44, 3972-73, 4027. Respondents did not provide input into the language of disclosure and marketing materials, and believed that inside and outside counsel had approved the disclosure and marketing materials and the manner in which SGC and SIB were doing business. Tr. 2576-81, 2609, 2850-52, 3017-18 (Bogar), 3414 (Young), 3681, 3701-02, 3760, 3979 (Green).

## C. Disclosures Made to Investors and Potential Investors[12]

As discussed below, representations in marketing material under the heading "Depositor Security" and in training FAs concerning SIB's portfolio were false, and those concerning insurance coverage were misleading.

### 1. Portfolio Disclosures

As found above, almost all of SIB's purported assets consisted of private equity, equity traded over-the-counter or in the "pink sheets," wildly overvalued real estate, and a bogus $2 billion loan. The disclosure statement, marketing brochure, and materials used to train SGC FAs contained representations that were clearly false in light of these facts.

The disclosure statement, which was provided to each investor, represented, "The funds deposited with us are primarily invested in foreign and U.S. investment grade bonds and securities, and Eurodollar and foreign currency deposits" and provided percentages of investments in categories such as Equities, Treasury Bonds, Notes, Corporate Bonds, Metals, and Alternatives. Div. Ex. 644 at 9.

Under the heading "Depositor Security," SIB's brochures represented, "We focus on maintaining the highest degree of liquidity as a protective factor for our depositors. The Bank's

---

[12] The offering document for the SIB CD, titled "disclosure statement," provided to prospective investors warned: "YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK." Div. Ex. 644 at 6. The subscription agreement contained a number of "Depositor Representations," including "You have read and you understand the Offering Documents, particularly the discussion of the risks." Green Ex. 15 at STAN P_0079055. Unfortunately, some investors signed the subscription agreement without reading the disclosure statement, placing their trust in their FA. Tr. 1143-44, 1444-46.

7

assets are invested in a well-diversified portfolio[13] of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Div. Ex. 607 at 5, Div. Ex. 608 at 5, Div. Ex. 611 at 5. FAs were permitted, but not required, to give the brochures to customers. Tr. 419. Young approved the use of the brochures and the disclosure statement. Tr. 3348-54. Green, through his assistant, provided the brochures to clients with the disclosure statement; the brochures had a convenient pocket in the back in which to place the disclosure statement.[14] Tr. 3954.

Bogar was aware of the training of FAs and the training material that was used. Tr. 2792-94. The SIB Training and Marketing Manual (dated December 2006 and updated March 20, 2007) (TMM), was provided individually to persons connected with SIB on condition that it not be distributed, disclosed, or disseminated to anyone else. Div. Ex. 742 at 2, 4. It was used in training FAs to sell SIB CDs and was available on SGC's intranet for FAs to consult. Tr. 3949-50. The TMM contained a chart that showed interest rates of SIB CDs to be vastly higher than those of U.S. bank CDs. Div. Ex. 742 at 9. The TMM stated, "The Bank's assets are invested in a well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." Div. Ex. 742 at 6. It further represented that, generally, asset allocation is kept within the following parameters: cash – 10-20%; fixed income – 0-70% (at least 90% investment grade); equity – 0-50%; precious metals – 0-20%; alternative investments – 0-30%. Div. Ex. 742 at 6. Under the heading "SECURITY," it represented that SIB "invests most of its assets in securities such as bonds and equities that are marketable instruments, negotiable in financial markets and easy to liquidate. . . . [SIB's] liquidity equals security, since it assures that the Bank has the resources to honor withdrawal requests as they appear." Div. Ex. 742 at 11. These representations concerning SIB's portfolio, used in training FAs to sell SIB CDs to customers, were false. Similar false representations, using almost identical language,[15] appear in a version of training material that Young used. Tr. 3181-82; Young Ex. 75 at BEY 003828, 0003831.

---

[13] FAs were encouraged to recommend high concentrations of the SIB CD in clients' portfolios. Div. Ex. 65 at 32. Among the specious rationalizations was the claim that the SIB CD in itself provided diversity because of diversification of assets in SIB's portfolio. Tr. 3830, 3916, 3954-55.

[14] Green had an investment advisory relationship with at least one client. Tr. 1502-04.

[15] "The Bank's assets are invested in a strategically-balanced global portfolio of marketable (publicly traded) financial instruments, namely U.S. and foreign securities (Equities and Debt), commodities, fiduciary placements (Deposits with other banks in US dollars or other currencies) and alternative investments." Young Ex. 75 at BEY 003828. "SECURITY . . . . [SIB] invests most of its assets in securities such as bonds and equities which are marketable instruments, negotiable in financial markets and easy to liquidate. . . . [SIB's] liquidity represents security to the client, since it ensures that the Bank has the resources to honor withdrawal requests as they appear." Young Ex. 75 at BEY 0003831.

APP. 008

Green created his own training presentation that he used instead of the TMM.[16] Tr. 3762-66. Bogar saw Green's presentation. Tr. 3087-88. Presentations Green used in 2006, 2007, and 2008 described the portfolio as "Predominantly marketable securities." Tr. 3775-80; Div. Ex. 65 at 29; Green Ex. 260, Green Ex. 261 at 31, Green Ex. 267, Green Ex. 268 at 29. Likewise, a presentation he made in 2004[17] listed under "Factors Mitigating SIB Credit Risk: . . . Marketability: Predominantly marketable securities in portfolio." Green Ex. 250 at DS 00130. The so-called Hollier presentation Green made in December 2004 or January 2005 contained the same representation. Tr. 3768-70; Green Ex. 254 at 24.

The above representations about SIB's portfolio, furnished or relayed to investors, were clearly false. None of the three Respondents questioned them at the time, and each was aghast on learning the truth in February 2009. Tr. 2820-24 (Bogar), 3238-49 (Young), 3697-700, 3742-47, 3906-07, 3916-17 (Green). Each, however, knew, throughout the time of his involvement in the events at issue, that he did not know, and no one at SGC knew, what was in SIB's portfolio.[18] Tr. 2626-27, 2646, 2656, 2658, 2883 (Bogar), 3406 (Young), 3759-60 (Green). In fact, it was widely known at SGC, including by each Respondent, that SIB affirmatively denied transparency into its portfolio on the basis of a purported Antiguan privacy law. Tr. 321-22, 2267-68, 2458, 2626, 2646, 2656, 2879-80, 2883, 2960-61, 2984, 3214, 3222, 3331-32, 3881. "[I]t was always a touchy subject." Tr. 2656 (Bogar). The disclosure statement did not disclose this, as each Respondent knew. Tr. 2885-86, 3414, 3980. An additional reason, which was given by Holt to Green and which Bogar, Young, and others had heard, was that the portfolio was traded on the basis of a proprietary system that would lose its advantage if divulged, as it might be copied by other firms. Tr. 2267, 2738, 3016, 3759, 3965-67. Neither Green nor Young ever asked whether it might be possible to enter into a confidentiality agreement that would protect the proprietary strategy. Tr. 3492-93, 3967-68. At any rate, the alleged prohibition in Antiguan law on divulging the portfolio is inconsistent with its purportedly being managed by Holt and the Memphis group.

In addition to what they knew that they did not know, Bogar and Young knew that SIB's portfolio included illiquid private equity holdings valued at hundreds of millions of dollars. SIB's portfolio contained such illiquid private equity by 2007. Tr. 2479-86; Div. Exs. 1, 2. Bogar was vague about when he specifically knew that SIB had private equity in its portfolio. Tr. 2582-85, 2901. Young was aware that SIB had private equity in its portfolio by at least October 2007. Tr. 672-73, 3471-88; Div. Exs. 398, 439, 476, 503, 530.

---

[16] Green was aware of the TMM and knew it was available to FAs on the firm's intranet. Tr. 3942-50.

[17] Green started training FAs in 2004. Tr. 3764-70. Green's presentation concerned marketing, and he was followed by Young or another person who conducted compliance training. Tr. 3810.

[18] In lieu of transparency into SIB's portfolio, Bogar believed in SIB, Allen Stanford, Davis, and Holt, as well as Antiguan regulator Leroy King. Tr. 2842, 2961, 3078. The source of Bogar's information on SIB's portfolio was Davis and Holt. Tr. 3090. Young also received information on SIB's portfolio from Davis and Holt. Tr. 3268-73.

9

## 2. Insurance

While a conventional U.S. bank CD is covered by FDIC insurance, there was no insurance protecting the SIB CD investor, as each Respondent knew.  Tr. 2794, 3407, 3815.  Instead of explicitly saying just that and no more, SIB's disclosures discussed the insurance SIB <u>did</u> have, using representations under the heading "Depositor Security" that were literally true but misleading.

SIB's disclosure statement stated:

> The Insurance coverage held by SIBL includes Property and Casualty, Exporter's Package, Vehicle, Worker's Compensation and Travel.  Fidelity coverages include Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages.  We also maintain Depository Insolvency insurance.  We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks.  The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds.  This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.

Div. Ex. 644 at 10.  The last sentence refers to "[t]he latter insurance," that is, "Depository Insolvency insurance," and not to the numerous other kinds of insurance that are listed.

Under the heading "Depositor Security," SIB's brochures represented:  "Insurance. Stanford International Bank maintains a comprehensive insurance program with the following coverages: · A depository insolvency policy insuring funds held in correspondent financial institutions · A bankers' blanket bond · A directors' and officers' liability policy."  Div. Ex. 607 at 7, Div. Ex. 608 at 7, Div. Ex. 611 at 7.

Under the heading "SECURITY," the TMM, stated: "Since Stanford International Bank is not a U.S. bank, it is not covered by FDIC insurance.  However, the FDIC provides relatively weak protection:  first, it covers only up to $100,000 per client/account; second, the FDIC reserve fund covers only a minor portion of the deposits of all the banks that are insured; and third, it does not make any bank safer, nor does it prevent the failure of any bank."  Div. Ex. 742 at 12.  The TMM went on to say that SIB's funds "are protected by a comprehensive insurance program which provides various coverages, including: (1) Depository insolvency policy insuring SIB's funds held in correspondent banks, including excess FDIC coverage in the case of US Banks.  This policy is issued by Brit Insurance Ltd. and is rated by A.M. BEST Rating "A" (Excellent) and Fitch Rating of A+ (strong). . . . (2) A Bankers Blanket Bond with Lloyds of London rated by A.M. Best Rating "A" (Excellent).  (3) Directors and Officers Insurance with Lloyds of London rated by A.M. Best Rating "A" (Excellent)."  Div. Ex. 742 at 12.  At least one worried investor was shown a photocopy of this page in the fall of 2008, understood it to mean that SIB's insurance was better than FDIC, was reassured that his investment was safe, and did not redeem his SIB CDs.  Tr. 1134-37; Div. Ex. 777.

Young's version of the training material contained similar representations under the heading "SECURITY"; however, it omitted language denigrating the FDIC and added language describing the Bankers Blanket Bond as "Operational fraud coverage" and Directors and Officers Insurance as "Protect against liability arising from errors or wrongful acts." Young Ex. 75 at BEY 0003832.

Green was confident that anyone who gave the compliance presentations following his marketing presentations stressed that there was no insurance that protected investors. Tr. 3813-17. He denies ever seeing page eight of the TMM (Div. Ex. 742 at 12) concerning insurance. Tr. 3762-63. However, presentations he used in 2006, 2007, and 2008 stated "Insured by • Lloyds of London · Directors and Officers: √ Covers Liability & Claims against directors or officers · Bankers Blanket Bond: √ covers fraud • Great American Insurance Co: · bank failure: √ covers SIB funds held at international correspondents or financial institutions which do not have FDIC Insurance." Tr. 3775-80; Div. Ex. 65 at 27; Green Ex. 260, Green Ex. 261 at 29, Green Ex. 267, Green Ex. 268 at 27. Likewise, a presentation he made in 2004 listed under "Factors Mitigating SIB Credit Risk: . . . Insurers 1. Banker's Blanket Bond 2. Directors and Officers Insurance 3. Excess FDIC Insurance." Green Ex. 250 at DS 00130. The Hollier presentation contained the same representations. Tr. 3768-70; Green Ex. 254 at 26. However, in the training sessions Green orally stressed that the insurance does not provide depositor insurance. Tr. 2262-64, 3797, 3816.

Green testified that he told clients to whom he sold the SIB CD that there was no insurance that protected their investments. Tr. 3816-17, 3922, 3933. The testimony of Green clients Cynthia Dore, James Harold Stegall, Robert Smith, and Peter Thevenot is inconsistent on this point. Tr. 1407, 1412, 1487-88, 1494-95, 1499, 1559-60, 1592, 2699. In light of this and the Division's burden of proof, it is found that Green did not tell clients to whom he sold the SIB CD that their investment was insured.

On December 16, 2008, Green sent the MDs an email responding to concerns of FAs and MDs prompted by the Madoff fraud that had just come to light; he suggested talking points to reassure clients. Div. Ex. 118. Green said, "I am comfortable reminding you of a few points from our training presentations that speak to the security and supervision of client deposits at SIBL." Div. Ex. 118 at 1. He then listed "some of the things that come to my mind in noting the safety and security of deposits held by SIBL," including "Has Directors and Officers Liability Insurance and a Bankers' Blanket Bond through Lloyd's of London" and "Has bank failure insurance for deposits held at other institutions through Great American Insurance Company." Div. Ex. 118 at 2.

Bogar "believed" that everyone associated with the Stanford companies knew the SIB CD had no deposit insurance and presented it as "not FDIC insured." Tr. 2794-95. Yet, to the extent that any marketing or disclosure document states that there is no insurance that protects the client, it is buried in language such as "comprehensive insurance program," "depository insolvency policy," "excess FDIC" insurance, "bankers' blanket bond," and the like. There was no reason to discuss such insurance except to mislead investors into thinking they were protected.[19]   Indeed, as

---

[19] Young and Green opined that the descriptions of insurance were not intended to describe insurance coverage but rather to indicate additional oversight in that the insurance companies would conduct risk assessments of SIB. Tr. 2264, 3426-27, 3744, 3815-16, 3971. This interpretation of the language describing insurance coverage is strained and is rejected.

11

Respondents knew, SGC's FAs were confused on the question of insurance. In April 2008, all three Respondents were part of an email chain originating from an FA whose potential $5 to $10 million client was "requesting a little detail on the insurance coverage that is referenced in the annual report and disclosure documents." Div. Ex. 438. In June 2008, Young forwarded to Green for reply an FA's question as to whether the Lloyd's of London insurance policy is for SIB's deposits in other institutions or for SIB itself. Div. Ex. 448. On February 14, 2009, an FA asked Young for detail on the Lloyd's of London Blanket Bond as clients were asking about it. Div. Ex. 552. On February 16, 2009, Young sent an email that was copied to Bogar and Green stating that he had had "numerous requests from FA's regarding insurance coverage at SIB."[20] Div. Ex. 562. On February 19, 2009, after SIB's operations were halted, an FA queried FA Chuck Vollmer indicating his belief that there was fraud insurance related to the SIB CDs, and Vollmer replied, "If such policies exist is a question we are all asking. They certainly did in all literature and materials including annual reports that we were given and were reiterated to us by our compliance department just 3 weeks ago." Div. Ex. 368.

### D. Clearing Firm Cuts Off Involvement in SIB CD Transactions

As an "introducing broker" that was not self-clearing, SGC relied on a clearing broker, such as Pershing LLC (Pershing), to execute its transactions, have custody of client assets, send out confirmations and customer account statements, and account for customer payables and receivables. Tr. 3099. Pershing and SGC entered a clearing agreement in December 2005. Tr. 800-01, 804, 918. Prior to entering a clearing relationship, Pershing undertakes a due diligence investigation of the broker-dealer, including its business model, client base, type of investments, transactional volume, its financial position, its management, any specific needs related to custody of the assets, and any other information that might be relevant. Tr. 802-03. Pershing began this process as to SGC in May 2005. Tr. 803. Pershing was not provided with information on the portfolio of SGC's affiliate, SIB, except for a representation as to the general allocation of its assets. Tr. 805-06.

The clearing agreement became operational in early 2006 and was fully implemented in late November 2006. Tr. 807, 1017. Pershing did not provide custody of SGC customers' SIB CD assets. Tr. 808. Initially it processed wire transfers from client accounts held at Pershing for the purchase of the SIB CD. Tr. 918. By the middle of 2006, Pershing became concerned about the financial reliance of SGC on SIB because SGC was losing money and a significant portion of its revenue consisted of referral payments from SIB. Tr. 809, 919. In late summer 2006, Pershing personnel, including John Ward (Ward), a relationship manager on the SGC account, had a telephone conference with SGC personnel, including Holt and Bogar. Tr. 811-12. Ward asked for verification of SIB's assets and the returns the SIB portfolio generated, but Holt responded with generalities about investment policy. Tr. 811-12. Pershing continued to try to obtain the information, including at a meeting in Miami on June 6, 2007. Tr. 813-15; Div. Ex. 230. The

---

[20] Young attached a letter, which tracked the representations in the TMM, to be sent to FAs "to help them educate their clients." Div. Ex. 223. He was denied permission to use the letter and was told that "legal" removed the TMM from SGC's intranet to avoid lawsuits against FAs for disseminating incorrect interpretation of coverage. Div. Ex. 562.

following day, Ward advised Bogar, "we need to go deeper into the plan for SGC, its reliance upon the referal [sic] fees generated from SIBL, and the ability of SIBL to continue generating returns to pay these referal [sic] fees. This understanding would include the portfolio investment policy and construct of the portfolios." Tr. 814-15; Div. Ex. 230. After some internal discussion and meetings with SGC, in June 2007, Edward Zelezen (Zelezen), a member of the relationship management team subordinate to Ward, asked Young for the SIB CD prospectus. Tr. 919-21, 939-49, 984-85; Div. Ex. 376. On receipt of the SIB CD disclosure document and subscription agreement, Pershing's chief credit risk officer emailed Young: "I was also looking for a list of the underlying investments and where they are held . . . . I would usually see that in the prospectus." Tr. 920-22; Div. Ex. 377.

On August 8, 2007, Ward and others met with Bogar and Davis in Davis's office. Tr. 816-20; Div. Ex. 240; Bogar Ex. 124. Davis became agitated when asked to provide information concerning SIB but ultimately, albeit grudgingly, agreed to provide the information, or possibly as an alternative, a financial statement of Allen Stanford. Tr. 818-19, 2494-95. Ward followed up with an August 27, 2007, email to Bogar listing the agreed-on information to be provided, including identifying the external managers of SIB's portfolio, statements from custodian[s] reflecting asset totals, and Allen Stanford's financial statement. Tr. 820-22; Div. Ex. 255. None of these three items was ever provided. Tr. 822.

Ward and others then traveled to Antigua, expecting to meet with SIB personnel and SIB's regulator, the Financial Services Regulatory Commission (FSRC), and to see documentation regarding SIB's balance sheet and the supporting paperwork that reflected the assets, as Bogar was informed in a January 8, 2008, email. Tr. 823-26; Div. Ex. 269. At a meeting with SIB, at which Bogar was present, SIB stated that Antiguan bank secrecy law would not allow Pershing and SGC to see work papers that would divulge SIB's portfolio. Tr. 828-29. Pershing's general counsel, Tres Arnett (Arnett), challenged this, pointing out that bank secrecy laws are intended to protect customers, not a bank's assets. Tr. 826, 829, 2943-44. In a subsequent meeting with the FSRC, at which Bogar was present, Arnett challenged the FSRC's head, Leroy King (King), concerning the unusual bank secrecy issue, but King refused to provide information on the bank's portfolio. Tr. 832-33, 2944. In sum, Pershing did not obtain the information that was expected to result from the trip to Antigua. Tr. 830, 834.

Pershing had another meeting with Davis and Bogar in March 2008, and, again, Davis became agitated when asked for transparency into SIB's portfolio. Tr. 835-36, 2670, 2711. Eventually, Pershing agreed to accept "a certification by a U.S. domiciled recognized accounting firm that they have conducted a review of the bank's assets and that in their professional opinion they are reflected accurately in the bank's balance sheet." Tr. 837-40, 2457-58; Div. Ex. 274. SGC was to select the accounting firm, and, after its first choice declined the engagement, scheduled a meeting with Grant Thornton on July 29, 2008. Tr. 842-45, 2459-60; Div. Ex. 298. After a lack of progress, on November 24, 2008, Ward advised Bogar that Pershing must have confirmation by December 1, 2008, of the date when Grant Thornton's review would be completed. Tr. 850-52; Div. Ex. 342. Bogar responded that SGC senior management was "focused on some other pressing issues." Tr. 853; Div. Ex. 344. Pershing's attempt to verify SIB's assets failed. Tr. 922-25.

13

Ward's point of contact during the two and a half year attempt to verify SIB's assets was Bogar. Tr. 809-53, 857. At the time, Ward considered that Bogar was making good faith efforts to respond to requests for information and was not attempting to withhold information or obfuscate. Tr. 857. However, he was unaware that, on August 28, 2007, Bogar had told Davis of his plan not to give Pershing the items that had been agreed on in the August 8, 2007, meeting, and that, on June 12, 2008, Davis had told Bogar not to comply with Pershing's request.[21] Tr. 899-903; Div. Exs. 256, 288.

Ultimately, in December 2008, Pershing notified SGC that it would no longer process customer wire transfers to SIB. Tr. 854, 926. Pershing continued to serve as SGC's clearing firm. Tr. 927. The reason for discontinuing the wire transfers was that SGC and SIB would not disclose the portfolio information that Pershing had been requesting for two and a half years. Tr. 897-98. This made the purchase of the SIB CD more burdensome to FAs and customers.[22] Tr. 2773, 2976. Thus, it was necessary to provide an explanation for the new complication. Tr. 2980-81; Div. Ex. 354. A December 21, 2008, email that Green drafted and sent to the MDs, and Bogar sent to his direct reports, including Young, blamed the discontinuance on a disagreement on tax reporting and Pershing's using this as leverage in negotiations on pricing in the clearing agreement.[23] Div. Exs. 355, 356. However, there was never any issue related to tax reporting.[24] Tr. 854, 927-28. Bogar acknowledged that the real issue was transparency but did not provide a convincing explanation for omitting this from the email.[25] Tr. 2984-88. Likewise, Green was aware of Pershing's concern about the lack of transparency into SIB's portfolio. Tr. 4031-33; Div. Ex. 798. He also did not provide a convincing explanation for omitting this from the email. Tr. 4059-63. Green also claimed that another reason that Pershing discontinued involvement in SIB CD purchases was that its parent,

[21] Bogar claims that he never understood that Davis was not going to supply the information that Pershing sought. Tr. 2661-62. This claim is inconsistent with the plain meaning of the June 12, 2008, email exchange in which Bogar asks, "I have got to know today if we are going to try to comply with Pershing's request. YES or NO will do." Davis replies, succinctly, "no." Div. Ex. 288. Bogar attempted to explain this by saying the "no" refers to the "scope of work," which is a tautology.

[22] SGC tried to evade Pershing's decision by laundering the wires through an affiliate, but Pershing recognized the evasion and advised that any disbursements for investments not carried at Pershing would be assumed to be for SIB unless supporting documentation showed otherwise. Tr. 2977-80; Div. Ex. 360.

[23] In 2008, SGC sought to renegotiate pricing of certain services Pershing provided. Tr. 960, 2721, 2724-25.

[24] Tax reporting of customers' SIB CDs was questioned by a different organization, Fidelity. Tr. 3885-86. SGC had discussed the possibility of Fidelity serving as its clearing broker in case Pershing withdrew. Tr. 2719-20, 2966.

[25] Essentially, Bogar asserted, it was unnecessary to mention transparency because everyone knew there was no transparency. Tr. 2984.

14

the Bank of New York, had been sued by Russia for money laundering. Tr. 2372, 3883-84, 4032; Green Ex. 298.

Bogar, Green, and Young agreed on the need for SGC people to be "all on the same page" regarding the Pershing decision not to wire to SIB – the "same page" explanation was Pershing's alleged concern over tax reporting and its allegedly trying to use the issue as leverage to avoid renegotiating lower fees for clearing. Div. Exs. 355, 356.

### E. Additional Red Flags

In combination with the stonewalling concerning SIB's portfolio, there were additional occurrences that should have caused Respondents to question the legitimacy of SIB and the SIB CD. There were communications from clients or potential clients concerning Allen Stanford's outsize influence over and involvement in corruption in Antigua and whether the SIB CDs were a Ponzi scheme: In February 2007, Young and Green were made aware of concerns of SGC clients Billy Hall and Electri International of corruption in Antigua, undue influence of Allen Stanford, an unsustainable business model of SIB suggestive of a Ponzi scheme, and that, at a minimum, the SIB CDs were junk bonds. Div. Exs. 71, 72, 74, 75, 653, 663. Rather than investigate the possible truthfulness of these charges,[26] Green commented about Billy Hall to Young and others, "I assume we may want to attack this one similar to the last one, with the talking points, etc." Tr. 3458-66; Div. Ex. 72 at 1, Div. Ex. 653 at 4, Div. Ex. 663 at 3. The talking points included in the approved responses that FAs sent to these clients included reassurances about Allen Stanford, SIB's soundness and its regulatory environment, representations (that as found above could not be verified) concerning SIB's portfolio and a (misleading) statement that "There are insurance policies in place to indemnify in case of fraud and/or embezzlement." Div. Ex. 77 at 8, Div. Ex. 79 at 4, Div. Ex. 658 at 3, Div. Ex. 660 at 5.

An FA, who was trying to sell the SIB CD to a wealthy prospect in May 2008, informed Green that the prospect, a CPA, did not recognize the auditor's name and was surprised that SIB did not retain a Big 4 auditor. Div. Ex. 95. In December 2008, post-Madoff, Green received an email from a CPA who was advising a prospect; the CPA was concerned that the auditor "is unknown to me. [SIB] shows consistent growth in assets and remarkably steady financial performance. How do I know that it is real?" Div. Ex. 120. Previously, in 2006, an FA informed Green that he had asked SIB what other companies Hewlett audited and was told that the names of those companies are not public. Tr. 4022-23; Div. Ex. 50.

Concerning news stories about corruption in Antigua and undue influence of Allen Stanford, each Respondent was either unaware of them or considered that there were two sides to such stories

---

[26] Green and Young opined that the sources of the complaints might have hoped to replace SGC as the clients' financial advisors. Tr. 3622-23, 3852-53. Also, three years previously, in 2004, SGC had won an NASD arbitration in which it claimed that a former employee failed to repay debit balances on employment promissory notes and the former employee counterclaimed that SGC was operating a Ponzi scheme and that she was fired because of her reluctance to push SIB products on her clients. Tr. 3629-30; Green Ex. 230.

15

and that it was unnecessary to investigate further. Tr. 2768-70 (Bogar), 3335-42, 3610-28 (Young), 3852-53 (Green). Additionally, Young and Green pointed to evidence that Antigua's climate of corruption had improved. Tr. 3307-08, 3709, 3722; Green Ex. 89.

Snyder Kearney LLC (Snyder Kearney) performs due diligence for broker-dealers and investment advisers. Tr. 1248-49. SGC engaged the firm in June or July 2008 to review two private fund offerings, which were to be sponsored by SGC and managed by an SGC affiliate, Stanford Capital Management. Tr. 1250-52. In the course of reviewing SGC's financial statements, Snyder Kearney found significant revenue being generated from a related party, SIB. Tr. 1252-53. Snyder Kearney found that SIB's financial statements did not provide much information concerning its investments and sought information that would show that the bank had investments that would support the kinds of returns that were being paid on the SIB CD. Tr. 1254-55. Snyder Kearney requested verification of SIB's portfolio, but never received any information on it or how revenue was generated and how the FAs were compensated. Tr. 1256, 1294-96. Additionally, no one at SGC provided information related to any ongoing investigations of SGC and the SIB CD by the Commission, FINRA, or of the states of Florida and Louisiana. Tr. 1257-59; Div. Ex. 494. Nor did anyone tell the firm that Pershing had been attempting to obtain information about SIB's assets. Tr. 1260-61. Had Snyder Kearney learned that these entities were all attempting without success to verify SIB's assets, it would have caused concern. Tr. 1262. Eventually Snyder Kearney withdrew from the engagement because information it had requested had not been provided, including correspondence with and examinations and investigations by regulatory authorities and information concerning SIB's investments; it so informed Young on December 16, 2008. Tr. 1262-66; Div. Ex. 506. At the hearing, Young tried to explain SGC's failure to supply Snyder Kearney with the information it requested by saying that by the fall of 2008 SGC did not want to bring a new product to market due to financial turmoil. Tr. 3571-72. He did not explain why SGC did not affirmatively inform Snyder Kearney that it was not going forward with the new product and instead waited for the firm to cancel the engagement after its repeated requests to SGC were ignored.

SGC was queried by various regulators concerning the SIB CD. Bogar and Young were aware, contemporaneously, of a November 2006 subpoena from the Commission concerning sales practices of the SIB CD that included a request for SIB's portfolio. Tr. 2795-98, 3119-21. Bogar was also aware of queries in early 2008 from the Louisiana regulator, the Office of Financial Institutions (OFI) and Young's February 14, 2008, response declining to reveal SIB's portfolio. Tr. 2802-04, 3000-01; Div. Exs. 424, 437. Young's response to the OFI stated, "[T]he SIB CDs are offered as a fixed income instrument issued by a bank. They are not marketed based on the underlying investment portfolio."[27] Div. Ex. 424 at 3. All three Respondents were aware of queries from the Florida regulator, the Office of Financial Regulation (OFR), in the summer of 2008. Tr. 2805-06, 3545-47, 4064; Div. Exs. 490, 768. With Bogar's and Green's knowledge, Young planned to send a letter to the clients that OFR had contacted and to call OFR and express outrage that OFR had contacted clients. Tr. 3545-47; Div. Ex. 491. Young was aware that all of the regulators were asking the same question – what is in the SIB portfolio. Tr. 3504-05. In December

---

[27] This statement was unambiguously false; the marketing material boasted of "liquidity as a protective factor for our depositors. The Bank's assets are invested in a well-diversified portfolio of highly marketable securities." Div. Ex. 607 at 5, Div. Ex. 608 at 5, Div. Ex. 611 at 5.

2008, Commission staff interviewed Bogar in conducting an examination of SGC. Tr. 2798-801. There was a FINRA examination at the same time. Tr. 2802, 2808-10. Young was involved in the response to the Commission's December 2008 document request. Tr. 3229-32. In fact, there were about twenty open items of this type from various regulators in that time frame. Tr. 3233-36. Young rationalized that the regulators were overzealous because they did not want to miss the next Madoff situation. Tr. 3506-07. Young was not aware contemporaneously of a December 2008 subpoena for his testimony. Tr. 3237-38.

Green was aware of a Commission investigation or examination related to the SIB CD in 2005. Tr. 3836-37. Green was also aware that, from time to time, clients and FAs asked to verify the assets in SIB's portfolio. Tr. 3334.

## F. SIB Goes Downhill

It was widely known at SGC that SIB had liquidity issues in 2008. Tr. 2479, 2486-87, 2517-19. Bogar was aware of SIB's liquidity problem in the fall of 2008. Tr. 2519. Redemptions of the SIB CD increased. Tr. 3004, 3057-58, 4034-35. Nonetheless, Green sent an email to all MDs and FAs on October 21, 2008, attaching a quarterly report for SIB and saying, "With new capital and lots of liquidity, I'm very optimistic for the future of SIBL." Div. Ex. 108. Green immediately received replies asking where the "new capital" came from. Div. Exs. 751, 752. Green replied that it came from Allen Stanford. Div. Ex. 752. Shortly thereafter, at a meeting that included Bogar and Green, Allen Stanford said that the "new capital" was his cash. Tr. 4038-40. Allen Stanford also proposed more capital for SIB, musing that he might get it from Libya, much to Green's surprise. Tr. 3058, 4040-42. Thereafter, in December, Allen Stanford sent Green a draft of a three-page newsletter. Tr. 4044-45. The newsletter mentioned a capital contribution of $541 million on November 28, 2008. Div. Ex. 121 at 3, Div. Ex. 125 at 4. When Green examined the third page, a financial statement, he noticed that the cash and equivalents line was about $200 million less than the $541 million in cash that Allen Stanford said he put in. Tr. 4045-46. When he asked about the discrepancy, Allen Stanford reacted negatively to being found out and articulated a complicated explanation. Tr. 4046-48. The newsletter, touting SIB's "strong liquidity" and misleading insurance information, was sent out as two pages, without the financial statement. Tr. 4048; Div. Exs. 121, 125. Then, SIB failed to meet its obligation to fund private equity deals, American Leisure and Health System Solutions Inc. Tr. 3005-07; Div. Ex. 336. Toward the end, on December 23, 2008, Bogar approved the drafting of a press release falsely explaining that SIB would not be funding the Health Systems Solutions Inc. deal "because of the last hour due diligence issues." Tr. 3006-08; Div. Ex. 357. In reality, SIB lacked the funds to complete the deal, as Bogar knew. Tr. 3004-07. By January and February, Bogar and others were drawing up plans to cut spending. Tr. 2817, 3040-41, 3044; Green Ex. 301.

SGC also had a product, Stanford Investment Model (SIM), that was supposed to replicate the allocation that SIB was using. Tr. 477, 2748. In late 2008, the SIM product was experiencing significant losses. Tr. 2748-49.

Despite the indications that were becoming evident of SIB's parlous financial situation, Green and Young went on a damage control roadshow to SGC offices during the weeks of January 26 and February 2, 2009, using a presentation titled "To review [SGC's] Due Diligence Process

17

including the regulatory and operational safeguards of [SIB], which ensure the integrity and transparency of [SIB's] operations." Tr. 2310, 2316, 2318, 3318-21, 3323-24, 3597, 3895-97; Div. Exs. 150, 745, Div. Ex. 796 at 3. The presentation touted SIB's "Yearly Audited Financials," the qualifications of "CAS Hewitt," and the rigor of the FSRC's oversight as compared to the FDIC and the Commission. Div. Ex. 796 at 12-14, 17, 20.[28] Green and Young told FAs that SIB was sound. Div. Ex. 150. Young denies that he said SIB was sound but rather that he was informing the FAs of his due diligence process. Tr. 3319-20. However, due diligence was a proxy for actual insight into SIB's portfolio, so Young's message was that SIB was sound. Tr. 2317-18, 2322. Young's message was understood as saying that SIB was sound. Div. Ex. 150. Green talked about cost-cutting measures at SGC that might be taken. Tr. 3896-97; Green Ex. 301. Bogar did not appear at the roadshow meetings. Tr. 2411.

## G. The End

A meeting was convened in Miami during the first week of February 2009. Tr. 2816-17. On Wednesday, February 4, Davis described Tier 1 of SIB's assets, as cash and cash equivalents. Tr. 2820, 3046-47. Holt then described Tier 2, and Bogar realized that Tiers 1 and 2 did not contain enough assets to account for all of SIB's purported assets. Tr. 2820-21, 3047-48. On Thursday, February 5, Tier 3 was revealed as containing some real estate and a loan to Allen Stanford, and Bogar realized Allen Stanford, Davis, and Holt had been lying; he and others became agitated and were asked to leave the meeting. Tr. 2822-24, 3048-50. Bogar emailed Green to stop selling the SIB CD and not to use the disclosure statement until it was modified based on advice of "legal."[29] Tr. 2824-29, 3050, 3898; Div. Ex. 363.

On February 12, Holt admitted to Green that she was not managing the entire SIB portfolio but would not tell him more. Tr. 3906-07. On February 17, Bogar told Green the truth about the portfolio, and Green then held a call with MDs and told them the money was missing. Tr. 3899, 3916-18.

Bogar called Young on the evening of February 5; Young was in a car with Green on the way to another location in the damage control roadshow. Tr. 3239. Bogar told Young that there was a problem with the disclosure statement and sales of the SIB CD must be stopped, but refused to elaborate on the problem, saying he needed to preserve attorney-client privilege. Tr. 3239-40. Young's attempts the following day to obtain more information from others were equally fruitless. Tr. 3240-41. Young called all the offices and required them to return the supplies of offering

---

[28] Young denies that Division Exhibit 796, a PowerPoint that contains various photographs, graphics, bullet points, and a chart, was either displayed to the FAs as a PowerPoint or distributed to them in hard copy; he claims he merely used it as a reference for his oral presentation. Tr. 3318-20, 3597. While this may be a distinction without a difference, Jonathan Batarsch, another participant in the roadshow, recalled the presentation. Tr. 2316.

[29] After the revelation, Bogar consulted attorney Tom Sjoblom, who advised that it was merely a disclosure problem and they drafted the email that was ultimately sent to Green. Tr. 2824-27; Bogar Ex. 357.

18

documents, to ensure that there were no further sales. Tr. 3243. Young learned about the hole in the portfolio on Monday, February 16, 2009. Tr. 3247-48.

Over the next few days Bogar and others discussed self-reporting to the Commission. Tr. 2829-33, 3050-51, 3062; Bogar Ex. 296. Attorney Tom Sjoblom withdrew from representation on February 11, 2009. Tr. 3052; Bogar Ex. 383. After a frenzied search, Bogar found another attorney who agreed to represent SGC, but SGC's funds had been frozen by the time the attorney's retainer was to have been paid. Tr. 2835-38.

Green arranged a conference call held on February 10, 2009, at which Allen Stanford addressed all the FAs and announced that early withdrawals of the SIB CD were stopped. Tr. 2369-70, 3011-12; Div. Exs. 147, 150. FAs had more questions, not fewer, after the call. Div. Ex. 147. An FA in Sarasota emailed Green, Bogar, and others with questions, including: "[Green and Young] were recently in our office discussing the soundness of the bank. Has anything changed that would cause an amendment [of Young's] comments?" Div. Ex. 150. Bogar did not tell the FA or Young of the information that he had learned on February 5 that a large part of SIB's supposed assets was illusory. Tr. 3013. Bogar reasoned it was unnecessary to divulge the new information in that "[W]e had already stopped early withdrawals" and he still hoped that the problem could be fixed. Tr. 3013.

Also on February 10, 2009, Bogar and Green approved "Talking Points" that FAs could use in discussions with clients reacting to the cessation of early withdrawals, including the statement that SIB "remains a strong institution." Div. Exs. 156, 159. The same falsehood appeared in the February 12, 2013, "Compliance Approved Copy for Client Responses" (full paragraphs that could be used in written correspondence), which also blamed negative information in a Business Week article on "three disgruntled ex-employees." Div. Ex. 367. Bogar excused the representation that SIB "remains a strong institution" on the theory that he still believed that Allen Stanford had enough assets to fill the hole in SIB. Tr. 3018-20. On Sunday, February 15, 2009, when sent a proposed press release and being told "We need to release this to the press today," Bogar replied, "I vote to get this out." Div. Ex. 216. The press release, however, contained a number of false statements: "SIB does not make loans" when it had a purported $2 billion loan to Allen Stanford and "SIB remains a strong institution." Div. Ex. 216. The press release blamed negative media coverage of SIB on "two disgruntled employees."[30] Div. Ex. 216. Bogar testified that he agreed to sending the press release out in order to calm Stanford companies' people and believed since it was a Sunday, it would not go out that day, and the next day he was supposed to meet with the new attorney and would be able to stop it. Tr. 3024-26, 3065-66. As far as Bogar knows, the press release was never actually released. Tr. 3060.

---

[30] This refers to Mark Tidwell and Charles Rawl, who were terminated for outside business activities in about January 2008 and owed SGC repayment of loans and threatened to complain to the Commission that SGC violated the securities laws if their loans were not forgiven. Tr. 3635-38; Div. Ex. 293.

19

## H. Respondents' Compensation Related to the SIB CD

The below calculation of Respondents' compensation is based on evidence provided by Karyl Van Tassel (Van Tassel) using available information concerning payments to them. Tr. 138-45, 194-200, 216-20; Div. Demonstrative (Dem.) Ex. 1. Van Tassel is a CPA engaged by the court-appointed receiver in SEC v. Stanford, No. 3-09-cv-0298-N (N.D. Tex. 2009), to provide forensic accounting and cash tracing. Tr. 77-78, 81-82, 154-55; Div. Ex. 746 at 107, 138.

Between January 15, 2005, and December 31, 2007, Green received total compensation relating to the SIB CD of $2,613,506.47. Tr. 138, 143-45; Div. Dem. Ex. 1. This amount consists of commissions, quarterly bonuses, and MD quarterly compensation of $554,929.35, $38,648.33, and $2,019,928.79, respectively.[31] Div. Dem. Ex. 1. After Green's Superstars team met annual goals in 2004, 2005, and 2006, a $3 million bonus offered to Green by Allen Stanford was paid directly to charity, at Green's request. Tr. 3878-80.

Unlike for Green, information available for Bogar and Young is not limited to compensation related to the SIB CD. Tr. 200-01. Also information concerning payments prior to 2006 is not available. Tr. 140-41; Div. Dem. Ex. 1. SGC's total revenue for the period 2006 through 2008 was $621,717,361 and SGC's total SIB CD related revenue for that same period was $344,332,878.[32] Tr. 108-09; Div. Ex. 707. Accordingly, SIB CD related revenue represents 55.38% of SGC's total revenue for the period 2006 through 2008.[33] Div. Ex. 707.

Between September 15, 2006, and February 13, 2009, Bogar received total payroll compensation of $2,808,750.[34] Tr. 139-40; Div. Dem. Ex. 1. This amount consists of regular pay, quarterly bonus, and semi-annual bonus in the amounts of $1,843,750, $465,000, and $500,000, respectively. Tr. 139-40; Div. Dem. Ex. 1. Additionally, between March 24, 2006, and February 6, 2009, Bogar received $276,846.74 in payments made to him outside of payroll compensation as reflected in SGC's Oracle Financial (Oracle), a financial management system. Tr. 139, 217; Div. Dem. Ex. 1.

---

[31] Green's MD quarterly compensation was based on the performance of the office he oversaw as an MD. Tr. 144.

[32] SGC total revenue is the sum of column A for the years 2006, 2007, and 2008 of Div. Ex. 707. The total SIB CD related revenue is the sum of columns B, C, and D of Div. Ex. 707 for the years 2006, 2007, and 2008.

[33] SIB CD revenue represented 57.77% of SGC's total revenue; however, this percentage includes revenue for years 2004 and 2005, for which there is no compensation information for Bogar and Young. Tr. 108-09; Div. Ex. 707.

[34] Using the 55.38% ratio of SGC's SIB CD related revenue to total revenue, Young received $591,992.46 in SIB CD related compensation.

Between July 6, 2006, and March 31, 2009, Young received total payroll compensation of $1,068,964.36.[35] Tr. 142-43; Div. Dem. Ex. 1. This amount consists of regular pay, quarterly bonus, relocation bonus, retroactive pay, vacation pay, semi-annual bonus, and an upfront loan in the amounts of $793,269.01, $135,000, $5,310.85, $12,500, $2,884.50, $45,000, and $75,000, respectively.[36] Tr. 142-43; Div. Dem. Ex. 1. Additionally, between May 5, 2006, and February 3, 2009, Young received $202,219.24 in payments made to him outside of payroll compensation as reflected in Oracle. Tr. 143; Div. Dem. Ex. 1.

The Oracle payments received by Bogar and Young were made through accounts payable rather than payroll. Tr. 217. In light of the evidence of record, it is found that they were reimbursement of expenses, such as travel expenses, and not compensation. Tr. 217-18, 3126-28.

## I. Expert Testimony[37]

Doug Henderson testified for the Division. Tr. 1603-2159; Div. Ex. 746. He is currently associated with KPMG in its securities regulatory practice and has an extensive background in the securities industry, including many years with the NASD. Tr. 1768, 1775-80; Div. Ex. 746 at 1, 36. He was accepted as an expert on industry standards and Respondents compliance with the standards. Tr. 1637. He opined that SGC fell short of industry standards in that it failed to perform adequate due diligence on the SIB CD, used unsubstantiated and misleading information in training FAs and marketing the SIB CD, had distorted sales incentives, and had incomplete disclosures. Div. Ex. 746. He further opined that each Respondent participated in one or more of these shortfalls. Div. Ex. 746.

Patricia Ross testified for Respondents. Tr. 4086-4302. She has an extensive background in the securities industry, including as a registered representative and principal at broker-dealers and as chief compliance officer of the firm then known as Wells Fargo Securities. Tr. 4089-4101. She was accepted as an expert in the topics on which she opined. Tr. 4102. She opined that Bogar appropriately delegated compliance responsibilities concerning due diligence and training to Young, to be kept in the loop on an exception basis, appropriately relied on the Stanford companies' inside and outside lawyers to prepare disclosure documents. Tr. 4110-11, 4117-18, 4123-25. She opined that Young had no duty to audit the auditor. Tr. 4174-75. She opined that Green appropriately relied on SGC's legal and compliance departments to determine the adequacy of disclosure and on their advice that Antiguan law prohibited disclosure of SIB's portfolio and on the Memphis group's stated goal of protecting its proprietary trading strategy as

---

[35] Using the 55.38% ratio of SGC's SIB CD related revenue to total revenue, Bogar received $1,555,485.75 in SIB CD related compensation.

[36] The relocation bonus relates to a move made by Young; payment was received in December 2006. Tr. 141. The retroactive pay relates to work performed prior to the receivership but paid after the receivership and the semi-annual bonus relates to a bonus program. Tr. 141-42, 216-18.

[37] To the extent that the experts' evidence does not lead to findings of fact, it will be summarized here and referred to as appropriate in the Conclusions of Law section of this Initial Decision.

21

an additional basis for the lack of transparency. Tr. 4179, 4181, 4194. She opined that Green did not have any duty to perform due diligence on the SIB CD. Tr. 4208-09.

## III. CONCLUSIONS OF LAW

The OIP charges that Respondents willfully violated Section 17(a) of the Securities Act and willfully violated and/or willfully aided and abetted and caused SIB's and SGC's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Additionally, it charges that Respondents willfully aided and abetted and caused SGC's violations of Section 15(c)(1) of the Exchange Act and of Sections 206(1) and 206(2) of the Advisers Act. As discussed below, it is concluded that each Respondent willfully violated Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5. Additionally, each was secondarily liable for SIB's and SGC's violations.

### A. Antifraud Provisions

The violations charged are of the antifraud provisions of the Securities, Exchange, and Advisers Acts – Section 17(a) of the Securities Act, Sections 10(b) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act – which prohibit essentially the same type of conduct. United States v. Naftalin, 441 U.S. 768, 773 n.4, 778 (1979); SEC v. Pimco Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 469 (S.D.N.Y. 2004).

Section 17(a) of the Securities Act makes it unlawful "in the offer or sale of" securities, by jurisdictional means, to:

1) employ any device, scheme, or artifice to defraud;

2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statement made not misleading; or

3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Similar proscriptions are contained in Exchange Act Sections 10(b) and 15(c)(1) and Rule 10b-5 and in Advisers Act Sections 206(1) and 206(2).

Scienter is required to establish violations of Securities Act Section 17(a)(1), Exchange Act Sections 10(b) and 15(c)(1) and Rule 10b-5, and Advisers Act Section 206(1). Aaron v. SEC, 446 U.S. 680, 690-91, 695-97 (1980); SEC v. Steadman, 967 F.2d 636, 641 & n.3 (D.C. Cir. 1992); Darvin v. Bache Halsey Stuart Shields, Inc., 479 F. Supp. 460, 464 (S.D.N.Y. 1979). It is "a mental state embracing intent to deceive, manipulate, or defraud." Aaron, 446 U.S. at 686 n.5; Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976); SEC v. Steadman, 967 F.2d at 641. Recklessness can satisfy the scienter requirement. See David Disner, 52 S.E.C. 1217, 1222 & n.20 (1997); SEC v. Steadman, 967 F.2d at 641-42; Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990). Reckless conduct is "conduct which is 'highly

22

unreasonable' and represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978) (quoting Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977)).

Scienter is not required to establish a violation of Securities Act Section 17(a)(2) or 17(a)(3) or of Advisers Act Section 206(2); a showing of negligence is adequate. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963); SEC v. Steadman, 967 F.2d at 643 & n.5; Steadman v. SEC, 603 F.2d 1126, 1132-34 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981). Negligence is the failure to exercise reasonable care. IFG Network Sec., Inc., Exchange Act Release No. 54127 (July 11, 2006), 88 SEC Docket 1374, 1389.

Material misrepresentations and omissions violate Securities Act Section 17(a), Exchange Act Sections 10(b) and 15(c)(1) and Rule 10b-5, and Advisers Act Sections 206(1) and 206(2). The standard of materiality is whether or not a reasonable investor or prospective investor would have considered the information important in deciding whether or not to invest. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 240 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); SEC v. Steadman, 967 F.2d at 643.

## 1. Respondents Are Fiduciaries

SGC was a dually registered broker-dealer and investment adviser, and Respondents were associated persons of an investment adviser. See Advisers Act Sections 202(a)(17), 203(f). Investment advisers and their associated persons are fiduciaries. Fundamental Portfolio Advisors, Inc., 56 S.E.C. 651, 684 (2003); see Capital Gains Research Bureau, Inc., 375 U.S. at 191-92, 194, 201; see also Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979). As fiduciaries, they are required "to act for the benefit of their clients, . . . to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." SEC v. DiBella, No. 3:04-cv-1342 (EBB), 2007 WL 2904211, at *12 (D. Conn. Oct. 3, 2007) (quoting SEC v. Moran, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996)), aff'd, 587 F.3d 553 (2d Cir. 2009); see also Capital Gains Research Bureau, Inc., 375 U.S. at 194 ("Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients." (footnotes omitted)). "[W]hat is required is '. . . not simply truth in the statements volunteered but disclosure' [of material facts]." Capital Gains Research Bureau, Inc., 375 U.S. at 201. "The law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011), rev'd on other grounds, 133 S. Ct. 1216 (2013).

## 2. Aiding and Abetting; Causing

The OIP charges that Respondents "aided and abetted" and "caused" violations by SGC and SIB of various provisions. For "aiding and abetting" liability under the federal securities laws, three elements must be established: (1) a primary or independent securities law violation committed by another party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an

23

overall activity that was improper; and (3) that the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation. See Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000); Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1009 (11th Cir. 1985); Investors Research Corp. v. SEC, 628 F.2d 168, 178 (D.C. Cir. 1980); IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980); Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94-97 (5th Cir. 1975); SEC v. Coffey, 493 F.2d 1304, 1316-17 (6th Cir. 1974); Russo Sec. Inc., 53 S.E.C. 271, 278 & n.16 (1997); Donald T. Sheldon, 51 S.E.C. 59, 66 (1992), aff'd, 45 F.3d 1515 (11th Cir. 1995); William R. Carter, 47 S.E.C. 471, 502-03 (1981). A person cannot escape aiding and abetting liability by claiming ignorance of the securities laws. See Sharon M. Graham, 53 S.E.C. 1072, 1084 n.33 (1998), aff'd, 222 F.3d 994 (D.C. Cir. 2000). The knowledge or awareness requirement can be satisfied by recklessness when the alleged aider and abettor is a fiduciary or active participant. See Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990); Cornfeld, 619 F.2d at 923, 925; Rolf, 570 F.2d at 47-48; Woodward, 522 F.2d at 97. That is, it must be established that a respondent either acted with knowledge or that he "encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violator," or there was a danger so obvious that he must have been aware of it. Howard v. SEC, 376 F.3d 1136, 1143 (D.C. Cir. 2004).

For "causing" liability, three elements must be established: (1) a primary violation; (2) an act or omission by the respondent that was a cause of the violation; and (3) the respondent knew, or should have known, that his conduct would contribute to the violation. Robert M. Fuller, 56 S.E.C. 976, 984 (2003), petition for review denied, 95 F. App'x 361 (D.C. Cir. 2004). A respondent who aids and abets a violation also is a cause of the violation under the federal securities laws. See Graham, 53 S.E.C. at 1085 n.35. Negligence is sufficient to establish liability for causing a primary violation that does not require scienter. See KPMG Peat Marwick LLP, 54 S.E.C. 1135, 1175 (2001), recon. denied, 55 S.E.C. 1 (2001), petition for review denied, 289 F.3d 109 (D.C. Cir. 2002), reh'g en banc denied, 2002 U.S. App. Lexis 14543 (D.C. Cir. 2002).

## 3. Willfulness

In addition to requesting a cease-and-desist order, as authorized by Sections 8A of the Securities Act, 21C(a) of the Exchange Act, and 203(k) of the Advisers Act and disgorgement, as authorized by Sections 8A(e) of the Securities Act, 21C(e) of the Exchange Act, and 203(j) of the Advisers Act, the Division requests sanctions pursuant to Sections 15(b) and 21B of the Exchange Act, 203(f) and 203(i) of the Advisers Act, and 9(b) and 9(d) of the Investment Company Act. Willful violations by Respondents must be found in order to impose sanctions on them pursuant to Sections 15(b) and 21B of the Exchange Act, 203(f) and 203(i) of the Advisers Act, and 9(b) and 9(d) of the Investment Company Act. A finding of willfulness does not require an intent to violate, but merely an intent to do the act which constitutes a violation. See Wonsover v. SEC, 205 F.3d 408, 413-15 (D.C. Cir. 2000); Steadman v. SEC, 603 F.2d at 1135; Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1976); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).

24

## B. Antifraud Violations

### 1. Primary Violations

Each Respondent violated Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 more than once through a material misrepresentation or omission. In February 2007, Young and Green were made aware of concerns of clients or potential clients of corruption in Antigua, undue influence of Allen Stanford, an unsustainable model of SIB suggestive of a Ponzi scheme, and that the SIB CDs were junk bonds. Rather than investigate the possible truthfulness of these charges, they decided that SGC should "attack" with talking points used previously. The approved responses that FAs sent to the clients included representations about SIB's portfolio that could not be verified and the misleading statement that "There are insurance policies in place to indemnify in case of fraud and/or embezzlement." These statements were clearly material and made with at least a reckless degree of scienter.

During the fall of 2008, each Respondent knew that SIB had a liquidity problem, and each was complicit in material misrepresentations and omissions designed to lull customers so as to forestall redemptions and continue sales of the SIB CD. On December 16, 2008, Green sent the MDs an email responding to concerns of FAs and MDs prompted by the Madoff fraud and suggesting talking points to reassure clients concerning "the safety and security of deposits." These included "Directors and Officers Liability Insurance and a Bankers' Blanket Bond [and] bank failure insurance." These insurance coverages were, of course, not insuring "security of deposits," yet Green was urging MDs and FAs to mention them when trying to persuade clients not to redeem their SIB CDs or when selling new SIB CDs. This misleading statement was clearly material and made with at least a reckless degree of scienter.

On December 21-22, 2008, all three Respondents agreed on an email sent to all MDs that gave a false reason for Pershing's decision to discontinue wiring funds to SIB so as to conceal the clearly material fact that Pershing's decision was based on its inability to obtain transparency into SIB's portfolio after a two and a half year effort to do so. Respondents' plan for everyone at SGC to be "all on the same page regarding the Pershing decision not to wire to SIB" was made with at least a reckless degree of scienter. This false explanation was to be given to clients who asked why the payment process for SIB CDs had become so difficult. The false statement and omission were clearly material and made with at least a reckless degree of scienter.

During late 2008, SIB failed to meet its obligation to fund at least two private equity deals because of insufficient funds. Despite knowing this, on December 23, 2008, Bogar approved a press release falsely explaining that SIB would not be funding the Health Systems Solutions Inc. deal "because of the last hour due diligence issues." This false statement and omission to state the real reason were clearly material and made with at least a reckless degree of scienter.

On December 23, 2008, Green sent a two-page newsletter to all FAs to be disseminated to clients and prospective clients that touted SIB's "strong liquidity," "extensive insurance program," and $541 million of increased capital. Yet, in addition to his awareness of SIB's liquidity issues, Green had examined Allen Stanford's original draft of the newsletter that included a financial

25

statement showing cash and equivalents as about $200 million less than the $541 million that Allen Stanford said he put in. When Green asked about the discrepancy, Allen Stanford reacted negatively to being found out and articulated a complicated explanation. Green then sent the newsletter out without the discordant financial statement. In addition to the false or misleading statements about SIB's liquidity and insurance, Green actually saw a $200 million discrepancy and reacted by covering it up. Again, this was done with at least a reckless degree of scienter.

During the weeks of January 26 and February 2, 2009, Young and Green went on a damage control road show at which Young conveyed the message that SIB was sound while Green discussed cost-cutting measures at SGC. While the cost-cutting measures were related to a decline in revenue from SIB, promoting the soundness of SIB can only have been intended to influence FAs to reassure clients so as to forestall redemptions and continue to sell SIB CDs. This last-ditch effort was, in effect, a continuance of the December 2008, material misrepresentations and omissions.

After the February 10, 2009, conference call at which Allen Stanford told the FAs that early redemptions were stopped, FAs emailed Green and Bogar with questions, including asking whether anything had changed since Green and Young's road show discussing the soundness of SIB. On the same day, Bogar and Green approved talking points for FAs to use in discussions with, and letters to, clients reacting to the cessation of early redemptions. The approved talking points included the blatant falsehood that SIB "remains a strong institution" and blamed negative information in the media on disgruntled ex-employees. While it can be argued that the misrepresentations were not in connection with the offer or sale of securities since the SIB CD was no longer being sold or redeemed, they reinforce the conclusion that Bogar's and Green's earlier misrepresentations were made with scienter. Finally, Bogar voted "yes" on Sunday, February 15, to release a proposed press release (that was never actually released) containing the same misrepresentations. Again, this reinforces the conclusion that his earlier misrepresentations were made with scienter.

In sum, it is concluded that each Respondent willfully violated Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5.[38]

## 2. Secondary Violations Related to SIB's and SGC's Marketing Materials

### a. Primary Violations by SIB and SGC

SIB and SGC violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and SGC violated Sections 15(c)(1) of the Exchange Act and 206(1) and 206(2) of the Advisers Act by the false and misleading statements of material facts concerning SIB's portfolio and insurance coverage in SIB's disclosure statement and brochure that SGC provided to prospective investors. The descriptions of SIB's portfolio were undeniably false. Further, there was no insurance protecting investors in the SIB CD, but the description of insurance that SIB did have created a confusing impression that investors were insured. Similar statements appeared in the materials used

---

[38] Respondents also aided and abetted and caused violations by SIB and SGC of Exchange Act Section 10(b) and Rule 10b-5 and violations by SGC of Exchange Act Section 15(c)(1) and Advisers Act Sections 206(1) and 206(2) by the same material misrepresentations and omissions.

APP. 026

to train FAs to sell the SIB CD. The compensation plan, including outsize commissions, trail commissions, bonuses, and SIB CD sales contests, pressured the FAs to sell the SIB CD in lieu of other investments, using the misleading information contained in the disclosure statement, brochure, and training material. These false and misleading statements, concerning the portfolio that was to generate returns for payments on the SIB CD and be available for liquidation to redeem SIB CDs and concerning insurance that provided peace of mind, were clearly material. Scienter in the form of "a mental state embracing intent to deceive, manipulate, or defraud" was provided by SGC and SIB's owner, Allen Stanford, and his confederate, Davis, who were convicted of fraud for their roles as masterminds in the sale of the SIB CD. (The violation of Advisers Act Section 206(2) required only negligence.)

### b. "Causing" Liability – Advisers Act Section 206(2)

All three Respondents knew that they did not know what was in SIB's portfolio, and Bogar and Young actually knew that the portfolio contained a significant amount of illiquid private equity. Yet Respondents distributed, or approved the distribution, of the disclosure statement and brochure that made representations concerning the liquidity and holdings of SIB's portfolio as a key component of "Depositor Security." Also, they knew that SIB affirmatively resisted their having transparency into the portfolio while purportedly allowing such transparency to the Memphis group, which was purportedly overseeing the trading of the portfolio. Likewise, all three knew that there was no depositor insurance and that at least some FAs were confused on the question of insurance. However, all three Respondents point to the involvement of various inside and outside counsel employed by the Stanford companies as support for the reasonableness of SGC's using the disclosure statement and brochure.[39]

Each Respondent engaged in an act or omission that was a cause of SGC's violation of Advisers Act Section 206(2) throughout the relevant period. Young approved the use of the brochures and the disclosure statement. Green, through his assistant, provided them to clients. Bogar was aware of the use and contents of these marketing materials and had overall authority over the sale of the SIB CD throughout the relevant period. Similar misstatements appeared in the materials developed and used by Green and Young to train FAs, who were the conduits conveying the misleading representations to clients, and Bogar was aware of and responsible for the contents of these training materials. All three were aware that SGC's distorted compensation system encouraged FAs to sell as many SIB CDs as possible, using the misleading material (although Bogar was taking steps to reform compensation, albeit "without killing the golden goose"). Green

---

[39] Respondents do not actually claim that they were relying on the advice of counsel claim. In considering whether to credit an advice of counsel claim, the Commission considers four elements: "that the person made complete disclosure to counsel, sought advice on the legality of the intended conduct, received advice that the intended conduct was legal, and relied in good faith on counsel's advice" (footnote citing precedent omitted). Howard Brett Berger, Exchange Act Release No. 58950 (Nov. 14, 2008), 94 SEC Docket 11615, 11629-31, petition for review denied, 347 F. App'x 692 (2d Cir. 2009), cert. denied, 130 S. Ct. 2380 (2010). Counsel must also be independent. C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1436 (10th Cir. 1988); Arthur Lipper Corp. v. SEC, 547 F.2d 171, 181-82 (2d Cir. 1976).

27

devoted a substantial portion of his time to overseeing the Superstars' competition in the SIB CD sales contest.

Concerning their state of mind, each Respondent failed to consider that SIB's lack of transparency was to conceal the weakness of its portfolio or the possibility that investors might be confused by the discussion of the "comprehensive insurance program" into believing that their investments were insured. Thus, each Respondent was at least negligent in allowing the use of marketing material that promised depositor security on the basis of facts about SIB's portfolio that could not be verified and on the basis of a discussion of insurance that all knew had no relevance to depositor security but that might confuse a potential investor into thinking that it did. This was a failure to exercise reasonable care. IFG Network Sec., Inc., 88 SEC Docket at 1389. Accordingly, it is concluded that each Respondent caused SGC's violation of Advisers Act Section 206(2).

### c. Aiding and Abetting Liability

To the extent that the language in the disclosure statement and brochure contained material misstatements and omissions, it cannot be attributed to any of the Respondents. No Respondent had any responsibility for drafting these documents or had any input into drafting the language. To the contrary, the Stanford companies' inside and outside counsel had responsibility for drafting the language. As such, none of the Respondents was a maker of the untrue statements or omissions. Nor did any of the Respondents conceal the facts about SIB from those who drafted these marketing materials; SIB's lack of transparency and insurance was widely known at SGC.

Scienter is an element of aiding and abetting and of causing violations of Exchange Act Sections 10(b) and 15(c)(1) and Rule 10b-5 and Advisers Act Section 206(1) and of aiding and abetting violations of Advisers Act Section 206(2). With reference to the primary violations by SIB and SGC addressed in this section, in light of Respondents' knowledge of the participation of inside and outside counsel in drafting the disclosure statement and brochure, it is concluded that none of them acted with knowledge that his role was part of an overall activity that was improper or encountered red flags that should have alerted him to the improper conduct of SIB and SGC; nor was there a danger so obvious that any Respondent must have been aware of it. Accordingly, with reference to the primary violations by SIB and SGC addressed in this section, it is concluded that none of the Respondents aided and abetted or caused SIB's and SGC's violations of Exchange Act Section 10(b) and Rule 10b-5 and SGC's violation of Exchange Act Section 15(c)(1) and Advisers Act Section 206(1) or aided and abetted SGC's violation of Advisers Act Section 206(2).

### IV. SANCTIONS

The Division requests cease-and-desist orders; bars; disgorgement (plus prejudgment interest) of $3,085,596.74 by Bogar, $1,271,183.60 by Young, and $5,613,506.47 by Green; and third-tier civil money penalties. As discussed below, Respondents will be ordered to cease and desist from violations of Section 17(a) of the Securities Act, Sections 10(b) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act and barred from the securities industry. Additionally, Bogar will be ordered to disgorge $1,555,485.75 plus prejudgment interest; Young, $591,992.46 plus prejudgment interest; and Green,

28

$2,613,506.47 plus prejudgment interest. Each will be ordered to pay a third-tier civil penalty of $260,000.

## A. Sanction Considerations

In determining sanctions, the Commission considers such factors as:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

Steadman, 603 F.2d at 1140 (quoting SEC v. Blatt, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)). The Commission also considers the age of the violation and the degree of harm to investors and the marketplace resulting from the violation. Marshall E. Melton, 56 S.E.C. 695, 698 (2003). Additionally, the Commission considers the extent to which the sanction will have a deterrent effect. Schield Mgmt. Co., Exchange Act Release No. 53201 (Jan. 31, 2006), 87 SEC Docket 848, 862 & n.46. As the Commission has often emphasized, the public interest determination extends to the public-at-large, the welfare of investors as a class, and standards of conduct in the securities business generally. See Christopher A. Lowry, 55 S.E.C. 1133, 1145 (2002), aff'd, 340 F.3d 501 (8th Cir. 2003); Arthur Lipper Corp., 46 S.E.C. 78, 100 (1975). The amount of a sanction depends on the facts of each case and the value of the sanction in preventing a recurrence. See Berko v. SEC, 316 F.2d 137, 141 (2d Cir. 1963); see also Leo Glassman, 46 S.E.C. 209, 211-12 (1975).

## B. Sanctions

### 1. Cease and Desist

Sections 8A of the Securities Act, 21B(e) and 21C(a) of the Exchange Act, and 203(k) of the Advisers Act authorize the Commission to issue a cease-and-desist order against a person who "is violating, has violated, or is about to violate" any provision of those Acts or rules thereunder. Whether there is a reasonable likelihood of such violations in the future must be considered. KPMG Peat Marwick LLP, 54 S.E.C. at 1185. Such a showing is "significantly less than that required for an injunction." Id. at 1183-91. In determining whether a cease-and-desist order is appropriate, the Commission considers the Steadman factors quoted above, as well as the frequency of the violation, the degree of harm to investors or the marketplace, and the combination of sanctions against the respondent. See id. at 1192; see also WHX Corp. v. SEC, 362 F.3d 854, 859-61 (D.C. Cir. 2004).

Each Respondent's conduct became egregious and exhibited a reckless degree of scienter after a period of negligence. Each Respondent's participation in statements designed to cover up SIB's parlous financial condition at the end of 2008 is an aggravating factor. Each Respondent's age, experience, and chosen occupation in or related to the financial industry will present opportunities for future violations. The violations were neither recent nor remote in time, having

29

ended about four years ago. Each one's ill-gotten gains related to the SIB CD quantify the degree of harm to the marketplace each caused individually. A mitigating factor is that Bogar and Green were victims as well as contributors to Allen Stanford's fraud as they and their relatives and/or friends invested in the SIB CD and lost money. In light of these considerations, a cease-and-desist order against each is appropriate.

## 2. Disgorgement

Sections 8A(e) of the Securities Act, 21B(e) and 21C(e) of the Exchange Act, 203(j) of the Advisers Act, and 9(e) of the Investment Company Act authorize disgorgement of ill-gotten gains from Respondents. Disgorgement is an equitable remedy that requires a violator to give up wrongfully-obtained profits causally related to the proven wrongdoing. See SEC v. First City Fin. Corp., Ltd., 890 F.2d 1215, 1230-32 (D.C. Cir. 1989); see also Hateley v. SEC, 8 F.3d 653, 655-56 (9th Cir. 1993). It returns the violator to where he would have been absent the violative activity.

The amount of the disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation. See Laurie Jones Canady, 54 S.E.C. 65, 84-85 n.35 (1999) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996)), petition for review denied, 230 F.3d 362 (D.C. Cir. 2000); see also SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998) (holding disgorgement amount only needs to be a reasonable approximation of ill-gotten gains); accord First City Fin. Corp., Ltd., 890 F.2d at 1231-32.

The Commission has the authority to order disgorgement of salary. Rita J. McConville, Exchange Act Release No. 51950 (June 30, 2005), 85 SEC Docket 3127, 3151 n.64. Likewise, commissions derived from management fees are appropriately disgorged where they constitute ill-gotten gains earned during the course of violative activities. SEC v. Kapur, No. 11 Civ. 8094, 2012 WL 5964389, at *3-*4 (S.D.N.Y. Nov. 29, 2012); SEC v. Radical Bunny, LLC, No. 09-cv-1560, 2011 WL 1458698, at *8 (D. Ariz. Apr. 12, 2011), aff'd, No. 11-16275, 2013 WL 3456657 (9th Cir. July 10, 2013); Joseph John VanCook, Exchange Act Release No. 61039A (Nov. 20, 2009), 97 SEC Docket 22664, 22691. However, the Commission distinguishes between amounts earned through legitimate activities and those connected to violative activities, and it falls on the Division to show what a reasonable approximation of the salary or fees was unjust enrichment. See Gregory O. Trautman, Securities Act Release No. 9088A (Dec.15, 2009), 97 SEC Docket 23492, 23529-32 (finding that all of respondent's salary was not a reasonable measure of his unjust enrichment, but that fifty percent was related to illegitimate revenues earned through violative conduct); accord, Joseph John VanCook, 97 SEC Docket at 22691. The Division argues that Respondents should disgorge amounts earned through their legitimate activities on the theory that the funds SGC used to pay them for legitimate activities were derived from sales of the SIB CD. However, this argument fails in light of the foregoing precedent.

Green will be ordered to disgorge $2,613,506.47, the total compensation (for which information is available) that he received relating to the SIB CD. This sum omits the amount that was paid directly to charity at Green's request, in lieu of a bonus, that Green never himself received.

30

Bogar and Young will be ordered to disgorge 55.38% of the total payroll compensation that each received between 2006 and 2009, the period for which information is available. SIB CD related revenue was 55.38% of SGC's total revenue for the period 2006 through 2008, so that 55.38% approximates that portion of compensation related to the SIB CD that each received. Thus Bogar will be ordered to disgorge $1,555,485.75, and Young will be ordered to disgorge $591,992.46. The amounts paid to Bogar and Young through Oracle will not be ordered disgorged since the evidence of record shows that the Oracle payments were reimbursement of expenses.

### 3. Civil Money Penalty

Sections 21B of the Exchange Act, 203(i) of the Advisers Act, and 9(d) of the Investment Company Act authorize the Commission to impose civil money penalties for willful violations of the Securities, Exchange, Advisers, or Investment Company Acts or rules thereunder. In considering whether a penalty is in the public interest, the Commission may consider six factors: (1) fraud; (2) harm to others; (3) unjust enrichment; (4) previous violations; (5) deterrence; and (6) such other matters as justice may require. See Sections 21B(c) of the Exchange Act, 203(i)(3) of the Advisers Act, and 9(d)(3) of the Investment Company Act; New Allied Dev. Corp., 52 S.E.C. 1119, 1130 n.33 (1996); First Sec. Transfer Sys., Inc., 52 S.E.C. 392, 395-96 (1995); see also Jay Houston Meadows, 52 S.E.C. 778, 787-88 (1996), aff'd, 119 F.3d 1219 (5th Cir. 1997); Consol. Inv. Servs., Inc., 52 S.E.C. 582, 590-91 (1996).

Respondents violated the antifraud provisions, so their violative actions "involved fraud [and] reckless disregard of a regulatory requirement" within the meaning of Sections 21B(b) of the Exchange Act, 203(i)(2) of the Advisers Act, and 9(d)(2) of the Investment Company Act.

Penalties in addition to the other sanctions ordered are in the public interest in this case in consideration of fraud, harm to others, unjust enrichment, and the need for deterrence. See Sections 21B(c) of the Exchange Act, 203(i)(3) of the Advisers Act, and 9(d)(3) of the Investment Company Act; see also H.R. Rep. No. 101-616 (1990). The Division requests that Respondents be ordered to pay third-tier penalties, without specifying dollar amounts or units of violation. In addition to arguing that there were no violations, Respondents argue that civil penalties are not warranted, much less third-tier penalties. A third-tier penalty, as the Division requests, is appropriate because Respondents' violative acts involved fraud and resulted in the risk of substantial losses to other persons and gains to themselves. See Sections 21B(b)(3) of the Exchange Act, 203(i)(2)(C) of the Advisers Act, and 9(d)(2)(C) of the Investment Company Act. Under those provisions, for each violative act or omission after February 14, 2005, and before March 3, 2009, the maximum third-tier penalty is $130,000 for a natural person. 17 C.F.R. §§ 201.1003, .1004. The provisions, like most civil penalty statutes, leave the precise unit of violation undefined. See Colin S. Diver, The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies, 79 Colum. L. Rev. 1435, 1440-41 (1979).

The events at issue will be considered as two courses of action related to marketing the SIB CD – each Respondent committed a primary violation of the antifraud provisions through his direct participation in false and misleading statements at least once, and each was a cause of

31

SGC's violation of Advisers Act Section 206(2) from 2006 through 2008.  Accordingly, a third-tier penalty amount of $260,000 will be ordered against each Respondent.

### 4. Bar

The Division requests a broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, nationally recognized statistical rating organization, and investment company bar against each Respondent.  Such collateral bars are authorized pursuant to Sections 15(b) of the Exchange Act, 203(f) of the Advisers Act, and 9(b) of the Investment Company Act and will be ordered.[40]  Combined with other sanctions ordered, bars are in the public interest and appropriate deterrents.

## V.  RECORD CERTIFICATION

Pursuant to Rule 351(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.351(b), it is certified that the record includes the items set forth in the record index issued by the Secretary of the Commission on July 3, 2013, as corrected on July 30, 2013.[41]

## VI.  ORDER

IT IS ORDERED that, pursuant to Sections 8A of the Securities Act, 21C(a) of the Exchange Act, and 203(k) of the Advisers Act,

Daniel Bogar CEASE AND DESIST from committing or causing any violations or future violations of Section 17(a) of the Securities Act, Sections 10(b) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act;

Bernerd E. Young CEASE AND DESIST from committing or causing any violations or future violations of Section 17(a) of the Securities Act, Sections 10(b) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act; and

---

[40] The collateral bar is authorized pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act).  While Respondents' misconduct antedates the July 22, 2010, effective date of the Dodd-Frank Act, the Commission has determined that sanctioning a respondent with a collateral bar for pre-Dodd-Frank wrongdoing is not impermissibly retroactive, but rather provides prospective relief from harm to investors and the markets.  John W. Lawton, Advisers Act Release No. 3513 (Dec. 13, 2012), 105 SEC Docket 61722; see also Alfred Clay Ludlum, III, Advisers Act Release No. 3628 (July 11, 2013); Johnny Clifton, Securities Act Release No. 9417 (July 12, 2013); Tzemach David Netzer Korem, Exchange Act Release No. 70044 (July 26, 2013).

[41] See Daniel Bogar, Admin. Proc. No. 3-15003 (A.L.J. July 30, 2013) (unpublished) (adding Div. Ex. 21 to record index).

Jason T. Green CEASE AND DESIST from committing or causing any violations or future violations of Section 17(a) of the Securities Act, Sections 10(b) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act.

IT IS FURTHER ORDERED that, pursuant to Sections 8A(e) of the Securities Act, 21B(e) and 21C(e) of the Exchange Act, 203(j) of the Advisers Act, and 9(e) of the Investment Company Act,

Daniel Bogar DISGORGE $1,555,485.75 plus prejudgment interest at the rate established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), compounded quarterly, pursuant to 17 C.F.R. § 201.600(b). Pursuant to 17 C.F.R. § 201.600(a), prejudgment interest is due from March 1, 2009, through the last day of the month preceding which payment is made.

Bernerd E. Young DISGORGE $591,992.46 plus prejudgment interest at the rate established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), compounded quarterly, pursuant to 17 C.F.R. § 201.600(b). Pursuant to 17 C.F.R. § 201.600(a), prejudgment interest is due from March 1, 2009, through the last day of the month preceding which payment is made.

Jason T. Green DISGORGE $2,613,506.47 plus prejudgment interest at the rate established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), compounded quarterly, pursuant to 17 C.F.R. § 201.600(b). Pursuant to 17 C.F.R. § 201.600(a), prejudgment interest is due from March 1, 2009, through the last day of the month preceding which payment is made.

IT IS FURTHER ORDERED that, pursuant to Sections 21B of the Exchange Act, 203(i) of the Advisers Act, and 9(d) of the Investment Company Act,

Daniel Bogar PAY A CIVIL MONEY PENALTY of $260,000;

Bernerd E. Young PAY A CIVIL MONEY PENALTY of $260,000; and

Jason T. Green PAY A CIVIL MONEY PENALTY of $260,000.

IT IS FURTHER ORDERED that, pursuant to Sections 15(b) of the Exchange Act, 203(f) of the Advisers Act, and 9(b) of the Investment Company Act,

Daniel Bogar IS BARRED from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization and IS PROHIBITED, permanently, from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

33

Bernerd E. Young IS BARRED from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization and IS PROHIBITED, permanently, from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

Jason T. Green IS BARRED from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization and IS PROHIBITED, permanently, from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

Payment of penalties and disgorgement plus prejudgment interest shall be made on the first day following the day this Initial Decision becomes final. Payment shall be made by certified check, United States postal money order, bank cashier's check, wire transfer, or bank money order, payable to the Securities and Exchange Commission. The payment, and a cover letter identifying the Respondent(s) and Administrative Proceeding No. 3-15003, shall be delivered to: Enterprises Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, AMZ-341, 6500 South MacArthur Bld., Oklahoma City, Oklahoma 73169. A copy of the cover letter and instrument of payment shall be sent to the Commission's Division of Enforcement, directed to the attention of counsel of record.

This Initial Decision shall become effective in accordance with and subject to the provisions of Rule 360 of the Commission's Rules of Practice, 17 C.F.R. § 201.360. Pursuant to that Rule, a party may file a petition for review of this Initial Decision within twenty-one days after service of the Initial Decision. A party may also file a motion to correct a manifest error of fact within ten days of the Initial Decision, pursuant to Rule 111(h) of the Commission's Rules of Practice, 17 C.F.R. § 201.111(h). If a motion to correct a manifest error of fact is filed by a party, then that party shall have twenty-one days to file a petition for review from the date of the undersigned's order resolving such motion to correct a manifest error of fact. The Initial Decision will not become final until the Commission enters an order of finality. The Commission will enter an order of finality unless a party files a petition for review or a motion to correct a manifest error of fact or the Commission determines on its own initiative to review the Initial Decision as to a party. If any of these events occur, the Initial Decision shall not become final as to that party.

Carol Fox Foelak
Administrative Law Judge

34

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES ACT OF 1933
Release No. 10060 / March 24, 2016

SECURITIES EXCHANGE ACT OF 1934
Release No. 774421 / March 24, 2016

INVESTMENT ADVISERS ACT OF 1940
Release No. 4358 / March 24, 2016

INVESTMENT COMPANY ACT OF 1940
Release No. 32050 / March 24, 2016

Admin. Proc. File No. 3-15003

---

In the Matter of

BERNERD E. YOUNG

---

OPINION OF THE COMMISSION

CEASE-AND-DESIST PROCEEDING

INVESTMENT ADVISER PROCEEDING

BROKER-DEALER PROCEEDING

*Grounds for Remedial Action*

Antifraud Violations

Respondent, who was chief compliance officer of a dually registered investment adviser and broker-dealer, violated the antifraud provisions of the securities laws. *Held*, it is in the public interest to (i) bar respondent from association with any broker, dealer, investment adviser, municipal securities dealer or transfer agent; (ii) prohibit respondent from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; (iii) enter a cease-and-desist order; (iv) order disgorgement; and (v) assess a third-tier civil money penalty.



EXHIBIT
2

APPEARANCES:

*Bernerd E. Young,* pro se.

*David Reece, Chris Davis,* and *Janie Frank,* for the Division of Enforcement.

Appeal filed: September 25, 2013
Last brief received: January 6, 2014
Oral argument: February 8, 2016

Bernerd Young, former chief compliance officer of Stanford Group Company ("SGC" or the "Firm"), a dually registered investment adviser and broker-dealer, appeals from an initial decision finding that he violated antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, and rules thereunder.[1]  Based on her findings of violation, the law judge issued a cease-and-desist order against Young; barred him from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and prohibited him from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter. The law judge also ordered Young to pay $591,992.46 in disgorgement, with prejudgment interest, and assessed a third-tier civil penalty of $260,000.  We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

### Introduction

This case concerns Young's role in a multi-billion dollar "Ponzi" scheme carried out by Robert Allen Stanford through a network of 130 companies he controlled (collectively, Stanford Financial Group or "SFG").[2]  At the center of this fraud were "CDs" issued by Stanford International Bank Limited ("SIB" or the "Bank"), a foreign bank organized under Antiguan law.[3]  Young was associated with SGC, a Houston-based registered investment adviser and

---

[1]     The law judge found that SGC violated the antifraud provisions of Advisers Act Section 206(2) and that Young was a cause of that violation.  The law judge further found that Young violated the antifraud provisions of Securities Act Section 17(a); violated, and aided and abetted and caused SGC's violations of, Exchange Act Section 10(b) and Exchange Act Rule 10b-5; and aided and abetted and caused SGC's violations of Advisers Act Sections 206(1) and (2) and Exchange Act Section 15(c)(1).  *Daniel Bogar,* Initial Decision Release No. 502, 2013 WL 393608 (Aug. 2, 2013).

[2]     A Ponzi scheme, named for the perpetrator of such a scheme in the 1920s, is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. *See* Fast Answers: Ponzi Schemes, *available at* http://www.sec.gov/answers/ponzi.htm (last visited Mar. 9, 2015).

[3]     Although SGC made varying claims about whether the CDs were securities, Young does not dispute their status as securities for purposes of this appeal, which is consistent with holdings
(continued...)

APP. 036

broker-dealer that promoted the CDs to U.S. investors as an affiliate of SFG. SGC convinced
U.S. investors that SIB was a legitimate bank with a proven track record of consistent above-
market returns on the CDs. But instead of being invested in diversified and liquid holdings, as
claimed, investor funds financed Stanford's lavish lifestyle and acquisition of Antiguan real
estate, compensated other scheme participants, and paid returns to earlier investors. SFG also
used proceeds to bribe SIB's Antiguan bank regulator, the Financial Services Regulatory
Commission (the "FSRC"), and SIB's auditor, C.A.S. Hewlett & Co., Ltd., to "not examine
[SIB's] books" and "to dishonestly audit [SIB's] financial condition," respectively.[4]

Over two decades, SFG appeared to thrive by generating a continuous large volume of
new CD sales. By 2008, SIB claimed approximately $7.2 billion in CD investments. SFG
collapsed in early 2009 when it was unable to generate sufficient funds from new CD sales to
cover interest and redemption payments, leaving investors with billions of dollars in losses.[5]

## I. Background

### A.    SGC heavily promoted the CDs with false and misleading claims.

SGC heavily promoted the CDs as its "premiere" investment product, and it paid its
financial advisors ("FAs") above-market fees and commissions that were approximately 150
times the amount paid for selling U.S. bank CDs. Sales targets, contests, and bonuses were also
used to promote the CDs, and SGC disciplined employees who failed to generate sufficient CD
revenue. For example, SGC fired a managing director ("MD") who encouraged FAs to diversify
and reduce their clients' CD holdings. These incentives worked: as the former MD testified, the
"vast majority of financial advisors only focused on the CD[s]."

---

(...continued)

in related proceedings. *See* Petition for Review note 1 ("For purposes of this submission and our
10(b) and 17(a) analysis, we assume that the CD is a security"). *Cf. Chadbourne & Parke LLP v.
Troice*, 134 S. Ct. 1058, 1070 (2014) ("[T]he term 'security ' under § 10(b) covers a wide range
of financial products . . . , apparently including the Bank's certificates of deposits at issue in these
cases."); *SEC v. Stanford Intl. Bank* (3:09cv298) (N.D. Tex. Nov. 30, 2011) (denying motion to
dismiss and concluding that "the CDs are securities under the federal securities laws").

[4]      *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 198 (5th Cir. 2013).

[5]      *See generally Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009) (receivership
litigation); *SEC v. SIPC*, 758 F.3d 357 (D.C. Cir. 2014) (SIPC litigation); *Chadbourne & Parke*,
134 S. Ct. at 1064-65 (class action litigation).

APP. 037

SGC depended for its financial survival on fees it received from SFG and SIB CD sales. From 2004 through 2008, SIB accounted for more than 50 percent of SGC's revenue, which also included fees SIB paid SGC for research and for managing SIB private equity investments. Additionally, SGC depended on regular capital contributions that Stanford channeled through SGC's holding company. These capital infusions were substantial, totaling $51.5 million in 2006, $41.75 million in 2007, and $51.0 million in 2008.

In communications to clients and FAs, SGC consistently touted the safety of the CDs based on information that had not been verified by, or was inconsistent with facts known to, Young and other senior SGC officials. These communications included a disclosure statement (the "Disclosure Statement") and marketing brochure (the "Brochure") that were distributed to investors, and a training manual (the "Manual" and, collectively, the "Marketing Materials").

The Marketing Materials reflected SGC's sales pitch for the CDs, which focused on the portfolio's asserted safety and liquidity without disclosing that the Bank refused to allow investors or SGC personnel to access information that would verify the actual assets in its portfolio.[6] Describing the CDs in the reassuring terms of traditional banking products, the Marketing Materials also emphasized SIB's private insurance policies and led investors, who were repeatedly described as "depositors," to believe that the policies provided "depositor security."

More specifically, the Disclosure Statement falsely claimed that "the funds deposited with us are primarily invested in foreign and US investment grade bonds and securities and Eurodollars and foreign currency deposits." According to the Disclosure Statement, the portfolio reflected "global diversification in the investment markets," and held as of December 31, 2006: 57.4 percent equities; 21.9 percent treasury bonds, notes, and corporate bonds; 13.0 percent metals; and 7.7 percent "alternatives." The Disclosure Statement also falsely stated that "conservation of principal and interest rates on the CD Deposits are dependent upon returns in our investment portfolio."

Despite the Bank's unwillingness to disclose its holdings, the Disclosure Statement falsely claimed that SIB would give investors "an opportunity to ask questions and receive answers, and to obtain such additional information as you may request concerning the [CDs] and our financial condition." It further falsely stated that the FSRC "aggressive[ly]" regulated SIB.

Additionally, the Disclosure Statement included misleading statements about SIB's insurance policies. The Disclosure Statement identified ten different types of private insurance held by the Bank. Included among these was a $20 million "excess FDIC and Depository Insolvency" policy, which purported to protect the Bank "against the possible insolvency of specified financial institutions where we may place our own funds."[7] But none of the policy

---

[6]      The only SIB investments that SGC had any insight into were illiquid private equity investments that SGC managed. Such investments, which were valued at less than 1% of the purported total CD portfolio, were inconsistent with SGC's claims about portfolio liquidity.

[7]      The Disclosure Statement contained two types of insurance disclaimers: (1) "NOT INSURED BY THE FDIC OR ANY OTHER AGENCY OF THE UNITED STATES

(continued...)

descriptions indicated how the policies protected, or were even relevant to, CD investors. As Young acknowledged in testimony, he knew that the insurance did not cover CD investors.

The Brochure, which was also typically provided to SGC's clients, made similar assurances, falsely describing SIB's holdings as a "conservative" and "well diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks" and claiming that the Bank maintained "the highest degree of liquidity as a protective factor for our depositors."[8] The Brochure also highlighted SIB's "comprehensive insurance program" as a factor promoting "[d]epositor [s]ecurity."

These misrepresentations were repeated and expanded on during Firm training presentations (the "Training Presentations") that Young was responsible for and in which he participated. For instance, Young personally delivered a February 2008 Training Presentation where he told the FAs that "[f]or the past 20 years, SIB clients have enjoyed interest rates on their deposits that are consistently higher than the . . . rates paid by other banks" and that were generated through a portfolio investment philosophy emphasizing "the highest degree of diversification." Similarly, during a June 2008 Training Presentation, Young and another SGC official provided assurances that SIB had a "[g]lobally diversified portfolio," and that Hewlett and the FSRC provided "appropriate oversight." The Training Presentation also falsely claimed that, although the CDs paid annual returns of between 15.71 percent and 11.72 percent from 1994 through 2004, SIB's returns on its portfolio exceeded its costs by at least five percent for each of those years.

---

(...continued)

GOVERNMENT OR ANY STATE JURISDICTION OR BY ANY INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA"; and (2) "This insurance does not insure customer deposits and is not the equivalent of FDIC insurance offered on deposits at many institutions in the United States."

[8]     SGC stopped using the Brochure in November 2007 when FINRA instituted a disciplinary action against SGC for misrepresentations. Contrary to Young's claim that SIB had sole responsibility for the Brochure, Young participated in related negotiations with FINRA, which resulted in revisions to the Brochure. At that time, FINRA stated that it "do[es] not provide an opinion on the appropriateness of the specific products . . . being solicited" and that "[i]t is assumed that the material does not omit material facts, contain statements that are not factual, or offer opinions that do not have a reasonable basis." As Young acknowledged, FINRA "was not in a position to verify the statements . . . about SIB's investment portfolio."

The Training Presentations, like the Marketing Documents, included inconsistent and ambiguous statements about insurance. One slide stated that the CDs were "Not Insured" and could not be "compared equally with U.S. CDs" because of "Major Differences,"[9] but another slide assured the FAs that SIB had a Lloyd's of London policy "cover[ing] fraud."

The Manual that Young distributed to FAs emphasized the portfolio's diversification and liquidity, stating that it held securities issued by "governments, well-known companies, multinationals and major international banks" and including pie charts showing the percentage holdings of the portfolio in different types of investments. The Manual falsely stated that "in the case of unusually strong demand for withdrawals, [SIB] could liquidate all the securities sufficient to cover all withdrawals," that this "liquidity equals security" for CD investors, and that Antigua's "regulatory and compliance environment [was] equal to, or stronger than most international financial cent[e]rs."

The Manual repeated the misleading claims about SIB's "comprehensive insurance program" protecting its funds and coverage through Lloyd's of London. It also disparaged the benefits of FDIC insurance, which it characterized as "relatively weak protection" because it covered "only up to $100,000 per client/account"; "covers only a minor portion of the deposits of all the banks that are insured"; and "does not make any bank safer, nor does it prevent the failure of any bank."[10] Although Young knew that FAs were confused about the Bank's insurance coverage, he trained them to use the Manual to answer investor questions.[11]

## B.    Young approved SGC's false and misleading disclosures without verification.

Young joined SGC as chief compliance officer in the fall of 2006, after almost two decades as a senior regulator with the NASD, including as director of its Dallas district office.[12]

---

[9]    Young argues that he should be credited for creating this disclaimer slide, but this same slide was used by SGC's prior chief compliance officer. [10]   The Manual also stated that the Bank qualified for the insurance policies by undergoing "an extensive risk management analysis by . . . an outside firm" to ensure that "reasonable care is routinely exercised in the protection of the Bank's assets" and that this analysis "provide[d] a further element of security for clients."

[10]   The Manual also stated that the Bank qualified for the insurance policies by undergoing "an extensive risk management analysis by . . . an outside firm" to ensure that "reasonable care is routinely exercised in the protection of the Bank's assets" and that this analysis "provide[d] a further element of security for clients."

[11]   In late 2007, a compliance staffer, citing FA confusion about SIB's insurance coverage, copied Young on an e-mail proposing to delete from the Training Presentations, among other things, claims about insurance coverage. Although Young omitted slides referencing the Bank's insurance policies during his next Training Presentation, he continued to distribute the Manual containing similar coverage claims, as did a subsequent presentation in which Young participated.

[12]   The NASD became FINRA in 2007. *See Order Granting Proposed Rule Change Relating to Restated Certificate of Incorporation of NASD*, Exchange Act Release No. 56146,

(continued...)

APP. 040

Young testified that he did not need to research SGC before accepting the position "because of [his] professional relationship with them spanning literally back to the beginning of [SGC]."

Young was aware of SGC's dependence on CD sales, given his involvement in a 2001 NASD examination that focused on the CDs and SGC's marketing practices.[13] He also acknowledged that before starting at SGC he knew about rumors that Stanford "had allegedly colluded with corrupt government officials to obtain financial favors." These rumors persisted throughout Young's time at SGC, and Young testified that he was generally aware of news reports about Stanford's improper financial dealings in Antigua and his undue influence on its government.[14] Young claimed to be unconcerned because he believed that, if such reports were true, Antigua "would have taken some action."

In addition to his duties as chief compliance officer, Young was designated as SGC's "due diligence officer" for the SIB portfolio.[15] As he admitted at the hearing, he reviewed and approved the Firm's written marketing materials to verify whether the materials were "accurate in all regards" or misleading. According to Young, if he discovered any misstatements or omissions, he was obligated "to discuss it with the people responsible for the document," *i.e.*, the SFG legal department, the Bank, and "possibly outside counsel,"[16] and "run it up the chain . . . all

---

(...continued)

2007 WL 5185331, at *1 (July 26, 2007). Young also held this position for certain SFG affiliates. Before becoming its chief compliance officer, Young was a compliance consultant to the Firm. Young was called a compliance manager until September or October 2006, when Young officially became chief compliance officer.

[13]     Young testified that this exam resulted in a letter of caution.

[14]     *See, e.g., Antiguan PM accuses Texan billionaire of 'political interference'*, BBC MONITORING AMERICAS, Caribbean Media Corporation, Feb. 24, 2007 (quoting the Antiguan Prime Minister "saying he was tired of [Stanford's] 'threats, innuendos and now, downright political interference in our nation's affairs'"); Nick Hoult, *Twenty20: Sir Allen Stanford, the cricketing high-roller who always gets his way*, DAILY TELEGRAPH, May 7, 2008.

[15]     Although Young claims that he did not formally assume the due diligence officer title until after February 2007, he had due diligence responsibilities throughout his employment.

[16]     As Young acknowledged at the hearing, he reviewed and concurred with the views expressed in an e-mail from outside counsel, Thomas Sjoblom, that emphasized SGC's obligation as a broker-dealer to conduct—and document—its own due diligence to ensure that the statements SGC used to market the CDs were "truthful and accurate." Young also acknowledged these due diligence responsibilities in other internal communications, in letters to regulators, and during the hearing. For instance, in 2008, Young approved an e-mail to other SGC officials explaining that SGC "had a fiduciary duty" to its clients and needed to ensure "proper due diligence" on its affiliates' products. In 2008, he also sent a letter to a state regulator stating that as chief compliance officer, he "perform[ed] due diligence, analysis and oversight" of the SIB CDs and sales of the CDs. Shortly before the scheme collapsed, Young assured the FAs

(continued...)

7

the way up to Mr. Stanford, if necessary."[17]  Young acknowledged that he never asked counsel or anyone else about the accuracy or adequacy of the disclosures.

Young learned soon after his arrival at SGC that, despite his due diligence responsibilities, he could not verify various statements SGC and its personnel were making regarding SIB and the CDs, including disclosures regarding SIB's use of CD sales proceeds and the source of interest. He tried to learn about SIB's portfolio from Jane Bates, an SFG compliance officer, and Lena Stinson, an SFG legal officer.[18]  He claims that they both told him that the portfolio was "subject to privacy rules" and that he was "never going to see it."  He testified further that he believed that four Antiguan statutes contained what he described vaguely as Antiguan "privacy laws" and "provisions for confidentiality of [SIB] information," that purportedly precluded verification of the Bank portfolio even by its affiliate SGC and SGC personnel. At the hearing, Young did not specify who identified or explained the "privacy" provisions, and Young has never identified the provisions on which he purportedly relied.[19]  At the hearing, he failed to identify any such provisions—even after Division lawyers provided him a copy of his due diligence file and the Antiguan laws it contained. Young claimed that he could not identify the relevant provisions "off the top of [his] head sitting here right now . . . ."[20]

---

(...continued)

that his due diligence covered "all material aspects of the" CDs, ensured "the integrity and transparency of [SIB]'s operations," and required "a reasonable review answering all the red flags."

[17]     Although he denies involvement in drafting these marketing materials, which were created before he joined SGC, evidence indicates that he had input into changes to the Brochure and the Training Presentations during his tenure.

[18]     At the hearing, Young did not offer details from any other conversations with the legal or compliance officers about the portfolio, and none of those officials testified at the hearing.  Many of the senior officials who most directly orchestrated the Ponzi scheme and payments, along with counsel involved, have been criminally convicted or are subject to ongoing litigation. *See, e.g.,* *United States v. Stanford*, 09cr342 (S.D. Tex. Sept. 24, 2012) (SFG's chief investment officer pleaded guilty to obstructing an SEC investigation and sentenced to three years' imprisonment); *United States v. Davis*, 09cr335 (S.D. Tex. Jan. 22, 2014) (SFG and SIB's chief financial officer pleaded guilty to conspiracy to commit wire, mail and securities fraud, mail fraud, and conspiracy to obstruct an SEC investigation and sentenced to five years' imprisonment).

[19]     During the hearing, the Division specifically asked Young about Section 32 of Antigua's Banking Act of 2005, labeled "[s]ecrecy of information," which limited disclosure of "the assets, liabilities, transactions or other information in respect of a depositor or customer of a financial institution."  Young initially claimed that this provision restricted verification of the SIB portfolio but eventually acknowledged that it limited disclosure about only "a depositor or a customer" and not the financial institution itself.

[20]     Young also failed to identify such provisions in his pleadings or otherwise provide
(continued...)

8

Young testified that he conducted due diligence by meeting with the FSRC and with SIB officials in Antigua, but the evidence indicates that these meetings were perfunctory and provided no meaningful insight into SIB's operations or oversight. For example, Young met briefly with Leroy King, head of the FSRC, early in Young's tenure in April 2007 and then again briefly in December 2008, immediately before the scheme's collapse. At the first meeting, King gave Young an overview of FSRC regulation and, at the second meeting, King assured Young that SIB was "one of the safest banks" in Antigua. But as Young admitted, he did not get information about the portfolio holdings from King and failed to ask King to explain the purported Antiguan limitations on SGC's access to such information. Nor did he verify the CD investment portfolio's purported returns or holdings. Although Young acknowledged that he knew that the portfolio was actually managed by SFG officials based in the United States, he neither sought relevant information from those officials, nor took any other reasonable steps to verify representations about the portfolio.[21] Young also claimed to rely on Hewlett's audits and Antiguan laws requiring that the FRSC approve Hewlett as SIB's auditor, but admitted at the

_____

(...continued)

evidence, such as expert testimony, that Antiguan law prohibited any due diligence on the portfolio information as he claimed. On appeal, Young claims that he relied on the same Antiguan law explanation that SFG affiliates gave Commission staff during its investigation and cites a Commission complaint as evidence that Stanford and King used Antiguan "bank secrecy laws" to withhold information from the Commission. But the referenced complaint indicates that the purported bank secrecy laws were actually "inapplicable." 3:09-cv-298, doc. 952, paragraph 91 (Jan. 8, 2010) ("Stanford and . . . others withheld information from the SEC, citing reliance on inapplicable bank secrecy laws in Antigua."). At oral argument, Young claimed that he "offered to review with [the Division] the three other Antiguan laws addressing privacy" and that the Division "misquoted" him in suggesting that he was "hiding behind the Antiguan privacy law" that, according to the Division, he was unable to identify at his hearing. But the hearing transcript flatly contradicts his claims. The Division asked: "Can you point to one of these acts or one of these other provisions in the other acts that you were pointed to as far as providing the secrecy of banks' portfolio information?" and Young replied "Not off the top of my head sitting here right now, no, unless we want to take a while to get there." At no other point in the hearing or in his briefs did Young identify the Antiguan privacy laws on which he allegedly relied.

[21]      Young testified that he believed that the portfolio was managed by Laura Pendergest-Holt (SFG's chief investment officer) and James Davis (SFG and SIB's chief financial officer) through SFG's Memphis-based analysts. There is no evidence that Young ever discussed the portfolio holdings or the disclosures at issue with Pendergest-Holt, Davis, or any of the Memphis-based analysts. In March 2008, Young listened in on two separate conference calls with Davis, Pendergest-Holt, and others about how market turbulence was affecting the portfolio. But Young testified that they did not discuss the "particulars of" the holdings in the portfolio during these calls, and Young apparently never asked these officials about those particulars.

9

hearing that he never once contacted Hewlett directly to discuss its auditing procedures, qualifications, or findings.

The FAs assumed that the Marketing Materials had been verified by Young, and they used those materials to persuade SGC clients to invest in, and dissuade them from redeeming, the CDs. One FA testified that he relied on the compliance department for verification because otherwise "that whole vetting process is an illusion." Clients, in turn, relied on the accuracy of the assurances when purchasing and holding the CDs. Investors testified that they understood that their FA was "representing he knew what was in the bank's portfolio" when he described its contents, which was important "[b]ecause if you don't know what's in the portfolio, you don't know where the return is coming from."[22] According to another investor, the portfolio was "a very comprehensive program, worldwide, different investments, including currency trading."

Investors also took comfort from the various assurances regarding the Bank's insurance policies. One testified that she invested about $2 million after she "became convinced that [the CD] was safer than the stock market" because "it was paying a set rate and was backed by Lloyd's of London." An FA testified that about 20 percent of his clients asked about SIB's insurance and whether it was "linked to the CD." In response, the FA recited the Manual's insurance assurances "pretty much verbatim" because "this was a compliance-approved version of the message . . . ." As an SGC MD indicated, he understood from the Training Presentations that the Bank's insurance "cover[ed] fraud" and that CD investors would be protected if SIB turned out to be a fraud, which is how he said FAs explained the insurance to clients.

## C.    Young approved false and misleading assurances despite "red flags" about the CDs.

In November 2006, shortly after Young joined SGC, the Firm received a Commission subpoena seeking documentation of, among other things: SGC's due diligence, compensation policies, and training programs; the Bank's portfolio and insurance coverage; and Hewlett's audits. Young was responsible for gathering responsive materials from SGC's due diligence files, which were under his control. Throughout his employment, Young received similar indications of interest and concern from other regulators, as well as from SGC clients and FAs. Young, however, conducted no responsive investigation and, instead, consistently sought to dismiss and downplay the significance of those expressions of concern.

In February 2007, two clients wrote separately to SGC with concerns about SIB and the CDs (together, the "February Inquiries"). The first asked whether CD sales funded Allen Stanford's "Antiguan developments"—which was, in fact, how at least a portion of those funds were used—instead of the diversified and liquid portfolio touted in the Marketing Materials. The investor also questioned the lack of regulatory protections "if something goes wrong with the [B]ank."

---

[22]    Another investor testified, "I fully expected [the FA] knew everything he needed to know about the banking business that I was doing."

APP. 044

The second investor, who had consulted an independent CPA, raised similar concerns, including that the Bank's financials suggested "a dependence on new deposits and renewed certificates in order to continue paying investors the guaranteed CD interest and the principal of maturing CDs"—*i.e.*, the cash flows characteristic of a Ponzi scheme.[23] The investor also doubted that the CDs' consistently above-market CD interest rates could be reconciled with the claim that 55 percent of the portfolio was held in volatile global stock markets, which, as was noted, dropped 43 percent from 2001 to 2003. The investor said he understood U.S. authorities had objected to Stanford's "unacceptable influence over" the FSRC, that Stanford allies had allegedly even "seized . . . banking records" from the Antiguan regulator, and that the FSRC was insufficiently staffed with only three examiners to oversee SIB's management of a multi-billion dollar portfolio.

Young directed the preparation of and approved responses to the February Inquiries (together, the "February Responses"), and the FAs and other SGC officials relied on his authorization before the FAs sent the February Responses to the SGC clients. Young acknowledged that he did not investigate the investors' concerns but nevertheless authorized the February Responses dismissing them as meritless.[24] His first response sought to discredit the inquiries as "misleading," "contain[ing] numerous misstatements," and merely "opinion, not fact."[25] The second response disparaged the concerns as "dated, taken out of context, incompletely cited or supported, or just plain wrong," and reflecting "at best a lack of objectivity." Neither of the February Responses mentioned the Bank's lack of transparency or Antiguan legal restrictions. Rather than acknowledging SGC's inability to verify the portfolio, both responses created an illusion of openness by "strongly recommend[ing]" that the customers meet with "Stanford leadership that can speak in significant depth to any questions that you may have."

The February Responses sought to reassure the clients about the safety and oversight of SIB. Both responses claimed that the Bank had followed a "prudent investment approach . . . for 20 years" involving "global diversifi[cation]" that was more conservative than U.S. banks and ensured its ability to make the stated CD interest payments. They falsely assured that "[t]here are insurance policies in place to indemnify in case of fraud and/or embezzlement," and identified SIB insurance policies, including two issued by Lloyd's of London, without disclosing

---

[23]      Young received a related e-mail from the SGC FA noting the concern "that the financials of the [B]ank are such that it may be a [P]onzi scheme."

[24]      In an e-mail transmitting the second investor's communications, another SGC official stated that "we may want to attack this one similar to the last one." Young was hostile to questions about Stanford's operations, admitting that he conducted an extensive investigation to build a case against former FAs who alleged impropriety at SGC and questioned their motives, asking: "What's their angle . . . ."? and "What ax do they have to grind . . . ."?

[25]      The first February Response also falsely claimed that funds deposited in SIB are "not invested in Stanford's Antiguan developments."

11

that those policies did not cover investors. And, to counter charges of corruption, the responses portrayed Stanford's influence over Antiguan authorities in favorable terms, noting Stanford's "solid relationship" with the government and his "recent knighting."[26]

**D.      Young approved further false assurances despite additional red flags.**

When confronted with additional red flags following the February Inquiries, Young continued to approve responses that repeated similar unverified assurances concerning the safety of the portfolio. On December 11, 2008, news broke about the massive Ponzi scheme Bernard Madoff operated through an investment adviser and broker-dealer[27] which prompted increased concerns and questions about SIB. Five days later, another SGC official, with Young's approval, sent an internal email providing "talking points" for sales staff to use "when fielding calls" from clients. Despite the fact that neither Young nor anyone else had verified SIB's holdings, the email encouraged the staff to reassure clients that SIB "had no exposure to CDOs, CMOs, [or] Structured Products, including those of Fairfield/Madoff."[28] The e-mail encouraged FAs to repeat the portfolio and insurance assurances from the Training Presentations, and defended the "security and supervision" of the CDs by emphasizing SIB's "20+ year audited track record," annual FSRC examinations, and Lloyd's of London insurance.

Also during the fall and winter of 2008, outside securities firms raised further questions about the lack of portfolio transparency. Pershing, LLC, SGC's clearing broker, and Snyder Kearney LLC, a professional due diligence firm, repeatedly sought information about the portfolio, and each curtailed or severed ties to SGC when the Firm failed to allay their concerns. Pershing was SGC's clearing broker from 2006 through December 2008. Its clearing services focused on non-SIB securities held by SGC clients, for which Pershing executed transactions and processed account statements. Pershing's involvement with the CDs was more limited, consisting mainly of executing wire transfers for CD purchases by SGC clients.

When Pershing sought to verify the portfolio, it was told that Antiguan law precluded such verification. Pershing challenged that explanation by pointing out that such laws usually cover information about bank customers, not bank assets. Beginning early in 2006 and for more

---

[26]      The second response similarly stated that "Mr. Stanford was asked to serve in an advisory capacity to the Government of Antigua and Barbuda on the drafting of anti-money laundering and regulatory matters in respect of the financial services sector."

[27]      See, e.g., *SEC v. Bernard L. Madoff, Bernard L. Madoff Inv. Sec. LLC*, 08-civ-10791 (S.D.N.Y. Dec. 11, 2008) (complaint).

[28]      CDOs, or collateralized debt obligations, are securities issued by a special purpose vehicle in tranches backed, or collateralized, by a portfolio of assets owned by the issuer. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, Exchange Act Release No. 71051, 2013 WL 6503674, at *1 (Dec. 12, 2013) (settlement). CMOs, or collateralized mortgage obligations, are "multiclass bond[s] backed by a pool of pass through securities or mortgage loans." *SEC Approves Amendments to CMO Advertising Guidelines: Effective Immediately*, NASD Notice to Members 93-85, 1993 WL 1434178, at *1 (Dec. 1993).

12

than two years, Pershing sought answers from SGC, its affiliates, and the FSRC, and tried but was prevented from meeting with Hewlett. Pershing then tried, but failed, to convince SFG to engage another, independent accounting firm to verify the portfolio. Eventually, in December 2008, after all of its verification efforts failed, Pershing notified SGC that it would no longer wire funds for CD purchases.

Young was aware of Pershing's inquiries and the obstacles it faced. In June 2007, a Pershing official asked Young for "a list of the [SIB portfolio's] investments and where they are held," and expressed surprise that such information was not in the Disclosure Statement. In refusing this request, Young never acknowledged that he did not have the information or explained why it was unavailable even though, as a Pershing official testified, Young "understood . . . what we were asking and why."

Pershing's December 2008 decision coincided with an escalating liquidity crisis at the Firm (as CD interest and redemption payments exceeded incoming funds from new CD sales) and news reports about the Madoff fraud, and SGC had trouble explaining Pershing's decision without acknowledging its own inability to verify the portfolio. Although Young was not directly involved in Pershing's third-party verification efforts, Young participated in the Firm's scheme to reassure the FAs by presenting a consistent and false explanation for Pershing's decision. As part of this effort, Young approved and distributed a misleading e-mail attributing Pershing's decision to a "tax reporting" issue, stating that SGC was "very comfortable with [its] position from a legal and compliance standpoint," and omitting any mention of Pershing's frustrated efforts at portfolio verification. Young forwarded the agreed-upon explanation (which had been drafted by other SGC personnel) to compliance staff and asked them to distribute the message "to [their] teams."[29]

Separately, Young arranged for SGC to retain Snyder in mid-2008 in connection with a planned SGC-sponsored fund offering to be managed by another Stanford affiliate. Snyder was hired to conduct due diligence on a security other than the CDs, so its involvement with the CDs was indirect. But after learning about SGC's financial dependence on SIB, Snyder focused on SIB's portfolio. On December 16, 2008, Snyder sent Young a letter stating that it was resigning because, like Pershing, it was unable to get information about the portfolio that it deemed critical to its due diligence. According to a Snyder officer, it was "looking for information that would show that the [B]ank was engaging [in] investments" that would make it possible to support and sustain the CD interest rates, and SIB's financial statements did not provide satisfactory detail.

Throughout late 2008, Young was aware of escalating scrutiny from various regulatory authorities, which included more than twenty open inquiries. Regulators were asking about many of the same issues that had generated concern throughout Young's tenure, including SIB's portfolio and operations, the FSRC's oversight, and Hewlett's audits. But rather than investigating these persistent concerns, Young continued to transmit misleading assurances.

---

[29]     SGC's president later transmitted this explanation to the Firm's operating committee, stating that it was "critical that we are all on the same page regarding the Pershing decision not to wire to SIB" and that management "give CONFIDENCE in dealing with these situations."

In addition to the continuing investigation by Commission staff, both FINRA and the Louisiana Office of Financial Institutions ("OFI") sought information regarding the portfolio and whether SIB was subject to any meaningful independent oversight.[30] FINRA asked SGC to provide documents confirming SIB's portfolio assets, allocations, and managers.[31] In a similar effort "to verify the validity of" the CD, OFI asked for a summary of due diligence on SIB, including any efforts to verify the legitimacy of the CD and SIB's portfolio assets.

Young sent a response to OFI that was consistent with his efforts to deflect similar inquiries from other regulators, FAs, securities professionals, and investors. Although OFI asked about any efforts to verify the portfolio and Young acknowledged that he had due diligence responsibilities, Young failed to mention that he was unable to and had not tried to ascertain the actual contents of SIB's portfolio.

After the Madoff Ponzi scheme was exposed and investor concerns and regulatory inquiries intensified and SGC's financial situation worsened, Young joined other SGC officials in a "roadshow" to reassure anxious personnel at each of SGC's branch offices. As an SGC official testified, FAs had finally learned that SGC did not "have insight into the portfolio" and that SIB "had close to a billion dollars of net outflows" in the previous quarter. According to this official, one of the roadshow's purposes was to describe "controls and safeguards" and "oversight . . . over the investment portfolio" to instill "confidence this wasn't a Ponzi scheme like Madoff."

During the roadshow, Young admitted that he had not "seen the portfolio of the Bank," but still tried to reassure the FAs that his due diligence ensured "the integrity and transparency of [SIB]'s operations" and covered "all material aspects" of the CDs. Young further reassured the FAs that the FSRC was a "strict" and "independent regulator" (*i.e.*, not Stanford's "puppet") that assessed SIB's "risk and [its] ability" to meet its financial obligations and reviewed and approved the Bank's auditor. Days after the last roadshow presentation, on February 16, 2009, the scheme, along with SGC, SIB, and their affiliates, collapsed and were placed into receivership.

## II. Initial Decision

The law judge found Young and two other Firm officials liable after a fifteen-day hearing that included testimony from twenty-six witnesses. The law judge held that the respondents defrauded SGC's clients through "clearly false" statements about the portfolio, as well as misleading reassurances about insurance which, even if "literally true," were used "to mislead investors into thinking they were protected." Young alone appealed.[32]

---

[30]     Young also learned, in the fall of 2008, that Florida officials were contacting SGC clients to investigate the Firm's $58.5 million in CD sales in that state.

[31]     Evidence indicates that Young was not forthcoming in responding to FINRA's inquiry. Young also knew that, in January 2009, FINRA made unannounced visits to five branch offices and seized SGC hard drives.

[32]     The initial decision is final as to the other respondents. *See Daniel Bogar and Jason T. Green*, Exchange Act Release No. 71123, 2013 WL 6665228 (Dec. 18, 2013).

14

The law judge found that Young was "at least negligent in allowing the use of marketing material that promised depositor security on the basis of facts about SIB's portfolio that could not be verified and on the basis of a discussion of insurance that [he] knew had no relevance to depositor security but that might confuse a potential investor into thinking that it did." The law judge further held Young liable for fraudulent communications intended to counter increasing concerns about SIB. The law judge found that, "[r]ather than investigate the possible truthfulness of these charges," Young acted with scienter when he "attack[ed]" them, making "representations" about the portfolio "that could not be verified" and misleadingly assuring the clients that there was insurance "to indemnify in case of fraud and/or embezzlement."

### III. Analysis

It is undisputed, and the evidence establishes, that SGC participated in a massive fraudulent scheme that caused substantial investor losses. As discussed, SGC FAs promoted the CDs to investors by distributing the Disclosure Statement and Brochure and reciting assurances from the Manual and Training Presentations. These written and oral statements consistently and falsely assured investors that SIB's portfolio consisted of diversified and liquid holdings which suggested the safety of the CDs and that, if asked, SIB was willing to provide further information about its finances. Moreover, as Young acknowledged at the hearing, these materials gave no hint of the Antiguan legal restrictions that purportedly precluded any verification—by investors, U.S. regulators, or SGC's own due diligence personnel who approved the use of the materials—of the contents of the portfolio. And there is no evidence that SGC or the FAs made any effort to disclose these verification restrictions when promoting the CDs. SGC also consistently used these materials to encourage investors to rely on SIB's private insurance policies as a key safety feature of the investment, even though these policies did not, as Young knew, cover CD investors.

Young does not challenge most of the relevant facts about SGC's promotion of the CDs. Instead, he disputes his liability primarily by claiming that he reasonably carried out his compliance and due diligence responsibilities in good-faith reliance on SFG officials, outside professionals, and regulators. But the evidence shows that Young approved material misrepresentations without verifying them or establishing any reasonable or independent basis for relying on verification by others. Then, despite his awareness of ever-increasing red flags, he approved additional misleading statements to placate concerns, prevent redemptions, and encourage further sales.

As an investment adviser, SGC had fiduciary duties of "utmost good faith, and full and fair disclosure of all material facts" and "to employ reasonable care to avoid misleading [its] clients."[33] Young, through his association with SGC and because of the due diligence and related responsibilities he undertook at the Firm, shared those duties, but failed to carry them out.[34]

---

[33]  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also Transamerica Mortg. Advisers, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) (stating that the Advisers Act was enacted "to impose enforceable fiduciary obligations" on investment advisers).

[34]  *See, e.g., Sherwin Brown*, Advisers Act Release No. 3217, 2011 WL 2433279, at *6

(continued...)

15

A.   **Young violated the Advisers Act by causing SGC's violation of Advisers Act Section 206(2) with respect to the Marketing Materials.**

A respondent is a cause of a securities law violation under Advisers Act Section 203(k)(1) if a primary violation occurred; the respondent engaged in an act or omission that contributed to the violation; and the respondent knew, or should have known, that his conduct would contribute to the violation.[35] Negligence is sufficient to establish causing liability where the underlying primary violation does not require scienter.[36]

1.   *SGC violated Advisers Act Section 206(2).*

Advisers Act Section 206(2) makes it unlawful for investment advisers to "engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or any prospective client."[37] Negligence, or a failure to exercise due care, is sufficient to establish a violation of Section 206(2).[38] We find that SGC engaged in a practice and course of business that operated as a fraud or deceit upon its clients by using the Disclosure Statement and Brochure, which contained material misstatements about SIB's portfolio and insurance coverage.

---

(...continued)

(June 17, 2011) ("Investment advisers and their associated persons have a fiduciary duty to their clients."); *In re Fundamental Portfolio Advisors, Inc.*, Advisers Act Release No. 2146, 2003 WL 21658248, at *15 (July 15, 2003) (holding that associated persons are fiduciaries held to the "affirmative duty of utmost good faith, and full and fair disclosure of all material facts"); *see also SEC v. DiBella*, 587 F.3d 553, 565 (2d Cir. 2009) (explaining that a fiduciary has an "obligation to verify facts relevant to prudent investment on behalf of those who did not possess the information").

[35]   15 U.S.C. § 203(k)(1); *see also Gregory M. Dearlove*, Exchange Act Release No. 57244, 2008 WL 281105, at *31 (Jan. 31, 2008), *petition denied*, 573 F.3d 801 (D.C. Cir. 2009); *Eric J. Brown*, Advisers Act Release No. 3376, 2012 WL 625874, at *10 n.16 (Feb. 27, 2012), *petition denied sub nom.*, *SEC v. Collins*, 736 F.3d 521 (D.C. Cir. 2013).

[36]   *Joseph John VanCook*, Exchange Act Release No. 61039A, 2009 WL 4026291, at *14 n.65 (*citing KMPG Peat Marwick LLP*, Exchange Act Release No. 43862, 2001 WL 47245, at *19 (Jan. 19, 2001), *petition denied*, 289 F.3d 109 (D.C. Cir. 2002)).

[37]   15 U.S.C. § 80b-6(2).

[38]   *See Capital Gains*, 375 U.S. at 200 ("Failure to disclose material facts must be deemed fraud or deceit within [the Adviser's Act's] intended meaning, . . . To impose . . . the burden of showing deliberate dishonesty . . . would effectively nullify the protective purposes of the statute."); *DiBella*, 587 F.3d at 569 (stating that § 206(2) covers "negligent acts" and "any transaction that functions or otherwise results in a fraud").

APP. 050

The Marketing Materials evidence a practice and course of business that operated as a fraud. They contained false statements and omissions about the portfolio that were used to convince investors of the safety and liquidity of the CDs. The Marketing Materials included detailed—but unverified and false—claims about the portfolio's holdings.[39] The Disclosure Statement cultivated an illusion of transparency by falsely assuring investors that they could "obtain such additional information as [they] may request concerning the [CDs] and SIB's financial condition and affairs." These portfolio claims and omissions were material because there is a substantial likelihood that accurate and complete disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information about the CDs.

The representations in the Marketing Materials about SIB's "comprehensive insurance program" were materially misleading and operated as a fraud on SGC's clients because they failed to say that the insurance policies did not protect the CD investors.[40] The Marketing Materials suggested that the investments were protected in a manner similar to bank depositor insurance by: appropriating the familiar terminology of more conventional bank product safeguards (including the terms "depositors," "deposits," and "withdrawals"); comparing the SIB CD rates and performance to U.S. bank CDs that had FDIC protections (which, according to the Manual, was relatively weak); and characterizing SIB's insurance as comprehensive and a source of investor safety. SGC misled its clients by citing these insurance statements to deflect investor concerns, and continued this emphasis after it was aware that such statements fostered confusion even among its own FAs about whether the policies covered CD investors.[41]

Young argues that SIB's insurance claims were not misleading because, among other things, the Disclosure Statement and Brochure included disclaimers stating that the CDs and

---

[39] *See, e.g., SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) ("[I]t would be material to a reasonable investor that his or her money was not being used as represented in safe investment strategies, but rather, in high risk ventures and for the payment of personal expenses.").

[40] *See SEC v. First Am. Bank & Trust Co.*, 481 F.2d 673, 678 (8th Cir. 1973) (when an issuer described itself as a "banking institution" and compared itself to a bank, its statement that it was "bonded and insured by major insurance companies" was a material misleading misrepresentation under § 17(a) because, even if "literally true" it was "susceptible to . . . interpretation by the reasonable investor . . . that the deposits were insured by the FDIC").

[41] Young argues that the law judge's finding that some of the insurance disclosure was "literally true" precludes liability for insurance related disclosures. Based on our de novo review of the record, we do not find persuasive evidence in the record that the descriptions of SIB's insurance policy coverage were "literally true." In any event, we find ample support for the law judge's finding that the insurance claims were misleading (even if literally true) because they were used to convince investors that the insurance provided "depositor security." It is well settled that a literally true statement may nevertheless be fraudulent based on the context in which that statement is made. *See Kleinman v. Elan Cor., plc*, 706 F.3d 145, 153 (2d Cir. 2013) ("Statements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors' . . . ." (internal citations omitted)).

17

deposits were not protected by FDIC, SIPC or other government insurance policies.[42] But as the confusion of the FAs confirmed, none of these disclaimers was specific or clear enough to satisfy SGC's fiduciary obligations to provide complete and non-misleading information.  The detailed and consistent emphasis on insurance in the Marketing Materials fostered the unmistakable impression that these policies somehow protected investors, and the disclaimers were inadequate to counter this misleading impression.[43]  Having chosen to use materials that extensively discussed insurance, SGC had a duty to fully and fairly disclose its significance by, at least, clearly explaining *how* these policies benefitted investors when *none* of them covered the CDs.[44]

Although the Disclosure Statement lists multiple insurance policies held by SIB, Young asserts that this disclosure is not misleading because it ends by including the following limiting language: "*[t]he latter insurance* protects us against the possible insolvency of other financial institutions . . . *This insurance* does not insure customer deposits and is not the equivalent of FDIC insurance offered on deposits at many institutions in the United States" (emphasis added). The  reference to "this insurance" is ambiguous because it could apply to either all of the SIB private insurance policies described in the paragraph, or solely to the "excess FDIC and Depository Insolvency insurance" described in the immediately preceding sentence.  We find that the latter interpretation more reasonable to an investor who receives this document as marketing for the CDs, because there would be no reason for describing SIB's insurance policies in a detailed manner, if in fact those investors were not covered by any of those policies.

Young suggests that these insurance policy descriptions were included in the Disclosure Statement because the insurers purportedly protected investors by providing oversight of SIB's operations.  But this explanation does not make sense:  the Disclosure Statement itself does not mention such oversight.[45]  As the investor testimony confirmed, investors believed that the detailed insurance policy descriptions meant that the insurance policies identified in the Disclosure Statement covered CD purchasers.

---

[42]    Young also claims that it was not misleading to call SIB's insurance comprehensive because "comprehensive" auto insurance can offer limited coverage. This analogy is fallacious. Even if some types of automobile damage are not covered by such policies, there is no doubt that purchasers of auto insurance are, unlike the CD investors, actually insured.

[43]    *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (noting that "cautionary statements were so deficient [respondent] must have known investors would be misled by the offering documents").

[44]    *Cf. Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

[45]    Nor does he offer evidence that the insurers actually provided such oversight.

18

Young points to other disclaimers stating that the CDs were not protected by FDIC or government-issued insurance, but, as he conceded, they did not address the multiple *private* insurance policies or explain that those policies did not cover CD investors.

2.   *Young engaged in conduct that he knew or should have known would contribute to SGC's Advisers Act Section 206(2) violation.*

Young's acts and omissions contributed to the distribution of misleading disclosures to SGC's clients, including (as part of his due diligence responsibilities) his vetting of the CDs and his review and approval of the Disclosure Statement and Brochure for use by the FAs. He further ensured that misleading disclosures would reach SGC's clients when he distributed the Manual and participated in the Training Presentations. Moreover, during the Training Presentations, Young directed the FAs to provide the Disclosure Statement to each potential investor, distributed and presented other materials that reinforced and elaborated on the fraudulent assurances it contained, and encouraged the FAs to repeat these assurances to investors.[46]

That Young was at least negligent is established by, among other things, his unjustifiable acceptance of SIB's lack of transparency. The fact that SFG officials repeatedly and consistently told him that he was "never going to see the portfolio" that purportedly produced remarkable returns is precisely the kind of unusual circumstance that requires thorough and independent investigation because the "darkness and ignorance of commercial secrecy are the conditions upon which predatory practices best thrive."[47] Rather than investigating, Young relied on vague references to unspecified Antiguan laws. But "[w]hen the facts known to a person place him on notice of a risk" of fraud "he cannot ignore the facts and plead ignorance of the risk."[48] Even if Young believed that the lack of transparency was a consequence of Antiguan law, he acted unreasonably when he approved unqualified assurances about the portfolio and the supposed willingness of Bank officials to answer investor questions.

---

[46]   Young claims that he was "not the author of the slides which discussed the financial strength of SIB" or the "supervisory principal in charge of conducting sales training." But internal e-mails and other evidence show, among other things, that he personally presented the February 2008 Training Presentation which described the portfolio as the source of returns on the CDs. At oral argument, Young asserted that the staff was "unable to produce one witness that testified that I trained him regarding the SIB product" or that Young "was even there . . . when they were trained." But Young acknowledged at the hearing that he assumed responsibility for training in 2007 and internal e-mails confirm that he either led or played a central role in Training Presentations on at least two occasions in 2008.

[47]   *Capital Gains*, 375 U.S. at 200.

[48]   *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008).

19

While not denying Stanford's fraud, Young claims that he was unaware of it during his time at SGC.[49] He defends his conduct by arguing that the fraudulent scheme pre-dated his arrival at SGC and that he was merely repeating false statements that were originally formulated by others. But Section 203(k)(1) covers actions and omissions that "contribute" to the fraud.[50] It is clear that SGC clients continued to be defrauded after Young approved the use of the Marketing Materials, and that Young—by failing to carry out his due diligence responsibilities with respect to those materials and by encouraging the FAs to repeat the misrepresentations— contributed to SGC's continuing violations.

Young also claims that he conducted "extensive due diligence" and reasonably relied on the verification and approval by SFG, SIB and SGC personnel, their auditors and counsel, and outside regulators. These claims are belied by the record. For example, Young acknowledged during the hearing that he never asked U.S.-based SFG officials who purportedly managed the portfolio, Hewlett, or the FSRC to confirm the accuracy of the pertinent disclosures. Young accepted without question that any portfolio verification was completely precluded by Antiguan law, knew that this lack of verification was not disclosed to investors, and made no effort to require such disclosure or question the omission. Nor did Young make reasonable efforts to understand the scope or operation of those purported Antiguan restrictions, such as why the restrictions applied to SGC, an SIB affiliate.[51]

Young also had no reasonable basis for approving the misstatements and omissions about how SIB's insurance provided "depositor security" because he knew that the insurance did not cover investors. As he acknowledged, he never contacted insurance company officials or other independent sources concerning the insurance disclosures. Young claims that he should not be held liable for disclosures in the Marketing Materials written and approved by others before he started at SGC because he "developed his own" Training Presentation slides stating that the CDs

---

[49]    Young claims an FBI agent testified that he had no knowledge of the Stanford scheme and could not have done anything to uncover or prevent it. The agent's testimony did not address the fraudulent or misleading statements that are the bases for holding Young liable for securities fraud; his liability does not turn on whether he could have uncovered the Stanford scheme. The agent also offered no testimony about Young's state of mind or due diligence efforts. As such, she did not have occasion to, and did not, exonerate Young. Young also asserted at oral argument that a Division lawyer told his lawyer that Young was unaware of "what was happening" at SIB. He provides no support for this claim and, in any event, our finding of liability is not dependent on a determination that Young was aware of the entirety of Stanford's scheme.

[50]    15 U.S.C. § 80b-3(k)(1). The law judge found that Young did not aid and abet the drafting of the Disclosure Statement and Brochure, and this finding was not appealed.

[51]    As the Supreme Court recently explained, "[i]n the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects" a legal conclusion "to rest on some meaningful legal inquiry" and to "fairly align[]" with the available facts at the time. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 & 1329 (2015).

20

were "Not Insured," could not be "compared equally with U.S. CDs," and had "Major differences" with U.S. CDs. The inclusion of those boilerplate disclaimers were not sufficient to overcome the other specific misstatements in the Training Presentations Young approved and co-presented, including a slide saying that a Lloyd's of London policy "cover[ed] fraud" and that led FAs to conclude that the insurance protected investors from fraud.[52] When Young gave these presentations, he knew or should have known that the FAs were confused about coverage.

Young claims that he "believed that the reviews of the portfolio by [Hewlett] and the [FSRC] in Antigua overcame the 'lack of transparency'" because neither "expressed any concern." But Young's own testimony and due diligence records confirm that he had no contact with Hewlett and that his interaction with the FSRC was perfunctory and provided no basis for accepting SIB's statements about the portfolio.[53] Although Young now claims that he "had no reason to question King's representations," during the hearing he acknowledged his awareness of persistent allegations of Antiguan corruption and doubts about the FSRC's independence.[54]

Similarly unpersuasive is Young's asserted reliance on legal counsel, such as Sjoblom, who purportedly reviewed CD "sales-practice issues" in 2005 before Young joined SGC. There is no evidence that, as Young claims, Sjoblom or other lawyers "represented" or "assured" him that the disclosures about the portfolio or insurance or SIB's willingness to answer questions were appropriate or that there were "no CD sales practice issues." Nor is there any evidence that, as Young suggests, lawyers explained how "Antiguan privacy law prevented [h]im from gaining access to the information he had requested."[55] Indeed, when Young testified, he failed to

---

[52]     Contrary to his claim that he personally developed disclaimer slides to address any confusion, those slides were used by SGC's previous chief compliance officer. *See supra* note 9 (explaining that Young did not create the disclaimer slides) and note 11 (describing attempts by a compliance staffer to make other modifications to the training slides to address FA confusion about insurance).

[53]     *See World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1249 (9th Cir. 2014) (rejecting reliance claim and stating that "brokers rely on third-parties at their own peril, and will not avoid liability through that reliance when the duty of reasonable inquiry rests with the brokers").

[54]     During the hearing he confirmed that he approached these meetings with skepticism, notwithstanding that during the roadshow, he tried to counter concerns that the FSRC was Stanford's "puppet."

[55]     In support of his claim of reasonable reliance, Young points to Stanford's retention of various prominent law firms (including Chadbourne & Park, where Sjoblom was a partner) and to Sjoblom's regulatory experience. Stanford's retention of those firms is not evidence of Young's reliance, because Young has failed to identify specific communications he had with counsel at those firms. *SEC v. McNamee*, 481 F.3d 451, 456 (7th Cir. 2007) ("It isn't possible to make out an advice-of-counsel defense without producing the actual advice from an actual lawyer").

21

describe any such representations or assurances and acknowledged that he never asked counsel about the accuracy or adequacy of the disclosures.[56]

Young further contends that it was reasonable for him to accept the existence and applicability of the purported Antiguan transparency restrictions because Sjoblom's 2005 response to Commission staff inquiries referred to Antiguan restrictions on providing information, and SFG officials accepted Sjoblom's interpretation. But such assertions, if made, would not have constituted a reasonable basis for unquestioning reliance because Young knew that the Commission, other regulators, and firms with which he dealt continued to question SIB's lack of transparency and SGC's due diligence.[57]

In addition, Young claims that he was entitled to rely on 2004 Commission examinations and examinations by NASD and other state regulators that did not identify the violative conduct at issue. But it is well established that regulatory oversight and involvement does not excuse misconduct.[58] Nor is there merit to Young's claim that it was reasonable for him to fail to investigate the portfolio because of an October 2004 letter from an SGC compliance officer to Commission staff stating that SGC did not have access to a list of SIB's portfolio holdings. In fact, Young knew that, rather than accepting this response, Commission staff followed up with more questions about the SIB portfolio in December 2004,[59] March 2005, and September 2005,

---

[56]    Young contends erroneously that any finding of liability is precluded by the law judge's finding that "Respondents did not provide input into the language of disclosure and marketing materials, and believed that in-house and outside counsel had approved the disclosure and marketing materials and the manner in which SGC and SIB were doing business." We agree with the law judge that even if Young did not originally draft the fraudulent disclosure and had such a subjective belief, his actions were still unreasonable because he knew of facts that made the portfolio and insurance disclosures misleading.

[57]    On appeal, Young purports to quote from a September 2005 letter from Sjoblom to the Commission staff to the effect that "there are certain provisions under the laws of Antigua and Barbuda (the violations of which can result in harsh consequences) which prohibit SIB from providing you with all the documentary information you currently request." This September 2005 letter is not in the record and Young did not testify about it at the hearing. In any event, the letter was a response to a regulatory inquiry; it did not address whether the referenced restrictions applied equally to SGC, an SIB affiliate.

[58]    *See, e.g., William H. Gerhauser, Sr.*, Exchange Act Release No. 40639, 1998 WL 767091, at *4 (Nov. 4, 1998) (stating that a regulator's "failure to take early action neither operates as an estoppel against later action nor cures a violation"). Moreover, Young knew that regulatory inquiries and examinations were ongoing.

[59]    In the December 2004 letter, the staff asked for "an explanation of why you do not have access to the requested information, given the fact that SIB and SGC are under common ownership and control." In response, SGC described "information barriers to isolate and prevent the improper flow of information and avoid any potential conflicts of interest," but made no mention of Antiguan bank secrecy requirements.

22

and sent a subpoena in November 2006. Young also knew that other regulators continued to seek this information during his tenure.

As support for his reliance claim, Young cites *Howard v. SEC*, where a salesperson was found to have relied, in good faith, on the advice of counsel about compliance with an ambiguous legal rule.[60] *Howard* is inapposite: unlike in this case, the violation in that case was not evident to Howard; Howard was a salesperson, who, unlike Young, had not assumed responsibility for due diligence on behalf of his firm; and, in contrast to Young, Howard encountered "green" rather than red flags regarding the violation. Also inapposite are the other cases Young cites to claim reasonable reliance. None of the cases Young cites found reasonable reliance despite comparable due diligence responsibilities, clearly fraudulent statements, or approvals despite known but unaddressed red flags.[61]

Young contends that it is unfair to hold him liable because doing so puts chief compliance officers "in the role of guarantor of the actions of" salespersons and "others within

---

[60]  376 F.3d 1136, 1143 (D.C. Cir. 2000) (finding "the evidence showed that Howard was not aware, generally or otherwise, of any wrongdoing"). Reliance is unreasonable when, as here, the respondent has a duty to investigate, encounters increasing warning signs without asking reasonable questions, and repeatedly authorizes statements downplaying concerns. *See Graham v. SEC*, 222 F.3d 994, 1006 (D.C. Cir. 2000) (finding extreme recklessness despite compliance approvals); *see Brendan E. Murray*, Initial Decision Release No. 332, 2007 WL 1988449, at *12 (July 10, 2007), *aff'd*, Exchange Act Release No. 28519, 2008 WL 4964110, at *6 (Nov. 21, 2008) (explaining that following instructions is not a defense to obviously fraudulent conduct); *Charles K. Seavey*, Initial Decision Release No. 200, 2002 WL 238500, at *14 (Feb. 20, 2002), *aff'd*, Advisers Act Release No. 2119, 2003 WL 1561440 (Mar. 27, 2003) (rejecting reliance defense despite consultation of counsel).

[61]  For example, in *Charles C. Carlson*, we found that a salesman's reliance on advice regarding a legal question mitigated the seriousness of his misconduct, but the salesman in that case sought advice from multiple sources, including a lawyer. Admin. Proc. File No. 3-5018, 1866 SEC LEXIS 162 (Mar. 28, 1977) (finding that salesman actively sought and reasonably relied on advice), *rev'g in part and aff'g in part on other grounds*, Exchange Act Release No. 14246, 46 SEC 1125, 1132 (Dec. 12, 1977). In *Kingsley, Jennison, McNulty & Morse Inc.*, the Commission found that a respondent's good faith precluded a finding of recklessness, but this finding was based on the respondent's "testimony and . . . demeanor" establishing a genuine good faith belief that the violative conduct was lawful and beneficial to clients. Advisers Act Release No. 1396, 1993 WL 538935, at *4 n.28 (Dec. 23, 1993). Such facts are not present with respect to Young.

The Commission has declined in some cases to find liability despite the presence of red flags, but, the respondents in those cases, unlike Young, investigated and took other appropriate responsive action. For instance, *in James Arthur Huff*, the Commission declined to find a supervisory failure, but in that case the respondent conducted his own independent investigation when he encountered indications of wrongdoing and recommended responsive personnel action. Exchange Act Release No. 29017, 1991 WL 296561, at *4 (Mar. 28, 1991).

23

and outside of their organization" which, he claims, would "create havoc in the compliance world." A compliance role does not preclude liability where the respondent engages in conduct that "otherwise violate[s] the securities laws or aid[s] and abet[s] or cause[s] a violation."[62] Young cites several cases in which compliance, legal or other officials were not found liable for violations by their firms or associated persons. But those cases do not undermine the well-established principle that the reasonableness of any respondent's actions depends on the facts and circumstances presented and we have held chief compliance officers liable for violative conduct in a variety of circumstances.[63] The record here clearly establishes that Young failed to make reasonable efforts to fulfill the responsibilities he voluntarily undertook. It is this evidence of Young's actions and failures to act, not his designation as chief compliance officer, that is the basis for his liability.

---

[62]    See Frequently Asked Questions about Liability of Compliance and Legal Personnel at Broker-Dealers under Sections 15(b)(4) and 15(b)(6) of the Exchange Act (Sept. 30, 2013) ("Failure to Supervise FAQs"), at n.1, *available at* http://www.sec.gov/divisions/marketreg/faq-cco-supervision-093013.htm (last checked Oct. 22, 2015).

Young cites *Scott G. Monson* where, in dismissing proceedings against the general counsel of a broker-dealer, we expressed concern about the potential for improper "interference with lawyers' ability to provide unbiased, independent legal advice regarding the securities laws." Investment Company Act Release No. 28323, 2008 WL 2574441, at *5 (June 30, 2008). But we found that Monson was not liable because the relevant violations were not within the purview of his responsibilities. Here, by contrast, it is undisputed that Young was responsible for reviewing the accuracy of the disclosures and conducting due diligence. Moreover, we emphasized in Monson that we will "pursue cases against lawyers who," among other things "engage in conduct that would render a non-lawyer liable for the same activity under comparable circumstances." *Id.* at *5.

[63]    See, e.g., *Robert Marcus Lane*, Exchange Act Release No. 74269, 2015 WL 627346 (Feb. 13, 2015) (finding chief compliance officer failed to reasonably supervise a trader who engaged in fraudulent trading); *Koch*, 2014 WL 1998524 (finding chief compliance officer violated antifraud provisions); *vFinance Invs., Inc.*, Exchange Act Release No. 62448, 2010 WL 2674858 (July 2, 2010) (finding chief compliance officer aided and abetted books and records violations). We further note that the precedent Young cites includes initial decisions of administrative law judges, which are not recognized as binding. *See Rapoport v. SEC*, 682 F.3d 98, 105 (D.C. Cir. 2012) ("not consider[ing]" order issued by law judge because it was "not a binding Commission decision"); *Absolute Potential, Inc.*, Exchange Act Release No. 71866 (Apr. 4, 2014), 2014 WL 1338256, at *8 n.48 ("We are not bound by a law judge's initial decision").

24

B.     **Young violated Exchange Act Section 10(b), Exchange Act Rule 10b-5 and Securities Act Section 17(a); and he aided and abetted and caused SGC's violations of Section 10(b) and Rule 10b-5, Exchange Act Section 15(c)(1), and Advisers Act Sections 206(1) and (2).**

In addition to causing SGC's violation of Section 206(2), Young also committed his own primary violations of Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a). Young also aided and abetted and caused SGC's violations of Exchange Act Section 10(b) and Rule 10b-5, Exchange Act Section 15(c)(1), and Advisers Act Sections 206(1) and 206(2).

1.     *Young committed primary violations of antifraud provisions.*

Exchange Act Section 10(b) makes it "unlawful for any person directly or indirectly . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" Commission rules.[64] Rule 10b-5 implements the Commission's Section 10(b) authority through three mutually supporting subsections. Rule 10b-5(a) prohibits "any device, scheme, or artifice to defraud"; Rule 10b-5(b) prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made . . . not misleading"; and Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Liability under each subsection requires a showing of scienter,[65] which can be established through recklessness.[66]

By directing the preparation of, approving, and distributing false and misleading statements about CDs, Young violated Exchange Act Section 10(b) and Exchange Act Rules 10b-5(a) and (c), as well as Securities Act Sections 17(a)(1) and (3), which largely track Rule 10b-5(a) and (c).[67] These statements included SGC's responses to client inquiries that dismissed

---

[64]     Section 10(b) applies to fraudulent conduct "in connection with the purchase or sale of any security." This element is satisfied because SGC continued to offer and sell the CDs until its collapse and the violations reflect SGC's efforts to downplay and misrepresent the risks associated with these transactions. *See, e.g., SEC v. Zandford*, 535 U.S. 813, 822 (2002) (finding the "in connection with" requirement satisfied if the "scheme to defraud and the sale of securities coincide").

[65]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976).

[66]     *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (stating that scienter can be established by an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."); *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992).

[67]     Securities Act Section 17(a) makes it unlawful for any person in the offer or sale of securities "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3). Scienter is required to establish a violation of Section

(continued...)

25

valid concerns as baseless; an internal email to SGC staff that falsely characterized Pershing's decision to stop facilitating CD purchases; and misleading talking points following exposure of the Madoff fraud.

### a. *Young engaged in fraud by authorizing the February Responses.*

We find that the February Responses were devices, schemes, and artifices to deceive concerned CD investors, and operated as a fraud by dismissing their concerns with false and misleading assertions. Young is liable because he authorized the responses with extreme indifference to the obvious risk of misleading the investors.

The February Responses—which dismissed the investors' concerns as "taken out of context, selectively chosen . . . and opinion, not fact" and "incomplete[] . . . , or just plain wrong"—were materially misleading and deceptive. They falsely stated, for instance, that the Bank used "a prudent investment approach that it has followed for 20 years"; that the Bank's "investment portfolio is a globally diversified allocation that is invested across countries, asset classes, sectors and currencies"; and that the "money deposited in [SIB] is . . . not invested in Stanford's Antiguan developments." In addition, like the Disclosure Statement, the February Responses cultivated a deceptive illusion of transparency by telling the investors that "Stanford leadership . . . can speak in significant depth" to their questions—while omitting any mention of the alleged transparency restrictions. The responses falsely suggested that insurance protection existed by claiming that SIB had "insurance policies in place to indemnify in case of fraud and/or embezzlement"—without explaining that none of these policies indemnified investors or protected them from fraud.

These false statements and omissions were material. They were directly relevant to the total mix of information about investments in the CDs, intended to counter significant and legitimate concerns about, among other things, SIB's portfolio, the legitimacy of the CDs, Antiguan corruption, and regulatory oversight.

Although the February Responses were not directly attributed to him, Young directed their preparation and approved their transmission by the FAs to the clients. Young's conduct constituted a deceptive device, scheme, or artifice to defraud under Rule 10b-5(a) and Securities Act Section 17(a)(1), and an act, practice, or course of business which operates or would operate as a fraud or deceit under Rule 10b-5(c).[68] Internal emails between Young, the FAs, and other

---

(...continued)

17(a)(1) but negligence will establish a violation of Section 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

[68]     Young suggests that *Janus* applies to all of the alleged violations, but the "making" language interpreted in *Janus* appears only in Rule 10b-5(b). *See, e.g., Donald L. Koch*, Advisers Act Release No. 3826, 2014 WL 1998524, at *18 (May 16, 2014) (stating that *Janus* does not apply to respondents charged with manipulative and deceptive conduct), *petition granted in part and denied in part*, 793 F.3d 147 (D.C. Cir. 2015).

SGC personnel show that Young reviewed the investors' inquiries, directed the strategy for the Firm's response, and approved the written responses that were sent to SGC's clients. We further find that Young's liability is not based on a single decision or action but reflected his direct involvement in an ongoing practice and course of business that violated Section 17(a)(3).[69] Throughout his SGC tenure, Young repeatedly directed and approved the presentation of materially misleading statements and omissions about the Bank and CDs, including as part of the roadshow presentation shortly before SGC's collapse.

Young acted with scienter. Given the facts known to him, the danger of misleading investors through the portfolio and insurance assurances was so obvious that Young must have been aware of it. He was, at the very least, recklessly indifferent to the truth or falsity of the February Responses and to the obvious risk of misleading investors by dismissing the February Inquiries—as mere "opinion, not fact" or "just plain wrong"—while responding with unsubstantiated, unqualified, dismissive and false assurances.[70] Further supporting our finding is his reckless indifference to the numerous red flags surrounding the February Inquiries, including questions about whether SIB was operating a Ponzi scheme. Even if Young believed the reassurances as he claims, including them in the February Responses without any investigation evidences the kind of "egregious refusal to see the obvious, or to investigate the doubtful" that is strong evidence of recklessness.[71]

---

[69]     See Webster's New International Dictionary 1937 (def. 1b) (2d ed. 1934) (defining "practice," when used as a noun, in terms suggesting repeated conduct engaged in over time: "often, repeated or customary action; usage; habit; custom; ... the usual mode or method of doing something"); id. 610 (def. 5) (defining "course," when used in phrases like "course of conduct," to mean "a succession of acts or practices" or "[a] series of motions or acts"); see also Johnny Clifton, Exchange Act Release No. 69982, 2013 WL 3487076, at *10 (July 12, 2013) (finding that respondent's repeated attempts to conceal material adverse information from sales representatives and prospective investors was a fraudulent course of business that violated Section 17(a)(3)).

[70]     An experienced securities professional acts with scienter if he recklessly "fail[s] to verify the legitimacy of the investment." SEC v. George, 426 F.3d 786, 795 (6th Cir. 2005); see also Gebhart v. SEC, 595 F.3d 1034, 1043 (9th Cir. 2010).

[71]     Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (internal citations omitted); see also Hanly v. SEC, 415 F.2d 589, 597 (2d. Cir. 1969) (noting the duty to disclose the unavailability of "essential information" about a security and "the risks which arise from [t]his lack of information"). Young asserts that he had no motive to mislead investors because his financial incentives were not directly tied to the CDs. But we need not identify a motive to find scienter. See, e.g., Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1324 (2011) (stating that "[t]he absence of a motive allegation, though relevant, is not dispositive"). In any event, Young was motivated to ensure SGC's financial survival and, as he testified, its growth as "a world class organization."

Young also argues he should not be blamed for his failure to expand his inquiries because collusion among knowledgeable officials precluded his discovery of the scheme. But Young's

(continued...)

27

Young seeks to shift blame by claiming that the February Responses merely "parroted" statements that were "boilerplate" previously drafted or vetted by the Bank or its affiliated persons for the Disclosure Statement or Brochure.[72]  But the February Responses included fraudulent statements that were not derived from the Marketing Materials or that were included to counter February Inquiries about the safety of the CDs —including statements (i) denigrating the investors' concerns as biased, incorrect, and outdated; (ii) asserting that the "money deposited in [SIB] is . . . not invested in Stanford's Antiguan developments"; and (iii) claiming that SIB had "insurance policies in place to indemnify in case of fraud and/or embezzlement."  Moreover, Young knew that his own direction and approval—not just the approval of those on whom he purported to rely—was required before these responses could be sent.  And he must have known that the statements about SIB's willingness to answer questions were deceptive and misleading given his own inability to verify information about SIB's portfolio.[73]

During its final two years, SGC's financial difficulties mounted and Young faced ever-increasing red flags, including escalating concern and skepticism about SIB and the portfolio among regulators and independent securities professionals.  Young also faced repeated questions about the Bank's auditor and Antiguan regulatory oversight.  While SGC's finances became increasingly precarious, requiring substantial monthly infusions from SFG, Young also learned that other securities professionals had raised doubts about SGC and SIB finances that echoed the Ponzi scheme warning he received in February 2007.[74]  In order to counter these red flags, Young and other SGC officials employed devices, schemes, and artifices to deceive investors and engaged in acts and practices that operated as a fraud or deceit.

---

(...continued)

liability is premised on his own responses to red flags and failures to inquire; it is not dependent on how others might have responded to potential inquiries. *Cf. Wendy McNeeley*, Exchange Act Release No. 68431, 2012 WL 6457291, at *12 (Dec. 13, 2012) (rejecting auditor's claim that "any follow up . . . would have been futile").

[72]     Given Young's admission that he did not take any steps to investigate the February Inquiries, it is highly unlikely that counsel reviewed the February Responses.  And even if Young believed that the responses repeated statements that counsel had reviewed in other contexts, Young's reliance without any relevant legal inquiry was reckless in light of the red flags the February Inquiries presented and his knowledge of facts making the responses misleading. *See SEC v. Melvin Ray Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) ("One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it.").

[73]     *See SEC v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009) ("[T]he fact that a defendant publishes statements when in possession of facts suggesting that the statements are false is 'classic evidence of scienter.'" (citations omitted)).

[74]     *Graham*, 222 F.3d at 1005 (finding that "economically irrational trading was a large red flag").

28

### b. *Young engaged in fraud by distributing the Pershing e-mail.*

We find that Young employed a deceptive device and artifice to defraud, and engaged in a deceptive act, violating Exchange Act Section 10b-5(a) and 10b-5(c) and Securities Act Section 17(a)(1) when he approved and distributed a misleading explanation for Pershing's decision to stop wiring funds for CD purchases.[75] This distribution falsely attributed Pershing's decision to tax reporting issues unrelated to the real reason—*i.e.*, the inability to verify SIB's claims about the portfolio—to reassure FAs and their clients that Pershing's decision was not cause for concern.

Young's actions were part of a deceptive SGC effort to conceal Pershing's unwillingness to accept the lack of portfolio transparency and to minimize its effect on FA confidence and CD sales. Shortly after another SGC official sent him the proposed explanation, Young agreed to forward it "to all of compliance" and later that night sent it to other SGC compliance officials with instructions for further distribution.

Young denies knowing the true reason for Pershing's decision, but his claim of ignorance is implausible given his awareness of Pershing's longstanding efforts to verify SIB's portfolio assets.[76] At a minimum, it was reckless under these circumstances for Young to distribute the explanation without making any effort to confirm its accuracy.[77]

### c. *Young engaged in fraud through his approval of the Madoff talking points.*

Young also violated Exchange Act Rules 10b-5(a) and (c) and Securities Act Section 17(a)(1) and (3) by approving false and misleading talking points for the sales staff to use in reassuring clients following news reports about the Madoff Ponzi scheme. His approval was, at a minimum, reckless given the red flags and other surrounding circumstances. Like SGC's responses to the February Inquiries, the talking points sought to address concerns about the

---

[75]    Although this message was not delivered directly to investors, the explanation was "in connection with the purchase and sale" of the CD because it described changes to the mechanics for purchases and sale that they continued. *Cf. MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 651 F.3d 268, 277 n.11 (2d Cir. 2011) ("Conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities" under the Exchange Act).

[76]    As early as June 2007, Young exchanged e-mails with a Pershing risk manager who was seeking to verify SIB's portfolio assets. Young was in regular contact with another Pershing official who testified that Young understood Pershing's verification efforts. Moreover, in April 2008, in the midst of SGC's negotiations with Pershing for portfolio verification, Young sent a memo that explained SGC's options for terminating the clearing relationship and recognized SGC's interest in avoiding "[i]ncreased scrutiny." And, in testimony, Young acknowledged that he knew about the ongoing efforts to secure third-party portfolio verification as Pershing proposed.

[77]    *See Gebhart*, 595 F.3d at 1041.

APP. 063

safety and legitimacy of the CDs through misleading assurances about SIB's portfolio and insurance. One talking point encouraged the FAs to represent, without verification, that SIB "[h]ad no exposure to CDOs, CMOs, Structured Products, including those of Fairfield/Madoff."[78] Another talking point echoed earlier false assurances about the protection afforded by SIB's insurance policies, including policies purportedly issued by Lloyd's of London.

Young's review and approval of these misleading talking points was a deceptive device, scheme or artifice to defraud SGC clients by challenging parallels between Madoff's operations and those of SIB. Although Young purported to approve this distribution for "internal use only," he knew that each of these deceptive statements could be repeated to investors because the e-mail itself encouraged their use "when fielding calls from" clients. Young's approval of each of these statements also reflected his ongoing fraudulent practices and courses of business of recklessly using and approving similar misstatements about SIB's portfolio and insurance to placate the concerns of investors.

2.    *Young aided and abetted and caused SGC's violations of antifraud provisions.*

In addition to Young's primary liability, the conduct described above also establishes SGC's primary liability for violating Exchange Act Section 10(b) and Rule 10b-5(a) and (c), and Young's liability for aiding and abetting and causing those violations.[79] Aiding and abetting liability can be established by: (1) a primary violation of the securities laws; (2) the aider and abettor's knowledge or recklessness as to the violation; and (3) the aider and abettor's substantial assistance in the achievement of the primary violation.[80] These elements are satisfied. With respect to each violation, the findings above establish the Firm's primary liability,[81] Young's knowledge or recklessness as to the violation and his role in the violation, and Young's substantial assistance.

---

[78]    Young claims these statements were "derived from" the Marketing Materials, but the Marketing Materials did not address whether the portfolio held CDOs, CMOs or "Fairfield/Madoff" securities.

[79]    A person who aids and abets violations is also a cause of those violations. *Graham*, 1998 WL 823072, at *7 n.35.

[80]    *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012); *Graham*, 222 F.3d at 1004 (stating that knowledge or recklessness establishes scienter for aiding and abetting liability); *Abraham & Sons Capital, Inc.*, Exchange Act Release No. 44624, 2001 WL 865448, at *7 (July 31, 2001) (stating that the requisite scienter may be established by "general awareness or reckless disregard by [the person] of the wrongdoing and of his role in furthering it").

[81]    The conduct and state of mind establishing SGC's primary liability is imputed to the Firm from Young and other responsible Firm officials. *A.J. White & Co. v. SEC*, 556 F.2d 619, 624 (1st Cir. 1977) (holding that a firm "is accountable for the actions of its responsible officers"); *Warwick Capital Mgmt.*, 2008 WL 149127, at *9 n.33 ("A company's scienter is imputed from that of the individuals controlling it."). *See infra* note 83 and accompanying text.

The findings also establish SGC's violations of Exchange Act Section 15(c)(1) and Advisers Act Section 206(1) and (2), and Young's liability for aiding and abetting and causing those violations. The prohibitions in those sections, which are applicable to SGC, are substantially the same as the prohibitions in Rule 10b-5(a) and (c).[82]

Finally, Young aided and abetted and caused SGC's violation of Rule 10b-5(b) in connection with the February Responses. SGC violated Rule 10b-5(b) by "making" these deceptive and misleading statements, which were attributable to SGC, through the FAs. Young aided and abetted and caused SGC's primary violation by directing the preparation of the February Responses and authorizing the FAs to send the responses to SGC clients.[83]

---

[82]     Under Exchange Act Section 15(c)(1), it is unlawful for broker-dealers to "induce or attempt to induce the purchase or sale of any security" through any "manipulative, deceptive, or other fraudulent device or contrivance," which includes, among other things, "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 15 U.S.C. § 78o(c)(1); Exchange Act Rule 15c1-2(a); *see also George*, 426 F.3d at 792.

Advisers Act Section 206 applies similar prohibitions to investment advisers. 15 U.S.C. § 80b-6(1) (making it unlawful for investment advisers to "employ any device, scheme, or artifice to defraud any client or prospective client"); 15 U.S.C. § 80b-6(2) (prohibiting "any transaction practice or course of business which operates as a fraud or deceit upon any client or prospective client"). Scienter is required to establish a violation of Section 206(1) but negligence is sufficient to establish a violation of Section 206(2). *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003); *Steadman*, 967 F.2d at 641. *See supra* note 38 and accompanying text.

[83]     Under Rule 10b-5(b), the maker of a statement is the person or entity with "ultimate control over the content of the" communication and the decision to send it. *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013). Here, the record confirms that SGC, through Young and the FAs acting together, exercised ultimate authority over the February Responses and the decision to send them to the investors. The FAs did not have ultimate control because SGC's approval, via Young, was required before the responses could be sent.

Young argues that he should not be held liable for fraudulent statements that he did not transmit directly to investors and that liability is precluded by *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) (holding that an investment adviser who helped prepare prospectuses did not make the prospectus statements). But *Janus* does not preclude a finding that Young aided and abetted statements made by SGC. *Janus* explained that "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 2302. Here, the record confirms SGC's primary liability for making the February Responses because they were attributed to SGC. Even though these statements were not attributed to Young, he substantially assisted this violation by overseeing the responses and giving the required approval after the FAs and other SGC officials expressly sought his guidance and relied on his approval for sending them.

31

C.     **Young's remaining arguments lack merit.**

1.     **Document Production**

Young argues that his ability to prepare a defense was compromised, and he was denied due process, because the Division was "unable to locate his extensive due-diligence file" and because the receiver who took possession of SGC's assets denied him personal access to "700 boxes of un-indexed, potentially relevant documents."[84]

We, however, find no prejudice to Young. We begin by noting that Young does not argue, and there is nothing in the record to suggest, that the Division failed to comply with the applicable requirements outlined in our Rules of Practice regarding document production and discovery. For example, Rule of Practice 230 requires the Division to provide a respondent with access to its investigative file, *i.e.*, "documents obtained by the Division . . . in connection with the investigation leading to the Division's recommendation to institute proceedings."[85] Moreover, although Rule 230 permits the Division to withhold a limited category of documents—to prevent disclosure of a confidential source, because the document is privileged, or for other recognized reasons—it expressly provides that "documents that contain material exculpatory evidence" may not be withheld.[86] The record indicates that the Division complied with these requirements. The record further indicates that the Division, in addition to providing access to its own investigative file, sought to accommodate Young's access to documents held by the receiver.[87]

---

[84]     At oral argument, Young claimed he has not seen a "complete set of due diligence binders, [his] original handwritten notes, responses to other regulatory requests, or any of the records other than what the staff has arbitrarily decided to provide [him]." The record offers no evidence, and Young points to none, that the Division withheld such documents from its investigative file or that the Division's production decisions were arbitrary.

Young also argued that Commission administrative proceedings deny respondents due process because "federal rules of evidence . . . don't apply." But we have long rejected such arguments, *see, e.g., Del Mar Fin. Servs., Inc.*, Exchange Act Release No. 48691, 2003 WL 22425516, at *8 (Oct. 24, 2003), and, as discussed below, we find no basis to conclude that Young was prejudiced in the conduct of these proceedings.

[85]     17 C.F.R. § 201.230(a).

[86]     17 C.F.R. § 201.230(b)(2).

[87]     Young could have sought documents from the receiver by subpoena under Rule of Practice 232 based on a showing of "the general relevance and reasonable scope of the . . . evidence sought." 17 C.F.R. § 201.232(a)(2). Young never sought such a subpoena, which would also have required the prior approval of the district court. *See* Second Order Appointing Receiver, Civil Action No. 3:09-cv-298, doc. no. 1130 (N.D. Tex. filed July 19, 2010) (Section 10(a) requiring prior district court approval for "[a]ny act to obtain possession of the Receivership Estate assets").

32

Although the receiver imposed certain limitations on Young's access to SGC's record—including requiring Young to send a representative to review the records and limiting access to just the files of Young and his assistant—those limitations were consistent with the receiver's court appointment which charged him with taking control of all the Stanford records and other assets and performing all acts necessary to prevent any irreparable loss or damage to the assets.[88] Although Young's then counsel complained to the law judge at a prehearing conference about the limitations imposed by the receiver, neither counsel then, nor Young subsequently, ever showed why the access provided was insufficient, how any of the other records the receiver held might have been relevant, or identified any categories of documents that were relevant to his defense which he did not have access to by virtue of the Division's document production (including its production of exculpatory *Brady* material pursuant to Rule 230).

It is significant that at the hearing Young expressly acknowledged that the record included the SGC due diligence files he produced to regulators while he was CCO. The due diligence files were compiled and sent in response to a Commission subpoena seeking "[a]ll documents regarding due diligence performed by SGC regarding SIB and SIB CDs." Young offers no suggestion as to why or how the receiver would have held additional due diligence files separate from the materials he produced in response to that subpoena specifically requesting all such documents. We find that Young was not prejudiced with respect to his access to SGC files.[89]

### 2.   Statute of Limitations

Young further challenges these proceedings based on the federal five year statute of limitations, 28 U.S.C. Section 2462, which applies to an "action or proceeding for the

---

[88]      Second Order Appointing Receiver, Civil Action No. 3:09-cv-298, doc. no. 1130 (N.D. Tex. filed July 19, 2010).

[89]      *Gary M. Kornman*, Exchange Act Release No. 59403, 2009 WL 367635, at *12 n.70 (Feb. 13, 2009) (noting that Rule 230 applies to "existing information in the Division's investigative file, but [not] to new discovery" sought by the respondent), *petition denied*, 592 F.3d 173 (D.C. Cir. 2010).

Young, who has never suggested what exculpatory evidence any other files held by the receiver might contain or how it could exonerate him, was not "'entitled to conduct a fishing expedition … in an effort to discover something that might assist him in his defense'… or 'in the hopes that some evidence will turn up to support an otherwise unsubstantiated theory.'" *Brown*, 2012 WL 625874, at *22 n.77 (internal citations omitted); *cf. Scott Epstein*, Exchange Act Release No. 59328, 2009 WL 223611, at *17 n.54 (Jan. 30, 2009); *Kirlin Sec., Inc.*, Exchange Act Release No. 61135, 2009 WL 4731652, at *17 (Dec. 10, 2009) ("Because Applicants have failed to establish what information they were denied and how that denial prejudiced their case, we reject Applicants' argument that the proceedings against them were procedurally flawed."); *Gateway Stock & Bond, Inc.*, Exchange Act Release No. 8003, 1966 WL 84124, at *3 (Dec. 8, 1966) (rejecting due process argument because "applicants have not shown that … any material evidence was not produced").

33

enforcement of any civil fine, penalty, or forfeiture." Young argues that the limitations period began to run in 2005, because the Commission suspected fraud involving the CDs at that time, and therefore expired in 2010, before these proceedings were instituted in August 2012.[90]

The statute of limitations applies to our authority to impose punitive sanctions, such as civil money penalties.[91] It does not apply to the imposition of equitable remedial sanctions, such as bars, cease and desist orders, or orders of disgorgement.[92] Even where the sanction is deemed punitive, and the violation that provides the basis for the sanction must have occurred within five years from the institution of proceedings, we may still consider additional misconduct from outside that period that reflect on a respondent's motive, intent, or knowledge during the limitations period. We also may consider evidence outside the limitations period showing that the respondent's misconduct during the limitations period reflected ongoing courses of fraudulent conduct.[93]

---

[90]     As support, Young cites *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013), where the Court declined to "graft[] the discovery rule onto § 2462" and held that the limitations period "begins to tick" when the "fraudulent conduct occurs." 133 S. Ct. at 1220. But *Gabelli* does not support Young's suggestion that an investigation or suspicion of fraud can trigger the running of the statute of limitations before an ongoing course of fraudulent conduct is complete. Adopting Young's view would immunize ongoing fraudulent conduct that lasts longer than five years. *See Birkelbach v. SEC*, 751 F.3d 472, 479 (7th Cir. 2014) (stating that "any violative conduct that falls within the statute of limitations is independently sanctionable, regardless of whether there was additional violative conduct which occurred before that time" and rejecting an interpretation where "avoid[ing] detection for five years" would allow the violator to "continue his unethical behavior forever" without discipline); *Newell Recycling Co., Inc. v. EPA*, 231 F.3d 204, 206 (5th Cir. 2000) (finding that the statute of limitations "did not accrue until the course of conduct complained of *no longer continued*" (italics added)).

Young attached to his filings a 2005 letter from Commission staff describing the then-suspected fraud. Although Young complains that the Commission's website includes a redacted version of this letter, the letter in the record is unredacted and was available to the parties on appeal.

[91]     *Gabelli*, 133 S. Ct. at 1223 (stating that "penalties . . . go beyond compensation [and] are intended to punish").

[92]     *Timbervest, LLC*, Exchange Act Release No. 31830, 2015 WL 5472520, at *15 (Sept. 17, 2015) (explaining that industry bars, cease and desist orders, and disgorgement are equitable remedies and are not subject to Section 2462).

[93]     *See Birkelbach*, 741 F.3d at 482 (explaining that the Commission "may consider pertinent conduct occurring both before and after the relevant violative period to craft its sanction" and "even assuming the five-year period applies, there was no error in the SEC considering events outside that period in crafting its sanction"); *Brown*, 2012 WL 625874, at *14 ("We may, however, consider conduct that occurred outside the statute of limitations to establish Respondents' motive, intent, or knowledge in committing violations that occurred within the

(continued...)

34

Here, proceedings were instituted in 2012. Although Young's misconduct that forms the basis for the Division's allegations began more than five years earlier, it continued for approximately a year and a half within the limitations period. And, while our authority to impose bars or other remedial sanctions is not limited by the statute of limitations, we have based our imposition of civil money penalties on violations that occurred within the limitations period, along with evidence from outside that period that reflects on his intent and on the ongoing nature of his fraudulent conduct.

## IV. Sanctions

The Advisers Act and Exchange Act authorize the Commission to bar individuals from association with any investment adviser, broker, dealer, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization if the person has willfully violated the securities laws and we find such sanction to be in the public interest.[94] The Investment Company Act authorizes the Commission to prohibit any person from serving or acting in certain capacities with respect to an investment company when similar conditions are satisfied.[95] To determine whether such remedies are in the public interest, we consider, among other things, the egregiousness of the respondent's actions; the degree of scienter; the isolated or recurrent nature of the infraction; the respondent's recognition of the wrongful nature of his or her conduct; the sincerity of any assurances against future violations; and the likelihood that the

---

(...continued)

statute of limitations."); *Jacob Wonsover*, Exchange Act Release No. 41123, 1999 WL 100935, at *11 (Mar. 1, 1999) (stating that "evidence relating to information that Wonsover knew or that he reasonably should have discovered before the five-year period—which would have alerted Wonsover to the need for searching inquiry . . . properly may be considered in evaluating the culpability of Wonsover's actions within the five-year period"), *petition denied*, 205 F.3d 408 (D.C. Cir. 2000); *Russel Ponce*, Exchange Act Release No. 43245, 2000 WL 1232986, at *12 (Aug. 31, 2000) (stating that we may consider "conduct outside the limitations period to determine motive, intent, or course of conduct" (*citing United States v. Gavin*, 565 F.2d 519, 523 (8th Cir. 1977)), *petition denied*, 345 F.3d 722 (9th Cir. 2003)).

[94]    15 U.S.C. § 80b-3(f); 15 U.S.C. § 78o(b).   Although we also now are authorized to impose bars from association with a municipal advisor or nationally recognized statistical rating organization, we do not do so here because Young's misconduct pre-dates such authority, which was provided in the Dodd-Frank Wall Street Reform and Consumer Protection Act enacted in 2010. *See Koch v. SEC*, 793 F.3d 147, 158 (D.C. Cir. 2015).

[95]    15 U.S.C.§ 80a-9(b) (authorizing the Commission to prohibit persons from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter).

35

respondent's occupation will present opportunities for future violations.[96] Although Young challenges each of the sanctions imposed by the law judge, he fails to identify mitigating factors justifying lesser sanctions.

Young engaged in egregious and repeated violations throughout his years at the Firm, resulting in substantial investor losses. By wholly failing to carry out his professional due diligence responsibilities and approving false and misleading reassurances in response to red flags about SIB and the CDs, Young played a central role in maintaining the legitimacy necessary to perpetuate Stanford's scheme for several years. In doing so, he demonstrated extreme recklessness and obvious unfitness for employment in the securities industry.[97]

We also note that Young evidences a lack of remorse and places all blame on others. In addition, Young's efforts to thwart regulatory investigations of SGC demonstrate hostility and indifference to regulatory oversight. Young's troubling attitude and failure to explain how he would respond differently in the future support our conclusion that he presents an unacceptable risk if permitted to return to industry-related employment. The public interest therefore will be served by barring him from association with any investment adviser, broker, dealer, municipal securities dealer, or transfer agent, and prohibiting him from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

The Advisers Act and Exchange Act authorize cease-and-desist orders based on violations of the securities laws when there is a risk of future violations and such orders serve the public interest.[98] The risk "need not be very great" and is ordinarily established by a single violation absent evidence to the contrary.[99] Our findings, establishing numerous instances of misconduct over a multi-year period, amply justify such orders in this case.

We also are authorized to order disgorgement, including reasonable prejudgment interest,[100] to prevent unjust enrichment and to reduce the incentive for others to engage in

---

[96]     *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981).

[97]     *See John W. Lawton*, Advisers Act Release No. 3513, 2012 WL 6208750, at *9 (Dec. 13, 2012) (considering past conduct in evaluating "future risk to the public interest because" the "'degree of intentional wrongdoing evident in a defendant's past conduct' is an important indication of the defendant's propensity to subject the trading public to future harm" (quoting *Aaron*, 446 U.S. at 701)).

[98]     15 U.S.C. § 80b-3(k) (Advisers Act); 15 U.S.C. § 78u-3(a) (Exchange Act).

[99]     *KPMG, LLP v. SEC*, 289 F.3d 109, 124 (D.C. Cir. 2002).

[100]     Securities Act Section 8A(e), 15 U.S.C. § 77h-1(e) (cease and desist proceedings); Exchange Act Section 21C(e), 15 U.S.C. § 78u-3(e) (cease and desist proceedings); Advisers Act Section 203(k)(5), 15 U.S.C § 80b-3(k)(5) (cease and desist proceedings); Exchange Act Section 21B(e), 15 U.S.C. § 78u-2(e) (civil penalty proceedings).

similar violations.[101]  Salary and other compensation may be disgorged,[102] and where it is difficult to separate compensation for legitimate versus illegitimate activities, the calculation need only reasonably approximate the portion of compensation causally connected to the misconduct or unjust enrichment.[103]  Once evidence reasonably approximating the unjust enrichment is introduced, the wrongdoer must show that the proposed amount is not reasonable.[104]  The law judge's determination to order Young to disgorge $591,992.46, plus prejudgment interest, comports with this requirement.  The Division introduced undisputed evidence regarding Young's total compensation ($1,068,964.36) and the percentage of SGC's revenue generated from the CDs during that period (55.38 percent).[105]  Accordingly, we order Young to disgorge $591,992.46, plus prejudgment interest.

We may impose civil penalties for willful violations of the securities laws if it serves the public interest.[106]  We find that two third-tier penalties, of $130,000 each are warranted based on Young's authorization of the Madoff talking points, which constituted separate violations based on false and misleading statements and omissions of material facts about (i) SIB's portfolio and

---

[101]   *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989).

[102]   *Gregory O. Trautman*, Exchange Act Release No. 61167A, 2009 WL 6761741, at *22 (Dec. 15, 2009).

[103]   *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (citing *First City*, 890 F.2d at 1231).

[104]   *SEC v. Happ*, 392 F.3d 12, 31-32 (1st Cir. 2004) ("The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty.").

[105]   We see no basis for excluding a portion of his SGC salary, as Young argues, given that his fraudulent conduct extended throughout his tenure.  We further note that the law judge's calculation excluded $202,219.24 in reimbursement for travel and other expenses but properly included a $75,000 loan that was not repaid.

[106]   15 U.S.C. § 80b-3(i)(1); 15 U.S.C. § 78u-2(b).  In assessing the public interest, we consider among other things whether the violations involved fraud and resulted in harm to others, and the need for deterrence.  15 U.S.C. § 80b-3(i)(3); 15 U.S.C. § 78u-2(c).

37

(ii) SIB's insurance coverage.  Young's actions with respect to the Madoff talking points occurred within five years of the institution of these proceedings, and therefore within the limitations period of Section 2462.  This conduct resulted in a risk of substantial losses to CD investors.[107]

An appropriate order will issue.[108]

By the Commission (Chair WHITE and Commissioners STEIN and PIWOWAR).


Brent Fields
Secretary

---

[107]    15 U.S.C. § 80b-3(i)(2)(C); 15 U.S.C. § 78u-2(a).  The relevant maximum third-tier penalty for a single violative act or omission was $130,000.  17 C.F.R. § 201.1004 & Pt. 201, Subpt. E. Tbl. IV.  Young argues, in a separate motion, that he is unable to pay disgorgement and civil penalties.  But Young waived such claim by not making it before the law judge, and any potential public interest in his possible inability to pay is outweighed by the egregiousness of his misconduct.  *See, e.g., Gregory O. Troutman,* Exchange Act Release No. 61167A, 2009 WL 6761741, at *24 (Dec. 15, 2009) (finding that the egregiousness of the respondent's conduct outweighed any public interest in discretionary waiver of monetary disgorgement, prejudgment or penalties).

[108]    We have considered all of the parties' contentions.  We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

38

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES ACT OF 1933
Release No. 10060 / March 24, 2016

SECURITIES EXCHANGE ACT OF 1934
Release No. 77442 / March 24, 2016

INVESTMENT ADVISERS ACT OF 1940
Release No. 4358 / March 24, 2016

INVESTMENT COMPANY ACT OF 1940
Release No. 32050 / March 24, 2016

Admin. Proc. File No. 3-15003

In the Matter of

BERNERD E. YOUNG

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Bernerd E. Young cease and desist from committing or causing any violations or future violations of Sections 17(a)(1) of the Securities Act of 1933, Sections 10(b) and 15(c)(1) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940; and it is further

ORDERED that Bernerd E. Young be barred from association with any broker, dealer, investment adviser, municipal securities dealer, or transfer agent; and it is further

ORDERED that Bernerd E. Young is prohibited, permanently, from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and it is further

ORDERED that Bernerd E. Young disgorge $591,992.46, plus prejudgment interest of $155,583.38, such prejudgment interest calculated beginning from March 1, 2009, with such

interest continuing to accrue on funds owed until they are paid, in accordance with Commission Rule of Practice 600; and it is further

ORDERED that Bernerd E. Young pay a civil money penalty of $260,000.

Payment of the amounts to be disgorged and the civil money penalty shall be: (i) made by United States postal money order, certified check, bank cashier's check, wire transfer, or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) mailed to Enterprises Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, AMZ-341, 6500 South MacArthur Bld., Oklahoma City, Oklahoma 73169; and (iv) submitted under cover letter that identifies the respondent and file number of this proceeding.

By the Commission.


Brent Fields
Secretary

2

APP. 074