**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-cv-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., et al., | § § § | |
| Defendants. | § § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § | |
| Plaintiffs, | § § | Civil Action No. 3:13-CV-0477-N-BG |
| v. | § § | |
| PROSKAUER ROSE, LLP, CHADBOURNE & PARKE, LLP, AND THOMAS V. SJOBLOM, | § § § § | |
| Defendants. | § | |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING
ORDER[1]AND MOTION TO APPROVE PROPOSED SETTLEMENT
WITH PROSKAUER ROSE LLP, TO APPROVE THE PROPOSED
NOTICE OF SETTLEMENT WITH PROSKAUER ROSE LLP, TO
ENTER THE BAR ORDER, TO ENTER THE FINAL JUDGMENT AND
BAR ORDER,
AND FOR PLAINTIFFS' ATTORNEYS' FEES**

COME NOW Ralph S. Janvey, in his capacity as the Court-appointed Receiver for the

Stanford Receivership Estate (the "Receiver"), the Official Stanford Investors Committee (the

"Committee"), and Sandra Dorrell and Philip Wilkinson, individually and on behalf of a

putative class of Stanford investors (collectively, the "Investor Plaintiffs," and with the Receiver

and the Committee, and the State Court Plaintiffs described in the actions listed in Exhibit E to

the Proskauer Settlement Agreement, the "Plaintiffs") and move the Court to approve the

settlement (the "Proskauer Settlement") among and between Plaintiffs and Defendant Proskauer

Rose LLP ("Proskauer").

Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling

Order, approve the Notices, and enter the Bar Order and the Judgment and Bar Order attached to

and incorporated by reference into the Proskauer Settlement Agreement, attached as **Exhibit 1**

to the Appendix in Support of this Motion.[2]  Movants also request that the Final Approval

Hearing requested as part of the Scheduling Order be set for a date at least 90 days after the entry

of the Scheduling Order.

---

[1]     Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

[2]     Capitalized terms not otherwise defined herein shall have the meaning set forth in the Proskauer Settlement Agreement.  To the extent of any conflict between this Motion and the terms of the Proskauer Settlement Agreement, the Proskauer Settlement Agreement shall control.

Plaintiffs jointly request that this Court find that the Proskauer Settlement is fair, equitable, and in the interests of the Receivership Estate and all its Claimants, and to approve the Proskauer Settlement.  Plaintiffs further request that the Court approve payment of Plaintiffs' attorneys' fees in accordance with the contingency fee agreements between Plaintiffs' Counsel (as herein defined) and the Plaintiffs.   In support thereof, Plaintiffs respectfully state the following:

## I.    INTRODUCTION

1.    As part of their lengthy and thorough investigation of the Ponzi scheme perpetrated by Robert Allen Stanford ("Stanford"), and after many years of investigating and pursuing claims against third parties, including Proskauer, Plaintiffs have reached a settlement with Proskauer, a law firm that provided legal representation to one or more of the Stanford Entities.  Under the agreement, once approved and effective, Proskauer has agreed to pay $63 million to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") and who have submitted claims that have been allowed by the Receiver.

2.    In return, Proskauer seeks a global release of all Stanford Claims[3] against Proskauer and the Proskauer Released Parties, and has conditioned the Proskauer Settlement on

---

[3]    "Stanford Claims" means any action, cause of action, suit, liability, claim, right of action, right of levy or attachment, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Person ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) Proskauer's relationship with any one or more of the Stanford Entities and/or any of their personnel; (iv) Proskauer's provision of services to or for the benefit of or on behalf of the Stanford Entities;

the Court entering the Bar Order attached to the Proskauer Settlement Agreement in Civil Action No. 3:09-cv-00298-N (the "SEC Action") and entering a Judgment and Bar Order in Civil Action No. 3:13-cv-0477-N, *Janvey v. Proskauer Rose, LLP, et al* (the "Receiver Litigation"). These bar orders would permanently bar, restrain, and enjoin Plaintiffs, the Claimants, the Interested Parties, and all other Persons or entities anywhere in the world, whether acting in concert with the foregoing or claiming by, through, or under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against Proskauer or any of the Proskauer Released Parties, the Litigation or any action, lawsuit, cause of action, liability, claim, investigation, demand, levy, complaint, or proceeding of any nature in any Forum, including, without limitation, any court of first instance or any appellate court, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is based upon, arises from, or is connected with the Stanford Entities; Proskauer's relationship with the Stanford Entities; the Litigation; the SEC Action; the subject matter of the Litigation or the SEC Action; or any Stanford Claim. The foregoing specifically includes, without limitation, all claims filed against Proskauer and Thomas Sjoblom in the *ARCA Investments* Litigation. The foregoing also specifically includes any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the

---

or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Stanford Claims" specifically includes, without limitation, the claims filed against Proskauer and Sjoblom in *ARCA Investments v. Proskauer Rose LLP*, Civil Action No. 3:15-CV-02423-N (N.D. Tex.) (the "*ARCA Investments* Litigation"). "Stanford Claims" also specifically includes, without limitation, all claims a Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Agreement and the Settlement ("Unknown Claims"). "

alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise.  Notwithstanding the foregoing, there shall be no bar of any claims, including but not limited to the Stanford Claims, that Proskauer may have against any Proskauer Released Party, including but not limited to Proskauer's insurers, reinsurers, employees and agents.  Further, the Parties retain the right to sue for alleged breaches of the Settlement Agreement.

3.      Plaintiffs request the Court to approve the Proskauer Settlement and enter the Bar Order in the SEC Action and the Judgment and Bar Order in the Receiver Litigation.

4.      Plaintiffs further request that the Court approve payment of attorneys' fees to counsel for the Receiver, the Committee, and the Investor Plaintiffs ("Plaintiffs' Counsel"), whose efforts were necessary to achieve the Proskauer Settlement, in an amount consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Receiver, Committee, and the Investor Plaintiffs.

## II.      BACKGROUND

### A.      *Authority of the Receiver and the Committee*

5.      On February 16, 2009, the Securities & Exchange Commission ("SEC") filed the SEC Action, and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to

any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [SEC Action, ECF No. 10].

6.      The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order"). [SEC Action, ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

7.      The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate. *Id.* ¶¶ 3, 5(b)-(c). The Court vested the Receiver with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id.* ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

8.      On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action." [SEC Action, ECF No. 322]. Although he is not a party to the Receiver Litigation, the Examiner signed the Proskauer Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the Proskauer Settlement and the obligation to post Notice of the Proskauer Settlement on his website.

9.     On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors.  [SEC Action, ECF No. 1149].  The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver).  *Id.* ¶ 8.  This Court has recognized the Committee's standing to prosecute claims, with the Receiver's consent, "in order to obtain funds for the benefit of the Receivership Estate," as the Committee has done in connection with the claims against Proskauer that are the subject of the Proskauer Settlement. *See* Order 4–6, *Janvey & Official Stanford Inv'rs Comm. v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N (Sept. 24, 2012 (N.D. Tex.), ECF No. 33 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as  an unincorporated association representing the interests of the Stanford Investors).

**B.      *The Investigation of Claims Against Proskauer***

10.     Plaintiffs' Counsel have spent many years and thousands of hours investigating and pursuing claims against Proskauer on behalf of the Stanford Receivership Estate and Stanford Investors.  As part of their investigation of the claims against Proskauer, Plaintiffs' Counsel have reviewed voluminous documents, emails, depositions and trial testimony obtained in multiple collateral lawsuits and the criminal prosecutions of Stanford, James Davis, Laura Pendergest-Holt, and other former insiders at one or more of the Stanford Entities.  The materials reviewed by Plaintiffs' counsel included, among other materials, thousands of pages of deposition and trial testimony, thousands of emails of Stanford and Proskauer personnel, and hundreds of boxes of documents, including documents that the Receiver secured from various offices of the Stanford Entities, other law firms and from Proskauer itself.

11.     Counsel was also required to, and did, research all relevant case law to support liability and damages claims belonging to the Receiver and Committee—including the Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors—to determine how the facts surrounding Proskauer's representation of one or more of the Stanford Entities might support those claims.  The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

12.     Investigation and prosecution of the Receivership Estate and Stanford Investor claims against Proskauer also necessarily required thousands of hours investigating and understanding the background and history of the complex web of companies associated with Stanford, the financial transactions, interrelationships and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities.  Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against Proskauer.

13.     The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against Proskauer, pursuant to an agreement between the Receiver and the Committee.  The Receiver, the Committee and Plaintiffs' Counsel have done an immense amount of work investigating and analyzing the Ponzi scheme perpetrated by Stanford since the commencement of the SEC Action, all of which allowed the Receiver, the Committee, and Plaintiffs' Counsel to formulate and file the claims against Proskauer that led to the Proskauer Settlement for which approval is sought by this Motion.  But for the diligent efforts of the Receiver, the Committee, and Plaintiffs' Counsel

since the commencement of this receivership proceeding, the Proskauer Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $63 million settlement.

14.     In summary, Plaintiffs and Plaintiffs' Counsel have conducted a thorough analysis of, and heavily litigated on multiple fronts, a series of claims against Proskauer considering:

      a.  claims available under both state and federal law;

      b.  the viability of those claims considering the facts underlying Proskauer's role as counsel for one or more of the Stanford Entities and this Court's previous rulings; and

      c.  the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

## C.     *The Proskauer Actions*

### (1)     **The Investor Litigation**

15.     On August 27, 2009 Plaintiffs' Counsel filed the first putative class action Complaint against Proskauer and Proskauer's former partner Sjoblom in the case styled *Troice v. Proskauer Rose et al.*, Civil action No. 3:09-cv-01600 (the "Troice Action") [ECF No. 1]. The complaint, which was filed on behalf of Samuel Troice, Punga Punga Financial, Ltd., Horacio Mendez, and Annalisa Mendez (the "Troice Plaintiffs"), individually and as representatives of a putative class of Stanford investors, alleged that the Troice Plaintiffs and the putative class suffered losses in excess of $7 billion. *Id.* The Defendants filed Motions to dismiss the Troice Action in December 2009. [ECF No. 36]. On October 21, 2011, this Court granted the various Motions to dismiss, finding that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") precluded the action. [ECF No. 96]. The Troice Plaintiffs appealed that decision to

the Fifth Circuit.  On March 19, 2012, the Fifth Circuit issued its opinion reversing this Court's order of dismissal.  *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012).  The Defendants then petitioned for *certiorari* to the United States Supreme Court, which granted the petition.  On February 26, 2014, the Supreme Court issued its opinion affirming the Fifth Circuit and concluding that SLUSA did not preclude the state law-based class action lawsuits brought against defendants by investors, including the Troice Action.  *Chadbourne & Parke, LLP v. Troice*, 134 S. Ct. 1058 (2014).  The litigation involving SLUSA took over four years to resolve.

16.     On September 16, 2014, this Court issued its Order denying the Troice Plaintiffs' request for entry of a scheduling order to permit merits discovery and granting Defendants' request to permit additional briefing on their attorney immunity defense, which Defendants had addressed in their Motions to dismiss.  [ECF No. 141].  On the same day the court issued its Class Action Scheduling Order.  [ECF No. 142].  The parties thereafter engaged in roughly six months of extensive class certification discovery and fact and expert witness depositions.  The Troice parties filed all of their class certification evidence and voluminous briefing with this Court on April 20, 2015.  [ECF No. 192-99].

17.     By Order dated March 4, 2015, the Court granted in part and denied in part Proskauer's Motion to dismiss the Troice Action, dismissing Plaintiffs' claim against Proskauer for negligent retention/negligent supervision, and declining to dismiss the other claims against Proskauer, including claims for aiding and abetting TSA violations, for aiding and abetting/participation in a fraudulent scheme, and for civil conspiracy.  [ECF No. 176].  Thereafter, on April 1, 2015, Defendants filed Rule 59(e) Motions for reconsideration of the Court's denial of their Motions to dismiss under the attorney immunity doctrine.  [ECF No. 187].  On May 15, 2015 the Court denied those Motions.  [ECF No. 217].

18.     Defendants then appealed the Court's denial of their Motions for reconsideration to the Fifth Circuit in June 2015.  A month later, the Texas Supreme Court issued its decision in the unrelated case *Cantey Hanger LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015).  On March 10, 2016, based on *Cantey Hanger* and finding that the Troice Plaintiffs had waived certain arguments, the Fifth Circuit reversed this Court's ruling and rendered judgment in favor of the Defendants, dismissing the Troice Action based on attorney immunity.  *Troice v. Proskauer Rose LLP*, No. 15-10500, 2016 WL 929476 (5th Cir. Mar. 10, 2016).

19.     On April 28, 2016, on behalf of the Investor Plaintiffs, Plaintiffs' Counsel filed a second putative class action styled *Dorrell v. Proskauer Rose LLP, et al*, Civil Action No. 3:16-cv-1152 (the "Dorrell Action") (together with the Troice Action, collectively referred to as the "Investor Litigation ") [ECF No. 1] against Proskauer and Sjoblom to litigate three exceptions that the Investor Plaintiffs claimed applied to the attorney immunity doctrine that were not considered by the Fifth Circuit in *Troice*.  By Order dated November 2, 2017 [ECF No. 52] the Court dismissed with prejudice the Dorrell Action.  On November 6, 2017, Plaintiffs filed a notice of appeal from the order dismissing the Dorrell Action.  [ECF No. 54].  The appeal was docketed under Cause No. 117-11313 styled *Dorrell v. Proskauer Rose LLP* (the "Dorrell Appeal").  The Dorrell Plaintiffs filed their main appellate brief on March 5, 2018, and also filed a Motion to certify the attorney immunity question to the Texas Supreme Court.  Proskauer filed its brief and opposition to the Motion to certify on April 4, 2018.  The Dorrell Plaintiffs filed their reply brief on May 14, 2018.  The Dorrell Appeal is fully briefed but has been stayed by the Fifth Circuit pending final approval of this settlement.

**(2)     The Receiver Litigation**

20.     On January 27, 2012, the Receiver and the Committee commenced an action against Defendants Proskauer, Chadbourne & Parke, LLP ("Chadbourne"), and Sjoblom  in the United States District Court for the District of Columbia (the "D.C. Court").   *See Janvey v. Proskauer Rose LLP*, No. 1:12-cv-00155, (D.D.C. Jan. 27, 2012) [ECF No. 1] (*"Janvey I"*). Defendants requested that the case be transferred to this Court by the Judicial Panel on Multidistrict Litigation (the "JPML").   On March 1, 2012, the JPML transferred *Janvey I* from the D.C. Court to this Court.   *See Janvey I*, No. 3:12-cv-00644-N, (N.D. Tex. Mar. 2, 2012) [ECF No. 13].   On October 24, 2012, Defendants asserted that neither this Court nor the D.C. Court had jurisdiction over *Janvey I*.   *See id.* at ECF Nos. 49-50.

21.     Plaintiffs then moved this Court to recommend that the JPML remand *Janvey I* to the D.C. Court so that Plaintiffs could ask the D.C. Court to transfer *Janvey I* back to this Court under 28 U.S.C. § 1631.   [ECF No. 55].   In an abundance of caution, Plaintiffs also filed the Receiver Litigation in this Court in the event *Janvey I* was dismissed rather than transferred by the D.C. Court.   *See Janvey v. Proskauer Rose LLP*, 313-cv-00477-N (N.D. Tex. Jan. 31, 2013) [ECF No. 1].

22.     By order dated August 21, 2013, the Court granted Plaintiffs' Motion and recommended that *Janvey I* be remanded back to the D.C. Court.   Order at 6, *Janvey I*, No. 3:12-cv-0644 (N.D. Tex. Aug. 21, 2013) [ECF No. 71] (the "Transfer Order").   Upon remand of *Janvey I*, Plaintiffs filed a Motion to transfer the case back to this Court under 28 U.S.C. § 1631. *See Janvey I*, No. 1:12-cv-00155, (D.D.C. Feb. 5, 2014) [ECF No. 15].   Defendants opposed the Motion to transfer on the ground that the D.C. Court lacked jurisdiction over the case in the first instance.   [ECF No. 49, 50].   On July 24, 2014, the D.C. Court denied Plaintiffs' Motion to

transfer and dismissed the case.  *Janvey v. Proskauer Rose, LLP*, Civil Action No. 12-155 (CKK), 2014 WL 3668578, at *5 (D.D.C. July 24, 2014).

23.     On or about July 1, 2013, Neligan LLP was retained to prosecute claims against Proskauer on behalf of the Receiver, replacing the Hohman Taube & Summers firm.  The Court granted the Receiver's motion to substitute Neligan LLP as Receiver's counsel on  October 9, 2014.  [ECF No. 60].

24.     The Defendants filed Motions to dismiss the Receiver Litigation in October 2014 [ECF Nos. 22, 58, 61], and the Receiver and Committee responded in December 2014.  [ECF No. 63].  On June 23, 2015, the Court granted in part and denied in part Proskauer's Motion to dismiss the original complaint in the Receiver Litigation, dismissing the claim for aiding and abetting fraudulent transfers but declining to dismiss the other claims against Proskauer.  [ECF No. 79].  Defendants filed their answers in the Receiver Litigation in August 2015.  [ECF Nos. 83, 85, 87].

25.     In May 2016, Proskauer filed a Motion for judgment on the pleadings.  [ECF No. 99].  On June 2, 2016, the Receiver and Committee filed an opposed Motion for leave to file an amended complaint.  [ECF No. 106].  On June 10, 2016, the Court entered a scheduling order setting the case for trial on October 14, 2017.  [ECF No. 109].  The parties then engaged in extensive written discovery, including disclosures, requests for production, interrogatories and requests for admission.  On December 22, 2016, the Court entered an order dismissing the Receiver's and Committee's claims against Sjoblom pursuant to a settlement with Sjoblom following his bankruptcy filing that allowed the Receiver and Committee to continue to pursue any insurance covering Sjoblom.  [ECF No. 140].

26.     On April 5, 2017, the Court granted Proskauer's Motion for continuance and the joint Motion to consolidate filed by the Receiver, the Committee, and Pablo M. Alvarado ("Alvarado"), consolidating the Receiver's action against Alvarado[4] with the Receiver Litigation [ECF No. 153].  On April 6, 2017, the Court entered a new scheduling order setting the case for trial on February 26, 2018.  [ECF No. 166].  On April 27, 2017, the parties, pursuant to Rule 41, stipulated that the Receiver and Committee voluntarily dismissed all claims against Proskauer asserted in Counts 1 (negligence), 4 (aiding, abetting, or participation in fraudulent transfers), 5 (aiding, abetting, or participation in conversion), 6 (civil conspiracy) and 7 (negligent retention/supervision) of the complaint but expressly reserved claims in Count 2 (aiding, abetting or participating in breaches of fiduciary duties) and Count 3 (aiding, abetting, or participating in a fraudulent scheme) [ECF No. 171].

27.     On July 7, 2017, the Court entered an amended scheduling order resetting the trial for April 30, 2018.  [ECF No. 177].  From that date until the Wednesday before trial when the Receiver Litigation settled, Plaintiffs' Counsel spent hundreds if not thousands of hours preparing the Receiver Litigation for trial.  The Receiver and Committee deposed a dozen witnesses: Sjoblom, Lena Stinson, Jennifer Brandt, Jane Bates, Stephen Korotash, James Davis, Rebecca Hamric, Bernerd Young, Linda Eads, Anne Flannery, Andrew Richmond, and Paul Gompers.  Plaintiffs' Counsel also defended seven depositions: Ralph Janvey, John Little, Karyl Van Tassel, James Spindler, Charles Herring, Jeffrey Marcus and Douglas Henderson.

---

[4]     The Receiver's claims against Alvarado had been pending in a separate action, Janvey v. Alvarado, Civil Action No. 3:10-cv-2584-N.

28.     On February 12, 2018, Proskauer filed its Motion for summary judgment and brief in support.  [ECF Nos. 219, 220].  The Receiver and Committee filed their response to Proskauer's Motion for summary judgment on March 13, 2018.  [ECF Nos. 235, 236].

29.     On February 20, 2018, Proskauer moved to exclude  expert witnesses Jeffrey Marcus and Karyl Van Tassel.  [ECF Nos. 224, 226].  On March 1, 2018, Proskauer filed a Motion to designate responsible third parties.  [ECF No. 228].  On March 22, 2018, Plaintiffs' Counsel responded to Proskauer's Motions to exclude the expert testimony of Jeffrey Marcus and Karyl Van Tassel.  [ECF Nos. 246, 248].  On March 30, 2018, Plaintiffs' Counsel filed their opposition to Proskauer's Motion to designate responsible third parties [ECF No. 327] and the parties filed requested voir dire questions [ECF Nos. 265, 279], proposed jury charges [ECF Nos. 266, 288], Motions in limine [ECF Nos. 268, 286], Motions to limit expert testimony [ECF Nos. 269, 280, 281, 282, 284], witness lists [ECF Nos. 271, 277], designations of deposition testimony [ECF Nos. 222, 278], exhibit lists [ECF Nos. 274, 289], notice of intent to offer business records [ECF No. 275] and a joint pretrial order [ECF No. 276].

30.     On April 9, 2018, the parties informed the Court that the Receiver's and Committee's claims against Alvarado had been settled.  [ECF No. 297].  On April 10, 2018, the Court granted the Receiver's and Committee's Motion to file an amended complaint and denied Proskauer's Motion for judgment on the pleadings.  [ECF No. 301].  Plaintiffs' Counsel filed their amended complaint that day. [ECF No. 368].  Proskauer later answered Plaintiffs' First Amended Complaint on April 24, 2018.  [ECF No. 337].  On April 18, 2018, the parties filed their objections to the proposed charges [ECF Nos. 314, 323], responses to Motions to limit the testimony of expert witnesses [ECF Nos. 315, 316, 318, 321], objections to deposition designations [ECF Nos, 319, 327], and objections to trial exhibits [ECF Nos. 320, 324].  On

April 20, 2018, the parties filed an agreed Motion to stay the claims against Alvarado to allow Alvarado to perform his obligations under the settlement agreement.  [ECF No. 330].  On April 24, 2018, the Court stayed the action filed by the Receiver against Alvarado.  [ECF No. 335].

31.     On April 16, 2018, Proskauer appealed the Court's denial of its Motion for judgment on the pleadings to the Fifth Circuit.  [ECF No. 374].  On April 23, 2018, Proskauer filed an advisory with the Court asserting that Proskauer's notice of appeal divested the Court of jurisdiction to proceed with the trial and asked that the Court adjourn the pretrial conference scheduled for April 27, 2018 and all other pending matters until Proskauer's appeal was resolved.  [ECF No. 310].  On April 23, 2018, Plaintiffs' Counsel responded to Proskauer's advisory, and Proskauer replied that same day.  [ECF Nos. 331, 332].  The Court held a telephonic hearing that afternoon regarding the advisory.  Construing Proskauer's advisory as a motion for a stay pending appeal, the Court issued an order the same day, which declined to stay the action as to the claims asserted against Proskauer by the Receiver.  [ECF No. 334].  In the same decision, the Court ordered a "separate trial of the claims, if any, asserted by [the Committee] against Proskauer" and ordered those claims "stayed pending [Proskauer's] appeal" to the Fifth Circuit.  [ECF No. 334].

32.     On April 24, 2018, Proskauer filed its Emergency Motion in the Fifth Circuit to stay the trial pending resolution of its appeal of the Court's denial of its motion for judgment on the pleadings.   On April 25, 2018, the parties reached an agreement in principle to settle the case.

33.     On May 1, 2018, Proskauer's appeal was docketed in the Fifth Circuit.  The Fifth Circuit issued a briefing notice on May 23, 2018.  On June 27, 2018, Proskauer, the Receiver, and the Committee jointly moved to stay Proskauer's appeal pending final approval of the

Proskauer Settlement Agreement.  In response to this motion, on June 28, 2018, the Fifth Circuit

dismissed the appeal without prejudice to the right of any party to reinstate it within 180 days.

**D.      Mediation**

34.      Mediation was held with Proskauer on April 12, 2018 in New York.  The parties

were unable to reach resolution at that time.  Following the Court's decisions declining to apply

New York law and denying Proskauer's request for stay, the parties reached an agreement

resulting in the Proskauer Settlement.  The parties executed the Proskauer Settlement Agreement

on August 15, 2018.

35.      Since the settlement was reached, the Parties have spent considerable time and

effort drafting, revising, and negotiating the form and terms of the Proskauer Settlement

Agreement, the Bar Order, the Judgment and Bar Order, the Notice, the Scheduling Order, and

this Motion, through which the Plaintiffs now seek approval of the Proskauer Settlement.

**E.      *Plaintiffs' and Examiner's Support of the Settlement***

36.      The analysis of potential claims against Proskauer performed by Plaintiffs'

Counsel and the litigation of the Investor Litigation  and Receiver Litigation (the Investor

Litigation  and the Receiver Litigation are collectively referred to herein as the "Proskauer

Actions") has been thorough.  Plaintiffs have sufficient information to enter into and endorse the

Proskauer Settlement and believe that the Proskauer Settlement is fair and reasonable taking

into consideration not only the merits of the claims, but also the risks, uncertainties, and

expenses associated with litigation.  Therefore, Plaintiffs believe that the Proskauer Settlement is

in the best interests of the Stanford Receivership Estate and the Stanford Investors and should

be approved by the Court.   The Chairman of the Committee, who oversaw the Receiver

Litigation and participated in the settlement negotiations and mediation, is also the Court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver.

37.     The Investor Plaintiffs also support the Proskauer Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it.   All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process. The Proskauer Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013).   The Proskauer Settlement, the Bar Order, and the Judgment and Bar Order protect both the Proskauer Released Parties and the Stanford Investors.

## F.     *The Proskauer Settlement*

38.     The proposed Proskauer Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs, and the Plaintiffs' Counsel, and was negotiated and entered into as a result of arm's-length negotiation both during and following mediation.

39.     The essential terms of the Proskauer Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

    a)  Proskauer will pay $63 million, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

    b)  Plaintiffs will fully release the Proskauer Released Parties from Stanford Claims, *e.g.*, claims arising from or relating to Robert Allen Stanford, the Stanford Entities, or any conduct by the Proskauer Released Parties relating to Robert Allen Stanford or the Stanford Entities, with prejudice;

c) The Settlement Agreement requires entry of a Final Judgment and Bar Order in the Receiver Litigation, and entry of a Final Bar Order in the SEC Action, each of which permanently enjoins, among others, Interested Parties, including all Stanford Investors and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against Proskauer or any of the Proskauer Released Parties, the Litigation, or any action, lawsuit, cause of action, claim, investigation, demand, levy, complaint, or proceeding of any nature arising from or relating to any Stanford Claim, including, without limitation, contribution or indemnity claims, and the claims filed against Proskauer and Sjoblom in the *ARCA Investments* Litigation;

d) The Receiver will disseminate notice of the Settlement Agreement to Interested Parties, through one or more of the following:  mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication, including on the websites maintained by the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and the Receiver (http://www.stanfordfinancialreceivership.com);

e) The Receiver will develop and submit to the Court for approval a plan for distributing the Net Settlement Amount (the "Distribution Plan");

f) Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted Claims that have been allowed by the Receiver;

g) Persons who accept funds from the Settlement Amount will, upon accepting the funds, fully release the Proskauer Released Parties from any and all Stanford Claims;

h) The Receiver Litigation will be fully and finally resolved and concluded and considered dismissed as to Proskauer, with each party bearing its own costs and attorneys' fees, by the Judgment and Bar Order being entered in the Receiver Litigation and becoming Final;

i) The Investor Litigation will be dismissed with prejudice, with each party bearing its own costs and attorneys' fees; and

j) The State Court Litigations pending in this Court will be dismissed with prejudice as to Proskauer, with each party bearing its own costs and attorneys' fees.

Copies of the Proskauer Settlement Agreement, this Motion, and other supporting papers may be

obtained from the Court's docket, and will also be available on the websites of the Receiver

(http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-

stanford-financial-group/).  Copies of these documents may also be requested by email or phone

by contacting  Edward C. Snyder (esnyder@casnlaw.com, 210-630-4200).

40.     For the reasons described herein, the Proskauer Settlement is fair, equitable,

reasonable, and in the interests of the Receivership Estate and all those who would claim

substantive rights to distribution of its assets.  Plaintiffs urge the Court to approve it.


### III.      REQUEST FOR APPROVAL OF THE PROSKAUER SETTLEMENT

#### A.   *Legal Standards*

41.     "'[T]he district court has broad powers and wide discretion to determine the

appropriate relief in an equity receivership.'"  *Kaleta*, 530 F. App'x at 362 (quoting *SEC v.

Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)); *see also Janvey v. Greenberg

Traurig, LLP, et al.*, Civil Action No. 3:12-cv-04641-N (ECF No. 265)(the "*Hunton* Order"), p.

4 (N.D. Tex., March 26, 2018).   "These powers include the court's 'inherent equitable authority

to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the

federal securities laws.'"   *Kaleta* at 362 (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th

Cir. 1980)); *Hunton* Order at 6.  "Such 'ancillary relief' includes injunctions to stay proceedings

by non-parties to the receivership."  *Kaleta* at 362 (citing *Wencke* and *SEC v. Stanford Int'l

Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)).  "[N]o federal rules prescribe a particular

standard for approving settlements in the context of an equity receivership; instead, a district

court has wide discretion to determine what relief is appropriate."  *SEC v. Kaleta*, No. CIV.A.

4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012) (quoting *Gordon v. Dadante*, 336

F. App'x 540, 549 (6th Cir. 2009), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).  Congress enacted

a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach

and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

42.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors. *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

43.     The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants. Second Order ¶ 5; *see supra* ¶¶ 2-3.

44.     The ability to compromise claims is critical to this Receivership. Courts have long emphasized that public policy favors settlement. *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010). That is especially true here, where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of the Receivership Estate, and the Proskauer Settlement will allow the Receiver to make a significant distribution.

45.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases. *See Hunton Order* at 6; *see also Kaleta*, 530 F. App'x. at 362-63 (approving bar order). Bar orders have

been used in this and in other receivership cases to achieve these purposes. *See, e.g.*, *SEC v. DeYoung*, 850 F.3d 1172, 1180-81 (10th Cir. 2017); *Gordon*, 336 F. App'x at 549; *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

46.     The Bar Order and the Judgment and Bar Order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

47.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate'"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives. *See Kaleta*, 530 F. App'x at 362-63.  The Proskauer Settlement satisfies each of these requirements.

48.     This Court and other district courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and

costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *Kaleta*, 2012 WL 401069, at *4 (citations omitted); *Hunton* Order at 6.[5]

49.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4. The Fifth Circuit's opinion noted that, like the Proskauer Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

## B.     *The Proskauer Settlement Satisfies the Factors for Settlement Approval*

### (1)     *Value of the Proposed Settlement*

50.     The $63 million payment in the Proskauer Settlement is substantial. "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular

---

[5]     The Receiver Litigation is not a class action nor is it a case under Title 11 of the United States Code. Though they are not binding here, both class action and Title 11 cases define tests for approving aggregate settlements that may be tailored for a receivership case such as the Receiver Litigation. *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy). Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement. For the same reasons that the Proskauer Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the Proskauer Settlement easily satisfies the tests set out in *Newby* or *Moore*.

standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The value of the Proskauer Settlement to the Receivership Estate and the Stanford Investors is significant, and the Court has approved settlements for lesser amounts with other law firms that provided legal services to the Stanford Entities. See *Janvey v. Proskauer Rose LLP*, Case No. 3:13-cv-00477-N-BQ (ECF No. 127) (entering Bar Order in connection with $35 million settlement with Chadbourne & Parke, LLP); and *Hunton* Order (entering Bar Order in connection with $34 million settlement with Hunton & Williams LLP).

### (2)   *Value and Merits of the Receiver and Stanford Investors' Potential Claims*

51.   Plaintiffs of course believe that the claims filed against Proskauer in the Receiver Litigation are meritorious and would be successful. However, they are not without substantial risk and uncertainty. Moreover, the ability to collect the maximum value of a judgment from Proskauer is also not without risk and uncertainty. Proskauer vigorously disputes the validity of the claims asserted in the Receiver Litigation. Among others, the following issues are hotly contested and could yield years of uncertain litigation:

    a. whether the attorney immunity doctrine bars all of the Stanford Investors' and Committee's claims against Proskauer;

    b. whether the Stanford Investors would be able to certify a class action;

    c. whether Proskauer had sufficient knowledge to meet the standard for aiding, abetting, or participation in a breach of fiduciary duty;

    d. whether Proskauer had sufficient knowledge to meet the standard for aiding, abetting, or participation in a fraudulent scheme;

e.  whether Proskauer's conduct constituted "substantial assistance" to meet the standard for aiding, abetting, or participation in a breach of fiduciary duty;

f.  whether Proskauer's conduct constituted "substantial assistance" to meet the standard for aiding, abetting, or participation in a fraudulent scheme;

g.  whether New York's *in pari delicto* doctrine bars some or all of Plaintiffs' claims;

h.  whether the four-year statute of limitations bars Plaintiffs from recovering damages incurred before January 31, 2009;

i.  whether Texas recognizes Plaintiffs' cause of action for aiding, abetting, or participation in a fraudulent scheme;

j.  whether Texas recognizes Plaintiffs' cause of action for aiding, abetting, or participation in a breach of fiduciary duty;

k.  whether Chapter 33 of the Texas Civil Practice and Remedies Code applies to Plaintiffs' claims;

l.  whether the Receiver and Committee have valid, supportable damage models;

m.  whether, after a successful judgment in the Receiver Litigation, Plaintiffs would be able to collect any more than the Proskauer Settlement already offers.

52.     For these and other reasons, but for the Proskauer Settlement, the Receiver Litigation would be vigorously defended by Proskauer, its prosecution would be expensive and protracted, and the ultimate outcome of such litigation would be uncertain.   In light of these issues, Plaintiffs believe that the Proskauer Settlement reflects a fair and reasonable compromise between the parties.

MOTION TO APPROVE SETTLEMENT WITH PROSKAUER ROSE LLP

(3)     *The Risk that Litigation Would Dissipate Receivership Assets*

53.     Plaintiffs believe that litigation against Proskauer would most likely go on for years, with no guarantee of a recovery.   While Plaintiffs' Counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership and other pending litigation.   The Receiver's primary counsel at Baker Botts are similarly paid by the hour and are necessarily involved in the efforts of Plaintiffs' Counsel to prosecute the Receiver Litigation. The Proskauer Settlement avoids further expense associated with the prosecution of the Receiver Litigation and continued monitoring and oversight of the case by the Receiver and the Committee Chairman/Examiner.

54.     Furthermore, as part of its fee agreement with its counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Receiver Litigation, including, *inter alia*, expert fees and out-of-pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.).   The parties were scheduled for trial commencing April 30, 2018.  Out-of-pocket litigation costs would have been substantial, including costs of travel associated with trial, expert witnesses' fees and expenses, fees and expenses for trial graphics and presentation, cost of reproduction of documents and trial exhibits, and jury consultant fees.

(4)     *The Complexity and Costs of Future Litigation*

55.     The prosecution of the Receiver Litigation would undoubtedly be challenging and expensive, as discussed above.  As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex.  There is no question that the Receiver Litigation, involving $1.5 billion in claimed damages, and an international Ponzi scheme

operated through a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment.

### (5)     *The Implications of Proskauer's Settlement Payment on Other Claimants*

56.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'" 530 F. App'x at 362.   The settlement will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

### (6)     *The Value and Merits of Any Foreclosed Parties' Potential Claims*

57.     Plaintiffs are aware that the Bar Order and Judgment and Bar Order they are requesting,  and the entry of which are conditions  to the Proskauer  Settlement,  will preclude Stanford Investors and others from asserting claims against Proskauer that are related to the Stanford Entities, Proskauer's relationship with the Stanford Entities, the Litigation, the SEC Action, the subject matter of the Litigation or the SEC Action, or any Stanford Claim.   However, in the eight years since the Receivership was created, other than the State Court Litigations, which are protective investor cases filed by Plaintiffs' Counsel when the SLUSA dismissal occurred,[6] only one case has been filed by investors against Proskauer— the *ARCA*

---

[6] A list of protective cases brought by the State Court Plaintiffs against Proskauer is attached as Exhibit E to the Settlement Agreement.  The State Court Plaintiffs are parties to the Settlement Agreement and have agreed to dismiss their claims with prejudice as part of the Settlement Agreement.

*Investments Litigation*.  That case faces at least the same legal and factual challenges faced by the Plaintiffs, as discussed above.

58.     Given that all Stanford Investors have been put on notice of the Receivership and have been given opportunities to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process and will receive a distribution from the Proskauer Settlement, the Stanford Investors' rights are not being unduly prejudiced by the Proskauer Settlement.  They have all had the opportunity to participate through the pre-existing Receivership claims process.

59.     Plaintiffs believe that the Bar Order and Judgment and Bar Order should be approved because they are in the collective best interest of _all_ Stanford Investors.  The Bar Order and Judgment and Bar Order should not be rejected based upon the possibility that some individual investor(s) or counsel might otherwise wish to pursue individual claims against Proskauer now or in the future.  *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

60.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit **as many** aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order) (emphasis added).

61.     The proposed Proskauer Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without

consumption of additional expenses or a race to the courthouse by various counsel.  Against this backdrop, the Court should approve the Proskauer Settlement and enter the Bar Order and Judgment and Bar Order.

### (7)    *Other Equities Attendant to the Situation*

62.    The entry of the Bar Order and the Judgment and Bar Order is a material term under the Proskauer Settlement Agreement, and a necessary condition to the obligations set forth in the Proskauer Settlement Agreement.  The bottom line is that there is no Proskauer Settlement without these bar orders.   Proskauer "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [Proskauer], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

63.    Proskauer has made  clear that in consideration  of paying  $63 million,  it must achieve "global peace" through the Proskauer Settlement, wholly and finally, with respect to all Stanford Claims.  Proskauer has stated that it would not enter into the Proskauer Settlement without securing  the  avoidance  of the  expense  of further  litigation,  particularly  given what it contends are its strong factual and legal defenses.

64.    The Receiver and the Committee were appointed to protect the interests of <u>all</u> of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will  maximize  the  eventual  distribution  to  Estate  claimants.   The  proposed  Bar  Order  and Judgment and Bar Order will help maximize the eventual distribution to Receivership Estate claimants of Proskauer's $63 million payment and provide Proskauer the global peace that is a necessary condition for that settlement payment by Proskauer.  Plaintiffs believe that the entry of  the  Bar  Order  and  Judgment  and  Bar  Order  are  fully  justified  by  the  Settlement  Amount

being paid by Proskauer.  The Court has already enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit (Civil Action No. 3:12-cv-01447-N-BG), the Adams & Reese lawsuit (Civil Action No. 3:12-cv-0495-N), the Chadbourne lawsuit (Civil Action No. 3:13-cv-00477-N-BQ), Kroll (SEC Action, ECF No. 2363), and the Hunton & Williams lawsuit (Civil Action No. 3: 12-cv-04641-N). Movants ask the Court to similarly enjoin and bar all claims and potential claims against the Proskauer Released Parties in order to effectuate the Proskauer Settlement.

65.     Plaintiffs and Plaintiffs' Counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors.  Plaintiffs firmly believe that they could prosecute viable causes of action against Proskauer, though Proskauer vigorously denies any wrongdoing or liability, and has indicated that it firmly believes it would successfully defend any claims against it.  Proskauer also has the resources to defend itself and to litigate the issues through a final trial court judgment, and appeal if necessary, which means the litigation would take years to be resolved without a settlement.

66.     Plaintiffs believe that the terms of the Proskauer Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

67.     The overall context of the MDL and Stanford Receivership also is relevant to the equities of the situation.  Stanford's Ponzi scheme collapsed in February 2009, and the nine years since have yielded numerous motions, dismissals, appeals, and a delay in any substantial recovery for Stanford's victims.  The parties – on both sides – are confronted by uncertainty, risk, and delay.  In this circumstance, the example of settlement is to be encouraged.

MOTION TO APPROVE SETTLEMENT WITH PROSKAUER ROSE LLP

68.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging.   For many of Stanford's victims, recovery delayed is recovery denied.  If possible, the time that Stanford's victims have waited to date should not be extended further.

69.     The equities of the Proskauer Settlement, including its necessary Bar Order and Judgment and Bar Order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims.   The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the Proskauer Settlement.   This level of coordination and quality of resolution are eminently desirable in a complex case like this one.   The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation. The result of this coordination will be the most orderly distribution to Stanford's victims that possibly can be achieved.

70.     The Court is well within its discretion to approve the Proskauer Settlement. In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors.   2012 WL 401069, at *1.  The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id*.  The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership.    The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed.   *Kaleta*, 530 F. App'x at 362-63.

71.     In approving the bar order, the district court noted the Receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate. *Kaleta*,

2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id.*

72.     In another case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014).   The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities."  *Id.* at *2;[7] *see also SEC v. DeYoung*, 850 F.3d 1172, 1183 (10th Cir. 2017) ("the district court found that the settlement offered the highest potential recovery for the Receivership Estate and the IRA Account Owners, and that the Claims Bar Order was necessary to that settlement") (affirming district court bar order) (citing *Kaleta*).

## IV.     REQUEST FOR APPROVAL OF ATTORNEYS' FEES

### A.    *Terms of Plaintiffs' Counsel's Engagement*

73.     In addition to approving the Proskauer Settlement, Plaintiffs also request that the Court approve an award of attorneys' fees to Plaintiffs' Counsel, consisting of Castillo Snyder, P.C. ("Castillo Snyder"), Clark Hill Strasburger ("Strasburger"), and Neligan LLP ("Neligan") under the terms of the fee agreements between Plaintiffs' Counsel and the Receiver, the Committee, and the Investor Plaintiffs, as well as reimbursement of expenses incurred in the prosecution of the Receiver Litigation.  As reflected in the Declaration of Edward C. Snyder,

---

[7]     The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [ECF No. 162] (E.D. Tex. Nov. 21, 2012).

attached as **Exhibit 2** to the Appendix in Support of this Motion, Plaintiffs' Counsel have been handling the Proskauer Actions (as defined *supra*) pursuant to 25% contingency fee agreements with the Receiver, the Committee, and the Investor Plaintiffs.  *See also* Declarations of Judith Blakeway and Doug Buncher attached to the Appendix as **Exhibits 3 and 4** respectively.

74.     Pursuant to the fee agreements, the Plaintiffs seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the Proskauer Settlement (i.e., the settlement amount less allowable disbursements), and to reimburse Plaintiffs' Counsel as well as the Receiver for expenses they have incurred and carried in the Proskauer Actions.  The gross amount of the settlement to be paid by Proskauer is $63,000,000.  The expense disbursements which are to be deducted from the settlement amount to calculate the Net Recovery from the Proskauer Settlement are $1,164,604.22, which are expenses either (i) previously incurred in the prosecution of the Proskauer Actions and carried by Plaintiffs' Counsel or (ii) expenses that have been incurred in the Proskauer Actions and have been or will be paid by the Receiver directly or reimbursed by the Receiver to Plaintiffs' Counsel pursuant to a fee agreement.[8]  *See* Powers Decl., Exhibit 5 (testifying that Plaintiffs have incurred $1,207,462.25 in expenses for the Proskauer Actions).

75.     Thus, the Net Recovery from Proskauer after reimbursement of expenses is $61,792.537.75, and 25% of the net Recovery is $15,448,134.  This is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver, the Committee, and the Investor Plaintiffs, and this is the amount of the fee for which approval is sought in this Motion.

**B.    *The Proposed Fee is Reasonable as a Percentage of the Overall Recovery***

---

[8]     The total expenses incurred by the Plaintiffs in connection with the Proskauer Actions are expected to increase as a result of costs related to the Plaintiffs' settlement notice obligations and other expenses.  Plaintiffs will provide the Court with their final expense figure at the hearing to be held on this matter.

76.     Trial courts can determine attorneys' fee awards in common fund cases such as this one[9] using different methods.  One is the percentage method, under which a court awards fees based on a percentage of the common fund.  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012).  The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable."  *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).[10]  Thus, when considering fee awards in class action cases, "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check."  *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K (lead case), 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[11]

77.     While the Proskauer Settlement is not a class action settlement, because the settlement is structured as a settlement with the Receiver and the Committee, with the Bar Order and the Judgment and Bar Order, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution.  In other settlements in this MDL, this Court analyzed the pertinent fee requests under both the common

---

[9]     The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *In re Harmon*, No 1-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[10]    The *Johnson* factors are discussed in Subsection C below.

[11]    While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth circuit and other courts in the Northern District of Texas have recognized that the percentage method is the preferred method of many courts.  *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25.  In *Schwartz*, the court observed that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court."  2005 WL 3148350, at *25.  The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes.  *Id.*  Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."  *Id.* at *26.

MOTION TO APPROVE SETTLEMENT WITH PROSKAUER ROSE LLP

fund and *Johnson* approaches, and there is no reason not to do so here.  *Id.* at 3; *see, e.g., Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80 (approving a 25% contingency fee on a $40 million settlement); *see also* SEC Action, ECF No. 2366 (order approving 25% contingency fee on a $35 million settlement with Chadbourne & Parke LLP).

78.     Whether analyzed under the common fund approach, the *Johnson* framework, or both, the 25% fee sought by Plaintiffs' Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

79.     The proposed 25% amount is a reasonable percentage of the common fund (*i.e., the $63 million settlement*).  "The vast majority of Texas federal courts and courts in this district have awarded fees of 25%-33% in securities class actions."  *Schwartz*, 2005 WL 3148350, at *31 (collecting cases).  "Indeed, courts throughout this circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method."  *Id.*[12] Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

C.     *The Proposed Fee is Reasonable Under the Johnson Factors*

---

[12]     As set forth in *Schwartz*, courts in the Northern District of Texas have routinely approved such awards. *See, e.g., Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, No. 4:00-CV-355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% in securities class action); *Scheiner v. i2 Techs., Inc.*, Civil Action No. 3:01-CV-418-H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc.*, Civil Action No. 3:98-CV-0998-M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fees); *In re Firstplus Fin. Group, Inc. Sec. Litig.*, Master File No. 3:98-CV-2551-M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc.*, Civil Action No. 2:00-CV-089-J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI*, No. 3:99CV2860-L (N.D. Tex. Mar. 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistaf Fin. Serv. Corp. Sec. Litig.*, No. 3:99-CV-2872-M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

80.    The *Johnson* factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.   A review of these factors also reveals that the proposed 25% fee is reasonable and should be approved.

### (1)    Time and Labor Required

81.    As reflected in the Snyder, Blakeway and Buncher Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in the Proskauer Actions over the last nine years.   Even a cursory review of the Court's docket reveals the immense amount of work that Plaintiffs' Counsel have put into the prosecution of the Proskauer Actions.

82.    Moreover, as the Court is aware, the prosecution of litigation of this magnitude and complexity requires a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial.   Plaintiffs' Counsel have spent thousands of hours in their investigation and prosecution of the Proskauer Actions.

83.    Plaintiffs' Counsel have spent over eight and one-half years and thousands of hours investigating and pursuing claims against third parties, including Proskauer, on behalf of the Stanford Receivership Estate and the Stanford Investors.   Castillo Snyder, P.C. has close to $8 million invested in the Stanford cases overall since 2009, and over 6,000 hours of time worth $3,625,573.50 at Castillo Snyder's applicable hourly rates invested specifically in the Proskauer

Actions. *See* Snyder Decl. (Ex. 2 at ¶¶ 49, 50).  Neligan LLP has 4,120 hours and $2,162,828.50 million worth of attorney and paralegal time invested in the Proskauer Actions.  *See* Buncher Decl. (**Ex. 4**, at ¶14).  Clark Hill Strasburger has over 4,529.1 hours of unpaid attorney and paralegal time worth $2,765,532 invested specifically in the Proskauer Actions.  *See* Blakeway Decl. (**Ex. 3**, at ¶ 32).

84.     The tremendous amount of work required by Plaintiffs' Counsel to prosecute the Proskauer Actions is described in the Snyder, Buncher, and Blakeway Declarations.

85.     Counsels' efforts included, among other things:

- researching, compiling evidence for, and filing the Complaint, and Amended Complaint;

- contacting and interviewing witnesses in the United States, Mexico, Venezuela, and Antigua;

- obtaining the production of discovery from multiple Defendants;

- reviewing thousands of documents produced by Defendants, the Department of Justice, the SEC, the Receiver, the Joint Liquidators in Antigua and others;

- briefing and defeating motions to dismiss;

- taking the depositions of Sjoblom, Lena Stinson, Jennifer Brandt, Jane Bates, Stephen Korotash, James Davis, Rebecca Hamric, Bernerd Young, Linda Eads, Anne Flannery, Andrew Richmond, and Paul Gompers;

- defending depositions of Ralph Janvey, John Little, Karyl Van Tassel, James Spindler, Charles Herring, Jeffrey Marcus and Douglas Henderson;

- responding to a motion to transfer;

- propounding and responding to subpoenas, and numerous interrogatories, requests for production and requests for admission;

- responding to motions for continuance;

- preparing witness files and privilege logs;

- briefing legal issues such as choice of law, attorney immunity, obstruction of justice, *in pari delicto*, aiding, abetting and participating in breaches of fiduciary duties and fraudulent schemes, damages, causation, willful ignorance, sham affidavits, standing, trial court jurisdiction, joint and several liability, proportionate responsibility, and settlement credits;

- selecting, retaining and briefing expert witnesses;

- drafting a jury charge, pretrial order, voir dire questions, motions in limine and Daubert motions to exclude or limit expert testimony;

- responding to a motion to designate responsible third parties;

- responding to a motion for summary judgment;

- analyzing all of the contested legal and factual issues posed by the litigation to make accurate demands and evaluations of the settling Defendants' positions;

- preparing mediation submissions;

- engaging in negotiations and mediation;

- briefing and arguing in the Fifth Circuit the appeal of the dismissal of the action under the Securities Litigation Uniform Standards Act of 1998 (SLUSA), resulting in reversal of the dismissal;

- participating in briefing and preparation for oral argument in the United States Supreme Court, resulting in an opinion affirming the Fifth Circuit's judgment that SLUSA did not bar the Investor Plaintiffs' claims;

- briefing and arguing in Fifth Circuit the appeal of dismissal under the attorney immunity doctrine.

*See* Blakeway, Snyder and Buncher Decl. (detailing the work completed by Plaintiffs' Counsel).

86.     Furthermore, Plaintiffs' Counsel retained Washington-based U.S. Supreme Court appellate counsel Tom Goldstein to assist and serve as lead Supreme Court appellate counsel with respect to the SLUSA appeal before the U.S. Supreme Court, and paid Mr. Goldstein's firm, Goldstein & Russell P.C., the sum of $334,000.00 for the work he performed on said appeal.

87.     The significant time and effort devoted to this case by Plaintiffs' Counsel, and their commitment to the efficient management of the Proskauer Actions, support approval of the requested award.

### (2)     The Novelty and Difficulty of the Issues Support the Fee Award Requested

88.     The factual and legal issues presented in these lawsuits are difficult and complex.

89.     Plaintiffs' Counsel conducted a thorough analysis of the potential claims against the Proskauer for allegedly aiding and abetting Stanford's fraudulent scheme; the viability of those claims considering the underlying facts and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, in the Fifth Circuit and elsewhere; and defenses raised by the Proskauer.

90.     Beginning when the Troice Action commenced in 2009, and continuing throughout the Litigation, Proskauer has raised, and Plaintiffs' Counsel have had to respond to, complex and novel issues concerning (1) SLUSA, (2) attorney immunity, (3) limitations, and (4) joint and several liability, (5) proportionate liability, and (6) the *in pari delicto* doctrine, among many others.  The SLUSA issue was litigated all the way to the Supreme Court. The attorney immunity issue was appealed to the Fifth Circuit in two different cases.

### (3)     The Skill Required and the Quality of the Representation Support the Fee Award Requested

91.     Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required significant skill and effort on the part of Plaintiffs' Counsel. Plaintiffs' Counsel have represented investor classes as well as receivership and bankruptcy estates on numerous occasions, and have served and are currently serving as counsel for the Receiver, the Committee, and other investor plaintiffs, both

individually and as representatives of putative classes of Stanford Investors, in multiple other lawsuits pending before the Court. Snyder Decl., at ¶¶ 6-16; Blakeway Decl., at ¶¶ 10-12; Buncher Decl., at ¶¶ 4-9. Plaintiffs submit that the result in this case is indicative of Plaintiffs' Counsel's skill and expertise in matters of this nature.

92.     This skill and experience is extremely important because the Stanford cases are not "typical" cases where a client comes to a lawyer with an injury and a readily identifiable defendant that caused the injury. Here the Investor Plaintiffs knew in 2009 only that they had invested money with the Stanford Entities, the Stanford Entities had been shut down, and an SEC Receiver had been appointed.  Plaintiffs' Counsel had to perform an extensive investigation to locate and identify potential responsible third parties, identify what they did wrong or how they contributed to Stanford's fraud, and then file and prosecute lawsuits against them. Thus it was only through these diligent efforts that these cases even came into existence. These are not the type of cases that many lawyers have the experience or capacity (or desire) to take on, particularly on a contingent fee basis.

93.     The quality of representation is further evidenced by the work product that was filed before the Court, as well as in the results achieved, including the victories in the Fifth Circuit and U.S. Supreme Court.

94.     The high quality of the opposition that Plaintiffs' Counsel faced is a further testament to the quality of Plaintiffs' Counsel's representation. The Defendants were represented by skilled and highly regarded counsel from prestigious firms with well-deserved reputations for vigorous advocacy in the defense of complex civil cases. Courts have repeatedly recognized that the caliber of the opposition faced by plaintiffs' counsel should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance, and in this case it supports

approval of the requested fee. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, No. 09-CV-118(VM) 2012 WL 1981505 (S.D.N.Y. Jun. 1, 2012) (considering "the quality and vigor of opposing counsel"); *In re Marsh & McLennan*, 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) (reasonableness of fee was supported by fact that defendants "were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

### (4)    Preclusion of Time to Work on Other Matters Supports the Fee Award Requested

95.    The sheer amount of time and resources required to investigate, prepare, and prosecute the Proskauer Actions, as reflected by the hours invested, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters, including work to be performed on an hourly basis.

### (5)    The Customary Fee Supports the Fee and Expense Award Requested

96.    The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude. *See Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting that 30% fee is standard in complex securities cases). "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Klein*, 705 F. Supp. 2d at 675 (citing Manual for Complex Litig. (Fourth) § 14.121 (2010)); see, e.g., *SEC v. Temme*, No.4:11-cv-00655-ALM, at *4–5 (E.D. Tex. Nov. 21, 2012), ECF No. 162 (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Sec. Am., Inc.*, No. 3:09–cv–01568–F (lead

case), 2011 U.S. Dist. LEXIS 93907, *4–9 (N.D. Tex. 2011) (25% fee for a $80 million settlement); *Klein*, 705 F. Supp. 2d at 675–81 (30% fee for a $110 million settlement).

97.     The Proskauer Actions were and are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery, and dispositive motions to get to trial.  The Proskauer Actions have involved significant financial outlay and risk by Plaintiffs' Counsel of either an almost certain appeal following any victory at trial or loss at trial after years of work for no compensation. Plaintiffs' Counsel submit that these factors would support a contingency fee of more than 25%. Nonetheless, Plaintiffs' Counsel agreed to handle the Proskauer Actions on a 25% contingency fee basis which this Court previously approved.  That percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

**(6)     The Fact that the Fee Is Contingent Supports the Fee Award Requested.**

98.     The contingency fee arrangement was reached voluntarily with the Receiver, the Committee, and the Investor Plaintiffs before the fact.  The Receiver determined that this litigation was too risky for the Receiver to undertake on an hourly basis.  Because Plaintiffs' Counsel assumed considerable risks of the litigation, Receivership assets were not dissipated in pursuing litigation that might not be successful or cost-effective.  And investors will receive an enormous benefit—a net of $46,497,335—that they would not have received had Plaintiffs' Counsel not agreed to the 25% contingency fee agreement.

99.     An evaluation of the risks undertaken by Plaintiffs' Counsel in prosecuting this action also supports the reasonableness of their fee request. "Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees." Schwartz, 2005 U.S. Dist. LEXIS 27077 *102.

MOTION TO APPROVE SETTLEMENT WITH PROSKAUER ROSE LLP

100.     Despite the most vigorous and competent of efforts, success is never guaranteed. If Plaintiffs' Counsel were not successful, they risked losing everything. They invested enormous numbers of hours of service and advanced large sums for expenses "up front."

101.     This case presented risks and uncertainties beyond those typically encountered, which made it uncertain that any recovery, let alone the settlement eventually obtained, would be achieved. For example, Defendants twice moved to dismiss the class complaints, ultimately achieving complete success in the Troice Action but requiring two appeals to the Fifth Circuit and one all the way to the United States Supreme Court.  The dismissal of the Dorrell Action resulted in a still-pending appeal to the Fifth Circuit.  The Court's denial of judgment on the pleadings in the Receiver Litigation resulted in yet another appeal to the Fifth Circuit.

102.     Plaintiffs' Counsel undertook this case on a wholly contingent fee basis, knowing the litigation could (and did) last for many years and would (and did) require the expenditure of thousands of attorney hours and thousands of dollars in expenses, with no guarantee of compensation, let alone when there might be any recovery.  This request is inherently reasonable when considered in light of the risks undertaken.

### (7)     Time Limitations Support the Fee Award Requested

103.     Plaintiffs' Counsel have been consistently under deadlines and immense time pressure throughout the Proskauer Actions given extensive briefing and motion practice, including an appeal to the Fifth Circuit and an appeal to the Supreme Court with the case settling only on the eve of trial.  Moreover the activity in these cases must be measured in the context of this MDL as a whole, as Plaintiffs' Counsel were litigating multiple cases at the same time.

### (8)     The Amount Involved and Results Obtained Support the Fee Award Requested

104. The $63,000,000 settlement represents a significant value to the Receivership Estate. This factor also supports approval of the requested fee and expense. As discussed above, the proposed award represents 25% of the value of the total settlement after expenses, an amount well within the range of fees awarded by courts in similarly-sized class actions.

### (9) The Attorneys' Experience, Reputation, and Ability Support the Fee Award Requested

105. Plaintiffs' Counsel have represented numerous investor classes, receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding. See Snyder Decl. at ¶¶ 6-16; Buncher Decl. at ¶¶ 10-12. Plaintiffs' Counsel have been actively engaged in the Stanford Receiver proceeding since its inception. Given the complexity of the issues in the Proskauer Actions, Plaintiffs submit that the Proskauer Settlement is indicative of Plaintiffs' Counsel's ability to obtain favorable results in such proceedings.

### (10) The Undesirability of the Case Supports the Fee Award Requested

106. Cases such as the Proskauer Actions carry with them elevated risks, require lengthy investigation, and may result in no recovery, making them undesirable. *Di Giacomo v. Plains All Am. Pipeline*, 2001 U.S. Dist. LEXIS 25532, at *35 (S.D. Tex. Sept. 18, 2001). The issues presented in this litigation rendered the case inherently risky, if not "undesirable" from the start. The case involved a panoply of difficult issues of law and fact. The case was risky when Plaintiffs' Counsel accepted this engagement. The risks Plaintiffs' Counsel faced must be assessed as they existed at the time counsel undertook the litigation and not in light of the settlement ultimately achieved. *See, e.g., Harmon v. Lymphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (the riskiness of a case must be judged ex ante not ex post); *Goldberger v. Integrated*

*Res. Inc.*, 209 F.3d 43, 55 (2d Cir. 2000) ("It is well-established that litigation risk be measured as of when the case is filed," not when the fee application is adjudicated."); *Johnson*, 488 F.2d at 718. The "undesirability" of the litigation supports the requested percentage.

### (11)   The Nature and Length of Professional Relationship with the Client Support the Fee Award Requested

107.    As the Court is aware, Plaintiffs' Counsel have represented the Receiver, the Committee, and investor plaintiffs in numerous actions pending before the Court since 2009. This factor also weighs in favor of approval of the requested fee.

### (12)   Awards in Similar Cases Support the Fee Award Requested

108.    As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement"). *See* SEC Action [ECF No. 1267, p. 2] ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, [SEC Action, ECF No. 1208, Ex. A, p. 3] (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals). The Court's order approving the OSIC-Receiver Agreement also provided that the Committee need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23. [*See* SEC Action, ECF No. 1267, p. 2.].

109.    The OSIC-Receiver Agreement further provided that the Committee "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford investors/creditors in cooperation with Ralph S. Janvey, as Receiver." See OSIC-Receiver

Agreement, [SEC Action, ECF No. 1208, Ex. A, p. 1]. The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute . . . or otherwise . . ." and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." Id. at pp. 1-2.

110.    The contingency fee agreements with Plaintiffs in the Proskauer Actions similarly provided for a fee of 25% of the Net Recovery (defined as the total recovery after deducting allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

111.    The 25% contingency fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for the 25% contingency fee agreements that the Receiver and Committee entered into with Plaintiffs' Counsel in the Receiver Litigation as well as in other third party lawsuits.

112.    Further, this Court has approved a 25% contingency fee in the BDO, Adams & Reese, Kroll, Chadbourne and Hunton cases. See *Official Stanford Inv'rs Comm. v. BDO USA, LLP*, Civil Action No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80; Order Approving Attorneys' Fees, SEC Action ECF No. 2231 (approving attorneys' fees in Adams & Reece settlement); Order Approving Attorneys' Fees, SEC Action ECF No. 2364 (N.D. Tex. Aug. 30, 2016)(approving attorneys' fees in Kroll settlement); Order Approving Attorneys' Fees, SEC Action, ECF No. 2366 (N.D. Tex. Aug. 30, 2016)(approving attorneys' fees in Chadbourne settlement); and *Janvey v. Greenberg Traurig, LLP*, Civil Action No. 3:12-cv-04641-N, ECF No. 264 (N.D. Tex. March 26, 2018)(approving attorneys' fees in Hunton settlement) SEC Action, ECF No. 2366.

113.     For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, the Court should find the 25% contingency fee in the Proskauer Actions to be reasonable and approve it for payment. Here, there is even more reason to find the fee to be reasonable given the vast amount of work and risk undertaken by Plaintiffs' Counsel over the last almost nine years. The settlement of the Proskauer Actions has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors.   Thus, Plaintiffs submit that an award of attorneys' fees equal to 25% of the net recovery from the Proskauer Settlement as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.

### D.     The Examiner's Recommendation Supports the Fee Award Requested

114.     John J. Little in his capacity as Court-appointed Examiner also supports the award of attorneys' fees to Plaintiffs' Counsel sought herein, and requests that the Court approve them. Little Decl. (Ex. 6).

### E.     Plaintiffs' Counsel's Expenses Should Be Reimbursed

115.     Plaintiffs' Counsel also request reimbursement of all litigation costs and expenses incurred during this litigation, which currently total $1,207,462.25.   Powers Decl. (Ex. 5). Expenses and administrative costs expended by class counsel are recoverable in a common fund class action.   *Billitteri*, 2011 U.S. Dist. LEXIS 93907 *42; *Klein*, 705 F.Supp.2d at 682; *Schwartz*, 2005 U.S. Dist. LEXIS 27077 *109.   These expenses are typically billed by attorneys to paying clients in the marketplace and include such costs as fees paid to experts, mediation fees, notice costs, computer research, document processing and travel in connection with the litigation.   *Schwartz*, 2005 U.S. Dist. LEXIS 27077 *109 (N.D. Tex. 2005) (reimbursing

expenses such as "expert fees, transportation, meals and lodging, in-house and outsourced photocopying, computerized and on-line research, court reporting fees and deposition transcripts, telephone and facsimile, overnight courier service, statutory notice publication, postage"); *see also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 334-35 (W.D. Tex. 2007) (costs typically billed to fee-paying clients are compensable in a class action, including "cost for filing fees, expert witnesses and consultants, photocopies, mailing and travel" as well as "costs for computerized factual and legal research"); *Billitteri v. Sec. Am., Inc.*, No. 3:11 CV 00191 F (N.D. Tex. 2011) (same). The fact that Plaintiffs' Counsel were willing to expend their own money, evidences that the expenditures were reasonable and necessary.

## V.      CONCLUSION & PRAYER

116.     The Proskauer Settlement represents a substantial and important recovery for the Receivership Estate and the Stanford Investors.  The large amount of the recovery, the time and costs involved in pursuing the Proskauer Actions, and the uncertain prospects for obtaining and then recovering a judgment against Proskauer, all weigh heavily toward approving the Proskauer Settlement, entering the Bar Order, and entering the Judgment and Bar Order, and approving the attorneys' fees of Plaintiffs' Counsel.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

a.      Enter the proposed Scheduling Order, providing for notice and a hearing on this Motion;

b.      Set the Final Approval Hearing for a date at least 90 days after the entry of the Scheduling Order;

c.      Grant this Motion;

d.      Approve the Proskauer Settlement;

e.      Enter the Bar Order in the SEC Action;

f.      Enter the Judgment and Bar Order in the Receiver Litigation;

g.      Approve the payment of attorneys' fees to Plaintiffs' Counsel in the total amount of $15,458,849;

h.      Approve the reimbursement of expenses incurred by Plaintiffs in the amount of $1,164,604.22; and

i.      Grant Plaintiffs all other relief to which they are entitled.

**CASTILLO SNYDER PC**
By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

**BAKER BOTTS LLP**
By: */s/ David T. Arlington*
Kevin M. Sadler
kevin.sadler@bakerbotts.com
Scott D. Powers
scott.powers@bakerbotts.com
David T. Arlington
david.arlington@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 322-2500
Facsimile: (512) 322-2501

**NELIGAN LLP**
By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CLARK HILL STRASBURGER**
By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clarkhillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone: (210) 250-6004
Facsimile: (210) 258-2706

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger.com
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the _____ day of _____, 2018, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Edward C. Snyder*
Edward C. Snyder